Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Proposed Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 11- |
| NURSERYMEN'S EXCHANGE, INC. | Chapter 11 |
| Debtor and Debtor in Possession | **Date:** May __, 2011<br>**Time:**<br>**Place:** 235 Pine Street, Courtroom 2_<br>San Francisco, CA |

**MOTION FOR ORDER (A) APPROVING SALE PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF DEBTOR'S OPERATING ASSETS AT AUCTION (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY AND PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH (C) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

Nurserymen's Exchange, Inc., debtor and debtor in possession herein ("Debtor"), hereby moves (the "Motion") this Court for an Order: (a) approving the proposed sale procedures, including a breakup fee, in the form attached as Exhibit A to the Proposed Order (the "Sale Procedures"), in connection with the proposed sale (the "Sale") at auction (the "Auction") of Debtor's operating business and substantially all of the assets used in connection therewith (the "Operating Assets") (b) approving the date of the Auction and date of the Sale Approval Hearing, (c) approving at the Sale Approval Hearing the highest and best bidder at the Auction, and (d) approving procedures for the assumption and assignment of real or personal property leases and executory contracts in connection with the Sale Procedures and the

MOTION RE SALE PROCEDURES        1

Auction.

This Motion is based upon this Motion, the Notice of Motion, the following memorandum of points and authorities, the Declarations of Justin Dautoff and Alexander Stevenson, the pleadings on file in this case and such other and further evidence and argument to be presented prior to or at the hearing on this Motion.

**RELIEF SOUGHT BY THIS MOTION**

For the reasons set forth in the supporting declarations, Debtor seeks to sell its operating business and substantially all of the assets used in connection therewith (the "Operating Assets"), which Operating Assets include the following:

(i) Debtor's intellectual, real and personal property (including inventory and accounts receivable), licenses and leasehold interests in its operating business, including the greenhouses, warehouses and other agricultural facilities for the growing of flowering plants and foliage for indoor décor, sales and marketing, and decorative packing and shipping, located at 2651 North Cabrillo Highway, Half Moon Bay, California 94109;

(ii) Debtor's wholesale center facility for sale of flowering plants, foliage and hard goods to wholesalers and certain other commercial customers

(iii) Debtor's plant brokerage business also located at 2651 North Cabrillo Highway, Half Moon Bay, California 94109; and

(iv) The assumption of certain of the Debtor's accounts payables to vendors, licensors and other suppliers critical to the ongoing operation of Debtor's business.

Debtor seeks approval of the Sale Procedures to be utilized by Debtor and its advisers in soliciting and accepted bids to purchase the Operating Assets. The Sale Procedures are summarized in the attached Memorandum of Points and Authorities. In case of any conflicts or omissions, the Sale Procedures Order and the Sale Procedures attached as Exhibit A to the Sale Procedures Order shall govern. Pursuant to the Sale Procedures, Debtor proposes to sell the Operating Assets based upon the highest and best bid received at Auction, followed by the proposed approval of such highest and best bid at the Sale Approval Hearing, free and clear of all liens, claims, interests and encumbrances whatsoever, pursuant to sections 363(b), (f) and (m) of the Bankruptcy Code to be identified. Debtor also intends to

confirm at the Sale Approval Hearing a backup bid for the second highest and best bid, the maker of which will close a sale transaction for the Operating Assets if the winning bidder does not close the sale transaction.

The Sale Procedures allow Debtor, based upon Qualified Bids received from Qualified Bidders (as defined in the Sale Procedures), in its reasonable business judgment, to designate one such Qualified Bidder as a stalking horse bidder and provide a break-up fee. As set forth in the Sale Procedures, the Debtor will promptly provide written notice of such stalking horse bidder, including the applicable Form Asset Purchase Agreement, to all Qualified Bidders, Wells Fargo, the Committee and will file such notice with the Court.

Debtor seeks approval of the following schedule with respect to the anticipated sale:

(i) July 8, 2011 as the date that all bids for the Operating Assets are due;

(ii) July 13, 2011 as the date of the Auction of the Operating Assets;

(iii) July 15, 2011, or at a time to be set by the Court, but no later than July 19, 2011 as the date of the hearing to consider approval of the sale of the Operating Assets, (the "Sale Approval Hearing");

Debtor seeks approval of certain procedures for the assumption and assignment of real and personal property leases and executory contracts in connection with the Sale Procedures and Auction; and seeks such other relief as is fair and equitable.

In implementing the Sale Procedures, including but not limited to the selection of the highest and best bid received at the Auction, the Debtor and its professionals will consult with and provide timely information to the following: Official Committee of Unsecured Creditors (the "Committee"); and Wells Fargo Bank, N.A. ("Wells Fargo") and any counsel of the Committee and Wells Fargo.

Debtor seeks approval of deadlines for objections to the sale of the Operating Assets to the highest and best bidder, such that any objections shall be set forth in writing and shall specify with particularity the grounds for such objections and shall be filed with the Court at least one day before the Sale Approval Hearing.

Debtor is in the process of finalizing a form asset purchase agreement ("Form Asset Purchase

MOTION RE SALE PROCEDURES  3

Case: 11-31985    Doc# 6    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 3 of 16

Agreement"). The proposed Form Asset Purchase Agreement will be filed with the Court as a supplement to this Motion no later than one day prior to the Sale Procedures Hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

The relief requested by this Motion is critical to Debtor's goal of ensuring that its creditors obtain the best recovery possible in this case. Under the proposed Sale Procedures (as herein defined), the Debtor seeks authorization to conduct an auction and sale process for the Operating Assets. The Sale Procedures are carefully crafted to provide Debtor with the requisite flexibility to pursue an auction and sale of the Operating Assets and, in so doing, maximize creditor recoveries.

The Sale Procedures provide that if a bid is acceptable to Debtor, Debtor will conduct an Auction and seek approval to sell the Operating Assets to the winning bidder free and clear of any liens (which liens shall be identified by Debtor), interests or encumbrances pursuant to section 363 of the Bankruptcy Code. Debtor has not selected a stalking horse bidder and will seek to do so only if, in Debtor's business judgment such stalking horse bidder will act as a catalyst to competitive bidding from other qualified bidders.

The Sale Procedures are fair and reasonable and have received, or are expected shortly to receive, the endorsement of the Debtor's secured creditor and DIP lender, Wells Fargo Bank.  Critically, Debtor and its professionals have been marketing Operating Assets since September 2010, and their sustained efforts have generated significant interest in the marketplace from many strategic and financial potential buyers. To date, approximately 48 operational, strategic and financial buyers have executed non-disclosure agreements in connection with the potential purchase of the Operating Assets.  The Sale Procedures contain the needed flexibility to maximize the sale value of the Operating Assets.

**II.  STATEMENT OF FACTS**

**A.  Jurisdiction and Venue**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105(a), 363 and 365 of title 11 of the United States Code, 11. U.S.C. §§ 101-1532 (the "Bankruptcy Code")

and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### B. General Background

On May 23, 2011 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

**1. The Debtor's Business**

Founded in 1941 as a San Francisco bulb brokerage business, and currently based in Half Moon Bay in the San Francisco Bay Area, Debtor is a producer, broker and wholesaler of home decor products incorporating indoor blooming plants (miniature roses, sun stars, Campanula), specialty foliage (miniature Christmas trees, bonsai, bamboo, cactus and succulents, etc.), holiday grow kits, and potted edibles. The Debtor offers a broad range of unique, differentiated products known for their horticultural excellence and inspired design.

Debtor operates in two segments: the core business and the wholesale facility. The core business services clients nationwide across all major retail channels, including supermarket chains, mass merchandisers, home and garden centers, and specialty and independent operators. The core business includes the growing, brokerage, and distribution of home decor products. The core business also includes sales, marketing, and product design and development staff who collaborate with top-tier customers to create unique designs for their specific market needs. The wholesale center is a stand-alone wholesaler of flowers, foliage, designer dish gardens and hardgoods to smaller, independently owned specialty stores, florists, garden centers and supermarkets. The wholesale center also has a direct sales team and a packing and shipping facility that sells and ships directly to customers' individual stores.

Beginning in 2008, NEI faced challenges resulting from a declining economy and industry overcapacity, which spurred the need to implement aggressive restructuring initiatives. Notwithstanding these challenges, NEI implemented an aggressive crop plan that anticipated an economic recovery in 2010, which resulted in substantial overproduction and the operation of unproductive facilities during declining economy. Moreover, NEI was obligated to grow and bring to market a pipeline of expensive

orchids that ramped up going into the recession, with no ability to reduce production due to prior purchase orders with suppliers.

In an attempt to restore operational and financial stability, NEI implemented aggressive operational and restructuring initiatives that have positioned the NEI for more efficient, streamlined operations, greater responsiveness to customers' needs, and future growth in revenues and profitability.

Despite the vastly improved prospects created by NEI's restructuring efforts, NEI determined that it was in the best interests of all of its stakeholders to sell all of the assets of the Debtor through a chapter 11 bankruptcy case. NEI has entered into an agreement with a buyer for the sale of real property (the "PUD Property") not involved in its operations for $8 million. NEI intends to sell its operating business too in order to pay off its secured debt to Wells Fargo (approximately $15.3 million as of the Petition Date and create a return for unsecured creditors. In addition to the PUD Property and the Operating Assets, Debtor owns approximately 407 acres of open space land in Half Moon Bay.

**2. Sale and Marketing Efforts**

**(a) Interest Generated Pre-petition**

In September 2010, Debtor's financial advisor, FocalPoint Securities, LLC ("FocalPoint"), set up a general data room containing substantial business and financial information on the Debtor's assets. The data room was part of the Debtor's effort to locate a strategic partner or a buyer. Beginning in September 2010, Debtor and FocalPoint commenced a two-part solicitation process designed to either (i) refinance the existing secured lender or (ii) find a financial or strategic buyer for the Debtor's operating business. On a parallel track to the process undertaken by FocalPoint, Debtor marketed the PUD Property.

As part of this pre-petition process, FocalPoint has contacted (or been contacted by) in excess of 150 potential interested parties, including both debt capital providers and strategic and financial buyers. Of these, approximately 48 have executed non-disclosure agreements for additional information and access to Debtor's data room. Through that process, Debtor received a number of written proposals to provide working capital financing from financial institutions but these proposals did not provide enough capital to fully repay the Wells Fargo or were contingent on new equity being invested into the business.

In addition to the proposals from lenders, Debtor received several indications of interest to consummate a purchase of the Debtor's assets. After evaluating these proposals, holding management

MOTION RE SALE PROCEDURES    6

Case: 11-31985    Doc# 6    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 6 of 16

presentations, meeting with the various investor groups and consulting with Wells Fargo Bank, Debtor executed a Letter of Intent with a buyer that provided for a period of exclusivity, and Debtor began engaging in extensive business and legal due diligence. Unfortunately, Debtor was not able to finalize an asset purchase agreement with the interested party prior to filing the bankruptcy and exclusivity was terminated on or about May 11, 2011. Upon termination of exclusivity, FocalPoint immediately began re-marketing the Operating Assets and have begun conducting discussions with potential strategic and financial investors since that time.

### III. THE SALE PROCEDURES

#### 1. The Procedures:

So as not to repeat the all the procedures in full, the Court is directed to refer to the Sale Procedures attached to the proposed form of order. In general terms, the Sale Procedures provide Debtor (with assistance from FocalPoint) the opportunity to continue to market the Operating Assets until the proposed Bid Deadline, July 8, 2011 and the proposed Auction Date, July 13, 2011.

The Sale Procedures set forth the information that an interested party must submit and the format in which it must be submitted in order to be considered a Qualified Bidder (as defined in the Sale Procedures) and gives Debtor the discretion to determine whether an entity has submitted a Qualified Bid. The Sale Procedures also outline the necessary deposit that must be submitted along with a Qualified Bid. The Sale Procedures also advise a potential bidder of the information it must provide with respect to adequate assurance to the real property leases and other executory contracts. Finally, the Sale Procedures allow Debtor to indentify and select a Stalking Horse Bidder, provide such bidder with "Break-Up Fee" protections and controls the procedure and amount of any bids in excess of the Stalking Horse Bid.

#### 2.. Due Diligence and Becoming a Potential Bidder

Upon execution and delivery of a confidentiality and nondisclosure agreement (in form and substance satisfactory to Debtor), which agreement must permit the disclosure of the bidder's identity to Wells Fargo, to FocalPoint..

(i) Any party that wishes to conduct due diligence with respect to the Operating Assets may be granted access to all material information that has been or will be provided to other bidders; provided

that, Debtor shall retain the ability to withhold trade secrets or other proprietary information from competitors; and

    (ii)    A potential purchaser shall be provided a form of asset purchase agreement (the "Form Agreement") relating to the Operating Assets, substantially in the form attached to these Sale Procedures.

**3.    Qualified Bids and Becoming A Qualified Bidder**

**(a) Bid Deadline**

A Qualified Bid must be sent so as to be received by FocalPoint no later than 5:00 p.m. Pacific Daylight Time on Friday, July 8, 2011 (the "Bid Deadline").

**(b) Format Of a Qualified Bid**

A Qualified Bid must (1) be presented under a signed, irrevocable and binding contract, marked to show any modifications made to the Form Agreement, including the name of the bidder and other conforming changes that must be made to reflect the bidder and its Qualified Bid; (2) be signed by an individual authorized to bind the bidder; (3) not be subject to obtaining financing, or future consent or approval, including, without limitation, consent of the bidder's board of directors (or similar governing body), due diligence, or the receipt of any consents, in each case, not otherwise required by the Form Agreement, or any other contingency (other than entry of an order approving the Sale); (4) fully disclose the identity of each entity that will be bidding for the Operating Assets or otherwise participating in connection with such Qualified Bid, and the complete terms of any such participation; and (5) state such bidder's offer is irrevocable and binding until the conclusion of the auction for the purchase of the Operating Assets pursuant to the Sales Procedures (the "Auction") and, if such bidder is the Winning Bidder or the Back-Up Bidder (each as defined below), until the closing of the sale of the Operating Assets.

**(c) Deposit**

A Qualified Bid must provide for a deposit of five percent (5%) of the purchase price (inclusive of liabilities to be assumed) set forth in such bid (the "Deposit"), which shall, upon execution of the Qualified Bid be delivered either by a certified or bank check or by wire transfer of immediately

available funds as a minimum good faith deposit and shall be used to fund a portion of the purchase price in the event that the bidder is the Winning Bidder.

**(d) Overbids Prior To Auction**

In the event that Debtor selects a Stalking Horse Bidder, then (i) the bid of each bidder, in order to be considered a Qualified Bid (the "Initial Overbid"), shall, in addition to meeting the other criteria set forth in these Sale Procedures, be in an amount that is sufficient to pay the Break-Up Fee and result in additional consideration to Debtor's estate in the minimum amount of $100,000, (such amount as determined pursuant to this clause the "Overbid Amount"), and (ii) if an Initial Overbid is made, each Qualified Bidder, including the Stalking Horse Bidder, shall have the right to submit a Qualified Bid; provided that any such increased Qualified Bid must (x) exceed the Initial Overbid by no less than $50,000 (the "Incremental Bid"), and (y) be submitted so as to be received by FocalPoint, on or before the Bid Deadline (or such subsequent date as Debtor shall determine).

**4. Notification Prior To Auction and Deadline To Participate**

Debtor, prior to the Auction, will inform in writing each Qualified Bidder of (i) the Qualified Bid that represents the highest or otherwise best offer for the Operating Assets as the starting bid at the Auction (each a "Highest Pre-Auction Qualified Bid"); and (ii) the conditions (including the minimum overbid increment) for the submission at the Auction of a bid that would be higher and better than the Highest Pre-Auction Qualified Bid (a "Subsequent Qualified Overbid"). On or prior to **July 11, 2011 at 5:00 p.m. Pacific Daylight Time**, each Qualified Bidder shall inform FocalPoint of its intention to participate in the Auction.

**5. The Auction**

Only Qualified Bidders will be permitted to attend and to participate at the Auction; provided, however, that nothing herein prohibits Wells Fargo from attending and participating in the Auction in their capacity as creditors of the estate, consistent with these Sale Procedures, and not as bidders. Qualified Bidders who wish to submit a Subsequent Qualified Overbid at the Auction must attend the Auction in person or through an authorized representative. If no Stalking Horse Bidder is identified and no break-up fee protection provided prior to the Auction, then at the Auction any increases in bids must be in increments of no less than $50,000.

MOTION RE SALE PROCEDURES 9

**(a) Auction Date And Time**

The Auction shall be held on **July 13, 2011, commencing at 10:00 a.m. (Pacific Time)** at the offices of Gunderson Dettmer, 1200 Seaport Blvd., Redwood City, CA 94063, or at such other time, date and place as determined and announced by Debtor for consideration of Qualified Overbids with respect to the Operating Assets. The Auction may be adjourned as Debtor deems appropriate in the exercise of its reasonable business judgment. If the Auction is adjourned, reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders.

**(b) Failure to Receive Qualified Bids**

If no Qualified Bid from a Qualified Bidder is received on or prior to the Bid Deadline for the Operating Assets, Debtor may cancel the Auction.

**(c) Withdrawal of Assets, Cancellation of Auction**

Debtor, in the exercise of its reasonable business judgment may at any time cancel the Auction with respect to the Operating Assets, and proceed to seek approval of the Highest Pre-Auction Qualified Bid at the Sale Approval Hearing (as defined below).

**(d) No Collusion**

Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the Operating Assets or the Auction.

**(e) Other Terms**

Debtor may make modifications to the Auction rules and these Sale Procedures, as may be determined to be in the best interests of Debtor's estate or creditors announced by Debtor from time to time prior to or during the Auction; provided that such modifications are not materially inconsistent with these Sale Procedures or the Sale Procedures Order

**6.     Selection of the Winning Bidder**

Immediately at the conclusion of the Auction, Debtor shall determine which bid constitutes the highest and best offer for the Operating Assets (the "Winning Bid"), and the Qualified Bidder that has submitted a Winning Bid (the "Winning Bidder") shall execute and deliver to Debtor its Form Agreement with any necessary modifications (the "Winning Purchase Agreement"). Notice of selection of such Winning Bidder shall be given promptly to any party known to have asserted a security interest

or other interest in the Operating Assets, all counterparties to real estate leases or executory contracts to be assumed and assigned to such bidder or bidders, and any other party that requests to receive such notice on or before the hearing on this Motion, and filed with the Court at least 24 hours prior to the Sale Approval Hearing

**7.     The Sale Approval Hearing**

Debtor will request that the Court set July 15, 2011 as the date for the hearing for approval of the sale to the Winning Bidder (the "Sale Approval Hearing"). If this date is not convenient for the Court, then Debtor will request a hearing date no later than July 19, 2011.

**8.     Executory Contracts**

**(a) Notice To Counterparties**

As soon as reasonably practicable following the entry of the Sale Procedures Order, but in any event no later than June 25, 2011, Debtor shall provide notice to each counterparty to the Executory Contracts of Debtor's calculation of the amounts that must be paid in connection with the assumption and assignment of the Executory Contracts pursuant to section 365(b) of the Bankruptcy Code (the "Cure Amount"). As soon as practical before the Auction, Debtor will provide on a confidential basis to each counterparty to a Executory Contract designated for potential assumption and assignment with (i) the identity of each Qualified Bidder, and (ii) information regarding each Qualified Bidder's adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code

**(b) Objections**

If an objection is raised by a counterparty to any of the Executory Contracts solely with respect to the Cure Amount, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, Debtor may seek to assume such lease or contract and assign it to a Winning Bidder; provided that the entire disputed Cure Amount must be immediately paid upon such assumption and assignment, and Debtor must segregate the applicable disputed Cure Amount pending the resolution of such dispute by the Court or by agreement of the parties, for payment to the counterparty or refund to the Winning Bidder. If an objection is raised by a counterparty to any of the Executory Contracts as to adequate assurance of future performance, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, said objection will be determined by the Court. Hearings on disputed Cure

MOTION  RE SALE PROCEDURES                    11

Case: 11-31985    Doc# 6    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 11 of 16

Amount(s) and/or adequate assurance of future performance in connection with the Executory Contracts (as applicable) shall be held (i) on the date of the Sale Approval Hearing, or (ii) on such other date as the Court may designate.

### 9. Irrevocability of Certain Qualified Bids

Each Winning Bid shall remain open, irrevocable and binding upon each Winning Bidder; provided that no Winning Bid shall be binding upon Debtor until it has been approved by the Court. The bid of the next highest Qualified Bidder (the "Back-Up Bidder") at the highest price bid by such Qualified Bidder at the Auction, shall remain open and irrevocable and the Deposit of the Back Up Bidder shall be held in accordance with these Sale Procedures until the closing of the sale of the Operating Assets. The Deposits of all other Qualified Bidders will be returned to such Qualified Bidders no later than three (3) business days following the conclusion or cancellation of the Auction and the Deposit of the Back Up Bidder shall be returned to such Back Up Bidder no later than three (3) business days following the closing of the sale of the Operating Assets to the Winning Bidder.

### 10. Failure to Close

Subject to the terms of the Winning Purchase Agreement, in the event a Winning Bidder (as determined by Debtor and approved by the Court) fails to consummate the proposed transaction by the closing date contemplated in the Winning Purchase Agreement, (i) such Winning Bidder shall be deemed to have forfeited its Deposit and Debtor shall retain the Deposit and reserve the right to pursue all available remedies, whether legal or equitable, available to it, and (ii) Debtor shall be authorized without further order of the Court to consummate the proposed transaction with the Back-Up Bidder

### 11. Submission to Jurisdiction of The Court

All bidders will be deemed to have submitted to the jurisdiction of the Court with respect to all matters related to the Auction or with respect to the Operating Assets.

### 12. Expenses

Subject to the terms of the Winning Purchase Agreement or any other executed agreement binding upon Debtor, all Qualified Bidders shall bear their own costs and expenses in connection with the Auction or with respect to the Operating Assets.

///

MOTION RE SALE PROCEDURES 12

Case: 11-31985   Doc# 6   Filed: 05/23/11   Entered: 05/23/11 14:48:32   Page 12 of 16

**13. Objections to the Sale to the Winning Bidder.**

Objections to the sale of Operating Assets to the Winning Bidder shall be set forth in writing and shall specify with particularity the grounds for such objections and other statements of position and shall be filed with the Court at least one day before the date of the Sale Approval Hearing.

## IV. LEGAL ARGUMENT

**A. Cause Exists to Approve the Sale Under Section 363(b) of the Bankruptcy Code**

The Debtor, after notice and a hearing, may use, sell, or lease property, other than in the ordinary course of business. 11 U.S.C. § 363(b)(1). A debtor's application of its sound business judgment in the use, sale, or lease of property is subject to great judicial deference. *See, e.g., In* re Moore, 110 B.R. 924 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985); *see also Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . . whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *In re Lionel* Corp. 722 F.2d 1063, 1071 (2nd Cir. 1983), the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."

In interpreting section 363(b)(1) of the Bankruptcy Code, courts have held that a transaction involving property of the estate generally should be approved where the debtor can demonstrate "some articulated business justification for using, selling, or leasing the property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *accord In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Walter*, 83 B.R. at 19-20; *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Among other factors, courts should consider the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *See Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974) (affirming trial court's finding that the proposed sale of the debtor's assets would be in the best interest of the estate in light of impending deterioration of market value of debtor's assets).

Debtor believes that subjecting the Operating Assets to an auction process governed by the proposed Sale Procedures will ensure that the maximum proceeds will be realized by the estate. Debtor's secured creditor, Wells Fargo supports this sale process as it too, is hopeful that the process will result in a sale at market value. The Sale Procedures are fair and reasonable under the facts and circumstances of this case, especially in light of the extensive marketing of the assets that the Debtor and its professionals have conducted pre-petition and will conduct post petition. By testing the marketplace, the proposed Sale Procedures will assign an appropriate fair market value to the Operating Assets.

**B. This Court is Empowered to Approve Sales Procedures**

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131(Bankr. N.D. Ga. 1988). Applying section 363, bankruptcy courts frequently have considered and approved auction and bidding procedures in advance of a proposed sale of property of the estate. *See, e.g., Doehring v. Crown Corp (In re Crown Corp.)*, 679 F.2d 774, 775 (9th Cir. 1982); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990).

Courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing value to the estate and are appropriate in the context of bankruptcy sales. *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991), appeal dismissed, 931 F. 2d 217 (2d Cir. 1991) In fact, courts have made it clear that the debtor's business judgment is entitled to great deference with respect to the procedures to be used in selling assets from the estate. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures that have been negotiated by a debtor in possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Sale procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. *See Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 535-537 (3rd Cir. 1999) ( bidding incentives as being appropriate in bankruptcy

because they provide a benefit to the estate).

Debtor believes that the Sale Procedures satisfy this standard .The Sale Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by potential bidders, thereby increasing the likelihood that the best possible value for the Operating Assets will be obtained. Similarly, if a Stalking Horse Bidder is identified by Debtor prior to the Auction, Debtor believes it appropriate for it to be able to provide such Stalking Horse Bidder with break-up fee protection and set minimum overbids for an additional bidder to participate. *See, In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

Debtor submits that the Sale Procedures, including provisions potentially allowing for a Stalking Horse Bidder(s) with a Break-Up Fee, and the Auction will ensure that Debtor's estate receives the highest and best value available for the Operating Assets. Debtor hereby requests the Court's approval of the process and procedures set forth in the Sale Procedures.

**C. Debtor Will Be Able to Sell the Operating Assets Free and Clear of Liens, Interests or Encumbrances Under Bankruptcy Code Section 363(f).**

A buyer/bidder for the Operating Assets willing be interested in purchasing the Operating Assets only if it can do so free and clear of any liens, interests or encumbrances pursuant to Bankruptcy Code section 363(f). Because the Debtor has support for the Sale Procedures from its major secured creditor, Wells Fargo, and Debtor does not foresee any objections from the other creditors of the Estate, Debtor is confident that it will be able to establish at the Sale Approval Hearing that the Operating Assets can be sold free and clear of any liens, interests or encumbrances pursuant to Bankruptcy Code section 363(f)(2).

The Debtor is not currently aware of any other material secured creditors who are asserting liens or other security interests in or against Operating Assets. However, to the extent that any entity might seek to assert a lien or other interest in or against any of the Debtor's assets and raise an objection at the Sale Approval Hearing, the Debtor believes that it would be able to show at the Sale Approval Hearing either that the purchase price to be paid for Operating Assets exceeds the aggregate value of all liens on

such assets, or that such interest is in bona fide dispute, and that such assets can be sold free and clear of any liens, interests or encumbrances pursuant to Bankruptcy Code sections 363(f)(3) and (f)(4).

### D. The Assumption And Assignment Procedures Will Should Be Approved

Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). Section 365(b)(1) sets forth the requirements for assumption of an executory contract. Section 365(f)(2) provides that a debtor may assign an executory contract, subject to certain conditions. Debtor believes the assumption and adequate assurance procedures set forth in the proposed Sale Procedures, are reasonable and will facilitate any closing on sale of the Operating Assets. For this reason, Debtor requests the Court's approval of the assumption and assignment procedures as set forth in the Sale Procedures

## V. CONCLUSION

For all the foregoing reasons, Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as Exhibit A: (a) approving the proposed Sale Procedures in connection with the sale of the Operating Assets; (b) approving the date of the Auction and date of the Sale Approval Hearing; (c) approving at the Sale Approval Hearing the highest and best bid selected by the Debtor at the Auction; (d) approving procedures for the assumption and assignment of real or personal property leases and executory contracts in connection with the Sale Procedures and the Auction; (f) authorizing the Debtor under the Sale Procedures and in accordance with the Sale Determination Process and; and (g) granting such other relief as is fair and equitable.

Dated: May 23, 2011 LAW OFFICES OF STEPHEN D. FINESTONE

/s/ Stephen D. Finestone
Stephen D. Finestone
Attorney for Debtor