Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Proposed Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re | ) Case No. 11-31985 |
| | ) |
| NURSERYMEN'S EXCHANGE, INC. | ) Chapter 11 |
| | ) |
|     Debtor and Debtor in Possession | ) **Date:** May 25, 2011 |
| | ) **Time:** 11:00 a.m. |
| | ) **Place:** 235 Pine Street, Courtroom 2_ |
| | )        San Francisco, CA |
| _____ | ) |

**ORDER (A) APPROVING SALE PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF DEBTOR'S OPERATING ASSETS AT AUCTION (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY AND PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH (C) GRANTING RELATED RELIEF**

Upon consideration of the motion ("Motion") of Nurserymen's Exchange, Inc., debtor and debtor in possession herein ("Debtor"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an Order (a) approving the proposed sale procedures, including a breakup fee, in the form attached as Exhibit A to this Order (the "Sale Procedures"), in connection with the proposed sale (the "Sale") at auction (the "Auction") of Debtor's operating business and substantially all of the assets used in connection therewith (the "Operating Assets") (b) approving the date of the Auction and date of the Sale Approval Hearing, and, (c) approving procedures for the assumption and assignment of real or personal property leases and

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 1 of 57

executory contracts in connection with the Sale Procedures and the Auction; upon consideration of the pleadings submitted in support of the Motion; upon the record of the hearing held regarding the Motion; and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over this matter and over the property of the Debtor and its bankruptcy estate pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).

B.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

C.      Proper, timely, adequate and sufficient notice of the Motion and proposed entry of this Order has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and no other or further notice of the Motion is required.

D.      Good cause has been shown for the entry of this Order. The Debtor has articulated good and sufficient reasons for approving the Sale Procedures in connection with the Auction of the Operating Assets, including (i) approval of the Sale Procedures, and (ii) granting the Debtor the authority, as set forth in the Sale Procedures, to provide a Stalking Horse Bidder with a Break-Up Fee.

E.      The Sale Procedures are fair and reasonable under the circumstances and, together with the marketing process commenced by the Debtor prior to the Petition Date and now being continued by FocalPoint Partners, LLC, provide an appropriate framework for selling the Debtor's assets and will enable the Debtor, to review, analyze and compare all bids received to determine whether any of the bids or any combination thereof would result in the highest and best value being realized for the Operating Assets.

F.      A Break-Up Fee not to exceed three percent (3%) of the purchase price (inclusive of liabilities to be assumed) to be paid to a Stalking Horse Bidder under the Sale Procedures is fair and reasonable under the circumstances. Specifically, Debtor may determine to offer the Break-Up Fee and select a Stalking Horse Bidder if it has concluded that doing so would increase the Debtor's chances of

ORDER RE SALE PROCEDURES                                    2

receiving the highest and best offer for the Operating Assets by establishing a bid standard or minimum for other bidders to the Auction, and serving as a catalyst for other potential or actual bidders, to the benefit of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, a Break-Up Fee would be: (i) an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtor's estate by any Stalking Horse Bidder; and (iii) reasonable and appropriate in light of the size and nature of the proposed sale of the Operating Assets.

G. The procedures for the assumption and assignment of the Leases and other Executory Contracts are fair and reasonably necessary to expedite the closing of the Sale.

H. A reasonable opportunity to object or to be heard regarding the relief requested in the Motion with respect to the Sale Procedures has been afforded to all interested parties and entities.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1. The Motion is granted as set forth herein.

2. The sale of the Operating Assets shall be governed by the Sale Procedures attached as Exhibit A to this Order, which are hereby authorized and approved, including any Break-Up Fee

3. Debtor is authorized to take all of the actions contemplated by the Sale Procedures, including conducting the Auction. Debtor or FocalPoint will provide information in a timely manner to the Official Committee of Unsecured Creditors (the "Committee") and Wells Fargo with respect to: (i) the identify of bidders and any bids submitted; (ii) the selection of a stalking horse bidder, if any, and the terms of any stalking horse protections to be provided; (iii) the selection of the highest and best bid; (iv) any other decisions materially impacting the sale process.

4. The Operating Assets may be sold in connection with the sale free and clear of any liens, interests or encumbrances, with any such liens, interests or encumbrances to attach to the proceeds of the sale in the same order, amount and priority as existed immediately prior to the Petition Date.

5. In accordance with and subject to the Sale Procedures, the Bid Deadline for submitting bids shall be **July 8, 2011 at 3:00 p.m.**

6. In accordance with and subject to the Sale Procedures, the Auction shall be held on **July**

ORDER  RE SALE PROCEDURES        3

**13, 2011, commencing at 10:00 a.m.** at the offices of Gunderson Dettmer, 1200 Seaport Blvd., Redwood City, CA 94063, or at such other time, date and place as determined and announced by Debtor.

       7.     The assumption and assignment procedures for the Leases and Executory Contracts as set forth in the Sale Procedures are hereby expressly authorized.

       8.     The Court hereby schedules the Sale Approval Hearing to be held on **July 15, 2011 at __:___ __.m. (Pacific Time)** before the Honorable _____, United States Bankruptcy Judge, 235 Pine Street, ___nd Floor, San Francisco, CA 94104, to consider the entry of an order, inter alia, approving the sale of the Operating Assets free and clear of all liens, claims, interests and encumbrances.

      10.     No later than June 10, 2011Debtor shall provide notice of the Sale Procedures, the time and place of the Auction, the time and place of the Sale Approval Hearing, and the deadline to file any objection to the Sale Approval Hearing, by sending the notice (by first class mail, postage prepaid) to (i) the Office of the United States Trustee; (ii) counsel to the Official Committee of Unsecured Creditors (or if no counsel has been selected, then to the twenty largest unsecured creditors); (iii) Wells Fargo Bank, N.A. and its counsel, Buchalter Nemer; (iv) all federal, state, local regulatory or taxing authorities which have a reasonably known interest in the relief requested by the Motion; (v) the Internal Revenue Service; and  all entities on the 2002 service list as of the date of entry of this order

      11.     As will be set forth in the notice of the hearing, objections to the sale of Operating Assets to the Winning Bidder shall be set forth in writing and shall specify with particularity the grounds for such objections and other statements of position and shall be filed with the Court at least one day before the date of the Sale Approval Hearing.

      12.     As soon as reasonably practicable following the entry of this Order, but in any event no later June 25, 2011, Debtor shall provide notice to each counterparty of the Leases and/or Executory Contracts of the Debtor's calculation of the amounts that must be paid in connection with the assumption and assignment of the Leases and/or Executory Contracts pursuant to section 365(b) of the Bankruptcy Code (the "Cure Amount").

      13.     As soon as is practical before the Auction date, Debtor shall provide on a confidential basis to each counterparty Lease and/or Executory Contract designated for potential assumption and

ORDER  RE SALE PROCEDURES

4

assignment with (i) the identity of each Qualified Bidder, and (ii) information regarding each Qualified Bidder's adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code.

14. If an objection is raised by a counterparty to any of the Leases and/or Executory Contracts solely to the Cure Amount, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, the Debtor may seek to assume such lease or contract and assign it to a Winning Bidder; provided that the entire disputed Cure Amount must be immediately paid by the Winning Bidder upon such assumption and assignment, and Debtor must segregate the applicable disputed Cure Amount pending the resolution of such dispute by the Court or by agreement of the parties, for payment to the counterparty or refund to the Winning Bidder. If an objection is raised by a counterparty to any of the Leases and/or Executory Contracts as to adequate assurance of future performance, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, said objection will be determined by the Court. Hearings on disputed Cure Amount(s) and/or adequate assurance of future performance in connection with Leases and/or Executory Contracts (as applicable) shall be held (i) on the date of the Sale Approval Hearing, or (ii) on such other date as the Court may designate.

15. All Potential Bidders are deemed to have submitted to the jurisdiction of this Court with respect to all matters related to the Auction or the sale of the Operating Assets.

16. Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) Debtor may, in its discretion and without further delay, take any action and perform any act authorized by this Order.

17. All objections to the Motion or the relief requested therein are overruled to the extent they have not been withdrawn, waived or otherwise resolved.

18. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

** END OF ORDER **

ORDER RE SALE PROCEDURES

5

Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Proposed Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.


## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 11- |
| | ) |
| NURSERYMEN'S EXCHANGE, INC. | ) Chapter 11 |
| | ) |
| Debtor and Debtor in Possession | ) **Date:** May __, 2011 |
| | ) **Time:** |
| | ) **Place:** 235 Pine Street, Courtroom 2_ |
| | ) San Francisco, CA |
| _____ | ) |

**APPROVED SALE PROCEDURES GOVERNING THE PROPOSED SALE OF DEBTOR'S OPERATING ASSETS AT AUCTION; FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY AND PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH**

Debtor and debtor in possession, Nurserymen's Exchange, Inc. ("Debtor"), is seeking to sell its operating business and substantially all of the assets used in connection therewith (the "Operating Assets"). As contemplated by and incorporated into that certain Order (A) Approving Sale Procedures, Including Break-Up Fee, In Connection With The Proposed Sale, (B) Approving Procedures For The Assumption And Assignment Of Real And Personal Property Leases And Executory Contracts In Connection therewith, (C) Approving Sale of the Operating Assets to The Highest and Best Bidder At Auction, and (D) Granting Related Relief (the "Sale Procedures Order"), the following procedures (the "Sale Procedures") shall be the exclusive mechanism governing such sale (the "Sale").

///

Case: 11-31985   Doc# 6-1   Filed: 05/23/11   Entered: 05/23/11 14:48:32   Page 6 of 57

**A.     Due Diligence and Financial Wherewithal**

Any party that satisfies the following criteria in paragraphs 1 and 2 below in this Section A shall be permitted to conduct due diligence regarding the Operating Assets.

**1. Due Diligence**

Upon execution and delivery of a confidentiality and nondisclosure agreement (in form and substance satisfactory to Debtor), which agreement must permit the disclosure of the bidder's identity to Wells Fargo Bank, N. A. ("Wells Fargo"), to FocalPoint Securities, LLC ("FocalPoint") 11150 Santa Monica Blvd., Suite 1550, Los Angeles, California 90025, Attn.: Alexander Stevenson and Gayane Arabyan.

a..     any party that wishes to conduct due diligence with respect to the Operating Assets may be granted access to all material information that has been or will be provided to other bidders; provided that, Debtor shall retain the ability to withhold trade secrets or other proprietary information from competitors, and

b.     a potential purchaser shall be provided a form of asset purchase agreement (the "Form Agreement") relating to the Operating Assets, substantially in the form attached to these Sale Procedures.

**2. Evidence of Financial Wherewithal**

Any party wishing to move forward must provide FocalPoint with sufficient information to demonstrate to Debtor that such party has the financial wherewithal and ability to consummate the transactions contemplated in the Form Agreement.

**B.     The Submission of Qualified Bids**

A bid that, in Debtor's reasonable business judgment, satisfies the following criteria in paragraphs 1 through 5 below in this Section B shall be a "Qualified Bid", and a bidder that submits a Qualified Bid shall be a "Qualified Bidder". Notwithstanding the foregoing, Wells Fargo, to the extent of the validity, priority and amount of its security interest, shall be deemed to be a Qualified Bidder pursuant to its rights to credit bid under section 363(k) of the Bankruptcy Code, and any such credit bid of Wells Fargo shall be a Qualified Bid without the necessity of satisfying the criteria set forth in paragraphs 1 through 5 below in this Section B.

**1. Bid Deadline**

A Qualified Bid must be sent so as to be received by FocalPoint no later than 5:00 p.m. Pacific Daylight Time on Friday, July 8, 2011 (the "Bid Deadline").

**2. Format of a Qualified Bid**

A Qualified Bid must (1) be presented under a signed, irrevocable and binding contract, marked to show any modifications made to the Form Agreement, including the name of the bidder and other conforming changes that must be made to reflect the bidder and its Qualified Bid; (2) signed by an individual authorized to bind the bidder; (3) not be subject to obtaining financing, or future consent or approval, including, without limitation, consent of the bidder's board of directors (or similar governing body), due diligence, or the receipt of any consents, in each case, not otherwise required by the Form Agreement, or any other contingency (other than entry of an order approving the Sale); (4) fully disclose the identity of each entity that will be bidding for the Operating Assets or otherwise participating in connection with such Qualified Bid, and the complete terms of any such participation; and (5) state such bidder's offer is irrevocable and binding until the conclusion of the auction for the purchase of the Operating Assets pursuant to the Sales Procedures (the "Auction") and, if such bidder is the Winning Bidder or the Back-Up Bidder (each as defined below), until the closing of the sale of the Operating Assets.

**3. Deposit**

A Qualified Bid must provide for a deposit of five percent (5%) of the purchase price (inclusive of liabilities to be assumed) set forth in such bid (the "Deposit"), which shall, upon execution of the Qualified Bid be delivered either by a certified or bank check or by wire transfer of immediately available funds as a minimum good faith deposit and shall be used to fund a portion of the purchase price in the event that the bidder is the Winning Bidder.

**4. Financial Information**

A Qualified Bid must be accompanied by sufficient and adequate information to demonstrate to Debtor that such bidder has the financial wherewithal and ability to consummate the transactions contemplated in the Form Agreement, including evidence of adequate financing, a parent guaranty, or an irrevocable letter of credit, if deemed appropriate, each in a form agreed upon by Debtor. Such evidence

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 8 of 57

shall include, but not be limited to, the most current audited and latest unaudited financial statements of the bidder or, if the bidder is an entity formed for the purpose of pursuing the Sale , financial statements of the equity holder(s) of the bidder and the written commitment of the equity holder(s) of the bidder to be financially responsible for the bidder's obligations in connection with the sale. If the bidder is unable to provide such information, Debtor may accept other information sufficient to demonstrate that the bidder has the financial wherewithal to consummate the sale.

**5. Adequate Assurance**

A bidder must provide, prior to the Auction, a declaration attesting to such bidder's ability to provide adequate assurance of future performance with respect to any and all real property leases and other executory contracts (the "Executory Contracts") to be assumed and assigned by Debtor in connection with a sale of the Operating Assets.

**6. Rejection of Qualified Bids; Non-Conforming Bids**

Debtor may reject any Qualified Bid not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Sale Procedures Order or these Sale Procedures; provided that, notwithstanding anything to the contrary therein, Debtor shall have the right to accept as a Qualified Bid any non-conforming bid for the Operating Assets.

**7. Debtor's Option to Select a Stalking Horse Bidder**

Based upon Qualified Bids received, Debtor may, but shall not be obligated to, at any time designate one Qualified Bidder as a "Stalking Horse Bidder". Notice of selection of such Stalking Horse Bidder shall be promptly given to all Qualified Bidders and Wells Fargo and filed with the Court.

**(a) Break-Up Fee**

Debtor may in its reasonable business judgment provide a selected Stalking Horse Bidder (if any) with customary and usual "stalking horse" protections, including a break-up fee and/or an expense reimbursement in an amount not to exceed three percent (3%) of the purchase price (inclusive of liabilities to be assumed) in the Qualified Bid of such Stalking Horse Bidder (the "Break-Up Fee").

**(b) Overbids Prior To Auction**

In the event that Debtor selects a Stalking Horse Bidder, then (i) the bid of each bidder, in order to be considered a Qualified Bid (the "Initial Overbid"), shall, in addition to meeting the other criteria

APPROVED SALE PROCEDURES 4

set forth in these Sale Procedures, be in an amount that is sufficient to pay the Break-Up Fee and result in additional consideration to Debtor's estate in the minimum amount of $100,000, (such amount as determined pursuant to this clause the "Overbid Amount"), and (ii) if an Initial Overbid is made, each Qualified Bidder, including the Stalking Horse Bidder, shall have the right to submit a Qualified Bid; provided that any such increased Qualified Bid must (x) be greater than the Initial Overbid by no less than $50,000 (the "Incremental Bid"), and (y) be submitted so as to be received by FocalPoint, on or before the Bid Deadline (or such subsequent date as Debtor shall determine).

### 8. Notification Prior To Auction and Deadline to Participate

Debtor, prior to the Auction, will inform in writing each Qualified Bidder of (i) the Qualified Bid that represents the highest or otherwise best offer for the Operating Assets as the starting bid at the Auction (each a "Highest Pre-Auction Qualified Bid"); and (ii) the conditions (including the minimum overbid increment) for the submission at the Auction of a bid that would be higher and better than the Highest Pre-Auction Qualified Bid (a "Subsequent Qualified Overbid"). On or prior to **July 11, 2011 at 5:00 p.m. Pacific Daylight Time**, each Qualified Bidder shall inform FocalPoint of its intention to participate in the Auction.

**C.     The Auction**

Only Qualified Bidders will be permitted to attend and to participate at the Auction; provided, however, that nothing herein prohibits Wells Fargo from attending and participating in the Auction in their capacity as creditors of the estate, consistent with these Sale Procedures, and not as bidders. Qualified Bidders who wish to submit a Subsequent Qualified Overbid at the Auction must attend the Auction in person or through an authorized representative.

### 1. Auction Date And Time

The Auction shall be held on **July 13, 2011, commencing at 10:00 a.m. (Pacific Time)** at the offices of Gunderson Dettmer, 1200 Seaport Blvd., Redwood City, CA 94063, or at such other time, date and place as determined and announced by Debtor for consideration of Subsequent Qualified Overbids with respect to the Operating Assets. The Auction may be adjourned as Debtor deems appropriate in the exercise of its reasonable business judgment. If the Auction is adjourned, reasonable notice of such

APPROVED SALE PROCEDURES                5

adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders.

**2. Failure to Receive Qualified Bids**

If no Qualified Bid from a Qualified Bidder is received on or prior to the Bid Deadline for the Operating Assets, Debtor may cancel the Auction.

**3. Cancellation of Auction**

Debtor, in the exercise of its reasonable business judgment may at any time cancel the Auction with respect to the Operating Assets, and proceed to seek approval of the Highest Pre-Auction Qualified Bid at the Sale Approval Hearing (as defined below).

**4. No Collusion**

Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the Operating Assets or the Auction.

**5. Other Terms**

Debtor may make modifications to the Auction rules and these Sale Procedures, as may be determined to be in the best interests of Debtor's estate or creditors announced by Debtor from time to time prior to or during the Auction; provided that such modifications are not materially inconsistent with these Sale Procedures or the Sale Procedures Order.

**D.     Selection of the Winning Bidder**

At the conclusion of the Auction, Debtor shall determine which bid constitutes the highest and best offer for the Operating Assets (the "Winning Bid"), and the Qualified Bidder that has submitted a Winning Bid (the "Winning Bidder") shall execute and deliver to Debtor its Form Agreement with any necessary modifications (the "Winning Purchase Agreement"). Notice of selection of such Winning Bidder shall be given promptly to any party known to have asserted a security interest or other interest in the Operating Assets, all counterparties to real estate leases or executory contracts to be assumed and assigned to such bidder or bidders, and any other party that requests to receive such notice on or before the hearing on this Motion, and filed with the Court at least 24 hours prior to the Sale Approval Hearing.

///

///

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 11 of 57

**E.     The Sale Approval Hearing**

A hearing to approve the Winning Bid (the "Sale Approval Hearing") shall be held before United States Bankruptcy Court for the Northern District of California (the "Court") on **July 15, 2011 at __:___ __.m.** (Pacific Time)

**F.     Executory Contracts**

**1. Notice to Counterparties**

As soon as reasonably practicable following the entry of the Sale Procedures Order, but in any event no later than June 25, 2011, Debtor shall provide notice to each counterparty to the Executory Contracts of Debtor's calculation of the amounts that must be paid in connection with the assumption and assignment of the Executory Contracts pursuant to section 365(b) of the Bankruptcy Code (the "Cure Amount"). As soon as practical before the Auction, Debtor will provide on a confidential basis to each counterparty to a Executory Contract designated for potential assumption and assignment with (i) the identity of each Qualified Bidder, and (ii) information regarding each Qualified Bidder's adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code

**2. Objections**

If an objection is raised by a counterparty to any of the Executory Contracts solely with respect to the Cure Amount, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, Debtor may seek to assume such lease or contract and assign it to a Winning Bidder; provided that the entire disputed Cure Amount must be immediately paid upon such assumption and assignment, and Debtor must segregate the applicable disputed Cure Amount pending the resolution of such dispute by the Court or by agreement of the parties, for payment to the counterparty or refund to the Winning Bidder. If an objection is raised by a counterparty to any of the Executory Contracts as to adequate assurance of future performance, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, said objection will be determined by the Court. Hearings on disputed Cure Amount(s) and/or adequate assurance of future performance in connection with the Executory Contracts (as applicable) shall be held (i) on the date of the Sale Approval Hearing, or (ii) on such other date as the Court may designate.

///

Case: 11-31985     Doc# 6-1     Filed: 05/23/11     Entered: 05/23/11 14:48:32     Page 12 of 57

**G.** **Irrevocability of Certain Qualified Bids**

Each Winning Bid shall remain open, irrevocable and binding upon each Winning Bidder; provided that no Winning Bid shall be binding upon Debtor until it has been approved by the Court. The bid of the next highest Qualified Bidder (the "Back-Up Bidder") at the highest price bid by such Qualified Bidder at the Auction, shall remain open and irrevocable and the Deposit of the Back Up Bidder shall be held in accordance with these Sale Procedures until the closing of the sale of the Operating Assets. The Deposits of all other Qualified Bidders will be returned to such Qualified Bidders no later than three (3) business days following the conclusion or cancellation of the Auction and the Deposit of the Back Up Bidder shall be returned to such Back Up Bidder no later than three (3) business days following the closing of the sale of the Operating Assets to the Winning Bidder.

**H.** **Failure to Close**

Subject to the terms of the Winning Purchase Agreement, in the event a Winning Bidder (as determined by Debtor and approved by the Court) fails to consummate the proposed transaction by the closing date contemplated in the Winning Purchase Agreement, (i) such Winning Bidder shall be deemed to have forfeited its Deposit and Debtor shall retain the Deposit and reserve the right to pursue all available remedies, whether legal or equitable, available to it, and (ii) Debtor shall be authorized without further order of the Court to consummate the proposed transaction with the Back-Up Bidder.

**I.** **Submission to Jurisdiction of the Court**

All bidders will be deemed to have submitted to the jurisdiction of the Court with respect to all matters related to the Auction or with respect to the Operating Assets.

**J.** **Expenses**

Subject to the terms of the Winning Purchase Agreement or any other executed agreement binding upon Debtor, all Qualified Bidders shall bear their own costs and expenses in connection with the Auction or with respect to the Operating Assets.

Dated: May 23, 2011                    LAW OFFICES OF STEPHEN D. FINESTONE

                                       /s/ Stephen D. Finestone
                                       Stephen D. Finestone
                                       Attorney for Debtor

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**NURSERYMEN'S EXCHANGE, INC.**

**as the Seller**

**AND**

**[      ]**

**as the Buyer**

**[          ], 2011**

1

31567436v4

# TABLE OF CONTENTS

**Page**

**Article I DEFINITIONS**................................................................................................ **2**

    1.1    Certain Definitions ............................................................................... 2

    1.2    Other Terms .......................................................................................... 12

    1.3    Knowledge ............................................................................................ 12

    1.4    Interpretation ........................................................................................ 12

**Article II PURCHASE OF ASSETS** .......................................................................... **12**

    2.1    Purchase ................................................................................................ 12

    2.2    Cash Purchase Price; Adjustments ....................................................... 13

    2.3    Allocation of Purchase Price ................................................................ 15

    2.4    Closing .................................................................................................. 16

    2.5    Closing Deliveries ................................................................................ 16

    2.6    Assignment and Assumption of Contracts ........................................... 17

    2.7    Retained Liabilities .............................................................................. 18

    2.8    PUD Property and Family Property Leases. ......................................... 18

    2.9    The Seller's Chapter 11 Bankruptcy Case ........................................... 19

**Article III REPRESENTATIONS AND WARRANTIES OF SELLER** ............................... **19**

    3.1    Organization, Standing and Power ....................................................... 19

    3.2    Authority ............................................................................................... 19

    3.3    No Conflict............................................................................................ 20

    3.4    Title ...................................................................................................... 20

    3.5    Assumed Contracts .............................................................................. 20

31567436v4

Case: 11-31985   Doc# 6-1   Filed: 05/23/11   Entered: 05/23/11 14:48:32   Page 15 of 57

| 3.6 | Employee and Related Matters | 20 |
| 3.7 | Brokers | 21 |

**Article IV REPRESENTATIONS AND WARRANTIES OF BUYER** ........................... **21**

| 4.1 | Organization, Standing and Power | 21 |
| 4.2 | Authority | 21 |
| 4.3 | Consents and Approvals; No Violation | 21 |
| 4.4 | Actions and Proceedings | 22 |
| 4.5 | Brokers | 22 |
| 4.6 | Financing | 22 |
| 4.7 | **AS IS SALE** | 22 |
| 4.8 | No Other Representations or Warranties of the Seller | 23 |

**Article V COVENANTS** ........................................................................................ **23**

| 5.1 | Access | 23 |
| 5.2 | Operation of Business | 24 |
| 5.3 | Notification | 25 |
| 5.4 | Third Party Consents | 26 |
| 5.5 | All Reasonable Efforts | 26 |
| 5.6 | Further Assurances | 26 |
| 5.7 | Publicity | 26 |
| 5.8 | Bankruptcy Matters | 26 |
| 5.9 | Confidentiality | 27 |
| 5.10 | Transaction Taxes | 27 |
| 5.11 | Notice of Nonsatisfaction of Closing Condition | 27 |

31567436v4

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 16 of
57

5.12    Sale of PUD Property ..................................................................................... 27

5.13    Cooperation ................................................................................................... 28

5.14    Access to Records ......................................................................................... 28

5.15    Notice of Sale ............................................................................................... 28


**Article VI EMPLOYEE MATTERS** ............................................................................ **28**

6.1    Personnel; Transferred Employees ................................................................ 28

6.2    COBRA and Health Claim Data ................................................................... 29

6.3    WARN ........................................................................................................... 29

6.4    Welfare Benefits ........................................................................................... 29

6.5    Vacations ...................................................................................................... 29

6.6    Employee Benefit Plans — Seller's Liability ................................................ 29

6.7    Wage Reporting ............................................................................................ 30

6.8    Unemployment Compensation ...................................................................... 30

6.9    Employee Rights ........................................................................................... 30

6.10   Prior Service Recognized ............................................................................. 30


**Article VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** ......................... **30**

7.1    Conditions to Each Party's Obligations ....................................................... 30

7.2    Conditions to Obligations of the Buyer ....................................................... 31

7.3    Conditions to Obligations of the Seller ........................................................ 31


**Article VIII TERMINATION** .................................................................................... **32**

8.1    Termination .................................................................................................. 32

8.2    Procedure and Effect of Termination ........................................................... 33

31567436v4

| 8.3 | Buyer's Exclusive Remedy | 34 |
| 8.4 | The Seller's Remedy | 34 |

**Article IX GENERAL PROVISIONS** ........................................................................ **34**

| 9.1 | Survival of Representations and Warranties | 34 |
| 9.2 | Notices | 34 |
| 9.3 | Section and Other Headings | 35 |
| 9.4 | Waiver | 35 |
| 9.5 | Entire Agreement | 35 |
| 9.6 | Amendments, Supplements, Etc. | 35 |
| 9.7 | No Rights of Third Parties | 35 |
| 9.8 | Enforcement | 36 |
| 9.9 | Invalid Provisions | 36 |
| 9.10 | Successors and Assigns | 36 |
| 9.11 | Counterparts | 36 |
| 9.12 | Facsimile Signature | 36 |
| 9.13 | Further Assurances | 36 |
| 9.14 | Fees and Expenses | 36 |
| 9.15 | WAIVER OF JURY TRIAL | 37 |
| 9.16 | Exclusive Jurisdiction | 37 |
| 9.17 | Computation of Days | 37 |
| 9.18 | No Consequential or Punitive Damages | 37 |
| 9.19 | Time of Essence | 37 |

31567436v4

Case: 11-31985   Doc# 6-1   Filed: 05/23/11   Entered: 05/23/11 14:48:32   Page 18 of 57

## Exhibits and Schedules

**Exhibits**

| | |
|---|---|
| A | Sale Procedures Order |
| B | Form of Assignment and Assumption Agreement for Assumed Contracts |
| C | Form of Assignment and Assumption Agreement for Real Property Leases |
| D | Form of Assignment for Intellectual Property |
| E | Form of Assignment and Assumption Agreement for Assumed Liabilities |
| F | Form of Bill of Sale for Purchased Assets |
| G | Forms of Family Property Leases |
| H | Form of Owned Real Property Deed |
| I | Form of PUD Lease |
| J | Form of Reservoir Easement Agreement |
| K | Form of Sale Motion |
| L | Form of Sale Order |
| M | Form of Escrow Agreement |

**Disclosure Schedule**

| | |
|---|---|
| 1.1(a) | Leased Real Property |
| 1.1(b) | Accounts Payable |
| 1.1(c) | Assumed Contracts |
| 1.1(d) | Customer Liabilities |
| 1.1(e) | Family Owned Fixtures and Leasehold Improvements |
| 1.1(f) | Excluded Contracts |
| 1.1(g) | Excluded Owned Real Property |
| 1.1(h) | Existing Family Property Leases |
| 1.1(i) | Leased Family Property |
| 1.1(j) | Owned Real Property |
| 1.1(k) | Permitted Liens |
| 2.3 | Asset Allocation |
| 2.6(b) | Cure Costs |
| 3.2 | Third Party Consents |
| 3.4 | Title |
| 3.5 | Defaults Under Assumed Contracts |
| 3.6 | Employee Matters |

31567436v4

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 19 of 57

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of [          ], 2011 (the "Execution Date"), by and between **NURSERYMEN'S EXCHANGE, INC.**, a California corporation (the "Seller"), and [                    ], a [          ] (the "Buyer").  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Article I.

## RECITALS

WHEREAS, the Seller operates a commercial nursery in Half Moon Bay, California, producing and distributing horticultural products, including flowering plants and foliage for indoor home decor, for sale to retail and commercial customers, including through premium supermarkets, leading home centers and mass merchandisers, a related brokerage operation and wholesale center (the "Business");

WHEREAS, on [          ], 2011, the Seller commenced a bankruptcy case (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court");

WHEREAS, on [          ], 2011, the Bankruptcy Court entered an order (the "Sale Procedures Order"), in the form attached hereto as Exhibit A, containing, among other things, (i) the sale procedures to be followed by the Seller and all potential bidders for the Purchased Assets, (ii) scheduling an auction and a hearing to consider the approval of the sale of the Purchased Assets (the "Sale Hearing") and (iii) the form and manner of notice of the Sale Motion and Sale Hearing;

WHEREAS, in accordance with the procedures approved in the Sale Procedures Order, the Seller desires to sell, and the Buyer desires to buy, the Purchased Assets upon the terms and conditions set forth herein;

WHEREAS, the parties hereto have agreed that, subject to the terms and conditions of this Agreement, the Seller will sell, and the Buyer will acquire, the Purchased Assets free and clear of all Liens, Claims, and Indebtedness under Sections 363(f) and 365 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of an Order of the Bankruptcy Court under, inter alia, sections 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

31567436v4

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 20 of 57

# ARTICLE I
## DEFINITIONS

1.1     <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"*Accounts Payable*" shall mean the trade accounts payable of the Seller incurred in the ordinary course of business, which may include accounts payable that would be claims under Section 503(b)(9) of the Bankruptcy Code and accounts payable to the critical vendors, licensors suppliers and service providers specifically set forth on Section 1.1(b) of the Disclosure Schedule (Accounts Payable).

"*Accounts Receivable*" means all of the trade notes or accounts receivable arising out of Inventory sold or shipped or services performed in connection with the operation of, or relating to, the Business.

"*Affiliate*" or "*Affiliates*" shall mean with respect to a specified Person, another Person that, either directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.

"*Agreement*" has the meaning set forth in the opening paragraph to this Agreement.

"*Alternative Transaction*" shall mean any agreement or arrangement, or agreement to support or propose to the Bankruptcy Court any agreement or arrangement, in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Bankruptcy Court) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to the Buyer pursuant to the terms of this Agreement.

"*Ancillary Documents*" has the meaning set forth in Section 2.5(b)(xii).

"*Applicable Law(s)*" shall mean any federal, state, provincial, territorial, local or foreign laws, including common law, Orders, writs, injunctions, decrees, codes, guidelines, policies, ordinances, awards, stipulations, judgments, directions, requirements, statutes, judicial or administrative doctrines, rules or regulations enacted, promulgated, issued or entered by a Governmental Authority, including the Bankruptcy Code and the Code, to which a specified Person or property is subject.

"*Asset Allocation*" has the meaning set forth in Section 2.3.

"*Assignment and Assumption Agreement for Assumed Contracts*" shall mean an instrument substantially in the form attached hereto as <u>Exhibit B</u>, assigning the Assumed Contracts, other than Real Property Leases, to the Buyer.

31567436v4

Case: 11-31985     Doc# 6-1     Filed: 05/23/11     Entered: 05/23/11 14:48:32     Page 21 of 57

"*Assignment and Assumption Agreement for Assumed Liabilities*" shall mean an instrument substantially in the form attached hereto as <u>Exhibit E</u>, pursuant to which the Buyer will assume and agree to pay and discharge the Assumed Liabilities in accordance with the Sale Order.

"*Assignment and Assumption Agreement for Real Property Leases*" shall mean an instrument substantially in the form attached hereto as <u>Exhibit C</u>, assigning the Real Property Leases for the properties set forth on <u>Section 1.1(a)</u> of the Disclosure Schedule (Leased Real Property), to the Buyer.

"*Assignment for Intellectual Property*" shall mean an instrument substantially in the form attached hereto as <u>Exhibit D</u>, assigning the Intellectual Property to the Buyer.

"*Assumed Contracts*" shall mean (i) all Contracts between the Seller and its customers relating to the purchase of the Seller's products and/or services, including, retailer and supplier agreements, (ii) all Contracts between the Seller and its critical vendors, licensors, suppliers and service providers specifically set forth on <u>Section 1.1(b)</u> of the Disclosure Schedule (Accounts Payable) that are assumed by the Buyer, (iii) all Contracts relating to Intellectual Property or Internet domain names, (iii) all confidentiality agreements between the Seller or its Representatives and any other Person and (iv) all leases for equipment and other personal property of the Seller, in each case, other than the Excluded Contracts and only as set forth on <u>Section 1.1(c)</u> of the Disclosure Schedule (Assumed Contracts).

"*Assumed Liabilities*" shall mean the following liabilities and obligations of the Seller: (i) all liabilities and obligations arising with respect to periods commencing after the Closing Date under or pursuant to any Assumed Contracts and which relate to the performance of the Assumed Contracts on and after the Closing Date (other than any obligations or liabilities that are the result of the breach of any Assumed Contract prior to or on the Closing Date), (ii) all liabilities and obligations occurring, arising out of or related to the ownership and operation of the Business and the Purchased Assets after the Closing Date, (iii) up to two weeks of all accrued, but unpaid wages of the Transferred Employees that are paid semi-monthly pursuant to the Seller's standard payroll, together with the corresponding payroll taxes, (iv) all liabilities for accrued vacation or cash payments for accrued vacation of Transferred Employees as of the Closing Date in an amount not to exceed $[          ], (v) the Accounts Payable, (vi) any other post-petition liabilities  or obligations of the Seller incurred in the ordinary course of business that are not yet due and payable on or prior to the Closing Date in an amount not to exceed $[          ]; (vii) all Cure Costs and (viii) any customer related liabilities to the extent set forth on <u>Section 1.1(d)</u> of the Disclosure Schedule (Customer Liabilities).

"*Avoidance Actions*" means any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Estate under applicable state statute or Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

"*Bankruptcy Case*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Code*" has the meaning set forth in the recitals of this Agreement.

3

"*Bankruptcy Court*" has the meaning set forth in the recitals of this Agreement.

"*Bill of Sale for Purchased Assets*" shall mean an instrument in substantially the form attached hereto as <u>Exhibit F</u>, assigning, conveying and transferring the Purchased Assets (other than the Assumed Contracts and the Real Property) to the Buyer.

"*Books and Records*" shall mean all business records, books, files, ledgers, documents and correspondence owned and controlled by the Seller, confidential and otherwise, in whatever form, wherever located, which relate to the Seller, the Business, the Purchased Assets or the Transferred Employees or their dependents or beneficiaries (subject, in the case of Transferred Employees or their dependents or beneficiaries, to the obtaining of any consents required from any third party), including market information, sales aids, customer and supplier lists, files, records and data; written medical records, medical surveillance samples, capital expenditure plans and studies; emergency studies; maintenance and repair reports; accounting, real property, environmental, tax, health, safety, toxicology and hygiene records; plans and designs for capital and cost reduction projects, but excluding the Excluded Books and Records.

"*Business*" has the meaning set forth in the recitals to this Agreement.

"*Business Day*" shall mean any date, other than a Saturday, Sunday or any other day on which national banks are required or authorized by law to close in California.

"*Buyer*" has the meaning set forth in the opening paragraph to this Agreement.

"*Buyer's Confidentiality Agreement*" means that certain confidentiality agreement, dated as of [          ], 2011, by and between FocalPoint Securities, LLC, on behalf of the Seller, and [the Buyer][, on behalf of the Buyer].

"*Capital Stock*" means, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in the corporation; and (ii) any other Entity, any share, membership or other percentage interest, unit of participation or other equivalent (however designated) of an equity interest in the Entity.

"*Cash*" shall mean all cash on the Seller's books as of the Closing, taking into account all outstanding checks, deposits in transit, outstanding bank fees, amounts deposited with any banks or other depositary institutions, cash on hand and other items required to be reconciled under GAAP.

"*Cash Purchase Price*" has the meaning set forth in Section 2.1(b).

"*Charter Documents*" means, with respect to any Entity at any time, in each case as amended, modified and supplemented at that time, (i) the articles or certificate of formation, incorporation or organization (or the equivalent organizational documents) of the Entity, (ii) the bylaws or limited liability company agreement or regulations (or the equivalent governing documents) of the Entity, and (iii) each document setting forth the designation, amount and relative rights, limitations and preferences of any class or series of the Entity's Capital Stock or of any rights in respect of the Entity's Capital Stock.

4

"*Claim*" means a claim against the Seller or its property, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Closing*" shall mean the consummation of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities, in each case in accordance with the terms and provisions of this Agreement.

"*Closing Date*" has the meaning set forth in Section 2.4.

"*Closing Date Accounts Receivable*" has the meaning set forth in Section 2.2(b)(i).

"*Closing Date Inventory Amount*" has the meaning set forth in Section 2.2(b)(i).

"*Closing Date Statement*" has the meaning set forth in Section 2.2(b)(i).

"*Closing Payment*" has the meaning set forth in Section 2.1(d).

"*COBRA*" has the meaning set forth in Section 6.2.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended (or the applicable provisions of any succeeding statute).

"*Contract*" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment or other binding arrangement or understanding, whether written or oral.

"*Cure Costs*" has the meaning set forth in Section 2.6(b).

"*Deposit*" has the meaning set forth in Section 2.1(c).

"*Disclosure Schedule*" shall mean the disclosure schedule supplied by the Seller to the Buyer and dated as of the date hereof.

"*Employee*" shall mean an employee of the Seller, including inactive employees and employees on leave.

"*Employee Benefit Plan(s)*" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA) or material fringe benefit plan maintained or contributed to or required to be contributed to by the Seller.

"*Entity*" shall mean any sole proprietorship, corporation, partnership of any kind having a separate legal status, limited liability company, business trust, unincorporated organization or association, mutual company, joint stock company or joint venture.

"*Equipment*" shall mean all machinery and equipment, spare parts, furniture, office equipment, computer equipment and hardware, fittings, tools, apparatus, signage, maintenance equipment, vehicles and rolling stock and other personal property of any kind or type that is used or held for use in connection with Business.

5

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"*Escrow Agent*" has the meaning set forth in Section 2.1(c).

"*Escrow Agreement*" has the meaning set forth in Section 2.1(c).

"*Estate*" means the Seller's estate created pursuant to section 541 of the Bankruptcy Code.

"*Estimated Cash Purchase Price*" has the meaning set forth in Section 2.2(a)(ii).

"*Estimated Closing Date Accounts Receivable*" has the meaning set forth in Section 2.2(a)(i).

"*Estimated Closing Date Inventory Amount*" has the meaning set forth in Section 2.2(a)(i).

"*Estimated Closing Date Statement*" has the meaning se forth in Section 2.2(a)(i).

"*Excluded Assets*" shall mean (i) any Contract that is not an Assumed Contract, (ii) any Avoidance Actions (other than against Transferred Employees), (iii) the right to the Purchase Price and other rights granted to the Seller under this Agreement, (iv) the Existing Family Property Leases; (v) the Excluded Owned Real Property (vi) all fixtures, trade fixtures and leasehold improvements located on the Leased Family Property as set forth on Section 1.1(e) of the Disclosure Schedule (Family Owned Fixtures and Leasehold Improvements) (vii) any shares of capital stock or other equity interests of the Seller or any of or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Seller, (viii) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of the Seller, in each case to the extent applicable to any period prior to the Closing Date (but not any of the foregoing paid by the Buyer), (ix) any property or asset of any kind (whether tangible, intangible or otherwise) held or used by the Seller primarily in connection with any Contract or Lease that is not among the Assumed Contracts, (x) the Excluded Books and Records, (xi) all Cash, (xii) all insurance policies, including, without limitation, insurance policies on the lives of key employees that are held by the Seller, (xiii) professional retainers paid by the Seller, (xiv) any amounts that have been placed into escrow accounts for the benefit of professionals, (xv) all refunds, deposits, prepayments and prepaid expenses, including, for the avoidance of doubt all utility deposits, (xvi) all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person that has provided insurance to the Seller, (xvii) all personnel records of employees of the Seller (other than personnel records of Transferred Employees) and (xviii) all attorney-client and other privileged materials of the Seller relating to the preparation, commencement and administration of the Bankruptcy Case, the transactions contemplated by this Agreement and the PUD Transaction.

"*Excluded Books and Records*" shall mean (i) any Tax Returns (ii) any books and records of whatever type relating to the Seller as an Entity, including stock records and minute books and (iii) any books and records, contracts or correspondence or documents or records of any kind,

31567436v4

whether tangible or intangible, relating to the Excluded Assets, the Retained Liabilities and the Bankruptcy Case, the transactions contemplated by this Agreement and the PUD Transaction.

"*Excluded Contracts*" shall mean each Contract set forth on <u>Section 1.1(f)</u> of the Disclosure Schedule (Excluded Contracts).

"*Excluded Owned Real Property*" shall mean the properties set forth on <u>Section 1.1(g)</u> of the Disclosure Schedule (Excluded Owned Real Property).

"*Execution Date*" has the meaning set forth in the opening paragraph of this Agreement.

"*Existing Family Property Leases*" shall mean each Lease set forth on <u>Section 1.1(h)</u> of the Disclosure Schedule (Existing Family Property Leases).

"*Family Property Leases*" shall mean the real property leases substantially in the forms attached hereto as <u>Exhibits G-1</u>, <u>G-2</u> and <u>G-3</u>, between the Buyer and the respective owners of the property named therein, superseding the Existing Family Property Leases and entered into as of the Closing Date.

"*Final Cash Purchase Price*" has the meaning set forth in Section 2.2(b)(ii).

"*Final Order*" shall mean (i) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari or motion for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings or motion for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, motion for reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or motion for reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or motion for reargument or rehearing shall have expired.

"*GAAP*" shall mean generally accepted accounting principles in the United States, consistent with the Seller's past practices.

"*Governmental Authority*" shall mean any national, federal, state, provincial, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"*Holdback Period*" has the meaning set forth in Section 2.2(c).

"*Indebtedness*" with respect to any Person shall mean any obligation of such Person for borrowed money, but in any event shall include: (i) any obligation or liabilities incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business (whether such Person has assumed or become liable for the payment of such obligation) (whether accrued, absolute, contingent, unliquidated or otherwise, known or unknown, whether due or to

7

become due) whether or not secured by a Lien; (ii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (iii) capitalized lease obligations; and (iv) all guarantees of such Person of obligations of other Persons of the type referred to in clauses (i) through (iii) above.

"*Intellectual Property*" shall mean the Intellectual Property Rights owned or used by the Seller that are used in, or held for use in, the Business.

"*Intellectual Property Rights*" shall mean all intellectual property rights, including both statutory and common law rights, throughout the world, as applicable, in or to any (i) patents, patent applications and invention disclosure, (ii) copyrights, registrations, renewals and applications for registrations thereof, (iii) trade secrets, know-how and confidential information, or (iv) trademarks, trade names, service marks, trade dress, product configurations, slogans, logos and any applications and registrations therefor.

"*Inventory*" shall mean (i) all inventories of the Seller, including all growing plants, cuttings, samples, and labels, cartons, wrapping and other decorative materials, packaging materials and pots that are used in connection with, are held for use solely in, or otherwise relate solely to, the operations of the Business and (ii) all raw materials, work-in-process of the Seller that are used in connection with, are held for use solely in, or otherwise relate solely to, the Business.

"*Inventory Amount*" means the value of the Inventory as carried on the books of the Seller as of the Closing Date.

"*Lease(s)*" means any leases, subleases, licenses or other agreements for real property, including all amendments, extensions, renewals, guaranties or other agreements with respect thereto.

"*Leased Family Property*" shall mean the real properties leased by the Seller set forth on Section 1.1(i) of the Disclosure Schedule (Leased Family Property).

"*Leased Real Property*" shall mean all of the real property leased by the Seller, other than the Leased Family Property, all of such Leased Real Property being set forth on Section 1.1(a) of the Disclosure Schedule (Leased Real Property).

"*Lien(s)*" shall mean any (i) security interest, lien, mortgage, pledge, hypothecation, encumbrance, Claim, easement, charge, restriction on transfer or otherwise, or interest of another Person of any kind or nature, including any conditional sale or other title retention Contract or lease in the nature thereof, (ii) any filing or agreement to file a financing statement as debtor under the applicable Uniform Commercial Code or any similar statute and (iii) any subordination arrangement in favor of another Person.

"*Material Adverse Effect*" shall mean any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, that has, or would have, a material adverse effect on the Purchased Assets or the Business (excluding the Excluded Assets), taken as a whole; or change in the result of operations, properties, assets or condition (financial or otherwise) of the Purchased Assets and the Business in the aggregate or the

8

Purchased Assets taken as a whole, excluding: (i) any events, changes or conditions that generally affect the industry in which the Seller operates, (ii) general business or economic conditions, (iii) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack, (iv) the conditions of any financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (v) changes in GAAP, (vi) acts or omissions of the Seller carried out (or omitted to be carried out) in accordance with this Agreement, (vii) any Effect caused by events, changes or developments relating to the transactions contemplated by this Agreement or the announcement thereof or (viii) any condition arising by reason of the commencement of the Bankruptcy Case, unless, in the case of clauses (i), (ii), (iii), (iv) or (v) above only, such Effect would be expected to result in a materially disproportionate adverse effect on, or change in, the Business, taken as a whole, relative to the businesses of other comparable companies in the industry in which the Business operates.

"*Material Contract*" shall mean any Contract requiring (or anticipated to require) payments by the Seller, or resulting in (or anticipated to result in) receipts by the Seller of amounts, in excess of $50,000 during the 2010 calendar year.

"*Notice*" has the meaning set forth in Section 9.2.

"*Objection Notice*" has the meaning set forth in Section 2.2(c)(i).

"*Objection Period*" has the meaning set forth in Section 2.2(c)(i).

"*Order*" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of any Governmental Authority (in each such case whether preliminary or final).

"*Owned Real Property*" means all of the real property owned by the Seller other than the Excluded Owned Real Property, all of such Owned Real Property being set forth on Section 1.1(j) of the Disclosure Schedule (Owned Real Property).

"*Owned Real Property Deed*" means the real property deed substantially in the form attached hereto as Exhibit H;

"*Permitted Liens*" means (i) statutory liens for current property Taxes and assessments (A) not yet due and payable or (B) being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for ad valorem Taxes and statutory liens not yet due and payable arising other than by reason of any default by the Seller, easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (iii) Liens that constitute or secure Assumed Liabilities (including Liens arising under the Assumed Contracts), (iv) Liens, title exceptions or other imperfections of title caused by or resulting from the acts of the Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's

9

liens or other like Liens arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate proceedings, (vi) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to any real property, which would not have a Material Adverse Effect and (vii) Liens specified on Section 1.1(k) of the Disclosure Schedule (Permitted Liens).

"*Person*" or "*Persons*" shall mean any individual, company, corporation, association, partnership, limited liability company, firm, joint venture, trust, Governmental Authority, or other entity.

"*Petition Date*" shall mean the date on which the Seller commenced the Bankruptcy Case.

"*PUD Lease*" shall mean the real property lease substantially in the form attached hereto as Exhibit I, between the Buyer and the Seller.

"*PUD Leaseback*" means the Lease Agreement by and between [   ] and the Seller, a copy of which has been delivered to the Buyer.

"*PUD Leaseback Assignment*" means the assignment and assumption agreement by and between the Seller and the Buyer, pursuant to which the Seller will assign all of its rights under the PUD Leaseback to the Buyer and Buyer will assume all of Seller's obligations thereunder.

"*PUD Property*" means the property described on Exhibit A to the PUD Purchase Agreement.

"*PUD Purchase Agreement*" means the Purchase and Sale Agreement and Joint Escrow Instructions, dated as of May 16, 2011, by and between RL Communities, Inc., a California corporation, and the Seller, a copy of which has been delivered to the Buyer.

"*PUD Transaction*" means the sale of the PUD Property pursuant to the PUD Purchase Agreement and the transactions contemplated thereby.

"*Purchase Price*" shall have the meaning set forth in Section 2.1(b).

"*Purchased Assets*" shall mean any and all assets and rights of the Seller that are used in or held for use in the Business, other than the Excluded Assets, including the following:

(a)     Inventory;

(b)     Accounts Receivable;

(c)     Real Property;

(d)     Equipment;

(e)     all rights under Assumed Contracts;

(f)     all Intellectual Property Rights owned or used by the Seller;

10

(g)      all goodwill relating to the Business;

(h)      all claims, causes of action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability;

(j)      all Books and Records.

"*Qualified Bidder*" has the meaning set forth in <u>Exhibit A</u>.

"*Real Property*" shall mean the Leased Real Property and the Owned Real Property.

"*Real Property Lease(s)*" shall mean any lease or sublease of Leased Real Property.

"*Representatives*" shall mean, with respect to any Person, the officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives of such Person.

"*Reservoir Easement Agreement*" means the PUD Easement Agreement by and between the Seller, as grantor, and the Buyer, in substantially the form of <u>Exhibit J</u>.

"*Retained Liabilities*" has the meaning set forth in Section 2.7.

"*Sale Hearing*" has the meaning set forth in the recitals of this Agreement.

"*Sale Motion*" shall mean the motion in substance in the form of <u>Exhibit K</u> to be filed by the Seller with the Bankruptcy Court seeking, among other things, entry of the Sale Order (with such changes as agreed to by the Buyer in its reasonable discretion).

"*Sale Order*" shall mean an order of the Bankruptcy Court in substance in the form of <u>Exhibit L</u> (with such changes as agreed to by the Buyer in its reasonable discretion).

"*Sale Procedures Order*" has the meaning set forth in the recitals of this Agreement.

"*Seller*" has the meaning set forth in the opening paragraph to this Agreement.

"*Target Accounts Receivable*" shall mean $[       ].

"*Target Inventory Amount*" shall mean $[       ].

"*Tax*" or "*Taxes*" shall mean all federal, state, local, foreign or provincial taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, Capital Stock, net proceeds, ad valorem, turnover, real, personal and other property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, unitary, severance and employees' income withholding, unemployment and Social Security taxes, duties, assessments and charges (including the recapture of any tax items such as investment tax credits), which are imposed by the United States, or any Governmental Authority, including any interest, penalties or additions to tax related thereto imposed by any Governmental Authority (including any interest or penalties with respect to such Taxes).

11

"*Tax Return(s)*" shall mean all reports, estimates, declarations of estimated tax, information statements and returns relating to, or required to be filed in connection with, any Taxes, including information returns or reports with respect to backup withholding and other payments to third parties.

"*Third Party Consents*" shall mean any consent, notice, waiver, approval or authorization of any third party, including a party to any agreement with the Seller, which are required to be obtained or taken to consummate the transactions contemplated herein.

"*Transaction Taxes*" has the meaning set forth in Section 5.10.

"*Transferred Employees*" has the meaning set forth in Section 6.1.

"*UST*" has the meaning set forth in Section 5.2.

"*WARN*" has the meaning set forth in Section 6.3.

1.2     Other Terms.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall be used throughout this Agreement as so defined.

1.3     Knowledge.  For the purposes of this Agreement, unless expressly provided otherwise, any reference to "knowledge of the Seller" or any similar expression shall be deemed to mean and include the knowledge of any of the following officers of the Seller: Jack Pearlstein, Co-Chief Executive Officer; Gail Hollingsworth, Co-Chief Executive Officer and Chief Financial Officer, and Justin Dautoff, Chief Operating Officer, after reasonable due inquiry.

1.4     Interpretation.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

## ARTICLE II
## PURCHASE OF ASSETS

2.1     Purchase.

(a)     *Purchase*.  Subject to the satisfaction of the conditions contained in this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey, and deliver to the Buyer, free and clear of all Claims, Liens and Indebtedness, except Assumed Liabilities and Permitted Liens, as contemplated by Section 363 of the Bankruptcy Code, and the Buyer, or one or more Affiliates thereof as specified by the Buyer, shall purchase and accept, all right, title and interest of the Seller in and to the Purchased Assets.

12

(b)  *Purchase Price*.  The purchase price for the Purchased Assets shall be an aggregate amount equal to (i) $[     ]  (the "Cash Purchase Price"), plus (ii) the Assumed Liabilities (together with the Cash Purchase Price, the "Purchase Price").

(c)  *Deposit*.  On the date hereof, the Buyer shall deliver to [     ],  acting  as escrow agent (the "Escrow Agent"), a deposit in the amount of $[          ][1] in respect of this Agreement (together with all accrued interest thereon, the "Deposit"), pursuant to an escrow agreement in substantially the form of Exhibit M attached hereto (the "Escrow Agreement"). The Escrow Agent shall hold the Deposit subject to the jurisdiction of the Bankruptcy Court. The Deposit shall be

(i)  applied to the final Cash Purchase Price payment and released to the Seller or released to the Buyer as provided in Section 2.2 if the Closing occurs, or

(ii)  distributed pursuant to the provisions of Sections 8.3 or 8.4 if the Closing does not occur.

(d)  *Closing Payment*.  At the Closing, the Buyer shall pay to the Seller for the Purchased Assets hereunder in immediately available funds, an amount equal to the Estimated Cash Purchase Price (the "Closing Payment").

(e)  *Assumption of Liabilities*.  At the Closing, as additional consideration to the Seller for the sale of the Purchased Assets, the Buyer shall assume, and agree to pay, perform, fulfill and discharge, the Assumed Liabilities.  From and after the Closing, the Buyer shall indemnify, defend and hold harmless the Seller with respect to the Assumed Liabilities.

2.2  Cash Purchase Price; Adjustments.

(a)  *Estimated Cash Purchase Price*.

(i)  Five (5) Business Days prior to the Closing Date, the Seller shall deliver to the Buyer a statement setting forth (A) the estimated Accounts Receivable as of the Closing Date (the "Estimated Closing Date Accounts Receivable"), (B) the estimated Inventory Amount (the "Estimated Closing Date Inventory Amount") and (C) a calculation of the estimated Cash Purchase Price as determined pursuant to Section 2.2(a)(ii) (collectively, the "Estimated Closing Date Statement").

(ii)  The estimated Cash Purchase Price shall equal the Cash Purchase Price (A)(1) plus the amount, if any, by which the Estimated Closing Date Accounts Receivable amount exceeds the Target Accounts Receivable or (2) less the amount, if any, by which the Target Accounts Receivable exceeds the Estimated Closing Date Accounts Receivable amount, and (B)(1) plus the amount, if any, by which the Estimated Closing Date Inventory Amount exceeds

---

[1] 5% of the Purchase Price.

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 32 of 57

the Target Inventory Amount, if and only if such amount is greater than $400,000 or (2) less the amount, if any, by which Target Inventory Amount exceeds the Estimated Closing Date Inventory Amount, if and only if such amount is greater than $400,000 (the estimated Cash Purchase Price, as determined pursuant to this Section 2.2(a)(ii), the "Estimated Cash Purchase Price").

(b)     *Final Cash Purchase Price; Holdback; Objection.*

(i)     Within fifteen (15) Business Days following the Closing Date, the Buyer shall deliver to the Seller a statement setting forth (A) the actual Accounts Receivable as of the Closing Date (the "Closing Date Accounts Receivable"), (B) the actual Inventory Amount (the "Closing Date Inventory Amount"), (C) a calculation of the final Cash Purchase Price as determined pursuant to Section 2.2(b)(ii) and (D) the amount by which the Final Cash Purchase Price as determined by the Buyer pursuant to Section 2.2(b)(ii) is less than or greater than the Estimated Cash Purchase Price as reflected in the Estimated Closing Date Statement (collectively, the "Closing Date Statement").

(ii)     The final Cash Purchase Price shall equal the Cash Purchase Price (A)(1) plus the amount, if any, by which the Closing Date Accounts Receivable amount exceeds the Target Accounts Receivable or (2) less the amount, if any, by which the Target Accounts Receivable exceeds the Closing Date Accounts Receivable amount, (B)(1) plus the amount, if any, by which the Closing Date Inventory Amount exceeds the Target Inventory Amount, if and only if such amount is greater than $400,000 or (2) less the amount, if any, by which the Target Inventory Amount exceeds the Closing Date Inventory Amount, if and only if such amount is greater than $400,000 (the final Cash Purchase Price, as determined pursuant to this Section 2.2(b)(ii), the "Final Cash Purchase Price"). Notwithstanding the foregoing, in no event will the Final Cash Purchase Price be less than $[          ].

(c)     *Holdback Period*; *Objection.*  Subject to the other provision of this Section 2.2, the Deposit shall be held in Escrow for a period of time after the Closing Date (i) until the Objection Period expires without an Objection Notice, or (ii) if there is an Objection Notice, (A) until the Seller and the Buyer have agreed on the Final Cash Purchase Price, or (B) if the Buyer and the Seller cannot agree on the Final Cash Purchase Price, until the Bankruptcy Court makes its determination of the Final Cash Purchase Price (the "Holdback Period"), as security for the amount by which the Final Cash Purchase Price as determined in accordance with this Section 2.2 may be less than the Estimated Cash Purchase Price as reflected in the Estimated Closing Date Statement.

(i)     The Seller shall have five (5) Business Days following the receipt of the Closing Date Statement (the "Objection Period") within which to give notice in writing to the Buyer objecting on bona fide grounds to the Closing Date Statement (the "Objection Notice").  In the event the Buyer receives an Objection Notice within the Objection Period, the Buyer and the Seller shall in good faith attempt to resolve the objection to the Closing Date Statement within five (5)

14

Business Days following the Objection Period, and, if the Buyer and the Seller have not resolved the Objection Notice, not later than fifteen (15) Business Days following the Objection Period, the Buyer and the Seller shall submit the determination of the Final Cash Purchase Price to the Bankruptcy Court for determination.

(ii)     When the Buyer and the Seller have agreed on the Final Cash Purchase Price, or if it is necessary for the Bankruptcy Court to make a final determination of the Final Cash Purchase Price, within three (3) Business Days of such agreement or entry of the Bankruptcy Court order establishing the final determination of the Final Cash Purchase Price, as the case may be:

(A)     if the Final Cash Purchase Price is greater than the Closing Payment, the Buyer and the Seller shall cause the Escrow Agent to release to the Seller that portion of the Deposit that when added to the Closing Payment equals the Final Cash Purchase Price, and if the amount of the Deposit is insufficient to make up such deficiency, the Buyer shall pay the Seller the amount of such deficiency; or if the amount of the Deposit is greater than such deficiency, the Buyer and the Seller shall cause the Escrow Agent to release to the Buyer the amount by which the Deposit exceeds such deficiency; and

(B)     if the Final Cash Purchase Price is less than the Closing Payment, the Buyer and the Seller shall cause the Escrow Agent to release to the Buyer the Deposit, and if the amount of the Deposit is insufficient to make up such deficiency, the Seller shall pay the Buyer the amount of such deficiency.

(iii)     During the Objection Period, the Buyer shall give the Seller reasonable access to the Books and Records in the possession or control of the Buyer and any personnel which relate to the preparation of the Closing Date Statement for purposes of resolving any dispute concerning the Closing Date Statement and the calculation of the Final Cash Purchase Price.

(d)     *No Other Adjustment*.  The Deposit shall not be subject to any claim, set-off or adjustment by the Buyer or any Affiliate of the Buyer except as provided in this Section 2.2.

2.3     <u>Allocation of Purchase Price</u>.  The Buyer and the Seller agree to allocate the Purchase Price (together with any Assumed Liabilities) for the Purchased Assets as set forth on Section 2.3 of the Disclosure Schedule (Asset Allocation) (the "<u>Asset Allocation</u>").  The Asset Allocation shall be completed in the manner required by Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder.  The Buyer and the Seller further agree to comply with all filing, notice and reporting requirements described in Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder, including the timely preparation and filing of Form 8594 based on the Asset Allocation.  The Buyer and the Seller

31567436v4

Case: 11-31985     Doc# 6-1     Filed: 05/23/11     Entered: 05/23/11 14:48:32     Page 34 of 57

hereby agree that they will report the federal, state, foreign and other Tax consequences of the transactions contemplated by this Agreement in a manner consistent with the Asset Allocation.

2.4 <u>Closing</u>. The Closing shall occur within five (5) Business Days following the date of satisfaction or waiver of the conditions to Closing set forth in <u>Article VII</u> (or on such other date or at such other time as agreed to in writing by the parties). The Closing shall take place at the offices of [          in [          ], California or at such other location as agreed to in writing by the parties. The date upon which the Closing actually occurs shall be referred to herein as the "<u>Closing Date</u>."

2.5 <u>Closing Deliveries</u>.

(a) At the Closing, unless waived by the Seller, the Buyer shall deliver, cause to be delivered, or execute and deliver, as applicable, to the Seller:

(i) an executed counterpart of the Assignment and Assumption Agreement for Assumed Contracts;

(ii) an executed counterpart of the Assignment and Assumption Agreement for Real Property Leases;

(iii) an executed counterpart of the Assignment and Assumption Agreement for Assumed Liabilities;

(iv) an executed counterpart of the Assignment for Intellectual Property;

(v) executed counterparts of the Family Property Leases;

(vi) an executed counterpart of the PUD Lease, unless the PUD Transaction is consummated prior to the Closing, in which case the Buyer shall deliver an executed counterpart of the PUD Leaseback Assignment;

(vii) an executed counterpart of the Reservoir Easement Agreement;

(viii) the Owned Real Property Deed;

(ix) the Closing Payment;

(x) a certificate, dated as of the Closing Date, executed on behalf of the Buyer, that the conditions to Closing specified in Sections 7.1 and 7.3 have been satisfied or waived; and

(xi) all other documents, certificates, instruments or writings reasonably requested by the Seller in connection herewith.

(b) At the Closing, unless waived by the Buyer, the Seller shall execute and deliver or cause to be executed and delivered, as applicable, to the Buyer:

16

(i)     the Bill of Sale for the Purchased Assets;

(ii)    an executed counterpart of the Assignment and Assumption Agreement for the Assumed Contracts;

(iii)   an executed counterpart of the Assignment and Assumption Agreement for Real Property Leases;

(iv)    an executed counterpart of the Assignment and Assumption Agreement for Assumed Liabilities;

(v)     an executed counterpart of the Assignment for Intellectual Property;

(vi)    executed counterparts of the Family Property Leases;

(vii)   an executed counterpart of the PUD Lease, unless the PUD Transaction is consummated prior to the Closing, in which case the Seller shall deliver an executed counterpart of the PUD Leaseback Assignment;

(viii)  an executed counterpart of the Reservoir Easement Agreement;

(ix)    any other documents necessary to convey clear title to the Owned Property, free of all Liens other than Permitted Liens;

(x)     a certificate, dated as of the Closing Date, executed on behalf of the Seller, certifying in such detail as the Buyer may reasonably request that the conditions to Closing specified in Sections 7.1 and 7.2 have been satisfied or waived;

(xi)    a certified copy of the Sale Order, which order has not been reversed or modified on appeal or, if any such appeal is pending, such order shall not have been stayed; and

(xii)   all other documents, certificates, instruments or writings reasonably requested by the Buyer in connection herewith, including all documents necessary to transfer all vehicles and other Purchased Assets to the Buyer (all the documents referred to in Sections 2.5(a) and 2.5(b) being referred to as the "Ancillary Documents").

2.6     Assignment and Assumption of Contracts.

(a)     Subject to the Order of the Bankruptcy Court approving the assumption and assignment of executory Contracts pursuant to Section 365 of the Bankruptcy Code, the Seller shall assign, and the Buyer shall assume, the Assumed Contracts and the Real Property Leases as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order. In the Sale Motion, or in such additional or subsequent motions as may be appropriate,

17

the Seller shall seek authority to assign the Assumed Contracts and the Real Property Leases to the Buyer (or the Buyer's designee) in accordance with Section 365 of the Bankruptcy Code.

(b)     In connection with such assumption and assignment, the Buyer shall cure all monetary defaults under such Assumed Contracts as set forth on <u>Section 2.6(b)</u> of the Disclosure Schedule (Cure Costs) to the extent required by Section 365(b) of the Bankruptcy Code (any such costs incurred to cure such defaults, "<u>Cure Costs</u>").

2.7     <u>Retained Liabilities</u>.  The Seller shall retain the Retained Liabilities and the Buyer will not assume or otherwise be responsible at any time for any liability, obligation, Indebtedness, Contract or commitment of the Seller with respect to the Retained Liabilities. "<u>Retained Liabilities</u>" shall mean every liability of the Seller, whether known or unknown, whether absolute, contingent, liquidated or unliquidated, unaccrued, asserted, unasserted, or otherwise, and whether related to the Business, the Purchased Assets, the Excluded Assets or otherwise, other than the Assumed Liabilities, including:

(a)     any liabilities, obligations, debts or commitments of the Seller incident to, arising out of or incurred with respect to this Agreement and the transactions contemplated hereby, (i) which otherwise arise or are asserted or incurred by reason of events, acts or transactions occurring, or the operation of the Business, prior to or on the Closing Date, (ii) relating to or arising under any Employee Benefit Plans, or (iii) which is in existence on or prior to the Closing Date and which relates to or arises under any environmental Applicable Law;

(b)     all Taxes of the Seller, including those related to the Business or the Purchased Assets prior to the Closing Date and any and all Taxes arising out of the transactions contemplated hereby other than Transaction Taxes;

(c)     except for the liabilities referred to in clauses (iii) and (iv) of the definition of Assumed Liabilities, all of the Seller's liabilities or obligations under the Employee Benefit Plans or relating to any Employees or former Employees, including without limitation, any wages, severance, bonuses, Claims, sick leave, unemployment benefits, pension benefits, employee stock options or profit-sharing plans, health care plans on benefits or any other employee plans or benefits of any kind for the Employees or former Employees or both;

(d)     any liabilities or obligations owed to any Employee or former Employee under a workers compensation claim filed prior to the Closing;

(e)     all of the Seller's liabilities or obligations under any employment, severance, retention or termination Contract with any Employee;

(f)     all of the Seller's liabilities or obligations not expressly to be assumed by the Buyer at the Closing hereunder; and

(g)     the accounts payable that arise before the Petition Date, unless they are specifically included in Assumed Liabilities.

2.8     <u>PUD Property and Family Property Leases</u>.

18

(a)     At the Closing, the Seller and the Buyer will enter into (i) the Reservoir Easement Agreement pursuant to which the Seller will grant to the Buyer certain rights with respect to the Excluded Owned Real Property and (ii) the PUD Lease pursuant to which Buyer will lease the PUD Property from the Seller; provided, however, that if the PUD Transaction is consummated prior to the Closing, the Seller and the Buyer will enter into the PUD Leaseback Assignment in place of the PUD Lease.

(b)     At the Closing, the Buyer will enter into the Family Property Leases with respect to the properties specified in each such lease, including two leases with Redwing Properties, LLC, and one lease with Jack and Linda Pearlstein, Trustees of the Jack and Linda Pearlstein Trust u/a dated 1/11/99 and Gail and Thomas Hollingsworth, Trustees of the Hollingsworth Family Trust u/a dated 6/4/93.

2.9     The Seller's Chapter 11 Bankruptcy Case.  Notwithstanding any conflicting or inconsistent provisions of this Agreement, the Seller's obligations under this Agreement and the transactions contemplated hereby are subject to and contingent upon the approval and authorization of the Bankruptcy Court.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Buyer as of the Execution Date and, unless otherwise specifically provided in any representation or warranty, the Closing Date as follows:

3.1     Organization, Standing and Power.  The Seller is validly existing and in good standing under the laws of the jurisdiction of its organization and has full corporate power and authority to conduct its business in the places and in the manner now being conducted.  The Seller has full corporate power and authority to own and operate the Purchased Assets owned or operated by it.

3.2     Authority.  Subject to the approval of the Bankruptcy Court, the Seller has the requisite power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents.  The execution and delivery by the Seller of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by them of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the Seller, and no other action on the part of the Seller is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.  Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered by the Seller and constitutes a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms. Subject to the approval of the Bankruptcy Court, each of the Ancillary Documents, when executed and delivered by the Seller, shall constitute a valid and binding agreement of the Seller, enforceable against the Seller, in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting

19

creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Subject to requisite Bankruptcy Court approval, except as set forth in Section 3.2 of the Disclosure Schedule (Third Party Consents), the Seller is not required to give any notice to, make any filing with or obtain any consent, approval or authorization from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the Ancillary Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

3.3    No Conflict. Subject to the approval of the Bankruptcy Court, when the consents and other actions described in Section 3.2 of the Disclosure Schedule have been obtained and taken, neither the execution and delivery by the Seller of this Agreement and any Ancillary Document to which it will be a party, nor the consummation of the transactions contemplated hereby or thereby, will result in the creation of any Lien, Claim or Order upon the Purchased Assets or Assumed Liabilities (except as specifically contemplated by this Agreement), does or will conflict with, result in any violation of, or constitute a default under any provision of (a) the Seller's Charter Documents or (b) any Applicable Law. The Seller has complied in all material respects with all Applicable Laws and Orders in connection with the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

3.4    Title. Except as set forth on Section 3.4 of the Disclosure Schedule (Title), the Seller owns good and, subject to the Bankruptcy Case, transferable title to all of the Purchased Assets, free and clear of all Claims, Orders and Liens, other than Permitted Liens, Liens to be released at or prior to the Closing and Liens for Taxes that are not yet due and payable.

3.5    Assumed Contracts. To the Seller's knowledge, true, correct and complete copies of all Assumed Contracts to which the Seller is a party and all amendments thereto have been made available to the Buyer by the Seller. Except as permitted herein, to the knowledge of the Seller, none of the Assumed Contracts has been materially modified since such copies were made available to the Buyer. To the Seller's knowledge, except for defaults caused by the commencement of the Bankruptcy Case and payment defaults by the Seller set forth on Section 3.5 of the Disclosure Schedule (Defaults Under Assumed Contracts), each Assumed Contract is valid, binding upon the Seller and in full force and effect in all material respects, and no material default or event of default by the Seller or, to the Seller's knowledge, any other party thereto, exists under any of the Assumed Contracts. To the Seller's knowledge, no party to any of the Assumed Contracts has given notice of default or termination. The Seller has not made an assignment or transfer of any of its rights under any of the Assumed Contracts, except collateral assignments to secured lenders that are to be released at or prior to the Closing.

3.6    Employee and Related Matters. The Seller is not a party to any collective bargaining agreement covering the Employees and, except for the matters set forth on Section 3.6 of the Disclosure Schedule (Employee Matters) since July 1, 2010, there have been no strikes, material work stoppages, nor to the knowledge of the Seller, any written demands for collective bargaining by any union, labor organization or other Person with respect to the Employees. There are no unfair labor practice proceedings, discrimination or civil rights complaints pending or, to the Seller's knowledge, threatened in writing between the Seller and any of the current or former Employees or any labor or other collective bargaining unit

20

representing any current or former Employee that would reasonably be expected to result in any liability.

3.7 <u>Brokers</u>. FocalPoint Securities, LLC, the Seller's exclusive financial advisor and investment banker, is the only intermediary / broker entitled to a fee at the Closing in connection with the transactions contemplated herein and will be paid by the Seller from the proceeds of the sale in accordance with the terms of that certain engagement letter by and between the Seller and FocalPoint Securities, LLC, dated September 7, 2010; provided, however, that any payments to FocalPoint Securities, LLC for services rendered following the Petition Date shall be subject to the Bankruptcy Court's approval.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer represents and warrants to the Seller as of the Execution Date and the Closing Date:

4.1 <u>Organization, Standing and Power</u>. The Buyer is organized, validly existing, and in good standing under the laws of its jurisdiction of formation and has the requisite power and authority to carry on its Business as now being conducted and to effect the transactions contemplated hereunder.

4.2 <u>Authority</u>. The Buyer has the requisite power and authority to execute and to deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents. The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been (or will be at the time of execution thereof) duly authorized by all necessary limited liability company action on the part of the Buyer, and no other action on the part of the Buyer is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, subject (a) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies and (b) to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Each of the Ancillary Documents, when executed and delivered by the Buyer, shall constitute a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, subject (i) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and (ii) as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.3 <u>Consents and Approvals; No Violation</u>. The execution and delivery of this Agreement by the Buyer do not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give to others a right of termination,

31567436v4

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 40 of 57

cancellation or acceleration of any obligation or the loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of the Buyer under, any provision of (a) the Buyer's Charter Documents, (b) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to the Buyer, or (c) any Applicable Laws, other than, in the case of clauses (b) or (c), any such violations, defaults, rights or Liens that, individually or in the aggregate, would not prevent the consummation of any of the transactions contemplated hereby in accordance with the terms of this Agreement. No filing or registration with, or authorization, consent or approval of, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement by the Buyer or is necessary for the consummation of the transactions contemplated by this Agreement.

      4.4   <u>Actions and Proceedings</u>. There are no actions, suits, labor disputes or other litigation, legal or administrative proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened against or affecting the Buyer or any of its present or former officers, directors, employees, consultants, agents or shareholders, as such, or any of its properties, assets or business relating to the transactions contemplated by this Agreement or which could have the effect of delaying or prohibiting the consummation of the transactions contemplated by this Agreement.

      4.5   <u>Brokers</u>. No broker, investment banker or other person engaged by the Buyer is entitled to any broker's, finder's or other similar fee or commission payable by the Seller in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

      4.6   <u>Financing</u>. The Buyer has, and will have on the Closing Date, sufficient cash, committed financing or other sources of immediately available funds to enable it to consummate the transactions contemplated hereunder.

      4.7   **AS IS SALE**. The Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) the Buyer is purchasing the Purchased Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on the Buyer's own investigation of the Purchased Assets and (b) none of the Seller nor any real estate broker, agent, officer, employee, servant, attorney, or representative of the Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets or the Assumed Liabilities or any part of the Purchased Assets or the Assumed Liabilities relating to the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets. The Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Seller and the Buyer after good-faith arms-length negotiation in light of the Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS." The Buyer confirms that the Seller has made available to the Buyer the opportunity to ask questions of the officers and management of the Seller and to acquire additional information about the Business, the Purchased Assets and the Assumed Liabilities. The Buyer agrees, warrants, and represents that, except as set forth in this Agreement, the Buyer has relied, and shall rely, solely upon the Buyer's own investigation of all such matters, and that the Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER DOES NOT MAKE ANY EXPRESS

31567436v4

Case: 11-31985   Doc# 6-1   Filed: 05/23/11   Entered: 05/23/11 14:48:32   Page 41 of 57

WARRANTY, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

4.8     No Other Representations or Warranties of the Seller.

(a)     Except for the representations and warranties contained in Article III, the Buyer acknowledges that neither the Seller nor any other Person on behalf of the Seller makes any other express or implied representation or warranty with respect to the Seller or the Business (including representations and warranties as to the condition of the Purchased Assets). Neither the Seller nor any other Person will have or be subject to any liability or indemnification obligation to the Buyer resulting from the distribution to the Buyer, or use by the Buyer of, any such information, including any information, documents, budgets, projections, forecasts or other material made available to the Buyer in certain "data rooms," confidential information memoranda or management presentations in expectation of the transactions contemplated by this Agreement.

(b)     In connection with investigation by the Buyer, the Buyer has received or may receive from the Seller certain projections, forward-looking statements and other forecasts and certain business plan information. The Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, budgets, projections and other forecasts and plans, the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that, except for the representations and warranties contained in Article III and subject to the terms and conditions hereof, the Buyer shall have no claim against anyone with respect thereto. Accordingly, except for the representations and warranties contained in Article III, the Buyer acknowledges that the Seller makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

ARTICLE V
COVENANTS

5.1     Access. From the Execution Date until the earlier of the Closing Date or the date this Agreement is terminated pursuant to Section 8.1, upon reasonable notice from the Buyer, and subject to the provisions of any applicable confidentiality agreement or any applicable lease or sublease, the Seller shall afford to the Representatives of the Buyer reasonable access during normal business hours to the Business and the Purchased Assets, to the Books and Records of the Seller relating to the Business and the Purchased Assets and to the management of the Seller for reasonably dedicated portions of time, so as to afford the Buyer reasonable opportunity to make such review, examination and investigation of the Business as the Buyer determines is reasonably necessary solely for the purpose of the consummation of the transactions contemplated hereby (including, upon obtaining the Seller's prior written consent and, to the

31567436v4

Case: 11-31985     Doc# 6-1     Filed: 05/23/11     Entered: 05/23/11 14:48:32     Page 42 of 57

extent required, the applicable landlord's prior written consent, to perform environmental site assessments and subject to providing adequate insurance coverage for any damage that may be caused by such assessments), and shall permit the Buyer and its authorized Representatives to make copies of such materials at the Buyer's sole expense. From and after the date hereof until the Closing, and subject to the confidentiality obligations to which the Seller may be bound, the Seller shall furnish to the Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Business and the Assumed Liabilities as shall be reasonably requested by the Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable the Buyer or its authorized Representatives to (i) verify the accuracy of the Seller's representations and warranties contained in this Agreement, (ii) verify that the Seller has complied with the covenants contained in this Agreement and (iii) determine whether the conditions set forth in <u>Article VII</u> have been satisfied. Notwithstanding anything to the contrary herein, no such investigation or examination shall be permitted, and no such documents or information shall be required to be provided or made available, to the extent that it would require the Seller to disclose documents or information subject to attorney-client privilege. For the avoidance of doubt, nothing in this Section 5.1 is intended to create a due diligence contingency in favor of the Buyer.

5.2     <u>Operation of Business</u>.  Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee (the "<u>UST</u>"), and subject to any Order or direction of the Bankruptcy Court, during the period from the Execution Date to the Closing, the Seller shall operate the Purchased Assets and conduct the Business in the ordinary course of business consistent with prudent business practices and in material compliance with Applicable Laws, and to the extent consistent therewith so as to preserve the current value and integrity of the Business and the Purchased Assets, (i) pay all Taxes for all periods following the Petition Date as they become due and payable, (ii) purchase, maintain and grow Inventory, supplies and spare parts at customary operation levels consistent with past operating practices, (iii) maintain in full force and effect the existence of all Intellectual Property consistent with past operating practices, (iv) maintain insurance on the Purchased Assets (in amounts and types consistent with past practice), (v) allow customer rebates consistent with past practice and (vi) use its commercially reasonable efforts to preserve the goodwill and organization of the Business and its relationships with customers, suppliers and others having business dealings with it consistent with past operating practices.  Without limiting the generality of the foregoing, prior to the Closing and subject to the requirements of the Bankruptcy Code, the UST, and any Orders entered by the Bankruptcy Court, the Seller shall not, and shall cause its officers, directors, employees, representatives and agents not to:

(a)     enter into any Material Contract that may be included in the Purchased Assets or make a material adverse change or modification to any existing Material Contract included in the Purchased Assets, except for agreements relating to sales of Inventory and purchases of Inventory from suppliers in the ordinary course of business and consistent with past practices;

(b)     sell, lease, dispose of or otherwise distribute any material portion of the Purchased Assets, except for sales, leases, dispositions and distributions of Inventory in the ordinary course of business and consistent with past practices;

31567436v4

Case: 11-31985     Doc# 6-1     Filed: 05/23/11     Entered: 05/23/11 14:48:32     Page 43 of 57

(c)     mortgage or pledge any of the Purchased Assets or subject any Purchased Assets to any Lien, other than Permitted Liens;

(d)     unless agreed to by the Buyer in writing or approved by the Bankruptcy Court, increase in any material manner the salary, bonus, severance or other compensation or benefits of any member of management or other Employee, except for any annual and usual increases in salary to any Employee consistent with past operating practices

(e)     unless agreed to by the Buyer in writing, enter into any employment Contract with any Employee, adopt any benefit plan for any Employees or amend or modify any existing Employee Benefit Plan for any Employees;

(f)     take or omit to take any action that would require disclosure under <u>Article III</u> or that would otherwise result in a breach of any of the representations, warranties or covenants made by the Seller in this Agreement or in any of the agreements contemplated hereby;

(g)     take any action or omit to take any action which act or omission would reasonably be anticipated to have a Material Adverse Effect on the Business or the Purchased Assets;

(h)     unless agreed to by the Buyer, cancel, release, waive or compromise any debt, Claim or right in its favor involving the Purchased Assets or the Assumed Contracts having a value in excess of $25,000, or $50,000 in the aggregate, other than in connection with returns of Inventory for credit or replacement in the ordinary course of business;

(i)     other than the extension of credit to customers or advances to Employees in the ordinary course of business, make any loan, guaranty or other extension of credit to any Person or enter into any commitment to make any loan, advance, guaranty or other extension or credit;

(j)     pay any dividends or make any distributions to its shareholders or redeem, repurchase or otherwise acquire any Capital Stock;

(k)     take any other action that would require Bankruptcy Court approval unless such approval is obtained

(l)     accelerate, delay or otherwise modify any of the Seller's shipping, billing or collection practices; or

(m)     agree in writing or otherwise to take any of the foregoing actions.

Additionally, from the Execution Date to the Closing Date, the Seller shall promptly consult with the Buyer about any material matters concerning the Purchased Assets or the Business.

5.3     <u>Notification</u>.  Prior to the Closing, the Seller shall notify the Buyer, and the Buyer shall notify the Seller, of any litigation, arbitration, appeal or administrative proceeding pending,

31567436v4

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 44 of 57

or, to its knowledge, threatened against the Seller or the Buyer, as the case may be, which challenges the transactions contemplated hereby.

5.4    Third Party Consents.  Subject to Section 2.6, from and after the date hereof until the Closing, the Seller, on the one hand, and the Buyer, on the other hand, will reasonably cooperate with the other to secure, before the Closing Date, all Third Party Consents to the extent such consents are not provided for, or the need for which are obviated or satisfied, by the Sale Order, provided that, subject to Section 2.6, neither the Seller nor the Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers (in the case of the Seller, unless the Buyer requests that the Seller make such a payment or provide such other consideration and the Buyer agrees to pay the Seller or provide such other consideration in advance for such payment and any associated costs); provided, however, that neither the Buyer nor the Seller shall be required to waive any of the conditions to Closing set forth in Article VII.[2]

5.5    All Reasonable Efforts.  Without limiting the ability of either party to use discretion in exercising its rights pursuant to this Agreement, prior to the Closing, each of the parties shall use reasonable efforts to (a) satisfy promptly all conditions required hereby to be satisfied by such party in order to expedite the consummation of the transactions contemplated hereby and (b) take, or cause to be taken, all action, and to do, or cause to be done, as promptly as practicable, all things necessary, proper or advisable under Applicable Laws to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement.

5.6    Further Assurances.  From time to time from and after the Execution Date, including following the Closing, the Buyer and the Seller shall each execute, acknowledge and deliver such additional documents or instruments and take such other action as the Buyer or the Seller, as the case may be, may reasonably request to more effectively accomplish the transactions contemplated by this Agreement.

5.7    Publicity.  The parties hereto shall consult with each other and shall mutually agree (the agreement of each party not to be unreasonably withheld or delayed) upon the content and timing of any press release or other public statements with respect to the transactions contemplated by this Agreement and shall not issue any such press release or make any such public statement prior to such consultation and agreement, except as may be required by Applicable Laws or in connection with the Bankruptcy Case; provided, however, that to the extent reasonably possible, each party shall give prior notice to the other party of the content and timing of any such press release or other public statement required by Applicable Laws.

5.8    Bankruptcy Matters .

       (a)    The Seller and the Buyer acknowledge that to obtain the approval of the Bankruptcy Court, the Seller must demonstrate that it has taken reasonable steps to obtain the highest and best price possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties, including other potential bidders for the Purchased Assets, as ordered by the Bankruptcy Court.  The Buyer

---

[2] Seller to confirm whether there are any required third party consents.

26

understands that the Seller will likely contract with or obtain a commitment from the Qualified Bidder with the next best bid to remain in a backup position to consummate an Alternative Transaction in the event the Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof. The Buyer acknowledges that the Seller is not in breach of this Agreement by making such arrangements.

(b)     The Buyer acknowledges that it is the Buyer's obligation to provide adequate assurance of future performance of the Assumed Contracts pursuant to Section 365(b) of the Bankruptcy Code.

(c)     The Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order and in obtaining the assignment and assumption of the Assumed Contracts, including but not limited to furnishing affidavits and other information to demonstrate the Buyer's status as a "good faith" purchaser and providing proof of adequate assurance of future performance under the Assumed Contracts.

5.9     Confidentiality. Except as required by Applicable Law, including the Bankruptcy Code and any Order by the Bankruptcy Court, the schedules annexed hereto shall not be disclosed to any Person that has not executed a confidentiality agreement on terms substantially the same as the Buyer's Confidentiality Agreement without the prior consent of each of the parties hereto.

5.10    Transaction Taxes. Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Transaction Taxes") shall be borne by the Buyer. The Seller and the Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transaction Taxes. The Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transaction Taxes; provided, however, that in the event any such Tax Return requires execution by the Seller, the Buyer shall prepare and deliver to the Seller a copy of such Tax Return at least ten (10) days before the due date thereof, and the Seller shall promptly execute such Tax Return and deliver it to the Buyer, which shall cause it to be filed.

5.11    Notice of Nonsatisfaction of Closing Condition. The Buyer and the Seller shall, within three (3) Business Days of discovery thereof, notify the other party of any fact or circumstance that would cause (a) its representations and warranties to be untrue, (b) its covenants to be unlikely to be fulfilled prior to or on the Closing Date or (c) the conditions in Section 7.1 to be unsatisfied; provided, however, that inclusion or omission of any such fact, circumstance or condition in or from any such written notification shall not be deemed a waiver of any rights under this Agreement, and shall not alter or otherwise affect the representations, warranties, covenants, conditions or agreements contained in this Agreement

5.12    Sale of PUD Property. The Buyer acknowledges that Seller has entered into the PUD Purchase Agreement and intends to seek Bankruptcy Court approval of the PUD Purchase Agreement and the transactions contemplated thereby. The Buyer agrees that it will not take any action to interfere with the consummation of the transactions contemplated by the PUD Purchase

31567436v4

Agreement or object to Bankruptcy Court approval thereof. The Buyer agrees that if the PUD Purchase Agreement is approved by the Bankruptcy Court and the PUD Transaction consummated, the obligations of the Seller under Sections [  ] and [  ] of the PUD Purchase Agreement and under the PUD Leaseback will constitute Assumed Contracts under this Agreement.

5.13 <u>Cooperation</u>. The Buyer shall reasonably cooperate with the Seller in furnishing to the Bankruptcy Court evidence of adequate assurance by the Buyer of its future performance under the Assumed Contracts, and to otherwise perform and discharge the Assumed Liabilities, and evidence that the Buyer has the financial wherewithal to timely close the transactions contemplated by this Agreement. In addition, the Buyer shall reasonably cooperate with the Seller in the Seller's efforts to obtain the approval of the Sale Order.

5.14 <u>Access to Records</u>. From and after the Closing Date, the Seller on the one hand and the Buyer on the other hand shall afford each other and their respective counsel, accountants and other representatives such access to records in respect of the Business which, after the Closing, are in the custody or control of the other party and which such party reasonably requires in order to comply with its obligations under Applicable Law, including administration of the Bankruptcy estate, preparation of Tax returns and audits by Tax authorities, which the Buyer reasonably requires to comply with its material obligations under the Assumed Liabilities or the Assumed Contracts or which the Seller reasonably requires pursuant to Section 2.2(c)(iii). In connection therewith, the Buyer, at its sole cost and expense, will retain the Books and Records, and all other records that the Buyer may have, if any, relating and material to the operation of the Business and the Purchased Assets, for a period of three (3) years after the Closing Date and, during such period, shall grant, at no charge, to the Seller and its successors and assigns (including any subsequently appointed trustee) reasonable access to the Books and Records, and such other records, for reasonable purposes.

5.15 <u>Notice of Sale</u>. Except to the extent limited by any Order of the Bankruptcy Court, Notice of this Agreement and notice of the Sale Motion and Sale Order and the hearings therefor shall be duly and properly given by the Seller by actual notice to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on the Purchased Assets, the lessors on the material leases, potential bidders for the Purchased Assets, the non-Seller parties to the Assumed Contracts being assumed pursuant to this Agreement, the employees of the Business, and applicable taxing and Governmental Authorities.

ARTICLE VI
EMPLOYEE MATTERS

6.1 <u>Personnel; Transferred Employees</u>. Prior to the Closing the Buyer shall offer employment on an "at will" basis commencing after the Closing, to all current Employees and commissioned sales agents or representatives. The Seller shall reasonably assist the Buyer in effecting an orderly change of employment of such Employees who accept offers of employment by the Buyer pursuant to this Section 6.1 (collectively, the "<u>Transferred Employees</u>"). The compensation and benefits provided by the Buyer to the Transferred Employees shall be in the

31567436v4

aggregate substantially equivalent to the compensation and benefits provided to the Transferred Employees by the Seller prior to the Closing.

6.2    COBRA and Health Claim Data.  The Seller shall provide all notices and fulfill all of its obligations, if any, under Section 4980B(f) of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA") with respect to the Transferred Employees and all current and former Employees.  Notwithstanding anything to the contrary, on and after the later of (a) any date on which the Seller ceases to provide such notices and fulfill such obligations with respect to any Employee or (b) the Closing Date, with respect to qualifying events (as defined by COBRA) occurring on or before the Closing Date, the Buyer shall have sole responsibility for satisfying the continuation coverage requirements for group health plans under COBRA for all "M&A qualified beneficiaries" (as defined in Q&A-4 of Treasury Regulation Section 54.4980B-9) related to the Business.

6.3    WARN.  The Seller shall have sole responsibility for any obligations or liabilities of the Seller under the Worker Adjustment and Retraining Notification Act ("WARN"), or any similar Applicable Law under any other applicable jurisdiction, with respect to the Employees, and shall indemnify, defend and hold harmless the Buyer with respect to any such obligations and liabilities.

6.4    Welfare Benefits.  In addition to any requirements under COBRA, the Buyer will be responsible for all claims for health, accident, sickness, and disability benefits that are incurred after the Closing Date by Transferred Employees or their eligible dependents.  Except as may be required under COBRA, the Buyer shall have no obligation or responsibility for any claims for health, accident, sickness, and disability benefits (a) that are incurred prior to or on the Closing Date by any Transferred Employees or their eligible dependents, or (b) for any reason or purpose, in the case of Employees or their eligible dependents who are not Transferred Employees or related to Transferred Employees.  As of the Closing, any Employee who is receiving benefits under the Seller's short-term or long-term disability program shall be deemed to not be a Transferred Employee.  If such Employee will be returning to work on a full time basis, such Employee may become employed by the Buyer only at the Buyer's option.

6.5    Vacations.  As of the Closing Date, vacation for the Transferred Employees shall be governed by the Buyer's vacation policies.  However, the Buyer shall honor any of the Transferred Employees' original dates of hire with the Seller and provide credit, under the Buyer's applicable vacation policies, for the Transferred Employees' years of service with the Seller.

6.6    Employee Benefit Plans — Seller's Liability.  With respect to any Transferred Employees, any other former or current Employees of the Seller or their respective beneficiaries, and except as provided in this Article VI or the definition of Assumed Liabilities, the Buyer shall not be responsible for or assume (a) any liabilities incurred by the Seller a result, directly or indirectly, of any breach by the Seller, any fiduciary or administrator, or other Person of their obligations or duties under or with respect to any Employee Benefit Plans and (b) any severance obligations of the Seller with respect to the termination, discharge or constructive termination or discharge by the Seller of the Transferred Employees' or such other Employees' employment with the Seller.  The Buyer shall not be responsible for and shall not assume any claim, benefit,

29

liability or obligation under or with respect to any of the Employee Benefit Plans and, except as provided in Sections 6.5 and 6.6, the Seller and its insurers shall be exclusively liable for any and all such claims, benefits, liabilities and obligations described in this Section 6.6. Before and after the Closing Date, the Seller shall be exclusively responsible for the payment, sponsorship, funding, operation, investment, administration, or benefits with respect to all Employee Benefit Plans.

6.7    <u>Wage Reporting</u>.  The Buyer and the Seller shall, before the Closing Date, agree upon the method of the reporting of wages and the method used shall be one of the procedures permitted by the Internal Revenue Service.

6.8    <u>Unemployment Compensation</u>.  Upon the Buyer's written request, to the extent permitted by Applicable Law, the Seller and the Buyer shall jointly file an agreement or other document or instrument, in form and substance satisfactory to the parties, with the appropriate state authorities for the purpose of transferring to the Buyer the Seller's unemployment compensation experience rating for the Transferred Employees as of the Closing Date.

6.9    <u>Employee Rights</u>.  All provisions contained in this Agreement with respect to Employee Benefit Plans or compensation of Transferred Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein shall (a) confer upon any former, current or future employee of the Seller or the Buyer or any legal representative, dependent or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (b) cause the employment status of any former, present or future employee of the Buyer to be other than terminable at will or (c) confer any third party beneficiary rights upon any Transferred Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

6.10    <u>Prior Service Recognized</u>.    With respect to a Transferred Employee's participation in any medical plan, vacation policy, or plan intended to be qualified under Section 401(a) of the Code on or after the Closing Date, the Buyer agrees that for purposes of eligibility and vesting (but not for benefit accruals), credit will be given to the Transferred Employees for service previously credited under similar employee benefit plans, policies or arrangements of the Seller.

ARTICLE VII
CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

7.1    <u>Conditions to Each Party's Obligations</u>.  The respective obligations of each party to effect the transactions contemplated by this Agreement, unless waived by the other parties hereto, shall be subject to the fulfillment, on or prior to the Closing Date, of the following conditions:

(a)    No Order, writ, injunction or decree shall have been entered and be in effect that restrains, enjoins or invalidates, or otherwise materially and adversely affects the transactions contemplated by this Agreement, and no action, suit or other proceeding shall be pending that has a reasonable likelihood of resulting in any such Order, writ, injunction or decree.

(b)     The Bankruptcy Court shall have entered the Sale Order in a form acceptable to the Buyer approving the transactions contemplated hereby and the terms and conditions of this Agreement, finding that notice of the hearing concerning approval of the transactions contemplated hereunder was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, and the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, providing for the sale of the Purchased Assets free and clear of all Claims (other than Assumed Liabilities) and Liens (other than Permitted Liens). A Sale Order in substance in the form of Exhibit L shall be deemed acceptable to the Buyer.

7.2     Conditions to Obligations of the Buyer. The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions, which may be waived in writing by the Buyer in its sole discretion:

(a)     all representations and warranties of the Seller in Article III of this Agreement shall be true and complete in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case, when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true and complete in all respects or all material respects, as applicable, as of such earlier date;

(b)     the Seller shall have executed and delivered the documents required to be executed and delivered by it pursuant to Section 2.5(b) hereof;

(c)     all of the terms, covenants and conditions to be complied with and performed by the Seller on or prior to the Closing Date shall have been complied with or performed in all material respects;

(d)     the Bankruptcy Court shall have entered orders satisfactory to the Buyer in its reasonable discretion, granting the Sale Motion, the sale of the Purchased Assets by the Seller to the Buyer, the assignment by the Seller of the Assumed Contracts to the Buyer and the assumption by the Buyer of the Seller's obligations thereunder, and such orders shall have become Final Orders; and

(e)     (i) none of the facilities operated by the Seller shall have been damaged or destroyed, prior to the Closing Date, by fire or other casualty, whether or not fully covered by insurance, such that there has been a Material Adverse Effect and (ii) there shall not have been an interruption in the operations of the Business which is reasonably expected to last more than fifteen (15) days after the period of time covered by the Seller's business interruption insurance and that would have a Material Adverse Effect.

7.3     Conditions to Obligations of the Seller. The obligations of the Seller under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all of the following

31567436v4

Case: 11-31985    Doc# 6-1    Filed: 05/23/11    Entered: 05/23/11 14:48:32    Page 50 of 57

conditions, any one or more of which may be waived in writing by the Seller in its sole discretion:

(a) all representations and warranties of the Buyer in <u>Article IV</u> of this Agreement shall be true and complete in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case, when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true and complete in all respects or all material respects, as applicable, as of such earlier date;

(b) The Buyer shall have executed and delivered the documents required to be executed and delivered and made the payments required to be made by it pursuant to Section 2.5(a) hereof; and

(c) all of the terms, covenants and conditions to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

ARTICLE VIII
TERMINATION

8.1 <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by mutual written consent of the Seller and the Buyer;

(b) by the Buyer:

(i) if all of the conditions in Section 7.1 and Section 7.3 have been satisfied, and the Seller fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii) if the Bankruptcy Court has not entered the Sale Order and such order does not become a Final Order by [August 1], 2011, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court (and such stay is not terminated by [August 1], 2011) or (B) ceases to be effective and is not reinstated by [August 1], 2011;

(iii) upon the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case, or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein;

(iv) if the Closing does not occur on or before [August 1], 2011, unless the failure to consummate the Closing is solely due to the failure of the Buyer to

32

perform any of its obligations under this Agreement to the extent required to be performed by the Buyer on or prior to the Closing Date;

(v) if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Buyer set forth in Section 7.1 or Section 7.2 to be satisfied and either cannot be, or if curable has not been, cured within thirty (30) Business Days after the giving of written notice to the Seller; or

(c) by the Seller:

(i) if all of the conditions in Section 7.1 and Section 7.2 have been satisfied, and the Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii) if the Bankruptcy Court has not entered the Sale Order and such order does not become a Final Order by [August 1], 2011, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court (and such stay is not terminated by [August 1], 2011) or (B) ceases to be effective and is not reinstated by [August 1], 2011;

(iii) if the Closing does not occur on or before [August 1], 2011, unless the failure to consummate the Closing is due to the failure of the Seller to perform any of its obligations under this Agreement to the extent required to be performed by the Seller on or prior to the Closing Date;

(iv) if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 7.1 to be satisfied and cannot be cured within thirty (30) Business Days after the giving of written notice to the Buyer; or

(v) if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 7.3 to be satisfied and either cannot be, or if curable has not been, cured within thirty (30) Business Days after the giving of written notice to the Buyer; or

8.2 <u>Procedure and Effect of Termination</u>. In the event of termination of the transactions contemplated hereby pursuant to Section 8.1, written notice thereof shall forthwith be given to the other party to this Agreement, and this Agreement shall terminate (subject to the provisions of this Section 8.2, Section 8.3 and Section 8.4) and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto. If this Agreement is terminated as provided herein:

33

(a)    upon request therefor, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

(b)    no party hereto shall have any liability or further obligation under this Agreement, except that the provisions of Sections 5.9, 8.2, 8.3, 8.4, 9.14, 9.15 and 9.16 shall survive any termination and remain in full force and effect.

8.3    <u>Buyer's Exclusive Remedy</u>.  If this Agreement is terminated pursuant to Sections 8.1(a), 8.1(b)(i), 8.1(b)(ii), 8.1(b)(iii), 8.1(b)(iv), 8.1(b)(v), 8.1(c)(ii), 8.1(c)(iii) or 8.1(c)(v), without further order of the Bankruptcy Court the Deposit shall be returned to the Buyer in accordance with the Escrow Agreement.

8.4    <u>The Seller's Remedy</u>.  If the Seller terminates this Agreement pursuant to Sections 8.1(c)(i) or 8.1(c)(iv), the Seller, at its election, shall be entitled to the Deposit as liquidated damages and not a penalty, and as its sole and exclusive remedy, which shall be paid to the Seller in accordance with the Escrow Agreement and without further order of the Bankruptcy Court.  Notwithstanding the foregoing, the Seller shall be entitled to forego the liquidated damages remedy and proceed against the Seller to the fullest extent provided by law and equity, including seeking specific performance of the Buyer's obligations under this Agreement.

## ARTICLE IX
## GENERAL PROVISIONS

9.1    <u>Survival of Representations and Warranties</u>.  The representations and warranties set forth in this Agreement or in any schedule, exhibit or instrument delivered pursuant to this Agreement by the Seller shall terminate upon the Closing.

9.2    <u>Notices</u>.  All notices, requests, demands and other communications hereunder (a "<u>Notice</u>") shall be in writing and deemed to be duly given, (a) when delivered by hand, with a record of receipt, (b) the fourth day after mailing, if mailed by certified or registered mail, return receipt requested with postage prepaid, (c) the day delivered by a nationally recognized overnight courier, with a record of receipt or (d) the day of transmission, with confirmation of receipt, if delivered by facsimile or telecopy during regular business hours (which regular business hours shall be 9:00 am — 5:00 pm on each Business Day), or the day after transmission, with confirmation of receipt, if delivered by facsimile or telecopy after regular business hours, to the parties at the following addresses or telecopy numbers (or to such other address or telecopy number as a party may have specified by the notice given to the other party pursuant to this provision):

If to the Seller:        Nurserymen's Exchange, Inc.
                        2651 North Cabrillo Highway
                        Half Moon Bay, California 94019
                        Attention: Chief Executive Officer
                        Facsimile:

34

<pre>
        And a copy to:              Katten Muchin Rosenman LLP
                                    2029 Century Park East, Suite 2700
                                    Los Angeles, CA  90067
                                    Attention: Mark A. Conley
                                    Facsimile:  310-712-8225

        If to the Buyer:            [                    ]
                                    [                    ]
                                    [                    ]
                                    [                    ]
                                    Attn: [            ]
                                    Facsimile: [           ]

        And a copy to:              [                      ]
</pre>

or to such other addresses as either party may provide to the other in writing.  Notices hereunder (which shall not constitute notice) shall also be provided to the Official Committee of Unsecured Creditors of the Seller, c/o [                        ,                        ,                        ]..

9.3     Section and Other Headings.   Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.4     Waiver.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement.  All remedies, either under this Agreement or by Applicable Law or otherwise afforded, will be cumulative and not alternative.

9.5     Entire Agreement.   This Agreement, which includes the annex, exhibits and schedules hereto, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party relating to the matters contemplated hereby and constitutes the entire agreement by and among the parties hereto.

9.6     Amendments, Supplements, Etc.   This Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by the Buyer and the Seller to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the parties.

9.7     No Rights of Third Parties.  Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person other than the parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

31567436v4
Case: 11-31985   Doc# 6-1   Filed: 05/23/11   Entered: 05/23/11 14:48:32   Page 54 of
57

9.8     Enforcement.  The laws of the State of California shall govern the interpretation, validity, performance and enforcement of this Agreement, without reference to any conflict of law or choice of law provisions therein.

9.9     Invalid Provisions.  If any provision of this Agreement (other than Article VIII of this Agreement or any part or provision thereof) is held to be illegal, invalid, or unenforceable under any present or future Applicable Law, and if the rights or obligations under this Agreement of the Seller on the one hand and the Buyer on the other hand will not otherwise be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

9.10     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or similar officer appointed for the Seller) and permitted assigns, but shall not be assignable or delegable (a) by the Seller without the prior written consent of the Buyer or by court order, or (b) by the Buyer without the prior written consent of the Seller or by court order; provided, however, that the Buyer may assign, convey, transfer or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement and the Ancillary Agreements to (i) one or more Affiliates of the Buyer as specified by the Buyer or (ii) any financial institution or other lender financing or refinancing the transactions contemplated hereby or otherwise extending credit to the Buyer, or its Affiliates and all the Buyer's rights shall inure to the benefit of and shall be enforceable by such Affiliate, financial institution or other lender.

9.11     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

9.12     Facsimile Signature.  This Agreement may be executed and accepted by facsimile signature or by other electronic means (including Adobe's Portable Document Format) and any such signature shall be of the same force and effect as an original signature.

9.13     Further Assurances.  Both parties agree that either will execute such further documentation or take such further actions as the other party may reasonably request to effectuate the transfer of the Purchased Assets and implement this Agreement.

9.14     Fees and Expenses.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the party incurring such costs and expenses.  The Seller shall bear all of the costs of the Bankruptcy Case.

31567436v4

9.15  <u>WAIVER OF JURY TRIAL</u>. THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE RELATED IN ANY WAY TO BUYER'S SUBMISSION OF THE BID MATERIALS OR THIS AGREEMENT.

9.16  <u>Exclusive Jurisdiction</u>.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9.2 hereof

9.17  <u>Computation of Days</u>.  In computing any time period prescribed or allowed in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

9.18  <u>No Consequential or Punitive Damages</u>.  No party hereto (or its Affiliates) shall, under any circumstance, be liable to any other party (or its Affiliates) for any consequential, exemplary, special, incidental or punitive damages claimed by such other party under the terms of or due to any breach of this Agreement, including loss of revenue or income, cost of capital, or loss of business reputation or opportunity.

9.19  <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**[The remainder of this page has intentionally been left blank.]**

37

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date set forth above.

**NURSERYMEN'S EXCHANGE, INC.**

By: _____

Name: _____

Title: _____


[                                    ]


By: _____

Name: _____

Title: _____

31567436v4