**DEBTOR-IN-POSSESSION
CREDIT AND SECURITY AGREEMENT**

**WELLS FARGO BUSINESS CREDIT
DEBTOR-IN-POSSESSION
CREDIT AND SECURITY AGREEMENT**

BN 9031290v5

# TABLE OF CONTENTS

**Page**

1. AMOUNT AND TERMS OF THE LINE OF CREDIT AND TERM LOAN.................. 1

    1.1 Post-Petition Line of Credit; Limitations on Borrowings; Termination Date; Use of Proceeds ........................................................................... 1

    1.2 Borrowing Base; Mandatory Prepayment............................................. 2

    1.3 Procedures for Post-Petition Line of Credit Advances ........................ 3

    1.4 Collection of Accounts; Proceeds of Collateral; and Application to Post-Petition Revolving Note ............................................................ 4

    1.5 Reserved.................................................................................................. 5

    1.6 Interest and Interest Related Matters .................................................... 5

    1.7 Fees ........................................................................................................ 5

    1.8 Interest Accrual; Principal and Interest Payments; Computation ......... 7

    1.9 Termination or Reduction of Post-Petition Line of Credit by Company............... 8

    1.10 Letters of Credit ................................................................................... 8

    1.11 Special Account .................................................................................... 8

2. SECURITY INTEREST AND OCCUPANCY OF COMPANY'S PREMISES ............. 9

    2.1 Grant of Security Interest ...................................................................... 9

    2.2 Notifying Account Debtors and Other Obligors; Collection of Collateral ........... 9

    2.3 Assignment of Insurance........................................................................ 9

    2.4 Company's Premises ............................................................................ 10

    2.5 License ................................................................................................. 10

    2.6 Financing Statements .......................................................................... 10

    2.7 Intentionally Deleted............................................................................ 11

    2.8 Collateral Related Matters ................................................................... 11

    2.9 Notices Regarding Disposition of Collateral ...................................... 11

3. CONDITIONS PRECEDENT ................................................................. 11

    3.1 Conditions Precedent to Initial Advance and Issuance of Initial Letter of Credit.............................................................................. 11

    3.2 Additional Conditions Precedent to All Advances and Letters of Credit ........... 11

4. REPRESENTATIONS AND WARRANTIES................................................. 12

5. COVENANTS .................................................................................... 12

    5.1 Reporting Requirements ...................................................................... 12

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 2 of 99

# TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| 5.2 | Financial Covenants | 16 |
| 5.3 | Other Liens and Permitted Liens | 17 |
| 5.4 | Indebtedness | 18 |
| 5.5 | Guaranties | 18 |
| 5.6 | Investments and Subsidiaries | 18 |
| 5.7 | Dividends and Distributions | 18 |
| 5.8 | Salaries | 19 |
| 5.9 | Key Person Life Insurance | 19 |
| 5.10 | Books and Records; Collateral Examination; Inspection and Appraisals | 19 |
| 5.11 | Account Verification; Payment of Permitted Liens | 19 |
| 5.12 | Compliance with Laws | 20 |
| 5.13 | Payment of Taxes and Other Claims | 20 |
| 5.14 | Maintenance of Collateral and Properties | 20 |
| 5.15 | Insurance | 21 |
| 5.16 | Preservation of Existence | 21 |
| 5.17 | Delivery of Instruments, etc | 21 |
| 5.18 | Sale or Transfer of Assets; Suspension of Business Operations | 21 |
| 5.19 | Consolidation and Merger; Asset Acquisitions | 22 |
| 5.20 | Sale and Leaseback | 22 |
| 5.21 | Restrictions on Nature of Business | 22 |
| 5.22 | Accounting | 22 |
| 5.23 | Discounts, etc | 22 |
| 5.24 | Pension Plans | 22 |
| 5.25 | Place of Business; Name | 22 |
| 5.26 | Constituent Documents; S Corporation Status | 22 |
| 5.27 | Performance by Wells Fargo | 23 |
| 5.28 | Wells Fargo Appointed as Company's Attorney in Fact | 23 |
| 5.29 | Bankruptcy Case Matters | 23 |
| 6. | EVENTS OF DEFAULT AND REMEDIES | 24 |
| 6.1 | Events of Default | 24 |

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 3 of 99

# TABLE OF CONTENTS
(continued)

**Page**

6.2     Rights and Remedies...............................................................................28

7.     MISCELLANEOUS .................................................................................28

    7.1     No Waiver; Cumulative Remedies .....................................................28

    7.2     Amendments; Consents and Waivers; Authentication ......................29

    7.3     Execution in Counterparts; Delivery of Counterparts ......................29

    7.4     Notices, Requests, and Communications; Confidentiality ................29

    7.5     Company Information Reporting; Confidentiality...............................30

    7.6     Further Documents............................................................................31

    7.7     Costs and Expenses.........................................................................31

    7.8     Indemnity ..........................................................................................32

    7.9     General Release ...............................................................................32

    7.10     Bankruptcy Waivers..........................................................................33

    7.11     Retention of Company's Records .....................................................33

    7.12     Binding Effect; Assignment; Complete Agreement ..........................34

    7.13     Sharing of Information.......................................................................34

    7.14     Severability of Provisions .................................................................34

    7.15     Headings ...........................................................................................34

    7.16     Governing Law; Jurisdiction, Venue .................................................34

    7.17     Intentionally Omitted ........................................................................34

    7.18     Reaffirmation of Pre-Petition Loan Documents ...............................35

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 4 of 99

**WELLS FARGO BUSINESS CREDIT**
**DEBTOR-IN-POSSESSION**
**CREDIT AND SECURITY AGREEMENT**

**THIS CREDIT AND SECURITY AGREEMENT** (the "Agreement") is dated as of May 23, 2011, and is entered into between Nurserymen's Exchange, Inc., a California corporation, a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code ("Company"), and Wells Fargo Bank, National Association (as more fully defined in Exhibit A, "Wells Fargo"), acting through its Wells Fargo Business Credit operating division.

**RECITALS**

Company and Wells Fargo are parties to a Credit and Security Agreement, dated as of August 15, 2008, as amended by that certain First Amendment to Credit and Security Agreement and Notice of Defaults, dated as of August 4, 2010, that certain Second Amendment to Credit and Security Agreement, dated as of August 26, 2010, that certain Third Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of September 7, 2010, that certain Fourth Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of February 28, 2011, and that certain Fifth Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of April 26, 2011 (as so amended, the "Pre-Petition Credit Agreement").

On May 23, 2011, Company filed a bankruptcy petition under the United States Bankruptcy Code (11 U.S.C. et seq.) (the "Bankruptcy Code"), with the intention of consummating one or more sales pursuant to section 363 of the Bankruptcy Code ("363 Sales") of Company's assets, which 363 Sales are expected to generate sufficient Net Cash Proceeds to repay all Indebtedness of Company owing to Wells Fargo.

Company has asked Wells Fargo to provide it with a $5,000,000 debtor-in-possession line of credit (the "Post-Petition Line of Credit") for working capital purposes and to facilitate the issuance of letters of credit pending the consummation of the 363 Sales and repayment of the Indebtedness of Company to Wells Fargo, and termination of the Pre-Petition Credit Agreement. Wells Fargo is agreeable to meeting Company's request, subject to the terms and conditions this Agreement.

For purposes of this Agreement, capitalized terms not otherwise defined in the Agreement shall have the meaning given them in Exhibit A.

**1.      AMOUNT AND TERMS OF THE LINE OF CREDIT AND TERM LOAN**

**1.1      Post-Petition Line of Credit; Limitations on Borrowings; Termination Date; Use of Proceeds.**

(a)      <u>Post-Petition Line of Credit and Limitations on Borrowing</u>.  Wells Fargo shall make Advances to Company under the Post-Petition Line of Credit that, together with the sum of the Pre-Petition L/C Amount and the Post-Petition L/C Amount, shall not at any time exceed in the aggregate the least of (i) the Maximum Line Amount, (ii) the Borrowing Base

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 5 of 99

limitations described in Section 1.2, or (iii) an amount equal to the result of (x) the Budget Limiter Percentage of the amounts of all projected disbursements for each week set forth in the Budget minus (y) the aggregate amount of Advances actually made under the Post-Petition Line of Credit through such date of determination (prior to giving effect to any requested Advance not yet made) on a weekly basis. Within these limits, Company may periodically borrow, prepay in whole or in part, and reborrow. Wells Fargo has no obligation to make an Advance during a Default Period or at any time Wells Fargo believes that an Advance would result in an Event of Default. As used in this Section 1.1(a), "Budget Limiter Percentage" means 120% through the week ending June 3, 2011, and 110% thereafter.

(b)     Maturity and Termination Dates.    Company may request Post-Petition Line of Credit Advances from the date that the conditions set forth in Section 3 are satisfied until the earlier of: (i) the Maturity Date, (ii) the date Company terminates the Post-Petition Line of Credit, (iii) the date Wells Fargo terminates the Post-Petition Line of Credit following an Event of Default, (iv) the effective date of a Plan of Reorganization in form and substance acceptable to Wells Fargo, or (v) the closing of the final 363 Sale that pays off the Indebtedness in full in cash (the earliest of these dates is the "Termination Date").

(c)     Use of Post-Petition Line of Credit Proceeds.    Company shall use the proceeds of each Post-Petition Line of Credit Advance and each Letter of Credit solely to fund general corporate and working capital requirements of Company (including fees and expenses) and identified as projected disbursements in the Budget. No proceeds of any Post-Petition Line of Credit Advance or Letter of Credit shall be used to commence or prosecute any action or objection with respect to the Pre-Petition Indebtedness, or the Pre-Petition Liens on the Pre-Petition Collateral securing the Pre-Petition Indebtedness.

(d)     Post-Petition Revolving Note.    Company's obligation to repay Post-Petition Line of Credit Advances, regardless of how initiated under Section 1.3, shall be evidenced by a revolving promissory note (as renewed, amended or replaced from time to time, the "Post-Petition Revolving Note").

**1.2     Borrowing Base; Mandatory Prepayment.**

(a)     Borrowing Base.    The borrowing base (the "Borrowing Base") is an amount equal to:

(i)     80% or such lesser percentage of Eligible Accounts as Wells Fargo in its sole discretion may deem appropriate; provided that this rate may be reduced at any time by Wells Fargo's in its sole discretion by one (1) percent for each percentage point by which Dilution on the date of determination is in excess of ten percent (10.0%), plus

(ii)     50% or such lesser percentage of Eligible Inventory as Wells Fargo in its sole discretion may deem appropriate, or the Inventory Sublimit, whichever is less,[1]

(iii)     the Borrowing Base Reserve, less

---

[1] Amended in Third Amendment.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 6 of 99

(iv)     the Merchant Card Reserve, <u>less</u>

(v)     a reserve in the amount of the claim of certain "carve out" expenses relating to fees and costs incurred by Professionals retained by Borrower or other party pursuant to section 328 of the Bankruptcy Code, <u>less</u>

(vi)     Indebtedness that Company owes Wells Fargo that has not been advanced on the Post-Petition Revolving Note, <u>less</u>

(vii)     Pre-Petition Indebtedness evidenced by the Pre-Petition Revolving Note and the Pre-Petition L/C Amount, <u>less</u>

(viii)     Indebtedness that is not otherwise described in Section 1, including Indebtedness that Wells Fargo in its sole discretion finds on the date of determination to be equal to Wells Fargo's net credit exposure with respect to any swap, derivative, foreign exchange, hedge, deposit, treasury management or similar transaction or arrangement extended to Company by Wells Fargo and any Indebtedness owed by Company to Wells Fargo Merchant Services, L.L.C. in excess of the Merchant Card Reserve.

(b)     <u>Mandatory Prepayment; Overadvances</u>.     If unreimbursed Post-Petition Line of Credit Advances evidenced by the Post-Petition Revolving Note plus the sum of the Pre-Petition L/C Amount and the Post-Petition L/C Amount the L/C Amount exceed the Borrowing Base or the Maximum Line Amount at any time, then Company shall immediately prepay the Post-Petition Revolving Note in an amount sufficient to eliminate the excess, and if payment in full of the Post-Petition Revolving Note is insufficient to eliminate this excess and the sum of the Pre-Petition L/C Amount and the Post-Petition L/C Amount continues to exceed the Borrowing Base, then Company shall deliver cash to Wells Fargo in an amount equal to the remaining excess for deposit to the Special Account, unless in each case, Wells Fargo has delivered to Company an Authenticated Record consenting to the Overadvance <u>prior</u> to its occurrence, in which event the Overadvance shall be temporarily permitted on such terms and conditions as Wells Fargo in its sole discretion may deem appropriate, including the payment of additional fees or interest, or both.

### 1.3     Procedures for Post-Petition Line of Credit Advances.

(a)     <u>Advances to Operating Account</u>.     Post-Petition Line of Credit Advances shall be credited to Company's demand deposit account maintained with Wells Fargo (the "Operating Account"), unless the parties agree in a Record Authenticated by both of them to disburse to another account.   Post-Petition Line of Credit Advances may be funded upon Company's request.   No request will be deemed received until Wells Fargo acknowledges receipt, and Company, if requested by Wells Fargo, confirms the request in an Authenticated Record.   Company shall repay all Advances, even if the Person requesting the Advance on behalf of Company lacked authorization.   Company shall make the request no later than the Cut-Off Time on the Business Day on which it wants the Advance to be funded, which request shall specify the principal Advance amount being requested.

(b)     <u>Protective Advances; Advances to Pay Indebtedness Due</u>.     Wells Fargo may initiate a Floating Rate Advance on the Post-Petition Line of Credit in its reasonable

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 7 of 99

discretion at any time, without Company's compliance with any of the conditions of this Agreement, and (i) disburse the proceeds directly to third Persons in order to protect Wells Fargo's interest in Collateral or to perform any of Company's obligations under this Agreement, or (ii) apply the proceeds to the amount of any Indebtedness then due and payable to Wells Fargo.

**1.4    Collection of Accounts; Proceeds of Collateral; and Application to Post-Petition Revolving Note**.

(a)    <u>The Collection Account</u>.  Company has granted a security interest to Wells Fargo in the Collateral, including all Accounts. Except as otherwise agreed by both parties in an Authenticated Record, all Proceeds of Accounts and other Collateral, upon receipt or collection, shall be deposited each Business Day into the Collection Account. Funds so deposited ("Account Funds") are the property of Wells Fargo, and may only be withdrawn from the Collection Account by Wells Fargo.

(b)    <u>Payment of Accounts by Company's Account Debtors</u>.  Company shall instruct all account debtors to make payments either directly to the Lockbox for deposit by Wells Fargo directly to the Collection Account, or instruct them to deliver such payments to Wells Fargo by wire transfer, ACH, or other means as Wells Fargo may direct for deposit to the Collection Account or for direct application to the Post-Petition Line of Credit. If Company receives a payment or the Proceeds of Collateral directly, Company will promptly deposit the payment or Proceeds into the Collection Account. Until deposited, it will hold all such payments and Proceeds in trust for Wells Fargo without commingling with other funds or property.  All deposits held in the Collection Account shall constitute Proceeds of Collateral and shall not constitute the payment of Indebtedness.

(c)    <u>Application of Payments to Post-Petition Revolving Note</u>.  Except as otherwise provided in Section 1.4(d), Wells Fargo will withdraw Account Funds deposited to the Collection Account and pay down borrowings on the Post-Petition Line of Credit by applying them to the Post-Petition Revolving Note on the first Business Day following the Business Day of deposit to the Collection Account, or, if payments are received by Wells Fargo that are not first deposited to the Collection Account pursuant to any treasury management service provided to Company by Wells Fargo, such payments shall be applied to the Post-Petition Revolving Note as provided in the Master Agreement for Treasury Management Services and the relevant service description.

(d)    <u>Proceeds of Pre-Petition Collateral</u>.  The proceeds of all Pre-Petition Collateral shall be applied first to repay outstanding Pre-Petition Indebtedness until paid in full, and thereafter applied in accordance with Section 1.4(c).  The proceeds of all Post-Petition Collateral shall be applied first in accordance with Section 1.4(c) until all Post-Petition Indebtedness is paid in full, and thereafter to repay outstanding Pre-Petition Indebtedness but to the extent of any diminution in value following commencement of the Bankruptcy Case.  In the event any proceeds cannot conclusively identified by Company as Pre-Petition Collateral or Post-Petition Collateral, Wells Fargo shall be entitled to treat such proceeds as Pre-Petition Collateral.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 8 of 99

**1.5    Reserved.**

**1.6    Interest and Interest Related Matters.**

(a)    <u>Interest Rates Applicable to Post-Petition Line of Credit</u>.  Except as otherwise provided in this Agreement, the unpaid principal amount of each Post-Petition Line of Credit Advance evidenced by the Post-Petition Revolving Note shall accrue interest at an annual interest rate calculated as follows:

> Post-Petition Line of Credit Advances = Prime Rate plus three and one half of one percent (3.50%), which interest rate shall change whenever the Prime Rate changes (the "Floating Rate")

(b)    <u>Minimum Interest Charge</u>.  Waived.

(c)    <u>Default Interest Rate</u>.  Commencing on the day an Event of Default occurs, through and including the date identified by Wells Fargo in a Record as the date that the Event of Default has been cured or waived (each such period a "Default Period"), or during a time period specified in Section 1.9, or at any time following the Termination Date, in Wells Fargo's sole discretion and without waiving any of its other rights or remedies, the principal amount of the Post-Petition Revolving Note and the Term Note shall bear interest at a rate that is three percent (3.0%) above the contractual rate set forth in Section 1.6(a) (the "Default Rate"), or any lesser rate that Wells Fargo may deem appropriate, starting on the first day of the fiscal quarter in which the Default Period begins through the last day of that Default Period, or any shorter time period to which Wells Fargo may agree in an Authenticated Record.

(d)    <u>Interest Accrual on Payments Applied to Post-Petition Revolving Note</u>.  Payments received by Wells Fargo shall be applied to the Post-Petition Revolving Note as provided in Section 1.4(c), but the principal amount paid down shall continue to accrue interest through the end of the first Business Day following the Business Day that the payment was applied to the Post-Petition Revolving Note.

(e)    <u>Usury</u>.  No interest rate shall be effective which would result in a rate greater than the highest rate permitted by law.  Payments in the nature of interest and other charges made under any Loan Documents or any other document or agreement described in or related to this Agreement that are later determined to be in excess of the limits imposed by applicable usury law will be deemed to be a payment of principal, and the Indebtedness shall be reduced by that amount so that such payments will not be deemed usurious.

**1.7    Fees**.

(a)    <u>Origination Fee</u>.  Company shall pay Wells Fargo an origination fee of $50,000 ("Origination Fee"), which shall be fully earned, non-refundable and due and payable upon the execution of this Agreement.

(b)    <u>Unused Line Fee</u>.  Company shall pay Wells Fargo an annual unused line fee of one-half of one percent (0.50%) of the daily average of the Maximum Line Amount reduced by the sum of the outstanding Advances, the Pre-Petition L/C Amount and the Post-

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 9 of 99

Petition L/C Amount (the "Unused Amount"), from the date of this Agreement to and including the Termination Date, which unused line fee shall be payable monthly in arrears on the first day of each month and on the Termination Date.  .

      (c)    <u>Facility Fee</u>.  Waived.

      (d)    <u>Collateral Exam Fees</u>.  Company shall pay Wells Fargo fees in connection with any collateral exams, audits or inspections conducted by or on behalf of Wells Fargo at the current rates established from time to time by Wells Fargo as its collateral exam fees (which fees are currently $135 per hour per collateral examiner), together with all actual out-of-pocket costs and expenses incurred in conducting any collateral examination or inspection.

      (e)    <u>Collateral Monitoring Fees</u>.  Company shall pay Wells Fargo a fee at the rates established from time to time by Wells Fargo as its Collateral monitoring fees (which fees are currently $250 per month), due and payable monthly in advance on the first day of the month and on the Termination Date.

      (f)    <u>Post-Petition Line of Credit Termination and/or Reduction Fees</u>.  Waived.

      (g)    <u>Overadvance Fees</u>.  Company shall pay an Overadvance fee of $500 for each day that an Overadvance exists which was not agreed to by Wells Fargo in an Authenticated Record prior to its occurrence; provided that Wells Fargo's acceptance of the payment of such fees shall not constitute either consent to the Overadvance or waiver of the resulting Event of Default.  Company shall pay additional Overadvance fees and interest in such amounts and on such terms as Wells Fargo in its sole discretion may consider appropriate for any Overadvance to which Wells Fargo has specifically consented in an Authenticated Record prior to its occurrence.

      (h)    <u>Treasury Management Fees</u>.  Company will pay service fees to Wells Fargo for treasury management services provided pursuant to the Master Agreement for Treasury Management Services or any other agreement entered into by the parties, in the amount prescribed in Wells Fargo's current service fee schedule.

      (i)    <u>Letter of Credit Fees</u>.  Company shall pay a fee with respect to each Letter of Credit issued by Wells Fargo of one and one-half percent (1.5%) of the aggregate undrawn amount of the Letter of Credit (the "Aggregate Face Amount") accruing daily from and including the date the Letter of Credit is issued until the date that it either expires or is returned, which shall be payable monthly in arrears on the first day of each month and on the date that the Letter of Credit either expires or is returned; and following an Event of Default, this fee shall increase to three and one-half percent (3.5%) of the Aggregate Face Amount, commencing on the first day of the fiscal quarter in which the Default Period begins and continuing through the last day of such Default Period, or any shorter time period that Wells Fargo in its sole discretion may deem appropriate, without waiving any of its other rights and remedies.

      (j)    <u>Letter of Credit Administrative Fees</u>.  Company shall pay all administrative fees charged by Wells Fargo in connection with the honoring of drafts under any Letter of Credit, and any amendments to or transfers of any Letter of Credit, and any other activity with respect to the Letters of Credit at the current rates published by Wells Fargo for such services rendered on behalf of its customers generally.

(k)     <u>Other Fees and Charges</u>.  Wells Fargo may impose additional fees and charges during a Default Period for (i) waiving an Event of Default, or for (ii) the administration of Collateral by Wells Fargo. All such fees and charges shall be imposed at Wells Fargo's sole discretion following oral notice to Company on either an hourly, periodic, or flat fee basis, and in lieu of or in addition to imposing interest at the Default Rate, and Company's request for an Advance following such notice shall constitute Company's agreement to pay such fees and charges.

## 1.8     Interest Accrual; Principal and Interest Payments; Computation.

(a)     <u>Interest Payments and Interest Accrual</u>.  Accrued and unpaid interest under the Note shall be due and payable on the first day of each month (each an "Interest Payment Date") and on the Termination Date, and shall be paid in the manner provided in Section 1.4(c) and Section 1.5(d).  Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of Advance to the Interest Payment Date.

(b)     <u>Payments of Principal</u>.  The principal amount of the Note shall be paid from time to time as provided in this Agreement, and shall be fully due and payable on the Termination Date, if not earlier due and payable in accordance with the terms and conditions hereof.

(c)     <u>Payments Due on Non Business Days</u>.  If an Interest Payment Date or the Termination Date falls on a day which is not a Business Day, payment shall be made on the next Business Day, and interest shall continue to accrue during that time period.

(d)     <u>Computation of Interest and Fees</u>.  Interest accruing on the unpaid principal amount of the Note and fees payable under this Agreement shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(e)     <u>Liability Records</u>.  Wells Fargo shall maintain accounting and bookkeeping records of all Advances and payments with respect to the Indebtedness in such form and content as Wells Fargo in its sole discretion deems appropriate.  Wells Fargo's calculation of the amount of the Indebtedness shall be presumed correct unless proven otherwise by Company.  Upon request, Company will admit and certify to Wells Fargo in a Record the exact unpaid principal amount of Indebtedness that Company then believes to be due and payable to Wells Fargo.  Any billing statement or accounting provided by Wells Fargo shall be conclusive and binding unless Company notifies Wells Fargo in a detailed Record of its intention to dispute the billing statement or accounting within 30 days of receipt.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 11 of 99

**1.9     Termination or Reduction of Post-Petition Line of Credit by Company.**
Company may terminate or reduce the Post-Petition Line of Credit at any time prior to the
Maturity Date if it (i) delivers written notice to Wells Fargo of its intention to terminate or
reduce the Post-Petition Line of Credit, and (ii) pays the Indebtedness in full or down to the
reduced Maximum Line Amount.

**1.10     Letters of Credit.**

(a)     Issuance of Letters of Credit; Amount.  Wells Fargo, subject to the terms
and conditions of this Agreement, shall issue, on or after the date that Wells Fargo is obligated to
make its first Advance under this Agreement and prior to the Termination Date, one or more
irrevocable standby or documentary letters of credit (each, a "Letter of Credit", and collectively,
"Letters of Credit") for Company's account.  Wells Fargo will not issue any Letter of Credit if
the face amount of the Letter of Credit would exceed the lesser of: (i) $1,000,000 less the sum of
the Prepetition L/C Amount and the Post-Petition L/C Amount, or (ii) the Borrowing Base, less
an amount equal to the sum of the aggregate Post-Petition Line of Credit Advances, the
Prepetition L/C Amount and the Post-Petition L/C Amount.

(b)     Additional Letter of Credit Documentation.  Prior to requesting issuance
of a Letter of Credit, Company shall first execute and deliver to Wells Fargo a Standby Letter of
Credit Agreement or a Commercial Letter of Credit Agreement, as applicable, an L/C
Application, and any other documents that Wells Fargo may request, which shall govern the
issuance of the Letter of Credit and Company's obligation to reimburse Wells Fargo for any
related Letter of Credit draws (the "Obligation of Reimbursement").

(c)     Expiration.  No Letter of Credit shall be issued that has an expiry date that
is later than one (1) year from the date of issuance, or the then current Maturity Date on the date
of issuance, whichever is earlier.

(d)     Obligation of Reimbursement During Default Periods.  If Company is
unable, due to the existence of a Default Period or for any other reason, to obtain an Advance to
pay any Obligation of Reimbursement, Company shall pay Wells Fargo on demand and in
immediately available funds, the amount of the Obligation of Reimbursement together with
interest, accrued from the date presentment of the underlying draft until reimbursement in full at
the Default Rate.  Wells Fargo is authorized, alternatively and in its sole discretion, to make an
Advance in an amount sufficient to discharge the Obligation of Reimbursement and pay all
accrued but unpaid interest and fees with respect to the Obligation of Reimbursement.

**1.11     Special Account.**  If the Post-Petition Line of Credit is terminated for any reason
while a Letter of Credit is outstanding, or if after prepayment of the Post-Petition Revolving
Note the sum of the Pre-Petition L/C Amount and the Post-Petition L/C Amount continues to
exceed the Borrowing Base, then Company shall promptly pay Wells Fargo in immediately
available funds for deposit to the Special Account, an amount equal, as the case may be, to either
(a) the sum of the Pre-Petition L/C Amount and the Post-Petition L/C Amount, plus any
anticipated fees and costs, or (b) the amount by which the sum of the Pre-Petition L/C Amount
and the Post-Petition L/C Amount exceeds the Borrowing Base.  If Company fails to pay these
amounts promptly, then Wells Fargo may in its sole discretion make an Advance to pay these

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 12 of
99

amounts and deposit the proceeds to the Special Account.  The Special Account shall be an interest bearing account maintained with Wells Fargo or any other financial institution acceptable to Wells Fargo.  Wells Fargo may in its sole discretion apply amounts on deposit in the Special Account to the Indebtedness.  Company may not withdraw amounts deposited to the Special Account until the Post-Petition Line of Credit has been terminated and all outstanding Letters of Credit have either been returned to Wells Fargo or have expired and the Indebtedness has been fully paid.

## 2.    SECURITY INTEREST AND OCCUPANCY OF COMPANY'S PREMISES

**2.1    Grant of Security Interest**.  Company hereby pledges, assigns and grants to Wells Fargo, for the benefit of Wells Fargo and as agent for Wells Fargo Merchant Services, L.L.C., a Lien and security interest pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of all Indebtedness. Following request by Wells Fargo, Company shall grant Wells Fargo, for the benefit of Wells Fargo and as agent for Wells Fargo Merchant Services, L.L.C., a Lien and security interest in all commercial tort claims that it may have against any Person.

**2.2    Notifying Account Debtors and Other Obligors; Collection of Collateral**. Wells Fargo may at any time (whether or not a Default Period then exists) deliver a Record giving an account debtor or other Person obligated to pay an Account, a General Intangible, or other amount due, notice that the Account, General Intangible, or other amount due has been assigned to Wells Fargo for security and must be paid directly to Wells Fargo.  Company shall join in giving such notice and shall Authenticate any Record giving such notice upon Wells Fargo's request.  After Company or Wells Fargo gives such notice, Wells Fargo may, but need not, in Wells Fargo's or in Company's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, such Account, General Intangible, or other amount due, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any account debtor or other obligor.  Wells Fargo may, in Wells Fargo's name or in Company's name, as Company's agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of Company's mail to any address designated by Wells Fargo, otherwise intercept Company's mail, and receive, open and dispose of Company's mail, applying all Collateral as permitted under this Agreement and holding all other mail for Company's account or forwarding such mail to Company's last known address.

**2.3    Assignment of Insurance**.  As additional security for the Indebtedness, Company hereby assigns to Wells Fargo and to Wells Fargo Merchant Services, L.L.C., all rights of Company under every policy of insurance covering the Collateral and all business records and other documents relating to it, and all monies (including proceeds and refunds) that may be payable under any policy, and Company hereby directs the issuer of each policy to pay all such monies directly to Wells Fargo, if Wells Fargo requests.  At any time, whether or not a Default Period then exists (provided that if a Default Period does not exist, only with respect to claims in the aggregate in excess of $200,000 in any calendar year), Wells Fargo may (but need not), in Wells Fargo's or Company's name, execute and deliver proofs of claim, receive payment of proceeds and endorse checks and other instruments representing payment of the policy of

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 13 of 99

insurance, and adjust, litigate, compromise or release claims against the issuer of any policy. Any monies received under any insurance policy assigned to Wells Fargo, other than liability insurance policies, or received as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid to Wells Fargo and, as determined by Wells Fargo in its sole discretion, either be applied to prepayment of the Indebtedness or disbursed to Company under staged payment terms reasonably satisfactory to Wells Fargo for application to the cost of repairs, replacements, or restorations which shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed.

### 2.4    Company's Premises

(a)    <u>Wells Fargo's Right to Occupy Company's Premises</u>.  Subject to the Automatic Stay, if any, Company hereby grants to Wells Fargo the right, at any time during a Default Period and without notice or consent, to take exclusive possession of all locations where Company conducts its business or has any rights of possession, including the locations described on Exhibit B (the "Premises"), until the earlier of (i) payment in full and discharge of all Indebtedness and termination of the Post-Petition Line of Credit, or (ii) final sale or disposition of all items constituting Collateral and delivery of those items to purchasers.

(b)    <u>Wells Fargo's Use of Company's Premises</u>.  Wells Fargo may use the Premises to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, and for any other incidental purposes deemed appropriate by Wells Fargo in good faith.

(c)    <u>Company's Obligation to Reimburse Wells Fargo</u>.  Wells Fargo shall not be obligated to pay rent or other compensation for the possession or use of any Premises, but if Wells Fargo elects to pay rent or other compensation to the owner of any Premises in order to have access to the Premises, then Company shall promptly reimburse Wells Fargo all such amounts, as well as all taxes, fees, charges and other expenses at any time payable by Wells Fargo with respect to the Premises by reason of the execution, delivery, recordation, performance or enforcement of any terms of this Agreement.

### 2.5    License.    Without limiting the generality of any other Security Document, Company hereby grants to Wells Fargo a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of Company for the purpose of: (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by Company for its own manufacturing and subject to Company's reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

### 2.6    Financing Statements.    Company authorizes Wells Fargo to file financing statements describing Collateral to perfect Wells Fargo's Security Interest in the Collateral, and Wells Fargo may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including commercial tort claims as Wells Fargo may consider necessary or useful to perfect the Security Interest.  All financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by Company and are hereby

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 14 of 99

re-authorized.  Following the termination of the Post-Petition Line of Credit and payment of all Indebtedness, Wells Fargo shall, at Company's expense and within the time periods required under applicable law, release or terminate any filings or other agreements that perfect the Security Interest.

**2.7    Intentionally Deleted.**

**2.8    Collateral Related Matters**.  This Agreement does not contemplate a sale of Accounts or chattel paper, and, as provided by law, Company is entitled to any surplus and shall remain liable for any deficiency.  Wells Fargo's duty of care with respect to Collateral in its possession (as imposed by law) will be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or third Person, and Wells Fargo need not otherwise preserve, protect, insure or care for such Collateral.  Wells Fargo shall not be obligated to preserve rights Company may have against prior parties, to liquidate the Collateral at all or in any particular manner or order or apply the Proceeds of the Collateral in any particular order of application.  Wells Fargo has no obligation to clean-up or prepare Collateral for sale.  Company waives any right it may have to require Wells Fargo to pursue any third Person for any of the Indebtedness.

**2.9    Notices Regarding Disposition of Collateral**.  If notice to Company of any intended disposition of Collateral or any other intended action is required by applicable law in a particular situation, such notice will be deemed commercially reasonable if given in the manner specified in Section 7.4 at least ten calendar days before the date of intended disposition or other action.

**3.    CONDITIONS PRECEDENT**

**3.1    Conditions Precedent to Initial Advance and Issuance of Initial Letter of Credit.**  Wells Fargo's obligation to make the initial Advance or issue the first Letter of Credit shall be subject to the condition that Wells Fargo shall have received this Agreement and each of the Loan Documents, and any document, agreement, or other item described in or related to this Agreement, and all fees and information described in Exhibit C, executed and in form and content satisfactory to Wells Fargo.

**3.2    Additional Conditions Precedent to All Advances and Letters of Credit**.  Wells Fargo's obligation to make any Advance (including the initial Advance) or issue any Letter of Credit shall be subject to the further additional conditions:

(a)    that the representations and warranties described in Exhibit D are correct on the date of the Advance or the issuance of the Letter of Credit, except to the extent that such representations and warranties relate solely to an earlier date;

(b)    that no event has occurred and is continuing, or would result from the requested Advance or issuance of the Letter of Credit that would result in an Event of Default; and

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 15 of 99

(c)	an Applicable Financing Order shall be entered by the Bankruptcy Court and of full force and effect approving the Postpetition Loan Documents and granting super priority claim status and liens in favor of Wells Fargo, which Applicable Financing Order shall not have been appealed, stayed, reversed or modified.

## 4.	REPRESENTATIONS AND WARRANTIES

To induce Wells Fargo to enter into this Agreement, Company makes the representations and warranties described in Exhibit D.  Any request for an Advance will be deemed a representation by Company that all representations and warranties described in Exhibit D are true, correct and complete as of the time of the request, unless they relate exclusively to an earlier date. Company shall promptly deliver a Record notifying Wells Fargo of any change in circumstance that would affect the accuracy of any representation or warranty, unless the representation and warranty specifically relates to an earlier date.

## 5.	COVENANTS

So long as the Indebtedness remains unpaid, or the Post-Petition Line of Credit has not been terminated, Company shall comply with each of the following covenants, unless Wells Fargo shall consent otherwise in an Authenticated Record delivered to Company.

**5.1	Reporting Requirements**.  Company shall deliver to Wells Fargo the following information, compiled where applicable using GAAP consistently applied, except, in the case of quarterly and monthly financial statements, for the footnotes and adjustments made in preparation of the audited financial statements, and, in the case of monthly financial statements, for estimates of Inventory, in form and content acceptable to Wells Fargo:

(a)	Annual Financial Statements.  As soon as available and in any event within 120 days after Company's fiscal year end, Company's audited financial statements prepared by an independent certified public accountant acceptable to Wells Fargo, which shall include Company's balance sheet, income statement, and statement of retained earnings and cash flows prepared, if requested by Wells Fargo, on a consolidated and consolidating basis to include Company's Affiliates.  The annual financial statements shall be accompanied by a certificate (the "Compliance Certificate") in the form of Exhibit E that is signed by Company's chief financial officer.

Each Compliance Certificate that accompanies an annual financial statement shall also be accompanied by (i) copies of all management letters prepared by Company's accountants; and (ii) a report signed by the accountant stating that in making the investigations necessary to render the opinion, the accountant obtained no knowledge, except as specifically stated, of any Event of Default under the Agreement, and a detailed statement, including computations, demonstrating whether or not Company is in compliance with the financial covenants of this Agreement.

(b)	Monthly Financial Statements.  As soon as available and in any event within 30 days after the end of each month, a Company prepared balance sheet, income statement, and statement of retained earnings prepared for that month and for the year–to-date period then ended, prepared, if requested by Wells Fargo, on a consolidated and consolidating

Case: 11-31985	Doc# 8-2	Filed: 05/23/11	Entered: 05/23/11 15:19:00	Page 16 of 99

basis to include Company's Affiliates, and stating in comparative form the figures for the corresponding date and periods in the prior fiscal year, subject to year-end adjustments. The financial statements shall be accompanied by a Compliance Certificate in the form of Exhibit E that is signed by Company's chief financial officer.

(c)     Collateral Reports.  No later than 15 days after each month end (or more frequently if Wells Fargo shall request it), detailed agings of Company's accounts receivable and accounts payable, a detailed inventory report (by category and location), an inventory certification report, and a calculation of Company's Accounts, Eligible Accounts, Inventory and Eligible Inventory as of the end of that month or shorter time period requested by Wells Fargo.

(d)     Projections.  No later than 30 days prior to each fiscal year end, Company's projected balance sheet and income statement and statement of retained earnings and cash flows for each month of the next fiscal year, certified as having been made in good faith and are based on reasonable assumptions and investigations by Company by Company's chief financial officer and accompanied by a statement of assumptions and supporting schedules and information.

(e)     Supplemental Reports.  Daily, Wells Fargo's standard form of "daily collateral report", together with receivables schedules, collection reports, and copies of the three largest invoices and any invoice over $100,000, along with the related shipment documents for goods sold to account debtors with respect to those invoices.

(f)     Litigation.  No later than five days after discovery, a Record notifying Wells Fargo of any litigation or other proceeding before any court or governmental agency which seeks a monetary recovery against Company in excess of $200,000.

(g)     Intellectual Property.  (i) No later than 30 days before it acquires material Intellectual Property Rights, a Record notifying Wells Fargo of Company's intention to acquire such rights; provided that no such notice will be required in connection with (A) the extension or renewal, on substantially the same terms and conditions, of the licenses to grow roses, clematis and campanula that were disclosed to Wells Fargo in Exhibit D, and (B) the acquisition of licenses for additional components of the Navision enterprise software that Company will use in connection with its new enterprise information technology system as disclosed to Wells Fargo in Exhibit D; (ii) except for transfers permitted under Section 5.18, no later than 30 days before it disposes of material Intellectual Property Rights, a Record notifying Wells Fargo of Company's intention to dispose of such rights, along with copies of all proposed documents and agreements concerning the disposal of such rights as requested by Wells Fargo; (iii) promptly upon discovery, a Record notifying Wells Fargo of (A) any Infringement of Company's Intellectual Property Rights by any Person, (B) claims that Company is Infringing another Person's Intellectual Property Rights and (C) any threatened cancellation, termination or material limitation of Company's Intellectual Property Rights; and (iv) promptly upon receipt, copies of all registrations and filings with respect to Company's Intellectual Property Rights.

(h)     Defaults.  No later than five days after learning of the probable occurrence of any Event of Default, a Record notifying Wells Fargo of the Event of Default and the steps being taken by Company to cure the Event of Default.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 17 of 99

(i)    Disputes.  Promptly upon discovery, a Record notifying Wells Fargo of (i) any disputes or claims by Company's customers exceeding $40,000 individually or $150,000 in the aggregate during any fiscal year; (ii) credit memos not previously reported in Section 5.1(e); and (iii) any goods returned to or recovered by Company outside of the ordinary course of business.

(j)    Changes in Officers and Directors.  Promptly following occurrence, a Record notifying Wells Fargo of any change in the persons constituting Company's Officers and Directors.

(k)    Collateral.  Promptly upon discovery, a Record notifying Wells Fargo of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of its payment.

(l)    Commercial Tort Claims.  Promptly upon discovery, a Record notifying Wells Fargo of any commercial tort claims brought by Company against any Person, including the name and address of each defendant, a summary of the facts, an estimate of Company's damages, copies of any complaint or demand letter submitted by Company, and such other information as Wells Fargo may request.

(m)    Reports to Owners.  Promptly upon distribution, copies of all financial statements, reports and proxy statements which Company shall have sent to its Owners.

(n)    Tax Returns of Company.  No later than October 31 of each year, unless Company files an extension, in which case no later than 30 days after the applicable due date as extended, copies of Company's signed and dated state and federal income tax returns and all related schedules with respect to the prior fiscal year, and copies of any extension requests.

(o)    Reserved.

(p)    Violations of Law.  No later than five days after discovery of any violation, a Record notifying Wells Fargo of Company's violation of any law, rule or regulation, the non-compliance with which could have a Material Adverse Effect on Company.

(q)    Pension Plans.  (i) Promptly upon discovery, and in any event within 30 days after Company knows or has reason to know that any Reportable Event with respect to any Pension Plan has occurred, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the Reportable Event in detail and the actions which Company proposes to take to correct the deficiency, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; (ii) promptly upon discovery, and in any event within 10 days after Company fails to make a required quarterly Pension Plan contribution under Section 412(m) of the IRC, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the failure in detail and the actions that Company will take to cure the failure, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; and (iii) promptly upon discovery, and in any event within 10 days after Company knows or has reason to know that it may be liable or may be reasonably expected to have liability for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Sections 4201 or 4243 of ERISA, a Record authenticated by Company's chief financial officer notifying

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 18 of 99

Wells Fargo of the details of the event and the actions that Company proposes to take in response.

        (r)    <u>Customer Lists</u>. By January 1 and July 1 of each year, an updated list of Company's customers, which shall include contact information.

        (s)    <u>Violations of Law</u>. Except as otherwise exempted by reason of the commencement of the Bankruptcy Case or by an order of the Bankruptcy Court in the Bankruptcy Case, promptly upon knowledge thereof, Company will deliver to Wells Fargo notice of Company's violation of any law, rule or regulation, the non-compliance with which could materially and adversely affect Company's business or its financial condition.

        (t)    <u>Bankruptcy Court Reporting</u>. Concurrently with the filing or service thereof, copies of all reports, pleadings, motions, applications, financial information and other documents filed by or on behalf of Company with the Bankruptcy Court or the U.S. Trustee assigned to the Bankruptcy Case.

        (u)    <u>Other Reports</u>. From time to time, with reasonable promptness, all receivables schedules, inventory reports, collection reports, deposit records, equipment schedules, invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other materials, reports, records or information as Wells Fargo may request.

Case: 11-31985   Doc# 8-2   Filed: 05/23/11   Entered: 05/23/11 15:19:00   Page 19 of 99

**5.2    Financial Covenants.**

　　　　(a)    <u>Minimum Cumulative Net Sales/Revenue</u>.  Company shall achieve, for each period described below, net sales/revenue, on a cumulative basis, of not less than the amount set forth for each such period:

| **Period From May 21, 2011 Through and Including:** | **Minimum Cumulative Net Sales/Revenue** |
|:---:|:---:|
| 06/03/2011 | $500,000 |
| 06/10/2011 | $1,000,000 |
| 06/17/2011 | $1,400,000 |
| 06/24/2011 | $2,100,000 |
| 07/01/2011 | $2,400,000 |
| 07/08/2011 | $2,700,000 |
| 07/15/2011 | $3,000,000 |
| 07/22/2011 | $4,000,000 |
| 07/29/2011 | $4,400,000 |

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 20 of 99

(b)     <u>Maximum Total Disbursements</u>.  Company shall not, for each period described below, make any expenditures, on a cumulative basis, of more than the amount set forth for each such period:

| **Period From May 21, 2011 Through and Including:** | **Maximum Total Disbursements** |
|---|---|
| 06/03/2011 | $2,845,000 |
| 06/10/2011 | $3,489,000 |
| 06/17/2011 | $4,247,000 |
| 06/24/2011 | $4,849,000 |
| 07/01/2011 | $6,143,000 |
| 07/08/2011 | $6,772,000 |
| 07/15/2011 | $7,348,000 |
| 07/22/2011 | $7,725,000 |
| 07/29/2011 | $8,412,000 |

**5.3     Other Liens and Permitted Liens.**

(a)     <u>Other Liens; Permitted Liens</u>.  Company shall not create, incur or suffer to exist any Lien upon any of its assets, now owned or later acquired, as security for any indebtedness, with the exception of the following (each a "Permitted Lien"; collectively, "Permitted Liens"): (i) in the case of real property, covenants, restrictions, rights, easements and minor irregularities in title which do not materially interfere with the Company's business or operations as currently conducted; (ii) certain liens and interests of certain senior, purchase money, and lessor interests of record as perfected by UCC-1 Financing Statement in existence at the time of commencement of the Bankruptcy Case, and not otherwise avoided, (iii) valid, enforceable and perfected liens that are capitalized leases, purchase money security interests or mechanics' liens in existence at the time of commencement of the Bankruptcy Case as identified and scheduled, (iv) valid and enforceable liens that are capitalized leases, purchase money security interests or mechanics' liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code as identified and scheduled, (v) the claim of certain "carve out" expenses relating to fees and costs incurred by Professionals retained by Borrowers or other party pursuant to Section 328 of the Bankruptcy Code, not to exceed an aggregate sum of $200,000, (vi) the payment of certain fees owed to certain governmental agencies and the Court pursuant to 28 U.S.C. § 1930, and (vii) Pre-Petition Liens.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 21 of 99

(b)    Financing Statements.  Company shall not authorize the filing of any financing statement by any Person as Secured Party with respect to any of Company's assets, other than Wells Fargo.  Company shall not amend any financing statement filed by Wells Fargo as Secured Party except as permitted by law.

**5.4    Indebtedness**.  Company shall not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or letters of credit issued on Company's behalf, or advances or any indebtedness for borrowed money of any kind, whether or not evidenced by an instrument, except: (a) Indebtedness described in this Agreement; (b) indebtedness of Company described in Exhibit F; (c) indebtedness secured by Permitted Liens; and (d) the Pre-Petition Indebtedness.

**5.5    Guaranties**.  Company shall not assume, guarantee, endorse or otherwise become directly or contingently liable for the obligations of any Person, except: (a) the endorsement of negotiable instruments by Company for deposit or collection or similar transactions in the ordinary course of business; and (b) guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons in existence on the date of this Agreement and described in Exhibit F.

**5.6    Investments and Subsidiaries**.  Company shall not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any Person or Affiliate, including any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of indebtedness of any Person or Affiliate, except:

(a)    Investments in direct obligations of the United States of America or any of its political subdivisions whose obligations constitute the full faith and credit obligations of the United States of America and have a maturity of one year or less, commercial paper issued by U.S. corporations rated "A 1" or "A 2" by Standard & Poor's Ratings Services or "P 1" or "P 2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation);

(b)    Travel advances or loans to Company's Officers and employees not exceeding at any one time an aggregate of $25,000, or $130,000 in the case of the loan to Robert Steinlein;

(c)    Prepaid rent not exceeding one month or security deposits; and

(d)    Current outstanding loans or advances to, or investments in, those Subsidiaries in existence on the date of this Agreement which are identified on Exhibit D.

**5.7    Dividends and Distributions**.  Except as set forth in this Agreement, Company shall not declare or pay any dividends (other than dividends payable solely in stock of Company) on any class of its stock, or make any payment on account of the purchase, redemption or retirement of any shares of its stock, or other securities or evidence of its indebtedness or make any distribution regarding its stock, either directly or indirectly.  So long as Company is a "pass-through" tax entity for United States federal income tax purposes, and after first providing such

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 22 of 99

supporting documentation as Wells Fargo may request (including the personal state and federal tax returns (and all related schedules) of each Owner net of any prior year loss carry-forward, Company may pay Pass-Through Tax Liabilities. Market rent paid by Company to its Owners who are also landlords of the Premises pursuant to the lease agreements for such Premises between Company and such Owners, and reasonable salary and other employment compensation paid by Company to its Owners who are also officers and employees of Company, shall not be deemed to be dividends for purposes of this Section 5.7.

5.8    **Salaries**.  Company shall not pay excessive or unreasonable salaries, bonuses, commissions, consultant fees or other compensation.

5.9    **Key Person Life Insurance.**  Waived.

5.10    **Books and Records; Collateral Examination; Inspection and Appraisals.**

(a)    Books and Records; Inspection.  Company shall keep complete and accurate books and records with respect to the Collateral and Company's business and financial condition and any other matters that Wells Fargo may request, in accordance with GAAP. Company shall permit any employee, attorney, accountant or other agent of Wells Fargo to audit, review, make extracts from and copy any of its books and records at any time during ordinary business hours, and to discuss Company's affairs with any of its Directors, Officers, employees, Owners or agents.

(b)    Authorization to Company's Agents to Make Disclosures to Wells Fargo. Company authorizes all accountants and other Persons acting as its agent to disclose and deliver to Wells Fargo's employees, accountants, attorneys and other Persons acting as its agent, at Company's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding Company.

(c)    Collateral Exams and Inspections.  Company shall permit Wells Fargo's employees, accountants, attorneys or other Persons acting as its agent, to examine and inspect any Collateral or any other property of Company at any time during ordinary business hours.

(d)    Collateral Appraisals.  Wells Fargo may also obtain, from time to time, but no more than one time each calendar year except during a Default Period, at Company's expense, an appraisal of Company's Inventory and the Real Property Collateral, by an appraiser acceptable to Wells Fargo in its sole discretion.

5.11    **Account Verification; Payment of Permitted Liens.**

(a)    Account Verification.  Wells Fargo or its agents may (i) contact account debtors and other obligors at any time to verify Company's Accounts; and (ii) require Company to send requests for verification of Accounts or send notices of assignment of Accounts to account debtors and other obligors.

(b)    Covenant to Pay Permitted Liens.  Company shall pay when due each account payable due to any Person holding a Permitted Lien (as a result of such payable) on any Collateral.

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 23 of 99

**5.12    Compliance with Laws.**

       (a)    <u>General Compliance with Applicable Law; Use of Collateral</u>.  Company shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable laws and regulations, the non compliance with which would have a Material Adverse Effect on its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance.

       (b)    <u>Compliance with Federal Regulatory Laws</u>.  Company shall (i) prohibit, and cause each Subsidiary to prohibit, any Person that is an Owner or Officer from being listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not permit the proceeds of the Post-Petition Line of Credit or any other financial accommodation extended by Wells Fargo to be used in any way that violates any foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act and Wells Fargo's related policies and procedures.

       (c)    <u>Compliance with Environmental Laws</u>.  Company shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable Environmental Laws and obtain and comply with all permits, licenses and similar approvals required by them, and (ii) not generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any Environmental Law.

**5.13    Payment of Taxes and Other Claims**.  Company shall pay or discharge, when due, and cause each Subsidiary to pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach, (b) all federal, state and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of Company, although Company shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

**5.14    Maintenance of Collateral and Properties**.

       (a)    Company shall keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, although Company may discontinue the operation and maintenance of any properties if Company believes that such discontinuance is desirable to the conduct of its business and not disadvantageous in any material respect to Wells Fargo.  Company shall take all commercially reasonable steps necessary to protect and maintain its Intellectual Property Rights.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 24 of 99

(b)     Company shall defend the Collateral against all Liens, claims and demands of all third Persons claiming any interest in the Collateral. Company shall keep all Collateral free and clear of all Liens except Permitted Liens. Company shall take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights.

**5.15    Insurance**.   Company shall at all times maintain insurance with insurers acceptable to Wells Fargo, in such amounts, on such terms (including any deductibles) and against such risks as Wells Fargo may require, in such amounts and against such risks as is usually carried by companies engaged in similar business and owning similar properties in the same geographical areas in which Company operates.   Company shall also at all times maintain business interruption insurance (including force majeure coverage) and keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles) and such other risks and in such amounts as Wells Fargo may reasonably request, with any loss payable to Wells Fargo to the extent of its interest, and all such policies of insurance shall contain a lender's loss payable endorsement for the benefit of Wells Fargo.   All policies of liability insurance shall name Wells Fargo as an additional insured.

**5.16    Preservation of Existence**.  Company shall preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in an orderly, efficient and regular manner.

**5.17    Delivery of Instruments, etc.**  Upon request by Wells Fargo, Company shall promptly deliver to Wells Fargo in pledge all instruments, documents and chattel paper constituting Collateral, endorsed or assigned by Company.

**5.18    Sale or Transfer of Assets; Suspension of Business Operations**.

(a)     Except as otherwise provided in Section 5.18(b), Company shall not sell, lease, assign, transfer or otherwise dispose of (i) the stock of any Subsidiary, (ii) all or a substantial part of its assets, or (iii) any Collateral or any interest in Collateral (whether in one transaction or in a series of transactions) to any other Person. Company shall not liquidate, dissolve or suspend business operations.  Company shall not transfer any part of its ownership interest in any Intellectual Property Rights and shall not permit its rights as licensee of Licensed Intellectual Property to lapse, except that Company may transfer such rights or permit them to lapse if it has reasonably determined that such Intellectual Property Rights are no longer useful in its business.  If Company transfers any Intellectual Property Rights for value, Company shall pay the Proceeds to Wells Fargo for application to the Indebtedness.  Company shall not license any other Person to use any of Company's Intellectual Property Rights, except that Company may grant licenses in the ordinary course of its business in connection with sales of Inventory or the provision of services to its customers.

(b)     Notwithstanding the first sentence of Section 5.18(a), (i) Company shall be permitted to sell its Inventory in the ordinary course of business, and (ii) Company shall be permitted to consummate 363 Sales that are approved by the Bankruptcy Court.  Company shall

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 25 of 99

cause the Net Cash Proceeds from each 363 Sale to be paid directly to Wells Fargo, and Wells Fargo shall apply such Net Cash Proceeds to the Indebtedness in such order as Wells Fargo shall determine in its sole discretion. In the event that such Net Cash Proceeds exceeds the Indebtedness at the time of application, the excess, if any, shall be paid to Company.

**5.19    Consolidation and Merger; Asset Acquisitions**. Company shall not consolidate with or merge into any other entity, or permit any other entity to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other entity.

**5.20    Sale and Leaseback**. Company shall not enter into any arrangement, directly or indirectly, with any other Person pursuant to which Company shall sell or transfer any real or personal property, whether owned now or acquired in the future, and then rent or lease all or part of such property or any other property which Company intends to use for substantially the same purpose or purposes as the property being sold or transferred.

**5.21    Restrictions on Nature of Business**. Company will not engage in any line of business materially different from that presently engaged in by Company, and will not purchase, lease or otherwise acquire assets not related to its business.

**5.22    Accounting**. Company will not adopt any material change in accounting principles except as required by GAAP, consistently applied. Company will not change its fiscal year.

**5.23    Discounts, etc.** During any Default Period, Company will not (i) grant any discount, credit or allowance to any customer of Company or accept any return of goods sold, or (ii) modify, amend, subordinate, cancel or terminate any Account. If no Default Period exists, Company will not, except in the ordinary course of business, (i) grant any discount, credit or allowance to any customer of Company or accept any return of goods sold, or (ii) modify, amend, subordinate, cancel or terminate any Account.

**5.24    Pension Plans**. Except as disclosed to Wells Fargo in a Record prior to the date of this Agreement, neither Company nor any ERISA Affiliate will (a) adopt, create, assume or become party to any Pension Plan, (b) become obligated to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required by law) or (d) amend any Plan in a manner that would materially increase its funding obligations.

**5.25    Place of Business; Name**. Company will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business Premises. Company will not permit any tangible Collateral or any records relating to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. Company will not change its name or jurisdiction of organization.

**5.26    Constituent Documents; S Corporation Status**. Company will not amend its Constituent Documents. Company shall not change or rescind its status as an S Corporation.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 26 of 99

**5.27  Performance by Wells Fargo**.  If Company fails to perform or observe any of its obligations under this Agreement at any time, Wells Fargo may, but need not, perform or observe them on behalf of Company and may, but need not, take any other actions which Wells Fargo may reasonably deem necessary to cure or correct this failure; and Company shall pay Wells Fargo upon demand the amount of all costs and expenses (including reasonable attorneys' fees and legal expense) incurred by Wells Fargo in performing these obligations, together with interest on these amounts at the Default Rate.

**5.28  Wells Fargo Appointed as Company's Attorney in Fact**.  To facilitate Wells Fargo's performance or observance of Company's obligations under this Agreement, Company hereby irrevocably appoints Wells Fargo and Wells Fargo's agents, as Company's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) to create, prepare, complete, execute, deliver, endorse or file on behalf of Company any instruments, documents, assignments, security agreements, financing statements, applications for insurance and any other agreements or any Record required to be obtained, executed, delivered or endorsed by Company in accordance with the terms of this Agreement.

**5.29  Bankruptcy Case Matters**.

(a)  Promptly after the same is available, Company shall furnish or cause to be furnished to counsel for Wells Fargo all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Company with the Bankruptcy Court or served by or on behalf of Company upon a United States Trustee in the Bankruptcy Case or other non-confidential material documents distributed by or on behalf of Company to any creditors' committee appointed in the Bankruptcy Case.  Without limiting the generality of the foregoing, Company shall promptly provide reasonable access to, and discuss with, Wells Fargo and its counsel any and all material information and developments in connection with any proposed plan of reorganization, including, without limitation, any non-confidential and non-privileged letters of intent, commitment letters or engagement letters received by Company, any asset valuation and disclosure statement, and any other event or condition which is reasonably likely to have a material effect on Company or the Bankruptcy Case.

(b)  All fees or expenses of Professionals of Company at any time shall be paid pursuant to an order entered by the Bankruptcy Court in the Bankruptcy Case approving the allowance and payment of such fees and reimbursement of such expenses, or establishing procedures for such payments or approval of such fees and reimbursement.

(c)  Company shall not request, seek or consent to, and shall oppose and contest (unless otherwise consented to by Wells Fargo), any modification, stay, vacation or amendment of any Applicable Financing Order or any other Loan Document.

(d)  Except as otherwise expressly provided by the Applicable Financing Orders, Company shall not seek or support any approval of the granting of any priority for any administrative expense, secured claim or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative priority expenses of the kind specified in sections 105, 326, 328, 503(b), 506(c), 507(a) or 507(b) of the

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 27 of 99

Bankruptcy Code) unless otherwise expressly consented to by Wells Fargo and Wells Fargo in writing.

(e)     Prior to the date on which the Indebtedness has been paid in full in cash and any commitment of Wells Fargo to provide Loans or any other financial accommodation hereunder has been terminated, Company shall not pay any administrative priority expenses except for (i) those types of expenses contemplated under the Budget, and (ii) the allowed fees and expenses of Professionals as provided and otherwise not prohibited herein, and (iii) as ordered by the Bankruptcy Court.

(f)     Company shall not make any payments or transfers of any property on account of claims asserted by any vendors of Company for reclamation in accordance with Section 2-702 of any applicable UCC and section 546(c) of the Bankruptcy Code.

(g)     Company shall not return any Inventory to any vendor out of the ordinary course pursuant to section 546(h) of the Bankruptcy Code unless otherwise provided by an order of the Bankruptcy Court.

(h)     Except as specifically provided in this Agreement with respect to the Pre-Petition Indebtedness, Company shall not transfer value, whether in cash, in kind or by way of offset, on account of the Pre-Petition Indebtedness unless otherwise provided by an order of the Bankruptcy Court.

(i)     If any Subsidiary becomes a debtor in a case under the Bankruptcy Code on or after the Closing Date, Company shall, as promptly as possible and in any event within three Business Days of such Subsidiary becoming a debtor in such case, seek to cause such Subsidiary to become a borrower under this Agreement and the other Loan Documents and to execute and deliver to Wells Fargo such other and further documents and instruments as may be required to facilitate the same; provided, that such Subsidiary shall not become a borrower under this Agreement or the other Loan Documents without the consent of Wells Fargo and a Bankruptcy Order.

## 6.     EVENTS OF DEFAULT AND REMEDIES

**6.1     Events of Default**.  An "Event of Default" means any of the following:

(a)     Company fails to pay the amount of any Indebtedness on the date that it becomes due and payable;

(b)     Company fails to observe or perform any covenant or agreement of Company set forth in this Agreement, or in any of the Loan Documents, or in any other document or agreement described in or related to this Agreement or to any Indebtedness; provided that, with respect to the covenants set forth in Sections 5.12 and 5.14, such failure shall not be an Event of Default until such failure has continued for fifteen calendar days commencing on the earlier of (i) receipt, or deemed receipt in accordance with the terms hereof, by Company of notice from Wells Fargo of such failure, or (ii) the time at which Company or any authorized officer thereof knew or became aware, or should have known or been aware, of such failure; or any covenant in Section 5.2 becomes inapplicable due to the lapse of time, and Company and

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 28 of 99

Wells Fargo fail to come to an agreement acceptable to Wells Fargo in Wells Fargo's sole discretion to amend the covenant to apply to future periods;

(c)     An Overadvance arises as the result of any reduction in the Borrowing Base, or arises in any manner or on terms not otherwise approved of in advance by Wells Fargo in a Record that it has Authenticated;

(d)     An event of default or termination event (however defined) occurs under any swap, derivative, foreign exchange, hedge or any similar transaction or arrangement entered into between Company and Wells Fargo;

(e)     A Change of Control shall occur;

(f)     Intentionally Omitted;

(g)     Intentionally Omitted;

(h)     Intentionally Omitted;

(i)     Any representation or warranty made by Company in this Agreement or by any Guarantor in any Guaranty, or by Company (or any of its Officers) or any Guarantor in any agreement, certificate, instrument or financial statement or other statement delivered to Wells Fargo in connection with this Agreement or pursuant to such Guaranty is untrue or misleading in any material respect when delivered to Wells Fargo;

(j)     A final, non-appealable arbitration award, judgment, or decree or order for the payment of money in an amount in excess of $500,000 which is not insured or subject to indemnity, is entered against Company which is not immediately stayed or appealed;

(k)     Company is in default with respect to any bond, debenture, note or other evidence of material indebtedness issued by Company that is held by any third Person other than Wells Fargo, or under any instrument under which any such evidence of indebtedness has been issued or by which it is governed, or under any material lease or other contract, and the applicable grace period, if any, has expired, regardless of whether such default has been waived by the holder of such indebtedness;

(l)     Intentionally Omitted;

(m)     Intentionally Omitted;

(n)     Any Guarantor repudiates or purports to revoke the Guarantor's Guaranty, or fails to perform any obligation under such Guaranty, or any individual Guarantor dies or becomes incapacitated, or any other Guarantor ceases to exist for any reason;

(o)     Company engages in any act prohibited by any Subordination Agreement, or makes any payment on Subordinated Indebtedness (as defined in the Subordination Agreement) that the Subordinated Creditor was not contractually entitled to receive;

(p)     Intentionally Omitted.

(q)     Any Director, Officer, Guarantor, or Owner of at least 20% of the issued and outstanding common stock of Company is indicted for a felony offence under state or federal law, or Company hires an Officer or appoints a Director who has been convicted of any such felony offense, or a Person becomes an Owner of at least 20% of the issued and outstanding common stock of Company who has been convicted of any such felony offense.

(r)     Any Reportable Event, which Wells Fargo in good faith believes to constitute sufficient grounds for termination of any Pension Plan or for the appointment of a trustee to administer any Pension Plan, has occurred and is continuing 30 days after Company gives Wells Fargo a Record notifying it of the Reportable Event; or a trustee is appointed by an appropriate court to administer any Pension Plan; or the Pension Benefit Guaranty Corporation institutes proceedings to terminate or appoint a trustee to administer any Pension Plan; or Company or any ERISA Affiliate files for a distress termination of any Pension Plan under Title IV of ERISA; or Company or any ERISA Affiliate fails to make any quarterly Pension Plan contribution required under Section 412(m) of the IRC, which Wells Fargo in good faith believes may, either by itself or in combination with other failures, result in the imposition of a Lien on Company's assets in favor of the Pension Plan; or any withdrawal, partial withdrawal, reorganization or other event occurs with respect to a Multiemployer Plan which could reasonably be expected to result in a material liability by Company to the Multiemployer Plan under Title IV of ERISA.

(s)     Any of the following events shall occur:

(i)     (x) On or before June 15, 2011, the Bankruptcy Court shall have failed to enter a Bankruptcy Order approving the procedures for the 363 Sales for the sale of all of the operating assets of Company and the sale of the PUD Properties, or (y) on or before July 29, 2011, the Bankruptcy Court shall have failed to enter a final Bankruptcy Order approving the 363 Sales for the sale of all of the operating assets of Company and the sale of the PUD Properties;

(ii)     The filing, presentation or supporting of any motion, application or request, or adversary proceeding, in each case, by Company without the consent of Wells Fargo, which motion, application, request or adversary proceeding, requests entry of an order or the entry of an order in the Bankruptcy Case or any adversary proceeding which has not been withdrawn, stayed, dismissed or reversed:

(A)     authorizing Company in the Bankruptcy Case to incur Debt (except as expressly permitted under this Agreement) or additional financing under section 364(c) or (d) of the Bankruptcy Code other than from Wells Fargo in accordance with this Agreement, or without the express prior written consent of Wells Fargo;

(B)     authorizing any party other than Wells Fargo to recover from any material portion of the Collateral, whether or not such party takes any action to recover such Collateral;

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 30 of 99

(C) authorizing any costs or expenses under section 506(c) of the Bankruptcy Code as a surcharge against the Collateral;

(D) authorizing the use of cash collateral in which Wells Fargo asserts an interest under section 363(c) of the Bankruptcy Code (except as provided herein or in the Applicable Financing Orders) without Wells Fargo's prior written consent;

(E) appointing (i) an interim or permanent trustee or (ii) an examiner having enlarged powers relating to the operation of the businesses of Company (beyond those powers set forth under section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(F) dismissing the Bankruptcy Case or converting the Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code;

(G) granting relief from or modifying the Automatic Stay to allow any party to execute upon or enforce a Lien on or exercise any right with respect to any material portion of the Collateral;

(H) amending, supplementing, staying, reversing, vacating or otherwise modifying any Applicable Financing Order, this Agreement or any other Loan Document, or any of Wells Fargo's rights, interests, claims, benefits, privileges or remedies under the Applicable Financing Orders, this Agreement or any other Loan Document without the consent of Wells Fargo;

(I) approving or allowing any other administrative expense claim having any priority over, or being pari passu with the administrative expense priority of the Indebtedness in respect of the Bankruptcy Case; or

(J) rejecting pursuant to section 365 of the Bankruptcy Code or other applicable law one or more executory contracts to which Company is a party that would result in a Material Adverse Effect unless otherwise consented to by Wells Fargo;

(iii) The Final Financing Order is not entered by the Bankruptcy Court within 30 days after the Petition Date;

(iv) The filing by Company or any Guarantor of a Plan of Reorganization in the Bankruptcy Case or a motion to sell all or substantially all of the operating assets of Company pursuant to section 363 of the Bankruptcy Code that, when taken together with the proceeds of a Section 363 sale of the PUD Properties so long as such a sale is pending, does not provide for the payment and satisfaction of all Indebtedness, in full, in cash, on the effective date thereof (including by the continuation, amendment, restatement or extension of this Agreement or by any financing of the Indebtedness);

(v) The entry of an order confirming a Plan of Reorganization that does not require repayment in full in cash of all Indebtedness on the effective date of such Plan of Reorganization;

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 31 of 99

(vi)     The failure by Company to perform, in any material respect, any of the terms, conditions, or covenants or its obligations under the Applicable Financing Order;

(vii)     The cessation of the Liens or super-priority claims granted to Wells Fargo with respect to this Agreement to be valid, perfected and enforceable in all respects; or

(viii)     A trustee, receiver or custodian is appointed for Company or any of its properties.

**6.2     Rights and Remedies**.  During any Default Period, Wells Fargo may in its discretion exercise any or all of the following rights and remedies:

(a)     Wells Fargo may terminate the Post-Petition Line of Credit and decline to make Advances, and terminate any services extended to Company under the Master Agreement for Treasury Management Services;

(b)     Wells Fargo may declare the Indebtedness (other than the Pre-Petition Indebtedness) to be immediately due and payable and accelerate payment of the Notes, and all Indebtedness shall immediately become due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Company hereby expressly waives;

(c)     Intentionally Deleted;

(d)     Subject to the Automatic Stay, if any, Wells Fargo may exercise and enforce any rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, proceeding with or without judicial process (without a prior hearing or notice of hearing, which Company hereby expressly waives) and sell, lease or otherwise dispose of Collateral for cash or on credit (with or without giving warranties as to condition, fitness, merchantability or title to Collateral, and in the event of a credit sale, Indebtedness shall be reduced only to the extent that payments are actually received), and Company will upon Wells Fargo's demand assemble the Collateral and make it available to Wells Fargo at any place designated by Wells Fargo which is reasonably convenient to both parties;

(e)     Subject to the Automatic Stay, if any, Wells Fargo may exercise and enforce its rights and remedies under any of the Loan Documents and any other document or agreement described in or related to this Agreement; and

(f)     Subject to the Automatic Stay, if any, Wells Fargo may exercise any other rights and remedies available to it by law or agreement.

**7.     MISCELLANEOUS**

**7.1     No Waiver; Cumulative Remedies**.  No delay or any single or partial exercise by Wells Fargo of any right, power or remedy under the Loan Documents, or under any other document or agreement described in or related to this Agreement, shall constitute a waiver of any other right, power or remedy under the Loan Documents or granted by Company to Wells Fargo

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 32 of 99

under other agreements or documents that are unrelated to the Loan Documents. No notice to or demand on Company in any circumstance shall entitle Company to any additional notice or demand in any other circumstances. The remedies provided in the Loan Documents or in any other document or agreement described in or related to this Agreement are cumulative and not exclusive of any remedies provided by law. Wells Fargo may comply with applicable law in connection with a disposition of Collateral, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**7.2    Amendments; Consents and Waivers; Authentication**. No amendment or modification of any Loan Documents, or any other document or agreement described in or related to this Agreement, or consent to or waiver of any Event of Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or any release of Wells Fargo's Security Interest in any Collateral, shall be effective <u>unless</u> it has been agreed to by Wells Fargo and memorialized in a Record that: (a) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Event of Default or the application of any covenant or representation of any terms of specific Loan Documents, or any other document or agreement described in or related to this Agreement, or is intended to release Wells Fargo's Security Interest in specific Collateral; and (b) is Authenticated by the signature of an authorized employee of both parties, or by an authorized employee of Wells Fargo with respect to a consent or waiver. The terms of an amendment, consent or waiver memorialized in any Record shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Wells Fargo has agreed.

**7.3    Execution in Counterparts; Delivery of Counterparts**. This Agreement and all other Loan Documents, or any other document or agreement described in or related to this Agreement, and any amendment or modification to them may be Authenticated by the parties in any number of counterparts, each of which, once authenticated and delivered in accordance with the terms of this Section 7.3, will be deemed an original, and all such counterparts, taken together, shall constitute one and the same instrument. Delivery by fax or by encrypted e-mail or e-mail file attachment of any counterpart to any Loan Document Authenticated by an authorized signature will be deemed the equivalent of the delivery of the original Authenticated instrument. Company shall send the original Authenticated counterpart to Wells Fargo by first class U.S. mail or by overnight courier, but Company's failure to deliver a Record in this form shall not affect the validity, enforceability, and binding effect of this Agreement or the other Loan Documents, or any other document or agreement described in or related to this Agreement.

**7.4    Notices, Requests, and Communications; Confidentiality**. Except as otherwise expressly provided in this Agreement:

(a)    <u>Delivery of Notices, Requests and Communications</u>. Any notice, request, demand, or other communication by either party that is required under the Loan Documents, or any other document or agreement described in or related to this Agreement, to be in the form of a Record (but excluding any Record containing information Company must report to Wells Fargo under Section 5.1) may be delivered (i) in person, (ii) by first class U.S. mail, (iii) by overnight courier of national reputation, or (iv) by fax, or the Record may be sent as an Electronic Record

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 33 of 99

and delivered (v) by an encrypted e-mail, or (vi) through Wells Fargo's *Commercial Electronic Office*® ("CEO®") portal or other secure electronic channel to which the parties have agreed.

(b)     <u>Addresses for Delivery</u>.  Delivery of any Record under this Section 7.4 shall be made to the appropriate address set forth on the last page of this Agreement (which either party may modify by a Record sent to the other party), or through Wells Fargo's CEO portal or other secure electronic channel to which the parties have agreed.

(c)     <u>Date of Receipt</u>.  Each Record sent pursuant to the terms of this Section 7.4 will be deemed to have been received on (i) the date of delivery if delivered in person, (ii) the date deposited in the mail if sent by mail, (iii) the date delivered to the courier if sent by overnight courier, (iv) the date of transmission if sent by fax, or (v) the date of transmission, if sent as an Electronic Record by electronic mail or through Wells Fargo's CEO portal or similar secure electronic channel to which the parties have agreed; <u>except</u> that any request for an Advance or any other notice, request, demand or other communication from Company required under Section 1, and any request for an accounting under Section 9210 of the UCC, will not be deemed to have been received until actual receipt by Wells Fargo on a Business Day by an authorized employee of Wells Fargo.

(d)     <u>Confidentiality of Unencrypted E-mail</u>.  Company acknowledges that if it sends or receives an Electronic Record to or from Wells Fargo without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing Company will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.

**7.5     Company Information Reporting; Confidentiality**.  Except as otherwise expressly provided in this Agreement:

(a)     <u>Delivery of Company Information Records</u>.  Any information that Company is required to deliver under Section 5.1 in the form of a Record may be delivered to Wells Fargo (i) in person, or by (ii) first class U.S. mail, (iii) overnight courier of national reputation, or (iv) fax, or the Record may be sent as an Electronic Record (v) by encrypted e-mail, or (vi) through the file upload service of Wells Fargo's CEO portal or other secure electronic channel to which the parties have agreed.

(b)     <u>Addresses for Delivery</u>.  Delivery of any Record to Wells Fargo under this Section 7.5 shall be made to the appropriate address set forth on the last page of this Agreement (which Wells Fargo may modify by a Record sent to Company), or through Wells Fargo's CEO portal or other secure electronic channel to which the parties have agreed.

(c)     <u>Date of Receipt</u>.  Each Record sent pursuant to this Section will be deemed to have been received on (i) the date of delivery to an authorized employee of Wells Fargo, if delivered in person, or by U.S. mail, overnight courier, fax, or e-mail; or (ii) the date of transmission, if sent as an Electronic Record through Wells Fargo's CEO portal or similar secure electronic channel to which the parties have agreed.

(d)     <u>Authentication of Company Information Records</u>.  Company shall Authenticate any Record delivered (i) in person, or by U.S. mail, overnight courier, or fax, by the

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 34 of 99

signature of the Officer or employee of Company who prepared the Record; (ii) as an Electronic Record sent via encrypted e-mail, by the signature of the Officer or employee of Company who prepared the Record by any file format signature that is acceptable to Wells Fargo, or by a separate certification signed and sent by fax; or (iii) as an Electronic Record via the file upload service of Wells Fargo's CEO portal or similar secure electronic channel to which the parties have agreed, through such credentialing process as Wells Fargo and Company may agree to under the CEO agreement.

(e)    Certification of Company Information Records.  Any Record (including any Electronic Record) Authenticated and delivered to Wells Fargo under this Section 7.5 will be deemed to have been certified as materially true, correct, and complete by Company and each Officer or employee of Company who prepared and Authenticated the Record on behalf of Company, and may be legally relied upon by Wells Fargo without regard to method of delivery or transmission.

(f)    Confidentiality of Company Information Records Sent by Unencrypted E-mail.  Company acknowledges that if it sends or receives an Electronic Record to or from Wells Fargo without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing Company will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure. Company acknowledges that it may deliver or receive Electronic Records containing Company information to or from Wells Fargo by e-mail pursuant to any encryption tool acceptable to Wells Fargo and Company, or through Wells Fargo's CEO portal file upload service without risk of unauthorized disclosure.

**7.6    Further Documents**.  Company will from time to time execute, deliver, endorse and authorize the filing of any instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements that Wells Fargo may reasonably request in order to secure, protect, perfect or enforce the Security Interest or Wells Fargo's rights under the Loan Documents, or any other document or agreement described in or related to this Agreement (but any failure to request or assure that Company executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents, or any other document or agreement described in or related to this Agreement, and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

**7.7    Costs and Expenses**.  Company shall pay on demand all costs and expenses, including reasonable attorneys' fees, incurred by Wells Fargo in connection with the Indebtedness, this Agreement, the Loan Documents, or any other document or agreement described in or related to this Agreement, and the transactions contemplated by this Agreement, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Indebtedness and all such documents and agreements and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 35 of 99

**7.8** **Indemnity**. In addition to its obligation to pay Wells Fargo's expenses under the terms of this Agreement, Company shall indemnify, defend and hold harmless Wells Fargo, its parent Wells Fargo & Company, and any of its affiliates and successors, and all of their present and future Officers, Directors, employees, attorneys and agents (the "Indemnitees") from and against any of the following (collectively, "Indemnified Liabilities"):

(a)    Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents, or any other document or agreement described in or related to this Agreement, or the making of the Advances;

(b)    Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in Exhibit D proves to be incorrect in any respect or as a result of any violation of the covenants contained in Section 5.12; and

(c)    Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) in connection with this Agreement and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party to such proceedings, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents, or any other document or agreement described in or related to this Agreement, or the use or intended use of the proceeds of the Advances, with the exception of any Indemnified Liability caused by the gross negligence or willful misconduct of an Indemnitee.

If any investigative, judicial or administrative proceeding described in this Section is brought against any Indemnitee, upon the Indemnitee's request, Company, or counsel designated by Company and satisfactory to the Indemnitee, will resist and defend the action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at Company's sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If this agreement to indemnify is held to be unenforceable because it violates any law or public policy, Company shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities to the extent permissible under applicable law. Company's obligations under this Section shall survive the termination of this Agreement and the discharge of Company's other obligations under this Agreement.

**7.9    General Release**.

(a)    Company hereby absolutely and unconditionally releases and forever discharges Wells Fargo, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents and employees of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which Company has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 36 of
99

beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown. Company certifies that it has read the following provisions of California Civil Code Section 1542:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

(b)     Company understands and acknowledges that the significance and consequence of this waiver of California Civil Code Section 1542 is that even if it should eventually suffer additional damages arising out of the facts referred to above, they will not be able to make any claim for those damages. Furthermore, Company acknowledges that it intends these consequences even as to claims for damages that may exist as of the date of this release but which it does not know exist, and which, if known, would materially affect its decision to execute this Agreement, regardless of whether its lack of knowledge is the result of ignorance, oversight, error, negligence, or any other cause.

(c)     The Applicable Final Financing Order shall provide that any action contesting the release and validation provisions set forth in this Section 7.9 as applicable to and binding upon any party other than Company must be filed (x) by the Creditors' Committee, within 60 days from the date of the selection of counsel for the Creditors' Committee, or (y) in the event that no Creditors' Committee is appointed, by any party in interest within 75 days from the date of entry of the Applicable Financing Order, provided that nothing herein shall be deemed to grant or alter standing of the Creditors' Committee or such other party to assert such an action.

(d)     Notwithstanding any other term or provision contained herein, nothing contained in this Section 7.9 shall impair, prohibit, or otherwise affect any Committee's right to prosecute an Adverse Action subject to the terms of the Applicable Financing Orders.

**7.10    Bankruptcy Waivers**.

(a)     Surcharge Waiver.  In accordance with and to the extent approved by the Applicable Financing Orders, Company hereby waives any claims to surcharge the Collateral under section 506(c) of the Bankruptcy Code.

(b)     No Other Financing.  Company hereby irrevocably waives any rights that it may have to seek authority (i) to obtain postpetition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code secured by the Collateral other than from Wells Fargo unless such authority results in the Indebtedness being paid in full in cash.

**7.11    Retention of Company's Records**.  Wells Fargo shall have no obligation to maintain Electronic Records or retain any documents, schedules, invoices, agings, or other Records delivered to Wells Fargo by Company in connection with the Loan Documents, or any other document or agreement described in or related to this Agreement for more than 30 days after receipt by Wells Fargo.  If there is a special need to retain specific Records, Company must notify Wells Fargo of its need to retain or return such Records with particularity, which notice

Case: 11-31985   Doc# 8-2   Filed: 05/23/11   Entered: 05/23/11 15:19:00   Page 37 of 99

must be delivered to Wells Fargo in accordance with the terms of this Agreement at the time of the initial delivery of the Record to Wells Fargo.

**7.12    Binding Effect; Assignment; Complete Agreement**.  The Loan Documents, or any other document or agreement described in or related to this Agreement, shall be binding upon and inure to the benefit of Company and Wells Fargo and their respective successors and assigns, except that Company shall not have the right to assign its rights under this Agreement or any interest in this Agreement without Wells Fargo's prior consent, which must be confirmed in a Record Authenticated by Wells Fargo. To the extent permitted by law, Company waives and will not assert against any assignee any claims, defenses or set-offs which Company could assert against Wells Fargo. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower.  This Agreement, together with the Loan Documents, or any other document or agreement described in or related to this Agreement, comprises the complete and integrated agreement of the parties on the subject matter of this Agreement and supersedes all prior agreements, whether oral or evidenced in a Record.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents other than this Agreement, or any other document or agreement described in or related to this Agreement, this Agreement shall control.

**7.13    Sharing of Information**.  Wells Fargo may share any information that it may have regarding Company and its Affiliates with its accountants, lawyers, and other advisors, and Wells Fargo and each direct and indirect subsidiary of Wells Fargo & Company may also share any information that they have with each other, and Company waives any right of confidentiality it may have with respect to the sharing of all such information.

**7.14    Severability of Provisions**.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining terms of this Agreement.

**7.15    Headings**.  Section and subsection headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**7.16    Governing Law; Jurisdiction, Venue**.  The Loan Documents (other than real estate related documents, if any) shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of California. The parties to this Agreement (a) consent to the personal jurisdiction of the state and federal courts located in the State of California in connection with any controversy related to this Agreement; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Wells Fargo or Company in connection with this Agreement or the other Loan Documents may be venued in either the state or federal courts located in the County of Los Angeles, State of California; and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**7.17    Intentionally Omitted**.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 38 of 99

**7.18    Reaffirmation of Pre-Petition Loan Documents**.    The Pre-Petition Credit Agreement and the Pre-Petition Loan Documents remain in full force and effect, and Company shall continue to perform all of its obligations thereunder, including without limitation, the timely payment of all payments of principal and interest due on the Pre-Petition Indebtedness, including the Advances, the Term Loan and the Term Loan E (as such terms are defined in the Pre-Petition Credit Agreement).

*[remainder of this page intentionally left blank]*

**COMPANY AND WELLS FARGO** have executed this Agreement through their authorized officers as of the date set forth above.

**WELLS FARGO BANK,
NATIONAL ASSOCIATION**

By: _____
Name: Harry L. Joe
Its      Vice President


**NURSERYMEN'S EXCHANGE, INC.,**
a California corporation

By: _____
Name:
Title:


**Wells Fargo Bank, National Association**
245 South Los Robles
Suite 700
Pasadena, CA 91101
Fax:  (626) 844-9063
Attention:  Harry L. Joe
e-mail: joeharry@wellsfargo.com

**Nurserymen's Exchange, Inc.**
2651 North Cabrillo Highway
Half Moon Bay, CA 94109
Fax:  (650) 712-4285
Attention:  Jack Pearlstein
e-mail:  jpearlstein@bloomrite.com
Federal Employer Identification No.:
94-1424729
Organizational Identification No.:
C0348449

S-1
Credit and Security Agreement

BN 9031290v5

# REVOLVING NOTE

**$5,000,000**                                                                                          **May 23, 2011**

    **FOR VALUE RECEIVED**, the undersigned, NURSERYMEN'S EXCHANGE, INC., a California corporation, a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Company"), hereby promises to pay to the order of WELLS FARGO BANK, NATIONAL ASSOCIATION ("Wells Fargo"), acting through its WELLS FARGO BUSINESS CREDIT operating division, on the Termination Date described in the Debtor-In-Possession Credit and Security Agreement dated as of even date herewith (as amended from time to time, the "Agreement") and entered into between Wells Fargo and Company, at Wells Fargo's office at 245 South Los Robles, Suite 700, Pasadena, CA 91101, or at any other place designated at any time by the holder, in lawful money of the United States of America and in immediately available funds, the principal sum of Five Million Dollars ($5,000,000) or the aggregate unpaid principal amount of all Advances under the Post-Petition Line of Credit made by Wells Fargo to Company under the terms of the Agreement, together with interest on the principal amount computed on the basis of actual days elapsed in a 360-day year, from the date of this Revolving Note until this Revolving Note is fully paid at the rate from time to time in effect under the terms of the Agreement.  Principal and interest accruing on the unpaid principal amount of this Revolving Note shall be due and payable as provided in the Agreement.  This Revolving Note may be prepaid only in accordance with the Agreement.

    This Revolving Note is the Post-Petition Revolving Note referred to in the Agreement, and is subject to the terms of the Agreement, which provides, among other things, for the acceleration of this Revolving Note.  This Revolving Note is secured, among other things, by the Agreement and the Security Documents as defined in the Agreement, and by any other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements that may subsequently be given for good and valuable consideration as security for this Revolving Note.

    Company shall pay all costs of collection, including reasonable attorneys' fees and legal expenses if this Revolving Note is not paid when due, whether or not legal proceedings are commenced.

    Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

                                **NURSERYMEN'S EXCHANGE, INC.**,
a California corporation

By: _____
Name:
Title:

BN 9031290v5

# Exhibit A to Credit and Security Agreement

## DEFINITIONS

"Account Funds" is defined in Section 1.4(a).

"Accounts" shall have the meaning given it under the UCC.

"Advance" and "Advances" means an advance or advances under the Post-Petition Line of Credit.

"Adverse Action" means (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek any order, judgment, determination, finding or similar relief: (i) challenging or contesting the legality, validity, priority, amount, or enforceability of the Indebtedness, (ii) challenging or contesting the legality, validity, priority, or enforceability, or seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, any lien or interest in favor of Wells Fargo in the Collateral, or (iii) seeking to prevent, hinder, or delay the assertion or enforcement by Wells Fargo of any right, remedy, claim, benefit, or privilege of, or lien or interest in favor of such party in the Collateral or realization upon any Collateral, (b) a request to use the Cash Collateral without Wells Fargo's consent, (c) any negotiation, solicitation, or attempt to obtain postpetition loans or other financial accommodations (other than the Indebtedness or which would pay all Indebtedness in full) pursuant to section 364(c) or (d) other than from Wells Fargo or such other party without Wells Fargo's consent, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against Wells Fargo, or any of its officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including without limitation any attempt to recover on an Avoidance Claim from any such party, or (e) any act which has or could have the effect of materially modifying or compromising any right, remedy, claim, benefit or privilege of Wells Fargo, or which is contrary to any term or condition set forth in or acknowledged by the Loan Documents.

"Affiliate" or "Affiliates" means any Person controlled by, controlling or under common control with Company, including any Subsidiary of Company. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Face Amount" means the aggregate amount that may then be drawn under each outstanding Letter of Credit, assuming compliance with all conditions for drawing.

"Agreement" means this Credit and Security Agreement.

"Authenticated" means (a) to have signed; or (b) to have executed or to have otherwise adopted a symbol, or have encrypted or similarly processed a Record in whole or in part, with the present intent of the authenticating Person to identify the Person and adopt or accept a Record.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 42 of 99

"Applicable Financing Order" means the Interim Financing Order, until such time as it is superseded by the Final Financing Order, at which time "Applicable Financing Order" will mean the Final Financing Order.

"Automatic Stay" has the meaning of "stay" within the meaning of section 262 of the Bankruptcy Code.

"Avoidance Claims" mean claims, actions, and causes of action under sections 502(d), 542, 544, 547, 548, 550, or 551 of the Bankruptcy Code, and all recoveries and proceeds relating thereof or arising therefrom, but specifically excluding claims, actions, or causes of action under section 549 of the Bankruptcy Code and any proceeds relating thereto or arising therefrom.

"Avoiding Power Causes of Action" means all rights, actions and recoveries arising under Chapter 5 of the Bankruptcy Code including avoidance actions.

"Bankruptcy Case" is defined in the Recitals.

"Bankruptcy Code" is defined in the Recitals.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of California or any such other court before which the Bankruptcy Case are pending.

"Bankruptcy Order" means the order(s) entered by the Bankruptcy Court in the Bankruptcy Case and any notices and motions filed with the Bankruptcy Court relating to such order.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended, and any successor statute.

"Borrowing Base" is defined in Section 1.2(a).

"Borrowing Base Reserve" means, as of any date of determination, an amount or a percent of a specified category or item that Wells Fargo establishes in its sole discretion from time to time to reduce availability under the Borrowing Base (a) to reflect events, conditions, contingencies or risks which affect the assets, business or prospects of Company, or the Collateral or its value, or the enforceability, perfection or priority of Wells Fargo's Security Interest in the Collateral, as the term "Collateral" is defined in this Agreement, or (b) to reflect Wells Fargo's judgment that any collateral report or financial information relating to Company and furnished to Wells Fargo may be incomplete, inaccurate or misleading in any material respect.

"Budget" means that certain Budget attached as Exhibit G hereto and updated pursuant to Section 5.1(u). The Budget shall not be modified or otherwise amended without the consent of Wells Fargo.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 43 of 99

"*CEO*" is defined in Section 7.4(a).

"Change of Control" means the occurrence of any of the following events:

(a)     Any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) who does not have an ownership interest in Company on the date of the initial Advance is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that any such Person, entity or group will be deemed to have "beneficial ownership" of all securities that such Person, entity or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than twenty-five percent (25%) of the voting power of all classes of ownership of Company;

(b)     During any consecutive two-year period, individuals who at the beginning of such period constituted the board of Directors of Company (together with any new Directors whose election to such board of Directors, or whose nomination for election by the Owners of Company, was approved by a vote of two thirds of the Directors then still in office who were either Directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the board of Directors of Company then in office.

(c)     Either Jack Pearlstein or Gail Hollingsworth shall cease to actively manage Company's day-to-day business activities.

(d)     Intentionally Omitted.

(e)     Company shall cease to engage a turnaround consultant acceptable to Wells Fargo unless Wells Fargo has notified Company in an Authenticated Record that Wells Fargo no longer requires Company to engage a turnaround consultant.  Wells Fargo acknowledges that, as of the date hereof, Chell Chelliah is acceptable.

"Collateral" means all of Company's Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, all sums on deposit in any Collection Account, and any items in any Lockbox; together with (a) all substitutions and replacements for and products of such property; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, Equipment and repairs now or subsequently attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title that cover such goods now or in the future; (e) all collateral subject to the Lien of any of the Security Documents; (f) any money, or other assets of Company that come into the possession, custody, or control of Wells Fargo now or in the future; (g) Proceeds of any of the above Collateral; (h) books and records of Company, including all mail or e-mail addressed to Company; and (i) all of the above Collateral, whether now owned or existing or acquired now or in the future or in which Company has rights now or in the future, including without limitation, all Pre-Petition Collateral, excluding, however, all Avoiding Power Causes of Action.

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 44 of 99

"Collection Account" means "Collection Account" as defined in the Master Agreement for Treasury Management Services and related Lockbox and Collection Account Service Description or Collection Account Service Description, whichever is applicable.

"Company Deed of Trust" means that certain Deed of Trust, Assignment of Rents and Leases, and Fixture Filing, dated as of August 15, 2008, executed by Company, as trustor, in favor of Wells Fargo, as beneficiary, recorded on September 19, 2008 in the Official Records of the County of San Mateo, State of California, as instrument number 2008-105571, as the same may be amended or restated from time to time.

"Compliance Certificate" is defined in Section 5.1(a) and is in the form of Exhibit E.

"Commercial Letter of Credit Agreement" means an agreement governing the issuance of documentary letters of credit entered into between Company as applicant and Wells Fargo as issuer.

"Constituent Documents" means with respect to any Person, as applicable, that Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Copyright Security Agreement" means each Copyright Security Agreement entered into between Company and Wells Fargo.

"Creditors' Committee" means the Committee of creditors holding unsecured claims.

"Cut-off Time" means 10:00 a.m., Pasadena, California time (or 9:00 a.m., Pasadena, California time, on the last Business Day of each month, on Christmas Eve, and on New Years Eve).

"Debt" means of a Person as of a given date, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP.

"Deeds of Trust" means, collectively, the Company Deed of Trust, the Trust Deed of Trust and the Jack/Gail Deed of Trust.

"Default Period" is defined in Section 1.6(c).

"Default Rate" is defined in Section 1.6(c).

"Dilution" means, as of any period of determination determined by Wells Fargo, a percentage, which is the result of dividing (a) actual bad debt write-downs, discounts, advertising allowances, credits, and any other items with respect to the Accounts determined to be dilutive

by Wells Fargo in its sole discretion during this period, by (b) Company's net sales during such period (excluding extraordinary items) plus the amount of clause (a).

"Director" means a director if Company is a corporation, or a governor or manager if Company is a limited liability company.

"Electronic Record" means a Record that is created, generated, sent, communicated, received, or stored by electronic means, but **does not** include any Record that is sent, communicated, or received by fax.

"Eligible Accounts" means all unpaid Accounts of Company arising from the sale or lease of goods or the performance of services, whether in existence before of after the Petition Date, net of any credits, but excluding any Accounts having any of the following characteristics:

(a)    That portion of Accounts unpaid 90 days or more after the invoice date;

(b)    That portion of Accounts related to goods or services with respect to which Company has received notice of a claim or dispute, which are subject to a claim of offset or a contra account, or which reflect a reasonable reserve for warranty claims or returns;

(c)    That portion of Accounts not yet earned by the final delivery of goods or that portion of Accounts not yet earned by the final rendition of services by Company to the account debtor, including with respect to both goods and services, progress billings, and that portion of Accounts for which an invoice has not been sent to the applicable account debtor;

(d)    Accounts constituting (i) Proceeds of copyrightable material unless such copyrightable material shall have been registered with the United States Copyright Office, or (ii) Proceeds of patentable inventions unless such patentable inventions have been registered with the United States Patent and Trademark Office;

(e)    Accounts owed by any unit of government, whether foreign or domestic (except that there shall be included in Eligible Accounts that portion of Accounts owed by such units of government for which Company has provided evidence satisfactory to Wells Fargo that (i) Wells Fargo's Security Interest constitutes a perfected first priority Lien in such Accounts, and (ii) such Accounts may be enforced by Wells Fargo directly against such unit of government under all applicable laws);

(f)    Accounts denominated in any currency other than United States Dollars;

(g)    Accounts owed by an account debtor located outside the United States or Canada which are not (i) backed by a bank letter of credit naming Wells Fargo as beneficiary or assigned to Wells Fargo, in Wells Fargo's possession or control, and with respect to which a control agreement concerning the letter-of-credit rights is in effect, and acceptable to Wells Fargo in all respects, in its sole discretion, or (ii) covered by a foreign receivables insurance policy acceptable to Wells Fargo in its sole discretion;

(h)    Accounts owed by an account debtor who is insolvent or is the subject of bankruptcy proceedings or who has gone out of business;

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 46 of 99

(i)      Accounts owed by an Owner, Subsidiary, Affiliate, Officer or employee of Company;

(j)      Accounts not subject to the Security Interest or which are subject to any Lien in favor of any Person other than Wells Fargo;

(k)      That portion of Accounts that has been restructured, extended, amended or modified;

(l)      That portion of Accounts that constitutes advertising, finance charges, service charges or sales or excise taxes;

(m)      Accounts owed by an account debtor (including all affiliates of such account debtor), regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds 15% (or 20% in the case of Accounts owing by Trader Joe's and the Wal-Mart Concentration Limit in the case of the aggregate Accounts owing by Wal-Mart and Sam's Club) of the aggregate amount of all Accounts;

(n)      Accounts owed by an account debtor, regardless of whether otherwise eligible, if 25% or more of the total amount of Accounts due from such debtor is ineligible under clauses (a), (b), or (k) above;

(o)      C.O.D. Accounts and Accounts owing with respect to credit card sales;

(p)      Accounts arising from consignment sales; and

(q)      Accounts, or portions of Accounts, otherwise deemed ineligible by Wells Fargo in its sole discretion.

"Eligible Inventory" means all Inventory of Company, whether in existence before or after the Petition Date, valued at the lower of cost or market in accordance with GAAP; but excluding Inventory having any of the following characteristics:

(a)      Inventory that is: in-transit; located at any warehouse, job site or other premises not approved by Wells Fargo in an Authenticated Record delivered to Company; not subject to a perfected first priority Lien in Wells Fargo's favor; subject to any Lien or encumbrance other than a Permitted Lien; covered by any negotiable or non-negotiable warehouse receipt, bill of lading or other document of title; on consignment from any consignor; or on consignment to any consignee or subject to any bailment;

(b)      Inventory that is located on any leased Premises unless Company has first delivered to Wells Fargo a Landlord's Disclaimer and Consent with respect to such leased Premises, duly executed by the applicable landlord, pursuant to which the landlord waives its Lien in any goods or other Inventory of Company located on the Premises; provided that this clause (b) shall not be in effect until September 15, 2008;

(c)      Supplies, packaging, maintenance parts or sample Inventory, or customer supplied parts or Inventory;

Case: 11-31985   Doc# 8-2   Filed: 05/23/11   Entered: 05/23/11 15:19:00   Page 47 of 99

(d)     Inventory that is damaged, defective, obsolete, slow moving or not currently saleable in the normal course of Company's operations, or the amount of such Inventory that has been reduced by shrinkage;

(e)     Inventory that Company has returned, has attempted to return, is in the process of returning or intends to return to the vendor of the Inventory;

(f)     Inventory manufactured or grown by Company pursuant to a license unless the applicable licensor has agreed in a Licensor Agreement that has been Authenticated by such licensor to permit Wells Fargo to exercise its rights and remedies against such Inventory, which Licensor Agreement shall attach as an exhibit a true, correct and complete copy of the license agreement entered into between such licensor and Company;

(g)     Inventory stored at locations holding less than 10% of the aggregate value of Company's Inventory; and

(h)     Inventory otherwise deemed ineligible by Wells Fargo in its sole discretion.

"Entry" means notation of a document or event on the docket relating to the Bankruptcy Case maintained by the Bankruptcy Court.

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the Uniform Commercial Code in effect in the state whose laws govern this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group which includes Company and which is treated as a single employer under Section 414 of the IRC.

"Event of Default" is defined in Section 6.1.

"Final Financing Order" means a Financing Order entered after a final hearing pursuant to Bankruptcy Rule 4001(c)(2).

"Financing Order(s)" means, individually and collectively, orders and related findings of fact and conclusions of law in support thereof, relating thereto or authorizing on or after the Petition Date, the incurrence of debt by Company, the provision of loans, advances and other financial accommodations by Wells Fargo to Company, the granting of liens, interests, priority claims and other rights in favor of Wells Fargo pursuant to the Post-Petition Loan Documents, on an emergency, interim, final or other basis pursuant to section 364 and other applicable sections of the Bankruptcy Code as may be issued or entered in the Bankruptcy Case, each and all in form and substance acceptable to Wells Fargo in each of their sole and absolute discretion, as the same may be amended, supplemented or otherwise modified from time to time with the express

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 48 of
99

written consent of Company and Wells Fargo, and that is not subject to any stay or injunction pending any appeal or petition for certiorari, review, rehearing or reconsideration, or otherwise.

"First Day Orders" means individually and collectively, each order entered in the Bankruptcy Case as a result of a motion or application filed by Company in the Bankruptcy Case on or about the Petition Date, each in form and substance acceptable to Wells Fargo in its sole and absolute discretion, that is not subject to any stay or injunction pending any appeal or petition for certiorari, review, rehearing, reconsideration or otherwise.

"Floating Rate" is defined in Section 1.6(a).

"Floating Rate Advance" means an Advance bearing interest at the Floating Rate.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described on Exhibit D.

"General Intangibles" shall have the meaning given it under the UCC.

"Guarantor" means any Person in the future guaranteeing any Indebtedness through the issuance of a Guaranty.

"Guaranty" means an unconditional continuing guaranty executed by a Guarantor in favor of Wells Fargo (if more than one, the "Guaranties").

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"Hollingsworth Family Trust" means the Hollingsworth Family Trust dated June 4, 1993.

"Indebtedness" is used in its most comprehensive sense and means any debts, obligations and liabilities of Company to Wells Fargo, whether incurred in the past, present or future, whether voluntary or involuntary, and however arising, and whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and including without limitation all obligations arising under any swap, derivative, foreign exchange, hedge, deposit, treasury management or similar transaction or arrangement however described or defined that Company may enter into at any time with Wells Fargo or with Wells Fargo Merchant Services, L.L.C., whether or not Company may be liable individually or jointly with others, or whether recovery upon such Indebtedness may subsequently become unenforceable, including without limitation, the Pre-Petition Indebtedness.

"Indemnified Liabilities" is defined in Section 7.8.

"Indemnitees" is defined in Section 7.8.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 49 of 99

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Interim Financing Order" means a Financing Order entered after an interim hearing pursuant to Bankruptcy Rule 4001(c)(2) that is not a Final Financing Order.

"Interest Payment Date" is defined in Section 1.8(a).

"Inventory" shall have the meaning given it under the UCC.

"Inventory Sublimit" means $3,000,000.

"Investment Property" shall have the meaning given it under the UCC.

"Jack/Gail Deed of Trust" means that certain Deed of Trust, Assignment of Rents and Leases, and Fixture Filing, dated as of September 7, 2010, executed by the trustees of the Pearlstein Trust, and the Hollingsworth Family Trust, as trustor, in favor of Wells Fargo, as beneficiary, encumbering the Jack/Gail Property, as the same may be amended or restated from time to time.

"Jack/Gail Property" means the real property indentified as location numbers 17 and 18 listed on Exhibit B to the Credit Agreement (APN: 066-093-030 and 066-093-040, respectively).

"KEIP" means that certain Key Employee Incentive Plan as adopted by the Company and approved by the Bankruptcy Court.

"L/C Application" means an application for the issuance of standby or documentary Letters of Credit pursuant to the terms of a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, in form acceptable to Wells Fargo.

"Letter of Credit" and "Letters of Credit" are each defined in Section 1.10(a).

"Licensed Intellectual Property" is defined in Exhibit D.

"Licensor Agreement" means a Licensor Agreement in favor of Wells Fargo, duly executed by a licensor of any Licensed Intellectual Property, on Wells Fargo's standard form or such other form acceptable to Wells Fargo in its sole discretion.

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Post-Petition Line of Credit" is defined in the Recitals.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 50 of 99

"Loan Documents" means this Agreement, the Note, the Master Agreement for Treasury Management Services, each Guaranty, each Subordination Agreement, each Standby Letter of Credit Agreement, each Commercial Letter of Credit Agreement, any L/C Applications, each Licensor Agreement, and the Security Documents, together with every other agreement, note, document, contract or instrument to which Company now or in the future may be a party and which may be required by Wells Fargo in connection with, or as a condition to, the execution of this Agreement. Any documents or other agreements entered into between Company and Wells Fargo that relate to any swap, derivative, foreign exchange, hedge, or similar product or transaction, or which are entered into with an operating division of Wells Fargo other than Wells Fargo Business Credit, shall not be included in this definition.

"Lockbox" means "Lockbox" as defined in the Master Agreement for Treasury Management Services and related Lockbox and Collection Account Service Description.

"Master Agreement for Treasury Management Services" means the Master Agreement for Treasury Management Services, the related Acceptance of Services, and the Service Description governing each treasury management service used by Company.

"Material Adverse Effect" means any of the following (other than the filing of the Bankruptcy Case):

(a)    A material adverse effect on the business, operations, results of operations, prospects, assets, liabilities or financial condition of Company;

(b)    A material adverse effect on the ability of Company to perform its obligations under the Loan Documents, or any other document or agreement related to this Agreement;

(c)    A material adverse effect on the ability of Wells Fargo to enforce the Indebtedness or to realize the intended benefits of the Security Documents, including a material adverse effect on the validity or enforceability of any Loan Document or of any rights against any Guarantor, or on the status, existence, perfection, priority (subject to Permitted Liens) or enforceability of any Lien securing payment or performance of the Indebtedness; or

(d)    Any claim against Company or threat of litigation which (i) would reasonably be expected to cause Company to be liable to pay an amount exceeding $500,000, which is not fully covered by applicable insurance (subject to retention) and as to which the insurer has assumed the defense, or (ii) would result in the occurrence of an event described in clauses (a), (b) and (c) above.

"Maturity Date" means August 5, 2011.

"Maximum Line Amount" means $5,000,000.

"Merchant Card Reserve" means a reserve against the Borrowing Base to cover the liability of Company to Wells Fargo Merchant Services, L.L.C. for its credit card exposure, which reserve shall initially be in the amount of $55,000 but shall be adjusted from time to time by Wells Fargo as requested by Wells Fargo Merchant Services, L.L.C., in its sole discretion.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 51 of 99

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which Company or any ERISA Affiliate contributes or is obligated to contribute.

"Net Cash Proceeds" means the cash proceeds of any asset sale (including cash proceeds received as deferred payments pursuant to a note, installment receivable or otherwise, but only upon actual receipt) net of (a) attorney, accountant, and investment banking fees, (b) payments to employees of the Company provided for in the KEIP as being payable from the proceeds of such asset sale, (c) brokerage commissions, (d) amounts required to be applied to prior Liens the repayment of debt secured by a Lien not prohibited by this Agreement on the asset being sold, and (e) taxes paid or reasonably estimated to be payable as a result of such asset sale.

"Net Income" means after-tax net income from continuing operations, including extraordinary losses but excluding extraordinary gains, all as determined in accordance with GAAP.

"Net Loss" means after-tax net loss from continuing operations, including extraordinary losses but excluding extraordinary gains, all as determined in accordance with GAAP.

"Note" means the Post-Petition Revolving Note.

"Obligation of Reimbursement" is defined in Section 1.10(b).

"OFAC" is defined in Section 5.12(b).

"Officer" means with respect to Company, an officer if Company is a corporation, a manager if Company is a limited liability company, or a partner if Company is a partnership.

"Open Space Property" means the real property owned by Company indentified as location number 3 listed on Exhibit B to the Credit Agreement (APN: 047-340-120).

"Operating Account" is defined in Section 1.3(a), and maintained in accordance with the terms of Wells Fargo's Commercial Account Agreement in effect for demand deposit accounts.

"Overadvance" means the amount, if any, by which the unpaid principal amount of the Revolving Note, plus the sum of the Pre-Petition L/C Amount and the Post-Petition L/C Amount, is in excess of the then-existing Borrowing Base.

"Owned Intellectual Property" is defined in Exhibit D.

"Owner" means with respect to Company, each Person having legal or beneficial title to an ownership interest in Company or a right to acquire such an interest.

"Pass-Through Tax Liabilities" means the amount of state and federal income tax paid or to be paid by Company's Owners on taxable income earned by Company and attributable to the Owners as a result of Company's "pass-through" tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any Owner is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 52 of 99

deductions, credits, deferrals and other reductions available to the Owners from or through Company.

"Patent and Trademark Security Agreement" means each Patent and Trademark Security Agreement entered into between Company and Wells Fargo.

"Pearlstein Trust" means the Jack and Linda Pearlstein Trust dated January 11, 1999.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of Company or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Lien" and "Permitted Liens" are defined in Section 5.3(a).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity.

"Petition Date" means May 23, 2011, the date of commencement of the Bankruptcy Case.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of Company or any ERISA Affiliate.

"Plan of Reorganization" means a plan under chapter 11 of the Bankruptcy Code.

"Post-Petition Collateral" means all Collateral other than Pre-Petition Collateral.

"Post-Petition L/C Amount" means the sum of (a) the Aggregate Face Amount of any outstanding Letters of Credit, plus (b) the amount of each Obligation of Reimbursement that either remains unreimbursed or has not been paid through an Advance on the Post-Petition Line of Credit.

"Post-Petition Loan Documents" means this Agreement, the Note, the Guarantees, the Security Documents and all Applicable Financing Orders, and all other documents relating thereto.

"Post-Petition Revolving Note" is defined in Section 1.1(d).

"Premises" is defined in Section 2.4(a).

"Pre-Petition Collateral" means and includes all "Collateral" and all "Real Property Collateral" as such terms are defined in the Pre-Petition Credit Agreement.

"Pre-Petition Company" means individually and collectively, Company as it existed immediately before the Petition Date and as a party to the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" is defined in the Recitals.

"Pre-Petition L/C Amount" means "L/C Amount" as defined in the Pre-Petition Credit Agreement.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 53 of 99

"Pre-Petition Liens" means the Liens granted by Company to Wells Fargo on the Collateral and the Real Property Collateral pursuant to the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents.

"Pre-Petition Loan Documents" means the "Loan Documents" as that term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Letters of Credit" means the letters of credit issued under the Pre-Petition Credit Agreement that are outstanding on the Closing Date.

"Pre-Petition Indebtedness" means Indebtedness in existence at or arising prior to the Petition Date.

"Pre-Petition Revolving Note" means the "Revolving Note" issued pursuant to the Pre-Petition Credit Agreement as one of the Pre-Petition Loan Documents.

"Prime Rate" means at any time the rate of interest most recently announced by Wells Fargo at its principal office as its Prime Rate, with the understanding that the Prime Rate is one of Wells Fargo's base rates, and serves as the basis upon which effective rates of interest are calculated for those loans making reference to it, and is evidenced by its recording in such internal publication or publications as Wells Fargo may designate. Each change in the rate of interest shall become effective on the date each Prime Rate change is announced by Wells Fargo.

"Proceeds" shall have the meaning given it under the UCC.

"Professionals" has the meaning set forth in the Applicable Financing Order, but shall not include "ordinary course" Professionals if retention and payment of such Professionals is approved by a separate Bankruptcy Order.

"PUD Properties" means the properties identified as APN Nos. 048-300-280, 048-300-310, 048-300-330, 047-340-120 and 047-340-180.

"Real Property Collateral" means the real properties that are encumbered by the Deeds of Trust from time to time.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, and includes all information that is required to be reported by Company to Wells Fargo pursuant to Section 5.1.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the Pension Benefit Guaranty Corporation.

"Security Documents" means this Agreement, the Copyright Security Agreements, the Patent and Trademark Security Agreement(s), the Deeds of Trust, and any other document delivered to Wells Fargo from time to time to secure the Indebtedness.

"Security Interest" is defined in Section 2.1.

Case: 11-31985   Doc# 8-2   Filed: 05/23/11   Entered: 05/23/11 15:19:00   Page 54 of 99

"Shiotani Trust" means the Kit Shiotani 2001 Revocable Trust Dated January 17, 2001.

"Special Account" means a specified cash collateral account maintained with Wells Fargo or another financial institution acceptable to Wells Fargo in connection with each undrawn Letter of Credit issued by Wells Fargo, as more fully described in Section 1.11.

"Standby Letter of Credit Agreement" means an agreement governing the issuance of standby letters of credit by Wells Fargo entered into between Company as applicant and Wells Fargo as issuer.

"Subordinated Creditor" means any Person in the future subordinating indebtedness of Company held by that Person to the payment of the Indebtedness.

"Subordination Agreement" means a subordination agreement executed by a Subordinated Creditor in favor of Wells Fargo (if more than one, the "Subordination Agreements").

"Subsidiary" means any Person of which more than 50% of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, irrespective of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by Company, by Company and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Termination Date" is defined in Section 1.1(b).

"Trust Deed of Trust" means that certain Deed of Trust, Assignment of Rents and Leases, and Fixture Filing, dated as of September 7, 2010, executed by the trustees of the Pearlstein Trust, the Hollingsworth Family Trust, and the Shiotani Trust, as trustor, in favor of Wells Fargo, as beneficiary, encumbering the Trust Properties, as the same may be amended or restated from time to time.

"Trust Properties" means the real properties indentified as location numbers 9 (APN: 048-300-230), 10 (APN: 048-300-210), and 11 (APN: 048-300-240), respectively, listed on Exhibit B to the Credit Agreement.

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"Wal-Mart Concentration Limit" means that Dollar amount, or percentage of all Accounts, set forth in the table below opposite the applicable period:

| Period | Wal-Mart Concentration Limit |
|---|---|
| Effective Immediately – 06/30/2011 | $6,300,000 |
| 07/01/2011 – 07/15/2011 | $5,500,000 |
| 07/16/2011 – 07/30/2011 | $5,000,000 |

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 55 of 99

| 07/31/2011 and at all time thereafter | 30% of all Accounts |

"Wells Fargo" means Wells Fargo Bank, National Association in its broadest and most comprehensive sense as a legal entity, and is not limited in its meaning to the Wells Fargo Business Credit operating division, or to any other operating division of Wells Fargo.

## Exhibit B to Credit and Security Agreement

## PREMISES

| Location | APN | Address | Description | Acreage | Zoning | Owned/Leased |
|---|---|---|---|---|---|---|
| Half Moon Bay CA 94019 | | | | | | |
| *North Property* | | | | | | |
| 1. 047-340-180 | | 2651 N. Cabrillo Hwy. | Open Space | 328.934 | Open Space Reserve | Owned |
| 2. 048-300-310 | | 2651 N. Cabrillo Hwy. | Open Fields | 15.009 | Planned Unit Development | Owned |
| 3. 047-340-120 | | 2651 N. Cabrillo Hwy. | Open Space | 79 | Planned Agricultural Dist. | Owned |
| 4. 048-300-280 | | 2651 N. Cabrillo Hwy. | Hoops | 3.717 | Planned Unit Development | Owned |
| 5. 048-300-300 | | 2651 N. Cabrillo Hwy. | NE Corner of #16 | 0.01 | Agricultural Land Use | Owned |
| 6. 048-300-330 | | 2651 N. Cabrillo Hwy. | Open Fields | 9.441 | Planned Unit Development | Owned |
| 7. 048-300-190 | | 2651 N. Cabrillo Hwy. | Road and Landscaping | 0.23 | Agricultural Land Use | Owned |
| 8. 048-300-260 | | 2651 N. Cabrillo Hwy. | Ship. Whse; GH; Hoops | 14 | Agricultural Land Use | Owned |
| 9. 048-300-230 | | 2651 N. Cabrillo Hwy. | GH | 7.07 | Agricultural Land Use | Leased |
| 10. 048-300-210 | | 2651 N. Cabrillo Hwy. | GH; Warehouse | 17.68 | Agricultural Land Use | Leased |
| 11. 048-300-240 | | 2651 N. Cabrillo Hwy. | Open Storage | 1.108 | Agricultural Land Use | Leased |
| 12. 048-300-090 | | 2281 N. Cabrillo Hwy. | Frenchmen's Creek | 12.322 | Agricultural Land Use | Owned |
| 13. 048-300-100 | | 2281 N. Cabrillo Hwy. | Frenchmen's Creek | 3.64 | Agricultural Land Use | Owned |
| 14. 048-300-220 | | 2651 N. Cabrillo Hwy. | GH Bldg 20; Parking Lot | 8.864 | Agricultural Land Use | Owned |
| 15. 048-300-110 | | 2711 N. Cabrillo Hwy. | GH; Open Fields | 8 | Agricultural Land Use | Leased |

| | | N. | | | | |
|---|---|---|---|---|---|---|
| 16. | 048-300-030 | 2651 Cabrillo Hwy. N. | Open Fields | 1.5 | Planned Unit Development | Leased |

***South Property***

| | | | | | | |
|---|---|---|---|---|---|---|
| 17. | 066-093-030 | 2125 S. Cabrillo Hwy. | GH; Hoops; Field | 8.93 | Planned Agricultural Dist. | Leased |
| 18. | 066-093-040 | 2125 S. Cabrillo Hwy. | GH; Hoops; Field | 1.13 | Agricultural Land Use | Leased |
| 19. | 066-093-050 | 2125 S. Cabrillo Hwy. | GH; Hoops; Field | 0.57 | Agricultural Land Use | Leased |
| 20. | 066-093-060 | 2125 S. Cabrillo Hwy. | GH; Hoops; Field | 8.43 | Planned Agricultural Dist. | Leased |

BN 9031290v5

**Legal Description – Property #1**

The land referred to is situated in the County of San Mateo, City of , State of California, and is described as follows:

Parcel B, as said parcel is designated on the Map filed in the office of the County Recorder of San Mateo County, State of California on November 14, 1977, in Volume 39 of Parcel Maps at Pages 22 and 23.

EXCEPTING THEREFROM that portion conveyed to Nurserymen's Exchange, Inc., a California corporation, by Deed recorded August 28, 1980, in Reel 7984, at Image 122, Official Records.

ALSO EXCEPTING THEREFROM that portion conveyed to Nurserymen's Exchange, Inc., a California corporation, by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records.

ALSO EXCEPTING THEREFROM Lot 4, as designated on the Map entitled, "Map of the Lands of J. M. Vasques, Part of the Rancho Corral De Tierra Vasques", which Map was filed in the Office of the Recorder of the County of San Mateo, State of California on January 2, 1886, in Book "A" of Maps, at Page 44 and a copy entered in Book 1 of Maps at Page 63. Said Lot 4 being a portion of Parcel "B" above.

ALSO EXCEPTING THEREFROM all that portion lying Southwesterly of the following described line:

Beginning at the Southerly terminus of the Westerly line of said Parcel "B" shown on said Map as "S 10° 30' W 9982.5' " , thence along a Southerly production of said line, South 10° 38' 16" West 816.48 feet to a point in the Northerly line of that parcel of land conveyed to Nurseryman's Exchange, Inc., a California corporation by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records, said line described in said Deed as "South 60° 15' 23" East 160.93 feet", said point distant thereon North 58° 49' 30" West 148.83 feet from the Southeasterly terminus.

Set out as Parcel "B" on Approval of Lot Line Adjustment recorded January 7, 2010, Series No. 2010-001484, San Mateo County Records.

APN: 047-340-180

**Legal Description – Property #3**

The land referred to is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Lot 3, as designated on the Map entitled, "Map of the Lands of J. M. Vasques, part of the Rancho Corral De Tierra Vasques", which Map was Filed in the Office of the Recorder of the County of San Mateo, State of California on January 2, 1886 in Book "A" of Maps at Page 44 and a copy entered in Book 1 of Maps at Page 63.

APN:  047-340-120          JPN:  047-34-340-12

BN 9031290v5

**Legal Description – Properties #2, #5 and #6**

All that certain real property situated in the City of Half Moon Bay, County of San Mateo, State of California, being a portion of the lands shown as Parcel "A" and Parcel "B" on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County Records, said real property being more particularly described as follows:

Beginning at the most Westerly corner of the lands described as Parcel I in the Deed to Nurserymen's Exchange Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122; said point of beginning also being the most Northerly corner of the lands described in the Deed recorded in Book 2786 of Official Records of San Mateo County, at Page 414; thence from said point of beginning along the Northwesterly line of last said lands, South 59° 11' 54" West, 206.67 feet to the most Westerly corner of last said lands; thence along the Southwesterly line of the aforesaid Parcel "B", North 28° 45' 46" West, 533.70 feet to the beginning of 2080.00 foot radius curve, concave Southwesterly; thence Northwesterly 225.66 feet along said curve through a central angle of 06° 12' 58"; thence leaving last said curve, North 65° 54' 43" East, 103.05 feet; thence North 30° 51' 33" West 218.46 feet to the Northwesterly line of said Parcel "B"; thence Northeasterly along said Northwesterly line, North 65° 54' 43" East 1505.00 feet; thence Southeasterly, along a production of the Westerly line of said Parcel "B", shown on said Map as S 10° 30' W 9982.5', South 10° 38' 16" West 816.48 feet to a point in the Northerly line of that parcel of land conveyed to Nurseryman's Exchange, Inc., a California corporation by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records, said line described in said Deed as "South 60° 15' 23" East 160. 93 feet"; thence South 58° 49' 30" East along said line, 148.83 feet to a point designated "A" for the purpose of this description; thence North 62° 35' 35" East, 173.55 feet; thence North 39° 32' 31" East, 126.05 feet; thence North 44° 01' 59" East, 73.37 feet; thence North 40° 27' 35" East, 85.82 feet; thence North 51° 31' 08" East, 152.41 feet; thence South 29° 24' 27" East, 181.64 feet to a point on the Southeasterly line of the aforesaid Parcel "B"; thence along last said line, South 42° 40' 33" West, 527.72 feet to the most Westerly corner of Parcel "C", as last said parcel is shown on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County records; thence along the Southwesterly line of last said parcel, South 40° 24' 32" East, 40.08 feet to the most Northerly corner of the lands described in the Deed to Half Moon Bay Properties Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 120; thence along the Northwesterly line of last said lands to a point on the Northeasterly line of the lands described as Parcel II in the Deed to Nurserymen's Exchange, Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122, South 53° 08' 40" West, 21.52 feet; thence North 65° 03' 34" West 44.98 feet to the most Westerly corner of last said lands; thence along the Northwesterly line of the aforesaid Parcel "A", the following courses:

South 53° 08' 40" West, 130.00 feet; North 36° 51' 20" West, 40.00 feet; South 53° 08' 40" West, 40.00 feet and South 36° 51' 20" East, 6.00 feet to the most Northerly corner of the aforesaid lands described as Parcel I; thence along the Northwesterly line of last said lands the following courses:

South 54° 35' 05" West, 58.85 feet; South 84° 41' 06" West, 32.21 feet; South 44° 39' 45" West, 94.59 feet; South 80° 52' 48" West, 40.04 feet; South 83° 39' 13" West, 70.26 feet; North 73° 57' 01" West, 48.77 feet; South 86° 50' 54" West, 50.18 feet; North 33° 14' 33" West, 43.62

feet; North 75° 58' 47" West, 45.40 feet; South 59° 16' 30" West, 32.26 feet; South 72° 15' 45" West, 67.05 feet; North 87° 31' 51" West, 20.33 feet; North 84° 51' 02" West, 35.40 feet; South 76° 55' 26" West, 27.81 feet; South 53° 37' 20" West, 76.045 feet; South 47° 16' 44" West, 81.56 feet and South 46° 37' 01" West, 90.79 feet to the point of beginning.

RESERVING THEREFROM an easement for ingress and egress, public or private utilities, storm drainage, appurtenances and maintenance thereto, lying in, on, over, under and along a strip of land 20 feet in width, lying immediately adjacent to and Southeasterly of the following described Northwesterly line thereof:

Beginning at the herein described Point "A"; thence from said point of beginning along the Northwesterly line of the herein described real property, the following courses:

North 61° 09' 42" East, 173.55 feet; North 38° 06' 38" East, 126.05 feet; North 42° 36' 06" East, 73.37 feet; North 39° 01' 42" East, 85.82 feet; and North 50° 05' 15" East, 152.41 feet to the most Northerly corner of the herein described real property and the Northeasterly terminus of the herein described Northwesterly line; said easement being contiguous, for its full width, at its Northeasterly terminus to a line that bears South 29° 22' 27" East and at its Southwesterly terminus to a line that bears South 41° 28' 53" East.

ALSO RESERVING THEREFROM an easement for ingress and egress, public or private utilities, storm drainage, appurtenances and maintenance thereto, lying in, on, over, under and along the following described parcel:

Beginning at the herein described Point "A"; thence from said point of beginning along the Northwesterly line of the herein described real property, North 62° 35' 35" East, 51.55 feet; thence leaving last said line, South 41° 28' 53" East, 230.55 feet to a point on the Southeasterly line of Parcel "B", as last said parcel is shown on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County Records; thence along last said line, South 42° 40' 33" West, 9.86 feet to the most Westerly corner of Parcel "C", as last said parcel is shown on said Parcel Map; thence along the Southwesterly line of last said parcel, South 40° 24' 32" East, 40.08 feet to the most Northerly corner of the lands described in the Deed to Half Moon Bay Properties Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 120; thence along the Northwesterly line of last said lands, South 53° 08' 40" West, 21.52 feet to a point in the Northeasterly line of the lands described as Parcel II in the Deed to Nurserymen's Exchange Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122, thence along said Northeasterly line, North 65° 03' 34" West, 44.98 feet to the most Northerly corner of said Parcel II; thence North 41° 28' 53" West, 241.20 feet to the point of beginning.

Set out as Parcel "A" on Approval of Lot Line Adjustment recorded January 7, 2010, Series No. 2010-001484, San Mateo County Records.

APN:  048-300-300

APN:  048-300-310

APN:  048-300-330

## Legal Description – Property #4

The land referred to is situated in the County of San Mateo, City of , State of California, and is described as follows:

Being a portion of Parcel "B" as said Parcel is shown on that certain map filed in the Office of the County Recorder of San Mateo County, State of California on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23, Records of San Mateo County, California, more particularly described as follows:

Beginning at the Southwesterly end of that course shown as North 53° 06' 31" East 825.26 feet as shown on said parcel map, said point also being the Easterly corner of the Lands of Guttman as recorded in Book 2786 of Official Records at Page 414, Records of San Mateo County, California; thence North 28° 46' 20" West along the Northeasterly line of said Lands of Guttman, a distance of 314.00 feet to the Northerly corner of said Lands of Guttman, said Northerly corner of being in the flow line up a small creek; thence up the flow line of said creek the following courses and distances: North 47° 20' 28" East 87.90 feet, North 48° 00' 11" East 78.96 feet, North 54° 20' 47" East 74.02 feet, North 77° 38' 53" East 26.92 feet, South 84° 07' 35" East 34.27 feet, South 86° 48' 24 East 19.68 feet, North 72° 59' 12" East 64.92 feet, North 59° 59' 57" East 31.23 feet, South 75° 51' 20" East 43.95 feet, South 32° 31' 06" East 42.23 feet North 87° 34' 21" East 48.58 feet, South 73° 13' 34" East, 47.22 feet, North 84° 22' 40" East 68.02 feet, North 81° 36' 15" East 38.77 feet, North 45° 23' 12" East 91.58 feet, North 85° 24' 33" East 31.18 feet, North 55° 18' 32" East 56.98 feet where said creek intersects the common line of Parcels "A" and "B" of said Parcel Map; thence South 36° 53' 29" East along said common line 34.00 feet; thence South 53° 06' 31" West along the Southwesterly line of said Parcel "B" 825.26 feet to the point of beginning.

APN:   048 300 280

**Legal Description – Properties #7 and #8**

The land referred to is situated in the County of San Mateo, City of , State of California, and is described as follows:

Parcel "A" as shown on that certain Map entitled "Parcel Map being a Resubdivision of a Portion of Lot 1 as shown on that certain Map entitled "Map of the land of J. M. Vasques, Port of the Rancho Corral de Tierra Vasques", which Map was filed on January 1, 1886 in Book "A" of Maps at Page 44, and a copy entered in Book 1 of Maps at Page 63 and a portion of that Parcel as conveyed from Louis S. Miguel to State Building Supply and Equipment Company, as recorded in Volume 2910, Official Records, 501, Records of San Mateo County, Half Moon Bay, San Mateo County, Calif.", filed in the office of the County Recorder of San Mateo County, State of California, on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23.

EXCEPTING THEREFROM that portion conveyed to Half Moon Bay Properties, Inc., a Delaware corporation, in the Deed recorded August 28, 1980 in Book 7984 at Page 120, Official Records of San Mateo County, California.

APN:  048-300-190 and
      048-300-260

**Legal Description – Properties #9 and #10**

The land referred to is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

The Parcel of Land as shown on that certain parcel Map entitled "Parcel Map, in the incorporated area of the City of Half Moon May, being a portion of the Rancho Corral de Tierra Vasquez, Half Moon Bay, San Mateo County, California", which parcel map was filed in the Office of the Recorder of the County of San Mateo on Jan 3, 1972 in Book 15 of Parcel Maps, at Page 15.

APN:   048-300-210 and 230

**Legal Description – Property #11**

The land referred to is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Parcel A, as shown on that certain parcel map entitled, "Parcel Map, in the incorporated area of the City of Half Moon Bay, being a portion of the Rancho Corral de Tierra Vasquez, Half Moon Bay, San Mateo County, California", which parcel map was filed in the Office of the Recorder of the County of San Mateo on July 5, 1974 in Book 25 of Parcel Maps, at Page 8.

APN: 048-300-240

**Legal Description – Property #12**

The land referred to is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

PARCEL ONE:

BEGINNING at a point on the Easterly side of the road leading from Spanishtown to Half Moon Bay, said point being marked on the fence "P V" and running thence North 62 - 30' East 20.04 chains to a fence on the Easterly side of a field; thence South 29° East 2.57 chains to a stake; thence South 81° East 8.82 chains to a stake in line of fence; thence South 62° 30' West 19.23 chains to a mark on fence of race track; thence North 29° East 5.40 chains; thence South 59° West 8.60 chains to road above mentioned; thence North 29° West 2.67 chains to a place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

EXCEPTING THEREFROM so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950 in Book 1774 of Official Records of San Mateo County at page 182
(30521-I).

PARCEL TWO:

A non-exclusive easement for an existing electrical line along the Southeasterly line of Parcel Two as described in Decree Establishing Death and Terminating Joint Tenancy recorded December 19th, 1949 in Volume 1763 at Page 80, San Mateo County Records.

APN:  048-300-090          JPN:  48-30-300-09
                           R/W  48-30-300-10

**Legal Description – Property #13**

The land situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a stake in line of fence, on the Easterly line of the road leading from the Town of Spanishtown of Amesport Landing, said stake being 5 chains and 30 links distance South 29° East from the Southwest corner of a tract of land conveyed to Louis Cardoza Lial by Pablo Vasquez, by Deed recorded in Book 22 of Deeds of Page 117, Records of San Mateo County and running thence North 29° West 5.30 chains to the above-mentioned Southwest corner of the Louis Cardoza Lial property; thence North 59° East 8.52 chains to a stake; thence South 29° East 5.40 chains to a stake in a line of the outside fence, which encloses the Half Moon Bay Race Track, on the Easterly side of said track' thence South 59° West 8.52 chains to the place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

Excepting Therefrom so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950, in Book 1774 of Official Records of San Mateo County at Page 182 (30521-I)

APN:  048-300-100          JPN:  48-30-300-10

**Legal Description – Property #14**

The land referred to is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a point that is distant North 28° 33' West 255.00 feet from a one inch iron pipe set for the most Southerly corner of the M. Joseph 47.723 acre Tract, said point of beginning being distant at right angles 25.00 feet from the center line and opposite Engineer's Station 372 plus 02.50 Route 2 Division 4, San Mateo County Highways; running thence from said point of beginning North 59° 04' 38" East 1403.92 feet to an old fence dividing the lands of Joseph and lands of E. Vasquez; thence along said fence North 13° 44' West 336.85 feet; thence leaving said fence South 56° 30' 26" West 1494.49 feet to the Easterly line of the above mentioned County Highway; thence along the Easterly line of said Highway South 28° 33' East 255.00 feet to the point of beginning.

EXCEPTING THEREFROM so much of the herein described property as contained in the Deed from Rose Joseph Roach, also known as Rose Joseph Roache, a widow, to State of California, dated August 16, 1949 and recorded September 26, 1949 in Book 1718 of Official Records of San Mateo County at Page 308 (11176-I).

APN:  048-300-220          JPN:  048-030-300-07

**Legal Description – Property #15**

The following described real property in the City of Half Moon Bay,

County of San Mateo, State of California:

048-300-110

BEGINNING at a concrete monument set in the Easterly line of the County Highway opposite Engineer's Station 361+87. 00 Route 2, Division 4, San Mateo County High-ways; thence, running along the Easterly line of said Highway South 28° 33' East 250.50 feet; thence leaving said Easterly line North 53° 51' 47" East 1505.31 feet to an old fence dividing the lands of Joseph and lands of E. Vasquez; thence along said fence North 40° 17' West 311.51 feet to the most Northerly corner of the M. Joseph 47. 723 acre tract; thence along the old fence forming the Northerly boundary of said Joseph Tract South 51° 33' 45" West 1450. 19 feet to the Easterly line of the above mentioned Highway; thence along the Easterly line of said Highway South 28° 33' East 4. 29 feet to the point of beginning.

CONTAINING 9.545 acres, more or less, and being parcel marked No. 5 on Map of the M. Joseph 47. 723 acre tract made by Geo. A. Kneese, County Surveyor in August 1922.

EXCEPTING THEREFROM that certain 0.672 acre parcel described as Parcel 11 in that certain Deed from Rose Joseph Roche to the State of California dated August 16, 1949 and recorded September 26, 1949 in Book 1718 of Official Records at page 308 (File No. 11176-1), Records of San Mateo County, California, more particularly described as follows:

COMMENCING at the most Southerly corner of that certain 9, 545 acre parcel of land described in the Deed recorded October 11, 1922 in Book 51 of Official Records of San Mateo County at page 450; said corner being also on the Northeasterly line of the existing State Highway (50 feet wide); thence along said Northeasterly highway line North 28° 46' 20" West, 254. 80 feet to the property line common to the lands now or formerly of Rose Joseph Roche and of the State of California; thence along said common property line North 50° 54' 40" East 30.49 feet to Engineer's Station ''C'' 521+ 22. 54 on the centerline of the Department of Public Works' survey for the State Highway between Half Moon Bay and Miramar in San Mateo County, Road IV-SM-56-C, and North 50° 54' 40" East 81.32 feet; thence South 30° 51' 39" East 137.19 feet to a line parallel with and distant 85 feet, Northeasterly, at right angles, from said "C" centerline; thence along said parallel line South 28° 46' 20" East, 122. 38 feet to the property line common to the lands now or formerly of Rose Joseph Roche and of Mary Joseph Cardoza; thence along said common property line South 53° 37' 44" West 116. 02 feet to the point of commencement.

Reserving unto Rose Joseph Roche a life interest measured by the life of Rose Joseph Roche in the following described property, which life interest shall also terminate in the event said Rose Joseph Roche shall personally vacate or abandon the use of said premises. The property affected by said life interest is described as follows:

Beginning at the corner of existing fence 76.3 feet northwest of the most Southerly corner of the lands now or formerly of Rose Joseph Roche, containing 8.873 acres, said corner being

BN 9031290v5

also on the Northeasterly line of the existing State Highway; thence Northwesterly 183. 9 feet along said fence line to a concrete monument set in ground dividing the lands of Roche and the lands now or formerly of State Bldg. Supply and Equipment Co.; thence Northeasterly 176. 6 feet along said common property line to a 1" pipe set in ground; thence Southeasterly 101.6 feet to a 1" pipe set in ground; thence Southwesterly 24. 9 on a line parallel with and distant 5 feet from fence line to an existing old fence; thence Southeasterly 65. 7 feet to the corner of said fence; thence Southwesterly 176.2 feet along said fence to the point of beginning.

## Legal Description – Property #16

PREMISES: Beginning at a point on the Northeasterly line of lands described in the deed from Louis J. Miguel and wife, to the State of California, dated December 30th, 1948 and recorded January 28th, 1949 in Book 1618 of Official Records at Page 164; Records of San Mateo County, California; said point being North 28° 46' 20" West 470.33 feet from the intersection of said Northeasterly line with the Northwesterly line of lands described in the Deed from Mary Joseph Cardoza, et al., to Rose Joseph Roche, dated September 16th, 1922, and recorded October 11, 1922 in Book 51 of Official Records at Page 450, Records of San Mateo County, California; thence from said point of beginning, on and along the said Northeasterly line of lands described in the first above mentioned Deed, North 28° 46' 20" West 320.550 feet; thence having said Northeasterly line, North 54° 11' 20" East 208.11 feet; thence South 28° 46' 20" East 314 feet; thence South 52° 25' 10" West 209 feet to the point of beginning.

**Legal Description – Properties #17 and #18**

All that certain real property situate in the State of California, unincorporated area of the County of San Mateo, and also City of Half Moon Bay; being a portion of Lots 9 and 10, as described on that Map entitled "Map of the Johnston Ranch, San Mateo County," which Map was filed in Volume B of Maps at Page 31 and copied into Volume 2 of Maps at Page 4, Records of San Mateo County, more particularly described as follows:

Beginning at the point of intersection of the Easterly line of the Coast Highway as established by the Deed from Frank Enos Alves and Virginin Alves, husband and wife, to the State of California, dated August 27, 1952, and recorded November 12, 1952, in Book 2325, Official Records of San Mateo, County, Page 21 (41575-K) with the Northerly line of said Lot 9; thence North 83° 56' 54" East 1, 131.27 feet along said line of Lot 9 to a point, said point being marked by a 1-1/2 inch pipe; thence South 5° 59' 29" East 387.42 feet; thence South 83° 56' 54" West 1,131.21 feet to the said Easterly line of the Coast Highway; thence North 6° 00' 00" West along said last mentioned line 387.42 feet to the point of beginning.

APN: 066-093-030

APN: 066-093-040

**Legal Description – Properties #19 and #20**

ALL THAT CERTAIN REAL PROPERTY SITUATE IN THE CITY OF HALF MOON BAY, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PORTION OF LOTS 10 AND 11, AS DESIGNATED ON THE MAP ENTITLED "SUBDIVISION MAP OF A PORTION OF THE JOHNSTON RANCH", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON NOVEMBER 4, 1892 IN BOOK "B" OF MAPS AT PAGE 4, AND A COPY ENTERED IN BOOK 2 OF MAPS AT PAGE 57, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT ON THE EASTERLY LINE OF THE COAST HIGHWAY AS ESTABLISHED BY THE DEED FROM FRANK ENOS ALVES AND VIRGINIA ALVES, HUSBAND AND WIFE, TO THE STATE OF CALIFORNIA, DATED AUGUST 27, 1952 AND RECORDED NOVEMBER 12, 1952 IN BOOK 2325 OFFICAL RECORDS OF SAN MATEO COUNTY, PAGE 21 (41575-K), DISTANT THEREON SOUTH 6° 00' EAST 387.42 FEET FROM THE NORTHERLY LINE OF LOT 9, AS SHOWN ON SAID MAP OF "SUBDIVISION MAP OF A PORTION OF THE JOHNSTON RANCH", THENCE NORTH 84° 00' EAST 1132.00 FEET PARALLEL WITH SAID NORTHERLY LINE OF LOT 9; THENCE SOUTH 6° 00' EAST 383.00 FEET TO A POINT, SAID POINT BEING MARKED BY A 1-1/2 INCH IRON PIPE, WHICH POINT BEARS NORTH 84° 00' EAST 21.44 FEET FROM THE NORTHEASTERLY CORNER OF THAT CERTAIN 9.75 ACRE TRACT OF LAND DESCRIBED IN THE DEED FROM FRANK ENOS ALVES AND WIFE, TO ANNA MAY ALVES, DATED MAY 3, 1933 AND RECORDED MAY 8, 1933 IN BOOK 590 OFFICIAL RECORDS OF SAN MATEO COUNTY, PAGE 360 (24482-C); THENCE SOUTH 84° 00' WEST 21.44 FEET TO THE SAID NORTHEASTERLY CORNER OF SAID 9.75 ACRE TRACT 901.85 FEET, MORE OR LESS, TO THE EASTERLY LINE OF THE LANDS DESCRIBED IN THE DEED FROM FRANK ENOS ALVES AND EIFE, TO ERNEST ALVES AND CLARA K. ALVES, DATED OCTOBER 17, 1950 AND RECORDED OCTOBER 24, 1950 IN BOOK 1963 OFFICIAL RECORDS OF SAN MATEO COUNTY, PAGE 206 (94758-I); THENCE NORTH 6° 00' WEST ALONG SAID LAST MENTIONED EASTERLY LINE 198.81 FEET, MORE OR LESS, TO THE NORTHEASTERLY CORNER OF SAID LAST MENTIONED LANDS; THENCE SOUTH 84° 02' 30" WEST ALONG THE . NORTHERLY LINE THEREOF 208.71 FEET, MORE OR LESS, TO THE SAID EASTERLY LINE OF THE COAST HIGHWAY, FIRST ABOVE REFERRED TO, THENCE, NORTH-WESTERLY ALONG SAID LAST MENTIONED LINE 184.04 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

**Exhibit C to Credit and Security Agreement**

**CONDITIONS PRECEDENT**

Wells Fargo's obligation to make an initial Advance shall be subject to the condition that Wells Fargo shall have received the following, executed and in form and content satisfactory to Wells Fargo. The following descriptions are limited descriptions for reference purposes only and should not be construed as limiting in any way the subject matter that Wells Fargo requires each document to address.

A. **Loan Documents to be Executed by Company:**

(1) The **Revolving Note**.

(2) The **Debtor-In-Possession Credit and Security Agreement**.

(3) The **Master Agreement for Treasury Management Services**, the **Acceptance of Services**, and the related Service Description for each deposit or treasury management related product or service that Company will subscribe to, including without limitation the **Lockbox and Collection Account Service Description**.

(6) Amendments to the **Deeds of Trust**.

(7) The **Standby Letter of Credit Agreement** and the **Commercial Letter of Credit Agreement**, and a separate **L/C Application** for each Letter of Credit that Company has requested that Wells Fargo issue.

B. **Loan Documents to be Executed by Third Parties:** None**.**

(1) **Certificates Insurance** required under this Agreement, with all hazard insurance containing a lender's loss payable endorsement in Wells Fargo's favor and with all liability insurance naming Wells Fargo as additional insured.

C. **Documents Related to the Premises:** None**.**

D. **Federal Tax, State Tax, Judgment, UCC and Intellectual Property Lien Searches**

(1) **Current searches of Company** in appropriate filing offices showing that (i) no Liens have been filed and remain in effect against Company and Collateral except Permitted Liens or Liens held by Persons who have agreed in an Authenticated Record that upon receipt of proceeds of the initial Advances, they will satisfy, release or terminate such Liens in a manner satisfactory to Wells Fargo, and (ii) Wells Fargo has filed all **UCC financing statements** necessary to perfect the Security Interest, to the extent the Security Interest is capable of being perfected by filing.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 75 of 99

E.    **Constituent Documents**:

(1)    The **Certificate of Authority of Company**, which shall include as part of the Certificate or as exhibits to the Certificate, (i) the **Resolution** of Company's Directors and, if required, Owners, authorizing the execution, delivery and performance of those Loan Documents and other documents or agreements described in or related to this Agreement to which Company is a party, (ii) an **Incumbency Certificate** containing the signatures of Company's Officers or agents authorized to execute and deliver those instruments, agreements and certificates referenced in (i) above, as well as Advance requests, on Company's behalf, (iii) Company's **Constituent Documents**, (iv) a current **Certificate of Good Standing** or **Certificate of Status** issued by the secretary of state or other appropriate authority for Company's state of organization, certifying that Company is in good standing and in compliance with all applicable organizational requirements of the state of organization, and (v) a **Secretary's Certificate** of Company's secretary or assistant secretary certifying that the Certificate of Authority of Company is true, correct and complete.

(2)    **Evidence that Company is licensed or qualified to transact business** in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(3)    An **Officer's Certificate** of an appropriate Officer of Company confirming, in his or her personal capacity, the representations and warranties set forth in this Agreement.

(4)    A **Customer Identification Information Form** and such other forms and verification as Wells Fargo may need to comply with the U.S.A. Patriot Act.

F.    **Real Estate Related Documents:**

With respect to the Real Property Collateral:

(1)    Endorsements to the American Land Title Association **policies of title insurance**.

G.    **Bankruptcy Matters:**

(1)    The Petition Date must have occurred no late than May 23, 2011.

(2)    The Bankruptcy Court shall have issued and entered the Interim Order within seven days after the Petition Date, (a) creating and granting a first priority Lien on the Collateral pursuant to sections 364(c)(1), (c)(2), and (c)(3) and (d) of the Bankruptcy Code, subject only to Permitted Liens, (b) authorizing Company to continue to use its depository bank accounts and cash management procedures as such exist as of the Petition Date and authorizing the dominion of Wells Fargo with respect to cash proceeds, including without limitation (or reaffirmations thereof, if requested by Wells Fargo) and any other agreements with respect to blocked accounts and other deposit or bank accounts which may include proceeds of the Collateral, (c) authorizing payments to Wells Fargo of proceeds of Pre-Petition Collateral consistent with the this Agreement, (d) authorizing replacement Liens in favor of Wells Fargo in

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 76 of 99

all Pre-Petition Collateral and Post-Petition Collateral, of the same extent, validity and priority as the Pre-Petition Liens, to the extent of any diminution in value, and (e) authorizing an administrative unsecured claim priority pursuant to Sections 364(b) and 364(c)(1) of the Bankruptcy Code, excluding, however, Avoiding Power Causes of Action. The Interim Order shall contain also such terms as required by Wells Fargo, and shall include, without limitation, terms that provide that all parties must object to the claims and liens of Wells Fargo by no later than the earlier of (i) 60 days from the date of selection of counsel for the Creditors' Committee; and (ii) payment in full of the Indebtedness, and grant in favor of Wells Fargo relief from the Automatic Stay under section 362(a) of the Bankruptcy Code upon shortened notice with respect to any act to enforce rights or remedies with respect to the Collateral following an Event of Default, and provide a waiver of the right to recover upon any claim under Section 506(c) of the Bankruptcy Code against any Collateral upon satisfaction in full of the Indebtedness.

(3)     Entry of findings of fact and conclusions of law in support of the Interim Order, in form and substance acceptable to Wells Fargo.

(4)     At the commencement of the Bankruptcy Case, Company shall file one or more motions as necessary with the Bankruptcy Court seeking approval of bid procedures and a sale timeline for the sale of substantially all of Company's operating assets.

## H.     Miscellaneous Matters or Documents

(1)     Payment of **fees and reimbursable costs and expenses due under this Agreement through the date of initial Advance** or issuance of a Letter of Credit, including all legal expenses incurred through the date of the closing of this Agreement.

(2)     the Budget.

(3)     Any documents or other agreements entered into by Company and Wells Fargo that relate to any swap, derivative, foreign exchange, hedge, deposit, treasury management or similar product or transaction extended to Company by Wells Fargo not already provided pursuant to the requirements of (A)-(G) above.

(4)     Such other documents as Wells Fargo in its sole discretion may require.

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 77 of 99

**Exhibit D to Credit and Security Agreement**

**REPRESENTATIONS AND WARRANTIES**

Company represents and warrants to Wells Fargo as follows:

(a)     <u>Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number</u>. Company is a corporation, duly organized, validly existing and in good standing under the laws of the State of California and is licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.  Company has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, those Loan Documents and any other documents or agreements that it has entered into with Wells Fargo related to this Agreement.  During its existence, Company has done business solely under the names set forth below in addition to its correct legal name. Company's chief executive office and principal place of business is located at the address set forth below, and all of Company's records relating to its business or the Collateral are kept at that location.  All Inventory and Equipment is located at that location or at one of the other locations set forth below.  Company's name, Federal Employer Identification Number and Organization Identification Number are correctly set forth at the end of the Agreement next to Company's signature.

| Trade Names |
|---|
| None. |
| **Chief Executive Office / Principal Place of Business** |
| 2651 North Cabrillo Highway, Half Moon Bay, California 94019. |

| Other Inventory and Equipment Locations |
|---|
| 1.      Half Moon Bay<br>        2651 North Cabrillo Highway<br>        Half Moon Bay, California 94019<br><br>2.      Half Moon Bay<br>        2125 South Cabrillo Highway<br>        Half Moon Bay, California 94019<br><br>3.      Southern California<br>        1330 Distribution Way, Suite C<br>        Vista, California 92081 |

(b)    _Capitalization_.  In a separate certificate, dated the date hereof, Company has certified a copy of its Capitalization Chart which constitutes a correct and complete list of all ownership interests of Company and all rights to acquire ownership interests, including the record holder, number of interests and percentage interests on a fully diluted basis, and the Organizational Chart below shows the ownership structure of all Subsidiaries of Company.

| Organizational Chart |
|---|
| Not applicable. |

(c)    _Authorization of Borrowing; No Conflict as to Law or Agreements_.  The execution, delivery and performance by Company of the Loan Documents and any other documents or agreements described in or related to this Agreement, and all borrowing under the Post-Petition Line of Credit have been authorized and do not (i) require the consent or approval of Company's Owners; (ii) require the authorization, consent or approval by, or registration, declaration or filing with, or notice to, any governmental agency or instrumentality, whether domestic or foreign, or any other Person, except to the extent obtained, accomplished or given prior to the date of this Agreement; (iii) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to Company or of Company's Constituent Documents; (iv) result in a breach of or constitute a default or event of default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Company is a party or by which it or its properties may be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or subsequently acquired by Company.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 79 of 99

(d)    <u>Legal Agreements</u>.  This Agreement, the other Loan Documents, and any other document or agreement described in or related to this Agreement, will constitute the legal, valid and binding obligations of Company, enforceable against Company in accordance with their respective terms.

(e)    <u>Subsidiaries</u>.  Except as disclosed below, Company has no Subsidiaries.

| **Subsidiaries** |
| --- |
| None. |

(f)    <u>Financial Condition; No Adverse Change</u>.  Company has furnished to Wells Fargo its audited financial statements for its fiscal year ended June 30, 2010, and unaudited financial statements for the fiscal-year-to-date period ended March 31, 2011, and those statements fairly present Company's financial condition as of those dates and the results of Company's operations and cash flows for the periods then ended and were prepared in accordance with GAAP.  Since the date of the most recent financial statements, there has been no Material Adverse Effect in Company's business, properties or condition (financial or otherwise).

(g)    <u>Litigation</u>.  There are no actions, suits or proceedings pending or, to Company's knowledge, threatened against or affecting Company or any of its Affiliates or the properties of Company or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Company or any of its Affiliates, would result in a final judgment or judgments against Company or any of its Affiliates in an amount in excess of $10,000, apart from those matters specifically disclosed below.

**Litigation Matters in Excess of $10,000**

1. In March 2008, Company was joined in a lawsuit via a cross-complaint from Design One Environments ("Design One"), who is an interior landscaper and customer. Several years ago, Design One installed a large house plant in a home. They completed the installation by adding a light for effect and Spanish Moss for decoration. Over the years they purchased Spanish Moss from Company as well as others. In April 2007, the house burned down. It appears the plant installation is the cause of the fire. Design One was sued and has filed a cross-complaint against Company essentially claiming that the Spanish Moss was a contributing factor in the fire. Company has tendered the claim to their insurance company and the insurance company has accepted defense.

2. In July 2008, Company was contacted by the attorney representing Jennifer Carter, a former employee who was terminated as part of the Company's reduction in workforce that was implemented in June 2008. Ms. Carter was an hourly administrative employee in the Company's Wholesale Center. Attorney for Ms. Carter contends that, because she was out on protected leave at the time of her termination, she was unlawfully terminated. Company strongly disagrees. The regulations regarding protected leave uniformly state that an employee out on leave is entitled to no more protection than if the employee was continuously employed. Ms. Carter's position was eliminated due to the installation of a point of sale program which automated most of Ms. Carter's job responsibilities. The remainder of her job responsibilities are being transferred into the customer service group where they are currently performed for the entire Company. Ms. Carter's position was a planned job elimination and would have happened even if Ms. Carter had been working continuously. Company has provided Ms. Carter's attorney with a written response.

3. In late June 2010, Company implemented a significant downsizing of its operations and workforce. Because of the size of the reduction in workforce (138 employees), the lay-off was conducted in compliance with the requirements of the WARN Act. The permanently laid-off employees were each notified in writing that they were being placed on 60 day paid administrative leave, relieved of all their duties and given a termination date.Following the reduction in force, the United Farm Workers Union ("UFW") began an organizing campaign to represent the agricultural workers at Company. On August 2, 2010, pursuant to an order of the California Agricultural Labor Relations Board ("ALRB"), a representative election was held. Votes were cast by the current employees as well as the laid-off workers. The current employees voted 58-3 against union representation. Company and the UFW challenged 107 ballots consisting of 13 ballots cast by current employees working in the Wholesale Center and 94 ballots cast by the laid-off workers. The ALRB ruled that the laid-off workers were eligible to vote and ordered their ballots counted. Including the votes of the permanently laid-off employees, the UFW received the majority of the combined total votes cast. The election results could not be certified until final ALRB disposition of Company's Objections and a Petition to Set Aside the Election, which were timely filed immediately following the election.

In February 2011, the ALRB dismissed some of the objections and set some for hearing. Specifically, the ALRB set for hearing the objections regarding whether Company was at the

Case: 11-31985     Doc# 8-2     Filed: 05/23/11     Entered: 05/23/11 15:19:00     Page 81 of
99

legally required 50% of peak employment (including seasonal workers) to hold an election.

    After further investigation, the ALRB Salinas Regional Office ("Regional") issued a letter to the UFW, dated May 13, 2011 (the "Regional Letter"), notifying the UFW that Regional had determined that its original methodology used to calculate peak in Company's case was in error and that peak was not reached. The Regional Letter requested that UFW withdraw its Petition for Certification or, in the alternative, Regional would "seek to have the election set aside on the basis of an incorrect count." On May 16, 2011, Regional issued a written ruling (the "Regional Ruling") restating Regional's determination set forth in the Regional Letter. In connection with the Regional Ruling, Regional has petitioned ALRB to dismiss the election. Under the applicable regulations, both UFW and Company can file responses to the Regional Ruling and petition.

4. On December 8, 2010 John Jackson, an employee of Company, was involved in a traffic accident at an onramp to Interstate 5 in San Diego. Mr. Jackson rear-ended the car in front of him (Hurst) which propelled the car into the car in front of it (Verzaro). The front car had stopped on the belief that the metering lights were operational when in fact they were not. Injuries were sustained by the passengers in the car struck by Mr. Jackson and there was extensive damage to the vehicle struck by Mr. Jackson. Suit was filed by Hurst on January 19, 2011 against Company and Mr. Jackson as well as the driver of the front car that was stopped (Verzaro). The case was tendered to insurance which accepted defense of both Company and Mr. Jackson. Because it appears that liability will be imposed on both Company and Mr. Jackson, as well as Verzaro, defense counsel has recommended that the case be handled with a focus on plaintiff's damages and the potential for early resolution through settlement. Verzaro shares liability because he stopped on the freeway onramp when there was no need to do so.

5. On December 25, 2008 a truck carrying Company's product was involved in a traffic accident on Interstate 10 when it rear-ended a vehicle and caused fatalities and serious injuries to the vehicle passengers. Shippers Choice, Company's truck broker, contracted with Western Star Transportation to haul to load of Company's product. The product was scheduled to be delivered to two Wal-Mart distribution centers, one in Tennessee and one in Louisiana. Suit was brought against many defendants, including Shippers Choice, Western Star Transportation, Company and Wal-Mart. Because of Company's Indemnity Agreement with Shippers Choice, suit against Company was tendered to Shippers Choice insurance (Traveler's) which accepted defense. It is the opinion of counsel for Company that Company has no liability in the case as it was in no way responsible for either the hiring of Western Star or the accident itself. As of the date of this writing, discovery against Company (which was minimal) has been completed and counsel for Company is preparing a motion for summary judgment to have Company removed from the case. Wal-Mart, whose connection with this case is even more attenuated than Company's, has written to Company, seeking indemnity and defense pursuant to its Vendor Agreement with Company. Company has sent this request to its insurance which has not yet given a formal response.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 82 of
                                        99

(h)    Intellectual Property Rights.

(i)    Owned Intellectual Property.  Set forth below is a complete list of all patents, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which Company is the owner of record (the "Owned Intellectual Property").  Except as set forth below, (A) Company owns the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens, whether by agreement memorialized in a Record Authenticated by Company or otherwise, (B) no Person other than Company owns or has been granted any right in the Owned Intellectual Property, (C) all Owned Intellectual Property is valid, subsisting and enforceable, and (D) Company has taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(ii)    Agreements with Employees and Contractors.  Company has entered into a legally enforceable agreement with each Person that is an employee or subcontractor obligating that Person to assign to Company, without additional compensation, any Intellectual Property Rights created, discovered or invented by that Person in the course of that Person's employment or engagement with Company (except to the extent prohibited by law), and further obligating that Person to cooperate with Company, without additional compensation, to secure and enforce the Intellectual Property Rights on behalf of Company, unless the job description of the Person is such that it is not reasonably foreseeable that the employee or subcontractor will create, discover, or invent Intellectual Property Rights.

(iii)    Intellectual Property Rights Licensed from Others.  Set forth below is a complete list of all agreements under which Company has licensed Intellectual Property Rights from another Person ("Licensed Intellectual Property") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("Off-the-shelf Software") and a summary of any ongoing payments Company is obligated to make with respect thereto.  Except as set forth below or in any other Record, copies of which have been given to Wells Fargo, Company's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs, whether by agreement to in a Record Authenticated by Company or otherwise.  Except as disclosed below, Company is not contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(iv)    Other Intellectual Property Needed for Business.  Except for Off-the-shelf Software and as disclosed below, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct Company's business as it is presently conducted or as Company reasonably foresees conducting it.

(v)    Infringement.  Except as disclosed below, Company has no knowledge of, and has not received notice either orally or in a Record alleging, any Infringement of another Person's Intellectual Property Rights (including any claim set forth in a Record that Company must license or refrain from using the Intellectual Property Rights of any Person) nor, to Company's knowledge, is there any threatened claim or any reasonable basis for any such claim.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 83 of 99

| **Intellectual Property Disclosures** |
| --- |

(i)   <u>Owned Intellectual Property</u>

      (a)   <u>Patents</u>.
           None.

      (b)   <u>Trademarks</u>.

           **1.  BLOOM-RITE®**



- REG # 1,308,252
- Class 31
- Registered 12/4/1984
- Renewed 11/10/2004
- Next renewal due by December 4, 2014
- Granting Jurisdiction: USPTO

           **2.  BLOOM-RITE®**

- "BLOOM RITE"
- REG #900511
- Class 31
- Registered October 13, 1970
- Renewed March 2, 2001
- Next Renewal due by October 13, 2010
- Granting Jurisdiction: USPTO

           **3.  BLOOM-RITE® Australia**



- REG # 575153
- Class 31
- Registered 3/25/1992
- Renewal due by March 2009
- Granting Jurisdiction: IP Australia

           **4.  GET MEE®**

- "GET MEE"
- REG # 2,891,767
- Class 31
- Registered 10/5/2004
- §8 Statement of Use due 10/5/2010
- Renewal due by October 5, 2014
- Granting Jurisdiction: USPTO

           **5.  KID'S DAY®**

              **a.**

- "KID'S DAY"
- REG #1833043

Case: 11-31985   Doc# 8-2   Filed: 05/23/11   Entered: 05/23/11 15:19:00   Page 84 of 99

- o Classes 20, 21, 26
- o Registered 4/26/1994
- o Renewed 3/23/2007
- o Next renewal due by April 2014
- o Granting Jurisdiction: USPTO

    **b.**
- o "KID'S DAY"
- o REG #1816068
- o Class 31
- o Registered 1/11/1994
- o Renewed 2/29/2004
- o Next renewal due by January 11,  2014
- o Granting Jurisdiction: USPTO

**6.  KID'S DAY® Australia**
- o "KID'S DAY"
- o REG #577906
- o Class 31
- o Registered 5/6/1992
- o Renewal due by May 2009
- o Granting Jurisdiction: IP Australia

**7.  CHILDREN'S DAY®**

    **a.**
- o "CHILDREN'S DAY"
- o REG #1737746
- o Class 31
- o Registered 12/1/1992
- o Renewed 11/20/2003
- o Next renewal due by December 1,  2012
- o Granting Jurisdiction: USPTO

    **b.**
- o "CHILDREN'S DAY"
- o REG #1831770
- o Class 20,21,26
- o Registered 4/19/1994
- o Renewed 3/23/2007
- o Next renewal due by April 19, 2014
- o Granting Jurisdiction: USPTO

**8.  CHILDREN'S DAY® Australia**
- o "CHILDREN'S DAY"
- o REG # 577905
- o  Class 31
- o Registered 5/6/92
- o Renewal due by May 2009

**9.   Alpine Series®**



- o   REG # 3309701
- o    Class 31
- o   Registered 10/9/2007
- o   §8 Statement of Use due b/t October 2012-2013
- o   Renewal due by October 2017
- o   Granting Jurisdiction: USPTO

**[ABANDONED DUE TO NON-USE]**

**11.   EUROPEAN TREE ®**
- o   "EUROPEAN TREE"
- o   SN: 77/ 284,490
- o   Class 31
- o   Registered 7/15/2008

**12.   SPRING BRITE®**
- o   "SPRING BRITE"
- o   SN: 77/ 284,951
- o   Class 31
- o   Registered 6/17/2008

(c)   <u>Copyrights</u>.

**1.   Sorbet Pot Collection**
- o   Registration Number: VA 1-231-589
- o   Registration Date: 11/12/2003
- o   Granting Jurisdiction: Copyright Office
- o   See Attachment A

**2.   Venus Fly Trap Container & Display**
- o   Registration Number: VA 1-629-679
- o   Registration Date: 11/1/2007
- o   Granting Jurisdiction: Copyright Office

**3.   Pool Party- Confetti #1 Mylar Wrap**
- o   Registration Number: VAu 707-550
- o   Registration Date: 6/9/2006
- o   Granting Jurisdiction: Copyright Office
- o   See Attachment B

4. **Pool Party- Confetti #2 Mylar Wrap**
   - o   Registration Number: VAu 707-105
   - o   Registration Date: 6/9/2006
   - o   Granting Jurisdiction: Copyright Office
   - o   See Attachment B

5. **Pool Party- Bubbles Mylar Wrap**
   - o   Registration Number: VAu 707-106
   - o   Registration Date: 6/9/2006
   - o   Granting Jurisdiction: Copyright Office
   - o   See Attachment B

6. **Pool Party- Cabana Stripe Mylar Wrap**
   - o   Registration Number: VAu 707-549
   - o   Registration Date: 6/9/2006
   - o   Granting Jurisdiction: Copyright Office
   - o   See Attachment B

7. **Argyle Mylar Wrap (various patterns)**
   - o   Registration Number: VAu 719-698
   - o   Registration Date: 6/9/2006
   - o   Granting Jurisdiction: Copyright Office
   - o   See Attachment B

8. **Blob Dots Mylar Wrap (various colors)**
   - o   Registration Number: VAu 719-696
   - o   Registration Date: 6/9/2006
   - o   Granting Jurisdiction: Copyright Office
   - o   See Attachment B

9. **Blueberries Mylar Wrap (various patterns)**
   - o   Registration Number: VAu 719-699
   - o   Registration Date: 6/9/2006
   - o   Granting Jurisdiction: Copyright Office
   - o   See Attachment B

10. **Falling Leaves Mylar Wrap (various colors)**
    - o   Registration Number: VAu 719-695
    - o   Registration Date: 6/9/2006
    - o   Granting Jurisdiction: Copyright Office
    - o   See Attachment B

11. **Chambray Mylar Wrap (various colors)**
    - o   Registration Number: VAu 719-693
    - o   Registration Date: 6/9/2006
    - o   Granting Jurisdiction: Copyright Office
    - o   See Attachment B

12. **Scroll  Mylar Wrap (various colors)**

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 87 of 99

- o Registration Number: VAu 719-694
- o Registration Date: 6/9/2006
- o Granting Jurisdiction: Copyright Office
- o See Attachment B

**13. Watermelon Mylar Wrap (various patterns)**
- o Registration Number: VAu 719-697
- o Registration Date: 6/9/2006
- o Granting Jurisdiction: Copyright Office
- o See Attachment B

**14. Abutilon Merchandising Jacket**
- o Registration Number: VA 1-111-047
- o Registration Date: 8/13/2001
- o Granting Jurisdiction: Copyright Office

**15. Phalaenopsis Merchandising Jacket**
- o Registration Number: VA 1-111-048
- o Registration Date: 8/13/2001
- o Granting Jurisdiction: Copyright Office

**16. Passion Flower Merchandising Jacket**
- o Registration Number: VA 1-130-743
- o Registration Date: 4/25/2002
- o Granting Jurisdiction: Copyright Office

**17. Perennial Collection Merchandising Jacket**
- o Registration Number: VA 1-130-744
- o Registration Date: 4/25/2002
- o Granting Jurisdiction: Copyright Office

**18. Towne & Country Roses Merchandising Jacket**
- o Registration Number: VA 1-120-960
- o Registration Date: 8/16/2001
- o Granting Jurisdiction: Copyright Office

**19. Tulips Merchandising Jacket**
- o Registration Number: VA 1-158-752
- o Registration Date: 4/25/2002
- o Granting Jurisdiction: Copyright Office

**20. Tree Peony Merchandising Jacket**
- o Registration Number: VA 1-110-522
- o Registration Date: 8/13/2001
- o Granting Jurisdiction: Copyright Office

**21. Clematis Merchandising Jacket**
- o Registration Number: VA 1-110-523
- o Registration Date: 8/13/2001
- o Granting Jurisdiction: Copyright Office

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 88 of 99

**22. Narcissus Sleeve - *PENDING***
   o   Application received by Copyright Office 10/30/2007


(iii)   <u>Intellectual Property Rights Licensed from Others</u>.

1.      Plant License Agreement, by and between Poulsen Roser A/S ("Licensor") and Company ("Licensee"), dated May 12, 2004, whereby Licensor grants to Licensee a license for commercial exploitation of certain plant varieties, including, without limitation, for such Plant Varieties all plant patents and other rights regarding the reproduction, propagation and use of such plants in the United States and Canada.

   a.      Appendix A, dated October 8, 2010, to apply in the period from October 1, 2010 to September 30, 2011.

2.      Plant License Agreement, by and among Raymond J. Evison Ltd., Poulsen Roser A/S ("Licensor") and Company ("Licensee"), dated May 12, 2004, whereby Licensor grants to Licensee a license for commercial exploitation of certain plant varieties, including, without limitation, for such Plant Varieties all plant patents and other rights regarding the reproduction, propagation and use of such plants in the United States and Canada.

   a.      Appendix A (4.C2), dated October 8, 2010, to apply in the period from October 1, 2010 to September 30, 2011.

   b.      Appendix A (4.C4), dated October 8, 2010, to apply in the period from October 1, 2010 to September 30, 2011.

3.      Campanula Cooperation Agreement ("Agreement"), by and between Gartneriet PKM A/S ("Licensor") and Company ("Licensee"), dated December 15, 2005, whereby Licensor granted to Licensee the exclusive right in the USA to grow the varieties in possession of, or owned by Licensee, including varieties that are developed during the term of this Agreement.

   a.      Appendix A, Production Goals

   b.      Appendix B, Royalty Schedule

4.      Microsoft Software License Terms, Microsoft Dynamics AX 3.x, AX 4.0, Microsoft Dynamics GP 9.x, Microsoft Dynamics NAV 4.x, NAV 5.0, Microsoft Dynamics SL 6.x, by and between Microsoft Corporation and Nurserymen's Exchange, Inc., for  Microsoft Dynamics NAV 4.x, NAV 5.0 software.

(i)    Taxes.  Company has paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by each of them.  Company has filed all federal, state and local tax returns which to the knowledge of the Officers of Company are required to be filed, and Company has paid or caused to be paid to the respective taxing authorities all taxes as shown on these returns or on any assessment received by it to the extent such taxes have become due.

(j)    Titles and Liens.  Company has good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens.  No financing statement naming Company as debtor is on file in any office except to perfect only Permitted Liens.

(k)    No Defaults.  Company is in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which could have a Material Adverse Effect on Company's financial condition, properties or operations .

(l)    Submissions to Wells Fargo.  All financial and other information provided to Wells Fargo by or on behalf of Company in connection with Company's request for the credit facilities contemplated hereby is (i) true, correct and complete in all material respects, (ii) does not omit any material fact that would cause such information to be misleading, and (iii) as to projections, valuations or proforma financial statements, present a good faith opinion as to such projections, valuations and proforma condition and results.

(m)    Financing Statements.  Company has previously authorized the filing of financing statements sufficient when filed to perfect the Security Interest and other Liens created by the Security Documents.  When such financing statements are filed, Wells Fargo will have a valid and perfected security interest in all Collateral capable of being perfected by the filing of financing statements.  None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing has been filed with respect to such Collateral.

(n)    Rights to Payment.  Each right to payment and each instrument, document, chattel paper and other agreement constituting or evidencing Collateral is (or, in the case of all future Collateral, will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim of the account debtor or other obligor named in that instrument.

(o)    Employee Benefit Plans.

(i)    Maintenance and Contributions to Plans.  Except as disclosed below, neither Company nor any ERISA Affiliate (A) maintains or has maintained any Pension Plan, (B) contributes or has contributed to any Multiemployer Plan, or (C) provides or has provided post-retirement medical or insurance benefits to employees or former employees (other than benefits required under Section 601 of ERISA, Section 4980B of the IRC, or applicable state law).

(ii)    Knowledge of Plan Noncompliance with Applicable Law.  Except as disclosed below, neither Company nor any ERISA Affiliate has (A) knowledge that Company or the ERISA Affiliate is not in full compliance with the requirements of ERISA, the IRC, or

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 90 of
99

applicable state law with respect to any Plan, (B) knowledge that a Reportable Event occurred or continues to exist in connection with any Pension Plan, or (C) sponsored a Plan that it intends to maintain as qualified under the IRC that is not so qualified, and no fact or circumstance exists which may have an adverse effect on such Plan's tax qualified status.

(iii)    Funding Deficiencies and Other Liabilities.  Neither Company nor any ERISA Affiliate has liability for any (A) accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the IRC) under any Plan, whether or not waived, (B) withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Section 4201 or 4243 of ERISA, or (C) event or circumstance which could result in financial obligation to the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor or any participant in connection with any Plan (other than routine claims for benefits under the Plan).

| **Employee Benefit Plans** |
| --- |
| None. |

(p)    Environmental Matters.

(i)    Hazardous Substances on Premises.  Except as disclosed below, to Company's  knowledge, there are not present in, on or under the Premises any Hazardous Substances in such form or quantity as to create any material liability or obligation for either Company or Wells Fargo under the common law of any jurisdiction or under any Environmental Law, and no Hazardous Substances have ever been stored, buried, spilled, leaked, discharged, emitted or released in, on or under the Premises in such a way as to create a material liability.

(ii)    Disposal of Hazardous Substances.  Except as disclosed below, to Company's  knowledge, Company has not disposed of Hazardous Substances in such a manner as to create any material liability under any Environmental Law.

(iii)    Claims and Proceedings with Respect to Environmental Law Compliance. Except as disclosed below, to Company's  knowledge, there have not existed in the past, nor are there any threatened or impending requests, claims, notices, investigations, demands, administrative proceedings, hearings or litigation relating in any way to the Premises or Company, alleging material liability under, violation of, or noncompliance with any Environmental Law or any license, permit or other authorization issued pursuant thereto.

(iv)    Compliance with Environmental Law; Permits and Authorizations. Except as disclosed below, to Company's  knowledge, Company (A) conducts its business at all times in compliance with applicable Environmental Law, (B) possesses valid licenses, permits and other authorizations required under applicable Environmental Law for the lawful and efficient operation of its business, none of which are scheduled to expire, or withdrawal, or material limitation within the next 12 months, and (C) has not been denied insurance on grounds related to potential environmental liability.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 91 of 99

(v)    Status of Premises.  Except as disclosed below, to Company's knowledge, the Premises are not and never have been listed on the National Priorities List, the Comprehensive Environmental Response, Compensation and Liability Information System or any similar federal, state or local list, schedule, log, inventory or database.

(vi)    Environmental Audits, Reports, Permits and Licenses.  Company has delivered to Wells Fargo all environmental assessments, audits, reports, permits, licenses and other documents in the possession of Company describing or relating in any way to the Premises or Company's businesses.

| **Environmental Matters** |
|---|
| (v) Status of Premises<br><br>       (A) APN 048-300-220: Three 10,000 gallon diesel underground storage tanks (USTs) were removed from parcel number 048-300-220 in 1990, diesel fuel was found in some soil, and impacted soils were addressed.  San Mateo County Environmental Health Department (SMC-EHD) reported that the groundwater monitoring activities that were subsequently conducted following the UST removal indicated that the underlying groundwater has not been impacted.  According to the EDR database report dated April 30, 2008, the UST case was closed.  Because of these USTs, this parcel will appear on various governmental lists of sites that currently have, or previously had, USTs and because of the prior impacts to soil from the former USTs, this parcel will appear on various governmental lists of sites that had releases from USTs.  Inclusion on these lists does not necessarily indicate an environmental problem.<br><br>       (B) APN 048-300-260:  There were two USTs located at parcel number 045-300-260 (i) a 2,000 gallon gasoline UST; and (ii) a 6,000 gallon diesel UST.  Both tanks were removed n June 9, 2010. A report was issued by TEC Accutite on July 9, 2010 detailing the removal. On September 27, 2010 San Mateo County Environmental health issued a closure letter stating no further action was required. |

(q)    Acknowledgement of Pre-Petition Indebtedness.  As of the Petition Date, (i) the Pre-Petition Indebtedness was due and outstanding pursuant to the Pre-Petition Loan Documents in the principal amount of $16,405,150.62 in the aggregate (comprised of $5,846,150.62 evidenced by the Pre-Petition Revolving Note, $915,000 in face amount of Pre-Petition Letters of Credit, $7,425,000 evidenced by the Term Note, and $2,219,000 evidenced by the Term Note E), plus accrued but unpaid interest, fees and reimbursable expenses, all of which Pre-Petition Indebtedness is unconditionally owing by Pre-Petition Company to Wells Fargo, without offset, defense or counterclaim of any kind, nature and description whatsoever; (ii) Company has no defense to, right of set off, counterclaim or other basis to challenge the Pre-Petition Indebtedness; (iii) the Pre-Petition Indebtedness is secured by valid, enforceable and perfected liens in favor of Wells Fargo on all Pre-Petition Collateral; (iv) the Pre-Petition Liens encumbering the Pre-Petition Collateral are not avoidable in any way, including without limitation, by operation of any section of the Bankruptcy Code, including sections 541 through 550, or any other law; (v) the Pre-Petition Indebtedness and the Pre-Petition Liens are not subject to subordination in favor of any other person on any basis except as specifically provided in the

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 92 of 99

Pre-Petition Loan Documents; provided, however, that this acknowledgment, confirmation and agreement shall not impair, prohibit or otherwise affect any Committee's right to prosecute an Adverse Action subject to the terms of this Agreement and the Financing Orders.

(r)    Commencement of the Bankruptcy Case and Notices.  The Bankruptcy Case was commenced on the Petition Date, in accordance with applicable law.   Notice of the commencement of the Bankruptcy Case and of the motion and hearing for the approval of the Interim Financing Order and the Final Financing Order has been given, as identified in the certificate of service filed in the Bankruptcy Case.

(s)    Conversion of the Bankruptcy Case.  Company does not at this time contemplate converting or dismissing the Bankruptcy Case, or stipulating to the appointment of a chapter 11 trustee or examiner.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 93 of
99

**Exhibit E to Credit and Security Agreement**

<u>**COMPLIANCE CERTIFICATE**</u>

To:          Wells Fargo Bank, National Association
Date:        **[_____, 200__]**
Subject:     Financial Statements

       In accordance with our Credit and Security Agreement dated as of May 23, 2011 (as amended from time to time, the "Credit Agreement"), attached are the financial statements of Nurserymen's Exchange, Inc., a California corporation (the "Company") dated _____, 200__ (the "Reporting Date") and the year-to-date period then ended (the "Current Financials"). All terms used in this certificate have the meanings given in the Credit Agreement.

       **A.**     **Preparation and Accuracy of Financial Statements**. I certify that the Current Financials have been prepared in accordance with GAAP, subject to year-end audit adjustments, and fairly present Company's financial condition as of the Reporting Date.

       **B.**     **Name of Company; Merger and Consolidation**. I certify that:

(Check one)

☐     Company has not, since the date of the Credit Agreement, changed its name or jurisdiction of organization, nor has it consolidated or merged with another Person.

☐     Company has, since the date of the Credit Agreement, either changed its name or jurisdiction of organization, or both, or has consolidated or merged with another Person, which change, consolidation or merger: 0 was consented to in advance by Wells Fargo in an Authenticated Record, and/or 0 is more fully described in the statement of facts attached to this Certificate.

       **C.**     **Events of Default**. I certify that:

(Check one)

☐     I have no knowledge of the occurrence of an Event of Default under the Credit Agreement, except as previously reported to Wells Fargo in a Record.

☐     I have knowledge of an Event of Default under the Credit Agreement not previously reported to Wells Fargo in a Record, as more fully described in the statement of facts attached to this Certificate, and further, I acknowledge that Wells Fargo may under the terms of the Credit Agreement impose the Default Rate at any time during the resulting Default Period.

**D.**     **Litigation Matters**.  I certify that:

(Check one)

☐     I have no knowledge of any material adverse change to the litigation exposure of Company or any of its Affiliates or of any Guarantor.

☐     I have knowledge of material adverse changes to the litigation exposure of Company or any of its Affiliates or of any Guarantor not previously disclosed in Exhibit D, as more fully described in the statement of facts attached to this Certificate.

**E.**     **Reserved**.

**NURSERYMEN'S EXCHANGE, INC.,**
a California corporation


By:  _____
Its:  Chief Financial Officer

# Exhibit F to Credit and Security Agreement

## PERMITTED LIENS

| Creditor | Collateral | Jurisdiction | Filing Date | Filing No. |
|---|---|---|---|---|
| Banc of America Vendor Finance, Inc; National Bank of Kentucky; U.S. Bankcorp Oliver-Allen Technology Leasing | Certain equipment located at 2651 North Cabrillo Highway, Half Moon Bay, CA 94019 | California | 3/18/1999 | 99-08860645 |
| Wells Fargo Equipment Finance, Inc. | Certain equipment located at 2651 North Cabrillo Highway, Half Moon Bay, CA 94019 | California | 8/7/2003 | 03-22360014 |
| IOS Capital | Specific Equipment (Lease) | California | 11/10/2006 | 06-7091525540 |
| Wells Fargo Bank, National Association | Blanket | California | 1/26/2007 | 07-7100341174 |
| IOS Capital | Specific Equipment (Lease) | California | 2/10/2007 | 07-7102326987 |
| IKON Financial Services | Specific Equipment (Lease) | California | 12/21/2007 | 07-7141058952 |
| IKON Financial Services | Specific Equipment (Lease) | California | 9/13/2008 | 08-7171846941 |
| Wells Fargo Bank, National Association | Blanket | California | 6/16/2008 | 08-7161606792 |
| IBM Credit LLC | Specific Equipment (Lease) | California | 1/25/2010 | 10-7220792131 |
| Philippine Airline | $1,024 | All 50 States and the District of Columbia (Federal and State Tax Liens and Judgments) | 1/6/1997 Small Claims Judgment | 761809 |

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 96 of 99

## INDEBTEDNESS

| Creditor | Current Principal Amt. | Maturity Date | Approx. Monthly Payment | Collateral |
|---|---|---|---|---|
| Wells Fargo Bank | $12,500,000 | August 29, 2008 | $85,000 | Blanket |
| George Weir (Note dated 2/13/73) | $5,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Robert Rowley (Note dated 2/23/73) | $1,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| George Weir (Note dated 2/7/74) | $5,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| George Weir (Note dated 7/29/74) | $5,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Don Whitman (Note dated 2/4/75) | $1,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| George Weir (Note dated 2/6/75) | $5,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| George Weir (Note dated 7/1/75) | $10,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Don Whitman (Note dated 2/6/76) | $2,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| George Weir (Note dated 8/30/77) | $15,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| George Weir (Note dated 7/24/78) | $5,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Hamilton Dunn (Note dated 10/2/80) | $40,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Hamilton Dunn (Note dated 10/1/81) | $2,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Mildred Sexton/Julie Sexton (Note dated 10/1/81) | $10,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Mildred Sexton/Julie Sexton (Note dated 11/15/81) | $10,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Hamilton Dunn (Note dated 7/7/83) | $8,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Gail Hollingsworth (Note dated 6/30/89) | $26,200 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Jack Pearlstein (Note dated 9/28/95) | $10,090 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| Mildred Sexton/Julie Sexton (Note dated 1/1/99) | $6,000 | 90 days upon written demand | Interest paid quarterly | Unsecured |
| N. Kramer[2] | $14,370 | January 10, 2011 | $4,790 (paid annually, without interest) | Unsecured |
| G. Caudle[1] | $100,341 | January 15, 2011 | $33,447 (paid annually, without | Unsecured |

[2] This payout is to a former employee pursuant to a Phantom Stock Plan that provides for the payment of the amount due to the former employee over time. The payment is accounted for as compensation expense at the time each payment is made, not as the repayment of principal.

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 97 of 99

| Creditor | Current Principal Amt. | Maturity Date | Approx. Monthly Payment | Collateral |
|---|---|---|---|---|
| | | | interest) | |
| Wm. Epstein[1] | $100,341 | February 3, 2011 | $33,447 (paid annually, without interest) | Unsecured |
| C. Buschbom[1] | $16,786 | April 1, 2010 | $8,393 (paid annually, without interest) | Unsecured |
| M. Costa[1] | $23,994 | April 27, 2011 | $7,998 (paid annually, without interest) | Unsecured |
| A. Carvalho[1] | $13,797 | May 31, 2011 | $4,599 (paid annually, without interest) | Unsecured |
| L. Yang[1] | $9,597 | May 31, 2011 | $3,199 (paid annually, without interest) | Unsecured |
| G. Cheng[1] | $116,320 | June 1, 2012 | $29,080 (paid annually, without interest) | Unsecured |
| J. Lopes[1] | $4,152 | November 26, 2008 | $4,152 (paid annually, without interest) | Unsecured |
| M. Nagai[1] | $37,366 | November 28, 2010 | $15,286 (paid annually, without interest) | Unsecured |
| Principal Life Insurance Company (funds borrowed against the cash value of a Company owned policy on the life of Gail Hollingsworth) | $394,596.64 | N/A | Interest paid monthly in the amount of $1,644 | Unsecured |
| Principal Life Insurance Company (funds borrowed against the cash value of a Company owned policy on the life of Jack Pearlstein) | $692,211.77 | N/A | Interest paid monthly in the amount of $2,884 | Unsecured |

## GUARANTIES

| Primary Obligor | Amount and Description of Obligation Guaranteed | Beneficiary of Guaranty |
|---|---|---|
| Not applicable. | | |
| | | |
| | | |
| | | |

BN 9031290v5

Case: 11-31985    Doc# 8-2    Filed: 05/23/11    Entered: 05/23/11 15:19:00    Page 98 of 99

**Exhibit G to Credit and Security Agreement**

<u>**BUDGET**</u>