Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Proposed Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 11-31985 |
| NURSERYMEN'S EXCHANGE, INC. | Chapter 11 |
| Debtor and Debtor in Possession | **Date:** May 25, 2011<br>**Time:** 11:00 a.m.<br>**Place:** 235 Pine Street, Courtroom 2<br>San Francisco, CA |

**DECLARATION OF ALEXANDER STEVENSON IN SUPPORT OF FIRST DAY MOTION FOR ORDER AUTHORIZING ENTRY INTO DEBTOR IN POSSESSION FINANCING AND RELATED RELIEF**

I, Alexander Stevenson, declare as follows:

1. I am a Managing Director of FocalPoint Securities, LLC ("FocalPoint"). FocalPoint is the proposed investment banker to the Debtor, Nurserymen's Exchange, Inc. ("Debtor"). FocalPoint was retained by the Debtor in September 2010 to assist with efforts in connection with a possible sale, merger, acquisition, refinancing, reorganization, financial restructuring or recapitalization of Debtor, its businesses or assets, or any portion thereof, in a single or multiple transactions.

2. This declaration is submitted in support of Debtor's Motion for Order Authorizing Entry in to Debtor in Possession Financing and related relief (the "Financing Motion"). If called as a witness I could and would testify to the matters stated herein.

3. Beginning in September 2010, the Debtor and FocalPoint commenced a two-part

solicitation process designed to either (i) refinance the existing secured lender or (ii) find a financial or strategic buyer for the Debtor's operating business. On a parallel track to the process undertaken by FocalPoint, the Debtor has marketed certain real estate assets that are not essential to its operations.

4. As part of this pre-petition process, FocalPoint has contacted (or been contacted by) in excess of 150 potential interested parties, including both debt capital providers and strategic and financial buyers. Of these, approximately 48 have executed non-disclosure agreements and received additional information and access to the Debtor's on-line data room. Through that process, the Debtor received a number of written proposals to provide working capital financing from financial institutions but these proposals did not provide enough capital to fully repay Wells Fargo Bank, Debtor's pre-petition lender, (the "Secured Lender"), or were contingent on new equity being invested into the business. None of these proposals contemplated a priming lien or providing junior lien or unsecured debt to Debtor.

5. Based on our pre-petition efforts, my and FocalPoint's extensive experience in raising capital for distressed or troubled businesses, the Debtor's pre-petition capital structure its historical performance, and current credit market conditions specific to the industry in which the Debtor operates, it was apparent that new financing from a third party on any basis, including potentially DIP financing, would not be available to the Company absent a significant infusion of new equity capital from a third party investor or from asset sales.

6. As a result, FocalPoint focused its efforts on negotiating the DIP Financing, as it was apparent that Debtor could not operate and finance its business during the bankruptcy case solely on the basis of the use of cash collateral. It was also clear that given the short time frame and limited sources available in the current credit market, the only viable lender willing to lend on acceptable terms was the Secured Lender. After substantial negotiations, Debtor and the Secured Lender reached an agreement pursuant to which the Secured Lender would extend the DIP financing to fund the Debtor through a competitive sale process. My best estimate at this time is that the sale of Operating Assets and the real estate assets mentioned above, should result in payment in full to the Secured Lender of the DIP Financing and the Pre-Petition Secured Indebtedness.

7. The DIP Financing consists of a commitment in the maximum amount of $5,000,000, in

accordance with the terms and conditions described herein and as more fully set forth in the DIP Loan Documents

8. Based on my experience:

   a. Debtor would not have been able to obtain any unsecured financing;

   b. Debtor would not have been able to obtain any secured financing junior to Wells Fargo Bank's existing debt and security position;

   c. I believe the terms of the DIP financing agreement with Wells Fargo Bank are reasonable and fair under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of May 2011 at Los Angeles, California

                                                  /s/ Alexander Stevenson
                                               Alexander Stevenson