Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Proposed Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>NURSERYMEN'S EXCHANGE, INC.<br><br>Debtor and Debtor in Possession | Case No. 11-31985<br><br>Chapter 11<br><br>**DECLARATION OF JUSTIN DAUTOFF IN SUPPORT OF FIRST DAY MOTIONS OF DEBTOR**<br><br>**Date:** May 25, 2011<br>**Time:** 11:00 a.m.<br>**Place:** 235 Pine Street, Courtroom 22<br>San Francisco, CA |

1. I am the Chief Operating Officer of Nurserymen's Exchange, Inc. ("NEI" or the "Debtor"), the debtor and debtor in possession in the above-captioned Chapter 11 case. I make this declaration in support of the motions listed in Exhibit A hereto. If called upon to testify as to the matters set forth in this declaration, I could and would competently testify thereto, as the facts set forth herein are personally known to me through my service in the capacities referred to below or I have gained knowledge of them from the business records of the Debtor maintained in the ordinary course of business.

2. Before my promotion to Chief Operating Officer in October 2010, I was Vice President of Marketing, overseeing product management, product design and development, creative services, and

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 1 of 9

web site development. As the Vice President of Marketing, I led the development and execution of marketing plans for NEI, driving marketing initiatives cross-functionally to achieve annual business goals and strategically positioning the company to realize its objectives through sustained horticultural excellence and inspired design. From 2002 to 2009, I was Director of Sales where I built, led, and managed the overall sales function across all operating divisions within the company. From 1998 to 2002, I served as National Sales Manager, where I implemented new business development and joint planning processes to drive new customer relationships.

**THE CHAPTER 11 FILING**

3. On May 23, 2011 (the "Petition Date"), NEI filed a voluntary petition with this court for reorganization under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced bankruptcy case (the "Case"). Debtor continues to manage and operate its business as a debtor in possession. No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated.

**THE DEBTOR, ITS OPERATIONS, AND THE ANTICIPATED SALE**

4. Founded in 1941 as a San Francisco bulb brokerage business, and currently based in Half Moon Bay in the San Francisco Bay Area, the Debtor is a producer, broker and wholesaler of home decor products incorporating indoor blooming plants (miniature roses, sun stars, campanula), specialty foliage (miniature Christmas trees, bonsai, bamboo, cactus and succulents, etc.), holiday grow kits, and potted edibles. The Debtor offers a broad range of unique, differentiated products known for their horticultural excellence and inspired design.

5. The Debtor operates in two segments: the core business and the wholesale facility. The core business services clients nationwide across all major retail channels, including supermarket chains, mass merchandisers, home and garden centers, and specialty and independent operators. The core business includes the growing, brokerage, and distribution of home decor products. The core business also includes sales, marketing, and product design and development staff who collaborate with top-tier

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 2 of 9

customers to create unique designs for their specific market needs. The wholesale center is a stand-alone wholesaler of flowers, foliage, designer dish gardens and hardgoods to smaller, independently owned specialty stores, florists, garden centers and supermarkets. The wholesale center also has a direct sales team and a packing and shipping facility that sells and ships directly to customers' individual stores.

6. Beginning in 2008, NEI faced challenges resulting from a declining economy and industry overcapacity, which spurred the need to implement aggressive restructuring initiatives. Notwithstanding these challenges, NEI implemented an aggressive crop plan that anticipated an economic recovery in 2010, which resulted in substantial overproduction and the operation of unproductive facilities during declining economy. Moreover, NEI was obligated to grow and bring to market a pipeline of expensive orchids that ramped up going into the recession, with no ability to reduce production due to prior purchase orders with suppliers.

7. In an attempt to restore operational and financial stability, NEI implemented aggressive operational and restructuring initiatives that have positioned NEI for more efficient, streamlined operations, greater responsiveness to customers' needs, and future growth in revenues and profitability.

8. Beginning in September 2010, along with FocalPoint, its investment banker, NEI began a two-part solicitation process designed to either (i) refinance the existing lender, or (ii) find a financial or strategic buyer for NEI's operating business. On a parallel track to this process, NEI has marketed certain real estate assets that are not essential to its operations. The efforts to market the real estate have culminated in the proposed sale of certain real estate to RL Communities for $8 million.

9. In connection with the pre-petition sale process, FocalPoint has contacted (or been contacted by) more than 150 potentially interested parties, including both debt capital providers and strategic and financial buyers. Of these, approximately 41 have executed non-disclosure agreements for additional information and access to the NEI's data room. As a result of this process, NEI received a number of written proposals to provide working capital financing from financial institutions but these proposals did not provide enough capital to pay off pre-petition indebtedness or were contingent on new equity being invested into the business. In addition to lender proposals, NEI received several indications of interest to purchase NEI's assets. After evaluating these proposals, holding management

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 3 of 9

presentations, meeting with the various investor groups and consulting with Wells Fargo Bank, N.A. ("Wells Fargo"), NEI's primary pre-petition lender, NEI executed a letter of intent that provided for a period of exclusivity for the proposed buyer, which began engaging in extensive business and legal due diligence. Unfortunately, NEI was unable to finalize an asset purchase agreement with the interested party and exclusivity was terminated less than two weeks before the Petition Date. Upon termination of exclusivity, FocalPoint immediately began re-marketing the operating assets and have begun conducting discussions with potential strategic and financial investors.

10. Despite the vastly improved prospects created by NEI's restructuring efforts, and in consultation with its Board, its advisors and Wells Fargo, NEI determined in its reasonable business judgment that the appropriate way to maximize the value of the business and creditor recovery is to conduct a sale of its assets under Bankruptcy Code section 363 or seek to restructure its existing indebtedness. Debtor intends to sell its operating business within approximately sixty days of the filing of the Petition Date.

**THE DEBTOR'S ASSETS AND LIABILITIES**

11. The Debtor owns assets with an estimated value as of April 30, 2011, of approximately $34.8 million. The Debtor currently owns eleven parcels of real property, totaling approximately 475 acres. The aggregate value of the real property is approximately $17 million. The real property consists of planned unit development land (valued by the Debtor at $8 million), open space land (valued by the Debtor at $5 million), and land used in business operations (valued by the Debtor at $4 million). The Debtor also owns personal property worth approximately $17.8 million. The majority of this personal property, valued as of April 30, 2011, consists of accounts receivable (net book value of $11.4 million), soft goods inventory (net book value of $2.8 million), and hard goods inventory (net book value of $2.3 million).

12. The Debtor's total liabilities as of the Petition Date are approximately $25.9 million. Of this amount, approximately $15,490,150 is owed to Wells Fargo, plus accrued and unpaid pre-petition interest, fees, expenses and other amounts chargeable under the Pre-petition Secured Loan Documents

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 4 of 9

that may not have, as of the Petition Date been added to the amount due. In addition, Debtor is contingently liable to the Secured Lender on a posted letter of credits in the amount of $915,000, which liability is secured by the Pre-Petition Collateral. Approximately $9.5 million is owed to nonpriority unsecured creditors, and approximately $378,000 is owed to priority unsecured creditors.

**THE CASH MANAGEMENT MOTION**

13. As of the Petition Date, the Debtor maintained five bank accounts with Wells Fargo Bank (the "Bank"): the collateral account, the general operating account, the merchant account, the payroll account, and the time and expense ("T&E") account (collectively, the "Bank Accounts").

14. In the normal course of operations, wholesale center credit card deposit slips and accounts receivable checks are deposited into the merchant account, from which disbursements are made (via the collateral account) to pay down the revolving line of credit. Funds are drawn from the revolving line of credit to the general operating account, from which checks are drawn and transfers are made to the payroll and T&E accounts. NEI's cash management system assists NEI in reconciling payments received and allows NEI to maintain strict control of and visibility into its disbursements of the company.

15. It is in the best interests of the Debtor, the Debtor's estate and potential purchasers for the Debtor to maintain the Bank Accounts and its cash management system. By doing so, the Debtor will avoid the inevitable disruption associated with opening and closing of accounts, will not risk confusion or errors in its accounting from a change in accounts, and will ensure that all payments are properly received and available for use in the Debtor's operations.

16. Each of the Bank Accounts is maintained with Wells Fargo, an authorized depository for the Northern District of California approved by the United States Trustee for Region 17, and the Debtor will change the signature cards on each account to reflect the Debtor's "debtor-in-possession" status. The Debtor will work with Wells Fargo Bank to ensure that payments issued for pre-petition obligations will not be honored post-petition, except as authorized by orders of this Court.

17. In the ordinary course of business, the Debtor uses correspondence and business forms, including letterhead, purchase orders and invoices (collectively, the "Business Forms"). The Debtor is

requesting authorization to continue using these Business Forms without modification or reference to its debtor in possession status. Requiring new or modified Business Forms would create an unnecessary and expensive burden on the estate.

18. In order to clarify the post-petition arrangement between the Debtor and the Bank regarding the Bank Accounts, the Debtor requests confirmation from the Court that existing deposit agreements shall continue to govern the post-petition cash management relationship between Debtor and the Bank. Moreover, to maximize flexibility going forward, the Debtor requests the authority to implement (with the consent of the Bank) changes to the cash management systems and procedures in the ordinary course of business.

19. The Debtor also seeks clarification that the Bank may debit the Debtor's accounts for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtor's accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent Debtor was responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Bank as service charges for the maintenance of the Cash Management System.

20. The Debtor seeks clarification that the Banks may rely on the representations of Debtor with respect to whether any check or other payment order drawn or issued by Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Court, and that the Bank shall not have any liability to any party for relying on such representations by Debtor as provided for herein.

**THE EMPLOYEE WAGES, BENEFITS, AND DEDUCTIONS MOTION**

21. The Debtor currently has 165 full-time employees. Many of these employees have been with NEI for many years. These employees, and the specialized knowledge they have acquired through well-established relationships with the company's vendors and customers, are a key asset of the Debtor. Where, as here, the Debtor anticipates a sale of its operations on a going-concern basis, one of the

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 6 of 9

significant factors considered by potential purchasers is the continued employment of these employees. If the Debtor were not to pay these employees their pre-petition wages and commissions, many of them could move to other employers, taking their vendor and client relationships with them. This movement could reduce the value of the Debtor. In addition, the employees are dependent on their on-going earnings for their basic living expenses and many will suffer extreme personal hardship if the wages are not paid.

22. The Debtor's employees are paid biweekly in the ordinary course of the Debtor's business. In addition, certain of the employees are paid commissions based upon sales made during the prior period. The Debtor estimates that, as of the Petition Date, accrued but unpaid wages are approximately $373,000.00 and unpaid commissions are approximately $5,000.00 for an aggregate obligation of approximately $378,000.00 (the "Prepetition Wages"). None of the employees will receive Prepetition Wages in excess of $11,725.00. Since the last payroll period ended yesterday, NEI has been unable to generate a list of employees and the amount owed to each. NEI will provide more detailed information at or before the hearing on the wages motion.

23. In addition, the Debtor's employees have accrued but unused prepetition vacation time. The Debtor is seeking authorization to allow employees to use vacation time accrued prepetition in the ordinary course of business, but is not at this time requesting authorization to pay employees the accrued amounts upon termination of their employment.

24. In the ordinary course, certain deductions for taxes and insurances are deducted from each employee's payroll by Ceridian, the Debtor's payroll processing service, and deductions for 401k plan contributions are sent from NEI to Principal Life Insurance. The Debtor believes these continued deductions are authorized in the ordinary course of business. However, to provide assurance to third-parties, the Debtor further requests that the Court authorize the Debtor to process, apply, deduct and pay all standard payroll-deductions from each employee's Prepetition Wages.

25. The Debtor's payroll processor, Ceridian, automatically calculates the applicable payroll taxes related to the Prepetition Wages, obtains funding from the Debtor for wages and associated taxes, and forwards the payment to the tax authorities when payroll is paid. Consistent with this practice, the

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 7 of 9

Debtor further requests authorization to pay the payroll taxes associated with the Prepetition Wages.

**THE CUSTOMER PRACTICES MOTION**

26. As a large wholesaler and broker of home decor products, the Debtor routinely accepts the return of goods and grants credits and refunds (the "Customer Practices"). Such practices would typically involve granting credits to large wholesale customers to address situations where the delivered goods did not meet the needs of the customer. The Customer Practices cost relatively little but generate significant benefits for the Debtor. The customer loyalty generated from these programs is essential in the Debtor's business, as the Debtor has sophisticated wholesale customers operating in their own highly competitive market environments and all but a very small portion of the Debtor's sales are from repeat customers. Any significant loss of, or reduced demand from, such customers could negatively impact the value of the Debtor and the return to its creditors.

27. I estimate that returns, refunds, and credits redeemed from the period beginning June 1, 2011 and ending July 31, 2011, a period that largely overlaps the period beginning with the Petition Date and ending with the projected sale date of the operating assets of the Debtor, will be approximately $137,233. Some of these refunds, returns, and credits will be for pre-petition transactions, and the remainder will be for post-petition transactions. It is my business judgment that after the Petition Date, the Debtor should grant refunds, exchanges, and credits to customers in a manner consistent with its pre-petition business practices, in order to maximize the value of the Debtor for the benefit of the Estate.

**THE MOTION FOR ORDER LIMITING NOTICE**

28. The aggregate number of parties in the Case is approximately 625. Due to the large number of interested parties, service of all pleadings and orders in the Case on all parties would be burdensome to the Debtor and the Estate. Relief from such service obligations would benefit the Debtor and the Estate.

**THE UTILITIES MOTION**

29. The Debtor currently uses electric, natural gas, heat, water, sewer, telecommunications and other services of the same general type or nature provided by approximately 11 Utility Companies, including the Utility Companies identified on Exhibit B attached hereto (the "Utility Service List"). For

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 8 of 9

each Utility Company, Exhibit B identifies, to the extent known: (i) the name of the Utility Company; and (ii) the proposed adequate assurance deposit to be made with such Utility Company (the "Proposed Adequate Assurance"). The inclusion of any entity on, or any omission of any entity from, Exhibit B is not an admission by the Debtor that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtor reserves its rights with respect thereto. In addition, the Debtors requests that this Motion apply to all of the Debtor's Utility Companies, whether or not any given Utility Company is included on the Utility Service List. The Debtor estimates that its average monthly obligations to the Utility Companies on account of services rendered totals approximately $215,340.38. For each Utility Company, the proposed adequate assurance payment is equal to the average monthly payment from NEI to such Utility Company from April 2010 through March 2011.

30. Because the Utility Companies provide services essential to the Debtor's operations, any interruption in utility services could prove damaging. The temporary or permanent discontinuation of utility services could irreparably disrupt the Debtor's business operations and, as a result, fundamentally undermine the Debtor's sale and/or reorganization.

31. The Debtor intends to pay any postpetition obligations to the Utility Companies in a timely fashion and in the ordinary course, as it has substantially done prior to the Petition Date. The Debtor will make the payments from funds available under the Debtor's postpetition credit facility.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 23rd day of May, 2011, at Half Moon Bay, California.

/s/ Justin Dautoff
Justin Dautoff

Case: 11-31985 Doc# 10 Filed: 05/23/11 Entered: 05/23/11 16:19:15 Page 9 of 9