Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile:  (415) 398-2820
Email: sfinestone@pobox.com

Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ) | Case No. 11-31985 |
| ) | |
| NURSERYMEN'S EXCHANGE, INC. ) | Chapter 11 |
| ) | |
| Debtor and Debtor in Possession ) | **STATUS REPORT REGARDING THE SALE OF DEBTOR'S OPERATING ASSETS TO THE HIGHEST AND BEST BID FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS** |

**Date:** July 14, 2011
**Time:** 2:00 p.m.
**Place:** 235 Pine Street, Courtroom 22
San Francisco, CA

**LIEN CLAIMANTS:**
**Wells Fargo Bank, IBM Credit LLC, Ikon Financial Services and IOS Capital**

Debtor and Debtor in Possession, Nurserymen's Exchange, Inc. ("Debtor") files this Status Report concerning its Motion for Sale of Debtor's Operating Assets to the Highest and Best Bid Free and Clear of Liens, Claims and Interests (the "Motion").

**Background:**

Debtor filed this case on May 23, 2011. Debtor is producer, broker and wholesaler of home decor products incorporating indoor blooming plants (miniature roses, sun stars, campanula), specialty foliage (miniature Christmas trees, bonsai, bamboo, cactus and succulents, etc.), holiday grow kits, and potted edibles.

STATUS REPORT FOR HEARING ON OPERATING ASSET SALE

1

For reasons that have been previously discussed, Debtor determined that upon the filing of its bankruptcy, it was appropriate to seek, via a first day motion, approval of sale procedures (the "Procedures Motion") in order to continue its efforts to sell its operating assets as a going concern. The Court continued the hearing on the Procedures Motion to allow the Official Committee of Unsecured Creditors (the "Committee") to weigh in on the procedures and the sale concept in general. The Committee urged Debtor to advance its proposed sale time line by approximately one week, based largely on concerns over the "burn rate" of Debtor's operations. Debtor agreed to do so and the Court granted the Procedures Motion. The Procedures Motion established a framework for submitting bids, selecting a possible stalking horse bidder, and conducting an action of the assets. The applicable deadlines were as follows:

- June 30, 2011: Deadline for selecting a stalking horse bidder;
- July 6, 2011: Deadline for qualified bidders to submit bids;
- July 8, 2011: Auction between any qualified bidders; and,
- July 11, 2011: Court hearing to approve the sale to the highest bidder.

Debtor, primarily through the efforts of its personnel and investment bankers, FocalPoint Securities LLC ("FocalPoint") continued it pre-petition sale efforts. Debtor did not end up selecting a stalking horse bidder.

**The Bidding and Post Bid Activity:**

On the bid deadline, only one bidder, Floramoda, Inc ("Buyer") submitted a bid. Debtor determined that the bid was a qualified bid and pursuant to the sale procedures shared the bid with the Committee and the secured lender, Wells Fargo Bank ("Wells Fargo"). Debtor subsequently moved the auction date from July 8, 2011 to July 12, 2011, and the sale hearing from July 11, 2011 to July 14, 2011.

The Buyer's bid came with a significantly revised Asset Purchase Agreement and related schedules, disclosures and leases with third parties (collectively the "APA"). Since receiving the bid, Debtor has been in constant negotiations with the Buyer, Wells Fargo, and with third parties whose cooperation is required, to come to an agreed upon final form of the APA. While almost all issues are resolved, as of the submission of this report a final APA signed by Debtor and the Buyer and consented to by Wells Fargo does not exist. The outstanding issues will be discussed below.

While Debtor continued its negotiations with Buyer, it was also in discussions with the Committee concerning a jointly sponsored plan of reorganization (the "Plan"). If Debtor and the Committee agreed upon the terms of a Plan, Debtor would have terminated the sale process. In connection with the potential Plan option, the Committee also held lengthy meetings and conversations with Wells Fargo to see if Wells Fargo would consent to a Plan rather than a sale. These efforts to reach consensus on a Plan were in addition to the numerous contacts and discussions FocalPoint had with possible third party plan sponsors or lenders who might provide "take out" financing.

The efforts to develop a Plan alternative were not successful. In general terms, while Debtor and the Committee agreed upon the general framework of a Plan, there was not a sufficient amount of equity investment and lending availability to allow Debtor to exit its Chapter 11 via a traditional restructuring. From the Debtor's perspective, it was also of critical importance that delays to attempt to put in place all the necessary components of a restructuring would cause two significant problems. First, the Buyer would not wait and Debtor would lose the sale. Second, the DIP financing agreement with Wells Fargo expires on August 5, 2011, and Debtor believed that absent a restructuring deal in place, Wells Fargo would not extend the DIP financing termination date. Debtor's cash flow is significantly negative during the summer months and extending the DIP financing deadline would result in increased loan exposure for Wells Fargo. Moreover, Debtor believed that the industry in general and its major customers in particular were aware of the pending sale date and related procedures, and if Debtor withdrew its sale motion without being able to immediately file a Plan term sheet, it faced significant risk to its customer base and its business value.

Based on the above, Debtor determined in its business judgment that it was best to keep the sale hearing on calendar and resolve any outstanding contract issues with Buyer and Wells Fargo.

**The APA's Terms:**

The key terms of the APA are discussed below. Debtor will also be filing the latest version of the APA , including the numerous related schedules and exhibits.

///

///

///

**The Assets Being Purchased by Buyer:**

The Buyer is buying the following (the "Purchased Assets") "*Purchased Assets*" shall mean any and all assets and rights of the Seller that are used in or held for use in the Business, other than the Excluded Assets, including the following:

(a) Inventory;

(b) Real Property; provided, that with respect to the Leased Real Property, it is only the rights of the lessee under the applicable lease if such lease is an Assumed Contract;

(c) Equipment;

(d) the Purchased Advances;

(e) all rights under Assumed Contracts;

(f) all Intellectual Property Rights owned or used by the Seller, including Seller's Marks and Seller's Copyrights (except as set forth in Section 3.9(a) of the Disclosure Schedule (Seller's Registered IP)), and excluding any Intellectual Property Rights licensed to the Seller pursuant to the Excluded Licenses;

(g) all goodwill relating to the Business;

(h) all claims, causes of action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability;

(i) all Books and Records; and

(j) all Business Permits, in each case to the extent transferable by the Buyer.

**(APA - Definitions at pages 11-12)**

**Assets Not Being Purchased:**

Buyer is not acquiring the following assets:

"*Excluded Assets*" shall mean (i) any Contract that is not an Assumed Contract, (ii) the right to the Purchase Price and other rights granted to the Seller under this Agreement; (iii) the Existing Family Property Leases; (iv) the Excluded Owned Real Property; (v) all fixtures, trade fixtures and leasehold improvements located on the Leased Family Property as set forth on Section 1.1(e) of the Disclosure Schedule (Family Owned Fixtures and Leasehold Improvements); (vi) any shares of capital stock or other equity interests of the Seller or any of or any securities convertible into, exchangeable or exercisable for

shares of capital stock or other equity interests of the Seller; (vii) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of the Seller, in each case to the extent applicable to any period prior to the Closing Date (but not any of the foregoing paid by the Buyer); (viii) any property or asset of any kind (whether tangible, intangible or otherwise) held or used by the Seller solely in connection with any Contract or Lease that is not among the Assumed Contracts; (ix) the Excluded Books and Records; (x) all Cash; (xi) all insurance policies, including, without limitation, insurance policies on the lives of key employees that are held by the Seller; (xii) professional retainers paid by the Seller; (xiii) any amounts that have been placed into escrow accounts for the benefit of professionals; (xiv) all refunds, deposits, prepayments and prepaid expenses with respect to other Excluded Assets or made under any Excluded Contract; (xv) all Bankruptcy-Required Utility Deposits; (xvi) all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person that has provided insurance to the Seller; (xvii) all personnel records of employees of the Seller (other than personnel records of Transferred Employees); (xviii) all attorney-client and other privileged materials of the Seller relating to the preparation, commencement and administration of the Bankruptcy Case, the transactions contemplated by this Agreement and the PUD Transaction; (xix) all Accounts Receivable; (xx) all Avoidance Actions; (xxi) the prorated portion of all rent under the Existing Family Property Leases paid by the Seller for periods after the Closing Date (the "<u>Prorated Rent</u>"); (xxiii) ) any Business Permit that is not transferable by the Seller, and any amounts posted to secure the Seller's obligations thereunder; and (xxii) any deposits or letters of credit posted to secure workers compensation insurance for any period prior to the Closing; *provided, however*, that the Excluded Assets shall not include any Ordinary Course Utility Deposits.

**(APA - Definitions at pages 6-7)**

Of particular note, Accounts Receivable, cash on hand and the post petition utility deposits are excluded from the purchase. Debtor estimates that the Account Receivable balance as of the projected closing date of August 5, 2011 will be $2.75 million. Post closing, Wells Fargo will collect the receivables. The post petition utility deposits are approximately $215,000.

///

///

**The Purchase Price:**

Buyer will pay the Purchase Price of $4 million subject to certain potential downward adjustments. (**APA section 2.1**). The most significant potential downward adjustment is related to inventory on hand at closing. The Purchase Price may be adjusted downward to the extent the inventory at closing is less than the Target Inventory Amount (**APA Definitions pages 5 - "Closing Date Inventory" and 13 - "Target Inventory Amount" and section 2.2**). Out of the $4 million purchase price, $400,000 will be placed into escrow pending a determination of the final purchase price to account of any adjustments. **(APA section 2.1(c), 2.1(d) and 2.2)** Wells Fargo has conditioned its consent to the sale on the proceeds not being less than $3.3 million. Debtor anticipates that the inventory adjustment will be *de minimis* at best, but its analysis of the proceeds from sale includes a $200,000 deduction for the potential inventory adjustment. (See Stevenson Declaration Exhibit A)

Assumed Contracts:

Buyer is only assuming two non-residential real property leases and is not assuming any of Debtor's licenses used in connection with its growing operations. Debtor does not believe there is any cure liability for the two lessors in question. Some of Debtor's operations are on land owned by owners of the company. Debtor leases these properties. Buyer and the insiders/lessors have reached agreed-upon forms of leases for these properties. **(APA Exhibits G-1 - G-3)** Debtor understands that the owners (member of the Pearlstein Family) made significant concessions to the Buyer on the leases to support Debtor's sale effort. Debtor also uses a portion of its PUD land in its operations. Buyer and Debtor have agreed on a form of lease under which the Buyer will pay rent for the portion of the PUD land used in operations. **(APA Exhibit I)**

**Closing Date and Post Closing Employment:**

The target closing date is August 5, 2011 with an outside closing date of August 18, 2011. Debtor will continue to operate in the ordinary course of business up to the closing date. As of the closing date, Debtor will terminate its employees. After the close, Buyer has agreed that it will offer employment to a sufficient number of Debtor's employees (at least 135) at no less than their current pay and with substantially the same benefits **(APA section 6.3)**. Debtor is aware that the Buyer has had discussions with some members of Debtor's management team but Buyer has not made any offers to any of Debtor's

employees and the sale is not conditioned on any particular employee agreeing to work for Buyer. (Declaration of Charles Kosmont ¶ 7).

**Buyer's Deposit and Liquidated Damages:**

    Buyer wired a deposit of $200,000 into escrow. If Buyer breaches its obligation to close the sale, the $200,000 deposit becomes the liquidated damages for that breach. If, however, Buyer violates the WARN Act related provisions set forth in section 6.3, the liquidated damages provision would not apply.

**Bankruptcy Court Jurisdiction:**

    This Court will retain jurisdiction to resolve any disputes arising out of the APA and the performance of the parties thereunder. **(APA section 9.16)**

**Wells' Fargo Consent:**

    The APA requires Wells Fargo's consent to the sale and its terms. **(APA section 3.2 and Disclosure Schedule 3.2)** Wells Fargo has been intimately involved in negotiations over several provisions of the APA. Wells Fargo's primarily concerns involve: limiting any downward adjustments to the purchase price; preservation of or interference with non-purchased assets that are still subject to Wells Fargo's security interests. Debtor believes it has resolved all or almost all of Wells Fargo's issues. Debtor and Buyer continue to work with Wells Fargo to obtain its full consent.

**Administrative Claim For Buyer For Early Closing**

    In order to incentivize Buyer to close the sale as soon as possible, and in doing so minimizing Debtor's August 2011 operating losses, the APA provides that if the sale closes by August 5, 2011, Buyer shall have an administrative claim for $400,000 to be paid *pari passu* with the 503(b)(9) administrative claims. If there is a delay in closing, such administrative claim is reduced by $30,000 per day for each day of delay. **(APA Section 5.18)**

**Mutual Releases:**

    The APA includes a provision for Mutual Releases **(APA Exhibit N)**. The releases extend to Buyer's affiliates. Debtor's review of its pre-petition payments to Buyer's affiliate discloses that it paid Buyer's affiliate approximately $75,000 on antecedent debt in April 2011.

///

///

**Use of Sale Proceeds and Accounts Receivable:**

The proceeds from sale, after paying transaction costs and setting aside funds for outstanding payables, accrued payroll and taxes, when combined with anticipated collections from accounts receivable, will total approximately $5.1 million (Stevenson Declaration Exhibit A). These proceeds will be applied to the debt to Wells Fargo. Debtor estimates that once these proceeds are applied, Wells Fargo will be owed approximately $4.8-$5 million, which debt will still be secured by Debtor's PUD Land and Open Space Land.

Dated: July 14, 2011                    LAW OFFICES OF STEPHEN D. FINESTONE

/s/ Stephen D. Finestone
Stephen D. Finestone
Attorneys for Debtor and Debtor in Possession