Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile:  (415) 398-2820
Email: sfinestone@pobox.com

Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

NURSERYMEN'S EXCHANGE, INC.

    Debtor and Debtor in Possession

Case No. 11-31985

Chapter 11

**DECLARATION OF ALEXANDER STEVENSON IN SUPPORT OF MOTION FOR SALE OF DEBTOR'S OPERATING ASSETS TO THE HIGHEST AND BEST BID FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS**

**Date:** July 14, 2011
**Time:** 2:00 p.m.
**Place:** 235 Pine Street, Courtroom 22
San Francisco, CA

I, Alexander Stevenson, declare as follows:

1. I am a Managing Director of FocalPoint Partners, LLC ("FocalPoint"). FocalPoint is the investment banker to the Debtor, Nurserymen's Exchange, Inc. ("Debtor"). FocalPoint was retained by the Debtor in September 2010 to assist with efforts in connection with a possible sale, merger, acquisition, refinancing, reorganization, financial restructuring or recapitalization of Debtor, its businesses or assets, or any portion thereof, in a single or in multiple transactions. Debtor filed bankruptcy on May 23, 2011 and FocalPoint's post-petition retention was approved by the Court on July 5, 2011.

2. This declaration is submitted in support of Debtor's Motion for Order Approving the Sale

of Substantially all of the Debtor's Operating Assets (the "Sale Motion"). If called as a witness I could and would testify to the matters stated herein.

**The Pre-Petition Sale Process**

3. Beginning in September 2010, the Debtor and FocalPoint commenced a two-part solicitation process designed to either (i) refinance the existing secured lender or (ii) find a financial or strategic buyer for the Debtor's operating business. On a parallel track to the process undertaken by FocalPoint, the Debtor marketed certain real estate assets that are not essential to its operations. The assets employed in the Debtor's operating business (the "Operating Assets") include the following:

(i) Debtor's intellectual, real and personal property (including inventory and accounts receivable), licenses and leasehold interests in its operating business located at 2651 North Cabrillo Highway, Half Moon Bay, California 94109;

(ii) Debtor's plant brokerage business also located at 2651 North Cabrillo Highway, Half Moon Bay, California 94109 and a related brokerage business in Vista, California; and

(iii) Certain executory contracts and real property leases and the potential assumption of certain of the Debtor's accounts payable

4. Through the process managed by FocalPoint, the Operating Assets were extensively marketed to in excess of 150 parties who were contacted prior to the commencement of the bankruptcy case. These parties included both debt capital providers and strategic and financial buyers. Of these, approximately 48 executed non-disclosure agreements and received additional information, including a comprehensive memorandum discussing the Debtor's business, assets and prospects (the "CIM") and access to the Debtor's online data room. As a result of this process, the Debtor received a number of written proposals to provide working capital financing from financial institutions but these proposals did not provide enough capital to fully repay the Secured Lender or were contingent on new equity being invested into the business. In addition to the proposals from lenders, the Company received several indications of interest to consummate a purchase of the Debtor's assets. After evaluating these proposals, analyzing the economic impact of the various proposals and the financial ability of the various parties to close a transaction, conducting telephonic and in person management presentations with the various investment groups and consulting with the Pre-Petition Lender, the Company's Board of

Directors determined the highest and best proposal was that of Monterey Peninsula Holding Company) ("MPH" and through its subsidiary Floramoda, Inc., the "Buyer") and authorized the Company's officers and FocalPoint to negotiate certain modifications to the Buyer's proposal. After negotiating these modifications on a satisfactory basis, the Company executed a letter of intent with the Buyer that provided for a period of exclusivity and Buyer subsequently began engaging in extensive business and legal due diligence. The granting of exclusivity was also a requirement of the other proposals being considered by the Board of Directors and is a typical provision negotiated by buyers of businesses. The granting of exclusivity was considered by the Board and the Company and in their business judgment, after considering the valuation of the other proposals which also included exclusivity requirements, the interest level of those parties and the financial ability of the Buyer to perform, the Company entered into the letter of intent with the Buyer.

5. Unfortunately, the Debtor was not able to finalize an asset purchase agreement with the Buyer prior to filing the bankruptcy, and exclusivity was terminated on or about May 11, 2011. Upon termination of exclusivity, FocalPoint immediately began re-marketing the Operating Assets.

**The Post-Petition Process**

Beginning prior to the Petition Date and continuing through the Bid Deadline of July 6, FocalPoint continued to market the Operating Assets and took a number of steps to ensure that the assets were marketed as broadly as possible within the time permitted.

    a. FocalPoint distributed an updated CIM, the court approved Sale Procedures, a form Asset Purchase Agreement and a bid procedure letter to all parties who had previously executed non-disclosure agreements.

    b. FocalPoint distributed summary financial information, the court approved Sale Procedures, form Asset Purchase Agreement, a non-disclosure agreement and a bid procedure letter to all prospective buyers who had previously been contacted.

    c. FocalPoint sent an email announcement to its entire database of contacts and investors that highlighted the Company, its assets and announced that FocalPoint was seeking investors or buyers for the Operating Assets.

    d. FocalPoint contacted additional parties who either expressed interest directly,

were not able to be made contact with during the pre-petition marketing efforts or who had emerged as potential industry buyers subsequent to the pre-petition marketing process being conducted. Approximately eight additional parties interested in purchasing the Operating Assets executed non-disclosure agreements and were provided with the updated CIM and full access to the Company's data room.

   e. FocalPoint maintained its on-line data room and supplemented it regularly with additional information as it became available or was requested by various parties.

   f. FocalPoint engaged in substantive discussions with various parties regarding the business, its assets and prospects and the process including numerous management attended conference calls to discuss these matters

  6. In mid-June, the Buyer re-engaged with the Company and reiterated its desire to purchase the Operating Assets of the Company. At that time, the Buyer requested additional exclusivity such that it could potentially position itself as a stalking horse bidder as provided for in the Sale Procedures. The Debtor, in consultation with the DIP Lender and the Committee rejected this request for exclusivity. Nevertheless, the Buyer continued to perform significant due diligence and held additional meetings with management. On the Bid Deadline, the Buyer submitted (a) a marked version of the form asset purchase agreement and the related exhibits (the "MPH APA"; and (b) a letter from its financial institution discussing its financial capacity to complete the transaction contemplated in the asset purchase agreement. On July 7, 2011, the Buyer posted the deposit required pursuant to the Sale Procedures. No other proposals to acquire the Operating Assets were received by the Debtors on the Bid Deadline.

  7. Beginning on July 7, 2011 and continuing through July 13, 2011, the Debtor, in consultation with the DIP Lender and the Committee engaged in extensive negotiations pertaining to the terms and conditions of the MPH APA and certain related matters. In response to these negotiations, the Buyer provided (a) a revised letter in a form acceptable to the Company from its lender demonstrating its financial capacity to complete the transaction; (b) a guarantee by MPH of the Buyer's proposal; (c) and after extensive discussions a version of the asset purchase agreement attached to the motion that is in a form acceptable to the Debtor. The Buyer is considered a Qualified Bidder pursuant to the terms of the

STEVENSON DEC SALE OF OPERATING ASSETS 4

Case: 11-31985 Doc# 167 Filed: 07/14/11 Entered: 07/14/11 12:56:14 Page 4 of 8

Sale Procedures.

8. Prior to and during the time in which the Debtor was negotiating the MPH APA, it also engaged in discussions with the Committee and the DIP Lender regarding potential alternatives to a sale and to the MPH APA that were being considered by those parties. Those alternatives included a potential plan transaction to be funded by a combination of capital from an outside investor, the creditors and the DIP Lender and a hybrid wind-down alternative in which certain of the creditors proposed to purchase selected assets and wind-down the remaining operations. The Debtor and FocalPoint spent considerable time discussing these hypothetical alternatives with the DIP Lender and the Committee and analyzing the potential impact of these alternatives. As noted previously, as of the Bid Deadline, no other Qualified Bids had been submitted to FocalPoint or the Debtor. Late in the evening of July 13, 2011, seven days after the Bid Deadline, a proposal was received from one of the creditors (the "Creditor Proposal"). The Creditor Proposal contemplated the purchase of a portion of the assets of the Debtor and the wind-down of certain operations. However, in addition to the Creditor Proposal being received seven days after the Bid Deadline, it does not comply with the requirements of the Sale Procedures to be a Qualified Bid as it was (i) non-binding; (ii) subject to contingencies for material due diligence that would not be completed until August 5, 2011; (iii) was not accompanied by any information concerning the financial capacity of the acquiring entity to close the transaction; (iv) was not accompanied by a marked-up asset purchase agreement; and (v) was not accompanied by a non-refundable deposit. In addition, I believe the Creditor Proposal is subject to far greater contingencies, uncertainty, execution risk, and financial risk to the Debtor and its creditors than the Qualified Bid submitted by the Buyer, which is in the form of a binding asset purchase agreement, has been extensively diligenced, negotiated and vetted, and is supported by a non-refundable deposit.

**Valuation of the Buyer's Proposal**

9. The Company, in consultation with its Board, FocalPoint, the DIP Lender and the Committee, performed extensive analysis of the value of the Buyer's proposal as compared to the other alternatives available to the Debtor, including the liquidation of the Debtor's business. In order to evaluate the MPH APA, FocalPoint evaluated the value of the Debtor's assets under the Buyer's

proposal and under alternatives taking into account a number of factors including, but not limited to, (a) the consideration being provided by the Buyer and the timing of that consideration; (b) the potential risk of purchase price adjustments based on the terms and conditions of the Buyer's proposal; (c) any liabilities that may be incurred as a result of the Buyer's proposal; (d) the collectability of the Debtor's accounts receivable under the various scenarios; (e) the value of the Debtor's inventory in a liquidation scenario net of discounts on pricing necessary to sell-through existing inventory and the costs thereof; and (f) the marketability of the Debtor's real estate on a liquidation basis given (i) the single-use zoning of the facilities; (ii) the extensive marketing process that was undertaken to sell these assets as operational facilities that only yielded the one proposal from the Buyer as well as the condition of the nursery industry generally; and (iii) the substantial difficulty that a potential real estate buyer would have in re-zoning or entitling these properties for an alternative use given the restrictions imposed by the City of Half Moon Bay and the California Coastal Commission. Based on these analyses, the Debtor has concluded that the Buyer's proposal is equal to or better than a liquidation scenario and eliminates the timing and execution risks associated with that liquidation scenario by providing value today as opposed to over an extended and extremely uncertain and speculative timeframe in liquidation. In addition, the Buyer's proposal provides for continued employment for the majority of the Company's employees and an opportunity for trade creditors to recoup a portion of their losses through profitable business dealings with the Buyer in the future, neither of which are available under a liquidation scenario.

10. Exhibit A, attached hereto, summarizes FocalPoint's analysis of the economic implications of the MPH APA assuming a closing date of August 19, 2011 (as a proxy for August 18, 2011 which was the outside date in the version of the MPH APA dated July 12, 2011). As shown on Exhibit A, unsecured creditors have been estimated to receive approximately $1.8 million in proceeds after satisfaction of all secured, administrative and priority claims under a sale pursuant to the MPH APA that closes on August 18, 2011. This recovery compares favorably to a recovery of approximately $900 thousand through a liquidation scenario that is also subject to significantly greater risk.[1]

---

[1] The liquidation analysis assumes that the failed business exception to the WARN ACT would apply. If that assumption is incorrect and is challenged, the outcome in a liquidation scenario would be negatively affected, perhaps materially.

11. The valuation to the creditors (secured, administrative and unsecured) is impacted significantly in dollar terms, by the passage of time due to summer season operating losses in the business. In order to reduce (i) the risk and negative cash flow implications to the Debtor of an extended closing timeframe beyond the expiration of the DIP Financing; (ii) the resultant erosion of creditor recoveries; (iii) the risk of purchase price adjustments due to changes in inventory balances; and (iv) other business risks, the Debtor approached the Buyer and requested an acceleration of the closing date to August 5, 2011. The Buyer was willing to accommodate this request but in exchange for accelerating the closing and thereby funding the operating losses and other erosions of value between August 5, 2011 and August 18, 2011 required an addition to the MPH APA that provides that the Buyer receive an allowed administrative claim, to be treated and paid pari passu with allowed 503(b)(9) claims, in the amount of $400 thousand (the "MPH Allowed Administrative Claim"). Exhibit B hereto, replicates Exhibit A but forecasts proceeds available to creditors assuming a closing on August 5, 2011 instead of August 18, 2011. As shown on Exhibit B, proceeds to unsecured creditors from a sale pursuant to the MPH APA that closes on August 5, 2011 are estimated to be approximately $2.0 million and will exceed those to be received by unsecured creditors through a closing on August 18, 2011 by approximately $200 thousand, after consideration of the granting of the MPH Allowed Administrative Claim. The acceleration of the closing also reduces the risk to such proceeds for the reasons noted above.

12. In summary, a closing of the sale of the Operating Assets pursuant to the MPH APA on August 19, 2011 would provide for greater proceeds (approximately $1.8 million) and more certainty than a liquidation (as shown on Exhibit B, a liquidation scenario as of August 5, 2011 is projected to yield approximately $1.5 million). However, the closing of a transaction pursuant to the MPH APA on or prior to August 5, 2011 provides the greatest amount of proceeds to unsecured creditors, approximately $2.0 million after consideration of the MPH Allowed Administrative Claim, as compared to all the other scenarios and with the least amount of risk to all of the creditors.

**Conclusion**

13. Based on my 16 years of experience as an investment banker and financial advisor to companies seeking to sell assets inside and outside of bankruptcy proceedings, my knowledge of the Debtor's assets and business operations, the extensive process that was undertaken to market the assets

both pre-petition and post-petition, the vigorous and arms-length negotiations of the MPH APA and my analysis of the various alternative thereto, I believe that the MPH APA provides a reasonable and fair value for Operating Assets with greater certainty, speed and with less risk than any other alternative currently available to the Debtor and its various stakeholders.

I, declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of July 2011 at San Francisco, California.

/s/ Alexander Stevenson
Alexander Stevenson

STEVENSON DEC SALE OF OPERATING ASSETS 8
Case: 11-31985   Doc# 167   Filed: 07/14/11   Entered: 07/14/11 12:56:14   Page 8 of 8