

1
Stephen D. Finestone (125675)
John F. Sullivan (175236)
2
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20ᵗʰ Floor
3
San Francisco, CA 94104
Telephone: (415) 421-2624
4
Facsimile: (415) 398-2820
E-mail: sfinestone@pobox.com
5

**Signed and Filed: July 19, 2011**

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**
_____

6
Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

7

8                   UNITED STATES BANKRUPTCY COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11
In re:                              CASE NO.: 11-31985 (DM)

12
NURSERYMEN'S EXCHANGE, INC.         CHAPTER 11

13
          Debtor.

14
                                    **AMENDED ORDER APPROVING THE**
15                                  **SALE OF DEBTOR'S OPERATING**
                                    **ASSETS TO THE HIGHEST AND**
16                                  **BEST BID FREE AND CLEAR OF LIENS,**
                                    **CLAIMS, AND INTERESTS**

17       A hearing on the *Motion for Order Approving the Sale of Debtor's Operating Assets to*

18  *the Highest and Best Bid Free and Clear of Liens, Claims, and Interests* [Docket No. 116] ( the

19  "Motion"), filed by the debtor in the above-captioned chapter 11 case (the "Debtor"), [1] was held

20  before this Court on July 18, 2011 at 3:00 p.m. Appearances were as noted on the record.

21       Having considered the Motion and all related pleadings, any opposition thereto, and the

22  arguments of counsel,

23       THE COURT FINDS THAT:

24       A.      The notice of the Motion and the hearing thereon (the "Sale Hearing") was

25  adequate, sufficient and no further notice of the Motion is necessary for the Court to enter this

26  Order.

27
_____
28
[1] The order also applies to any sale by a trustee in a chapter 11 or chapter 7 case.

B.     A reasonable opportunity to object or to be heard regarding the requested relief in the Motion has been afforded to creditors and parties in interest.

C.     As demonstrated by the testimony and/or other evidence proffered, adduced or admitted at the hearing on the Motion and the representations of counsel made on the record at the Sale Hearing, the Debtor has marketed its business and assets and conducted the sale process in a commercially reasonable manner prepetition and in accordance with the Court's *Order (A) Approving Sale Procedures in Connection with the Proposed Sale of Debtor's Operating Assets at Auction; (B) Approving Procedures for the Assumption and Assignment of Certain Real Property and Personal Property Leases and Executory Contracts in Connection Therewith (C) Granting Related Relief* [Docket No. 78] (the "Sale Procedures Order").

D.     Floramoda, Inc. (the "Buyer") was the only party to submit a Qualified Bid[2] as required by the Sale Procedures Order, which Qualified Bid is contained in the *Asset Purchase Agreement* executed by the Debtor and Seller and attached hereto as **Exhibit A** (the "APA")..

E.     The Debtor has presented good and sufficient business justification for the sale of the Purchased Assets (as defined in the APA) pursuant to section 363 of the Bankruptcy Code, the assumption and assignment of the Assumed Contracts (as defined in the APA) pursuant to section 365 of the Bankruptcy Code, and the other relief granted herein.  The APA represents the highest and best offer for the Purchased Assets, the Purchase Price (as defined in the APA) is fair and reasonable and constitutes fair consideration and reasonably equivalent value under the Bankruptcy Code and any other applicable federal or state law.

F.     The Purchase Price and the terms of the APA were negotiated, proposed and entered into by the Debtor and Buyer without collusion, in good faith, from arm's length bargaining positions and for fair value.

G.     Based upon, among other things, the *Declaration of Charles Kosmont* [Docket No. 169], Buyer is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code in that (i) Kosmont has disclosed (1) Buyer's pre and post-

---

[2] Capitalized terms not defined herein shall have the meanings used in the Sale Procedures Order and exhibits thereto.

DOCS_SF:78512.8 58760/001

petition relationships with the Debtor and equity holders in this case, and any of the Debtor's officers, directors or agents, (2) whether any offers of employment or compensation have been or will be offered to the Debtor's present or former management or employees, (3) whether any consideration is contemplated to be transferred or has been transferred by Buyer in connection with the sale to any person other than the Debtor, and (4) the absence of fraud and collusion between Buyer and any other bidders or the Debtor's agents, employees, or any attempts to take unfair advantage of other bidders; and (ii) Buyer has not engaged in any conduct that would cause the transactions to be avoided as contemplated in section 363(n) of the Bankruptcy Code. The reversal or modification on appeal of this Order shall not affect the validity of the sale absent a stay pending appeal.

H.      The Buyer has negotiated the terms and conditions of and entered into the APA in good faith in accordance with section 363(m) of the Bankruptcy Code.

I.      Pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b), this Court has jurisdiction to hear the Motion and to grant the relief requested therein and grant this Order.

The Court, having reviewed and considered the Motion and the declarations, exhibits, and other documents filed in support of the Motion, any objections to the Motion, and any supporting documents thereto, and the files and record in this case; and after due deliberation and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The notice of the Motion and the Sale Hearing thereon is approved as being fair, reasonable and adequate under the circumstances, and any additional notice as may otherwise be required under state or federal law is waived.

2.      The Motion is granted and any objection to the Motion that was not resolved pursuant to this Order or withdrawn at or prior to the Sale Hearing is overruled.

3.      The Debtor is authorized to consummate and carry out the transactions described in the APA and to undertake the obligations or other matters imposed, required, or provided therein, such that, among other things, the Debtor, may sell the Purchased Assets, assign the Assumed Contracts, perform its obligations under the APA and enter into any other agreement or

DOCS_SF:77512.8 58766/001

document reasonably necessary or appropriate to effectuate the APA without further order of the Court.

4.     The Debtor is authorized to execute any such releases, termination statements, assignments, consents or instruments on behalf of any third party, including the holders of any Liens and Claims (as defined below) that are necessary or appropriate to effectuate or consummate the APA; provided, however, this paragraph shall not apply to any Liens and Claims of Wells Fargo Bank N.A. or its affiliates (collectively the "Bank").

5.     Buyer has not assumed and is not obligated for any of the Debtor's liabilities other than the Assumed Liabilities (as defined in the APA) expressly set forth in the APA.

6.     The Debtor hereby indefeasibly assigns to the Bank 100% of the proceeds (cash and otherwise) due to the Debtor and its estate pursuant to the APA ((including without limitation, the Cash Purchase Price (as defined in the APA)) (collectively, the "Proceeds") and shall irrevocably authorize and direct any payor to pay and deliver the Cash Purchase Price and all other Proceeds directly to the Bank at Closing (as defined in the APA), and thereafter, as and when received.

7.     Pursuant to section 363(f) of the Bankruptcy Code and without further order of this Court, upon the Closing (as defined in the APA), the Purchased Assets shall be transferred, sold and delivered to Buyer free and clear of all pre and post-petition claims, liens, interests, obligations, liabilities, lawsuits, interests, contractual commitments, employment-related claims, payroll taxes, employee contracts, tax claims or environmental liability claims and any and all pre and post-petition claims of the Bank, IBM Credit LLC, Ikon Financial Services, and IOS Capital that related to or purport to relate to the Purchased Assets (the "Liens and Claims"), with any Liens and Claims not paid prior to or concurrently with the Closing attaching to the portion of the Debtor's proceeds of the sale allocable to the property that was subject to the particular Lien or Claim in the same scope, order and validity, if any, as such Lien or Claim had prior to the Closing: *provided*, *however*, the Purchased Assets shall not be transferred, sold or delivered free and clear of the Liens and Claims of the Bank unless: (a) the Cash Purchase Price indefeasibly delivered to the Bank Fargo at Closing is $3,300,000 or more; (b) the Closing

occurs on or before August 5, 2011; (c) on the Closing Date (as defined in the APA ), the Debtor

has no negative variance from the budget previously agreed to by the Debtor and the Bank

except for any variance approved by the Bank in its sole discretion, or except as may be

otherwise permitted by the Credit and Security Agreement between the Debtor and the Bank

previously approved by the Court; and (d) any modification of the APA is approved in writing by

the Bank (collectively, the "Bank Consent Provisions").

8.      Notwithstanding any other provision of this Order, the Bank's Liens and Claims

shall be not terminated or released with respect to the assets set forth on Section 1.1(e) of the

Disclosure Schedule (Family Owned Fixtures and Leasehold Improvements) of the APA;

*provided*, *however*, the Bank's Liens and Claims shall not be enforceable against the Buyer so

long as the Debtor, Buyer, and Bank enter into an agreement contemplated by Section 7.2(h) of

the APA.

9.      As set forth in the APA, upon Closing the Debtor waives and releases any right to

assert against the Buyer any claim of ownership interest in or to the property described in

Disclosure Schedule 1.1(e) of the APA (the "Family Owned Fixtures and Leasehold

Improvements;" *provided*, *however*, nothing herein or the APA is intended to, nor shall it release

claims the Debtor may have against the Family Parties (as defined in the APA) with respect to

the ownership of the Family Owned Fixtures and Leasehold Improvements; *provided*, *further*,

that any recourse that the Debtor may have with respect to the Family Owned Fixtures and

Leasehold Improvements shall not interfere with Buyer's interest in the Lease and use of the

Family Owned Fixtures and Leasehold Improvements during the term of the Lease and any

extensions thereof.

10.      Provided that prior to Closing (a) the Bank Consent Provisions have been satisfied

and (b) the Debtor, Buyer, and the Bank have entered into the agreement contemplated by

Section 7.2(h) of the APA, after the Closing, the Bank, IBM Credit LLC, Ikon Financial

Services, and IOS Capital are barred from asserting against the Buyer, and its respective

successors or assigns, any claim or right based upon any such Liens and Claims.

DOCS_SF:78512.8 58760/001

11.     All creditors and other persons and entities are authorized and directed as of the Closing to deliver to the Debtor for delivery to Buyer (or directly to Buyer if after the Closing), all of the Purchased Assets in their possession, custody, or control.

12.     Buyer is and shall be deemed a good faith purchaser of the Purchased Assets for all purposes, including but not limited to the provisions of section 363(m) of the Bankruptcy Code.

13.     The terms of the APA are fair and reasonable and Buyer is paying reasonably equivalent value for the Purchased Assets.

14.     The terms and provisions of the APA, together with the terms and provisions of this Order and any actions taken hereunder shall be binding in all respects upon, the Debtor, its estate, successors and assigns and shall survive entry of any order which may be entered (a) appointing a chapter 11 trustee in this case, (b) converting the Debtor's chapter 11 case to a chapter 7 case, or (c) dismissing the Debtor's chapter 11 case.

15.     This Court retains jurisdiction to enforce and implement the terms and provisions of this Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the documents executed in connection therewith in all respects, including retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) resolve any disputes arising under or related to the APA, and (c) protect the Buyer against any Liens and Claims asserted against the Purchased Assets.

16.     The APA and any related documents or other instruments may be modified, amended or supplemented by the Debtor and Buyer, in a writing signed by both such parties and approved in writing by the Office Committee of Unsecured Creditors, and in accordance with the terms thereof, without further order of the Court; *provided*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's bankruptcy estate.

17.     The Mutual General Release set forth in Exhibit N of the APA shall include full and final settlement of the Debtor's claim for avoidance and recovery of a preference claim against Rocket Farms, an affiliate of the Buyer, in exchange for which the Buyer shall pay an

additional $15,000 to the estate, which sum shall be paid directly to the Estate within five (5) business days of the Closing, which sum shall not be deemed part of the Purchase Price.

18. To the extent any provisions of this Order conflict with the terms and conditions of the APA, this Order shall govern and control.

19. This Order shall be effective immediately upon entry. No automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Bankruptcy Rules 6004(h) or 6006(d), applies with respect to this Order.

**\*\* END OF ORDER\*\***

DOCS_SF:78512.8 58766/001

# **EXHIBIT A**

(Asset Purchase Agreement)

DOCS_SF:77512.8 58760-001

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 8 of
326

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**NURSERYMEN'S EXCHANGE, INC.**

**as the Seller**

**AND**

**FLORAMODA, INC.**

**as the Buyer**

**July 14, 2011**

1

# TABLE OF CONTENTS

**Page**

**Article I DEFINITIONS** ............................................................................................ **2**

    Certain Definitions ....................................................................................... 2

    Other Terms ................................................................................................. 13

    Knowledge .................................................................................................... 13

    Interpretation ............................................................................................... 14

**Article II PURCHASE OF ASSETS** ....................................................................... **14**

    Purchase ....................................................................................................... 14

    Cash Purchase Price; Adjustments ............................................................. 16

    Allocation of Purchase Price ...................................................................... 18

    Closing ......................................................................................................... 19

    Closing Deliveries ...................................................................................... 19

    Assignment and Assumption of Contracts ................................................. 20

    Excluded Liabilities .................................................................................... 22

    2.8    PUD Property and Family Property Leases ................................... 23

    The Seller's Chapter 11 Bankruptcy Case ................................................. 23

**Article III REPRESENTATIONS AND WARRANTIES OF SELLER** ................ **24**

    Organization, Standing and Power ............................................................. 24

    Authority ...................................................................................................... 24

    No Conflict .................................................................................................. 24

    Title ............................................................................................................. 25

    Assumed Contracts ..................................................................................... 25

    Employee and Related Matters ................................................................... 25

i

       Open Orders ...................................................................................................... 26

       Inventory .......................................................................................................... 26

3.9    Intellectual Property ......................................................................................... 26

       Customers ......................................................................................................... 26

       Financial Statements ......................................................................................... 27

       Business Permits ............................................................................................... 27

       Real Property .................................................................................................... 27

       Environmental Matters ..................................................................................... 28

       Brokers ............................................................................................................. 28

       Actions and Proceedings Involving Seller ....................................................... 29

**Article IV REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 29**

       Organization, Standing and Power ................................................................... 29

       Authority .......................................................................................................... 29

       Consents and Approvals; No Violation ............................................................ 29

       Actions and Proceedings .................................................................................. 30

       Brokers ............................................................................................................. 30

       Financing ......................................................................................................... 30

       **AS IS SALE** ..................................................................................................... 30

**Article V COVENANTS ...................................................................................................... 31**

       Access .............................................................................................................. 31

       Operation of Business ...................................................................................... 31

       Notification ...................................................................................................... 33

       Third Party Consents ....................................................................................... 33

       All Reasonable Efforts ..................................................................................... 33

DOCS_LA:239794.15

Further Assurances .................................................. 33

Publicity ................................................................. 34

Bankruptcy Matters ................................................ 34

Confidentiality ........................................................ 34

Transaction Taxes .................................................. 34

Notice of Nonsatisfaction of Closing Condition ......... 35

Sale of PUD Property .............................................. 35

Cooperation ............................................................ 35

Access to Records .................................................. 35

Notice of Sale ........................................................ 36

6    Collection of Seller's Accounts Receivable ............. 36

7    Cessation of Use of Intellectual Property Rights ...... 36

**Article VI EMPLOYEE MATTERS** ........................................ **37**

Personnel; Employees ............................................. 37

COBRA and Health Claim Data ................................ 37

WARN ................................................................... 37

Welfare Benefits ..................................................... 38

Employee Benefit Plans — Seller's Liability ............... 38

Wage Reporting ...................................................... 38

Unemployment Compensation ................................. 38

Employee Rights ..................................................... 38

ALRB Representation Matter .................................... 38

**Article VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** ............. **39**

Conditions to Each Party's Obligations ..................... 39

DOCS_LA:239794.15

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 12 of 326

Conditions to Obligations of the Buyer .................................................. 39

Conditions to Obligations of the Seller ................................................. 40

**Article VIII TERMINATION** ...................................................................... **40**

Termination .................................................................................................. 40

Procedure and Effect of Termination ...................................................... 42

Buyer's Exclusive Remedy ....................................................................... 42

The Seller's Remedy .................................................................................. 42

**Article IX GENERAL PROVISIONS** .......................................................... **43**

Survival of Representations and Warranties .......................................... 43

Notices ......................................................................................................... 43

Section and Other Headings ..................................................................... 44

Waiver .......................................................................................................... 44

Entire Agreement ....................................................................................... 44

Amendments, Supplements, Etc. ............................................................. 44

No Rights of Third Parties ........................................................................ 45

Enforcement ................................................................................................ 45

Invalid Provisions ...................................................................................... 45

Successors and Assigns ............................................................................. 45

Counterparts ............................................................................................... 45

Facsimile Signature ................................................................................... 45

Further Assurances .................................................................................... 45

Fees and Expenses ..................................................................................... 46

WAIVER OF JURY TRIAL ...................................................................... 46

Exclusive Jurisdiction ............................................................................... 46

iv

Computation of Days ................................................................ 46

No Consequential or Punitive Damages .................................. 46

Time of Essence ...................................................................... 46

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 14 of
326

# Exhibits and Schedules

**Exhibits**

| | |
|---|---|
| A | Sale Procedures Order |
| B | Form of Assignment and Assumption Agreement for Assumed Contracts |
| C | Form of Assignment and Assumption Agreement for Real Property Leases |
| D | Form of Assignment for Intellectual Property |
| E | INTENTIONALLY OMITTED |
| F | Form of Bill of Sale for Purchased Assets |
| G | Forms of Family Property Leases |
| H | Form of Owned Real Property Deed |
| I | Form of PUD Lease |
| J | Form of Reservoir Easement Agreement |
| K | Form of Sale Motion |
| L | INTENTIONALLY OMITTED |
| M | Form of Escrow Agreement |
| N | Form of Mutual General Release |

**Disclosure Schedule**

| | |
|---|---|
| 1.1(a) | Leased Real Property |
| 1.1(c) | Assumed Contracts |
| 1.1(e) | Family Owned Fixtures and Leasehold Improvements |
| 1.1(g) | Excluded Owned Real Property |
| 1.1(h) | Existing Family Property Leases |
| 1.1(i) | Leased Family Property |
| 1.1(j) | Owned Real Property |
| 1.1(k) | Permitted Liens |
| 1.1(l) | Certain Excluded Contracts |
| 1.1(m) | Utility Deposits |
| 1.1(n) | Excluded Licenses |
| 3.2 | Third Party Consents |
| 3.4 | Title |
| 3.5 | Defaults Under Assumed Contracts |
| 3.6 | Employee Matters |
| 3.7 | Open Orders |
| 3.8 | Inventory |
| 3.9(a) | Seller's Registered IP |
| 3.9(b) | Intellectual Property Contracts |
| 3.10 | Rebate Customers |
| 3.12 | Business Permits |
| 3.13 | Real Property |

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 15 of
326

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of July 14, 2011 (the "Execution Date"), by and between **NURSERYMEN'S EXCHANGE, INC.,** a California corporation (the "Seller"), and **FLORAMODA, INC.,** a California corporation (the "Buyer"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Article I.

## RECITALS

WHEREAS, the Seller operates a commercial nursery in Half Moon Bay, California, producing and distributing horticultural products, including flowering plants and foliage for indoor home decor, for sale to retail and commercial customers, including through premium supermarkets, leading home centers and mass merchandisers, a related brokerage operation and wholesale center (the "Business");

WHEREAS, on May 23, 2011, the Seller commenced a bankruptcy case (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court");

WHEREAS, on June 10, 2011, the Bankruptcy Court entered an order, identified as Docket No. 78 (the "Sale Procedures Order"), in the form attached hereto as Exhibit A, containing, among other things, (i) the sale procedures to be followed by the Seller and all potential bidders for the Purchased Assets, (ii) scheduling an auction and a hearing to consider the approval of the sale of the Purchased Assets (the "Sale Hearing") and (iii) the form and manner of notice of the Sale Motion and Sale Hearing;

WHEREAS, in accordance with the procedures approved in the Sale Procedures Order, the Seller desires to sell, and the Buyer desires to buy, the Purchased Assets upon the terms and conditions set forth herein;

WHEREAS, on July 7, 2011, the Buyer delivered to U.S. Bank National Association, acting as escrow agent (the "Escrow Agent"), as an earnest money deposit against the Cash Purchase Price, a deposit in the amount of $200,000 in immediately available funds (together with all accrued interest thereon, the "Escrow Deposit");

WHEREAS, the parties hereto have agreed that, subject to the terms and conditions of this Agreement, the Seller will sell, and the Buyer will acquire, the Purchased Assets free and clear of all Liens, Claims, and Indebtedness under sections 363(f) and 365 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of an Order of the Bankruptcy Court under, inter alia, sections 363 and 365 of the Bankruptcy Code.

1

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 16 of 326

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I
## DEFINITIONS

1.1 <u>Certain Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"*Accounts Receivable*" means any and all accounts receivable, notes receivable, checks, similar instruments and other amounts receivable owed to the Seller for products sold or services rendered in the operation of the Business, together with all security or other collateral therefor and any interest for unpaid financing charges accrued thereon, excluding any intercompany receivable from any Seller.

"*Additional ALRB Case Costs*" has the meaning set forth in <u>Section 6.9(b)</u>.

"*Affiliate*" or "*Affiliates*" shall mean with respect to a specified Person, another Person that, either directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.

"*Agreement*" has the meaning set forth in the opening paragraph to this Agreement.

"*ALRB Case*" has the meaning set forth in <u>Section 6.9(a)</u>.

"*ALRB Case Costs*" has the meaning set forth in <u>Section 6.9(b)</u>.

"*Allocation Schedule*" has the meaning set forth in <u>Section 2.3</u>.

"*Alternative Transaction*" shall mean any agreement or arrangement, or agreement to support or propose to the Bankruptcy Court any agreement or arrangement, in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Bankruptcy Court) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to the Buyer pursuant to the terms of this Agreement.

"*Ancillary Documents*" has the meaning set forth in <u>Section 2.5(b)(xii)</u>.

"*Applicable Law(s)*" shall mean any federal, state, provincial, territorial, local or foreign laws, including common law, Orders, writs, injunctions, decrees, codes, guidelines, policies, ordinances, awards, stipulations, judgments, directions, requirements, statutes, judicial or administrative doctrines, rules or regulations enacted, promulgated, issued or entered by a

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 17 of 326

Governmental Authority, including the Bankruptcy Code and the Code, to which a specified Person or property is subject.

"*Arbitrator*" has the meaning set forth in Section 2.2(c)(ii).

"*Assignment and Assumption Agreement for Assumed Contracts*" shall mean an instrument substantially in the form attached hereto as Exhibit B, assigning the Assumed Contracts, other than Real Property Leases, to the Buyer.

"*Assignment and Assumption Agreement for Real Property Leases*" shall mean an instrument substantially in the form attached hereto as Exhibit C, assigning the Real Property Leases for the properties set forth on Section 1.1(a) of the Disclosure Schedule (Leased Real Property), to the Buyer.

"*Assignment for Intellectual Property*" shall mean an instrument substantially in the form attached hereto as Exhibit D, assigning the Intellectual Property to the Buyer.

"*Assumed Contracts*" shall mean the Contracts and Leases set forth in Section 1.1(c) of the Disclosure Schedule (Assumed Contracts) and any other Contracts or Leases assumed and assigned by the Seller to the Buyer in accordance with the provisions hereof.

"*Assumed Liabilities*" shall mean all liabilities and obligations under or pursuant to any Assumed Contracts arising after the Closing Date and relating to the performance of the Assumed Contracts on and after the Closing Date (other than any obligations or liabilities that are the result of the breach of any Assumed Contract prior to or on the Closing Date) and (ii) occurring, arising out of or related to the ownership and operation of the Business and the Purchased Assets after the Closing Date.

"*Avoidance Actions*" means any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Estate under applicable state statute or Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

"*Bankruptcy Case*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Code*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Court*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy-Required Utility Deposits*" means any utility deposits required to have been made by the Seller pursuant to section 366 of the Bankruptcy Code as a result of the commencement of the Bankruptcy Case.

"*Bill of Sale for Purchased Assets*" shall mean an instrument in substantially the form attached hereto as Exhibit F, assigning, conveying and transferring the Purchased Assets (other than the Assumed Contracts and the Real Property) to the Buyer.

DOCS_LA:239794.15

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 18 of 326

"*Books and Records*" shall mean all business records, books, files, ledgers, documents and correspondence owned and controlled by the Seller, confidential and otherwise, in whatever form, wherever located, which relate to the Seller, the Business, the Purchased Assets or the Transferred Employees or their dependents or beneficiaries (subject, in the case of Transferred Employees or their dependents or beneficiaries, to the obtaining of any consents required from any third party), including market information, sales aids, customer and supplier lists, files, records and data; written medical records, medical surveillance samples, capital expenditure plans and studies; emergency studies; maintenance and repair reports; accounting, real property, environmental, tax, health, safety, toxicology and hygiene records; plans and designs for capital and cost reduction projects, but excluding the Excluded Books and Records.

"*Business*" has the meaning set forth in the recitals to this Agreement.

"*Business Day*" shall mean any date, other than a Saturday, Sunday or any other day on which national banks are required or authorized by law to close in California.

"*Business Permits*" shall mean (a) any and all permits or licenses of Governmental Authorities material to the Purchased Assets, the Assumed Liabilities or the Business and (b) any and all permits, licenses, rights and privileges to use, reuse, reclaim, recycle, take, store, divert or discharge water.

"*Buyer*" has the meaning set forth in the opening paragraph to this Agreement; provided that, notwithstanding anything to the contrary herein, Floramoda, Inc., shall have the right to designate by written notice to Seller given no later than five (5) Business Days prior to the Closing, a limited liability company to be formed prior to the Closing to take title to the Owned Real Property at the Closing.

"*Buyer's Claim*" means the absolute, unconditional, non-contingent, liquidated allowed administrative Claim under section 504(b) of the Bankruptcy Code granted by the Seller to the Buyer pursuant to Section 5.18, which Claim shall be (a) in an amount initially equal to $400,000, decreasing by $30,000 per day (not to exceed a maximum decrease of $400,000) for each day after August 5, 2011 on which the Closing has not been consummated for any reason, (b) junior to any Claims of professionals, ordinary course post-petition administrative Claims, and secured Claims in the Bankruptcy Case, and (c) *pari passu* with all Claims in the Bankruptcy Case arising under section 503(b)(9) of the Bankruptcy Code.

"*Buyer's Confidentiality Agreement*" means that certain confidentiality agreement, dated as of January 18, 2011, by and between FocalPoint Securities, LLC, on behalf of the Seller, and Monterey Peninsula Horticulture, Inc., on behalf of the Buyer.

"*Capital Stock*" means, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in the corporation; and (ii) any other Entity, any share, membership or other percentage interest, unit of participation or other equivalent (however designated) of an equity interest in the Entity.

"*Cash*" shall mean all cash on the Seller's books as of the Closing, taking into account all outstanding checks, deposits in transit, outstanding bank fees, amounts deposited with any banks

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 19 of 326

or other depositary institutions, cash on hand and other items required to be reconciled under GAAP.

"*Cash Purchase Price*" has the meaning set forth in Section 2.1(b).

"*Charter Documents*" means, with respect to any Entity at any time, in each case as amended, modified and supplemented at that time, (i) the articles or certificate of formation, incorporation or organization (or the equivalent organizational documents) of the Entity, (ii) the bylaws or limited liability company agreement or regulations (or the equivalent governing documents) of the Entity, and (iii) each document setting forth the designation, amount and relative rights, limitations and preferences of any class or series of the Entity's Capital Stock or of any rights in respect of the Entity's Capital Stock.

"*Claim*" means a claim against the Seller or its property, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Closing*" shall mean the consummation of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities, in each case in accordance with the terms and provisions of this Agreement.

"*Closing Date*" has the meaning set forth in Section 2.4.

"*Closing Date Accounts Receivable*" has the meaning set forth in Section 2.2(b)(i).

"*Closing Date Inventory Shortfall*" shall mean the amount, if any, by which the Closing Date Inventory Amount is less than the Target Inventory Amount.

"*Closing Date Inventory Amount*" has the meaning set forth in Section 2.2(b)(i).

"*Closing Date Statement*" has the meaning set forth in Section 2.2(b)(i).

"*Closing Deadline*" means August 18, 2011.

"*Closing Payment*" has the meaning set forth in Section 2.1(d).

"*COBRA*" has the meaning set forth in Section 6.2.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended (or the applicable provisions of any succeeding statute).

"*Contract*" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment or other binding arrangement or understanding, whether written or oral.

"*Copyrights*" shall mean all copyrights, including all registrations, renewals and applications thereof.

"*Cure Costs*" has the meaning set forth in Section 2.6(a).

"*Designation Deadline*" has the meaning set forth in Section 2.6(a).

5

"*Disclosure Schedule*" shall mean the disclosure schedule supplied by the Seller to the Buyer and dated as of the date hereof.

"*Employee*" shall mean an employee of the Seller, including inactive employees and employees on leave.

"*Employee Benefit Plan(s)*" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA) or material fringe benefit plan maintained or contributed to or required to be contributed to by the Seller.

"*Entity*" shall mean any sole proprietorship, corporation, partnership of any kind having a separate legal status, limited liability company, business trust, unincorporated organization or association, mutual company, joint stock company or joint venture.

"*Environmental Laws*" shall mean all Applicable Laws relating to pollution or protection of human health or the environment (including ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources, including all Applicable Laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any hazardous substances.

"*Equipment*" shall mean all machinery and equipment, spare parts, furniture, office equipment, computer equipment and hardware, fittings, tools, apparatus, signage, maintenance equipment, vehicles and rolling stock and other personal property of any kind or type that is used or held for use in connection with Business.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"*Escrow Agent*" has the meaning set forth in the recitals to this Agreement.

"*Escrow Agreement*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Escrow Deposit*" has the meaning set forth in the recitals to this Agreement.

"*Escrow Holdback*" has the meaning set forth in <u>Section 2.1(d)</u>.

"*Estate*" means the Seller's estate created pursuant to section 541 of the Bankruptcy Code.

"*Estimated Cash Purchase Price*" has the meaning set forth in <u>Section 2.2(a)(ii)</u>.

"*Estimated Closing Date Inventory Shortfall*" shall mean the amount, if any, by which the Estimated Closing Date Inventory Amount is less than the Target Inventory Amount.

"*Estimated Closing Date Inventory Amount*" has the meaning set forth in <u>Section 2.2(a)(i)</u>.

"*Estimated Closing Date Statement*" has the meaning se forth in <u>Section 2.2(a)(i)</u>.

6

"*Excluded Assets*" shall mean (i) any Contract that is not an Assumed Contract, (ii) the right to the Purchase Price and other rights granted to the Seller under this Agreement; (iii) the Existing Family Property Leases; (iv) the Excluded Owned Real Property; (v) all fixtures, trade fixtures and leasehold improvements located on the Leased Family Property as set forth on Section 1.1(e) of the Disclosure Schedule (Family Owned Fixtures and Leasehold Improvements); (vi) any shares of capital stock or other equity interests of the Seller or any of or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Seller; (vii) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of the Seller, in each case to the extent applicable to any period prior to the Closing Date (but not any of the foregoing paid by the Buyer); (viii) any property or asset of any kind (whether tangible, intangible or otherwise) held or used by the Seller solely in connection with any Contract or Lease that is not among the Assumed Contracts; (ix) the Excluded Books and Records; (x) all Cash; (xi) all insurance policies, including, without limitation, insurance policies on the lives of key employees that are held by the Seller; (xii) professional retainers paid by the Seller; (xiii) any amounts that have been placed into escrow accounts for the benefit of professionals; (xiv) all refunds, deposits, prepayments and prepaid expenses with respect to other Excluded Assets or made under any Excluded Contract; (xv) all Bankruptcy-Required Utility Deposits; (xvi) all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person that has provided insurance to the Seller; (xvii) all personnel records of employees of the Seller (other than personnel records of Transferred Employees); (xviii) all attorney-client and other privileged materials of the Seller relating to the preparation, commencement and administration of the Bankruptcy Case, the transactions contemplated by this Agreement and the PUD Transaction; (xix) all Accounts Receivable; (xx) the prorated portion of all rent under the Existing Family Property Leases paid by the Seller for periods after the Closing Date (the "Prorated Rent"); (xxi) all Avoidance Actions; (xxii) any Business Permit that is not transferable by the Seller, and any amounts posted to secure the Seller's obligations thereunder; and (xxiii) any deposits or letters of credit posted to secure workers compensation insurance for any period prior to the Closing; *provided, however*, that the Excluded Assets shall not include any Ordinary Course Utility Deposits.

"*Excluded Books and Records*" shall mean (i) any Tax Returns (ii) any books and records of whatever type relating to the Seller as an Entity, including stock records and minute books and (iii) any books and records, contracts or correspondence or documents or records of any kind, whether tangible or intangible, relating to the Excluded Assets, the Excluded Liabilities and the Bankruptcy Case, the transactions contemplated by this Agreement and the PUD Transaction. Notwithstanding the fact that Excluded Books and Records constitute Excluded Assets, Buyer shall have the right to have access to and make photocopies of any Excluded Books and Recoreds that relate to the Purchased Assets.

"*Excluded Contracts*" shall mean each and every Contract or Lease that is not an Assumed Contract, including the Contracts or Leases set forth on Section 1.1(l) of the Disclosure Schedule (Certain Excluded Contracts) and the Excluded Licenses.

"*Excluded Liabilities*" has the meaning set forth in Section 2.7.

DOCS_LA:239794.15

"*Excluded Licenses*" shall mean the licenses set forth on <u>Section 1.1(n)</u> of the Disclosure Schedule (Excluded Licenses).

"*Excluded Owned Real Property*" shall mean the properties set forth on <u>Section 1.1(g)</u> of the Disclosure Schedule (Excluded Owned Real Property).

"*Execution Date*" has the meaning set forth in the opening paragraph of this Agreement.

"*Existing Family Property Leases*" shall mean each Lease set forth on <u>Section 1.1(h)</u> of the Disclosure Schedule (Existing Family Property Leases).

"*Family-Owned Assets*" has the meaning set forth in <u>Section 5.18(a)</u>.

"*Family Parties*" has the meaning set forth in <u>Section 5.18(a)</u>.

"*Family Property Leases*" shall mean the real property leases substantially in the forms attached hereto as <u>Exhibits G-1</u>, <u>G-2</u> and <u>G-3</u>, between the Buyer and the respective owners of the property named therein, superseding the Existing Family Property Leases and entered into as of the Closing Date.

"*Final Cash Purchase Price*" has the meaning set forth in <u>Section 2.2(b)(ii)</u>.

"*Final Order*" shall mean (i) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari or motion for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings or motion for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, motion for reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or motion for reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or motion for reargument or rehearing shall have expired.

"*GAAP*" shall mean generally accepted accounting principles in the United States, consistent with the Seller's past practices.

"*Governmental Authority*" shall mean any national, federal, state, provincial, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"*Holdback Period*" has the meaning set forth in <u>Section 2.2(c)</u>.

"*Inbound License Agreements*" means all agreements granting to the Seller any right to use, exploit or practice any Intellectual Property Rights or licensed software owned or controlled by Persons other than the Seller (excluding Shrinkwrap Software).

"*Indebtedness*" with respect to any Person shall mean any obligation of such Person for borrowed money, but in any event shall include: (i) any obligation or liabilities incurred for all or

any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, whether such Person has assumed or become liable for the payment of such obligation, whether accrued, absolute, contingent, unliquidated or otherwise, known or unknown, whether due or to become due, and whether or not secured by a Lien; (ii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (iii) capitalized lease obligations; and (iv) all guarantees of such Person of obligations of other Persons of the type referred to in clauses (i) through (iii) above.

"*Intellectual Property*" shall mean the Intellectual Property Rights owned or used by the Seller that are used in, or held for use in, the Business.

"*Intellectual Property Rights*" shall mean all intellectual property rights, including both statutory and common law rights, throughout the world, as applicable, in or to any (i) patents, patent applications and invention disclosure, (ii) Marks, (iii) Copyrights, (iv) trade secrets, know-how and confidential information, or (v) trademarks, trade names, corporate names, service marks, trade dress, product configurations, slogans, logos and any applications and registrations therefor.

"*Inventory*" shall mean all supplies, goods, materials (including raw materials), work-in-progress, stock in trade and other inventory held by the Seller for use or sale in connection with the operation of the Business and the amount of the current balance of all Inventory Advances, including but not limited to (i) growing plants, cuttings, samples, and other live inventory, (ii) pots, fertilizers, and potting soils, and (iii) business forms, labels, cartons, packaging materials, and wrapping and other decorative materials.

"*Inventory Advances*" shall mean any prepayments or advances made to vendors with respect to the acquisition of Inventory either (i) set forth on <u>Section 3.8</u> of the Disclosure Schedule or (ii) otherwise approved in writing by the Buyer.

"*Inventory Amount*" means the value of all Inventory Advances and Inventory as of the Closing Date as carried on the financial books and records of the Seller in accordance with GAAP and, to the extent consistent therewith, on a basis consistent the manner in which the Seller's financial books and records have been maintained (with live Inventory at $0 if it is diseased or not properly cared for in accordance with horticulture industry standards).

"*Lease(s)*" means any leases, subleases, licenses or other agreements for real property, including all amendments, extensions, renewals, guaranties or other agreements with respect thereto.

"*Leased Family Property*" shall mean the real properties leased by the Seller set forth on <u>Section 1.1(i)</u> of the Disclosure Schedule (Leased Family Property).

"*Leased Real Property*" shall mean all of the real property leased by the Seller, other than the Leased Family Property, all of such Leased Real Property being set forth on <u>Section 1.1(a)</u> of the Disclosure Schedule (Leased Real Property), including without limitation all rights and privileges to use, reuse, reclaim, recycle, take, store, divert or discharge water with respect to such real property.

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 24 of
326

"*Lien(s)*" shall mean any (i) security interest, lien, mortgage, pledge, hypothecation, encumbrance, Claim, easement, charge, restriction on transfer or otherwise, or interest of another Person of any kind or nature, including any conditional sale or other title retention Contract or lease in the nature thereof, (ii) any filing or agreement to file a financing statement as debtor under the applicable Uniform Commercial Code or any similar statute and (iii) any subordination arrangement in favor of another Person.

"*Marks*" shall mean all trademarks, trade names, corporate names, service marks, trade dress, product configurations, slogans, logos and any applications and registrations therefore.

"*Material Adverse Effect*" shall mean any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, that has, or would have, a material adverse effect on the Purchased Assets or the Business (excluding the Excluded Assets), taken as a whole; or change in the result of operations, properties, assets or condition (financial or otherwise) of the Purchased Assets and the Business in the aggregate or the Purchased Assets taken as a whole, excluding: (i) any events, changes or conditions that generally affect the industry in which the Seller operates, (ii) general business or economic conditions, (iii) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack, (iv) the conditions of any financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (v) changes in GAAP, (vi) acts or omissions of the Seller carried out (or omitted to be carried out) in accordance with this Agreement, (vii) any Effect caused by events, changes or developments relating to the transactions contemplated by this Agreement or the announcement thereof, (viii) any Effect arising or resulting from any act or omission of the Buyer (other than any such act that Buyer is expressly required under this Agreement to take), or (ix) any condition arising by reason of the commencement of the Bankruptcy Case, unless, in the case of clauses (i), (ii), (iii), (iv) or (v) above only, such Effect would be expected to result in a materially disproportionate adverse effect on, or change in, the Business, taken as a whole, relative to the businesses of other comparable companies in the industry in which the Business operates.

"*Material Contract*" shall mean any Contract requiring (or anticipated to require) payments by the Seller, or resulting in (or anticipated to result in) receipts by the Seller of amounts, in excess of $50,000.

"*Mutual General Release*" shall mean the mutual general release substantially in the forms attached hereto as Exhibit N between the Buyer and its affiliated entities, including Monterey Peninsula Horticulture, Inc. and its subsidiaries and the Seller and entered into as of the Closing Date; *provided, however,* that such mutual general release shall not release the Buyer's Claim and other Claims arising under this Agreement.

"*Notice*" has the meaning set forth in Section 9.2.

"*Notice of Abandonment*" has the meaning set forth in Section 6.9(b).

"*Objection Notice*" has the meaning set forth in Section 2.2(c)(i).

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 25 of 326

"*Objection Period*" has the meaning set forth in <u>Section 2.2(c)(i)</u>.

"*Option*" has the meaning set forth in <u>Section 6.9(b)</u>.

"*Option Period*" has the meaning set forth in <u>Section 6.9(b)</u>.

"*Order*" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of any Governmental Authority (in each such case whether preliminary or final).

"*Ordinary Course Utility Deposits*" means all utility deposits of the Seller other than the Bankruptcy-Required Utility Deposits.

"*Owned Real Property*" means all of the real property owned by the Seller other than the Excluded Owned Real Property, all of such Owned Real Property being set forth on <u>Section 1.1(j)</u> of the Disclosure Schedule (Owned Real Property), including without limitation all rights and privileges to use, reuse, reclaim, recycle, take, store, divert or discharge water with respect to such real property.

"*Owned Real Property Deed*" means the real property deed substantially in the form attached hereto as <u>Exhibit H;</u>

"*Permitted Liens*" means Liens specified on <u>Section 1.1(k)</u> of the Disclosure Schedule (Permitted Liens).

"*Person*" or "*Persons*" shall mean any individual, company, corporation, association, partnership, limited liability company, firm, joint venture, trust, Governmental Authority, or other entity.

"*Petition Date*" shall mean the date on which the Seller commenced the Bankruptcy Case.

"*PUD Lease*" shall mean the real property lease substantially in the form attached hereto as <u>Exhibit I</u>, between the Buyer and the Seller.

"*PUD Leaseback*" means the Lease Agreement by and between RL Communities, Inc. and the Seller, a copy of which has been delivered to the Buyer.

"*PUD Leaseback Assignment*" means the assignment and assumption agreement by and between the Seller and the Buyer, pursuant to which the Seller will assign all of its rights under the PUD Leaseback to the Buyer and Buyer will assume all of Seller's obligations thereunder.

"*PUD Property*" means the property described on Exhibit A to the PUD Purchase Agreement and includes Assessor's Parcel Nos. 048-300-280, 048-300-300, 048-300-310, and 048-300-330.

11

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 26 of 326

"*PUD Purchase Agreement*" means the Purchase and Sale Agreement and Joint Escrow Instructions, dated as of May 16, 2011, by and between RL Communities, Inc., a California corporation, and the Seller.

"*PUD Transaction*" means the sale of the PUD Property pursuant to the PUD Purchase Agreement and the transactions contemplated thereby.

"*Purchase Price*" shall have the meaning set forth in <u>Section 2.1(b)</u>.

"*Purchased Advances*" shall mean all refunds, deposits, prepayments and prepaid expenses, in each case to the extent, and only to the extent, that such item relates to one or more Purchased Assets, and the Ordinary Course Utility Deposits; *provided, however*, that the "Purchased Advances" shall not include any Excluded Assets.

"*Purchased Assets*" shall mean any and all assets and rights of the Seller that are used in or held for use in the Business, other than the Excluded Assets, including the following:

(a)     Inventory;

(b)     Real Property; provided, that with respect to the Leased Real Property, it is only the rights of the lessee under the applicable lease if such lease is an Assumed Contract;

(c)     Equipment;

(d)     the Purchased Advances;

(e)     all rights under Assumed Contracts;

(f)     all Intellectual Property Rights owned or used by the Seller, including Seller's Marks and Seller's Copyrights (except as set forth in <u>Section 3.9(a)</u> of the Disclosure Schedule (Seller's Registered IP)), and excluding any Intellectual Property Rights licensed to the Seller pursuant to the Excluded Licenses;

(g)     all goodwill relating to the Business;

(h)     all claims, causes of action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability;

(i)     all Books and Records; and

(j)     all Business Permits, in each case to the extent transferable by the Seller.

"*Qualified Bidder*" has the meaning set forth in <u>Exhibit A</u>.

"*Real Property*" shall mean the Leased Real Property and the Owned Real Property.

"*Real Property Lease(s)*" shall mean any lease or sublease of Leased Real Property.

DOCS_LA:239794.15

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 27 of 326

"*Representatives*" shall mean, with respect to any Person, the officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives of such Person.

"*Reservoir Easement Agreement*" means the PUD Easement Agreement by and between the Seller, as grantor, and the Buyer, in substantially the form of Exhibit J.

"*Sale Hearing*" has the meaning set forth in the recitals of this Agreement.

"*Sale Motion*" shall mean that certain Motion to Sell Property Free and Clear Debtor's Operating Assets [Docket No. 116] filed by the Seller with the Bankruptcy Court on June 22, 2011, seeking, among other things, entry of the Sale Order.

"*Sale Order*" shall mean an order of the Bankruptcy Court in form satisfactory to the Buyer in its sole and absolute discretion).

"*Sale Procedures Order*" has the meaning set forth in the recitals of this Agreement.

"*Seller*" has the meaning set forth in the opening paragraph to this Agreement.

"*Seller's Marks*" has the meaning set forth in Section 3.9(a).

"*Seller's Copyrights*" has the meaning set forth in Section 3.9(a).

"*Shrinkwrap Software*" means off-the-shelf desktop applications available on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $5,000 per licensed user.

"*Target Inventory Amount*" shall mean $4,500,000.00.

"*Tax*" or "*Taxes*" shall mean all federal, state, local, foreign or provincial taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, Capital Stock, net proceeds, ad valorem, turnover, real, personal and other property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, unitary, severance and employees' income withholding, unemployment and Social Security taxes, duties, assessments and charges (including the recapture of any tax items such as investment tax credits), which are imposed by the United States, or any Governmental Authority, including any interest, penalties or additions to tax related thereto imposed by any Governmental Authority (including any interest or penalties with respect to such Taxes).

"*Tax Return(s)*" shall mean all reports, estimates, declarations of estimated tax, information statements and returns relating to, or required to be filed in connection with, any Taxes, including information returns or reports with respect to backup withholding and other payments to third parties.

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 28 of 326

"*Third Party Consents*" shall mean any consent, notice, waiver, approval or authorization of any third party, including a party to any agreement with the Seller, which are required to be obtained or taken to consummate the transactions contemplated herein.

"*Transaction Taxes*" has the meaning set forth in Section 5.10.

"*UST*" has the meaning set forth in Section 5.2.

"*Utility Deposits*" shall mean the Bankruptcy-Required Utility Deposits and the Ordinary Course Utility Deposits, each as set forth on Section 1.1(m) of the Disclosure Schedule (Utility Deposits).

"*Valuation Expert*" has the meaning set forth in Section 2.3.

"*WARN Act*" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"*WF Lender*" shall mean Wells Fargo Bank, N.A. and/or its affiliate holding any secured loan against the Seller.

1.2     Other Terms.   Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall be used throughout this Agreement as so defined.

1.3     Knowledge.   For the purposes of this Agreement, unless expressly provided otherwise, any reference to "knowledge of the Seller" or any similar expression shall be deemed to mean and include the knowledge of any of the following officers of the Seller: Jack Pearlstein, Co-Chief Executive Officer; Gail Hollingsworth, Co-Chief Executive Officer and Chief Financial Officer, and Justin Dautoff, Chief Operating Officer, in each case after reasonable due inquiry.

1.4     Interpretation.   Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

## ARTICLE II
## PURCHASE OF ASSETS

2.1     Purchase.

(a)     *Purchase*.   Subject to the satisfaction of the conditions contained in this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey, and deliver to the Buyer, free and clear of all Claims, Liens and Indebtedness, except Assumed Liabilities and Permitted Liens, as contemplated by section 363 of the Bankruptcy Code, and the Buyer, or one

14

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 29 of 326

or more Affiliates thereof as specified by the Buyer, shall purchase and accept, all right, title and interest of the Seller in and to the Purchased Assets.

(b)     *Purchase Price*.  The purchase price for the Purchased Assets shall be an aggregate amount equal to (i) $4,000,000 (the "Cash Purchase Price"), plus (ii) the Assumed Liabilities (together with the Cash Purchase Price, the "Purchase Price").  The Cash Purchase Price shall be subject to adjustment in accordance with Section 2.2.

(c)     *Escrow Deposit*.

(i)     The Escrow Deposit heretofore delivered to the Escrow Agent shall be the subject of an escrow agreement entered into among the Buyer, the Seller and the Escrow Agent substantially in the form of Exhibit M attached hereto (the "Escrow Agreement").  The Escrow Agent shall hold the Escrow Deposit in a segregated escrow account in accordance with the terms of this Agreement and subject to the jurisdiction of the Bankruptcy Court.  Seller and Buyer shall bear equally the fees and costs of the Escrow Agent.

(ii)     At the Closing, the Escrow Deposit shall be credited in favor of the Buyer and applied toward the Cash Purchase Price.

(iii)     Except as set forth in Section 2.2(c)(iv), if this Agreement is terminated pursuant to Section 8.1, then the Escrow Agent shall return the Escrow Deposit to Buyer, within three (3) Business Days of the Escrow Agent's receipt of the Buyer's written request therefor.

(iv)     If this Agreement is terminated by the Buyer other than in accordance with Section 8.1 or by the Seller pursuant to (A) Section 8.1(c)(i), (B) Section 8.1(c)(iii) provided that the failure to consummate the Closing is due to the failure of the Buyer to perform any of its obligations under this Agreement to the extent required to be performed by the Buyer on or prior to the Closing Date, or (C) Section 8.1(c)(iv) or Section 8.1(c)(v) provided that the event, circumstance, condition, fact, effect or other matter on which the termination is based is the result of the failure of the Buyer to perform any of its obligations under this Agreement, then the Escrow Agent shall release the Escrow Deposit to Seller, within three (3) Business Days of the Escrow Agent's receipt of the Seller's written request therefor.

(d)     *Escrow Holdback*.

(i)     At the Closing, Seller shall deliver to the Escrow Agent, as a holdback from and out of the proceeds of the Cash Purchase Price for any post-Closing purchase price adjustment required by Section 2.2 hereof, a deposit in immediately available funds in an amount equal to ten percent (10%) of the dollar amount of the Cash Purchase Price set forth in Section 2.1(b)(i) hereof (together with all accrued interest thereon, the "Escrow Holdback") pursuant to the Escrow Agreement.  The Escrow Agent shall hold the Escrow Holdback in a segregated escrow account in accordance with the terms of this Agreement and subject to the

15

jurisdiction of the Bankruptcy Court. Seller and Buyer shall bear equally the fees and costs of the Escrow Agent.

(ii)    The Escrow Holdback shall be retained by the Escrow Agent until the delivery to the Escrow Agent of joint written instructions, signed by the Seller and the Buyer, advising that the Final Cash Purchase Price has been finally determined pursuant to Section 2.2(c) hereof and directing the Escrow Agent to make disbursement of the Escrow Holdback. Each of the Seller and the Buyer agree not to make instructions to the Escrow Agent other than in accordance with Section 2.2(c)(vi). The Escrow Holder shall not be responsible for the independent verification that any such instructions are in accordance with Section 2.2(c)(vi). For the avoidance of doubt, in no event shall any such instructions operate to cause the Buyer to pay a Final Cash Purchase Price greater than the Cash Purchase Price dollar amount set forth in Section 2.1(b)(i) hereof.

(e)    *Closing Payment*. At the Closing, the Buyer shall pay to the Seller for the Purchased Assets hereunder in immediately available funds, an amount equal to: the Estimated Cash Purchase Price less the sum of the Escrow Deposit (such amount, as calculated pursuant to this Section 2.1(e), the "Closing Payment").

(f)    *Assumption of Liabilities*. At the Closing, as additional consideration to the Seller for the sale of the Purchased Assets, the Buyer shall assume, and agree to pay, perform, fulfill and discharge, the Assumed Liabilities. From and after the Closing, the Buyer shall indemnify, defend and hold harmless the Seller with respect to the Assumed Liabilities.

2.2    Cash Purchase Price; Adjustments.

(a)    *Estimated Cash Purchase Price*.

(i)    No earlier than five (5) Business Days prior to the Closing Date, the Seller shall deliver to the Buyer a statement setting forth (A) the estimated Inventory Amount (the "Estimated Closing Date Inventory Amount") and (B) a calculation of the estimated Cash Purchase Price as determined pursuant to Section 2.2(a)(ii) (the "Estimated Closing Date Statement"). The Inventory Amount shall be determined on the basis of a physical count conducted by the Seller to which Seller shall invite Buyer and its representatives to attend and observe. The Inventory Amount statement shall include a complete and accurate schedule of all Inventory Advances as of a date not earlier than the week ending immediately before the Closing Date.

(ii)    The estimated Cash Purchase Price shall equal the Cash Purchase Price, less the Estimated Closing Date Inventory Shortfall, if any (such estimated Cash Purchase Price, as determined pursuant to this Section 2.2(a)(ii), the "Estimated Cash Purchase Price"). For the avoidance of doubt, in no event shall the Estimated Cash Purchase Price be greater than the Cash Purchase Price dollar amount set forth in Section 2.1(b)(i) hereof.

(b)    *Final Cash Purchase Price; Holdback; Objection*.

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 31 of 326

(i)     Within forty-five (45) days following the Closing Date, the Buyer shall deliver to the Seller a statement setting forth (A) the actual Inventory Amount as of the Closing Date (the "Closing Date Inventory Amount"), (B) a calculation of the final Cash Purchase Price as determined pursuant to Section 2.2(b)(ii), and (C) the amount by which the Final Cash Purchase Price as determined by the Buyer pursuant to Section 2.2(b)(ii) is less than or greater than the Estimated Cash Purchase Price as reflected in the Estimated Closing Date Statement (such statement so delivered, the "Closing Date Statement").  The Closing Date Statement shall be prepared in accordance with GAAP and, to the extent consistent therewith, on a basis consistent with the Seller's financial statements.

(ii)     The final Cash Purchase Price shall equal the Cash Purchase Price less the Closing Date Inventory Shortfall, if any (the final Cash Purchase Price, as determined pursuant to this Section 2.2(b)(ii), the "Final Cash Purchase Price"). For the avoidance of doubt, in no event shall the Final Cash Purchase Price be greater than the Cash Purchase Price dollar amount set forth in Section 2.1(b)(i) hereof.

(c)     *Holdback Period*; *Objection*.

(i)     Subject to the other provisions of this Section 2.2, the Escrow Deposit shall be held in Escrow for a period of time after the Closing Date (i) until the Objection Period expires without an Objection Notice, or (ii) if there is an Objection Notice, (A) until the Seller and the Buyer have agreed on the Final Cash Purchase Price, or (B) if the Buyer and the Seller cannot agree on the Final Cash Purchase Price, until the Arbitrator makes its determination of the Final Cash Purchase Price (the "Holdback Period"), as security for the amount by which the Final Cash Purchase Price as determined in accordance with this Section 2.2 may be less than the Estimated Cash Purchase Price as reflected in the Estimated Closing Date Statement.

(ii)     The Seller shall have fifteen (15) Business Days following the receipt of the Closing Date Statement (the "Objection Period") within which to give notice in writing to the Buyer objecting on bona fide grounds to the Closing Date Statement (the "Objection Notice").  In the event the Buyer receives an Objection Notice within the Objection Period, the Buyer and the Seller shall in good faith attempt to resolve the objection to the Closing Date Statement within fifteen (15) Business Days following the Objection Period, and, if the Buyer and the Seller have not resolved the Objection Notice, not later than forty-five (45) Business Days following the Objection Period, such dispute shall be submitted to, and all issues having a bearing on such dispute shall be resolved by, a nationally recognized accounting firm reasonably satisfactory to Buyer and Seller (the "Arbitrator").

(iii)     In resolving any such dispute, the Arbitrator shall consider only those items or amounts in the Closing Date Statement as to which Seller has

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 32 of
326

disagreed. The Arbitrator's determination of such items and amounts shall be final and binding on the Parties, absent fraud or manifest error.

(iv)    Nothing in this <u>Section 2.2(c)</u> shall be construed to authorize or permit the Arbitrator to: (A) determine any questions or matters whatsoever under or in connection with this Agreement except for the resolution of differences between Seller and Buyer regarding the determination of the Closing Date Statement; (B) determine any issue regarding the Closing Date Statement except for items specifically identified in the dispute notice from Seller which have not theretofore been resolved by mutual agreement of Seller and Buyer; or (C) resolve any such differences by making an adjustment to the Closing Date Statement that is outside of the range defined by amounts as finally proposed by the Seller and Buyer.

(v)    The Arbitrator shall use commercially reasonable efforts to complete its work within thirty (30) days following its engagement. The expenses of the Arbitrator shall be shared equally by the Seller on one hand and Buyer on the other hand.

(vi)    When the Buyer and the Seller have agreed on the Final Cash Purchase Price within three (3) Business Days of such agreement, or if it is necessary for the Arbitrator to make a final determination of the Final Cash Purchase Price, within three (3) Business Days of the Arbitrator's final determination of the Final Cash Purchase Price, as the case may be, (A) if the Final Cash Purchase Price is less than the Estimated Cash Purchase Price, the Buyer and the Seller shall cause the Escrow Agent to release to the Buyer an amount of the Escrow Holdback equal to the difference between the Final Cash Purchase Price and the Estimated Cash Purchase Price (and if the amount of the Escrow Holdback is insufficient to make up such difference, the Buyer and the Seller shall cause the Escrow Agent to release to the Buyer the full amount of the Escrow Holdback and Seller shall pay the Buyer the additional amount necessary, when aggregated with the amount of the Escrow Holdback released to Buyer, to make up such deficiency, which additional amount shall constitute an allowed superpriority administrative claim of the Buyer under section 503(b) of the Bankruptcy Code), and (B) if the Final Cash Purchase Price is equal to or greater than the Estimated Cash Purchase Price, the Buyer and the Seller shall cause the Escrow Agent to release the full amount of the Escrow Holdback to the Seller and the Buyer shall pay to the Seller the additional amount (if any) necessary, when aggregated with the full amount of the Escrow Holdback, to make up the difference between the Final Cash Purchase Price and the Estimated Cash Purchase Price; *provided, however*, for the avoidance of doubt, in no event shall the Buyer have any obligation to pay any amount for the Final Cash Purchase Price in excess of the Cash Purchase Price dollar amount set forth in <u>Section 2.1(b)(i)</u> hereof, less the Escrow Deposit and the full amount of the Escrow Holdback released to Seller.

DOCS_LA:239794.15

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 33 of 326

(vii)    During the Objection Period, the Buyer shall give the Seller reasonable access, at the Seller's sole cost and expense, to the Books and Records in the possession or control of the Buyer and any personnel which relate to the preparation of the Closing Date Statement for purposes of resolving any dispute concerning the Closing Date Statement and the calculation of the Final Cash Purchase Price.

(d)    *No Other Adjustment*.  The Escrow Deposit and the Escrow Holdback shall not be subject to any claim, set-off or adjustment by the Buyer or any Affiliate of the Buyer except as provided in this <u>Section 2.2</u>.

2.3    <u>Allocation of Purchase Price</u>.  No later than 90 days following the Closing Date, Buyer shall provide Seller with a proposed allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets.  If the Seller does not deliver a written notice disagreeing with Buyer's proposed allocation within 30 days following Seller's receipt thereof, the proposed allocation shall be final.  If the Seller delivers a written notice disagreeing with Buyer's proposed allocation within 30 days following the Seller's receipt thereof, the Parties shall use commercially reasonable efforts to resolve such dispute within thirty days following the date of the dispute notice. If the Buyer and the Seller are unable to resolve any material differences with regard to the allocation of the Purchase Price within 30 days after the Seller's delivery of a written notice disagreeing with the Buyer's proposed allocation, then any disputed, material matters will be finally and conclusively determined by an independent certified public accounting firm or independent certified appraisal firm (the "<u>Valuation Expert</u>") mutually agreed upon by the Buyer and the Seller (such agreement not to be unreasonably withheld or delayed by the Buyer or the Seller).  The Valuation Expert shall promptly resolve any such matters in dispute and render a written report as to the disputed matters and the resulting allocation, which allocation shall be final and binding on the Buyer and the Seller.  The final allocation of the Purchase Price and Assumed Liabilities determined in accordance with this <u>Section 2.3</u>, shall be set forth on a written schedule (the "<u>Allocation Schedule</u>").  Seller and Buyer agree to timely file, or to cause to be timely filed, Internal Revenue Service Form 8594 (or any comparable form under state, local, or foreign Tax law) and any required attachments thereto in accordance with the Allocation Schedule.  Except to the extent otherwise required pursuant to a "determination" within the meaning of IRC Section 1313(a) (or any comparable provision of state, local or foreign law), neither Seller nor Buyer shall take, or shall permit any of its Affiliates to take, a Tax position (whether on a Tax Return or otherwise) that is inconsistent with the allocation reflected in the Allocation Schedule.

2.4    <u>Closing</u>.  Subject to the satisfaction or waiver of the conditions to Closing set forth in <u>Article VII</u>, the Closing shall take place on August 5, 2011 or such other date no later than the Closing Deadline as may be agreed upon in writing by the parties hereto.  The Closing shall take place at the offices of Katten Muchin Rosenman LLP in Los Angeles, California or at such other location as agreed to in writing by the parties.  The date upon which the Closing actually occurs shall be referred to herein as the "<u>Closing Date</u>."

DOCS_LA:239794.15

2.5    Closing Deliveries.

(a)    At the Closing, unless waived by the Seller, the Buyer shall deliver, cause to be delivered, or execute and deliver, as applicable, to the Seller:

(i)    an executed counterpart of the Assignment and Assumption Agreement for Assumed Contracts;

(ii)    an executed counterpart of the Assignment and Assumption Agreement for Real Property Leases;

(iii)    an executed counterpart of the Assignment for Intellectual Property;

(iv)    executed counterparts of the Family Property Leases;

(v)    an executed counterpart of the PUD Lease, unless the PUD Transaction is consummated prior to the Closing, in which case the Buyer shall deliver an executed counterpart of the PUD Leaseback Assignment;

(vi)    an executed counterpart of the Reservoir Easement Agreement;

(vii)    the Closing Payment;

(viii)    a certificate, dated as of the Closing Date, executed on behalf of the Buyer, that the conditions to Closing specified in Sections 7.1 and 7.3 have been satisfied or waived;

(ix)    an executed counterpart of the Mutual General Release; and

(x)    all other documents, certificates, instruments or writings reasonably requested by the Seller in connection herewith.

(b)    At the Closing, unless waived by the Buyer, the Seller shall execute and deliver or cause to be executed and delivered, as applicable, to the Buyer or to such Affiliate or nominee of Buyer as Buyer may designate:

(i)    the Bill of Sale for the Purchased Assets;

(ii)    an executed counterpart of the Assignment and Assumption Agreement for the Assumed Contracts;

(iii)    an executed counterpart of the Assignment and Assumption Agreement for Real Property Leases;

(iv)    an executed counterpart of the Assignment for Intellectual Property;

(v)    executed counterparts of the Family Property Leases;

20

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 35 of
326

(vi)    an executed counterpart of the PUD Lease, unless the PUD Transaction is consummated prior to the Closing, in which case the Seller shall deliver an executed counterpart of the PUD Leaseback Assignment;

(vii)    an executed counterpart of the Reservoir Easement Agreement;

(viii)    any other documents necessary to convey clear title to the Owned Property, free of all Liens other than Permitted Liens;

(ix)    a certificate, dated as of the Closing Date, executed on behalf of the Seller, certifying in such detail as the Buyer may reasonably request that the conditions to Closing specified in Sections 7.1 and 7.2 have been satisfied or waived;

(x)    a certified copy of the Sale Order, which order has become a Final Order;

(xi)    The Owned Real Property Deed;

(xii)    an executed counterpart of the Mutual General Release; and

(xiii)    all other documents, certificates, instruments or writings reasonably requested by the Buyer in connection herewith, including all documents necessary to transfer all vehicles and other Purchased Assets to the Buyer (all the documents referred to in Sections 2.5(a) and 2.5(b) being referred to as the "Ancillary Documents").

2.6    Assignment and Assumption of Contracts.

(a)    On or prior to the Execution Date, the Seller and the Buyer have attached to this Agreement, as Section 1.1(c) of the Disclosure Schedule, a list of each Contract and Lease of the Seller that as of the date hereof they intend to be assumed and assigned by the Seller to the Buyer at the Closing.  Notwithstanding anything in this Agreement to the contrary, Buyer, in its sole and absolute discretion, by written notice to the Seller may amend or revise Section 1.1(c) of the Disclosure Schedule, at any time up to two (2) days prior to the Closing Date (the "Designation Deadline") in order to add any Contract or Lease to or eliminate any Contract or Lease from the Assumed Contracts; provided, however, that unless and until such notice has been given the Seller may terminate or reject any Contract or Lease not included on Schedule 1.1(c) at any time whether prior to or after the Designation Deadline.  Automatically upon the addition of any Contract to Section 1.1(c) of the Disclosure Schedule, it shall be an Assumed Contract for all purposes of this Agreement, Buyer shall be responsible for the payment of all monetary defaults to the extent required by section 365(b) of the Bankruptcy Code (any such costs incurred to cure such defaults, "Cure Costs") of such Contract or Lease, and all Liabilities arising at and after the Closing Date under such Contract shall be Assumed Liabilities for all purposes of this Agreement to the extent so provided herein.  Automatically upon the deletion of any Contract or Lease from Section 1.1(c) of the Disclosure Schedule, it shall be an Excluded Contract for all purposes of this Agreement.  If the Buyer indicates in writing to the Seller after the Closing Date that it wishes to acquire a Contract or Lease of the Seller that was not an

21

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 36 of 326

Assumed Contract on the Closing Date, the Seller will use their commercially reasonable efforts to assign such Contract or Lease to the Buyer; provided, however, nothing herein shall be deemed or construed to obligate the Seller to retain, or refrain from rejecting or terminating any Contract after the Designation Deadline that does not constitute an Assumed Contract.

(b)     So long as an Excluded Contract has not been rejected by the Seller pursuant to section 365 of the Bankruptcy Code, the Seller shall, upon written request by the Buyer, assume and assign such Excluded Contract to the Buyer or its designee for no additional consideration; *provided, however*, that the Buyer shall solely be responsible for the payment of all Cure Costs under any such Excluded Contract the assumption and assignment of which has been requested by the Buyer, and all Liabilities arising at and after the Closing Date under any such Excluded Contract shall be Assumed Liabilities for all purposes of this Agreement to the extent so provided herein.

(c)     If at any time the Seller becomes aware, on or before the Closing Date, of any Contract or Lease to which the Seller is a party or by which the Seller is bound that has not been previously provided or made available to the Buyer, the Seller shall promptly thereafter advise the Buyer of the existence, and provide the Buyer with a copy, of such Contract or Lease and the Buyer thereupon shall have the right to request, by written notice to the Seller within five (5) days, that the Seller assume, assign and sell such Contract or Lease to the Buyer, in which case the Seller shall use commercially reasonable efforts to assume, assign and sell such Contract or Lease to the Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assumed Contracts; *provided, however*, that the Buyer shall solely be responsible for the payment of all Cure Costs under any such Excluded Contract the assumption and assignment of which has been requested by the Buyer, and all Liabilities arising at and after the Closing Date under any such Excluded Contract shall be Assumed Liabilities for all purposes of this Agreement to the extent so provided herein.

(d)     By the Sale Motion, and in such additional or subsequent motions as may be appropriate, the Seller shall seek authority to assign the Assumed Contracts to the Buyer (or the Buyer's designee) in accordance with section 365 of the Bankruptcy Code.  At the Closing, subject to the Order of the Bankruptcy Court approving the assumption and assignment of executory contracts and real property pursuant to section 365 of the Bankruptcy Code, the Seller shall assume and assign to Buyer the Assumed Contracts as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.  In connection with such assumption and assignment, the Buyer at its own cost and expense shall pay all Cure Costs under the Assumed Contracts.

(e)     If following the Closing, the Seller receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then the Seller shall transfer such asset, property or right to the Buyer as promptly as practicable for no additional consideration.

(f)     If following the Closing, the Buyer receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Buyer shall transfer such asset, property or right to the Seller as promptly as practicable for no additional consideration.

22

2.7    Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, neither the Buyer nor any Affiliate of the Buyer at any time shall be under any obligation to assume or become responsible for, or at any time shall be deemed to have assumed to have become responsible for, any liability, obligation, Claim, Indebtedness, Contract or commitment of the Seller with respect to the Excluded Liabilities.  "Excluded Liabilities" shall mean every liability of the Seller, whether known or unknown, whether absolute, contingent, liquidated or unliquidated, unaccrued, asserted, unasserted, or otherwise, and whether related to the Business, the Purchased Assets, the Excluded Assets or otherwise, other than the Assumed Liabilities, including without limitation:

(a)    any liabilities, obligations, debts or commitments of the Seller incident to, arising out of or incurred with respect to this Agreement and the transactions contemplated hereby, (i) which otherwise arise or are asserted or incurred by reason of events, acts or transactions occurring, or the operation of the Business, prior to or on the Closing Date, (ii) relating to or arising under any Employee Benefit Plans, or (iii) which is in existence on or prior to the Closing Date and which relates to or arises under any environmental Applicable Law;

(b)    all Taxes of the Seller, including those related to the Business or the Purchased Assets prior to the Closing Date with all real and personal property Taxes and assessments prorated to the Closing Date and any and all Taxes arising out of the transactions contemplated hereby other than Transaction Taxes;

(c)    any employment related liability or obligation arising prior to or as a result of the Closing to any Employees, agents or independent contractors of Seller, whether or not employed by the Buyer after the Closing or any benefit arrangement with respect thereto, including, but not limited to: all of the Seller's liabilities or obligations under the Employee Benefit Plans or relating to any Employees or former Employees, including without limitation, any wages, vacation pay, severance, bonuses, Claims, sick leave, unfair labor practices, discrimination or wrongful termination claims, workers compensation claims, unemployment benefits, pension benefits, employee stock options or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for the Employees or former Employees or both;

(d)    any liabilities or obligations owed to any Employee or former Employee under a workers compensation claim filed prior to the Closing;

(e)    all of the Seller's liabilities or obligations under any employment, severance, retention or termination Contract with any Employee;

(f)    all of the Seller's liabilities or obligations not expressly to be assumed by the Buyer at the Closing hereunder; and

(g)    all of the Seller's liabilities or obligations that constitute a Claim under section 105 of the Bankruptcy Code, including, but not limited to, any Claims relating to lawsuits commenced against the Seller prior to the Petition Date or other events occurring prior to the Closing; and

23

(h)     the accounts payable that arise before the Petition Date, unless they are specifically included in Assumed Liabilities.

2.8     PUD Property and Family Property Leases.

(a)     At the Closing, the Seller and the Buyer will enter into (i) the Reservoir Easement Agreement pursuant to which the Seller will grant to the Buyer certain rights with respect to the Excluded Owned Real Property and (ii) the PUD Lease pursuant to which Buyer will lease the PUD Property from the Seller; provided, however, that if the PUD Transaction is consummated prior to the Closing, the Seller and the Buyer will enter into the PUD Leaseback Assignment in place of the PUD Lease.

(b)     At the Closing, the Buyer will enter into the Family Property Leases with respect to the properties specified therein.

2.9     The Seller's Chapter 11 Bankruptcy Case.  Notwithstanding any conflicting or inconsistent provisions of this Agreement, the Seller's and Buyer's obligations under this Agreement and the transactions contemplated hereby are subject to and contingent upon the approval and authorization of the Bankruptcy Court.

2.10     Delivery of Purchased Assets Located on Leased Real Property.  On or before the Closing Date, the Seller shall, at its own expense, cause all portable tangible Purchased Assets located on the Leased Real Property, including Inventory, rolling stock and other Equipment but excluding any fixtures, to be moved onto the Owned Real Property or the premises subject to the Family Property Leases.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

The Seller hereby represents and warrants to the Buyer as of the Execution Date and, unless otherwise specifically provided in any representation or warranty, the Closing Date as follows:

3.1     Organization, Standing and Power.  The Seller is validly existing and in good standing under the laws of the jurisdiction of its organization and has full corporate power and authority to conduct its business in the places and in the manner now being conducted.  The Seller has full corporate power and authority to own and operate the Purchased Assets owned or operated by it.  The Seller does not have any subsidiaries having assets or operations material to the Business.

3.2     Authority.  Subject to the approval of the Bankruptcy Court, the Seller has the requisite power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents.  The execution and delivery by the Seller of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by them of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the Seller, and no other action on the part of the Seller is necessary to authorize the execution and

DOCS_LA:239794.15

delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby. Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered by the Seller and constitutes a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms. Subject to the approval of the Bankruptcy Court, each of the Ancillary Documents, when executed and delivered by the Seller, shall constitute a valid and binding agreement of the Seller, enforceable against the Seller, in accordance with its terms. Subject to requisite Bankruptcy Court approval, except as set forth in <u>Section 3.2</u> of the Disclosure Schedule (Third Party Consents), the Seller is not required to give any notice to, make any filing with or obtain any consent, approval or authorization from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the Ancillary Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

3.3 <u>No Conflict</u>. Subject to the approval of the Bankruptcy Court, when the consents and other actions described in <u>Section 3.2</u> of the Disclosure Schedule (Third Party Consents) have been obtained and taken, neither the execution and delivery by the Seller of this Agreement and any Ancillary Document to which it will be a party, nor the consummation of the transactions contemplated hereby or thereby, will result in the creation of any Lien, Claim or Order upon the Purchased Assets or Assumed Liabilities (except as specifically contemplated by this Agreement), does or will conflict with, result in any violation of, or constitute a default under any provision of (a) the Seller's Charter Documents or (b) any Applicable Law. The Seller has complied in all material respects with all Applicable Laws and Orders in connection with the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

3.4 <u>Title</u>. Except as set forth on <u>Section 3.4</u> of the Disclosure Schedule (Title), the Seller owns good and, subject to the Bankruptcy Case, transferable title to all of the Purchased Assets, free and clear of all Claims, Orders and Liens, other than Permitted Liens, Liens to be released at or prior to the Closing and Liens for Taxes that are not yet due and payable. Other than the Existing Family Real Property Leases, which shall be terminated at the Closing, and the fixtures, trade fixtures and leasehold improvements listed on Section 1.1(e) of the Disclosure Schedule (Family Owned Fixtures and Leasehold Improvements), no Related Person of the Seller has any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to the Business or is a party to any Contract or Lease with Seller pertaining to the Business.

3.5 <u>Assumed Contracts</u>. To the Seller's knowledge, true, correct and complete copies of all Assumed Contracts to which the Seller is a party and all amendments thereto have been made available to the Buyer by the Seller. Except as permitted herein, to the Seller's knowledge, none of the Assumed Contracts has been materially modified since such copies were made available to the Buyer. To the Seller's knowledge, except for defaults caused by the commencement of the Bankruptcy Case and payment defaults by the Seller set forth on <u>Section 3.5</u> of the Disclosure Schedule (Defaults Under Assumed Contracts), each Assumed Contract is valid, binding upon the Seller and in full force and effect in all material respects, and no material default or event of default by the Seller or, to the Seller's knowledge, any other party thereto, exists under any of the Assumed Contracts. To the Seller's knowledge, no party to any of the Assumed Contracts has given notice of default or termination. The Seller has not made an

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 40 of 326

assignment or transfer of any of its rights under any of the Assumed Contracts, except collateral assignments to secured lenders that are to be released at or prior to the Closing.

3.6   <u>Employee and Related Matters</u>.  The Seller is in compliance in all material respects with all currently applicable federal, state, local and foreign laws and regulations respecting employment, discrimination in employment, terms and conditions of employment, wages, hours, occupational safety and health and employment practices, and is not engaged in any unfair labor practice.  Except for matters set forth on <u>Section 3.6</u> of the Disclosure Schedule (Employee Matters), there are no material pending claims against the Seller under any workers compensation plan or policy or for long term disability.  Except for matters set forth on <u>Section 3.6</u> of the Disclosure Schedule (Employee Matters), the Seller does not have any material obligations under COBRA or any similar state law with respect to any former employees or qualifying beneficiaries thereunder.  There are no material controversies pending or, to the knowledge of the Seller, threatened, between the Seller and any of their respective employees or former employees.  The Seller has not incurred any material liability under, and has complied in all respects with, the Worker Adjustment Retraining Notification Act (the "WARN Act") and any similar state law, and, assuming the Buyer performs its obligations under <u>Section 6.3</u>, no fact or event exists that could give rise to material liability under such law or laws.  Except for matters set forth on <u>Section 3.6</u> of the Disclosure Schedule (Employee Matters), no employee is currently on a leave of absence that has reinstatement rights under the Family and Medical Leave Act, California Family Rights Act, Workers Compensation laws or any statute or federal law or by virtue of any contract with Seller.  The Seller is not a party to any collective bargaining agreement covering the Employees and, except for the matters set forth on <u>Section 3.6</u> of the Disclosure Schedule (Employee Matters) since July 1, 2010, there have been no strikes, material work stoppages, nor any written demands for collective bargaining by any union, labor organization or other Person with respect to the Employees.  There are no unfair labor practice proceedings, discrimination or civil rights complaints pending or, to the Seller's knowledge, threatened in writing between the Seller and any of the current or former Employees or any labor or other collective bargaining unit representing any current or former Employee that would reasonably be expected to result in any liability.

3.7   <u>Open Orders</u>.  <u>Section 3.7</u> of the Disclosure Schedule (Open Orders) contains a complete and accurate list of all open and pending purchase orders which the Seller has received from its customers as of July 9, 2011.

3.8   <u>Inventory.</u>  <u>Section 3.8</u> of the Disclosure Schedule (Inventory) contains a complete and accurate list of all Inventory as of the date indicated on such list, including all Inventory Advances as of such date.  All items included in Inventory consist of a quality and quantity usable and, with respect to finished goods, saleable in the ordinary course of business of the Seller consistent with the Seller's past practice except for obsolete items and items of below-standard quality.  The Seller is not in possession of any Inventory not owned by the Seller, including goods already sold.  All of the Inventory has been valued in a manner consistent with the manner in which the Seller's financial books and records have been maintained, with live Inventory valued at $0 if it is diseased or not properly cared for in accordance with horticulture industry standards.

3.9   <u>Intellectual Property</u>.

26

(a)     The Seller has no material patents or material trade secrets.  Section 3.9(a) of the Disclosure Schedule (Seller's Registered IP) sets forth an accurate and complete list of (i) all Marks (A) owned by the Seller and used in the Business or (B) registered or pending applications for registration of any Marks described in (A) or (B) in any jurisdiction (collectively "Seller's Marks"), and (ii) all Copyrights owned by the Seller and used in the Business ("Seller's Copyrights").  Except as may be set forth in Section 3.9(a) of the Disclosure Schedule (Seller's Registered IP), to the Seller's knowledge, (i) the use of any of Seller's Marks by the Buyer does not create a likelihood of confusion with any Marks of any other Person used prior to use of Seller's Marks by the Seller; (ii) to the Seller's knowledge, there has been no use of any of Seller's Marks by any third party that might confer upon said third party any rights in any such Mark; (iii) all of Seller's Marks which are registered in the United States have been in substantially continuous use by the Seller in connection with the products or services for which each such Mark is registered; (iv) none of Seller's Marks is the subject of any opposition or cancellation proceeding in a trademark office in any jurisdiction; and (v) the Seller has taken commercially reasonable actions to police and enforce their rights in Seller's Marks against third Persons.

(b)     Section 3.9(b) of the Disclosure Schedule (Intellectual Property Contracts) sets forth a complete and accurate list of all Contracts relating to Intellectual Property Rights to which Seller is a party or by which Seller is bound, including all Inbound License Agreements, indicating for each the title and the parties thereto.  The Seller owns or possesses adequate licenses or other rights to use all of the Intellectual Property Rights under the Contracts set forth on Section 3.9(b) of the Disclosure Schedule (Intellectual Property Contracts).

3.10    Customers.  Section 3.10 of the Disclosure Schedule sets forth a complete and accurate list of all customers of the Seller entitled to any rebates, discounts, promotional pricing, or special marketing incentives together with the terms of such arrangements.  Neither the Seller nor the Buyer has received notice to the effect, or otherwise has reason to believe, that any of Walmart, Sams, Safeway, HEB, Meijer, Ahold, Home Depot or Trader Joe's, does not intend to continue to do business with the Seller or to do business with the Buyer.

3.11    Financial Statements.  The financial statements previously delivered by the Seller to the Buyer fairly present the financial condition and results of operations, changes in shareholders' equity and cash flows of the Seller as at the respective dates of and for the periods referred to in such financial statements, all in accordance with GAAP and, to the extent consistent therewith, on a basis consistent with the manner in which the Seller's financial books and records have been maintained.  Such financial statements reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements.  Such financial statements have been and will be prepared from and are in accordance with the accounting books and records of Seller.

3.12    Business Permits.  The Seller has all Business Permits that are necessary for, or otherwise material to, the conduct of the Business.  Section 3.12 of the Disclosure Schedule (Business Permits) is an accurate and complete list of all Business Permits and, except as set forth on Section 3.12 of the Disclosure Schedule (Business Permits), to the Seller's knowledge, all such Business Permits are in full force and effect.  The Seller is in material compliance with the terms and conditions of the Business Permits and all required renewal applications have been

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 42 of 326

filed and no proceeding is pending or threatened in writing to revoke or limit any material Business Permit. To the extent permitted by law, the Seller has the power to assign such Business Permits. The representations and warranties set forth in this <u>Section 3.12</u> are made without limitation to any of the representations or warranties set forth in <u>Section 3.13</u>.

      3.13   <u>Real Property</u>.

          (a)    Use of the Real Property for the various purposes for which it is presently being used is permitted as of right under all applicable zoning legal requirements and is not subject to "permitted nonconforming" use or structure classifications. Except as set forth on <u>Schedule 3.13</u> of the Disclosure Schedule (Real Property), all improvements to the Real Property are in compliance with all Applicable Laws, including those pertaining to zoning and building, are maintained in a condition adequate for the continued conduct of the Business and are free from latent and patent defects; provided, however, that the Seller does not represent or warrant that improvements to the Real Property are in compliance with the American with Disabilities Act of 1990, as amended, or correlative state laws. The Real Property abuts on and has direct vehicular access to a public road or has access to a public road via a permanent, irrevocable, appurtenant easement benefitting such Real Property, is supplied with public or quasi–public utilities and other services appropriate for the operation of the Business and is not located within any flood plain or area subject to wetlands regulation or any similar restriction. There is no existing or proposed plan to modify or realign any street or highway or any existing or proposed eminent domain proceeding that would result in the taking of all or any part of any premises on the Real Property or that would prevent or hinder the continued use of any such premises as heretofore used in the conduct of the Business.

          (b)    The water rights under State Water Resources Control Board (the "<u>SWRCB</u>") Permit 019055 issued on December 9, 1983, and extended on May 10, 1988, December 11, 1992, and October 2, 1997 and Permit 18892 issued on June 8, 1983 and converted to License No. 12419 are valid and perfected water rights under the laws of the State of California. All Petitions for Extension of Time to place the water rights to beneficial use have been filed with the SWRCB. Seller has placed the water that has been permitted to beneficial use according to the terms of Permit 019055 and License No. 12419. All works associated with Permit 019055 have been constructed or that a Petition for Extension of Time has been filed with the SWRCB to extend the time in which such works may be constructed. The Seller has kept adequate records of its diversion of water from the unnamed streams listed in Permit 019055 and License 12419. The Seller has also maintained records to the extent legally required to maintain its permits and allowances with respect to the use of water in connection with the Business, including to the extent legally required, records of the amount of water it has placed to beneficial use, including diversion amounts and times, and the Seller will provide to the Buyer such originals or copies of these records that it has in its possession. The Seller has also maintained records to the extent legally required to maintain Permit 019055 and License No. 12419, and originals or copies of these records will be provided to the Buyer, to the extent they are in the Seller's possession. The Seller has filed its Annual Statement of Use of Water with the SWRCB. Copies of such Statements have been provided to Buyer. The Seller is in full compliance with all terms and conditions of SWRCB Permit 019055 and License No. 12419. If legally transferable, Permit 019055 and License No. 12419 can be conveyed to the Buyer in good standing.

DOCS_LA:239794.15

(c)    Either (i) the Seller has obtained all necessary approvals and permits under the California Coastal Act, including approvals and permits under any applicable Local Coastal Plan, and/or applicable approvals and permits from the California Coastal Commission or (ii) if such approvals and permits do not exist, to the Seller's knowledge, the Seller is exempt from any approval or permitting requirements under the California Coastal Act.

3.14    <u>Environmental Matters</u>.    The Seller is in material compliance with all Environmental Laws and, to the Seller's knowledge, there is no environmental condition affecting the Business premises other than as disclosed in the Phase I environmental reports delivered to the Buyer.  The Seller has not received any written notice not subsequently resolved with respect to the Business of, or any property owned or leased by, the Seller from any Governmental Authority or third party alleging that the Seller is not in compliance with or subject to any Liability under any Environmental Laws.  Except for releases authorized under or pursuant to Environmental Laws or Business Permits issued thereunder, there has been no release of any hazardous substance in excess of a quantity for which a report is required under Environmental Laws, on any real property of the Seller in connection with the Business.  The Seller is not liable for any costs, obligations, penalties, fines or forfeitures for failure to comply with any Environmental Laws or necessary to achieve or maintain compliance with Environmental Laws, other than such costs in the ordinary course of business, or with respect to any environmental conditions or any release or presence of any hazardous substance, nor is the Seller required to remedy any such existing condition or remove any hazardous substance from any real property.

3.15    <u>Brokers</u>.  FocalPoint Securities, LLC, the Seller's exclusive financial advisor and investment banker, is the only intermediary / broker entitled to a fee at the Closing in connection with the transactions contemplated herein and will be paid by the Seller from the proceeds of the sale in accordance with the terms of that certain engagement letter by and between the Seller and FocalPoint Securities, LLC, dated September 7, 2010; provided, however, that any payments to FocalPoint Securities, LLC for services rendered following the Petition Date shall be subject to the Bankruptcy Court's approval.

3.16    <u>Actions and Proceedings Involving Seller</u>.    Without limiting any other representation of Seller set forth herein, there are no actions, suits, labor disputes or other litigation, legal or administrative proceedings or governmental investigations pending or, to the knowledge of the Seller, threatened against or affecting the Seller or any of its present or former officers, directors, employees, consultants, agents or shareholders, as such, or any of its properties, assets or business relating to the transactions contemplated by this Agreement or which could have the effect of delaying or prohibiting the consummation of the transactions contemplated by this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

The Buyer represents and warrants to the Seller as of the Execution Date and the Closing Date:

29

DOCS_LA:239794.15

4.1    _Organization, Standing and Power_.  The Buyer is organized, validly existing, and in good standing under the laws of its jurisdiction of formation and has the requisite power and authority to carry on its Business as now being conducted and to effect the transactions contemplated hereunder.

4.2    _Authority_.  The Buyer has the requisite power and authority to execute and to deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents.  The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been (or will be at the time of execution thereof) duly authorized by all necessary limited liability company action on the part of the Buyer, and no other action on the part of the Buyer is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.  This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, subject (a) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies and (b) to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Each of the Ancillary Documents, when executed and delivered by the Buyer, shall constitute a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, subject (i) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and (ii) as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.3    _Consents and Approvals; No Violation_.  The execution and delivery of this Agreement by the Buyer do not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give to others a right of termination, cancellation or acceleration of any obligation or the loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of the Buyer under, any provision of (a) the Buyer's Charter Documents, (b) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to the Buyer, or (c) any Applicable Laws, other than, in the case of clauses (b) or (c), any such violations, defaults, rights or Liens that, individually or in the aggregate, would not prevent the consummation of any of the transactions contemplated hereby in accordance with the terms of this Agreement.  No filing or registration with, or authorization, consent or approval of, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement by the Buyer or is necessary for the consummation of the transactions contemplated by this Agreement.

4.4    _Actions and Proceedings_.  There are no actions, suits, labor disputes or other litigation, legal or administrative proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened against or affecting the Buyer or any of its present or former officers, directors, employees, consultants, agents or shareholders, as such, or any of its properties, assets or business relating to the transactions contemplated by this Agreement or

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 45 of 326

which could have the effect of delaying or prohibiting the consummation of the transactions contemplated by this Agreement.

4.5    Brokers.  No broker, investment banker or other person engaged by the Buyer is entitled to any broker's, finder's or other similar fee or commission payable by the Seller in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

4.6    Financing.  The Buyer has, and will have on the Closing Date, sufficient cash, committed financing or other sources of immediately available funds to enable it to consummate the transactions contemplated hereunder.

4.7    **AS IS SALE**.  The Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) the Buyer is purchasing the Purchased Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on the Buyer's own investigation of the Purchased Assets and (b) none of the Seller nor any real estate broker, agent, officer, employee, servant, attorney, or representative of the Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets or the Assumed Liabilities or any part of the Purchased Assets or the Assumed Liabilities relating to the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets.  The Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Seller and the Buyer after good-faith arms-length negotiation in light of the Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS."  The Buyer confirms that the Seller has made available to the Buyer the opportunity to ask questions of the officers and management of the Seller and to acquire additional information about the Business, the Purchased Assets and the Assumed Liabilities.  The Buyer agrees, warrants, and represents that, except as set forth in this Agreement, the Buyer has relied, and shall rely, solely upon the Buyer's own investigation of all such matters, and that the Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER DOES NOT MAKE ANY EXPRESS WARRANTY, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

## ARTICLE V
## COVENANTS

5.1    Access.  From the Execution Date until the earlier of the Closing Date or the date this Agreement is terminated pursuant to Section 8.1, upon reasonable notice from the Buyer, and subject to the provisions of any applicable confidentiality agreement or any applicable lease or sublease, the Seller shall afford to the Representatives of the Buyer reasonable access during normal business hours to the Business, the Leased Real Property and other Purchased Assets, the Books and Records of the Seller relating to the Business and the Purchased Assets, and the management of the Seller for reasonably dedicated portions of time, so as to afford the Buyer reasonable opportunity to make such review, examination and investigation of the Business as

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 46 of
326

the Buyer determines is reasonably necessary solely for the purpose of the consummation of the transactions contemplated hereby (including, upon obtaining the Seller's prior written consent and, to the extent required, the applicable landlord's prior written consent, to perform environmental site assessments and subject to providing adequate insurance coverage for any damage that may be caused by such assessments), and shall permit the Buyer and its authorized Representatives to make copies of such materials at the Buyer's sole expense. From and after the date hereof until the Closing, and subject to the confidentiality obligations to which the Seller may be bound, the Seller shall furnish to the Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Business and the Assumed Liabilities as shall be reasonably requested by the Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable the Buyer or its authorized Representatives to (i) verify the accuracy of the Seller's representations and warranties contained in this Agreement, (ii) verify that the Seller has complied with the covenants contained in this Agreement and (iii) determine whether the conditions set forth in Article VII have been satisfied. Notwithstanding anything to the contrary herein, no such investigation or examination shall be permitted, and no such documents or information shall be required to be provided or made available, to the extent that it would require the Seller to disclose documents or information subject to attorney-client privilege. For the avoidance of doubt, nothing in this Section 5.1 is intended to create a due diligence contingency in favor of the Buyer. The Seller hereby authorizes the Buyer to contact and communicate with all customers, lenders, vendors, suppliers and business partners of the Seller, without further notice to or consent by the Seller, in furtherance of the Buyer's investigation and examination of the Business.

5.2     Operation of Business.     Except as contemplated by this Agreement or to the extent required otherwise under the Bankruptcy Code or the operation and information reporting requirements of the Office of the United States Trustee (the "UST"), during the period from the Execution Date to the Closing, the Seller shall operate the Purchased Assets and conduct the Business in the ordinary course of business consistent with prudent business practices and in material compliance with Applicable Laws, and to the extent consistent therewith so as to preserve the current value and integrity of the Business and the Purchased Assets, (i) pay all Taxes for all periods following the Petition Date as they become due and payable, (ii) purchase, maintain and grow Inventory, supplies and spare parts at customary operation levels consistent with past operating practices, (iii) maintain in full force and effect the existence of all Intellectual Property consistent with past operating practices, (iv) maintain insurance on the Purchased Assets (in amounts and types consistent with past practice), (v) allow customer rebates consistent with past practice and (vi) use its commercially reasonable efforts to preserve the goodwill and organization of the Business and its relationships with customers, suppliers and others having business dealings with it consistent with past operating practices. Without limiting the generality of the foregoing, prior to the Closing and subject to the requirements of the Bankruptcy Code and the UST, unless agreed to by the Buyer in writing the Seller shall not, and shall cause its officers, directors, employees, representatives and agents not to:

(a)     enter into any Material Contract that may be included in the Purchased Assets or make a material adverse change or modification to any existing Material Contract included in the Purchased Assets, except for agreements relating to sales of Inventory and

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 47 of 326

purchases of Inventory from suppliers in the ordinary course of business and consistent with past practices;

(b)     sell, lease, dispose of or otherwise distribute any material portion of the Purchased Assets, except for sales, leases, dispositions and distributions of Inventory in the ordinary course of business and consistent with past practices;

(c)     mortgage or pledge any of the Purchased Assets or subject any Purchased Assets to any Lien, other than Permitted Liens;

(d)     increase in any material manner the salary, bonus, severance or other compensation or benefits of any member of management or other Employee, except for any annual and usual increases in salary to any Employee consistent with past operating practices;

(e)     enter into any employment Contract with any Employee, adopt any benefit plan for any Employees or amend or modify any existing Employee Benefit Plan for any Employees;

(f)     take or omit to take any action that would require disclosure under Article III or that would otherwise result in a breach of any of the representations, warranties or covenants made by the Seller in this Agreement or in any of the agreements contemplated hereby;

(g)     take any action or omit to take any action which act or omission would reasonably be anticipated to have a Material Adverse Effect on the Business or the Purchased Assets;

(h)     cancel, release, waive or compromise any debt, Claim or right in its favor involving the Purchased Assets or the Assumed Contracts having a value in excess of $25,000, or $50,000 in the aggregate, other than in connection with returns of Inventory for credit or replacement in the ordinary course of business;

(i)     other than the extension of credit to customers or advances to Employees in the ordinary course of business, make any loan, guaranty or other extension of credit to any Person or enter into any commitment to make any loan, advance, guaranty or other extension or credit;

(j)     pay any dividends or make any distributions to its shareholders or redeem, repurchase or otherwise acquire any Capital Stock;

(k)     take any other action out of the ordinary course of business;

(l)     accelerate, delay or otherwise modify any of the Seller's shipping, billing or collection practices; or

(m)     make any Inventory Advances; or

(n)     agree in writing or otherwise to take any of the foregoing actions.

33

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 48 of 326

Additionally, from the Execution Date to the Closing Date, the Seller shall consult with the Buyer about any material matters concerning the Purchased Assets or the Business and shall promptly update the Buyer regarding any material developments affecting its labor relations.

5.3    Notification.  Prior to the Closing, the Seller shall notify the Buyer, and the Buyer shall notify the Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its knowledge, threatened against the Seller or the Buyer, as the case may be, which challenges the transactions contemplated hereby.

5.4    Third Party Consents.  Subject to Section 2.6, from and after the date hereof until the Closing, each of the Seller and the Buyer shall use commercially reasonable efforts to secure, before the Closing Date, all Third Party Consents to the extent such consents are not provided for, or the need for which are obviated or satisfied, by the Sale Order, provided that, subject to Section 2.6, neither the Seller nor the Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers (in the case of the Seller, unless the Buyer requests that the Seller make such a payment or provide such other consideration and the Buyer agrees to pay the Seller or provide such other consideration in advance for such payment and any associated costs); provided, however, that neither the Buyer nor the Seller shall be required to waive any of the conditions to Closing set forth in Article VII.

5.5    All Reasonable Efforts.  Without limiting the ability of either party to use discretion in exercising its rights pursuant to this Agreement, prior to the Closing, each of the parties shall use reasonable efforts to (a) satisfy promptly all conditions required hereby to be satisfied by such party in order to expedite the consummation of the transactions contemplated hereby and (b) take, or cause to be taken, all action, and to do, or cause to be done, as promptly as practicable, all things necessary, proper or advisable under Applicable Laws to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement.

5.6    Further Assurances.  From time to time from and after the Execution Date, including following the Closing, the Buyer and the Seller shall each execute, acknowledge and deliver such additional documents or instruments and take such other action as the Buyer or the Seller, as the case may be, may reasonably request to more effectively accomplish the transactions contemplated by this Agreement.  Effective upon the Closing, the Seller hereby irrevocably constitutes and appoints the Buyer as its proxy and attorney-in-fact for the Seller with respect to the Purchased Assets with the right, following the Closing, to take any of the following actions take any action and to execute any instrument which the Buyer may deem necessary or advisable to accomplish the purposes of this Agreement.  The appointment of the Buyer as proxy and attorney-in-fact is coupled with an interest and shall be valid and irrevocable until the secured obligations have been satisfied in accordance with the provisions of this Agreement.

5.7    Publicity.  The parties hereto shall consult with each other and shall mutually agree (the agreement of each party not to be unreasonably withheld or delayed) upon the content and timing of any press release or other public statements with respect to the transactions contemplated by this Agreement and shall not issue any such press release or make any such public statement prior to such consultation and agreement, except as may be required by Applicable Laws or in connection with the Bankruptcy Case; provided, however, that to the

34

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 49 of
326

extent reasonably possible, each party shall give prior notice to the other party of the content and timing of any such press release or other public statement required by Applicable Laws.

5.8     Bankruptcy Matters.

(a)     The Seller and the Buyer acknowledge that to obtain the approval of the Bankruptcy Court, the Seller must demonstrate that it has taken reasonable steps to obtain the highest and best price possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties, including other potential bidders for the Purchased Assets, as ordered by the Bankruptcy Court. The Buyer understands that the Seller will likely contract with or obtain a commitment from the Qualified Bidder with the next best bid to remain in a backup position to consummate an Alternative Transaction in the event the Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof. The Buyer acknowledges that the Seller is not in breach of this Agreement by making such arrangements.

(b)     The Buyer acknowledges that it is the Buyer's obligation to provide adequate assurance of future performance of the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code. Upon request by the Seller, the Buyer will furnish affidavits or other information to demonstrate the Buyer's status as a "good faith" purchaser and providing proof of adequate assurance of future performance under the Assumed Contracts.

5.9     Confidentiality. Except as required by Applicable Law, including the Bankruptcy Code and any Order by the Bankruptcy Court, neither the schedules annexed hereto nor any other confidential or proprietary information of Seller shall be disclosed to any Person that has not executed a confidentiality agreement on terms substantially the same as the Buyer's Confidentiality Agreement without the prior consent of each of the parties hereto.

5.10    Transaction Taxes. Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by section 1146(c) of the Bankruptcy Code ("Transaction Taxes") shall be borne equally by the Seller and the Buyer; *provided, however*, that the portion of the Transaction Taxes to be borne by the Seller shall not exceed, and the Buyer shall be responsible for all Transaction Taxes in excess of, $50,000. The Seller and the Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transaction Taxes. The Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transaction Taxes; provided, however, that in the event any such Tax Return requires execution by the Seller, the Buyer shall prepare and deliver to the Seller a copy of such Tax Return at least ten (10) days before the due date thereof, and the Seller shall promptly execute such Tax Return and deliver it to the Buyer, which shall cause it to be filed.

5.11    Notice of Nonsatisfaction of Closing Condition. The Buyer and the Seller shall, within one (1) Business Day of discovery thereof, notify the other party of any fact or circumstance that would cause (a) its representations and warranties to be untrue, (b) its covenants to be unlikely to be fulfilled prior to or on the Closing Date or (c) the conditions in Section 7.1 to be unsatisfied; provided, however, that inclusion or omission of any such fact,

DOCS_LA:239794.15

circumstance or condition in or from any such written notification shall not be deemed a waiver of any rights under this Agreement, and shall not alter or otherwise affect the representations, warranties, covenants, conditions or agreements contained in this Agreement

5.12    Sale of PUD Property.  The Buyer acknowledges that Seller has entered into the PUD Purchase Agreement and intends to seek Bankruptcy Court approval of the PUD Purchase Agreement and the transactions contemplated thereby.  The Buyer agrees that it will not take any action to interfere with the consummation of the transactions contemplated by the PUD Purchase Agreement or object to Bankruptcy Court approval thereof.  The Buyer agrees that if the PUD Transaction is consummated, the obligations of the Seller under Section 2.2 of the PUD Purchase Agreement and under the PUD Leaseback will constitute Assumed Contracts under this Agreement.

5.13    Cooperation.  The Buyer shall reasonably cooperate with the Seller in furnishing to the Bankruptcy Court evidence of adequate assurance by the Buyer of its future performance under the Assumed Contracts, and to otherwise perform and discharge the Assumed Liabilities, and evidence that the Buyer has the financial wherewithal to timely close the transactions contemplated by this Agreement.  In addition, the Buyer shall reasonably cooperate with the Seller in the Seller's efforts to obtain the approval of the Sale Order.

5.14    Access to Records.  From and after the Closing Date, the Seller on the one hand and the Buyer on the other hand shall afford each other and their respective counsel, accountants and other representatives such access to records in respect of the Business which, after the Closing, are in the custody or control of the other party and which such party reasonably requires in order to comply with its obligations under Applicable Law, including administration of the Bankruptcy estate, preparation of Tax returns and audits by Tax authorities, which the Buyer reasonably requires to comply with its material obligations under the Assumed Liabilities or the Assumed Contracts or which the Seller reasonably requires pursuant to Section 2.2(c)(iii).  In connection therewith, the Buyer, for a period of one (1) year after the Closing Date, shall grant the Seller and its successors and assigns (including any subsequently appointed trustee) reasonable access to the Books and Records relating to the operation of the Business and the Purchased Assets before the Closing Date and shall refrain from destroying such Books and Records without first giving the Seller sixty (60) days' notice and opportunity to copy, at the Seller's sole cost and expense.  Nothing contained in this Section 5.14 shall obligate the Buyer to make available any of its employees in any manner that interferes with the performance of such employee's regular duties for the Buyer.

5.15    Notice of Sale.  Except to the extent limited by any Order of the Bankruptcy Court, Notice of this Agreement and notice of the Sale Motion and Sale Order and the hearings therefor shall be duly and properly given by the Seller by actual notice to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on the Purchased Assets, the lessors on the material leases, potential bidders for the Purchased Assets, the non-Seller parties to the Assumed Contracts being assumed pursuant to this Agreement, the employees of the Business, and applicable taxing and Governmental Authorities.

5.16    Collection of Seller's Accounts Receivable.  The WF Lender, as the Seller's secured creditor and holder of a security interest in the Accounts Receivable, or its designated agent, shall have the sole right to collect all Accounts Receivable owing to Seller as of the Closing Date.  The Buyer shall not commit any act or omission that impairs or interferes with the ability of the WF Lender to collect such Accounts Receivable.

5.17    Cessation of Use of Intellectual Property Rights.  Following the Closing Date, (a) Seller shall not use any Intellectual Property Rights included in the Purchased Assets, including but not limited to any Seller's Marks or any variation thereof or any mark confusingly similar thereto in connection with any business activity, (b) Seller shall change its corporate names so that neither "NURSERYMEN'S EXCHANGE," nor any Seller's Mark, nor any confusingly similar variation of either is incorporated or used therein, and (c) Seller shall file any necessary or appropriate motion with the Bankruptcy Court to change the caption in the Bankruptcy Case to reflect any change in its corporate names.

5.18    Buyer's Administrative Claim.  The parties acknowledge that the Seller is experiencing and is likely to continue to experience operating losses, and that the scheduling of a Closing at the earliest feasible date therefore would both generate substantial cost savings to the benefit of the estate and impose a substantial cost burden on the Buyer.  Accordingly, in consideration of the Buyer's agreement hereunder that the Closing Date shall be August 5, 2011, the Seller hereby grants the Buyer's Claim to the Buyer.

## ARTICLE VI
## EMPLOYEE MATTERS

6.1    Personnel; Employees.  On the Closing Date, the Seller shall terminate all Employees.  Subject to Section 6.3, the Buyer shall have the right in its sole discretion to hire (or not to hire) some or all of the Employees on such basis as shall be mutually acceptable to Buyer and such employee.  The Seller shall not take any actions, directly or indirectly, to prevent or discourage any such employee from being employed by the Buyer on or after the Closing. The Seller shall reasonably assist the Buyer in effecting an orderly change of employment of such Employees who accept any offer of employment by the Buyer.

6.2    COBRA and Health Claim Data.  The Seller shall provide all notices and fulfill all of its obligations, if any, under Section 4980B(f) of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA") with respect to all current and former Employees including those who are subsequently hired by Buyer.  Notwithstanding anything to the contrary, on and after the later of (a) any date on which the Seller ceases to provide any group health plan to any employee, or (b) the Closing Date, the Buyer shall have sole responsibility for satisfying the continuation coverage requirements for group health plans under COBRA for all "M&A qualified beneficiaries" (as defined in Q&A-4 of Treasury Regulation Section 54.4980B-9) related to the Business.

6.3    WARN.  The Seller shall have sole responsibility for any obligations or liabilities of the Seller under the Worker Adjustment and Retraining Notification Act ("WARN"), or any similar Applicable Law under any other applicable jurisdiction, with respect to the Employees, and shall indemnify, defend and hold harmless the Buyer with respect to any such obligations

37

DOCS_LA:239794.15

and liabilities. Buyer shall offer employment to not less than one hundred thirty five of the Employees as of the Closing Date at no less than their current rate of pay and substantially the same benefits they currently receive. Buyer retains the right to select, in its sole discretion, which of Seller's Employees to whom Buyer will offer employment.

6.4     <u>Welfare Benefits</u>.  Buyer shall have no obligation or responsibility for any claims for health, accident, sickness, and disability benefits (a) that are incurred prior to or on the Closing Date by any Employees or their eligible dependents, or (b) for any reason or purpose.

6.5     <u>Employee Benefit Plans — Seller's Liability</u>.  The Buyer shall not be responsible for or assume (a) any liabilities incurred by the Seller as a result, directly or indirectly, of any breach by the Seller, any fiduciary or administrator, or other Person of their obligations or duties under or with respect to any Employee Benefit Plans and (b) any severance obligations of the Seller with respect to the termination, discharge or constructive termination or discharge by the Seller of the Employees' or such other Employees' employment with the Seller. The Buyer shall not be responsible for and shall not assume any claim, benefit, liability or obligation under or with respect to any of the Employee Benefit Plans and Seller and its insurers shall be exclusively liable for any and all such claims, benefits, liabilities and obligations described in this <u>Section 6.5</u>.  Before and after the Closing Date, the Seller shall be exclusively responsible for the payment, sponsorship, funding, operation, investment, administration, or benefits with respect to all Employee Benefit Plans.

6.6     <u>Wage Reporting</u>.  To the extent necessary, Buyer and the Seller shall, before the Closing Date, agree upon the method of the reporting of wages and the method used shall be one of the procedures permitted by the Internal Revenue Service.

6.7     <u>Unemployment Compensation</u>.  Upon the Buyer's written request, to the extent permitted by Applicable Law, the Seller and the Buyer shall jointly file an agreement or other document or instrument, in form and substance satisfactory to the parties, with the appropriate state authorities for the purpose of transferring to the Buyer as of the Closing Date the Seller's unemployment compensation experience rating for any Employees rehired by the Buyer.

6.8     <u>Employee Rights</u>.  All provisions contained in this Agreement with respect to Employee Benefit Plans or compensation of Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein shall (a) confer upon any former, current or future employee of the Seller or the Buyer or any legal representative, dependent or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (b) cause the employment status of any former, present or future employee of the Buyer to be other than terminable at will or (c) confer any third party beneficiary rights upon any Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

6.9     <u>ALRB Representation Matter</u>.  From the Execution Date and continuing after the Closing Date, the Seller shall use its best efforts to continue to prosecute ALRB Case No. 2010-RC-003-SAL (Objections) (the "<u>ALRB Case</u>") to a successful completion in favor of Seller, including providing information to and otherwise communicating and cooperating with counsel, providing and preparing witnesses, gathering evidence, providing documents, including

DOCS_LA:239794.15

personnel and payroll information, giving notice, and attending hearings. Until the Buyer otherwise notifies the Seller in accordance with Section 9.2, the Buyer shall promptly reimburse the Seller for any and all attorneys' fees and filing and other legal costs incurred by the Seller after the Closing Date in connection with the ALRB Case (any such costs, the "ALRB Case Costs"). The Buyer and the Seller acknowledge that the Buyer's obligation to reimburse for ALRB Case Costs has been undertaken by the Buyer solely for the purpose of managing the possible, albeit unlikely, risk that the ALRB Case, if not successfully resolved, could result in potential cost, expense, inconvenience or liability on the part of the Buyer, and that such obligation shall not be construed or taken as an admission by the Buyer of liability or that the Buyer is a successor to the Seller.

## ARTICLE VII
## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

7.1     Conditions to Each Party's Obligations.  The respective obligations of each party to effect the transactions contemplated by this Agreement, unless waived by the other parties hereto, shall be subject to the fulfillment, on or prior to the Closing Date, of the following conditions:

(a)     No Order, writ, injunction or decree shall have been entered and be in effect that restrains, enjoins or invalidates, or otherwise materially and adversely affects the transactions contemplated by this Agreement, and no action, suit or other proceeding shall be pending that has a reasonable likelihood of resulting in any such Order, writ, injunction or decree.

(b)     The Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order.

7.2     Conditions to Obligations of the Buyer.  The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions, which may be waived in writing by the Buyer in its sole discretion:

(a)     all representations and warranties of the Seller in Article III of this Agreement shall be true and complete in all respects (with respect to any representation or warranty that is expressly qualified or limited by materiality) or in all material respects (with respect to all other representations and warranties), in each case, when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true and complete in all respects or all material respects, as applicable, as of such earlier date;

(b)     the Seller shall have executed and delivered the documents required to be executed and delivered by it pursuant to Section 2.5(b) hereof;

(c)     all of the covenants to be complied with and performed by the Seller on or prior to the Closing Date shall have been complied with or performed;

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 54 of 326

(d)     the Bankruptcy Court shall have entered orders satisfactory to the Buyer in its sole discretion, granting the Sale Motion, the sale of the Purchased Assets by the Seller to the Buyer, the assignment by the Seller of the Assumed Contracts to the Buyer and the assumption by the Buyer of the Seller's obligations thereunder, and such orders shall have become Final Orders;

(e)     there has not been any Material Adverse Effect;

(f)     the Buyer has received real estate title insurance commitments from reputable title insurance companies regarding the Owned Real Property and the Leased Real Property, which commitments are satisfactory to the Buyer in its sole discretion;

(g)     Wells Fargo Bank, N.A. and any other party holding a deed of trust or mortgage of record on any of the properties to be covered by the PUD Lease, the Family Property Leases and the Reservoir Easement Agreement have entered into a recognition and non-disturbance agreement satisfactory to the Buyer in its reasonable discretion; and

(h)     The Seller, the Buyer, and the WF Lender shall have entered into an written agreement satisfactory to the Buyer in its reasonable discretion by which (i) the Seller waives and releases any right to assert against the Buyer any claim of ownership interest in or to those assets and categories of assets described under the heading "Family Owned Assets" on the NEI Fixed Asset Listing heretofore furnished by the Seller to the Buyer, (ii) the Buyer acknowledges that any right, title or interest of the Buyer in such assets or categories of assets arises exclusively under and is subject to and governed by the Family Property Leases, and (iii) the WF Lender consents to and approves the foregoing arrangements and agrees to recognize and to refrain from interfering with the Buyer's use and enjoyment of such assets other than pursuant to any lawful exercise of its remedies as a secured lender against the Family Property Leases.

7.3     <u>Conditions to Obligations of the Seller</u>.  The obligations of the Seller under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing by the Seller in its sole discretion:

(a)     all representations and warranties of the Buyer in <u>Article IV</u> of this Agreement shall be true and complete in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case, when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true and complete in all respects or all material respects, as applicable, as of such earlier date;

(b)     The Buyer shall have executed and delivered the documents required to be executed and delivered and made the payments required to be made by it pursuant to <u>Section 2.5(a)</u> hereof; and

DOCS_LA:239794.15

(c) all of the terms, covenants and conditions to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

## ARTICLE VIII
## TERMINATION

8.1  <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by mutual written consent of the Seller and the Buyer;

(b) by the Buyer:

(i) if all of the conditions in <u>Section 7.1</u> and <u>Section 7.3</u> have been satisfied, and the Seller fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii) if the Seller has not, prior to the date of this Agreement, provided notice of the sale hearing and objection deadline to all interested parties in the Bankruptcy Case;

(iii) if the Seller has not, prior to the date of this Agreement, provided notice to each counterparty of the Assumed Contracts of the proposed assumption and assignment of the Assumed Contracts, and the Cure Costs;

(iv) [INTENTIONALLY OMITTED];

(v) if the Bankruptcy Court has not entered the Sale Order by August 1, or the Sale Order is entered by such date but has not become a Final Order by August 15, 2011;

(vi) upon the occurrence of a Material Adverse Effect;

(vii) if the WF Lender accelerates, terminates or exercises any of its remedies as a secured party under the DIP financing provided by it to the Seller, or if any trustee or examiner with expanded powers is appointed in the Bankruptcy Case, or upon the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case, or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein;

(viii) if the Closing does not occur on or before the Closing Deadline, unless the failure to consummate the Closing is solely due to the failure of the Buyer to perform any of its obligations under this Agreement to the extent required to be performed by the Buyer on or prior to the Closing Date;

DOCS_LA:239794.15

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 56 of
326

(ix) if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Buyer set forth in Section 7.1 or Section 7.2 to be satisfied and either cannot be, or if curable has not been, cured within three (3) Business Days after the giving of written notice to the Seller; or

(c) by the Seller:

(i) if all of the conditions in Section 7.1 and Section 7.2 have been satisfied, and the Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii) if the Bankruptcy Court has not entered the Sale Order by August 1, 2011, or the Sale Order is entered by such date but has not become a Final Order by August 15, 2011;

(iii) if the Closing does not occur on or before the Closing Deadline, 2011, unless the failure to consummate the Closing is due to the failure of the Seller to perform any of its obligations under this Agreement to the extent required to be performed by the Seller on or prior to the Closing Date;

(iv) if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 7.1 to be satisfied and cannot be cured within thirty (30) Business Days after the giving of written notice to the Buyer; or

(v) if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 7.3 to be satisfied and either cannot be, or if curable has not been, cured within thirty (30) Business Days after the giving of written notice to the Buyer.

8.2 Procedure and Effect of Termination. In the event of termination of the transactions contemplated hereby pursuant to Section 8.1, written notice thereof shall forthwith be given to the other party to this Agreement, and this Agreement shall terminate (subject to the provisions of this Section 8.2, Section 8.3 and Section 8.4) and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto. If this Agreement is terminated as provided herein:

(a) upon request therefor, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

(b) no party hereto shall have any liability or further obligation under this Agreement, except that the provisions of Sections 5.9, 8.2, 8.3, 8.4, 9.14, 9.15, 9.16 and 9.18 shall survive any termination and remain in full force and effect.

42

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 57 of 326

8.3  Buyer's Exclusive Remedy.  If this Agreement is terminated, the Buyer shall have any and all rights and remedies against the Seller available under Applicable Law.

8.4  The Seller's Remedy.  **THE PARTIES ACKNOWLEDGE THAT SELLER'S ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTION ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, BY SEPARATELY EXECUTING THIS <u>SECTION 8.4</u> BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE ESCROW DEPOSIT THAT IS THE SUBJECT OF <u>SECTION 2.1(C)</u> OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF THE SELLER'S DAMAGES, AND AS THE SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST THE BUYER (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD OR FAILURE OF THE BUYER TO PERFORM ANY OF ITS OBLIGATIONS UNDER SECTION 6.3 HEREOF), WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF THE BUYER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO (BUT OTHER THAN ANY OBLIGATIONS OF BUYER UNDER SECTION 6.3 HEREOF).**

**BY SEPARATELY EXECUTING THIS <u>SECTION 8.4</u> BELOW THE BUYER AND THE SELLER ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.**

**SELLER:**  _____

**BUYER:**  _____

## ARTICLE IX
## GENERAL PROVISIONS

9.1  Survival of Representations and Warranties.  The representations and warranties set forth in this Agreement or in any schedule, exhibit or instrument delivered pursuant to this Agreement by the Seller shall terminate upon the Closing.

9.2  Notices.  All notices, requests, demands and other communications hereunder (a "Notice") shall be in writing and deemed to be duly given, (a) when delivered by hand, with a record of receipt, (b) the fourth day after mailing, if mailed by certified or registered mail, return receipt requested with postage prepaid, (c) the day delivered by a nationally recognized overnight courier, with a record of receipt or (d) the day of transmission, with confirmation of receipt, if delivered by facsimile or telecopy during regular business hours (which regular business hours shall be 9:00 am — 5:00 pm on each Business Day), or the day after transmission, with confirmation of receipt, if delivered by facsimile or telecopy after regular

43

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 58 of 326

business hours, to the parties at the following addresses or telecopy numbers (or to such other address or telecopy number as a party may have specified by the notice given to the other party pursuant to this provision):

<table>
<tr><td>If to the Seller:</td><td>Nurserymen's Exchange, Inc.<br>2651 North Cabrillo Highway<br>Half Moon Bay, California 94019<br>Attention: Chief Executive Officer<br>Facsimile: (650) 284-3094</td></tr>
<tr><td>And a copy to:</td><td>Katten Muchin Rosenman LLP<br>2029 Century Park East, Suite 2700<br>Los Angeles, CA 90067<br>Attention: Mark A. Conley, Esq.<br>Facsimile: (310) 712-8225</td></tr>
<tr><td>If to the Buyer:</td><td>If by overnight courier, to:<br><br>Floramoda, Inc.<br>360 Espinosa Road<br>Salinas, CA 93907<br>Attn: Mr. Charles Kosmont and<br>Ms. Leslie Surber<br>Facsimile: (831) 443-1345<br><br>and<br><br>If by United States mail, to:<br><br>Floramoda, Inc.<br>Post Office Box 3756<br>Salinas, CA 93912<br>Attn: Mr. Charles Kosmont and<br>Ms. Leslie Surber<br>Facsimile: (831) 443-1345</td></tr>
<tr><td>And a copy to:</td><td>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard<br>Eleventh Floor<br>Los Angeles, CA 90067<br>Attention: Jeffrey N. Pomerantz, Esq.<br>Facsimile: (310) 201-0760</td></tr>
</table>

or to such other addresses as either party may provide to the other in writing. Notices hereunder (which shall not constitute notice) shall also be provided to the Official Committee of Unsecured

DOCS_LA:239794.15

Creditors of the Seller, c/o Peter Gurfein, Esq., Landau Gottfried & Berger LLP, 1801 Century Park East, Suite 1460, Los Angeles, CA 90067, Facsimile: (310) 557-0056.

9.3     Section and Other Headings.   Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.4     Waiver.   Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement.  All remedies, either under this Agreement or by Applicable Law or otherwise afforded, will be cumulative and not alternative.

9.5     Entire Agreement.   This Agreement, which includes the annex, exhibits and schedules hereto, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party relating to the matters contemplated hereby and constitutes the entire agreement by and among the parties hereto.

9.6     Amendments, Supplements, Etc.   This Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by the Buyer and the Seller to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the parties.

9.7     No Rights of Third Parties.   Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person other than the parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

9.8     Enforcement.   The laws of the State of California shall govern the interpretation, validity, performance and enforcement of this Agreement, without reference to any conflict of law or choice of law provisions therein.

9.9     Invalid Provisions.   If any provision of this Agreement (other than Article VIII of this Agreement or any part or provision thereof) is held to be illegal, invalid, or unenforceable under any present or future Applicable Law, and if the rights or obligations under this Agreement of the Seller on the one hand and the Buyer on the other hand will not otherwise be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

9.10     Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors (including any trustee, receiver,

receiver-manager, interim receiver or similar officer appointed for the Seller) and permitted assigns, but shall not be assignable or delegable (a) by the Seller without the prior written consent of the Buyer or by court order, or (b) by the Buyer without the prior written consent of the Seller or by court order; *provided, however*, that the Buyer may assign, convey, transfer or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement and the Ancillary Agreements to (i) one or more Affiliates of the Buyer as specified by the Buyer or (ii) any financial institution or other lender financing or refinancing the transactions contemplated hereby or otherwise extending credit to the Buyer, or its Affiliates and all the Buyer's rights shall inure to the benefit of and shall be enforceable by such Affiliate, financial institution or other lender.

9.11    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

9.12    <u>Facsimile Signature</u>.  This Agreement may be executed and accepted by facsimile signature or by other electronic means (including Adobe's Portable Document Format) and any such signature shall be of the same force and effect as an original signature.

9.13    <u>Further Assurances</u>.  Both parties agree that either will execute such further documentation or take such further actions as the other party may reasonably request to effectuate the transfer of the Purchased Assets and implement this Agreement.

9.14    <u>Fees and Expenses</u>.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the party incurring such costs and expenses.  The Seller shall bear all of the costs of the Bankruptcy Case.

9.15    <u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE RELATED IN ANY WAY TO BUYER'S SUBMISSION OF THE BID MATERIALS OR THIS AGREEMENT.

9.16    <u>Exclusive Jurisdiction</u>.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 9.2</u> hereof; *provided, however*, if the Bankruptcy Case has closed and cannot be reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the district in which the Bankruptcy Court is located and any appellate court thereof, for the resolution of any such Claim or dispute.

9.17 <u>Computation of Days</u>.  In computing any time period prescribed or allowed in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

9.18 <u>No Consequential or Punitive Damages</u>.  No party hereto (or its Affiliates) shall, under any circumstance, be liable to any other party (or its Affiliates) for any consequential, exemplary, special, incidental or punitive damages claimed by such other party under the terms of or due to any breach of this Agreement, including loss of revenue or income, cost of capital, or loss of business reputation or opportunity.

9.19 <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**[The remainder of this page has intentionally been left blank.]**

DOCS_LA:239794.15

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date set forth above.

**SELLER:**

NURSERYMEN'S EXCHANGE, INC.

By: _____
Name: _____
Title: _____


**BUYER:**

FLORAMODA, INC.,
a California corporation

By: _____
Name: _____
Title: _____


## GUARANTY

The undersigned hereby irrevocably, absolutely and unconditionally guarantees to the Seller the full, prompt and complete payment and performance, as, when and if due, of the obligations and liabilities of the Buyer under the foregoing Asset Purchase Agreement dated July14, 2011 by and between Nurserymen's Exchange, Inc., a California corporation, as Seller, and Floramoda, Inc., a California corporation, as Buyer.

MONTEREY PENINSULA HORTICULTURE,
INC., a California corporation

By: _____
Name: _____
Title: _____

*Signature Page to Asset Purchase Agreement*

# EXHIBIT A

(Sale Procedure Order)



1 | Stephen D. Finestone (125675)
John F. Sullivan (175236)
2 | LAW OFFICES OF STEPHEN D. FINESTONE

Signed and Filed: June 10, 2011

456 Montgomery Street, 20th Floor
3 | San Francisco, CA 94104
Telephone: (415) 421-2624
4 | Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

5 |
Proposed Counsel for Debtor and Debtor in Possession
6 | Nurserymen's Exchange, Inc.

7 |

8 |
UNITED STATES BANKRUPTCY COURT
9 |
NORTHERN DISTRICT OF CALIFORNIA
10 |

11 |
In re ) Case No. 11-31985
12 | )
NURSERYMEN'S EXCHANGE, INC. ) Chapter 11
13 | )
Debtor and Debtor in Possession ) **Date:** June 9, 2011
14 | ) **Time:** 1:00 p.m.
) **Place:** 235 Pine Street, Courtroom 2_
15 | ) San Francisco, CA
)
16 | _____ )

17 | **ORDER (A) APPROVING SALE PROCEDURES IN CONNECTION WITH THE PROPOSED
SALE OF DEBTOR'S OPERATING ASSETS AT AUCTION (B) APPROVING PROCEDURES
18 | FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY AND
PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION
19 | THEREWITH (C) GRANTING RELATED RELIEF**

20 | Upon consideration of the motion ("Motion") of Nurserymen's Exchange, Inc., debtor and debtor

21 | in possession herein ("Debtor"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States

22 | Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of

23 | Bankruptcy Procedure (the "Bankruptcy Rules") for an Order (a) approving the proposed sale

24 | procedures, including a breakup fee, in the form attached as Exhibit A to this Order (the "Sale

25 | Procedures"), in connection with the proposed sale (the "Sale") at auction (the "Auction") of Debtor's

26 | operating business and substantially all of the assets used in connection therewith (the "Operating

27 | Assets") (b) approving the date of the Auction and date of the Sale Approval Hearing, and, (c)

28 | approving procedures for the assumption and assignment of real or personal property leases and

ORDER RE SALE PROCEDURES 1

executory contracts in connection with the Sale Procedures and the Auction; upon consideration of the pleadings submitted in support of the Motion; upon the record of the hearing held regarding the Motion; and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over this matter and over the property of the Debtor and its bankruptcy estate pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).

B.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

C.    Proper, timely, adequate and sufficient notice of the Motion and proposed entry of this Order has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and no other or further notice of the Motion is required.

D.    Good cause has been shown for the entry of this Order. The Debtor has articulated good and sufficient reasons for approving the Sale Procedures in connection with the Auction of the Operating Assets, including (i) approval of the Sale Procedures, and (ii) granting the Debtor the authority, as set forth in the Sale Procedures, to provide a Stalking Horse Bidder with a Break-Up Fee.

E.    The Sale Procedures are fair and reasonable under the circumstances and, together with the marketing process commenced by the Debtor prior to the Petition Date and now being continued by FocalPoint Partners, LLC, provide an appropriate framework for selling the Debtor's assets and will enable the Debtor and the Official Committee of Unsecured Creditors (the "Committee"), to review, analyze and compare all bids received to determine whether any of the bids or any combination thereof would result in the highest and best value being realized for the Operating Assets.

F.    A Break-Up Fee not to exceed three percent (3%) of the purchase price (inclusive of liabilities to be assumed) to be paid to a Stalking Horse Bidder under the Sale Procedures is fair and reasonable under the circumstances. Specifically, Debtor may, in consultation with the Committee, determine to offer the Break-Up Fee and select a Stalking Horse Bidder if it has concluded that doing so

Case: 11-31985    Doc# 786   Filed: 06/09/11   Entered: 06/20/11 15:27:20   Page 66 of 326

would increase the Debtor's chances of receiving the highest and best offer for the Operating Assets by establishing a bid standard or minimum for other bidders to the Auction, and serving as a catalyst for other potential or actual bidders, to the benefit of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, a Break-Up Fee would be: (i) an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtor's estate by any Stalking Horse Bidder; and (iii) reasonable and appropriate in light of the size and nature of the proposed sale of the Operating Assets.

G. The procedures for the assumption and assignment of the Leases and other Executory Contracts are fair and reasonably necessary to expedite the closing of the Sale.

H. A reasonable opportunity to object or to be heard regarding the relief requested in the Motion with respect to the Sale Procedures has been afforded to all interested parties and entities.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1. The Motion is granted as set forth herein.

2. The sale of the Operating Assets shall be governed by the Sale Procedures attached as Exhibit A to this Order, which are hereby authorized and approved, including any Break-Up Fee

3. Debtor is authorized to take all of the actions contemplated by the Sale Procedures, including conducting the Auction. Debtor or FocalPoint will provide information in a timely manner, and pursuant to the Sale Procedures, to the Committee and Wells Fargo with respect to: (i) the identify of bidders and any bids submitted; (ii) the selection of a stalking horse bidder, if any, and the terms of any stalking horse protections to be provided; (iii) the selection of the highest and best bid; (iv) any other decisions materially impacting the sale process.

4. The Operating Assets may be sold in connection with the sale free and clear of any liens, interests or encumbrances, with any such liens, interests or encumbrances to attach to the proceeds of the sale in the same order, amount and priority as existed immediately prior to the Petition Date.

5. In accordance with and subject to the Sale Procedures, the Bid Deadline for submitting bids shall be **July 6, 2011 at 3:00 p.m.**

ORDER RE SALE PROCEDURES 3

1  6.  In accordance with and subject to the Sale Procedures, the Auction shall be held on **July**

2  **8, 2011, commencing at 10:00 a.m.** at the offices of Gunderson Dettmer, 1200 Seaport Blvd., Redwood

3  City, CA 94063, or at such other time, date and place as determined and announced by Debtor.

4  7.  The assumption and assignment procedures for the Leases and Executory Contracts as set

5  forth in the Sale Procedures are hereby expressly authorized.

6  8.  The Court hereby schedules the Sale Approval Hearing to be held on **July 11, 2011 at**

7  **9:00 a.m. (Pacific Time)** before the Honorable Dennis Montali, United States Bankruptcy Judge, 235

8  Pine Street, 22nd Floor, San Francisco, CA 94104, to consider the entry of an order, inter alia, approving

9  the sale of the Operating Assets free and clear of all liens, claims, interests and encumbrances.

10  10.  No later than June 17, 2011Debtor shall provide notice of the Sale Procedures, the time

11  and place of the Auction, the time and place of the Sale Approval Hearing, and the deadline to file any

12  objection to the Sale Approval Hearing, by sending the notice (by first class mail, postage prepaid) to (i)

13  the Office of the United States Trustee; (ii) counsel to the Committee; (iii) Wells Fargo Bank, N.A. and

14  its counsel, Buchalter Nemer; (iv) all federal, state, local regulatory or taxing authorities which have a

15  reasonably known interest in the relief requested by the Motion; (v) the Internal Revenue Service; and

16  all entities on the 2002 service list as of the date of entry of this order

17  11.  As will be set forth in the notice of the hearing, objections to the sale of Operating Assets

18  to the Winning Bidder shall be set forth in writing and shall specify with particularity the grounds for

19  such objections and other statements of position and shall be filed with the Court at least one day before

20  the date of the Sale Approval Hearing.

21  12.  As soon as reasonably practicable following the entry of this Order, but in any event no

22  later June 25, 2011, Debtor shall provide notice to each counterparty of the Leases and/or Executory

23  Contracts of the Debtor's calculation of the amounts that must be paid in connection with the

24  assumption and assignment of the Leases and/or Executory Contracts pursuant to section 365(b) of the

25  Bankruptcy Code (the "Cure Amount").

26  13.  As soon as is practical before the Auction date, Debtor shall provide on a confidential

27  basis to each counterparty Lease and/or Executory Contract designated for potential assumption and

28  assignment with (i) the identity of each Qualified Bidder, and (ii) information regarding each Qualified

Case: 11-31985    Doc# 786  Filed: 06/09/11  Entered: 06/20/11 15:27:20  Page 68 of
326

1   Bidder's adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code.

2       14.     If an objection is raised by a counterparty to any of the Leases and/or Executory Contracts

3   solely to the Cure Amount, and such dispute cannot be consensually resolved prior to the Sale Approval

4   Hearing, the Debtor may seek to assume such lease or contract and assign it to a Winning Bidder;

5   provided that the entire disputed Cure Amount must be immediately paid by the Winning Bidder upon

6   such assumption and assignment, and Debtor must segregate the applicable disputed Cure Amount

7   pending the resolution of such dispute by the Court or by agreement of the parties, for payment to the

8   counterparty or refund to the Winning Bidder. If an objection is raised by a counterparty to any of the

9   Leases and/or Executory Contracts as to adequate assurance of future performance, and such dispute

10  cannot be consensually resolved prior to the Sale Approval Hearing, said objection will be determined

11  by the Court. Hearings on disputed Cure Amount(s) and/or adequate assurance of future performance in

12  connection with Leases and/or Executory Contracts (as applicable) shall be held (i) on the date of the

13  Sale Approval Hearing, or (ii) on such other date as the Court may designate.

14      15.     All Potential Bidders are deemed to have submitted to the jurisdiction of this Court with

15  respect to all matters related to the Auction or the sale of the Operating Assets.

16      16.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) the terms of

17  this Order shall be immediately effective and enforceable upon its entry, (ii) Debtor is not subject to any

18  stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) Debtor

19  may, in its discretion and without further delay, take any action and perform any act authorized by this

20  Order.

21      17.     All objections to the Motion or the relief requested therein are overruled to the extent they

22  have not been withdrawn, waived or otherwise resolved.

23      18.     The Court retains jurisdiction with respect to all matters arising from or related to the

24  implementation of this Order.

25                          ** END OF ORDER **

26

27

28

Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Proposed Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 11-31985 |
| | ) | |
| NURSERYMEN'S EXCHANGE, INC. | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession | ) | **Date:** May 25, 2011 |
| | ) | **Time:** 11:00 a.m. |
| | ) | **Place:** 235 Pine Street, Courtroom 2_ |
| | ) | San Francisco, CA |
| _____ | ) | |

**APPROVED SALE PROCEDURES GOVERNING THE PROPOSED SALE OF DEBTOR'S OPERATING ASSETS AT AUCTION; FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY AND PERSONAL PROPERTY LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH**

Debtor and debtor in possession, Nurserymen's Exchange, Inc. ("Debtor"), is seeking to sell its operating business and substantially all of the assets used in connection therewith (the "Operating Assets"). As contemplated by and incorporated into that certain Order (A) Approving Sale Procedures, Including Break-Up Fee, In Connection With The Proposed Sale, (B) Approving Procedures For The Assumption And Assignment Of Real And Personal Property Leases And Executory Contracts In Connection therewith, (C) Approving Sale of the Operating Assets to The Highest and Best Bidder At Auction, and (D) Granting Related Relief (the "Sale Procedures Order"), the following procedures (the "Sale Procedures") shall be the exclusive mechanism governing such sale (the "Sale").

///

**A.     Due Diligence and Financial Wherewithal**

Any party that satisfies the following criteria in paragraphs 1 and 2 below in this Section A shall be permitted to conduct due diligence regarding the Operating Assets.

**1. Due Diligence**

Upon execution and delivery of a confidentiality and nondisclosure agreement (in form and substance satisfactory to Debtor), which agreement must permit the disclosure of the bidder's identity to Wells Fargo Bank, N. A. ("Wells Fargo"), The Official Committee of Unsecured Creditors (the "Committee") by its counsel, Landau Gottfried & Berger, LLP, 18012 Century Park East, Suite 1460, Los Angeles, CA 90067, Attn: Peter Gurfein, to FocalPoint Securities, LLC ("FocalPoint") 11150 Santa Monica Blvd., Suite 1550, Los Angeles, California 90025, Attn.: Alexander Stevenson and Gayane Arabyan.

a..     any party that wishes to conduct due diligence with respect to the Operating Assets may be granted access to all material information that has been or will be provided to other bidders; provided that, Debtor shall retain the ability to withhold trade secrets or other proprietary information from competitors, and

b.     a potential purchaser shall be provided a form of asset purchase agreement (the "Form Agreement") relating to the Operating Assets, substantially in the form attached to these Sale Procedures.

**2. Evidence of Financial Wherewithal**

Any party wishing to move forward must provide FocalPoint with sufficient information to demonstrate to Debtor and to the Committee that such party has the financial wherewithal and ability to consummate the transactions contemplated in the Form Agreement.

**B.     The Submission of Qualified Bids**

A bid that, in Debtor's reasonable business judgment, after consultation with the Committee, satisfies the following criteria in paragraphs 1 through 5 below in this Section B shall be a "Qualified Bid", and a bidder that submits a Qualified Bid shall be a "Qualified Bidder". Notwithstanding the foregoing, Wells Fargo, to the extent of the validity, priority and amount of its security interest, shall be deemed to be a Qualified Bidder pursuant to its rights to credit bid under section 363(k) of the

Case: 11-31985    Doc# 786  Filed 06/09/11  Entered 06/20/11 15:27:20  Page 71 of 326

Bankruptcy Code, and any such credit bid of Wells Fargo shall be a Qualified Bid without the necessity of satisfying the criteria set forth in paragraphs 1 through 5 below in this Section B.

**1. Bid Deadline**

A Qualified Bid must be sent so as to be received by FocalPoint no later than 5:00 p.m. Pacific Daylight Time on July 6, 2011 (the "Bid Deadline").

**2. Format of a Qualified Bid**

A Qualified Bid must (1) be presented under a signed, irrevocable and binding contract, marked to show any modifications made to the Form Agreement, including the name of the bidder and other conforming changes that must be made to reflect the bidder and its Qualified Bid; (2) signed by an individual authorized to bind the bidder; (3) not be subject to obtaining financing, or future consent or approval, including, without limitation, consent of the bidder's board of directors (or similar governing body), due diligence, or the receipt of any consents, in each case, not otherwise required by the Form Agreement, or any other contingency (other than entry of an order approving the Sale); (4) fully disclose the identity of each entity that will be bidding for the Operating Assets or otherwise participating in connection with such Qualified Bid, and the complete terms of any such participation; and (5) state such bidder's offer is irrevocable and binding until the conclusion of the auction for the purchase of the Operating Assets pursuant to the Sales Procedures (the "Auction") and, if such bidder is the Winning Bidder or the Back-Up Bidder (each as defined below), until the closing of the sale of the Operating Assets.

**3. Deposit**

A Qualified Bid must provide for a deposit of five percent (5%) of the purchase price (inclusive of liabilities to be assumed) set forth in such bid (the "Deposit"), which shall, upon execution of the Qualified Bid be delivered either by a certified or bank check or by wire transfer of immediately available funds as a minimum good faith deposit and shall be used to fund a portion of the purchase price in the event that the bidder is the Winning Bidder.

**4. Financial Information**

A Qualified Bid must be accompanied by sufficient and adequate information to demonstrate to Debtor, after consultation with the Committee, that such bidder has the financial wherewithal and ability

APPROVED SALE PROCEDURES                     3

to consummate the transactions contemplated in the Form Agreement, including evidence of adequate financing, a parent guaranty, or an irrevocable letter of credit, if deemed appropriate, each in a form agreed upon by Debtor, after consultation with the Committee. Such evidence shall include, but not be limited to, the most current audited and latest unaudited financial statements of the bidder or, if the bidder is an entity formed for the purpose of pursuing the Sale , financial statements of the equity holder(s) of the bidder and the written commitment of the equity holder(s) of the bidder to be financially responsible for the bidder's obligations in connection with the sale. If the bidder is unable to provide such information, Debtor, after consultation with the Committee, may accept other information sufficient to demonstrate that the bidder has the financial wherewithal to consummate the sale.

### 5. Adequate Assurance

A bidder must provide to the Debtor, FocalPoint, Wells Fargo and the Committee, prior to the Auction, a declaration attesting to such bidder's ability to provide adequate assurance of future performance with respect to any and all real property leases and other executory contracts (the "Executory Contracts") to be assumed and assigned by Debtor in connection with a sale of the Operating Assets.

### 6. Rejection of Qualified Bids; Non-Conforming Bids

Debtor, after consultation with the Committee, may reject any Qualified Bid not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Sale Procedures Order or these Sale Procedures; provided that, notwithstanding anything to the contrary therein, Debtor, after consultation with the Committee, shall have the right to accept as a Qualified Bid any non-conforming bid for the Operating Assets.

### 7. Debtor's Option to Select a Stalking Horse Bidder

On or before June 30, 2011, Debtor, after consultation with the Committee, may, but shall not be obligated to, designate one Qualified Bidder as a "Stalking Horse Bidder". Notice of selection of such Stalking Horse Bidder shall be promptly given to all Qualified Bidders and Wells Fargo and filed with the Court. Notwithstanding the foregoing, Debtor will only designate a Stalking Horse Bidder upon obtaining the agreement of Wells Fargo and the Creditor's Committee. In the event Debtor does

designate a Stalking Horse Bidder, it will provide notice of such designation to all Qualified Bidders within one business day of the designation.

**(a) Break-Up Fee**

Debtor may in its reasonable business judgment provide a selected Stalking Horse Bidder (if any) with customary and usual "stalking horse" protections, including a break-up fee and/or an expense reimbursement in an amount not to exceed in the aggregate three percent (3%) of the purchase price in the Qualified Bid of such Stalking Horse Bidder (the "Break-Up Fee"). Notwithstanding the foregoing, Debtor will only provide such stalking horse protections upon obtaining the agreement of Wells Fargo and the Creditor's Committee.

**(b) Overbids Prior To Auction and Bid Deadline:**

In the event that Debtor selects a Stalking Horse Bidder by June 30, 2011, then (i) the bid of each bidder, in order to be considered a Qualified Bid (the "Initial Overbid"), shall, in addition to meeting the other criteria set forth in these Sale Procedures, be in an amount that is sufficient to pay the Break-Up Fee and result in additional consideration to Debtor's estate in the minimum amount of $100,000, (such amount as determined pursuant to this clause the "Overbid Amount"), and (ii) if an Initial Overbid is made, each Qualified Bidder, including the Stalking Horse Bidder, shall have the right to submit a Qualified Bid; provided that any such increased Qualified Bid must (x) be greater than the Initial Overbid by no less than $50,000 (the "Incremental Bid"), and (y) be submitted so as to be received by FocalPoint, the Committee and Wells Fargo on or before the Bid Deadline.

**8. Notification Prior To Auction and Deadline to Participate**

Debtor, prior to the Auction, will inform in writing each Qualified Bidder of (i) the Qualified Bid that represents the highest or otherwise best offer for the Operating Assets as the starting bid at the Auction (the "Highest Pre-Auction Qualified Bid"); and (ii) the conditions (including the minimum overbid increment) for the submission at the Auction of a bid that would be higher and better than the Highest Pre-Auction Qualified Bid (a "Subsequent Qualified Overbid"). On or prior to **July 5, 2011 at 5:00 p.m. Pacific Daylight Time**, each Qualified Bidder shall inform FocalPoint of its intention to participate in the Auction.

*///*

**C.  The Auction**

Only Qualified Bidders will be permitted to attend and to participate at the Auction; provided, however, that nothing herein prohibits Wells Fargo from attending and participating in the Auction in their capacity as creditors of the estate, consistent with these Sale Procedures, and not as bidders. Qualified Bidders who wish to submit a Subsequent Qualified Overbid at the Auction must attend the Auction in person or through an authorized representative.

**1. Auction Date And Time**

The Auction shall be held on **July 8, 2011, commencing at 10:00 a.m. (Pacific Time)** at the offices of Gunderson Dettmer, 1200 Seaport Blvd., Redwood City, CA 94063, or at such other time, date and place as determined and announced by Debtor, after consultation with the Committee, for consideration of Subsequent Qualified Overbids with respect to the Operating Assets. The Auction may be adjourned as Debtor deems appropriate in the exercise of its reasonable business judgment. If the Auction is adjourned, reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders.

**2. Failure to Receive Qualified Bids**

If no Qualified Bid from a Qualified Bidder is received on or prior to the Bid Deadline for the Operating Assets, Debtor, after consultation with the Committee, may cancel the Auction.

**3.  No Collusion**

Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the Operating Assets or the Auction.

**4. Other Terms**

Debtor, after consultation with the Committee, may make modifications to the Auction rules and these Sale Procedures, as may be determined to be in the best interests of Debtor's estate or creditors announced by Debtor from time to time prior to or during the Auction; provided that such modifications are not materially inconsistent with these Sale Procedures or the Sale Procedures Order.

**D.  Selection of the Winning Bidder**

At the conclusion of the Auction, Debtor, after consultation with the Committee, shall determine which bid constitutes the highest and best offer for the Operating Assets (the "Winning Bid"), and the

Qualified Bidder that has submitted a Winning Bid (the "Winning Bidder") shall execute and deliver to Debtor its Form Agreement with any necessary modifications (the "Winning Purchase Agreement"). Notice of selection of such Winning Bidder shall be given promptly to any party known to have asserted a security interest or other interest in the Operating Assets, all counterparties to real estate leases or executory contracts to be assumed and assigned to such bidder or bidders, and any other party that requests to receive such notice on or before the hearing on this Motion, and filed with the Court at least 24 hours prior to the Sale Approval Hearing.

**E.      The Sale Approval Hearing**

A hearing to approve the Winning Bid (the "Sale Approval Hearing") shall be held before United States Bankruptcy Court for the Northern District of California (the "Court") on **July 11, 2011 at 9:00 a.m.** (Pacific Time). Debtor shall timely file a motion seeking approval of the sale of the Operating Assets pursuant to Bankruptcy Code Section 363.

**F.      Executory Contracts**

**1. Notice to Counterparties**

As soon as reasonably practicable following the entry of the Sale Procedures Order, but in any event no later than June 25, 2011, Debtor shall provide notice to each counterparty to the Executory Contracts of Debtor's calculation of the amounts that must be paid in connection with the assumption and assignment of the Executory Contracts pursuant to section 365(b) of the Bankruptcy Code (the "Cure Amount"). As soon as practical before the Auction, Debtor will provide on a confidential basis to each counterparty to a Executory Contract designated for potential assumption and assignment with (i) the identity of each Qualified Bidder, and (ii) information regarding each Qualified Bidder's adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code

**2. Objections**

If an objection is raised by a counterparty to any of the Executory Contracts solely with respect to the Cure Amount, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, Debtor may seek to assume such lease or contract and assign it to a Winning Bidder; provided that the entire disputed Cure Amount must be immediately paid upon such assumption and assignment, and Debtor must segregate the applicable disputed Cure Amount pending the resolution of such dispute by

Case: 11-31985    Doc# 186    Filed: 06/10/11    Entered: 06/10/11 16:27:20    Page 76 of 326

the Court or by agreement of the parties, for payment to the counterparty or refund to the Winning Bidder. If an objection is raised by a counterparty to any of the Executory Contracts as to adequate assurance of future performance, and such dispute cannot be consensually resolved prior to the Sale Approval Hearing, said objection will be determined by the Court. Hearings on disputed Cure Amount(s) and/or adequate assurance of future performance in connection with the Executory Contracts (as applicable) shall be held (i) on the date of the Sale Approval Hearing, or (ii) on such other date as the Court may designate.

**3.     Motion to Assume and Assign:**

Debtor shall file a motion to assume and assign the leases and executory contracts covered by this section such that the hearing on said motion will occur prior to the closing of the sale of the Operating Assets.

**G.     Irrevocability of Certain Qualified Bids**

Each Winning Bid shall remain open, irrevocable and binding upon each Winning Bidder; provided that no Winning Bid shall be binding upon Debtor until it has been approved by the Court. The bid of the next highest Qualified Bidder (the "Back-Up Bidder") at the highest price bid by such Qualified Bidder at the Auction, shall remain open and irrevocable and the Deposit of the Back Up Bidder shall be held in accordance with these Sale Procedures until the closing of the sale of the Operating Assets.  The Deposits of all other Qualified Bidders will be returned to such Qualified Bidders no later than three (3) business days following the conclusion or cancellation of the Auction and the Deposit of the Back Up Bidder shall be returned to such Back Up Bidder no later than three (3) business days following the closing of the sale of the Operating Assets to the Winning Bidder.

**H.     Failure to Close**

Subject to the terms of the Winning Purchase Agreement, in the event a Winning Bidder (as determined by Debtor, after consultation with the Committee, and approved by the Court) fails to consummate the proposed transaction by the closing date contemplated in the Winning Purchase Agreement, (i) such Winning Bidder shall be deemed to have forfeited its Deposit and Debtor shall retain the Deposit and reserve the right to pursue all available remedies, whether legal or equitable,

available to it, and (ii) Debtor shall be authorized without further order of the Court to consummate the proposed transaction with the Back-Up Bidder.

**I.  Submission to Jurisdiction of the Court**

All bidders will be deemed to have submitted to the jurisdiction of the Court with respect to all matters related to the Auction or with respect to the purchase of the Operating Assets.

**J.  Expenses**

Subject to the terms of the Winning Purchase Agreement or any other executed agreement binding upon Debtor, all Qualified Bidders shall bear their own costs and expenses in connection with the Auction or with respect to the Operating Assets.

Dated: June 9, 2011                    LAW OFFICES OF STEPHEN D. FINESTONE


                                       /s/ Stephen D. Finestone
                                       Stephen D. Finestone
                                       Attorney for Debtor

1
## PROOF OF SERVICE

2
      I, the undersigned, declare that I am over the age of eighteen years and am not a party to the

3
within-entitled action; my business address is 456 Montgomery Street, 20th Floor, San Francisco, CA 94104.

4
      On the below date I served the attached document(s) entitled:

5
**ORDER (A) APPROVING SALE PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF DEBTOR'S OPERATING ASSETS AT AUCTION (B)**

6
**APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN REAL PROPERTY AND PERSONAL PROPERTY LEASES AND**

7
**EXECUTORY CONTRACTS IN CONNECTION THEREWITH (C) GRANTING RELATED RELIEF**

8
on all interested parties in said cause addressed as follows:

9

10
Robert Izmirian                      Peter J. Gurfein
Buchalter Nemer                     Landau Gottfried & Berger LLP

11
333 Market St., 25th Floor             One Bush St., Ste. 600
San Francisco, CA 94105             San Francisco, CA 94104
**Via Email: rizmirian@buchalter.com**    **Via Email: pgurfein@lgbfirm.com**

12

13
Minnie Loo
Office of the U.S. Trustee

14
235 Pine St., Ste. 700
San Francisco, CA 94104

15
**Via Email: minnie.loo@usdoj.gov**

16

17
[ ]    **(BY MAIL)** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the ordinary course of business for collection and mailing that same day at 456

18
    Montgomery Street, 20th Floor, San Francisco, CA. I declare that I am readily familiar with the business practice of The Law Offices of Stephen Finestone for collection and processing of

19
    correspondence for mailing with the United States Postal Service and that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of

20
    business.

21
    Executed **June 9, 2011** at San Francisco, California.

22
[ X ]    **(Federal)** I declare under penalty of perjury that the foregoing is true and

23
    correct.

24
Name:        Stephen D. Finestone      /s/ Stephen D. Finestone

25

26

27

28

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT
## FOR ASSUMED CONTRACTS

This ASSIGNMENT AND ASSUMPTION AGREEMENT FOR ASSUMED CONTRACTS (this "Agreement") is made and entered into as of [          ], 2011 by and between Nurserymen's Exchange, Inc., a California corporation (the "Seller"), and Floramoda, Inc., a California corporation (the "Buyer").

## RECITALS

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of [          ], 2011 (the "Purchase Agreement") by between the Seller and the Buyer, the Seller has agreed to sell, and the Buyer has agreed to buy, the Purchased Assets. Capitalized terms used herein not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, the Seller has agreed to assign, and the Buyer has agreed to assume, the Assumed Contracts as set forth in Schedule 1.1(c) thereto.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties have agreed as follows:

1.      The Seller does hereby sell, transfer and assign, unto the Buyer and its successors and assigns, all of its right, title and interest in and to the Assumed Contracts free and clear of all Liens and Claims, other than Permitted Liens.

2.      The Buyer hereby accepts assignment of the Assumed Contracts and assumes and agrees to perform all of the obligations of the Seller arising and becoming due and payable or performable under the Assumed Contracts after the Closing Date.

3.      The Buyer and the Seller hereby agree to execute and deliver any and all additional documents that the Buyer or the Seller may reasonably request in order to more fully effect the agreements set forth in this Agreement.

4.      This Agreement shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order.  The Buyer and the Seller hereby acknowledge and agree that the provisions of this Agreement shall not limit the full force and effect or survival of the terms and provisions of the Purchase Agreement, and that in the event of a conflict between the terms and provisions of this Agreement and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall prevail, govern and control in all respects without limitation.

5.      No failure to exercise and no delay in exercising any right or power under this Agreement shall operate as a waiver thereof.  No modification or amendment of this Agreement shall be valid and binding, unless it is in writing and signed by the parties hereto.

1

6.      This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

7.      The undertakings, covenants, and agreements set forth herein shall be binding upon and inure to the benefit of the Buyer and the Seller and their respective successors and assigns.

8.      The terms and conditions of this Agreement shall be governed and construed in accordance with the laws of the State of California.

[The remainder of this page has intentionally been left blank]

DOCS_LA:240848.2 58760-001

IN WITNESS WHEREOF, the Seller and the Buyer have executed this Assignment and Assumption Agreement for Assumed Contracts as of the date first written above.

**NURSERYMEN'S EXCHANGE, INC.**

By: _____
Name:
Title:

**FLORAMODA, INC.**

By: _____
Name:
Title:

*Signature Page to Assignment and Assumption Agreement for Assumed Contracts*

DOCS_LA:240848.2 58760-001

<u>**EXHIBIT C**</u>

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT
FOR REAL PROPERTY LEASES**

This ASSIGNMENT AND ASSUMPTION AGREEMENT FOR REAL PROPERTY LEASES (this "<u>Agreement</u>") is made and entered into as of [                    ], 2011 by and between Nurserymen's Exchange, Inc., a California corporation (the "<u>Seller</u>"), and Floramoda, Inc., a California corporation (the "<u>Buyer</u>").

<u>**RECITALS**</u>

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of July 12, 2011 (the "<u>Purchase Agreement</u>") by between the Seller and the Buyer, the Seller has agreed to sell, and the Buyer has agreed to buy, the Purchased Assets. Capitalized terms used herein not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, the Seller has agreed to assign to the Buyer all of its rights under the Real Property Leases as set forth on <u>Exhibit A</u> hereto, and the Buyer has agreed to assume all of the Seller's obligations under the Real Property Leases.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties have agreed as follows:

1.      The Seller does hereby assign, transfer and convey to the Buyer and its successors and assigns, all right, title, estate, options and other interests (including any security or other deposits, prepaid rent, landlord estoppels executed in favor of the Seller or its lenders, etc.) in, to and under the Real Property Leases, free and clear of all Liens and Claims, other than Permitted Liens.

2.      The Buyer hereby (a) accepts this Agreement and the assignment and assumption of the Real Property Leases and (b) agrees to assume, perform and observe all of the obligations, covenants and conditions of each of the Real Property Leases on the part of the tenant to be performed and observed to the extent attributable to the period after the Closing Date.

3.      The Buyer and the Seller hereby agree to execute and deliver any and all additional documents that the Buyer or the Seller may reasonably request in order to more fully effect the agreements set forth in this Agreement.

4.      This Agreement shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order. The Buyer and the Seller hereby acknowledge and agree that the provisions of this Agreement shall not limit the full force and effect or survival of the terms and provisions of the Purchase Agreement, and that in the event of a conflict between the terms and provisions of this Agreement and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall prevail, govern and control in all respects without limitation.

1

5.     No failure to exercise and no delay in exercising any right or power under this Agreement shall operate as a waiver thereof.  No modification or amendment of this Agreement shall be valid and binding, unless it is in writing and signed by the parties hereto.

6.     This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart

7.     The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of the Buyer and the Seller and their respective successors and assigns.

8.     The terms and conditions of this Agreement shall be governed and construed in accordance with the laws of the State of California.

[The remainder of this page has intentionally been left blank]

DOCS_LA:240849.2 58760-001

IN WITNESS WHEREOF, the Seller and the Buyer have executed this Assignment and Assumption Agreement for Real Property Leases as of the date first written above.

**NURSERYMEN'S EXCHANGE, INC.**

By: _____
Name:
Title:

**FLORAMODA, INC.**

By: _____
Name:
Title:

*Signature Page to Assignment and Assumption Agreement for Real Property Leases*

## <u>EXHIBIT A</u>

Real Property Lease, dated as of October 9, 2000, as extended by that certain Extension of Lease, dated February 10, 2010, each of the foregoing by and between North County Industrial Park LP, a California Limited Partnership, as lessor ("North County Industrial Park"), and Seller, as lessee, with respect to that certain real property located at 1330 Distribution Way, Suites C and D, Vista, CA 92083.

Lease Agreement, by and between California Department of Transportation ("Cal Trans"), as lessor and Seller, as lessee, dated as of December 27, 2010 (the "Cal Trans Lease), with respect to that certain real property located at 2651 Cabrillo Highway, Half Moon Bay, San Mateo County, California 94029 and more particularly described as:

State highway access, driveway and service roads from the two locations (as indicated on the exhibit to the Cal Trans Lease) on the eastern side of Cabrillo Highway across Cal Trans property to the westerly edge of their respective adjoining private properties, comprising approximately 10,850 square feet.

<u>**EXHIBIT D**</u>

**FORM OF ASSIGNMENT FOR INTELLECTUAL PROPERTY**

This ASSIGNMENT FOR INTELLECTUAL PROPERTY (this "<u>Agreement</u>") is made and entered into as of [              ], 2011 by and between Nurserymen's Exchange, Inc., a California corporation (the "<u>Seller</u>"), and Floramoda, Inc., a California corporation (the "<u>Buyer</u>").

<u>**RECITALS**</u>

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of July 12, 2011 (the "<u>Purchase Agreement</u>") between the Seller and the Buyer, the Seller has agreed to sell, and the Buyer has agreed to buy, the Purchased Assets, including without limitation all Intellectual Property Rights owned or used by the Seller in the Business and listed on <u>Exhibit A</u> hereto (the "<u>Intellectual Property</u>").  Capitalized terms used herein not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties have agreed as follows:

1.      The Seller hereby irrevocably conveys, transfers and assigns to the Buyer all worldwide rights, title and interest in and to the Intellectual Property, together with all rights of action accrued, accruing and to accrue under and by virtue hereof, including all right to sue or otherwise recover for past infringement and to receive all damages, payments, costs and fees associated therewith free and clear of all Liens and Claims, other than Permitted Liens.  The assignment of the Intellectual Property granted herein includes an assignment of all goodwill associated therewith.

2.      The Buyer and the Seller hereby agree to execute and deliver any and all additional documents that the Buyer or the Seller may reasonably request in order to more fully effect the agreements set forth in this Agreement.

3.      This Agreement shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order.  The Buyer and the Seller hereby acknowledge and agree that the provisions of this Agreement shall not limit the full force and effect of the terms and provisions of the Purchase Agreement, and that in the event of a conflict between the terms and provisions of this Agreement and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall prevail, govern and control in all respects without limitation.

4.      No failure to exercise and no delay in exercising any right or power under this Agreement shall operate as a waiver thereof.  No modification or amendment of this Agreement shall be valid and binding, unless it is in writing and signed by the parties hereto.

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 87 of 326

5.     This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

6.     The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of the Buyer and the Seller and their respective successors and assigns.

7.     The terms and conditions of this Agreement shall be governed and construed in accordance with the laws of the State of California.

[The remainder of this page has intentionally been left blank]

31564468

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 88 of 326

IN WITNESS WHEREOF, the Seller and the Buyer have executed this Assignment for Intellectual Property as of the date first written above.

**NURSERYMEN'S EXCHANGE, INC.**


By: _____
Name:
Title:


**FLORAMODA, INC.**


By: _____
Name:
Title:

*Signature Page Assignment and Assumption Agreement for Assumed Contracts*

<u>**EXHIBT A**</u>

**Trademarks**

    1.   **BLOOM-RITE®**



- REG # 1,308,252
- Class 31
- Registered 12/4/1984
- Renewed 11/10/2004
- Next renewal due by December 4,  2014
- Granting Jurisdiction: USPTO

    2.   **BLOOM-RITE®**
- "BLOOM RITE"
- REG #900511
- Class 31
- Registered October 13, 1970
- Renewed March 2, 2001
- Next Renewal due by October 13, 2010
- Granting Jurisdiction: USPTO

    3.   **BLOOM-RITE® Australia**



- REG # 575153
- Class 31
- Registered 3/25/1992
- Renewal  due by March 2009
- Granting Jurisdiction: IP Australia

    4.   **GET MEE®**
- "GET MEE"
- REG # 2,891,767
- Class 31
- Registered 10/5/2004
- §8 Statement of Use due 10/5/2010
- Renewal due by October 5,  2014
- Granting Jurisdiction: USPTO

    5.   **KID'S DAY®**

    **a.**
- "KID'S DAY"
- REG #1833043
- Classes 20, 21, 26

- o Registered 4/26/1994
- o Renewed 3/23/2007
- o Next renewal due by April 2014
- o Granting Jurisdiction: USPTO

**b.**
- o "KID'S DAY"
- o REG #1816068
- o Class 31
- o Registered 1/11/1994
- o Renewed 2/29/2004
- o Next renewal due by January 11, 2014
- o Granting Jurisdiction: USPTO

**6. KID'S DAY® Australia**
- o "KID'S DAY"
- o REG #577906
- o Class 31
- o Registered 5/6/1992
- o Renewal due by May 2009
- o Granting Jurisdiction: IP Australia

**7. CHILDREN'S DAY®**

**a.**
- o "CHILDREN'S DAY"
- o REG #1737746
- o Class 31
- o Registered 12/1/1992
- o Renewed 11/20/2003
- o Next renewal due by December 1, 2012
- o Granting Jurisdiction: USPTO

**b.**
- o "CHILDREN'S DAY"
- o REG #1831770
- o Class 20,21,26
- o Registered 4/19/1994
- o Renewed 3/23/2007
- o Next renewal due by April 19, 2014
- o Granting Jurisdiction: USPTO

**8. CHILDREN'S DAY® Australia**
- o "CHILDREN'S DAY"
- o REG # 577905
- o Class 31
- o Registered 5/6/92
- o Renewal due by May 2009

- o IP Australia

**9. Alpine Series®**



- o REG # 3309701
- o Class 31
- o Registered 10/9/2007
- o §8 Statement of Use due b/t October 2012-2013
- o Renewal due by October 2017
- o Granting Jurisdiction: USPTO

**10. EUROPEAN TREE ®**
- o "EUROPEAN TREE"
- o SN: 77/ 284,490
- o Class 31
- o Registered 7/15/2008

**11. SPRING BRITE®**
- o "SPRING BRITE"
- o SN: 77/ 284,951
- o Class 31
- o Registered 6/17/2008

**Copyrights**

**1. Sorbet Pot Collection**
- o Registration Number: VA 1-231-589
- o Registration Date: 11/12/2003
- o Granting Jurisdiction: Copyright Office
- o See Attachment A

**2. Venus Fly Trap Container & Display**
- o Registration Number: VA 1-629-679
- o Registration Date: 11/1/2007
- o Granting Jurisdiction: Copyright Office

**3. Pool Party- Confetti #1 Mylar Wrap**
- o Registration Number: VAu 707-550
- o Registration Date: 6/9/2006
- o Granting Jurisdiction: Copyright Office
- o See Attachment B

**4. Pool Party- Confetti #2 Mylar Wrap**
- o Registration Number: VAu 707-105
- o Registration Date: 6/9/2006
- o Granting Jurisdiction: Copyright Office

  o See Attachment B

**5. Pool Party- Bubbles Mylar Wrap**
  o Registration Number: VAu 707-106
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**6. Pool Party- Cabana Stripe Mylar Wrap**
  o Registration Number: VAu 707-549
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**7. Argyle Mylar Wrap (various patterns)**
  o Registration Number: VAu 719-698
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**8. Blob Dots Mylar Wrap (various colors)**
  o Registration Number: VAu 719-696
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**9. Blueberries Mylar Wrap (various patterns)**
  o Registration Number: VAu 719-699
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**10. Falling Leaves Mylar Wrap (various colors)**
  o Registration Number: VAu 719-695
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**11. Chambray Mylar Wrap (various colors)**
  o Registration Number: VAu 719-693
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

**12. Scroll  Mylar Wrap (various colors)**
  o Registration Number: VAu 719-694
  o Registration Date: 6/9/2006
  o Granting Jurisdiction: Copyright Office
  o See Attachment B

13. **Watermelon Mylar Wrap (various patterns)**
    - o   Registration Number: VAu 719-697
    - o   Registration Date: 6/9/2006
    - o   Granting Jurisdiction: Copyright Office
    - o   See Attachment B

14. **Abutilon Merchandising Jacket**
    - o   Registration Number: VA 1-111-047
    - o   Registration Date: 8/13/2001
    - o   Granting Jurisdiction: Copyright Office

15. **Phalaenopsis Merchandising Jacket**
    - o   Registration Number: VA 1-111-048
    - o   Registration Date: 8/13/2001
    - o   Granting Jurisdiction: Copyright Office

16. **Passion Flower Merchandising Jacket**
    - o   Registration Number: VA 1-130-743
    - o   Registration Date: 4/25/2002
    - o   Granting Jurisdiction: Copyright Office

17. **Perennial Collection Merchandising Jacket**
    - o   Registration Number: VA 1-130-744
    - o   Registration Date: 4/25/2002
    - o   Granting Jurisdiction: Copyright Office

18. **Towne & Country Roses Merchandising Jacket**
    - o   Registration Number: VA 1-120-960
    - o   Registration Date: 8/16/2001
    - o   Granting Jurisdiction: Copyright Office

19. **Tulips Merchandising Jacket**
    - o   Registration Number: VA 1-158-752
    - o   Registration Date: 4/25/2002
    - o   Granting Jurisdiction: Copyright Office

20. **Tree Peony Merchandising Jacket**
    - o   Registration Number: VA 1-110-522
    - o   Registration Date: 8/13/2001
    - o   Granting Jurisdiction: Copyright Office

21. **Clematis Merchandising Jacket**
    - o   Registration Number: VA 1-110-523
    - o   Registration Date: 8/13/2001
    - o   Granting Jurisdiction: Copyright Office

22. ***Narcissus Sleeve - PENDING***
    - o   Application received by Copyright Office 10/30/2007

<u>**EXHIBIT F**</u>

**FORM OF BILL OF SALE FOR PURCHASED ASSETS**

This BILL OF SALE FOR PURCHASED ASSETS (this "<u>Bill of Sale</u>") is made and entered into as of [    ], 2011 by and between Nurserymen's Exchange, Inc., a California corporation (the "<u>Seller</u>"), and Floramoda, Inc., a California corporation (the "<u>Buyer</u>").

<u>**RECITALS**</u>

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of July 12, 2011 (the "<u>Purchase Agreement</u>") by and between the Seller and the Buyer, the Seller has agreed to sell, and the Buyer has agreed to buy, the Purchased Assets. Capitalized terms used herein not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

WHEREAS, pursuant to the Purchase Agreement, the Seller has agreed to execute and deliver this Bill of Sale to effectuate the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to the Buyer.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties have agreed as follows:

1.    For and in consideration of payment by the Buyer to the Seller of the Purchase Price, all upon the terms and subject to the conditions set forth in the Purchase Agreement, the receipt, sufficiency and adequacy of which are hereby acknowledged and accepted by the Seller, the Seller hereby sells, transfers, assigns, conveys and delivers to the Buyer, its successors and assigns, the Seller's entire right, title and interest in and to the Purchased Assets, free and clear of all Liens and Claims, other than Permitted Liens, the same to be held and enjoyed by the Buyer for its use and enjoyment, and for the use and enjoyment of its successors, assigns and other legal representatives as the same would have been held and enjoyed by the Seller had this sale, transfer, assignment, conveyance and delivery not been made.

2.    The Buyer and the Seller hereby agree to execute and deliver any and all additional documents that the Buyer or the Seller may reasonably request in order to more fully effect the agreements set forth in this Bill of Sale.

3.    This Bill of Sale shall be subject to the terms and conditions set forth in the Purchase Agreement and the Sale Order. The Buyer and the Seller hereby acknowledge and agree that the provisions of this Bill of Sale shall not limit the full force and effect and survival of the terms and provisions of the Purchase Agreement, and that in the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall prevail, govern and control in all respects without limitation.

4.    No failure to exercise and no delay in exercising any right or power under this Bill of Sale shall operate as a waiver thereof. No modification or amendment of this Bill of Sale shall be valid and binding, unless it is in writing and signed by the parties hereto.

1

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 95 of 326

5.      This Bill of Sale may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Bill of Sale by signing any such counterpart.

6.      The undertakings, covenants and agreements set forth herein shall be binding upon and inure to the benefit of the Buyer and the Seller and their respective successors and assigns.

7.      The terms and conditions of this Bill of Sale shall be governed and construed in accordance with the laws of the State of California.

[The remainder of this page has intentionally been left blank]

31564528
DOCS_LA:240842.2 58760-001

IN WITNESS WHEREOF, the Seller and the Buyer have executed this Bill of Sale for Purchased Assets as of the date first written above.

**NURSERYMEN'S EXCHANGE, INC.**

By: _____

Name:

Title:

ACKNOWLEDGED AND AGREED TO BY:

**FLORAMODA, INC.**

By: _____

Name:

Title:

Date: _____, 2011

*Signature Page to Bill of Sale for Purchased Assets*

31564528
DOCS_LA:240842.2 58760-001

**<u>EXHIBIT G-1</u>**

(Property Lease – North Parcel)

# LEASE AGREEMENT
## North Parcel

This Lease Agreement ("**Lease**") is made and effective _____, 2011 ("**Effective Date**"), by and between _____ ("**Landlord**") and _____, a _____ ("**Tenant**").

Landlord is the owner of land in Half Moon Bay, California, and legally described on "**Exhibit A-1**" attached hereto and the improvements and fixtures thereon described on "**Exhibit A-2**" attached hereto (collectively, the "**Leased Property**"). Tenant acknowledges that Landlord is the sole and exclusive owner of the Leased Property.

Landlord desires to lease the Leased Property to Tenant, and Tenant desires to lease the Leased Property from Landlord for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, it is agreed:

1. **Term.**

   A. <u>Initial Term</u>. Landlord hereby leases the Leased Property to Tenant, and Tenant hereby leases the same from Landlord, for an initial term of five (5) years beginning _____, 2011 and ending _____, 2016 (the "**Initial Term**").

   B. <u>Renewal Term</u>. Landlord hereby grants Tenant three (3) options to renew the Lease (each, a "**Renewal Option**") for terms of five (5) years each (each, a "**Renewal Term**"). Tenant shall exercise a Renewal Option, if at all, by giving written notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the Initial Term and each Renewal Term, as applicable. Rent for the Initial Term and each Renewal Term shall be at the rental set forth in <u>Section 2</u> below, and otherwise upon the same covenants, conditions and provisions as provided in this Lease. The Initial Term, and each Renewal Term, if applicable, are collectively referred to herein as the "**Lease Term**."

2. **Rent.**

   A. <u>Rent for Initial Term</u>. Tenant shall pay to Landlord, commencing _____, 2011, rental of $144,000 per year for the first three (3) years of the Initial Term, payable in installments of $12,000 per month for the first thirty-six (36) months of the Initial Term. Tenant and Landlord acknowledge and agree that the rental for the first thirty-six (36) months of the Initial Term is substantially below the lease value of the Leased Property as of the Effective Date of this Lease, and this reduction is in place to allow Tenant to transition as the owner of the business and pay for deferred maintenance. For the remaining two (2) years of the Initial Term, Landlord shall pay to Tenant, commencing on _____, 2014, rent in the amount of $204,000 per year, payable in installments of $17,000 per month for the remaining twenty-four (24) months of the Initial Term. Each installment payment shall be due in advance on the first

1

day of each calendar month during the Initial Term, without allowance or set-off, to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of rent for any partial calendar months included in the Initial Term shall be prorated on a daily basis. The rent due for the Initial Term shall be referred to herein as "**Initial Term Rent**". The Initial Term Rent, the First Renewal Term Rent, the Second Renewal Term Rent and the Third Renewal Term Rent (each, as defined below) are collectively referred to herein as the "**Rent**."

B.    Rent for First Renewal Term.  If Tenant exercises the first Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the sixty-first (61st) month of the Lease, rental of $204,000 per year, payable in installments of $17,000 per month (the "**First Renewal Term Rent**"). Payment of the First Renewal Term Rent shall be made in equal monthly installments, without allowance or set-off, and shall be due in advance on the first day of each calendar month during the first Renewal Term to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of the First Renewal Term Rent for any partial calendar months included in the first Renewal Term shall be prorated on a daily basis.

C.    Rent for Second Renewal Term.  If Tenant exercises the second Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the one hundred twenty-first (121st) month of the lease, rental of $225,000,000 per year, payable in installments of $18,750 per month (the "**Second Renewal Term Rent**"). Payment of the Second Renewal Term Rent shall be made in equal monthly installments, without allowance or set-off, and shall be due in advance on the first day of each calendar month during the second Renewal Term to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of the Second Renewal Term Rent for any partial calendar months included in the second Renewal Term shall be prorated on a daily basis

D.    Rent for Third Renewal Term:  If Tenant exercises the third Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the one hundred eighty-first (181st) month of the Lease, annual rent for the third Renewal Term , based on the following formula:  The annual Rent for the third Renewal Term shall be increased by an amount equal to the product of the annual Rent for the second Renewal Term and a fraction, (i) the numerator of which is the difference between (a) the Consumer Price Index – All Urban Consumers (CPI-U) (Current Series) for San Francisco-Oakland-San Jose, California Area, compiled and published by the Bureau of Labor Statistics ("**Bureau**") and the Department of Labor for the United States of America (the "**CPI**") published for the last day of the month immediately preceding the commencement date of the third Renewal Term (e.g., if the commencement of the third Renewal Term is August 1, 2026, the CPI for July 2026) and (b) the CPI published for the last day of the month immediately preceding the commencement of the second Renewal Term, and (ii) the denominator of which is the CPI published for the last day of the month immediately preceding the commencement of the second Renewal Term.  The annual Second Renewal Term Rent as increased by the resulting product shall be the new annual rent for the third Renewal Term (the "**Third Renewal Term Rent**"); provided, however, that in no event shall the Third Renewal Term Rent be less than the Second Renewal Term Rent and under no

2

circumstances shall the Third Renewal Term Rent be more than three percent (3%) greater than the Second Renewal Term Rent. Landlord shall give Tenant prior written notice indicating the Third Renewal Term Rent; provided, however, in the event such written notice is not delivered to Tenant prior to the commencement of the third Renewal Term, then Tenant shall still be obligated to pay to Landlord the Third Renewal Term Rent on or before the applicable due date in an amount equal to the Second Renewal Term Rent, and on or before the first (1st) day of the first (1st) calendar month following Tenant's receipt of such written notice, Tenant shall pay to Landlord, in addition to the Third Renewal Term Rent then due, an amount equal to the difference between the Second Renewal Term Rent and the Third Renewal Term Rent for all of the previous months of the third Renewal Term. In the event the Bureau discontinues the publication of the CPI, or publishes the same less frequently or on a different schedule, or alters the same in some other manner including, but not limited to, changing the name of the CPI or the geographic area covered by the CPI, Landlord, in its discretion, may adopt a substitute index or procedure which reasonably reflects and monitors consumer prices. Payment of the Third Renewal Term Rent as computed above shall be made in monthly installments, without allowance or set-off, and shall be due in advance on the first (1st) day of each calendar month during the third Renewal Term to the notice addresses provided by Landlord in <u>Section 18</u> below or at such other place designated by written notice from Landlord or Tenant. The payment of the Third Renewal Term Rent for any partial calendar months included in the third Renewal Term shall be prorated on a daily basis

      E.    <u>Triple Net Lease</u>. This Lease is a "Triple Net Lease," it being understood that Landlord shall receive the Rent free and clear of any and all other impositions, real property taxes, personal property taxes, liens, or expenses related to the Leased Property. In addition to the Rent, Tenant shall pay to Landlord or to the persons or entities entitled to receive them all expenses of the Leased Property (including, but not limited to, taxes, assessments, impositions, insurance premiums, operating charges, maintenance charges, construction costs, and any other expenses) which arise during or relate to the Leased Property during the Lease Term. All expenses shall be in addition to the Rent due under this Lease, and if Tenant fails to pay any of these expenses as and when they become due, Landlord shall have the same rights and remedies otherwise provided in this Lease for the failure of Tenant to timely pay Rent. Real property taxes and assessments shall be prorated as of the commencement of the Lease Term. Landlord shall be responsible for paying any real property taxes and assessments allocable to the period prior to commencement of the Lease Term.

      F.    <u>Reserve For Deferred Maintenance</u>. For the first twenty-three (23) months of the Initial Term, Landlord shall set aside $2,100 per month, from the Initial Term Rent received from Tenant, and in the twenty-fourth (24th) month of the Initial Term, Landlord shall set aside $1,700 from the Initial Term Rent received from Tenant; for a total amount of $50,000 (the "**Maintenance Reserve**"). The Maintenance Reserve shall be held in a separate account and distributed as herein provided. Tenant shall give Landlord prior written notice of any substantial deferred maintenance projects that are to be paid for out of the Maintenance Reserve (each, a "**Maintenance Project**"), together with an estimate of all of the costs of the Maintenance Project, including, without limitation, supplies, materials and labor ("**Cost Estimate**"), for Landlord's prior written approval, which approval shall not be unreasonably withheld. A Maintenance Project may be deferred maintenance on any real property, improvements, fixtures

3

31573272v2_336453-00006

or equipment owned by Landlord and leased by Tenant under the terms of this or any other lease agreement. Following Tenant's receipt of Landlord's written approval of the proposed Maintenance Project, Landlord shall advance the funds for the approved Maintenance Project from the Maintenance Reserve; provided that if and to the extent that the Cost Estimate for any Maintenance Project exceeds the then balance in the Maintenance Reserve, Landlord shall not be required to advance any funds to Tenant until Landlord is required to set aside such amounts as provided in this Section 2.F. Notwithstanding the foregoing, under no circumstances shall Landlord pay in the aggregate for all Maintenance Projects any amount in excess of the $50,000, nor shall Landlord be required to fund any set asides prior to Landlord's receipt thereof as provided in this Section 2.F. Nothing herein shall alter the obligation undertaken by Tenant to maintain the property, its fixtures and improvements as set forth in paragraph 5 hereof. .

G. <u>Rent Payments</u>. All payments of Rent shall be Payment shall be made on the first day of each month, commencing on [    ] [ ], 2011 at P.O. Box 620485, Woodside, CA 94062-0485, or at such other place as the Landlord Parties shall request by written notice to Tenant. Rent for the first month of the Initial Term shall be for a pro-rated portion of the remaining days of the such month.

**3. Use; Hazardous Substances; Compliance with Laws.**

A. <u>Use</u>. Tenant shall use and occupy the Leased Property for the management and operation of a nursery business, and for no other purposes.

B. <u>Definitions</u>. For purposes of this Lease, the following definitions shall apply: "**Hazardous Substance(s)**" and "**Hazardous Material(s)**" shall mean any solid, liquid or gaseous substance or material that is described or characterized as a toxic or hazardous substance, waste, material, pollutant, contaminant or infectious waste, or any matter that in certain specified quantities would be injurious to the public health or welfare, or words of similar import, in any of the Environmental Laws (as defined below), or any other words which are intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity or reproductive toxicity and includes, without limitation, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any mixture thereof), petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, nuclear or radioactive matter, medical waste, soot, vapors, fumes, acids, alkalis, chemicals, microbial matters (such as molds, fungi or other bacterial matters), biological agents and chemicals which may cause adverse health effects, including but not limited to, cancers and /or toxicity. "**Environmental Laws**" shall mean any and all federal, state, local or quasi-governmental laws (whether under common law, statute or otherwise), ordinances, decrees, codes, rulings, awards, rules, regulations or guidance or policy documents now or hereafter enacted or promulgated and as amended from time to time, in any way relating to (a) the protection of the environment, the health and safety of persons (including employees), property or the public welfare from actual or potential release, discharge, escape or emission (whether past or present) of any hazardous materials or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any hazardous materials, including, but not limited to, the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), Safe Drinking Water Act (42 U.S.C. Section 3000 et seq.),

4

Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), Clean Air Act (42 USCA Section 7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.), California Health and Safety Code (Section 25100 et seq, Section 39000 et seq.), and the California Water Code (Section 13000 et seq.).

C.    Compliance with Laws.  Tenant shall promptly comply with all applicable laws, statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the Lease Term which regulate the use or condition of the Leased Property, including, without limitation, all Environmental Laws.  Tenant represents and warrants that, except as herein set forth, it will not use, store or dispose of any Hazardous Materials or Hazardous Substances in or on the Leased Property except as is reasonable and customary in connection with the operation of a nursery business and in compliance with all applicable laws.

D.    Indemnification.  Tenant agrees to indemnify, defend, protect and hold harmless the Landlord Parties defined in Section 17 below from and against any liability, obligation, damage or costs, including without limitation, attorneys' fees and costs, resulting directly or indirectly from any use, presence, removal or disposal of any hazardous materials or breach of any provision of this Lease, to the extent such liability, obligation, damage or costs was a result of actions caused or permitted by Tenant, the contractors, officers, agents, servants, employees, invitees, or visitors of Tenant, or Tenant's partners or subpartners or their respective officers, agents, servants, employees, or independent contractors.

E.    Waste or Nuisance.  Tenant shall not commit, or permit others to commit, any waste upon the Leased Property.  Tenant shall not maintain, commit or permit the maintenance or commission of any nuisance as defined by California Civil Code Section 3479 on the Leased Property.  Tenant shall not use or permit the use of the Leased Property for any unlawful purpose.

## 4.    Sublease and Assignment; Insolvency of Tenant.

A.    Sublease and Assignment.  Landlord may freely assign this Lease to any party, in Landlord's sole and absolute discretion.  Tenant shall not assign this Lease, or any interest therein, or sublet the Leased Property or any part thereof, or allow any other person (the agents and employees of Tenant excepted) to occupy or use the Leased Property or any portion thereof, without the prior written consent of Landlord, which consent may be given or withheld by Landlord in its sole and absolute discretion.  Any such assignment or subletting, without Landlord's consent, shall be void and shall, at the option of Landlord, terminate this Lease.  This Lease shall not, nor shall any interest therein, be assignable as to the interest of Tenant by operation of law without the written consent of Landlord.

B.    Insolvency of Tenant.  The insolvency of Tenant, as evidenced by the appointment of a receiver to take possession of all or substantially all of the assets of Tenant, the making of a general assignment by Tenant for the benefit of creditors of an action taken or suffered by Tenant under any bankruptcy or insolvency act, shall terminate this Lease and entitle Landlord to re-enter and regain possession of the Leased Property.  The levying of any writ of attachment or writ of execution against Tenant's interest in the Leased Property which shall not be satisfied or discharged by Tenant within sixty (60) days from the date of levy or execution,

5

shall terminate this Lease and entitle Landlord to re-enter and regain possession of the Leased Property.

## 5. Operating and Maintenance Costs; Repairs.

Tenant shall, at its sole cost and expense, be responsible for and shall pay all operating costs in connection with Tenant's use of the Leased Property, including without limitation, production, labor and fuel costs, water, electricity and other utilities, and any tax or assessment imposed on the Leased Property by any irrigation district or similar entity for the provision of water to the Leased Property. Landlord shall not be responsible for any costs in connection with the operation, maintenance or repair of the Leased Property. Tenant shall, at its sole cost and expense, keep and maintain the Leased Property, any improvements thereon and all facilities appurtenant thereto in good order and repair and in as clean and safe condition as they were when received by Tenant, reasonable wear and tear excepted, including, but not limited to, the exterior walls and interior walls and floors of all structures (including, without limitation warehouse, office, storage and greenhouse space), other interior areas, doors, all lighting systems, driveways, walkways, entranceways, landscaping, security systems, roofs, HVAC systems, windows and fencing. Landlord shall not be responsible for any costs in connection with the maintenance or repair of the Leased Property or the improvements or utilities (including but not limited to irrigation water and associated reservoirs, pumps, and pipelines) located thereon, and disclaims all representations and warranties regarding the condition of the Leased Property or the suitability of all or any part thereof for any particular purpose. Tenant expressly waives the benefit of any statute now or hereinafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Leased Property in good order, condition and repair.

## 6. Alterations and Improvements.

Tenant shall make no alterations, additions or improvements to the Leased Property without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord may impose, as a condition to such consent, such requirements as may be reasonable, including but not limited to a requirement that all work be covered by a lien and completion bond satisfactory to Landlord and requirements as to the manner, time and contractor or contractors by which such work shall be done. Unless Landlord otherwise agrees in writing, or except as otherwise provided below, all such alterations, additions or improvements affixed or built into the Leased Property (but excluding movable trade fixtures and furniture) shall become the property of the Landlord and shall be surrendered with the Leased Property, as a part thereof, at the end of this Lease Term, except that Landlord may require Tenant to remove all or any alterations, decorations, additions, improvements and the like installed by Tenant, and to repair the Leased Property, or at Landlord's option to pay all costs relating to any damage to the Leased Property arising from such removal. Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant may install a reverse osmosis system (the "**RO System**") on the Leased Property, at Tenant's sole cost and expense, provided that, upon the expiration or earlier termination of the Lease Term, the RO System shall belong to Tenant and Tenant may remove the RO System from the Leased Property, at Tenant's sole cost and expense.

6

## 7. Property Taxes.

Tenant shall pay, prior to delinquency, all general real estate taxes and installments of special assessments owed during the Lease Term on the Leased Property to the extent allocable to the Lease Term, and all personal property taxes with respect to all personal property on the Leased Property to the extent allocable to the Lease Term. All such taxes shall be prorated as provided in Section 2 E above.

## 8. Insurance.

Tenant shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $5,000,000 combined single limit coverage of bodily injury, property damage or combination thereof. In addition, Tenant shall at its sole expense, maintain a policy or policy of casualty insurance (all risk) with premiums thereon fully paid on or before the due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than the full replacement value of the fixtures and improvements situate on the property and the equipment and personal property thereon, naming Landlord as the insured. Tenant shall provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to terminate or expire at least ten (10) days prior to such termination or expiration.

## 9. Liens.

Tenant may not do anything that will cause the title of the Leased Property to be encumbered in any way. If Tenant causes a lien to be filed against the Leased Property, Tenant will, within twenty (20) days after receipt of Landlord's demand: (1) pay the lien and have the lien released of record; or (2) take action to discharge the lien. Tenant will provide Landlord a copy of any release Tenant obtains pursuant to this Section 9.

## 10. Landlord Entry.

Landlord shall have the right to enter upon the Leased Property at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Property.

## 11. Remedies.

The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition. The acceptance of Rent hereunder, or any portion thereof, shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease. No payment by Tenant of a lesser amount than the Rent and other sums required by this Lease shall be deemed to be other than a partial payment on account of the earliest due sums, notwithstanding any check endorsement or letter to the contrary. It is understood and agreed that

31573272v2_336453-00006

the remedies herein given to Landlord and those available at law shall be cumulative, and the exercise of any one remedy by Landlord shall not be to the exclusion of any other remedy.

**12.    Damage and Destruction.**

A.    <u>Damage and Destruction</u>.  If the Leased Property or any part thereof shall be damaged or rendered untenantable by fire or other insured casualty during the Lease Term, Tenant shall promptly give notice of such damage or destruction to Landlord.  If the Leased Property or any part thereof shall be damaged or rendered untenantable by fire or other insured casualty during the Lease Term (a "**Covered Casualty**") and this Lease is not to be terminated pursuant to this <u>Section 12</u>, Landlord shall proceed with the repair of such damage (but Landlord shall have no obligation to repair any damage to any of Tenant's fixtures, furnishings, equipment or other personal property) with reasonable diligence after the collection of the insurance proceeds attributable to such damage, but only to the extent of available insurance proceeds.  In the event of a Covered Casualty for which:

(1)    the damage is to the extent of forty percent (40%) or less of the replacement cost of the Leased Property, and Landlord fails to repair such damage within the time period for repair set forth in the notice given to Tenant after the casualty (which notice shall be accompanied by a written certification from a third party contractor setting forth the time of such repair), or

(2)    the damage is to the extent of more than forty percent (40%) of the replacement cost of the Leased Property, and Landlord fails to repair such damage within twelve (12) months of the casualty,

then in the case of either (1) or (2) above, Tenant may provide Landlord with a sixty (60) day notice of intent to terminate.  If Landlord fails to substantially complete the repairs (with the exception of punch list items) with respect to a Covered Casualty, by the end of the sixty (60) day period, this Lease shall end and terminate on such date.  Except as provided in <u>Section 12.B</u> below, the Rent shall be equitably abated to the extent that all or any part of the Leased Property shall have been rendered untenantable by a Covered Casualty, from the date of the damage to the date that Landlord shall have completed the repairs required of Landlord pursuant to the previous sentence; provided, however, that if Tenant reoccupies a portion of the Leased Property during the period of repair, the Rent allocable to such reoccupied portion, based upon the proportion which the reoccupied portion of the Leased Property bears to the total area of the Leased Property, shall be payable by Tenant from the date of such occupancy.

B.    <u>Termination Rights</u>.  If (1) the Leased Property shall be totally damaged or rendered wholly untenantable by a Covered Casualty to the extent of forty percent (40%) of the replacement cost thereof or (2) if in connection with any casualty the insurance proceeds available to Landlord, in Landlord's sole opinion, shall not be reasonably sufficient to repair the damage, and in any of the above cases Landlord elects not to restore the damage, then in any such event Landlord may, at its option, terminate this Lease by giving Tenant thirty (30) days' notice of such termination at any time within one hundred twenty (120) days after the date of such fire or other casualty.  If such notice of termination shall be given, this Lease shall

8

terminate as of the date provided in such notice (whether or not the Lease Term shall have commenced) with the same effect as if that date were the expiration date of the Lease Term.

C.    <u>Partial Damage or Destruction During Last Two (2) Years of Lease Term</u>.  In the event of minor damage to any part of the Leased Property from a Covered Casualty, and if such damage does not render the Leased Property unusable for Tenant's purposes, Tenant shall promptly repair such damage at the cost of the Tenant, and Tenant shall not be relieved from paying Rent and other charges during any portion of the Lease Term.

D.    <u>Damage Caused By Tenant</u>.  If the Leased Property or other part thereof shall be damaged or rendered untenantable by a casualty arising from the acts or omissions of Tenant or Tenant's employees, contractors, agents, invitees or representatives that is not covered by insurance, Tenant shall promptly repair such damage at Tenant's sole cost and expense and the other paragraphs of this <u>Section 12</u> shall not apply.

## 13.    Default; Remedies.

A.    <u>Default by Tenant</u>.  The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

(1)    Any failure by Tenant to pay Rent or to make any other payment required to be made by Tenant under this Lease within five (5) days of the date when due;

(2)    The abandonment or vacation of the Leased Property by Tenant;

(3)    A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by Tenant, when that failure continues for thirty (30) days after written notice of such failure by Landlord to Tenant; provided however, that if the nature of that default is such that it cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if Tenant commences that cure within the thirty (30) day period and thereafter diligently prosecutes it to completion.

B.    <u>Remedies</u>.  In the event of any default by Tenant under this Lease, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the right to terminate this Lease and all rights of Tenant under this Lease by delivering written notice of the default and providing Tenant with a reasonable opportunity to cure same.  No act of Landlord shall be construed as terminating this Lease except written notice given by Landlord to Tenant advising Tenant that Landlord elects to terminate this Lease following the expiration of the cure period.  In the event Landlord elects to terminate this Lease, Landlord may recover from Tenant all of the following:

(1)    Any unpaid Rent that had been earned at the time of the termination of the Lease;

(2)    The unpaid Rent for the balance of the Lease Term to the extent not recovered by Landlord by reletting the Leased Property less the reasonable expense associated with such reletting, provided that Landlord shall have no obligation to relet the Leased Property; and

9

(3)     Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease, including but not limited to reasonable costs and attorneys' fees.

## 14.     Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Property during the term of this Lease.

## 15.     Condemnation.

If any legally constituted authority condemns the Leased Property or such part thereof which shall make the Leased Property unsuitable for operation of a nursery business, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for Rent as of that date.  Such termination shall be without prejudice to the rights of Landlord to recover compensation from the condemning authority for any loss or damage caused by the condemnation.  Any condemnation proceeds shall be the property of Landlord except for Tenant's personal property that may be taken.

## 16.     Subordination; Estoppel Certificates.

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Property, and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its sole discretion provided that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period. Nothing contained herein shall be deemed to create an obligation or duty on the part of Landlord to provide Tenant with a nondisturbance agreement from the existing lender as of the date of this Lease.  Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Property, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request provided that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period. In the event that Tenant should fail to execute any instrument of subordination herein required to be executed by Tenant promptly as requested, Tenant hereby irrevocably appoints Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time within five (5) days of request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that

31573272v2_336453-00006

Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

## 17. Indemnity.

Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Leased Property from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant, except as provided below in this <u>Section 17</u>. Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and attorneys' fees) (collectively, "**Claims**") incurred in connection with or arising from: (a) the use or occupancy of the Leased Property by Tenant or any person claiming under Tenant; (b) any activity, work, or thing done, or permitted or suffered by Tenant in or about the Leased Property; (c) any acts, omission, or negligence of Tenant or any person claiming under Tenant, or the contractors, agents, employees, invitees, or visitors of Tenant or any such person; or (d) any breach, violation, or non-performance by Tenant or any person claiming under Tenant or the employees, agents, contractors, invitees, or visitors of Tenant or any such person of any term, covenant, or provision of this lease or any law, ordinance, or governmental requirement of any kind. Pursuant to this <u>Section 17</u>, Tenant's agreement to indemnify and hold Landlord harmless is not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to this Lease to the extent such policies cover the results of such acts, omissions or willful misconduct. The provisions of this <u>Section 17</u> shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

## 18. Notice.

Any notice required or permitted under this Lease shall be deemed sufficiently given or served when hand-delivered, sent by certified mail, return receipt requested, or sent by facsimile transmission followed by a hard copy to:

    (a)    If to Tenant:

        If by overnight mail:

|  |  |
|---|---|
| | 360 Espinosa Road |
| | Salinas, CA 93907 |
| | Attn: Charles Kosmont & Leslie Surber |
| If by USPS: | Post Office Box 3756 |
| | Salinas, CA 93912 |
| | Attn: Charles Kosmont & Leslie Surber |
| If by facsimile: | (831) 443-1345 |
| | Attn: Charles Kosmont & Leslie Surber |

11

| | With a copy to: | Michael W. Burnett, P.C. |
| | | 3 San Joaquin Plaza, Suite 215 |
| | | Newport Beach, CA 92660 |
| | | Fax: 949-729-9191 |

 

| (b) | If to Landlord Parties: | Jack Pearlstein |
| | | 240 Shawnee Pass |
| | | Portola Valley, CA  94028 |

Gail Hollingsworth
541 Roehampton Road
Hillsborough, CA  94010-6853

Kit Shiotani
198 Zils Road
Watsonville, CA  95076

With a copy to:    Bancroft & McAlister
80 E. Sir Francis Drake Blvd, Suite 2G
Larkspur, CA  94939
Attention:  George R. Dirkes, Esq.

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

## 19.    Brokers.

Landlord acknowledges that no real estate broker procured this Lease.  If Tenant has dealt with any real estate broker or agent or any other person in connection with leasing of the Leased Property, Tenant shall be solely responsible for the payment of any fee due such person, and Tenant shall indemnify, defend and hold Landlord harmless from and against any liability in respect thereto, including attorneys' fees and costs.

## 20.    Memorandum of Lease.

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

## 21.    Headings.

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

31573272v2_336453-00006

**22.    Successors.**

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors, heirs and assigns.

**23.    Counterparts.**

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**24.    Compliance with Law.**

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Property. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Property.

**25.    Final Agreement.**

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

**26.    Governing Law.**

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of California.

**27.    Release Upon Assignment.**

Upon Landlord's sale or transfer of the Leased Property and assignment of this Lease, Landlord shall be released from any further obligation hereunder, provided that Landlord's assignee agrees to assume all of Landlord's obligations hereunder.

**28.    Holding Over.**

Holding over by Tenant after the termination or expiration of this Lease shall not constitute a renewal or extension thereof, nor give Tenant any rights hereunder in or to the Leased Property.

**29.    Condition of Leased Premises.**

Landlord delivered the Leased Premises to Tenant in an "AS IS" condition.    Tenant acknowledges that it is leasing the Leased Premises in reliance on its own investigation and waives any and all objections to the condition of the Leased Premises.  Tenant acknowledges that it has accepted the real property in its condition described above subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Leased Premises, and any covenants or restrictions of record, and accepts this Lease subject to them.

13

IN WITNESS WHEREOF, the parties have executed this Lease as of the Effective Date.

**TENANT:**

By:_____

**LANDLORD:**

By: _____

31573272v2_336453-00006

**EXHIBIT A-1**

Legal Description

The following describes the Leased Property subject to Lease between Landlord and Tenant.

Parcel 1:  The Real Property consists of approximately 25.83 acres of land located at 2651 No. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels:

048 - 300 -  210
048 - 300 -  230
048 - 300 -  240

**EXHIBIT A-2**

Fixtures

Main office, warehouse, house, water tanks, greenhouses (including rose ranges), the equipment, lighting, shade cloth, heating and heat retention systems, irrigation , and boilers, and any other property affixed thereto and incorporated into the structure, trailers, soil and chemical storage, box storage

# EXHIBIT G-2

(Property Lease – South Parcel I)

This Lease Agreement ("**Lease**") is made and effective _____, 2011 ("**Effective Date**"), by and between _____ ("**Landlord**") and _____, a _____ ("**Tenant**").

Landlord is the owner of land in Half Moon Bay, California, and legally described on "**Exhibit A-1**" attached hereto and the improvements and fixtures thereon described on "**Exhibit A-2**" attached hereto (collectively, the "**Leased Property**"). Tenant acknowledges that Landlord is the sole and exclusive owner of the Leased Property.

Landlord desires to lease the Leased Property to Tenant, and Tenant desires to lease the Leased Property from Landlord for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, it is agreed:

1.    **Term.**

A.    Initial Term. Landlord hereby leases the Leased Property to Tenant, and Tenant hereby leases the same from Landlord, for an initial term of five (5) years beginning _____, 2011 and ending _____, 2016 (the "**Initial Term**").

B.    Renewal Term. Landlord hereby grants Tenant three (3) options to renew the Lease (each, a "**Renewal Option**") for terms of five (5) years each (each, a "**Renewal Term**"). Tenant shall exercise a Renewal Option, if at all, by giving written notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the Initial Term and each Renewal Term, as applicable. Rent for the Initial Term and each Renewal Term shall be at the rental set forth in Section 2 below, and otherwise upon the same covenants, conditions and provisions as provided in this Lease. The Initial Term, and each Renewal Term, if applicable, are collectively referred to herein as the "**Lease Term**."

2.    **Rent.**

A.    Rent for Initial Term. Tenant shall pay to Landlord, commencing _____, 2011, rental of $72,000 per year for the first three (3) years of the Initial Term, payable in installments of $6,000 per month for the first thirty-six (36) months of the Initial Term. Tenant and Landlord acknowledge and agree that the rental for the first thirty-six (36) months of the Initial Term is substantially below the lease value of the Leased Property as of the Effective Date of this Lease, and this reduction is in place to allow Tenant to transition as the owner of the business and pay for deferred maintenance. For the remaining two (2) years of the Initial Term, Landlord shall pay to Tenant, commencing on _____, 2014, rent in the amount of $104,400 per year, payable in installments of $8,700 per month for the remaining twenty-four (24) months of the Initial Term. Each installment payment shall be due in advance on the first

1

day of each calendar month during the Initial Term, without allowance or set-off, to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of rent for any partial calendar months included in the Initial Term shall be prorated on a daily basis. The rent due for the Initial Term shall be referred to herein as "**Initial Term Rent**". The Initial Term Rent, the First Renewal Term Rent, the Second Renewal Term Rent and the Third Renewal Term Rent (each, as defined below) are collectively referred to herein as the "**Rent**."

B.       Rent for First Renewal Term.  If Tenant exercises the first Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the sixty-first (61st) month of the Lease, rental of $104,400 per year, payable in installments of $8,700 per month (the "**First Renewal Term Rent**"). Payment of the First Renewal Term Rent shall be made in equal monthly installments, without allowance or set-off, and shall be due in advance on the first day of each calendar month during the first Renewal Term to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of the First Renewal Term Rent for any partial calendar months included in the first Renewal Term shall be prorated on a daily basis.

C.       Rent for Second Renewal Term.  If Tenant exercises the second Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the one hundred twenty-first (121st) month of the lease, rental of $114,000 per year, payable in installments of $9,500 per month (the "**Second Renewal Term Rent**"). Payment of the Second Renewal Term Rent shall be made in equal monthly installments, without allowance or set-off, and shall be due in advance on the first day of each calendar month during the second Renewal Term to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of the Second Renewal Term Rent for any partial calendar months included in the second Renewal Term shall be prorated on a daily basis

D.       Rent for Third Renewal Term:  If Tenant exercises the third Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the one hundred eighty-first (181st) month of the Lease, annual rent for the third Renewal Term , based on the following formula:  The annual Rent for the third Renewal Term shall be increased by an amount equal to the product of the annual Rent for the second Renewal Term and a fraction, (i) the numerator of which is the difference between (a) the Consumer Price Index – All Urban Consumers (CPI-U) (Current Series) for San Francisco-Oakland-San Jose, California Area, compiled and published by the Bureau of Labor Statistics ("**Bureau**") and the Department of Labor for the United States of America (the "**CPI**") published for the last day of the month immediately preceding the commencement date of the third Renewal Term (e.g., if the commencement of the third Renewal Term is August 1, 2026, the CPI for July 2026) and (b) the CPI published for the last day of the month immediately preceding the commencement of the second Renewal Term, and (ii) the denominator of which is the CPI published for the last day of the month immediately preceding the commencement of the second Renewal Term.  The annual Second Renewal Term Rent as increased by the resulting product shall be the new annual rent for the third Renewal Term (the "**Third Renewal Term Rent**"); provided, however, that in no event

2

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 117 of 326

shall the Third Renewal Term Rent be less than the Second Renewal Term Rent and under no circumstances shall the Third Renewal Term Rent be more than three percent (3%) greater than the Second Renewal Term Rent. Landlord shall give Tenant prior written notice indicating the Third Renewal Term Rent; provided, however, in the event such written notice is not delivered to Tenant prior to the commencement of the third Renewal Term, then Tenant shall still be obligated to pay to Landlord the Third Renewal Term Rent on or before the applicable due date in an amount equal to the Second Renewal Term Rent, and on or before the first (1st) day of the first (1st) calendar month following Tenant's receipt of such written notice, Tenant shall pay to Landlord, in addition to the Third Renewal Term Rent then due, an amount equal to the difference between the Second Renewal Term Rent and the Third Renewal Term Rent for all of the previous months of the third Renewal Term. In the event the Bureau discontinues the publication of the CPI, or publishes the same less frequently or on a different schedule, or alters the same in some other manner including, but not limited to, changing the name of the CPI or the geographic area covered by the CPI, Landlord, in its discretion, may adopt a substitute index or procedure which reasonably reflects and monitors consumer prices. Payment of the Third Renewal Term Rent as computed above shall be made in monthly installments, without allowance or set-off, and shall be due in advance on the first (1st) day of each calendar month during the third Renewal Term to the notice addresses provided by Landlord in <u>Section 18</u> below or at such other place designated by written notice from Landlord or Tenant. The payment of the Third Renewal Term Rent for any partial calendar months included in the third Renewal Term shall be prorated on a daily basis

E. <u>Triple Net Lease</u>. This Lease is a "Triple Net Lease," it being understood that Landlord shall receive the Rent free and clear of any and all other impositions, real property taxes, personal property taxes, liens, or expenses related to the Leased Property. In addition to the Rent, Tenant shall pay to Landlord or to the persons or entities entitled to receive them all expenses of the Leased Property (including, but not limited to, taxes, assessments, impositions, insurance premiums, operating charges, maintenance charges, construction costs, and any other expenses) which arise during or relate to the Leased Property during the Lease Term. All expenses shall be in addition to the Rent due under this Lease, and if Tenant fails to pay any of these expenses as and when they become due, Landlord shall have the same rights and remedies otherwise provided in this Lease for the failure of Tenant to timely pay Rent. Real property taxes and assessments shall be prorated as of the commencement of the Lease Term. Landlord shall be responsible for paying any real property taxes and assessments allocable to the period prior to commencement of the Lease Term.

F. <u>Rent Payments</u>. All payments of Rent shall be Payment shall be made on the first day of each month, commencing on [     ] [ ], 2011 at P.O. Box 620485, Woodside, CA 94062-0485, or at such other place as the Landlord Parties shall request by written notice to Tenant. Rent for the first month of the Initial Term shall be for a pro-rated portion of the remaining days of such month.

**3.    Use; Hazardous Substances; Compliance with Laws.**

A. <u>Use</u>. Tenant shall use and occupy the Leased Property for the management and operation of a nursery business, and for no other purposes.

3

B.    Definitions.  For purposes of this Lease, the following definitions shall apply: "**Hazardous Substance(s)**" and "**Hazardous Material(s)**" shall mean any solid, liquid or gaseous substance or material that is described or characterized as a toxic or hazardous substance, waste, material, pollutant, contaminant or infectious waste, or any matter that in certain specified quantities would be injurious to the public health or welfare, or words of similar import, in any of the Environmental Laws (as defined below), or any other words which are intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity or reproductive toxicity and includes, without limitation, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any mixture thereof), petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, nuclear or radioactive matter, medical waste, soot, vapors, fumes, acids, alkalis, chemicals, microbial matters (such as molds, fungi or other bacterial matters), biological agents and chemicals which may cause adverse health effects, including but not limited to, cancers and /or toxicity. "**Environmental Laws**" shall mean any and all federal, state, local or quasi-governmental laws (whether under common law, statute or otherwise), ordinances, decrees, codes, rulings, awards, rules, regulations or guidance or policy documents now or hereafter enacted or promulgated and as amended from time to time, in any way relating to (a) the protection of the environment, the health and safety of persons (including employees), property or the public welfare from actual or potential release, discharge, escape or emission (whether past or present) of any hazardous materials or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any hazardous materials, including, but not limited to, the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), Safe Drinking Water Act (42 U.S.C. Section 3000 et seq.), Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), Clean Air Act (42 USCA Section 7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.), California Health and Safety Code (Section 25100 et seq, Section 39000 et seq.), and the California Water Code (Section 13000 et seq.).

C.    Compliance with Laws.  Tenant shall promptly comply with all applicable laws, statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the Lease Term which regulate the use or condition of the Leased Property, including, without limitation, all Environmental Laws.  Tenant represents and warrants that, except as herein set forth, it will not use, store or dispose of any Hazardous Materials or Hazardous Substances in or on the Leased Property except as is reasonable and customary in connection with the operation of a nursery business and in compliance with all applicable laws.

D.    Indemnification.  Tenant agrees to indemnify, defend, protect and hold harmless the Landlord Parties defined in Section 17 below from and against any liability, obligation, damage or costs, including without limitation, attorneys' fees and costs, resulting directly or indirectly from any use, presence, removal or disposal of any hazardous materials or breach of any provision of this Lease, to the extent such liability, obligation, damage or costs was a result of actions caused or permitted by Tenant, the contractors, officers, agents, servants, employees, invitees, or visitors of Tenant, or Tenant's partners or subpartners or their respective officers, agents, servants, employees, or independent contractors.

4

31571201v2_336453-00006

E.     Waste or Nuisance.  Tenant shall not commit, or permit others to commit, any waste upon the Leased Property.  Tenant shall not maintain, commit or permit the maintenance or commission of any nuisance as defined by California Civil Code Section 3479 on the Leased Property.  Tenant shall not use or permit the use of the Leased Property for any unlawful purpose.

**4.     Sublease and Assignment; Insolvency of Tenant.**

A.     Sublease and Assignment.  Landlord may freely assign this Lease to any party, in Landlord's sole and absolute discretion.  Tenant shall not assign this Lease, or any interest therein, or sublet the Leased Property or any part thereof, or allow any other person (the agents and employees of Tenant excepted) to occupy or use the Leased Property or any portion thereof, without the prior written consent of Landlord, which consent may be given or withheld by Landlord in its sole and absolute discretion.  Any such assignment or subletting, without Landlord's consent, shall be void and shall, at the option of Landlord, terminate this Lease.  This Lease shall not, nor shall any interest therein, be assignable as to the interest of Tenant by operation of law without the written consent of Landlord.

B.     Insolvency of Tenant.  The insolvency of Tenant, as evidenced by the appointment of a receiver to take possession of all or substantially all of the assets of Tenant, the making of a general assignment by Tenant for the benefit of creditors of an action taken or suffered by Tenant under any bankruptcy or insolvency act, shall terminate this Lease and entitle Landlord to re-enter and regain possession of the Leased Property.  The levying of any writ of attachment or writ of execution against Tenant's interest in the Leased Property which shall not be satisfied or discharged by Tenant within sixty (60) days from the date of levy or execution, shall terminate this Lease and entitle Landlord to re-enter and regain possession of the Leased Property.

**5.     Operating and Maintenance Costs; Repairs.**

Tenant shall, at its sole cost and expense, be responsible for and shall pay all operating costs in connection with Tenant's use of the Leased Property, including without limitation, production, labor and fuel costs, water, electricity and other utilities, and any tax or assessment imposed on the Leased Property by any irrigation district or similar entity for the provision of water to the Leased Property.  Landlord shall not be responsible for any costs in connection with the operation, maintenance or repair of the Leased Property.  Tenant shall, at its sole cost and expense, keep and maintain the Leased Property, any improvements thereon and all facilities appurtenant thereto in good order and repair and in as clean and safe condition as they were when received by Tenant, reasonable wear and tear excepted, including, but not limited to, the exterior walls and interior walls and floors of all structures (including, without limitation warehouse, office, storage and greenhouse space), other interior areas, doors, all lighting systems, driveways, walkways, entranceways, landscaping, security systems, roofs, HVAC systems, windows and fencing.  Landlord shall not be responsible for any costs in connection with the maintenance or repair of the Leased Property or the improvements or utilities (including but not limited to irrigation water and associated reservoirs, pumps, and pipelines) located thereon, and disclaims all representations and warranties regarding the condition of the Leased

5

31571201v2_336453-00006

Property or the suitability of all or any part thereof for any particular purpose. Tenant expressly waives the benefit of any statute now or hereinafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Leased Property in good order, condition and repair.

**6. Alterations and Improvements.**

Tenant shall make no alterations, additions or improvements to the Leased Property without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord may impose, as a condition to such consent, such requirements as may be reasonable, including but not limited to a requirement that all work be covered by a lien and completion bond satisfactory to Landlord and requirements as to the manner, time and contractor or contractors by which such work shall be done. Unless Landlord otherwise agrees in writing, or except as otherwise provided below, all such alterations, additions or improvements affixed or built into the Leased Property (but excluding movable trade fixtures and furniture) shall become the property of the Landlord and shall be surrendered with the Leased Property, as a part thereof, at the end of this Lease Term, except that Landlord may require Tenant to remove all or any alterations, decorations, additions, improvements and the like installed by Tenant, and to repair the Leased Property, or at Landlord's option to pay all costs relating to any damage to the Leased Property arising from such removal. Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant may install a reverse osmosis system (the "**RO System**") on the Leased Property, at Tenant's sole cost and expense, provided that, upon the expiration or earlier termination of the Lease Term, the RO System shall belong to Tenant and Tenant may remove the RO System from the Leased Property, at Tenant's sole cost and expense.

**7. Property Taxes.**

Tenant shall pay, prior to delinquency, all general real estate taxes and installments of special assessments owed during the Lease Term on the Leased Property to the extent allocable to the Lease Term, and all personal property taxes with respect to all personal property on the Leased Property to the extent allocable to the Lease Term. All such taxes shall be prorated as provided in Section 2 E above.

**8. Insurance.**

Tenant shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $5,000,000 combined single limit coverage of bodily injury, property damage or combination thereof. In addition, Tenant shall at its sole expense, maintain a policy or policy of casualty insurance (all risk) with premiums thereon fully paid on or before the due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than the full replacement value of the fixtures and improvements situate on the property and the equipment and personal property thereon, naming Landlord as the insured. Tenant shall provide Landlord with current Certificates of

6

Insurance evidencing Tenant's compliance with this paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to terminate or expire at least ten (10) days prior to such termination or expiration.

**9.      Liens.**

Tenant may not do anything that will cause the title of the Leased Property to be encumbered in any way. If Tenant causes a lien to be filed against the Leased Property, Tenant will, within twenty (20) days after receipt of Landlord's demand: (1) pay the lien and have the lien released of record; or (2) take action to discharge the lien. Tenant will provide Landlord a copy of any release Tenant obtains pursuant to this <u>Section 9</u>.

**10.      Landlord Entry.**

Landlord shall have the right to enter upon the Leased Property at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Property.

**11.      Remedies.**

The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition.  The acceptance of Rent hereunder, or any portion thereof, shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease.  No payment by Tenant of a lesser amount than the Rent and other sums required by this Lease shall be deemed to be other than a partial payment on account of the earliest due sums, notwithstanding any check endorsement or letter to the contrary.  It is understood and agreed that the remedies herein given to Landlord and those available at law shall be cumulative, and the exercise of any one remedy by Landlord shall not be to the exclusion of any other remedy.

**12.      Damage and Destruction.**

A.      <u>Damage and Destruction</u>.  If the Leased Property or any part thereof shall be damaged or rendered untenantable by fire or other insured casualty during the Lease Term, Tenant shall promptly give notice of such damage or destruction to Landlord.  If the Leased Property or any part thereof shall be damaged or rendered untenantable by fire or other insured casualty during the Lease Term (a "**Covered Casualty**") and this Lease is not to be terminated pursuant to this <u>Section 12</u>, Landlord shall proceed with the repair of such damage (but Landlord shall have no obligation to repair any damage to any of Tenant's fixtures, furnishings, equipment or other personal property) with reasonable diligence after the collection of the insurance proceeds attributable to such damage, but only to the extent of available insurance proceeds.  In the event of a Covered Casualty for which:

(1)      the damage is to the extent of forty percent (40%) or less of the replacement cost of the Leased Property, and Landlord fails to repair such damage within the time period for repair set forth in the notice given to Tenant after the casualty (which notice shall

7

31571201v2_336453-00006

be accompanied by a written certification from a third party contractor setting forth the time of such repair), or

(2)     the damage is to the extent of more than forty percent (40%) of the replacement cost of the Leased Property, and Landlord fails to repair such damage within twelve (12) months of the casualty,

then in the case of either (1) or (2) above, Tenant may provide Landlord with a sixty (60) day notice of intent to terminate.  If Landlord fails to substantially complete the repairs (with the exception of punch list items) with respect to a Covered Casualty, by the end of the sixty (60) day period, this Lease shall end and terminate on such date.  Except as provided in Section 12.B below, the Rent shall be equitably abated to the extent that all or any part of the Leased Property shall have been rendered untenantable by a Covered Casualty, from the date of the damage to the date that Landlord shall have completed the repairs required of Landlord pursuant to the previous sentence; provided, however, that if Tenant reoccupies a portion of the Leased Property during the period of repair, the Rent allocable to such reoccupied portion, based upon the proportion which the reoccupied portion of the Leased Property bears to the total area of the Leased Property, shall be payable by Tenant from the date of such occupancy.

B.     Termination Rights.  If (1) the Leased Property shall be totally damaged or rendered wholly untenantable by a Covered Casualty to the extent of forty percent (40%) of the replacement cost thereof or (2) if in connection with any casualty the insurance proceeds available to Landlord, in Landlord's sole opinion, shall not be reasonably sufficient to repair the damage, and in any of the above cases Landlord elects not to restore the damage, then in any such event Landlord may, at its option, terminate this Lease by giving Tenant thirty (30) days' notice of such termination at any time within one hundred twenty (120) days after the date of such fire or other casualty.  If such notice of termination shall be given, this Lease shall terminate as of the date provided in such notice (whether or not the Lease Term shall have commenced) with the same effect as if that date were the expiration date of the Lease Term.

C.     Partial Damage or Destruction During Last Two (2) Years of Lease Term.  In the event of minor damage to any part of the Leased Property from a Covered Casualty, and if such damage does not render the Leased Property unusable for Tenant's purposes, Tenant shall promptly repair such damage at the cost of the Tenant, and Tenant shall not be relieved from paying Rent and other charges during any portion of the Lease Term.

D.     Damage Caused By Tenant.  If the Leased Property or other part thereof shall be damaged or rendered untenantable by a casualty arising from the acts or omissions of Tenant or Tenant's employees, contractors, agents, invitees or representatives that is not covered by insurance, Tenant shall promptly repair such damage at Tenant's sole cost and expense and the other paragraphs of this Section 12 shall not apply.

**13.     Default; Remedies.**

A.     Default by Tenant.  The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

8

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 123 of 326

(1)     Any failure by Tenant to pay Rent or to make any other payment required to be made by Tenant under this Lease within five (5) days of the date when due;

(2)     The abandonment or vacation of the Leased Property by Tenant;

(3)     A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by Tenant, when that failure continues for thirty (30) days after written notice of such failure by Landlord to Tenant; provided however, that if the nature of that default is such that it cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if Tenant commences that cure within the thirty (30) day period and thereafter diligently prosecutes it to completion.

B.     Remedies.  In the event of any default by Tenant under this Lease, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the right to terminate this Lease and all rights of Tenant under this Lease by delivering written notice of the default and providing Tenant with a reasonable opportunity to cure same.  No act of Landlord shall be construed as terminating this Lease except written notice given by Landlord to Tenant advising Tenant that Landlord elects to terminate this Lease following the expiration of the cure period.  In the event Landlord elects to terminate this Lease, Landlord may recover from Tenant all of the following:

(1)     Any unpaid Rent that had been earned at the time of the termination of the Lease;

(2)     The unpaid Rent for the balance of the Lease Term to the extent not recovered by Landlord by reletting the Leased Property less the reasonable expense associated with such reletting, provided that Landlord shall have no obligation to relet the Leased Property; and

(3)     Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease, including but not limited to reasonable costs and attorneys' fees.

## 14.     Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Property during the term of this Lease.

## 15.     Condemnation.

If any legally constituted authority condemns the Leased Property or such part thereof which shall make the Leased Property unsuitable for operation of a nursery business, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for Rent as of that date.  Such termination shall be without prejudice to the rights of Landlord to recover compensation from the condemning authority for any loss or damage caused by the

9

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 124 of 326

condemnation. Any condemnation proceeds shall be the property of Landlord except for Tenant's personal property that may be taken.

## 16. Subordination; Estoppel Certificates.

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Property, and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its sole discretion provided that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period. Nothing contained herein shall be deemed to create an obligation or duty on the part of Landlord to provide Tenant with a nondisturbance agreement from the existing lender as of the date of this Lease. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Property, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request provided that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period. In the event that Tenant should fail to execute any instrument of subordination herein required to be executed by Tenant promptly as requested, Tenant hereby irrevocably appoints Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time within five (5) days of request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

## 17. Indemnity.

Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Leased Property from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant, except as provided below in this <u>Section 17</u>. Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and attorneys' fees) (collectively, "**Claims**") incurred in connection with or arising from: (a) the use or occupancy of the Leased Property by Tenant or any person claiming under Tenant; (b) any activity, work, or thing done, or permitted or suffered by Tenant in or about the Leased Property; (c) any acts, omission, or negligence of Tenant or any

10

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 125 of 326

person claiming under Tenant, or the contractors, agents, employees, invitees, or visitors of Tenant or any such person; or (d) any breach, violation, or non-performance by Tenant or any person claiming under Tenant or the employees, agents, contractors, invitees, or visitors of Tenant or any such person of any term, covenant, or provision of this lease or any law, ordinance, or governmental requirement of any kind.  Pursuant to this <u>Section 17</u>, Tenant's agreement to indemnify and hold Landlord harmless is not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to this Lease to the extent such policies cover the results of such acts, omissions or willful misconduct.  The provisions of this <u>Section 17</u> shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

**18.    Notice.**

Any notice required or permitted under this Lease shall be deemed sufficiently given or served when hand-delivered, sent by certified mail, return receipt requested, or sent by facsimile transmission followed by a hard copy to:

    (a)    If to Tenant:

| | |
|---|---|
| If by overnight mail: | 360 Espinosa Road<br>Salinas, CA 93907<br>Attn: Charles Kosmont & Leslie Surber |
| If by USPS: | Post Office Box 3756<br>Salinas, CA 93912<br>Attn: Charles Kosmont & Leslie Surber |
| If by facsimile: | (831) 443-1345<br>Attn: Charles Kosmont & Leslie Surber |
| With a copy to: | Michael W. Burnett, P.C.<br>3 San Joaquin Plaza, Suite 215<br>Newport Beach, CA 92660<br>Fax: 949-729-9191 |

    (b)    If to Landlord Parties:    Jack Pearlstein

        240 Shawnee Pass
        Portola Valley, CA  94028

        Gail Hollingsworth
        541 Roehampton Road
        Hillsborough, CA  94010-6853

        Kit Shiotani
        198 Zils Road

11

Watsonville, CA  95076

With a copy to:          Bancroft & McAlister
                         80 E. Sir Francis Drake Blvd, Suite 2G
                         Larkspur, CA  94939
                         Attention:  George R. Dirkes, Esq.

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

**19.   Brokers.**

Landlord acknowledges that no real estate broker procured this Lease.  If Tenant has dealt with any real estate broker or agent or any other person in connection with leasing of the Leased Property, Tenant shall be solely responsible for the payment of any fee due such person, and Tenant shall indemnify, defend and hold Landlord harmless from and against any liability in respect thereto, including attorneys' fees and costs.

**20.   Memorandum of Lease.**

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

**21.   Headings.**

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

**22.   Successors.**

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors, heirs and assigns.

**23.   Counterparts.**

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**24.   Compliance with Law.**

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Property. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Property.

12

31571201v2_336453-00006

**25.** **Final Agreement.**

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

**26.** **Governing Law.**

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of California.

**27.** **Release Upon Assignment.**

Upon Landlord's sale or transfer of the Leased Property and assignment of this Lease, Landlord shall be released from any further obligation hereunder, provided that Landlord's assignee agrees to assume all of Landlord's obligations hereunder.

**28.** **Holding Over.**

Holding over by Tenant after the termination or expiration of this Lease shall not constitute a renewal or extension thereof, nor give Tenant any rights hereunder in or to the Leased Property.

**29.** **Condition of Leased Premises.**

Landlord delivered the Leased Premises to Tenant in an "AS IS" condition. Tenant acknowledges that it is leasing the Leased Premises in reliance on its own investigation and waives any and all objections to the condition of the Leased Premises. Tenant acknowledges that it has accepted the real property in its condition described above subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Leased Premises, and any covenants or restrictions of record, and accepts this Lease subject to them.

IN WITNESS WHEREOF, the parties have executed this Lease as of the Effective Date.

**TENANT:**

By:_____

**LANDLORD:**

By: _____

13

31571201v2_336453-00006

**EXHIBIT A-1**

Legal Description

The following describes the Leased Property subject to Lease between Landlord and Tenant.

Approximately 9 acres of land located at 2125 So. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels:

066 - 093 - 060
066 - 093 - 050

**EXHIBIT A-2**

Fixtures

Greenhouses, water tanks, pump house, cold storage, offices, Equipment,

## **EXHIBIT G-3**

(Property Lease – South Parcel II)

# LEASE AGREEMENT
## South Parcel II

This Lease Agreement ("**Lease**") is made and effective _____, 2011 ("**Effective Date**"), by and between _____ ("**Landlord**") and _____, a _____ ("**Tenant**").

Landlord is the owner of land in Half Moon Bay, California, and legally described on "**Exhibit A-1**" attached hereto and the improvements and fixtures thereon described on "**Exhibit A-2**" attached hereto (collectively, the "**Leased Property**"). Tenant acknowledges that Landlord is the sole and exclusive owner of the Leased Property.

Landlord desires to lease the Leased Property to Tenant, and Tenant desires to lease the Leased Property from Landlord for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, it is agreed:

## 1. Term.

A. <u>Initial Term</u>. Landlord hereby leases the Leased Property to Tenant, and Tenant hereby leases the same from Landlord, for an initial term of five (5) years beginning _____, 2011 and ending _____, 2016 (the "**Initial Term**").

B. <u>Renewal Term</u>. Landlord hereby grants Tenant three (3) options to renew the Lease (each, a "**Renewal Option**") for terms of five (5) years each (each, a "**Renewal Term**"). Tenant shall exercise a Renewal Option, if at all, by giving written notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the Initial Term and each Renewal Term, as applicable. Rent for the Initial Term and each Renewal Term shall be at the rental set forth in <u>Section 2</u> below, and otherwise upon the same covenants, conditions and provisions as provided in this Lease. The Initial Term, and each Renewal Term, if applicable, are collectively referred to herein as the "**Lease Term**."

## 2. Rent.

A. <u>Rent for Initial Term</u>. Tenant shall pay to Landlord, commencing _____, 2011, rental of $36,000 per year for the first three (3) years of the Initial Term, payable in installments of $3,000 per month for the first thirty-six (36) months of the Initial Term. Tenant and Landlord acknowledge and agree that the rental for the first thirty-six (36) months of the Initial Term is substantially below the lease value of the Leased Property as of the Effective Date of this Lease, and this reduction is in place to allow Tenant to transition as the owner of the business and pay for deferred maintenance. For the remaining two (2) years of the Initial Term, Landlord shall pay to Tenant, commencing on _____, 2014, rent in the amount of $51,600 per year, payable in installments of $4,300 per month for the remaining twenty-four (24) months of the Initial Term. Each installment payment shall be due in advance on the first day of each calendar month during the Initial Term, without allowance or set-off, to the notice addresses

1

provided by Landlord in <u>Section 18</u> below or at such other place designated by written notice from Landlord or Tenant. The payment of rent for any partial calendar months included in the Initial Term shall be prorated on a daily basis. The rent due for the Initial Term shall be referred to herein as "**Initial Term Rent**". The Initial Term Rent, the First Renewal Term Rent, the Second Renewal Term Rent and the Third Renewal Term Rent (each, as defined below) are collectively referred to herein as the "**Rent**."

B.    <u>Rent for First Renewal Term</u>. If Tenant exercises the first Renewal Option in accordance with <u>Section 1.B</u> above, Tenant shall pay to Landlord, commencing on the first (1st) day of the sixty-first (61st) month of the Lease, rental of $51,600 per year, payable in installments of $4,300 per month (the "**First Renewal Term Rent**"). Payment of the First Renewal Term Rent shall be made in equal monthly installments, without allowance or set-off, and shall be due in advance on the first day of each calendar month during the first Renewal Term to the notice addresses provided by Landlord in <u>Section 18</u> below or at such other place designated by written notice from Landlord or Tenant. The payment of the First Renewal Term Rent for any partial calendar months included in the first Renewal Term shall be prorated on a daily basis.

C.    <u>Rent for Second Renewal Term</u>. If Tenant exercises the second Renewal Option in accordance with <u>Section 1.B</u> above, Tenant shall pay to Landlord, commencing on the first (1st) day of the one hundred twenty-first (121st) month of the lease, rental of $57,000 per year, payable in installments of $4,750 per month (the "**Second Renewal Term Rent**"). Payment of the Second Renewal Term Rent shall be made in equal monthly installments, without allowance or set-off, and shall be due in advance on the first day of each calendar month during the second Renewal Term to the notice addresses provided by Landlord in <u>Section 18</u> below or at such other place designated by written notice from Landlord or Tenant. The payment of the Second Renewal Term Rent for any partial calendar months included in the second Renewal Term shall be prorated on a daily basis

D.    <u>Rent for Third Renewal Term</u>: If Tenant exercises the third Renewal Option in accordance with Section 1.B above, Tenant shall pay to Landlord, commencing on the first (1st) day of the one hundred eighty-first (181st) month of the Lease, annual rent for the third Renewal Term , based on the following formula: The annual Rent for the third Renewal Term shall be increased by an amount equal to the product of the annual Rent for the second Renewal Term and a fraction, (i) the numerator of which is the difference between (a) the Consumer Price Index – All Urban Consumers (CPI-U) (Current Series) for San Francisco-Oakland-San Jose, California Area, compiled and published by the Bureau of Labor Statistics ("**Bureau**") and the Department of Labor for the United States of America (the "**CPI**") published for the last day of the month immediately preceding the commencement date of the third Renewal Term (e.g., if the commencement of the third Renewal Term is August 1, 2026, the CPI for July 2026) and (b) the CPI published for the last day of the month immediately preceding the commencement of the second Renewal Term, and (ii) the denominator of which is the CPI published for the last day of the month immediately preceding the commencement of the second Renewal Term. The annual Second Renewal Term Rent as increased by the resulting product shall be the new annual rent for the third Renewal Term (the "**Third Renewal Term Rent**"); provided, however, that in no event shall the Third Renewal Term Rent be less than the Second Renewal Term Rent and under no circumstances shall the Third Renewal Term Rent be more than three percent (3%) greater than

2

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 133 of 326

the Second Renewal Term Rent. Landlord shall give Tenant prior written notice indicating the Third Renewal Term Rent; provided, however, in the event such written notice is not delivered to Tenant prior to the commencement of the third Renewal Term, then Tenant shall still be obligated to pay to Landlord the Third Renewal Term Rent on or before the applicable due date in an amount equal to the Second Renewal Term Rent, and on or before the first (1st) day of the first (1st) calendar month following Tenant's receipt of such written notice, Tenant shall pay to Landlord, in addition to the Third Renewal Term Rent then due, an amount equal to the difference between the Second Renewal Term Rent and the Third Renewal Term Rent for all of the previous months of the third Renewal Term. In the event the Bureau discontinues the publication of the CPI, or publishes the same less frequently or on a different schedule, or alters the same in some other manner including, but not limited to, changing the name of the CPI or the geographic area covered by the CPI, Landlord, in its discretion, may adopt a substitute index or procedure which reasonably reflects and monitors consumer prices. Payment of the Third Renewal Term Rent as computed above shall be made in monthly installments, without allowance or set-off, and shall be due in advance on the first (1st) day of each calendar month during the third Renewal Term to the notice addresses provided by Landlord in Section 18 below or at such other place designated by written notice from Landlord or Tenant. The payment of the Third Renewal Term Rent for any partial calendar months included in the third Renewal Term shall be prorated on a daily basis

E.     Triple Net Lease. This Lease is a "Triple Net Lease," it being understood that Landlord shall receive the Rent free and clear of any and all other impositions, real property taxes, personal property taxes, liens, or expenses related to the Leased Property. In addition to the Rent, Tenant shall pay to Landlord or to the persons or entities entitled to receive them all expenses of the Leased Property (including, but not limited to, taxes, assessments, impositions, insurance premiums, operating charges, maintenance charges, construction costs, and any other expenses) which arise during or relate to the Leased Property during the Lease Term. All expenses shall be in addition to the Rent due under this Lease, and if Tenant fails to pay any of these expenses as and when they become due, Landlord shall have the same rights and remedies otherwise provided in this Lease for the failure of Tenant to timely pay Rent. Real property taxes and assessments shall be prorated as of the commencement of the Lease Term. Landlord shall be responsible for paying any real property taxes and assessments allocable to the period prior to commencement of the Lease Term.

F.     Rent Payments. All payments of Rent shall be Payment shall be made on the first day of each month, commencing on [     ] [   ], 2011 at P.O. Box 620485, Woodside, CA 94062-0485, or at such other place as the Landlord Parties shall request by written notice to Tenant. Rent for the first month of the Initial Term shall be for a pro-rated portion of the remaining days of such month.

## 3.     Use; Hazardous Substances; Compliance with Laws.

A.     Use. Tenant shall use and occupy the Leased Property for the management and operation of a nursery business, and for no other purposes.

B.     Definitions. For purposes of this Lease, the following definitions shall apply: "**Hazardous Substance(s)**" and "**Hazardous Material(s)**" shall mean any solid, liquid or

3

gaseous substance or material that is described or characterized as a toxic or hazardous substance, waste, material, pollutant, contaminant or infectious waste, or any matter that in certain specified quantities would be injurious to the public health or welfare, or words of similar import, in any of the Environmental Laws (as defined below), or any other words which are intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity or reproductive toxicity and includes, without limitation, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any mixture thereof), petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, nuclear or radioactive matter, medical waste, soot, vapors, fumes, acids, alkalis, chemicals, microbial matters (such as molds, fungi or other bacterial matters), biological agents and chemicals which may cause adverse health effects, including but not limited to, cancers and /or toxicity. "**Environmental Laws**" shall mean any and all federal, state, local or quasi-governmental laws (whether under common law, statute or otherwise), ordinances, decrees, codes, rulings, awards, rules, regulations or guidance or policy documents now or hereafter enacted or promulgated and as amended from time to time, in any way relating to (a) the protection of the environment, the health and safety of persons (including employees), property or the public welfare from actual or potential release, discharge, escape or emission (whether past or present) of any hazardous materials or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any hazardous materials, including, but not limited to, the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), Safe Drinking Water Act (42 U.S.C. Section 3000 et seq.), Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), Clean Air Act (42 USCA Section 7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.), California Health and Safety Code (Section 25100 et seq, Section 39000 et seq.), and the California Water Code (Section 13000 et seq.).

       C.    <u>Compliance with Laws</u>. Tenant shall promptly comply with all applicable laws, statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the Lease Term which regulate the use or condition of the Leased Property, including, without limitation, all Environmental Laws. Tenant represents and warrants that, except as herein set forth, it will not use, store or dispose of any Hazardous Materials or Hazardous Substances in or on the Leased Property except as is reasonable and customary in connection with the operation of a nursery business and in compliance with all applicable laws.

       D.    <u>Indemnification</u>. Tenant agrees to indemnify, defend, protect and hold harmless the Landlord Parties defined in <u>Section 17</u> below from and against any liability, obligation, damage or costs, including without limitation, attorneys' fees and costs, resulting directly or indirectly from any use, presence, removal or disposal of any hazardous materials or breach of any provision of this Lease, to the extent such liability, obligation, damage or costs was a result of actions caused or permitted by Tenant, the contractors, officers, agents, servants, employees, invitees, or visitors of Tenant, or Tenant's partners or subpartners or their respective officers, agents, servants, employees, or independent contractors.

       E.    <u>Waste or Nuisance</u>. Tenant shall not commit, or permit others to commit, any waste upon the Leased Property. Tenant shall not maintain, commit or permit the maintenance or commission of any nuisance as defined by California Civil Code Section 3479 on the Leased

4

Property. Tenant shall not use or permit the use of the Leased Property for any unlawful purpose.

## 4. Sublease and Assignment; Insolvency of Tenant.

A. <u>Sublease and Assignment</u>. Landlord may freely assign this Lease to any party, in Landlord's sole and absolute discretion. Tenant shall not assign this Lease, or any interest therein, or sublet the Leased Property or any part thereof, or allow any other person (the agents and employees of Tenant excepted) to occupy or use the Leased Property or any portion thereof, without the prior written consent of Landlord, which consent may be given or withheld by Landlord in its sole and absolute discretion. Any such assignment or subletting, without Landlord's consent, shall be void and shall, at the option of Landlord, terminate this Lease. This Lease shall not, nor shall any interest therein, be assignable as to the interest of Tenant by operation of law without the written consent of Landlord.

B. <u>Insolvency of Tenant</u>. The insolvency of Tenant, as evidenced by the appointment of a receiver to take possession of all or substantially all of the assets of Tenant, the making of a general assignment by Tenant for the benefit of creditors of an action taken or suffered by Tenant under any bankruptcy or insolvency act, shall terminate this Lease and entitle Landlord to re-enter and regain possession of the Leased Property. The levying of any writ of attachment or writ of execution against Tenant's interest in the Leased Property which shall not be satisfied or discharged by Tenant within sixty (60) days from the date of levy or execution, shall terminate this Lease and entitle Landlord to re-enter and regain possession of the Leased Property.

## 5. Operating and Maintenance Costs; Repairs.

Tenant shall, at its sole cost and expense, be responsible for and shall pay all operating costs in connection with Tenant's use of the Leased Property, including without limitation, production, labor and fuel costs, water, electricity and other utilities, and any tax or assessment imposed on the Leased Property by any irrigation district or similar entity for the provision of water to the Leased Property. Landlord shall not be responsible for any costs in connection with the operation, maintenance or repair of the Leased Property. Tenant shall, at its sole cost and expense, keep and maintain the Leased Property, any improvements thereon and all facilities appurtenant thereto in good order and repair and in as clean and safe condition as they were when received by Tenant, reasonable wear and tear excepted, including, but not limited to, the exterior walls and interior walls and floors of all structures (including, without limitation warehouse, office, storage and greenhouse space), other interior areas, doors, all lighting systems, driveways, walkways, entranceways, landscaping, security systems, roofs, HVAC systems, windows and fencing. Landlord shall not be responsible for any costs in connection with the maintenance or repair of the Leased Property or the improvements or utilities (including but not limited to irrigation water and associated reservoirs, pumps, and pipelines) located thereon, and disclaims all representations and warranties regarding the condition of the Leased Property or the suitability of all or any part thereof for any particular purpose. Tenant expressly waives the benefit of any statute now or hereinafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Leased Property in good order, condition and repair.

5

**6.      Alterations and Improvements.**

Tenant shall make no alterations, additions or improvements to the Leased Property without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord may impose, as a condition to such consent, such requirements as may be reasonable, including but not limited to a requirement that all work be covered by a lien and completion bond satisfactory to Landlord and requirements as to the manner, time and contractor or contractors by which such work shall be done.  Unless Landlord otherwise agrees in writing, or except as otherwise provided below, all such alterations, additions or improvements affixed or built into the Leased Property (but excluding movable trade fixtures and furniture) shall become the property of the Landlord and shall be surrendered with the Leased Property, as a part thereof, at the end of this Lease Term, except that Landlord may require Tenant to remove all or any alterations, decorations, additions, improvements and the like installed by Tenant, and to repair the Leased Property, or at Landlord's option to pay all costs relating to any damage to the Leased Property arising from such removal.  Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant may install a reverse osmosis system (the "**RO System**") on the Leased Property, at Tenant's sole cost and expense, provided that, upon the expiration or earlier termination of the Lease Term, the RO System shall belong to Tenant and Tenant may remove the RO System from the Leased Property, at Tenant's sole cost and expense.

**7.      Property Taxes.**

Tenant shall pay, prior to delinquency, all general real estate taxes and installments of special assessments owed during the Lease Term on the Leased Property to the extent allocable to the Lease Term, and all personal property taxes with respect to all personal property on the Leased Property to the extent allocable to the Lease Term.  All such taxes shall be prorated as provided in Section 2 E above.

**8.      Insurance.**

Tenant shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $5,000,000 combined single limit coverage of bodily injury, property damage or combination thereof.  In addition, Tenant shall at its sole expense, maintain a policy or policy of casualty insurance (all risk) with premiums thereon fully paid on or before the due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than the full replacement value of the fixtures and improvements situate on the property and the equipment and personal property thereon, naming Landlord as the insured.  Tenant shall provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to terminate or expire at least ten (10) days prior to such termination or expiration.

31573276v2_336453-00006

## 9. Liens.

Tenant may not do anything that will cause the title of the Leased Property to be encumbered in any way. If Tenant causes a lien to be filed against the Leased Property, Tenant will, within twenty (20) days after receipt of Landlord's demand: (1) pay the lien and have the lien released of record; or (2) take action to discharge the lien. Tenant will provide Landlord a copy of any release Tenant obtains pursuant to this <u>Section 9</u>.

## 10. Landlord Entry.

Landlord shall have the right to enter upon the Leased Property at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Property.

## 11. Remedies.

The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition. The acceptance of Rent hereunder, or any portion thereof, shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease. No payment by Tenant of a lesser amount than the Rent and other sums required by this Lease shall be deemed to be other than a partial payment on account of the earliest due sums, notwithstanding any check endorsement or letter to the contrary. It is understood and agreed that the remedies herein given to Landlord and those available at law shall be cumulative, and the exercise of any one remedy by Landlord shall not be to the exclusion of any other remedy.

## 12. Damage and Destruction.

A.    <u>Damage and Destruction</u>.  If the Leased Property or any part thereof shall be damaged or rendered untenantable by fire or other insured casualty during the Lease Term, Tenant shall promptly give notice of such damage or destruction to Landlord.  If the Leased Property or any part thereof shall be damaged or rendered untenantable by fire or other insured casualty during the Lease Term (a "**Covered Casualty**") and this Lease is not to be terminated pursuant to this <u>Section 12</u>, Landlord shall proceed with the repair of such damage (but Landlord shall have no obligation to repair any damage to any of Tenant's fixtures, furnishings, equipment or other personal property) with reasonable diligence after the collection of the insurance proceeds attributable to such damage, but only to the extent of available insurance proceeds. In the event of a Covered Casualty for which:

(1)    the damage is to the extent of forty percent (40%) or less of the replacement cost of the Leased Property, and Landlord fails to repair such damage within the time period for repair set forth in the notice given to Tenant after the casualty (which notice shall be accompanied by a written certification from a third party contractor setting forth the time of such repair), or

(2)    the damage is to the extent of more than forty percent (40%) of the replacement cost of the Leased Property, and Landlord fails to repair such damage within twelve (12) months of the casualty,

7

then in the case of either (1) or (2) above, Tenant may provide Landlord with a sixty (60) day notice of intent to terminate. If Landlord fails to substantially complete the repairs (with the exception of punch list items) with respect to a Covered Casualty, by the end of the sixty (60) day period, this Lease shall end and terminate on such date. Except as provided in <u>Section 12.B</u> below, the Rent shall be equitably abated to the extent that all or any part of the Leased Property shall have been rendered untenantable by a Covered Casualty, from the date of the damage to the date that Landlord shall have completed the repairs required of Landlord pursuant to the previous sentence; provided, however, that if Tenant reoccupies a portion of the Leased Property during the period of repair, the Rent allocable to such reoccupied portion, based upon the proportion which the reoccupied portion of the Leased Property bears to the total area of the Leased Property, shall be payable by Tenant from the date of such occupancy.

B. <u>Termination Rights</u>. If (1) the Leased Property shall be totally damaged or rendered wholly untenantable by a Covered Casualty to the extent of forty percent (40%) of the replacement cost thereof or (2) if in connection with any casualty the insurance proceeds available to Landlord, in Landlord's sole opinion, shall not be reasonably sufficient to repair the damage, and in any of the above cases Landlord elects not to restore the damage, then in any such event Landlord may, at its option, terminate this Lease by giving Tenant thirty (30) days' notice of such termination at any time within one hundred twenty (120) days after the date of such fire or other casualty. If such notice of termination shall be given, this Lease shall terminate as of the date provided in such notice (whether or not the Lease Term shall have commenced) with the same effect as if that date were the expiration date of the Lease Term.

C. <u>Partial Damage or Destruction During Last Two (2) Years of Lease Term</u>. In the event of minor damage to any part of the Leased Property from a Covered Casualty, and if such damage does not render the Leased Property unusable for Tenant's purposes, Tenant shall promptly repair such damage at the cost of the Tenant, and Tenant shall not be relieved from paying Rent and other charges during any portion of the Lease Term.

D. <u>Damage Caused By Tenant</u>. If the Leased Property or other part thereof shall be damaged or rendered untenantable by a casualty arising from the acts or omissions of Tenant or Tenant's employees, contractors, agents, invitees or representatives that is not covered by insurance, Tenant shall promptly repair such damage at Tenant's sole cost and expense and the other paragraphs of this <u>Section 12</u> shall not apply.

**13. Default; Remedies.**

A. <u>Default by Tenant</u>. The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

(1) Any failure by Tenant to pay Rent or to make any other payment required to be made by Tenant under this Lease within five (5) days of the date when due;

(2) The abandonment or vacation of the Leased Property by Tenant;

(3) A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by Tenant, when that failure continues for thirty (30) days after written notice of such failure by Landlord to Tenant; provided however, that if the nature of

8

that default is such that it cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if Tenant commences that cure within the thirty (30) day period and thereafter diligently prosecutes it to completion.

B.    Remedies.  In the event of any default by Tenant under this Lease, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the right to terminate this Lease and all rights of Tenant under this Lease by delivering written notice of the default and providing Tenant with a reasonable opportunity to cure same.  No act of Landlord shall be construed as terminating this Lease except written notice given by Landlord to Tenant advising Tenant that Landlord elects to terminate this Lease following the expiration of the cure period.  In the event Landlord elects to terminate this Lease, Landlord may recover from Tenant all of the following:

(1)    Any unpaid Rent that had been earned at the time of the termination of the Lease;

(2)    The unpaid Rent for the balance of the Lease Term to the extent not recovered by Landlord by reletting the Leased Property less the reasonable expense associated with such reletting, provided that Landlord shall have no obligation to relet the Leased Property; and

(3)    Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease, including but not limited to reasonable costs and attorneys' fees.

## 14.    Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Property during the term of this Lease.

## 15.    Condemnation.

If any legally constituted authority condemns the Leased Property or such part thereof which shall make the Leased Property unsuitable for operation of a nursery business, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for Rent as of that date.  Such termination shall be without prejudice to the rights of Landlord to recover compensation from the condemning authority for any loss or damage caused by the condemnation.  Any condemnation proceeds shall be the property of Landlord except for Tenant's personal property that may be taken.

## 16.    Subordination; Estoppel Certificates.

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Property, and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its sole discretion provided

9

that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period. Nothing contained herein shall be deemed to create an obligation or duty on the part of Landlord to provide Tenant with a nondisturbance agreement from the existing lender as of the date of this Lease. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Property, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request provided that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period. In the event that Tenant should fail to execute any instrument of subordination herein required to be executed by Tenant promptly as requested, Tenant hereby irrevocably appoints Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time within five (5) days of request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

## 17. Indemnity.

Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Leased Property from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant, except as provided below in this Section 17. Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and attorneys' fees) (collectively, "**Claims**") incurred in connection with or arising from: (a) the use or occupancy of the Leased Property by Tenant or any person claiming under Tenant; (b) any activity, work, or thing done, or permitted or suffered by Tenant in or about the Leased Property; (c) any acts, omission, or negligence of Tenant or any person claiming under Tenant, or the contractors, agents, employees, invitees, or visitors of Tenant or any such person; or (d) any breach, violation, or non-performance by Tenant or any person claiming under Tenant or the employees, agents, contractors, invitees, or visitors of Tenant or any such person of any term, covenant, or provision of this lease or any law, ordinance, or governmental requirement of any kind. Pursuant to this Section 17, Tenant's agreement to indemnify and hold Landlord harmless is not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to this Lease to the extent such policies cover the results of such acts, omissions or willful misconduct. The provisions of this Section 17 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

10

**18.  Notice.**

Any notice required or permitted under this Lease shall be deemed sufficiently given or served when hand-delivered, sent by certified mail, return receipt requested, or sent by facsimile transmission followed by a hard copy to:

|     |     |     |
| --- | --- | --- |
| (a) | If to Tenant: | If by overnight mail:<br>360 Espinosa Road<br>Salinas, CA 93907<br>Attn: Charles Kosmont & Leslie Surber |
|     | If by USPS: | Post Office Box 3756<br>Salinas, CA 93912<br>Attn: Charles Kosmont & Leslie Surber |
|     | If by facsimile: | (831) 443-1345<br>Attn: Charles Kosmont & Leslie Surber |
|     | With a copy to: | Michael W. Burnett, P.C.<br>3 San Joaquin Plaza, Suite 215<br>Newport Beach, CA 92660<br>Fax: 949-729-9191 |
| (b) | If to Landlord Parties: | Jack Pearlstein<br>240 Shawnee Pass<br>Portola Valley, CA  94028 |
|     |     | Gail Hollingsworth<br>541 Roehampton Road<br>Hillsborough, CA  94010-6853 |
|     |     | Kit Shiotani<br>198 Zils Road<br>Watsonville, CA  95076 |
|     | With a copy to: | Bancroft & McAlister<br>80 E. Sir Francis Drake Blvd, Suite 2G<br>Larkspur, CA  94939<br>Attention:  George R. Dirkes, Esq. |

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

**19.  Brokers.**

Landlord acknowledges that no real estate broker procured this Lease.  If Tenant has dealt with any real estate broker or agent or any other person in connection with leasing of the Leased

11

Property, Tenant shall be solely responsible for the payment of any fee due such person, and Tenant shall indemnify, defend and hold Landlord harmless from and against any liability in respect thereto, including attorneys' fees and costs.

## 20. Memorandum of Lease.

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

## 21. Headings.

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

## 22. Successors.

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors, heirs and assigns.

## 23. Counterparts.

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

## 24. Compliance with Law.

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Property. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Property.

## 25. Final Agreement.

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

## 26. Governing Law.

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of California.

## 27. Release Upon Assignment.

Upon Landlord's sale or transfer of the Leased Property and assignment of this Lease, Landlord shall be released from any further obligation hereunder, provided that Landlord's assignee agrees to assume all of Landlord's obligations hereunder.

31573276v2_336453-00006

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 143 of 326

**28. Holding Over.**

Holding over by Tenant after the termination or expiration of this Lease shall not constitute a renewal or extension thereof, nor give Tenant any rights hereunder in or to the Leased Property.

**29. Condition of Leased Premises.**

Landlord delivered the Leased Premises to Tenant in an "AS IS" condition. Tenant acknowledges that it is leasing the Leased Premises in reliance on its own investigation and waives any and all objections to the condition of the Leased Premises. Tenant acknowledges that it has accepted the real property in its condition described above subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Leased Premises, and any covenants or restrictions of record, and accepts this Lease subject to them.

IN WITNESS WHEREOF, the parties have executed this Lease as of the Effective Date.

**TENANT:**

By:_____

**LANDLORD:**

By: _____

31573276v2_336453-00006

**EXHIBIT A-1**

Legal Description

The following describes the Leased Property subject to Lease between Landlord and Tenant.

Parcel 2: Approximately 10 acres of land with improvements thereon located at 2125 So. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels:

066 – 093 - 030
066 - 093 - 040

**EXHIBIT A-2**

Fixtures

Hoop, offices, lunchroom, packing shed, cold storage, holding pond and Equipment,

# EXHIBIT H

## FORM OF OWNED REAL PROPERTY DEED

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:


MAIL TAX STATEMENTS TO:

SAME AS ABOVE

_____
(Above space for Recorder's use only)

## GRANT DEED


The undersigned grantor declares:

Documentary Transfer Tax not shown pursuant
to Section 11932 of the Revenue and
Taxation Code, as amended


City of Half Moon Bay, California


FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged **NURSERYMEN'S EXCHANGE, INC.,** a California corporation ("**Grantor**"), does hereby remise, release and forever grant to _____, a _____ ("**Grantee**") that certain real property in the City of Half Moon Bay, County of San Mateo, State of California, more particularly described in **Exhibit "1"** attached hereto and incorporated herein by this reference, together with all rights, privileges and appurtenances thereto, if any, including, but not limited to, all overlying, riparian, prior appropriation, groundwater, and other water rights, if any, as well as all permits, rights and privileges to use, reuse, reclaim, take, store, divert or discharge water, if any, and subject to all non-delinquent general and special real property taxes and assessments and all matters appearing of record in the office of the Recorder of said county.


DATED: _____, 2011        **GRANTOR:**

                                    **NURSERYMEN'S EXCHANGE, INC.,**
                                    a California corporation

                                    By:  _____
                                    Name: _____
                                    Title: _____

STATE OF _____ )
                           )
COUNTY OF _____   )


       On _____, 2011 before me, _____ (here insert name and title of the officer), personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____          (Seal)

# EXHIBIT 1

## To Owned Real Property Deed

## Legal Description of Owned Real Property Deed

1. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Parcel "A" as shown on that certain Map entitled "Parcel Map being a Resubdivision of a Portion of Lot 1 as shown on that certain Map entitled "Map of the land of J. M. Vasques, Port of the Rancho Corral de Tierra Vasques", which Map was filed on January 1, 1886 in Book "A" of Maps at Page 44, and a copy entered in Book 1 of Maps at Page 63 and a portion of that Parcel as conveyed from Louis S. Miguel to State Building Supply and Equipment Company, as recorded in Volume 2910, Official Records, 501, Records of San Mateo County, Half Moon Bay, San Mateo County, Calif.", filed in the office of the County Recorder of San Mateo County, State of California, on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23.

APN:                048-300-190 and
                       048-300-260

JPN:                048-034-340-14.02A
                       048-030-300-02.01A

2. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

PARCEL ONE:

BEGINNING at a point on the Easterly side of the road leading from Spanishtown to Half Moon Bay, said point being marked on the fence "P V" and running thence North 62 + 30' East 20.04 chains to a fence on the Easterly side of a field; thence South 29° East 2.57 chains to a stake; thence South 81° East 8.82 chains to a stake in line of fence; thence South 62° 30' West 19.23 chains to a mark on fence of race track; thence North 29° East 5.40 chains; thence South 59° West 8.60 chains to road above mentioned; thence North 29° West 2.67 chains to a place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

EXCEPTING THEREFROM so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950 in Book 1774 of Official Records of San Mateo County at page 182 (30521-I).

PARCEL TWO:

A non-exclusive easement for an existing electrical line along the Southeasterly line of Parcel Two as described in Decree Establishing Death and Terminating Joint Tenancy recorded December 19th, 1949 in Volume 1763 at Page 80, San Mateo County Records.

APN:    048-300-090

JPN:    048-030-300-09A

3. The land referred to herein is in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a stake in line of fence, on the Easterly line of the road leading from the Town of Spanishtown of Amesport Landing, said stake being 5 chains and 30 links distance South 29° East from the Southwest corner of a tract of land conveyed to Louis Cardoza Lial by Pablo Vasquez, by Deed recorded in Book 22 of Deeds of Page 117, Records of San Mateo County and running thence North 29° West 5.30 chains to the above-mentioned Southwest corner of the Louis Cardoza Lial property; thence North 59° East 8.52 chains to a stake; thence South 29° East 5.40 chains to a stake in a line of the outside fence, which encloses the Half Moon Bay Race Track, on the Easterly side of said track' thence South 59° West 8.52 chains to the place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

Excepting Therefrom so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950, in Book 1774 of Official Records of San Mateo County at Page 182 (30521-I)

APN:    048-300-100

JPN:    048-030-300-10A

4. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a point that is distant North 28° 33' West 255.00 feet from a one inch iron pipe set for the most Southerly corner of the M. Joseph 47.723 acre Tract, said point of beginning being distant at right angles 25.00 feet from the center line and opposite Engineer's Station 372 plus 02.50 Route 2 Division 4, San Mateo County Highways; running thence from said point of beginning North 59° 04' 38" East 1403.92 feet to an old fence dividing the lands of Joseph and lands of E. Vasquez; thence along said fence North 13° 44' West 336.85 feet; thence leaving said fence South 56° 30' 26" West 1494.49 feet to the Easterly line of the above mentioned County Highway; thence along the Easterly line of said Highway South 28° 33' East 255.00 feet to the point of beginning.

EXCEPTING THEREFROM so much of the herein described property as contained in the Deed from Rose Joseph Roach, also known as Rose Joseph Roache, a widow, to State of California, dated August 16, 1949 and recorded September 26, 1949 in Book 1718 of Official Records of San Mateo County at Page 308 (11176-I).

APN:    048-300-220

JPN:    048-030-300-07A

## DECLARATION OF DOCUMENTARY TRANSFER TAX

## DO NOT RECORD

County Recorder

San Mateo County, California

        It is hereby requested that this Declaration of Documentary Transfer Tax not be recorded with the attached Grant Deed, but be affixed to the Grant Deed after it is recorded and before it is returned.

The Grant Deed names **NURSERYMEN'S EXCHANGE, INC.**, a California corporation, as Grantor and _____, a _____, as Grantee.  The property being transferred is located in the County of San Mateo, State of California.  The Assessor's Parcel Nos. are 048-300-090, 048-300-100, 048-300-190, 048-300-220 and 048-300-260, and the amount of Documentary Transfer Tax due on the attached Grant Deed is $_____, computed on the full value of the interest or property conveyed.

        I declare under penalty of perjury that the foregoing is true and correct.

                         **GRANTOR:**

                         **NURSERYMEN'S EXCHANGE, INC.,**
                         a California corporation

                         By: _____
                         Name: _____
                         Title: _____

31565985

EXHIBIT I

## FORM OF PUD LEASE

### LEASE AGREEMENT

This Lease Agreement ("**Lease**") is made and effective _____, 2011, by and between **NURSERYMEN'S EXCHANGE, INC**., a California corporation ("**Landlord**") and _____, a _____("**Tenant**").

WHEREAS, Landlord and Tenant are parties to that certain Asset Purchase Agreement dated _____, 2011 (the "**Agreement**"), pursuant to which Tenant has agreed to purchase from Landlord substantially all of the operating assets relating to Landlord's wholesale business of growing and selling indoor blooming plants, specialty foliage and packaged plants (the "**Business**"), including that certain real property in the City of Half Moon Bay, California, and described on Exhibit A attached hereto (the "**Tenant's Property**").

WHEREAS, Landlord continues to own certain real property adjacent to Tenant's Property which contains infrastructure components (collectively, the "**Infrastructure**") critical to the water supply, tail water capture and recycle system that supports on-going operations of the Business as a nursery on Tenant's Property, including without limitation water lines, pipes, sumps, pumps, drains, reservoirs and ponds.

WHEREAS, Landlord and Tenant desire for Tenant to lease from Landlord that certain real property in the City of Half Moon Bay, California and described on Exhibit B attached hereto (the "**Leased Premises**"), so that Tenant may relocate the Infrastructure onto Tenant's Property, for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

WHEREAS, Tenant acknowledges that Landlord has entered into a Purchase and Sale Agreement with respect to the sale of the Leased Premises (such Purchase and Sale Agreement, or any subsequent agreement entered into with a replacement purchase of the Leased Premises, the "**PSA**") and upon consummation of a sale of the Leased Premises to the Buyer (as defined in the PSA) pursuant to the PSA, Landlord will assign all of Landlord's right, title and interest and Buyer will assume all of Landlord's obligations hereunder.

NOW THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

**1.     Term.**

A.  Landlord hereby leases the Leased Premises to Tenant, and Tenant hereby leases the same from Landlord, for an initial term beginning _____, 2011 and ending December 31, 2012 (the "**Initial Term**").

B.  This Lease shall automatically renew for one (1) extended term of one (1) year (the "**Renewal Term**"), unless either party delivers written notice to the other party of such party's desire not to renew the Lease at least six (6) months prior to the expiration of the Initial Term.  The Renewal Term shall be at the rental set forth below and otherwise upon the same covenants, conditions and provisions as provided in this Lease.  The Initial Term and Renewal Term, if applicable, are collectively referred to herein as the "**Lease Term**".  Unless terminated earlier in accordance with this Paragraph 1.B or the Lease, the Lease Term shall terminate at the end of the Renewal Term and neither party shall have any right or obligation to extend the Lease Term beyond such date.

31570547_336453-00006

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 152 of 326

**2.     Rental.**

Tenant shall pay to Landlord during the Lease Term rental of $4,522.00 per month (the "**Rent**"). Each installment payment shall be due in advance on the first day of each calendar month during the Lease Term to Landlord at _____ or at such other place designated by written notice from Landlord to Tenant. The rental payment amount for any partial calendar months included in the Lease Term shall be prorated on a daily basis.

**3.     Use.**

Tenant shall use the Leased Premises to relocate the Infrastructure and for agricultural purposes, and for no other purposes without the prior written consent of Landlord, which Landlord may withhold, condition or delay in its sole discretion. Tenant's use of the Leased Premises is subject to Tenant's obligations regarding the relocation and removal of the Infrastructure as set forth herein.

**4.     Sublease and Assignment.**

Landlord shall have the right, without Tenant's consent, to assign this Lease to any party, including, without limitation, any purchaser of the Leased Premises, and Landlord shall deliver to Tenant a copy of any such assignment. Tenant shall have the right without Landlord's consent, to assign this Lease to any entity (including, without limitation, a corporation, partnership, limited liability company, trust or other entity, herein an "**Entity**") with which Tenant may merge or consolidate, to any Entity controlled by, controlling or under common control with Tenant, or to a purchaser of all or substantially all of Tenant's assets, provided that such assignee executes and delivers to Landlord a writing in which said assignee agrees to assume all obligations of Tenant hereunder and to be bound by all of the terms and conditions of this Lease and that Tenant shall remain liable after said assignment for all of the obligations of Tenant hereunder. Except as set forth above, Tenant shall not sublease all or any part of the Leased Premises, or assign this Lease in whole or in part without Landlord's consent, which consent Landlord may withhold, condition or delay in its sole discretion.

**5.     Maintenance and Repairs.**

During the Lease Term, at Tenant's sole cost and expense, Tenant shall keep the Leased Premises in good order, condition and repair, and shall comply with all applicable federal, State and local statutes, laws, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements in effect during the Lease Term which regulate the use or condition of the Leased Premises. Tenant shall not commit waste or allow any another party to commit waste on or of the Leased Premises or otherwise materially and adversely affect the Leased Premises or the condition thereof; provided, however, that Landlord expressly agrees that Tenant may relocate the Infrastructure in accordance with this Lease and any work done by Tenant in connection with same shall not be deemed to materially or adversely affect the Leased Premises or the condition thereof.

**6.     Alterations and Improvements.**

Before the expiration or earlier termination of the Lease Term, Tenant, at Tenant's sole cost and expense, shall relocate the Infrastructure to Tenant's Property, which work shall include, but not be limited to: (1) moving a water recycling pipe that currently runs through the Leased Premises to Tenant's Property, and (2) relocating sump collection on the Lease Premises for Tenant's Property to Tenant's Property. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Leased Premises, provided that Tenant's placement and installation thereof complies with all of the requirements of this Lease. All personal property, equipment, machinery, trade fixtures and temporary installations, whether on the Leased Premises prior to the commencement of the Lease Term or placed or installed on the Leased Premises by Tenant thereafter, shall remain Tenant's Property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the Lease Term, and Tenant shall, prior to the expiration or earlier termination of the Lease Term, remove all of same from the Leased Premises, provided that all damage to the

31570547_336453-00006

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 153 of 326

Leased Premises caused by any such removal shall be repaired promptly by Tenant at Tenant's sole cost and expense. Notwithstanding the foregoing, the parties acknowledge and agree that: (a) upon the expiration or earlier termination of the Lease Term, Tenant may abandon and shall have no obligation to remove or repair (1) the existing sump located on the Leased Premises, and (2) the existing underground irrigation PVC piping located on the Leased Premises; and (b) that, if requested in writing by Tenant by no later than three (3) months prior to the termination or expiration of the Lease Term, Tenant and Landlord shall negotiate in good faith to reach an appropriate agreement/arrangement to allow Tenant to continue to use the sump located on the Leased Premises after the termination or expiration of the Lease Term. Except as set forth in this Paragraph 6, Tenant shall not make any alterations or improvements to the Leased Premises without Landlord's prior written consent, which consent Landlord may withhold, condition or delay in its sole discretion.

## 7. Liens.

Tenant shall promptly and punctually pay and perform all of its obligations to third parties, whether under any agreements or otherwise, with respect to or affecting the Leased Premises and/or Tenant's activities on the Leased Premises and shall not do anything that will cause the title of the Leased Premises to be encumbered in any way. If any third party files or causes a lien to be filed against the Leased Premises arising out of or related in any way to Tenant, Tenant's activities under this Lease, or Tenant's use of the Leased Premises, Tenant will within sixty (60) days after receipt of Landlord's demand, at Tenant's election: (1) pay the lien and have the lien released of record; or (2) take action to discharge, bond or insure over the lien. Tenant will provide Landlord a copy of any release, bond, discharge, or insurance Tenant obtains pursuant to this Paragraph 7. If Tenant fails to timely cure, discharge, or remove any such lien, Landlord shall have the right, but not the obligation, to take whatever action is necessary to remove, discharge, or cure such lien, including without limitation paying the full amount demanded by any third party, and Tenant shall promptly reimburse Landlord for all costs and expenses Landlord incurs with respect to same.

## 8. Property Taxes.

Landlord shall pay, prior to delinquency, for the Lease Term, all general real estate taxes and installments of special assessments due for the Leased Premises. Tenant shall pay, prior to delinquency, for the Lease Term, all taxes, charges, and assessments with respect to all of Tenant's personal property, including trade fixtures, equipment, temporary installations, and inventory on the Leased Premises. If Tenant fails to timely pay any such taxes, assessments or charges, Landlord shall have the right, but not the obligation, to pay same and Tenant shall promptly reimburse Landlord for all costs and expenses Landlord incurs with respect to same.

## 9. Insurance.

Tenant shall, at its own cost and expense, maintain throughout the Lease Term the following policies of insurance: (a) commercial general liability insurance with limits of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate for bodily or personal injury or death and property damage, (b) contractual liability insurance with respect to Tenant's obligations hereunder, and (c) workers' compensation insurance in accordance with applicable law, all covering any accident arising in connection with the presence of Tenant, its contractors, agents and representatives on the Leased Premises, which insurance shall (x) name or cover as additional insureds thereunder Landlord and such other parties holding insurable interests as Landlord may reasonably designate and (y) be written by the same insurance company as the Tenant currently uses or another insurance company provided that it is a reputable insurance company having a rating of at least "A-IX" by Best's Rating Guide (or a comparable rating by a successor rating service). All such policies shall be with the premiums thereon fully paid on or before due date, issued by and binding upon the insurance company, shall provide that such policies cannot be cancelled without at least thirty (30) days prior written notice to Landlord, and shall have deductibles and/or self-insured retentions only in amounts reasonably acceptable to Landlord. Tenant shall on or before the Effective Date of this Lease provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this Paragraph 9. Should Tenant fail to maintain any insurance

31570547_336453-00006

required under this Paragraph 9, Landlord shall have the right, but not the obligation, to obtain and maintain same and Tenant shall promptly reimburse Landlord for all costs and expenses Landlord incurs with respect to same.

## 10.     Utilities.

Tenant shall arrange for the provision of and pay all charges, fees and deposits for water, sewer, gas, electricity, telephone and other services and utilities used by Tenant on the Leased Premises during the Lease Term unless otherwise expressly agreed to in writing by Landlord.  The parties shall reasonably cooperate with each other to transfer said utilities to the Landlord upon expiration or earlier termination of the Lease Term.

## 11.     Signs.

Tenant shall have no right to install or place any new or additional signage on the Leased Premises during the Lease Term without Landlord's prior written consent, which consent Landlord shall not unreasonably withhold, condition or delay.

## 12.     Entry.

Landlord and its employees, contractors, subcontractors, agents, consultants, invitees and representatives, including, without limitation, any prospective purchasers of the Leased Premises and their employees, contractors, subcontractors, agents, consultants, invitees and representatives, shall have the right to enter upon the Leased Premises upon reasonable advance notice to Tenant, to take such actions that are necessary and appropriate to market or sell the Leased Premises or entitle and/or develop the Leased Premises, provided Landlord shall not unreasonably interfere with Tenant's business on the Leased Premises or Tenant's relocation work of the Infrastructure.

## 13.     Remedies.

The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition.  The acceptance of Rent hereunder shall not be construed to be a waiver of any breach by Tenant of any term, covenant or condition of this Lease.  No payment by Tenant of a lesser amount than the Rent and other sums required by this Lease shall be deemed to be other than a partial payment on account of the earliest due sums, notwithstanding any check endorsement or letter to the contrary.  It is understood and agreed that the remedies herein given to Landlord and those available at law shall be cumulative, and the exercise of any one remedy by Landlord shall not be to the exclusion of any other remedy.

## 14.     Damage and Destruction.

If for any reason other than the acts or omissions of Tenant or Tenant's employees, contractors, agents, invitees and representatives (the "**Tenant Parties**"), the Leased Premises or any part thereof or any appurtenance thereto is so damaged by fire, casualty or structural defects that the same cannot be used for Tenant's purposes, then Tenant shall have the right within one hundred eighty (180) days following damage to elect by notice to Landlord to terminate this Lease as of the date of such damage.  In the event of damage to any part of the Leased Premises, and Tenant does not elect to terminate this Lease as aforesaid, until such damage is repaired and Tenant resumes its business in the normal course, Rent and other charges during any portion of the Lease Term that the Leased Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes, shall be apportioned according to the portion of the Leased Premises as to which Tenant does not in fact conduct its business (whether directly damaged or rendered unusable as a result of such damage). The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Leased Premises, or any appurtenance thereto, inoperable or unfit for occupancy or use, in whole or in part, directly or indirectly, for Tenant's purposes.  Notwithstanding any other

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 155 of 326

provision of this Paragraph 14, Landlord shall have no obligation to repair any damage to or destruction of the Leased Premises, whether or not Landlord receives any insurance proceeds with respect to same.

### 15. Hazardous Materials.

Throughout the Lease Term, Tenant and Tenant Parties shall not use, dispose of, import, store, or discharge, or allow any third party to use, dispose of, import, store, or discharge, any Hazardous Materials or substances to, in, on, or under the Leased Premises. As used in this Lease, the term "**Hazardous Materials**" means "Hazardous Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, and any other substances regulated because of their effect or potential effect on public health or the environment, including PCBs, lead paint, asbestos, urea formaldehyde, radioactive materials, putrescible materials, and infectious materials.

### 16. Tenant's Indemnity.

Tenant shall indemnify, defend, and hold harmless Landlord and Landlord's financial partners/sources, employees, officers, directors, agents, representatives, contractors, and consultants (collectively, the "**Landlord Parties**") from and against any and all claims, demands, actions, causes of action, liabilities, injuries, fines, damages, losses, or costs (including court costs and attorney's fees) (collectively, "**Claims**") arising out of, related to, or connected with Tenant's, or any of the Tenant Parties', use of, activities on, or with respect to, the Lease Premises during the Lease Term, including without limitation any Claims arising out of, related to, or connected with (a) any damage to any property (including but not limited to property of Landlord) or any injury (including but not limited to death) to any person occurring in, on or about the Leased Premises; (b) the conduct or management of any work or thing whatsoever done by Tenant or any of the Tenant Parties in, on or about the Leased Premises or from transactions of Tenant or the Tenant Parties on or concerning the Leased Premises; (c) Tenant's or the Tenant Parties' actual or asserted failure to comply with any and all federal, State and local statutes, laws, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements, including, without limitation Environmental Laws (as defined below), applicable to the condition or use of the Leased Premises or its use or occupancy; and (d) any breach or default on Tenant's or any Tenant Parties' part of or in the performance of any covenant, requirement or agreement on the part of the Tenant to be performed pursuant to this Lease. As used herein, "**Environmental Laws**" shall mean any and all present and future federal, state and local law (whether under common law, statute, rule, ordinance, agreement, regulation or otherwise), requirement under any permit issued with respect thereto, and other requirements of agencies having jurisdiction thereunder relating to or dealing with the protection of health or the environment, including, without limitation, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136, et seq.; the Toxic Substances Control Act, 15. U.S.C. §§ 2601, et seq.; Federal Asbestos Hazard Emergency Response Act, 15 U.S.C. §§ 2641 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1321; 42 U.S.C. §§ 7401 et seq.; the California Hazardous Waste Control Act, Cal. Health & Safety Code §§ 25100 et seq.; the California Hazardous Substance Account Act, H.&S.C. §§ 25300 et seq.; the California Safe Drinking Water and Toxic Enforcement Act, H.&S.C. §§ 25249.5, et seq.; the California Hazardous Waste Management Act, H.&S.C. §§ 25170.1 et seq.; H.&S.C. §§ 25501 et seq. (Hazardous Materials Response Plans and Inventory); the Porter-Cologne Water Control Act, Cal. Water Code §§ 13000 et seq.; H.&S.C. §§ 25280, et seq. (Underground Storage of Hazardous Substances); H.&S.C. § 25915 et seq.; H.&S.C. § 25359.7; H.&S.C. §§ 2595 et seq.; Cal. Labor Code §§ 6501.5 et seq.; and Title 22 of the California Code of Regulations; all as amended to the date hereof.

### 17. Default.

If default shall at any time be made by Tenant in the payment of Rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after such due date (without any obligation of Landlord to

31570547_336453-00006

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 156 of 326

notify Tenant of same), or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for thirty (30) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the Lease Term ended and terminated by giving Tenant written notice of such intention, and if possession of the Leased Premises is not surrendered, Landlord may reenter and retake possession of the Leased Premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages.

**18.     Quiet Possession.**

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the Lease Term.

**19.     Condemnation.**

If any legally constituted authority condemns the Leased Premises or such part thereof which shall make the Leased Premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage caused by the condemnation. Neither party shall have any rights in or to any award made to the other by the condemning authority.

**20.     Lot Line Adjustment.**

Landlord has provided Tenant with a copy of the proposed lot line adjustment application that Tenant shall submit to the City of Half Moon Bay (the "**City**") for approval (the "**LLA**"), which LLA shall include adjusting the lot lines between the Leased Premises and Tenant's Property so as to add to Tenant's Property the portion of the Leased Premises depicted and described on <u>Exhibit C</u> attached hereto ("**Retained Land**"). The parties agree that if Tenant obtains approval of the LLA, Landlord shall promptly cooperate with the execution and recording in the official records of the County of all documents necessary to affect the LLA and to adjust the lot lines between the Leased Premises and the Tenant's Property so that after such recording(s) the Tenant's Property includes the Retained Land and at such time as Tenant owns the Retained Land, this Lease shall terminate in part and no longer apply with respect to the Retained Land. Notwithstanding any of the foregoing, there shall be no change in the monthly Rent as a result of the LLA.

**21.     Subordination; Estoppel Certificates.**

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Premises, and to any renewals, refinancing and extensions thereof, provided that, as a condition to any such subordination, each and every such lien holder agrees in writing (in recordable form) not to disturb Tenant's occupancy so long as Tenant is not in default under this Lease beyond any applicable cure period, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Tenant agrees upon demand to execute such further instruments in commercially reasonable form subordinating this Lease or attorning to the holder of any such liens as Landlord may reasonably request. Tenant agrees that it will, at the Closing under the Agreement, if requested by Landlord, and thereafter from time to time within twenty (20) days of request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, and stating that, to Tenant's actual knowledge, Landlord is not in default hereunder (or if Tenant alleges a default stating the

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 157 of 326

nature of such alleged default). Landlord agrees that it will from time to time within twenty (20) days of request by Tenant execute and deliver to such persons as Tenant shall request a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, and stating that, to Landlord's actual knowledge, Tenant is not in default hereunder (or if Landlord alleges a default stating the nature of such alleged default).

**22    Notice.**

Any notice required or permitted under this Lease shall be deemed sufficiently given or served when hand-delivered, sent by certified mail, return receipt requested, or sent by facsimile transmission, followed by a hard copy to:

Landlord at:      Nurserymen's Exchange Inc.
                  2651 North Cabrillo Highway
                  Half Moon Bay, CA 94019
                  Attn:         Jack Pearlstein
                  Phone:        (650) 712-4000
                  Facsimile:    (650) 284-2886
                  E-mail:       jpearlstein@bloomrite.com

and a copy to:    Katten Muchin Rosenman LLP
                  2029 Century Park East, Suite 2600
                  Los Angeles, California  90067
                  Attention:    Mark Conley
                  Telephone:    (310) 788-4690
                  Facsimile:    (310) 712-8225
                  E-mail:       mark.conley@kattenlaw.com

Tenant at:        If by overnight mail:
                  360 Espinosa Road,
                  Salinas, CA 93907
                  Attn: Charles Kosmont & Leslie Surber

If by USPS:       Post Office Box 3756
                  Salinas, CA 93912
                  Attn: Charles Kosmont & Leslie Surber

If by facsimile: (831) 443-1345 Attn: Charles Kosmont & Leslie Surber

And a copy to:    Michael W. Burnett, P.C.
                  3 San Joaquin Plaza, Suite 215
                  Newport Beach, CA 92660
                  Facsimile: (949) 729-9191

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

**23.    Broker.**

Tenant and Landlord represent and warrant that no broker has been involved in the procurement of this Lease. If Landlord has dealt with any real estate broker or agent or any other person in connection with leasing of the Leased Premises, Landlord shall be solely responsible for the payment of any fee due such person, and Landlord

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 158 of 326

shall indemnify, defend and hold Tenant harmless from and against any liability in respect thereto, including attorneys' fees and costs.

## 24. Waiver.

No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

## 25. Surrender/Holding Over.

Tenant shall promptly vacate and surrender the Leased Premises to Landlord on or before the expiration or earlier termination of this Lease. Tenant shall have no right to hold over or otherwise remain in possession of the Leased Premises after the expiration or earlier termination of this Lease. Tenant shall reimburse Landlord for, and indemnify Landlord against, all damages, claims, costs and expenses that Landlord incurs from Tenant's delay in vacating and surrendering the Leased Premises. If Tenant does not vacate the Leased Premises upon the expiration or earlier termination of this Lease, and Landlord thereafter provides written notice to Tenant that Landlord accepts such holdover and Landlord accepts Rent from Tenant (which Landlord shall have no obligation to do), Tenant's occupancy of the Leased Premises shall be a "month-to-month" tenancy, terminable upon thirty (30) days prior written notice by either party, and shall be subject to all of the terms of this Lease applicable to a month-to-month tenancy, except that the Rent then in effect shall be increased to $20,000.00 per month.

## 26. Memorandum of Lease.

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, Landlord and Tenant, at Tenant's option, in its sole and absolute discretion, may execute a Memorandum of Lease in the form attached hereto as <u>Exhibit D</u> and record same in the official records of San Mateo County, California, for the purpose of giving record notice of the appropriate provisions of this Lease; provided, however, that as a condition of Tenant's right to record the Memorandum of Lease, Tenant shall have delivered to Landlord the Quitclaim of Leasehold Rights, in the form attached hereto as <u>Exhibit E</u>, which Landlord may record at any time after the expiration or earlier termination of this Lease in order to remove the Memorandum of Lease as lien of record against the Leased Premises.

## 27. Headings.

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

## 28. Successors.

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

## 29. Consent.

Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desired under this Lease.

31570547_336453-00006

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 159 of 326

## 30.      Performance.

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Lease, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lesser of ten percent (10%) per annum or the then highest lawful rate. If this Lease terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the un-reimbursed balance plus accrued interest to Tenant on demand.

## 31.      Compliance with Law.

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises.

## 32.      Final Agreement.

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

## 33.      Governing Law.

This Agreement shall be governed, construed and interpreted by, through and under the laws of the State of California.

## 34.      Counterparts.

This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

<strong>[SIGNATURES ON FOLLOWING PAGE]</strong>

31570547_336453-00006

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 160 of 326

IN WITNESS WHEREOF, the parties hereto have executed this Lease on the day and year written above.

**LANDLORD**:

**NURSERYMEN'S EXCHANGE, INC.,**
a California corporation

By: _____
    Name: _____
    Title: _____

**TENANT**:

By: _____
    Name: _____
    Title: _____

31570547_336453-00006

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 161 of 326

<u>**EXHIBIT A**</u>

<u>**Legal Description of Tenant's Property**</u>

1. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Parcel "A" as shown on that certain Map entitled "Parcel Map being a Resubdivision of a Portion of Lot 1 as shown on that certain Map entitled "Map of the land of J. M. Vasques, Port of the Rancho Corral de Tierra Vasques", which Map was filed on January 1, 1886 in Book "A" of Maps at Page 44, and a copy entered in Book 1 of Maps at Page 63 and a portion of that Parcel as conveyed from Louis S. Miguel to State Building Supply and Equipment Company, as recorded in Volume 2910, Official Records, 501, Records of San Mateo County, Half Moon Bay, San Mateo County, Calif.", filed in the office of the County Recorder of San Mateo County, State of California, on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23.

APN: 048-300-190 and 048-300-260

JPN: 048-034-340-14.02A
048-030-300-02.01A

2. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

PARCEL ONE:

BEGINNING at a point on the Easterly side of the road leading from Spanishtown to Half Moon Bay, said point being marked on the fence "P V" and running thence North 62 + 30' East 20.04 chains to a fence on the Easterly side of a field; thence South 29° East 2.57 chains to a stake; thence South 81° East 8.82 chains to a stake in line of fence; thence South 62° 30' West 19.23 chains to a mark on fence of race track; thence North 29° East 5.40 chains; thence South 59° West 8.60 chains to road above mentioned; thence North 29° West 2.67 chains to a place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

EXCEPTING THEREFROM so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950 in Book 1774 of Official Records of San Mateo County at page 182 (30521-I).

PARCEL TWO:

A non-exclusive easement for an existing electrical line along the Southeasterly line of Parcel Two as described in Decree Establishing Death and Terminating Joint Tenancy recorded December 19th, 1949 in Volume 1763 at Page 80, San Mateo County Records.

APN: 048-300-090

JPN: 048-030-300-09A

3. The land referred to herein is in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a stake in line of fence, on the Easterly line of the road leading from the Town of Spanishtown of Amesport Landing, said stake being 5 chains and 30 links distance South 29° East from the Southwest corner of a tract of land conveyed to Louis Cardoza Lial by Pablo Vasquez, by Deed recorded in Book 22 of Deeds of Page 117, Records of San Mateo County and running thence North 29° West 5.30 chains to the above-mentioned Southwest corner of the Louis Cardoza Lial property; thence North 59° East 8.52 chains to a stake; thence South 29° East 5.40 chains to a stake in a line of the outside fence, which encloses the Half Moon Bay Race Track, on the Easterly side of said track' thence South 59° West 8.52 chains to the place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

Excepting Therefrom so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950, in Book 1774 of Official Records of San Mateo County at Page 182 (30521-I)

APN:    048-300-100

JPN:    048-030-300-10A

4. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a point that is distant North 28° 33' West 255.00 feet from a one inch iron pipe set for the most Southerly corner of the M. Joseph 47.723 acre Tract, said point of beginning being distant at right angles 25.00 feet from the center line and opposite Engineer's Station 372 plus 02.50 Route 2 Division 4, San Mateo County Highways; running thence from said point of beginning North 59° 04' 38" East 1403.92 feet to an old fence dividing the lands of Joseph and lands of E. Vasquez; thence along said fence North 13° 44' West 336.85 feet; thence leaving said fence South 56° 30' 26" West 1494.49 feet to the Easterly line of the above mentioned County Highway; thence along the Easterly line of said Highway South 28° 33' East 255.00 feet to the point of beginning.

EXCEPTING THEREFROM so much of the herein described property as contained in the Deed from Rose Joseph Roach, also known as Rose Joseph Roache, a widow, to State of California, dated August 16, 1949 and recorded September 26, 1949 in Book 1718 of Official Records of San Mateo County at Page 308 (11176-I).

APN:    048-300-220

JPN:    048-030-300-07A

<u>**EXHIBIT B**</u>

<u>**Legal Description of the Leased Premises**</u>

The land situated in the County of San Mateo, City of Half Moon Bay, State of California, and described as follows:

Being a portion of Parcel "B" as said parcel is shown on that certain Map filed in the Office of the County Recorder of San Mateo County, State of California on November 14, 1977, in Volume 39 of Parcel Maps, at Pages 22 and 23, Records of San Mateo County, California, more particularly described as follows: Beginning at the Southwesterly end of that course shown as North 53° 06' 31" East 825.26 feet as shown on said Parcel Map, said point also being the Easterly corner of the lands of Guttman as recorded in Book 2786 of Official Records, at Page 414, records of San Mateo County, California; thence North 28° 46' 20" West along the Northeasterly line of said lands of Guttman, a distance of 314.00 feet to the Northerly corner of said lands of Guttman, said Northerly corner of being in the flow line up a small creek; thence up the flow line of said creek the following courses and distances: North 47° 20' 28" East 87.90 feet, North 48° 00' 11" East 78.96 feet, North 54° 20' 47" East 74.02 feet, North 77° 38' 53" East 26.92 feet, South 84° 07' 35" East 34.27 feet, South 86° 48' 24 '' East 19.68 feet, North 72° 59' 12" East 64.92 feet, North 59° 59' 57" East 31.23 feet, South 75° 51' 20" East 43.95 feet, South 32° 31' 06" East 42.23 feet North 87° 34' 21" East 48.58 feet, South 73° 13' 34" East, 47.22 feet, North 84° 22' 40" East 68.02 feet, North 81° 36' 15" East 38.77 feet, North 45° 23' 12" East 91.58 feet, North 85° 24' 33" East 31.18 feet, North 55° 18' 32" East 56.98 feet where said creek intersects the common line of Parcels "A" and "B" of said Parcel Map; thence South 36° 53' 29" East along said common line 34.00 feet; thence South 53° 06' 31" West along the Southwesterly line of said Parcel "B" 825.26 feet to the point of beginning.

APN: 048-300-280          JPN: 48-30-300-2.03

All that certain real property situated in the City of Half Moon Bay, County of San Mateo, State of California, being a portion of the lands shown as Parcel "A" and Parcel "B" on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County Records, said real property being more particularly described as follows:

Beginning at the most Westerly corner of the lands described as Parcel I in the Deed to Nurserymen's Exchange Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122; said point of beginning also being the most Northerly corner of the lands described in the Deed recorded in Book 2786 of Official Records of San Mateo County, at Page 414; thence from said point of beginning along the Northwesterly line of last said lands, South 59° 11' 54" West, 206.67 feet to the most Westerly corner of last said lands; thence along the Southwesterly line of the aforesaid Parcel "B", North 28° 45' 46" West, 533.70 feet to the beginning of 2080.00 foot radius curve, concave Southwesterly; thence Northwesterly 225.66 feet along said curve through a central angle of 06° 12' 58"; thence leaving last said curve, North 65° 54' 43" East, 103.05 feet; thence North 30° 51' 33" West 218.46 feet to the Northwesterly line of said Parcel "B"; thence Northeasterly along said Northwesterly line, North 65° 54' 43" East 1505.00 feet; thence Southeasterly, along a production of the Westerly line of said Parcel "B", shown on said Map as S 10° 30' W 9982.5', South 10° 38' 16" West 816.48 feet to a point in the Northerly line of that parcel of land conveyed to Nurseryman's Exchange, Inc., a California corporation by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records, said line described in said Deed as "South 60° 15' 23" East 160. 93 feet"; thence South 58° 49' 30" East along said line, 148.83 feet to a point designated "A" for the purpose of this description; thence North 62° 35' 35" East, 173.55 feet; thence North 39° 32' 31" East, 126.05 feet; thence North 44° 01' 59" East, 73.37 feet; thence North 40° 27' 35" East, 85.82 feet; thence North 51° 31' 08" East, 152.41 feet; thence South 29° 24' 27" East, 181.64 feet to a point on the Southeasterly line of the aforesaid Parcel "B"; thence along last said line, South 42° 40' 33" West, 527.72 feet to the most Westerly corner of Parcel "C", as last said parcel is shown on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County records; thence along the Southwesterly line of last said parcel, South 40° 24' 32" East, 40.08 feet to the most Northerly corner of the lands described in the Deed to Half Moon Bay Properties Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 120;

thence along the Northwesterly line of last said lands to a point on the Northeasterly line of the lands described as Parcel II in the Deed to Nurserymen's Exchange, Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122, South 53° 08' 40" West, 21.52 feet; thence North 65° 03' 34" West 44.98 feet to the most Westerly corner of last said lands; thence along the Northwesterly line of the aforesaid Parcel "A", the following courses:

South 53° 08' 40" West, 130.00 feet; North 36° 51' 20" West, 40.00 feet; South 53° 08' 40" West, 40.00 feet and South 36° 51' 20" East, 6.00 feet to the most Northerly corner of the aforesaid lands described as Parcel I; thence along the Northwesterly line of last said lands the following courses:
South 54° 35' 05" West, 58.85 feet; South 84° 41' 06" West, 32.21 feet; South 44° 39' 45" West, 94.59 feet; South 80° 52' 48" West, 40.04 feet; South 83° 39' 13" West, 70.26 feet; North 73° 57' 01" West, 48.77 feet; South 86° 50' 54" West, 50.18 feet; North 33° 14' 33" West, 43.62 feet; North 75° 58' 47" West, 45.40 feet; South 59° 16' 30" West, 32.26 feet; South 72° 15' 45" West, 67.05 feet; North 87° 31' 51" West, 20.33 feet; North 84° 51' 02" West, 35.40 feet; South 76° 55' 26" West, 27.81 feet; South 53° 37' 20" West, 76.045 feet; South 47° 16' 44" West, 81.56 feet and South 46° 37' 01" West, 90.79 feet to the point of beginning.

RESERVING THEREFROM an easement for ingress and egress, public or private utilities, storm drainage, appurtenances and maintenance thereto, lying in, on, over, under and along a strip of land 20 feet in width, lying immediately adjacent to and Southeasterly of the following described Northwesterly line thereof:
Beginning at the herein described Point "A"; thence from said point of beginning along the Northwesterly line of the herein described real property, the following courses:

North 61° 09' 42" East, 173.55 feet; North 38° 06' 38" East, 126.05 feet; North 42° 36' 06" East, 73.37 feet; North 39° 01' 42" East, 85.82 feet; and North 50° 05' 15" East, 152.41 feet to the most Northerly corner of the herein described real property and the Northeasterly terminus of the herein described Northwesterly line; said easement being contiguous, for its full width, at its Northeasterly terminus to a line that bears South 29° 22' 27" East and at its Southwesterly terminus to a line that bears South 41° 28' 53" East.

ALSO RESERVING THEREFROM an easement for ingress and egress, public or private utilities, storm drainage, appurtenances and maintenance thereto, lying in, on, over, under and along the following described parcel:

Beginning at the herein described Point "A"; thence from said point of beginning along the Northwesterly line of the herein described real property, North 62° 35' 35" East, 51.55 feet; thence leaving last said line, South 41° 28' 53" East, 230.55 feet to a point on the Southeasterly line of Parcel "B", as last said parcel is shown on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County Records; thence along last said line, South 42° 40' 33" West, 9.86 feet to the most Westerly corner of Parcel "C", as last said parcel is shown on said Parcel Map;

thence along the Southwesterly line of last said parcel, South 40° 24' 32" East, 40.08 feet to the most Northerly corner of the lands described in the Deed to Half Moon Bay Properties Inc:, recorded in Book 7984 of Official Records of San Mateo County, at Page 120; thence along the Northwesterly line of last said lands, South 53° 08' 40" West, 21.52 feet to a point in the Northeasterly line of the lands described as Parcel II in the Deed to Nurserymen's Exchange Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122, thence along said Northeasterly line, North 65° 03' 34" West, 44.98 feet to the most Northerly corner of said Parcel II; thence North 41° 28' 53" West, 241.20 feet to the point of beginning.

Set out as Parcel "A" on Approval of Lot Line Adjustment recorded January 7, 2010, Series No. 2010-001484, San Mateo County Records.

APN:      048-300-340

<u>**EXHIBIT C**</u>

<u>**Retained Land**</u>

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF HALF MOON BAY, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, BEING A PORTION OF THE LANDS SHOWN AS PARCEL "A" AND PARCEL "B" OF THAT LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484 TOGETHER WITH THAT PORTION OF LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING IN THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL B, BEING THE SOUTHERLY TERMINUS OF THAT CERTAIN COURSE SHOWN AS "N25°38'24"E 2808.96'" ON SAID LOT LINE ADJUSTMENT; THENCE ALONG THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL "A" AND PARCEL "B" THE FOLLOWING COURSES:

| | |
|---|---|
| 1- | SOUTH 44°38'24" WEST 626.96 FEET; |
| 2- | SOUTH 42°40'33" WEST 527.72 FEET; |
| 2- | SOUTH 40°26'14" EAST 40.08 FEET; |
| 3- | SOUTH 53°08'40" WEST 21.54 FEET; |
| 4- | NORTH 65°04'21" WEST 44.99 FEET; |
| 5- | SOUTH 53°08'40" WEST 130.00 FEET; |
| 6- | NORTH 36°51'20" WEST 40.00 FEET; |
| 7- | SOUTH 53°08'40" WEST 40.00 FEET; |

THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, SOUTH 36°51'20" EAST 40.00 FEET TO THE SOUTHEASTERLY BOUNDARY OF SAID LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS; THENCE SOUTHWESTERLY ALONG SAID BOUNDARY, SOUTH 53°08'40" WEST 179.84 FEET; THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, NORTH 36°51'20" WEST 70.45 FEET; THENCE NORTH 53°08'40"EAST 259.84 FEET; THENCE NORTH 25°58'32" EAST 46.58 FEET; THENCE NORTH 35°44'33" EAST 45.32 FEET; THENCE SOUTH 56°38'37" EAST 12.39 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 100.14 FEET; THENCE SOUTHEASTERLY 34.04 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19°28'41" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 69.96 FEET; THENCE EASTERLY 50.95 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 41°43'20"; THENCE NORTH 52°04'25" EAST 26.84 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 52.06 FEET; THENCE NORTHEASTERLY 10.38 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°25'26"; THENCE NORTH 48°38'35" EAST 49.71 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 285.61 FEET; THENCE NORTHEASTERLY 51.15 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10°15'38" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 78.32 FEET; THENCE NORTHEASTERLY 17.67 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12°55'24" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 981.10 FEET; THENCE NORTHEASTERLY 45.81 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 2°40'31" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE WESTERLY, HAVING A RADIUS OF 60.13 FEET; THENCE NORTHERLY 59.68 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56°51'34"; THENCE NORTH 36°03'33" WEST 87.84 FEET; THENCE NORTH 46°39'08" EAST 44.81 FEET; THENCE NORTH 44°18'23" EAST 120.78 FEET; THENCE NORTH 54°59'03" EAST 88.24 FEET; THENCE NORTH 57°22'50" EAST 67.86 FEET; THENCE NORTH 54°58'54"EAST 62.05 FEET; THENCE NORTH 44°04'26" EAST 59.87 FEET; THENCE NORTH 38°15'32" EAST 76.39 FEET; THENCE NORTH 48°35'50" EAST

113.50 FEET; THENCE NORTH 52°51'17" EAST 68.68 FEET; THENCE NORTH 44°30'15" EAST 43.59 FEET; THENCE NORTH 36°06'45" EAST 68.88 FEET; THENCE NORTH 23°55'04" EAST 176.82 FEET; THENCE NORTH 13°03'00" EAST 275.30 FEET; THENCE NORTH 12°56'39" EAST 342.75 FEET; THENCE NORTH 07°40'40" WEST 65.80 FEET; THENCE NORTH 20°39'45" EAST 57.26 FEET; THENCE NORTH 48°07'35" EAST 67.18 FEET; THENCE SOUTH 90°00'00" EAST 69.22 FEET; THENCE SOUTH 67°55'59" EAST 95.44 FEET; THENCE SOUTH 64°21'36" EAST 135.16 TO A POINT ON THE SAID SOUTHEASTERLY BOUNDARY OF PARCEL B OF SAID LOT LINE ADJUSTMENT, SAID POINT LYING THEREON NORTH 25°38'24" EAST 958.88 FEET FROM THE POINT OF BEGINNING; THENCE SOUTH 25°38'24" WEST 958.88 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL "B" OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484.

ALSO EXCEPTING THEREFROM, THAT PORTION LYING WITHIN A 20.00 FOOT STRIP OF LAND, THE NORTHWESTERLY LINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING IN THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL B, BEING THE SOUTHERLY TERMINUS OF THAT CERTAIN COURSE SHOWN AS "N25°38'24"E 2808.96'" ON SAID LOT LINE ADJUSTMENT; THENCE ALONG THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL "A" AND PARCEL "B" THE FOLLOWING COURSES:

1-      SOUTH 44°38'24" WEST 626.96 FEET;
2-      SOUTH 42°40'33" WEST 527.72 FEET;
2-      SOUTH 40°26'14" EAST 40.08 FEET;
3-      SOUTH 53°08'40" WEST 21.54 FEET;
4-      NORTH 65°04'21" WEST 44.99 FEET;
5-      SOUTH 53°08'40" WEST 130.00 FEET;
6-      NORTH 36°51'20" WEST 40.00 FEET;
7-      SOUTH 53°08'40" WEST 40.00 FEET;

THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, SOUTH 36°51'20" EAST 40.00 FEET TO THE SOUTHEASTERLY BOUNDARY OF SAID LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS; THENCE SOUTHWESTERLY ALONG SAID BOUNDARY, SOUTH 53°08'40" WEST 179.84 FEET; THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, NORTH 36°51'20" WEST 70.45 FEET; THENCE NORTH 53°08'40"EAST 259.84 FEET; THENCE NORTH 25°58'32" EAST 46.58 FEET; THENCE NORTH 35°44'33" EAST 45.32 FEET; THENCE SOUTH 56°38'37" EAST 12.39 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 100.14 FEET; THENCE SOUTHEASTERLY 34.04 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19°28'41" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 69.96 FEET; THENCE EASTERLY 50.95 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 41°43'20"; THENCE NORTH 52°04'25" EAST 26.84 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 52.06 FEET; THENCE NORTHEASTERLY 10.38 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°25'26"; THENCE NORTH 48°38'35" EAST 49.71 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 285.61 FEET; THENCE NORTHEASTERLY 51.15 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10°15'38" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 78.32 FEET; THENCE NORTHEASTERLY 17.67 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12°55'24" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 981.10 FEET; THENCE NORTHEASTERLY 45.81 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 2°40'31" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE WESTERLY, HAVING A RADIUS OF 60.13 FEET; THENCE NORTHERLY 59.68 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56°51'34"; THENCE NORTH 36°03'33" WEST 77.84 FEET TO A POINT HEREINAFTER REFERED TO AS POINT

"A"; THENCE NORTH 36°03'33" WEST 10.00 FEET TO THE **TRUE POINT OF BEGINNING**; THENCE THE FOLLOWING 4 COURSES:

1) NORTH 46°39'08" EAST 44.81 FEET;
2) NORTH 44°18'23" EAST 120.78 FEET;
3) NORTH 54°59'03" EAST 88.24 FEET;
4) NORTH 57°22'50" EAST 42.14 FEET TO A POINT ON THE EASTERLY LINE OF PARCEL A OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484.

THE SOUTHEASTERLY LINE OF SAID 20.00 FOOT STRIP TO TERMINATE NORTHEASTERLY IN THE EASTERLY LINE OF PARCEL A OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484 AND SOUTHWESTERLY AT SAID POINT "A".

## EXHIBIT D

### Memorandum of Lease

Recording Requested By And:                          )
After Recordation Mail to:                           )
                                                     )
                                                     )
                                                     )
                                                     )
                                                     )
                                                     )

_____

Space above this line for recorder's use

### MEMORANDUM OF LEASE

This Memorandum of Lease ("**Memorandum**") is executed as of _____, 2011 in connection with that certain Lease Agreement, dated _____, 2011 ("**Lease**") between _____, a _____ ("**Landlord**"), and _____ a _____ (as the same may be assigned pursuant to the terms of the Lease, "**Tenant**"), relating to the real property described in Exhibit One attached hereto and incorporated herein by reference ("**Real Property**"). Unless defined herein, all capitalized terms in this Memorandum shall have the meaning given in the Lease.

Landlord has leased to Tenant, and Tenant has leased from Landlord, the Real Property at the rent and under the terms and conditions set forth in the Lease. The initial term of the Lease commences on _____, 2011 and expires December 31, 2012 ("**Initial Term**"). The Lease shall automatically renew for one (1) extended term of one (1) year ("**Renewal Term**"), unless either party delivers written notice to the other of such party's desire not to renew the Lease at lease six (6) months prior to the expiration of the Initial Term. Unless terminated earlier, the Lease shall terminate at the end of the Renewal Terms and neither party shall have any right or obligation to extend the term.


**TENANT**:

By: _____
Its: _____


**LANDLORD**:

By: _____
Its: _____


### [ATTACH NOTARY PAGE AND LEGAL DESCRIPTION]

# EXHIBIT E

## Quitclaim of Leasehold Rights

Recording Requested by and )
After Recordation, Mail to: )
)
)
)
)
)

_____   _____

Space above this line for recorder's use

## QUITCLAIM DEED

      For valuable consideration, receipt of which is hereby acknowledged, _____, a _____, "Tenant" under that certain Lease Agreement dated _____, 2011 ("**Lease**"), as evidenced by that certain Memorandum of Lease dated _ __, 2011 and recorded on _____ as Instrument No. _____ in Book _____, Page _____, of the Official Records of San Mateo County ("**Memorandum**"), does hereby remise, release and forever quitclaim to _____, as Landlord under said Lease, all of Tenant's right, title and interest as Tenant under the Lease in connection with the real property located in the City of Half Moon Bay, San Mateo County, California, described in Exhibit One attached hereto by this reference.

      This deed is given to relinquish and release any right, title, and interest Tenant may have by virtue of the Lease, as evidenced by the Memorandum.

Assessor's Parcel Nos. 048-300-280, 048-300-300, 048-300-310, 048-300-330

      Executed on _____.


_____
**a** _____

     By: _____

     Its: _____


Mail tax statements as directed above.

[ATTACH NOTARY PAGE AND LEGAL DESCRIPTION]

**FORM OF RESERVOIR EASEMENT AGREEMENT**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

---

## MASTER EASEMENT AGREEMENT

This **MASTER EASEMENT AGREEMENT** (this "**Easement Agreement**") is made this
___ day of _____ 2011 (the "**Effective Date**"), by and between **NURSERYMEN'S EXCHANGE,
INC.,** a California corporation ("**Grantor**") and _____, a _____
("**Grantee**"). Grantor and Grantee are sometimes collectively referred to herein as the "**Parties**" or
separately as a "**Party**".

### Recitals

A.       The Parties entered into that certain Asset Purchase Agreement dated _____, 2011
(the "**Purchase Agreement**"), pursuant to which Grantor has agreed to sell to Grantee substantially all of
the operating assets relating to Grantor's wholesale business of growing and selling indoor blooming
plants, specialty foliage and packaged plants (the "**Business**"), including that certain real property more
particularly described in **Exhibit "A"** attached hereto ("**Grantee's Property**").

B.       Grantor continues to own certain real property adjacent to Grantee's Property and more
particularly described in **Exhibit "B"** attached hereto and incorporated herein by reference ("**Grantor's
Property**"). In connection with the sale to Grantee of Grantee's Property, Grantor has agreed to grant to
Grantee certain easements and other rights with respect to Grantor's Property, on the terms and conditions
set forth herein.

C.       A portion of Grantor's Property as more particularly set forth on **Exhibit "C"** attached
hereto (the "**Exclusive Access Easement Area**") contains certain infrastructure components critical to the
operation of the Business. Among such critical components is water which drains from a portion of
Grantor's Property into a reservoir and three small ponds located on the Exclusive Access Easement Area,
and Naples Creek, which water Grantee will need to irrigate Grantee's Property. Grantee would not have
agreed to purchase Grantee's Property from Grantor without Grantee having the exclusive right to the
Exclusive Access Easement Area.

D.       A narrow unpaved dirt road will run between Grantor's Property and Grantee's Property,
as depicted on **Exhibit "E"** attached hereto (the "**Shared Roadway**"), and the Parties intend to grant to
each other a permanent, non-exclusive, reciprocal easement for vehicular and pedestrian ingress and
egress over the Shared Roadway upon the terms and conditions set forth herein.

1

31568980v5_336453-00006

E.     Grantor or Grantee has submitted or will submit a proposed lot line adjustment to the City of Half Moon Bay (the "**City**") for approval (the "**LLA**"), which, if approved, will relocate the property line between Grantor's Property and Grantee's Property so that the Exclusive Easement Area will become part of Grantee's Property and Grantee will own the Exclusive Access Easement Area.

F.     Until the LLA is approved, or if not approved, the parties intend for Grantee to have an exclusive easement for access, use and control of the Exclusive Access Easement Area, upon the terms and conditions set forth herein.

G.     Grantee also requires uninterrupted electricity service to Grantee's Property, currently provided by a series of seven (7) electrical power poles (the "**Power Poles**") that straddle the property line between the Grantor's Property and Grantee's Property. The Parties desire to confirm their respective rights and obligations with respect to the Power Poles and electricity service to Grantee's Property upon the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and promises made herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**I.     Exclusive Access Easement**

1.     **Grant of Exclusive Access Easement.** Grantor, on behalf of itself and its successors and assigns, hereby grants to Grantee an exclusive easement for Grantee to access, use and control all of the Exclusive Access Easement Area (the "**Exclusive Access Easement**"), subject to the terms and conditions set forth herein. Grantee's use of the Exclusive Access Easement Area shall be limited to the same uses for which the Exclusive Access Easement Area was used by Grantor in the twelve (12) months prior to the grant of the Exclusive Access Easement.

2.     **Maintenance and Repair of Exclusive Access Easement Area.** Grantee shall be solely responsible for the repair and maintenance of the Exclusive Access Easement Area, at Grantee's sole cost and expense, except to the extent that Grantor or any of its agents, causes damage to the Exclusive Access Easement Area that necessitates such repair and maintenance, in which case, such repair and maintenance shall be at Grantor's sole cost and expense. In the event that a Party fails to properly maintain or repair the Exclusive Access Easement Area, as required by this Section I, the other Party shall have the right, without obligation, following written notice to the other Party, and failure of the other Party to cure within thirty (30) days following receipt of such notice, (or, if such Party has commenced to cure but such cure cannot be reasonably accomplished within thirty (30) days, but is progressing, then such longer period as required to cure), to perform and to charge the other Party, as applicable, the actual cost of such maintenance and/or repair, plus interest at a rate of ten percent (10%) per annum. The non-performing Party shall reimburse the performing Party within thirty (30) days following receipt of such invoice(s).

3.     **Mechanic's Liens.** Each Party shall keep the Exclusive Access Easement Area free from liens or claims for work performed, materials furnished, or obligations incurred by a Party, and each Party shall indemnify, defend, and hold the other Party harmless from all court costs and reasonable attorneys' fees incurred in connection therewith to the extent of any work performed by or at the direction of such Party. Either Party shall have the right to contest the amount or validity of any such lien provided that it causes such lien to be removed or bonded within ninety (90) days after the filing thereof.

4.     **Insurance and Real Property Taxes.** Grantee shall maintain all of the same insurance, with the same insurance companies (or another reputable insurance company having a rating of at least "A-/VII" by Best's Rating Guide (or a comparable rating by a successor rating service)) and subject to the

2

same deductibles/self-insured retentions, that was in place twelve (12) months preceding the Effective Date of this Easement Agreement with respect to the Exclusive Access Easement Area. Grantee shall cause Grantor to be named as an additional insured on all such insurance policies, and shall provide Grantor with a Certificate of Insurance verifying same and that provides that such insurance shall not be terminated without providing Grantor thirty (30) days prior written notice thereof. If Grantor transfers all or any portion of Grantor's Property to a successor ("**Grantor's Successor**"), then Grantee shall name Grantor's Successor as an additional insured on all such insurance policies. Should Grantee fail to maintain any insurance required under this Paragraph I.4, Grantor shall have the right, but not the obligation, to obtain and maintain same and Grantee shall promptly reimburse Grantor for all costs and expenses Grantor incurs with respect to same. Grantor shall be responsible for paying the real property taxes applicable to the Exclusive Access Easement Area until such time as the LLA is approved and recorded, and then Grantee shall be responsible for paying the real property taxes applicable to the Exclusive Access Easement Area.

5. **Termination of Exclusive Access Easement**. The proposed LLA application that Grantor or Grantee has submitted or will submit to the City for approval, if approved, will relocate the lot line so that the Exclusive Access Easement Area becomes part of Grantee's Property and Grantee shall be the owner of the Exclusive Access Easement Area. If and when the City approves the LLA, no later than ten (10) days after final approval of the LLA has been obtained and all applicable appeal periods have passed, Grantee shall record the LLA in the official records of the County of San Mateo (the "**County**"). At such time as the LLA is recorded with the County, the Exclusive Access Easement shall automatically terminate and the provisions of this <u>Section I</u> shall be of no further force and effect.

II. **Reciprocal Roadway Easement and Maintenance Agreement**

1. **Grant of Reciprocal Roadway Easement.** The Shared Roadway runs between Grantor's Property and Grantee's Property, and the Parties hereby grant to each other, and their successors and assigns, a permanent, non-exclusive, reciprocal easement for vehicular and pedestrian ingress and egress over the Shared Roadway (the "**Reciprocal Roadway Easement**") on the terms and conditions set forth herein.

2. **Maintenance and Repair of Shared Roadway**. Grantee shall oversee and do all acts necessary to repair and maintain the Shared Roadway, and the costs and expenses incurred in connection with the regular maintenance and repair of the Shared Roadway shall be divided between Grantor and Grantee or the respective successors and assigns, in the proportion that is fifty percent (50%) Grantor and fifty percent (50%) Grantee. In the event that a Party does not pay its respective share, the other Party may advance such amount owed to the third party contractor and collect the amounts advanced, plus any and all additional costs and fees incurred, and interest at a rate of ten percent (10%) per annum, from the non-paying Party. The paying Party may record a lien against the non-paying Party's property until the non-paying Party reimburses the paying Party for such costs advanced pursuant to this Section II.

3. **Mechanic's Liens:** Each Party shall keep the Reciprocal Roadway Easement free from liens or claims for work performed, materials furnished, or obligations incurred by a Party, and each Party shall indemnify, defend, and hold the other Party harmless from all court costs and reasonable attorneys' fees incurred in connection therewith to the extent of any work performed by or at the direction of such Party. Either Party shall have the right to contest the amount or validity of any such lien provided that it causes such lien to be removed or bonded within ninety (90) days after the filing thereof.

III. **Agreement Regarding Power Poles**

The Power Poles straddle the property line between Grantor's Property and Grantee's Property, as

31568980v5_336453-00006

set forth on **Exhibit "D"** attached hereto, and provide electricity to both Grantor's Property and Grantee's Property. Grantor hereby acknowledges and agrees that such electricity is essential to the operations of Grantee's business on Grantee's Property. Grantor hereby grants to Grantee an easement in perpetuity for the maintenance, repair and replacement of the Power Poles. Grantee acknowledges that Grantor, or Grantor's successors, may desire or be obligated to remove, relocate, or replace the Power Poles or place the power lines underground. Grantor covenants and agrees not to relocate or remove the Power Poles or divert the electricity from the Power Poles from Grantee's Property, except in strict compliance with the requirements and approvals for any development of Grantor's Property by Grantor or Grantor's Successor, and in any case without any interruption of electricity service to Grantee's Property, all of which is subject to the express prior written consent of Grantee, which consent Grantee shall not unreasonably withhold, condition or delay. Upon any such removal or replacement, the easement granted above shall extend to the new location of the Power Poles or power lines on Grantor's Property. The easements granted pursuant to this Section III shall survive the recordation of the LLA.

IV.    **Terms and Conditions Applicable to All Rights**

The following terms and conditions apply to all rights granted under this Easement Agreement.

1.    **Grantor's Obligations.** Grantor retains the right to make any use of the areas over which rights are granted hereunder that does not interfere with Grantee's free use and enjoyment of the rights granted herein. Notwithstanding the foregoing, Grantor shall not, and shall not allow any third party to, obstruct, block, damage, or otherwise render unusable or inaccessible any of the areas over which easements or rights are granted herein for the uses granted to Grantee hereunder.

2.    **Grantee's Indemnities.** Grantee hereby releases Grantor and its officers, members, partners, employees, attorneys, agents, invitees, contractors, subcontractors, representatives, and affiliates (for purposes of this Section IV.2, collectively "**Grantor Parties**") of and from, and agrees to indemnify, defend and hold harmless Grantor Parties in connection with the defense, prosecution, satisfaction, settlement, or compromise, including the reasonable cost and expense of litigation (including reasonable attorneys' fees and accountants' fees, judgments, court costs, and related litigation expenses and such other actual and reasonable costs in connection with the defense, prosecution, satisfaction, settlement or compromise) of any claims, demands, controversies, actions, causes of action, obligations, expenses, fees, charges, damages, fines, penalties and liabilities of any nature whatsoever, whether at law or in equity, to the extent arising out of, contributed to by, based upon, and/or related to the use or occupation of Grantee, or activities on, any of the areas over which easements or rights are granted herein, by Grantee or any person or entity using, occupying, or conducting activities thereon authorized by Grantee, including without limitation their officers, members, partners, employees, attorneys, agents, invitees, contractors, subcontractors, representatives, and affiliates (collectively, "**Grantee Parties**") (except to the extent caused or contributed to by any act or omission of Grantor or any third party other than Grantee Parties). The terms of this Section IV.2 and the parties' rights and obligations hereunder, shall survive the termination of any of the easements or rights granted herein or this Easement Agreement.

3.    **Grantee's Obligations.** In exercising its rights under the easement granted herein, Grantee must use reasonable care and may not unreasonably increase the burden on any of the Exclusive Access Easement Area or Grantor's Property. Grantee covenants that Grantee and the Grantee Parties: (i) shall conduct all use of and activities on the Easement Areas or any other rights granted herein in accordance with all federal, State and local laws, statutes, regulations, ordinances, permits, approvals, and requirements, including, without limitation, all Environmental Laws (as defined below); and (ii) shall not use, dispose of, import, store, or discharge, or allow any third party to use, dispose of, import, store, or discharge, any Hazardous Materials (as defined below) to, in, on, or under the Exclusive Access Easement Area or Grantor's Property. For purposes hereof, "**Hazardous Materials**" means "Hazardous

4

Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, and any other substances regulated because of their effect or potential effect on public health or the environment, including PCBs, lead paint, asbestos, urea formaldehyde, radioactive materials, putrescible materials, and infectious materials. For purposes hereof, "**Environmental Laws**" shall mean any and all present and future federal, state and local law (whether under common law, statute, rule, ordinance, agreement, regulation or otherwise), requirement under any permit issued with respect thereto, and other requirements of agencies having jurisdiction thereunder relating to or dealing with the protection of health or the environment, including, without limitation, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136, et seq.; the Toxic Substances Control Act, 15. U.S.C. §§ 2601, et seq.; Federal Asbestos Hazard Emergency Response Act, 15 U.S.C. §§ 2641 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1321; 42 U.S.C. §§ 7401 et seq.; the California Hazardous Waste Control Act, Cal. Health & Safety Code §§ 25100 et seq.; the California Hazardous Substance Account Act, H.&S.C. §§ 25300 et seq.; the California Safe Drinking Water and Toxic Enforcement Act, H.&S.C. §§ 25249.5, et seq.; the California Hazardous Waste Management Act, H.&S.C. §§ 25170.1 et seq.; H.&S.C. §§ 25501 et seq. (Hazardous Materials Response Plans and Inventory); the Porter-Cologne Water Control Act, Cal. Water Code §§ 13000 et seq.; H.&S.C. §§ 25280, et seq. (Underground Storage of Hazardous Substances); H.&S.C. § 25915 et seq.; H.&S.C. § 25359.7; H.&S.C. §§ 2595 et seq.; Cal. Labor Code §§ 6501.5 et seq.; and Title 22 of the California Code of Regulations; all as amended to the date hereof.

V.    **Miscellaneous**

    1.    **Notices.** All notices to be given hereunder shall be in writing and shall be served on the Parties at the addresses set forth below or as otherwise set forth in a written notice of change of address as provided pursuant to the immediately following sentence. A Party's address may be changed by written notice to the other Party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Any such notices shall, unless otherwise provided herein, be given or served (1) by overnight delivery using a nationally recognized overnight courier, or (2) by personal delivery, or (3) by facsimile transmission during the hours of 9:00 a.m. and 5:00 p.m. (Pacific time) on business days (with a duplicate copy concurrently sent by another means provided herein). Notice given in accordance herewith shall be effective upon the earlier to occur of actual delivery to the address of the addressee or refusal of receipt by the addressee. Except for facsimile notices as described above, no notice hereunder shall be effective if sent or delivered by electronic means. In no event shall this Agreement be altered, amended or modified by electronic mail or electronic record. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

Grantor at:    Nurserymen's Exchange Inc.
               2651 North Cabrillo Highway
               Half Moon Bay, CA 94019
               Attn: Jack Pearlstein
               Phone: (650) 712-4000
               Facsimile: (650) 284-2886
               E-mail: jpearlstein@bloomrite.com

and a copy to:  Katten Muchin Rosenman LLP
               2029 Century Park East, Suite 2600
               Los Angeles, California 90067

5

31568980v5_336453-00000

Attention: Mark Conley
Telephone: (310) 788-4690
Facsimile: (310) 712-8225
E-mail: mark.conley@kattenlaw.com

Grantee at:    If by overnight mail: 360 Espinosa Road
                                    Salinas, California 93907
                                    Attn: Charles Kosmont & Leslie Surber

               If by USPS:         Post Office Box 3756
                                    Salinas, California 93912
                                    Attn: Charles Kosmont & Leslie Surber

               If by facsimile:    (831) 443-1345
                                    Attn: Charles Kosmont & Leslie Surber

and a copy to:  Michael W. Burnett, P.C.
               3 San Joaquin Plaza, Suite 215
               Newport Beach, CA 92660
               Facsimile: (949) 729-9191

2.     **Failure to Perform and Remedies**. In the event either Party fails to observe or perform any obligation under this Easement Agreement, the other Party shall give written notice of such failure to the non-performing Party setting forth the obligation that the non-performing Party has failed to perform with specificity, and in the event the non-performing Party fails perform such obligation within thirty (30) days after receipt of said notice, then the Party may elect, but shall not be required, to perform such work. If the Party so elects to perform maintenance or repairs in compliance with the foregoing terms, then the non-performing Party shall pay all of the Party's actual, related costs and expenses, within thirty (30) days after the non-performing Party's receipt of written itemized statements for such work.

3.     **Waiver**. The waiver by any Party of the breach by any other Party of any provision of this Easement Agreement does not waive any subsequent breach of the same or any other provision of this Easement Agreement.

4.     **Governing Law**. This Easement Agreement is made and entered into in the City and shall be governed by, interpreted and enforced in accordance with the laws of the State of California and the City, without regard to conflict of law principles.

5.     **Venue**. All litigation arising out of, or relating to this Easement Agreement, shall be brought in a State or Federal court in the County in the State of California. The Parties have irrevocably agreed to submit to the exclusive jurisdiction of the State of California and waive any defense of *forum non conveniens*.

6.     **Language Construction**. Whenever the context of this Easement Agreement requires, the masculine gender includes the feminine and neuter and the singular number includes the plural. Designations used herein are for convenience only and shall not be controlling in the interpretation of this Easement Agreement.

7.     **Partial Invalidity.** If any provision in this Easement Agreement is held by a court of competent jurisdiction to be unenforceable, the remaining provisions shall, nevertheless, continue in full force.

6

8. **Entire Agreement**. This Easement Agreement constitutes the sole agreement between the Parties and supersedes any and all other agreements, whether oral or written, with respect to the rights and obligations identified herein. The Parties hereby acknowledge that no representations, inducements, promises, or agreements, whether oral or otherwise, have been made by either Party or anyone acting on behalf of either Party which is not embodied herein; and that no other agreement, statement, or promise not contained in this Easement Agreement regarding the provisions of this Easement Agreement shall be valid or binding.

9. **Attorneys' Fees**. In the event either Party hereto employs an attorney in connection with claims by one Party against the other arising from the operation of this Easement Agreement, the non-prevailing Party shall pay the prevailing Party all reasonable actual, out of pocket attorneys' fees and disbursements incurred in connection with such claims.

10. **Exhibits**. All exhibits to this Easement Agreement are incorporated herein by this reference.

11. **Counterparts**. This Easement Agreement may be executed in multiple counterparts, each of which shall be an original and all of which shall constitute one agreement.

12. **Legal Representation**. Each Party was represented by legal counsel during the negotiation and execution of this Easement Agreement.

13. **Estoppel Certificate**. Within thirty (30) business days after the written request of a Party hereto, the other Party shall execute and deliver to the requesting Party an estoppel certificate stating that, to the delivering Party's knowledge, there are no defaults by any Party under this Easement Agreement (or if there are defaults, describing them in specificity) and certifying such other matters as may be reasonably requested by the other Party.

14. **Running of Benefits and Burdens**. All provisions of this Easement Agreement, including the benefits and burdens, shall run with Grantor's Property, for the benefit of Grantee's Property and every portion thereof, and burdening Grantor's Property and every portion thereof, and shall apply to and bind the respective successors in interest to Grantor's Property and every portion thereof, for the benefit of the successors in interest to Grantee's Property and every portion thereof, in accordance with applicable law, including, but not limited to Section 1468 of the Civil Code of the State of California.

15. **Subordination**. If Grantor obtains financing for the purchase or refinance of Grantor's Property which requires the recordation of a deed of trust on Grantor's Property, such deed of trust, or any modifications thereto, shall be subordinate to this Easement Agreement. Every person who hereafter owns or acquires any right, title or interest in or to any portion of Grantor's Property or Grantee's Property is and shall be conclusively deemed to have consented and agreed to every covenant, condition, restriction and easement contained herein, by reference and otherwise, whether or not any reference to this Easement Agreement is contained in the instrument by which such person acquired an interest in such property.

16. **Creation of HOA**. The Parties hereby acknowledge and agree that, in the event Grantor or Grantor's Successor develops Grantor's Property, upon the creation of a homeowner's association for such development ("**HOA**"), recordation of the covenants, conditions and restrictions and the sale of a unit within such development, all of Grantor's rights and obligations hereunder shall automatically transfer to the HOA and the HOA shall automatically assume such rights and obligations at such time. Upon such transfer, all references to Grantor herein shall refer to the HOA.

7

31568980v5_336453-00006

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]*

8

31568980v5_336453-00006

IN WITNESS WHEREOF, the Parties have executed this Easement Agreement as of the date first written above.

**GRANTOR:**

**NURSERYMEN'S EXCHANGE, INC.,**
a California corporation

By: _____
    Name: _____
    Title: _____

**GRANTEE:**

By: _____
    Name: _____
    Title: _____

*Master Easement Agreement*

# EXHIBIT A

## Legal Description of Grantee's Property

The land situated in the County of San Mateo, City of Half Moon Bay, State of California, and described as follows:

TRACT A:

PARCEL ONE:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF THE ROAD LEADING FROM SPANISHTOWN TO HALF MOON BAY, SAID POINT BEING MARKED ON THE FENCE "P V" AND RUNNING THENCE NORTH 62 + 30' EAST 20.04 CHAINS TO A FENCE ON THE EASTERLY SIDE OF A FIELD; THENCE SOUTH 29° EAST 2.57 CHAINS TO A STAKE; THENCE SOUTH 81° EAST 8.82 CHAINS TO A STAKE IN LINE OF FENCE; THENCE SOUTH 62° 30' WEST 19.23 CHAINS TO A MARK ON FENCE OF RACE TRACK; THENCE NORTH 29° EAST 5.40 CHAINS; THENCE SOUTH 59° WEST 8.60 CHAINS TO ROAD ABOVE MENTIONED; THENCE NORTH 29° WEST 2.67 CHAINS TO A PLACE OF BEGINNING.

BEING A PORTION OF THE RANCH CORRAL DE TIERRA (VASQUEZ).

EXCEPTING THEREFROM SO MUCH AS LIES WITHIN THE LANDS DESCRIBED IN THE DEED TO THE STATE OF CALIFORNIA, DATED NOVEMBER 25, 1949 AND RECORDED JANUARY 19, 1950 IN BOOK 1774 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 182 (30521-I).

PARCEL TWO:

A NON-EXCLUSIVE EASEMENT FOR AN EXISTING ELECTRICAL LINE ALONG THE SOUTHEASTERLY LINE OF PARCEL TWO AS DESCRIBED IN DECREE ESTABLISHING DEATH AND TERMINATING JOINT TENANCY RECORDED DECEMBER 19TH, 1949 IN VOLUME 1763 AT PAGE 80, SAN MATEO COUNTY RECORDS.

APN: 048-300-090 JPN: 48-30-300-09

TRACT B:

BEGINNING AT A STAKE IN LINE OF FENCE, ON THE EASTERLY LINE OF THE ROAD LEADING FROM TOWN OF SPANISHTOWN OF AMESPORT LANDING, SAID STAKE BEING 5 CHAINS AND 30 LINKS DISTANCE SOUTH 29° EAST FROM THE SOUTHWEST CORNER OF A TRACT OF LAND CONVEYED TO LOUIS CARDOZA LIAL BY PABLO VASQUEZ, BY DEED RECORDED IN BOOK 22 OF DEEDS OF PAGE 117, RECORDS OF SAN MATEO COUNTY AND RUNNING THENCE NORTH 29° WEST 5.30 CHAINS TO THE ABOVEMENTIONED SOUTHWEST CORNER OF THE LOUIS CARDOZA LIAL PROPERTY; THENCE NORTH 59° EAST 8.52 CHAINS TO A STAKE; THENCE SOUTH 29° EAST 5.40 CHAINS TO A STAKE IN A LINE OF THE OUTSIDE FENCE, WHICH ENCLOSES THE HALF MOON BAY RACE TRACK, ON THE EASTERLY SIDE OF SAID TRACK' THENCE SOUTH 59° WEST 8.52 CHAINS TO PLACE OF BEGINNING.

BEING A PORTION OF THE RANCH CORRAL DE TIERRA (VASQUEZ).

*Master Easement Agreement*

EXCEPTING THEREFROM SO MUCH AS LIES WITHIN THE LANDS DESCRIBED IN THE DEED TO THE STATE OF CALIFORNIA, DATED NOVEMBER 25, 1949 AND RECORDED JANUARY 19, 1950 IN BOOK 1774 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 182 (30521-I)

APN: 048-300-100 JPN: 48-30-300-10

TRACT C:

BEGINNING AT A POINT THAT IS DISTANT NORTH 28° 33' WEST 255.00 FEET FROM A ONE INCH IRON PIPE SET FOR THE MOST SOUTHERLY CORNER OF THE M. JOSEPH 47.723 ACRE TRACT, SAID POINT OF BEGINNING BEING DISTANT AT RIGHT ANGLES 25.00 FEET FROM THE CENTER LINE AND OPPOSITE ENGINEER'S STATION 372 PLUS 02.50 ROUTE 2 DIVISION 4, SAN MATEO COUNTY HIGHWAYS; RUNNING THENCE FROM SAID POINT OF BEGINNING NORTH 59° 04' 38" EAST 1043.92 FEET TO AN OLD FENCE DIVIDING THE LANDS OF JOSEPH AND LANDS OF E. VASQUEZ; THENCE ALONG SAID FENCE NORTH 13° 44' WEST 336.85 FEET; THENCE LEAVING SAID FENCE SOUTH 56° 30' 26" WEST 1494.49 FEET TO THE EASTERLY LINE OF THE ABOVE MENTIONED COUNTY HIGHWAY; THENCE ALONG THE EASTERLY LINE OF SAID HIGHWAY SOUTH 28° 33' EAST 255.00 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM SO MUCH OF THE HEREIN DESCRIBED PROPERTY AS CONTAINED IN THE DEED FROM ROSE JOSEPH ROACH, ALSO KNOWN AS ROSE JOSEPH ROACHE, A WIDOW, TO STATE OF CALIFORNIA, DATED AUGUST 16, 1949 AND RECORDED SEPTEMBER 26, 1949 IN BOOK 1718 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 308 (11176-I).

APN: 048-300-220 JPN: 048-030-300-07

TRACT D:

PARCEL "A" AS SHOWN ON THAT CERTAIN MAP ENTITLED "PARCEL MAP BEING A RESUBDIVISION OF A PORTION OF LOT 1 AS SHOWN ON THAT CERTAIN MAP ENTITLED, "MAP OF THE LAND OF J.M. VASQUES, PORT OF THE RANCHO CORRAL DE TIERRA VASQUES", WHICH MAP WAS FILED ON JANUARY 1, 1886 IN BOOK "A" OF MAPS AT PAGE 44, AND A COPY ENTERED IN BOOK 1 OF MAPS AT PAGE 63 AND A PORTION OF THAT PARCEL AS CONVEYED FROM LOUIS S. MIGUEL TO STATE BUILDING SUPPLY AND EQUIPMENT COMPANY, AS RECORDED IN VOLUME 2910, OFFICIAL RECORDS, 501, RECORDS OF SAN MATEO COUNTY, HALF MOON BAY, SAN MATEO COUNTY, CALIF.", FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA, ON NOVEMBER 14, 1977 IN VOLUME 39 OF PARCEL MAPS AT PAGES 22 AND 23.

APN: 048-300-190, 048-300-260  JPN: 048-030-300-02-01, 048-340-14-02

31568980v5_336453-00006

**EXHIBIT B**

**Legal Description of Grantor's Property**

The land situated in the County of San Mateo, City of Half Moon Bay, State of California, and described as follows:

PARCEL ONE:

BEING A PORTION OF PARCEL "B" AS SAID PARCEL IS SHOWN ON THAT SHOWN ON THAT CERTAIN MAP FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA ON NOVEMBER 14, 1977 IN VOLUME 39 OF PARCEL MAPS AT PAGES 22 AND 23, RECORDS OF SAN MATEO COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY END OF THAT COURSE SHOWN AS NORTH 53° 06' 31" EAST 825.26 FEET AS SHOWN ON SAID PARCEL MAP, SAID POINT BEING THE EASTERLY CORNER OF THE LANDS OF GUTTMAN AS RECORDED IN BOOK 2786 OF OFFICIAL RECORDS AT PAGE 414, RECORDS OF SAN MATEO COUNTY, CALIFORNIA; THENCE NORTH 28° 46' 20" WEST ALONG THE NORTHEASTERLY LINE OF SAID LANDS OF GUTTMAN, A DISTANCE OF 314.00 FEET TO THE NORTHERLY CORNER OF SAID LANDS OF GUTTMAN, SAID NORTHERLY CORNER OF BEING IN THE FLOW LINE UP A SMALL CREEK; THENCE UP THE FLOW LINE OF SAID CREEK THE FOLLOWING COURSES AND DISTANCES: NORTH 47° 20' 28" EAST: NORTH 47° 20' 28" EAST 87.90 FEET, NORTH 48° 00' 11" EAST 78.96 FEET, NORTH 54° 20' 47" EAST 74.02 FEET, NORTH 77° 38' 53" EAST 26.92 FEET, SOUTH 84° 07' 35" EAST 34.27 FEET, SOUTH 86° 48' 24" EAST 19.68 FEET, NORTH 72° 59' 12" EAST 64.92 FEET, NORTH 59° 59' 57" EAST 31.23 FEET, SOUTH 75° 15' 20" EAST 43.95 FEET, SOUTH 32° 31' 06" EAST 42.23 FEET NORTH 87° 34' 21" EAST 48.58 FEET, SOUTH 73° 13' 34" EAST, 47.22 FEET, NORTH 84° 22' 40" EAST 68.02 FEET, NORTH 81° 36' 15" EAST 38.77 FEET, NORTH 45° 23' 12" EAST 91.58 FEET, NORTH 85° 24' 33" EAST 31.18 FEET, NORTH 55° 18' 32" EAST 56.98 FEET WHERE SAID CREEK INTERSECTS THE COMMON LINE OF PARCELS "A" AND "B" OF SAID PARCEL MAP; THENCE SOUTH 36° 53' 29" EAST ALONG SAID COMMON LINE 34.00 FEET; THENCE SOUTH 53° 06' 31" WEST ALONG THE SOUTHWESTERLY LINE OF SAID PARCEL "B" 825.26 FEET TO THE POINT OF BEGINNING.

APN: 048-300-280 JPN: 048-030-300-02-03

PARCEL TWO:

BEING A PORTION OF PARCEL "B" AS SAID PARCEL IS SHOWN ON THAT CERTAIN MAP FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA ON NOVEMBER 14, 1977 IN VOLUME 39 OF PARCEL MAPS AT PAGES 22 AND 23, RECORDS OF SAN MATEO COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEASTERLY END OF THAT COURSE SHOWN AS NORTH 53° 06' 31" EAST 130 FEET AS SHOWN ON SAID PARCEL MAP; THENCE ALONG THE COMMON LINE OF PARCELS "A" AND "B" OF SAID PARCEL MAP, THE FOLLOWING COURSES:

*Master Easement Agreement*

SOUTH 36° 53' 29" EAST 40.00 FEET, NORTH 53° 06' 31" EAST 21.26 FEET; THENCE LEAVING SAID COMMON LINE NORTH 64° 52' 55" WEST 45.30 FEET TO THE POINT OF BEGINNING.

APN: 048-300-300 JPN: 048-030-300-02-01-01

TRACT F:

PARCEL A:

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF HALF MOON BAY, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, BEING A PORTION OF THE LANDS SHOWN AS PARCEL "A" AND PARCEL "B" ON THAT CERTAIN PARCEL MAP RECORDED IN BOOK 39 OF PARCEL MAPS AT PAGES 22 AND 23, SAN MATEO COUNTY RECORDS, SAID REAL PROPERTY BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THE LANDS DESCRIBED AS PARCEL I IN THE DEED TO NURSERYMEN'S EXCHANGE INC., RECORDED IN BOOK 7984 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 122; SAID POINT OF BEGINNING ALSO BEING THE MOST NORTHERLY CORNER OF THE LANDS DESCRIBED IN THE DEED RECORDED IN BOOK 2786 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 414; THENCE FROM SAID POINT OF BEGINNING ALONG THE NORTHWESTERLY LINE OF LAST SAID LANDS, SOUTH 59° 11'54" WEST, 206.67 FEET TO THE MOST WESTERLY CORNER OF LAST SAID LANDS; THENCE ALONG THE SOUTHWESTERLY LINE OF THE AFORESAID PARCEL "B", NORTH 28° 45'46" WEST, 533.70 FEET TO THE BEGINNING OF 2080.00 FOOT RADIUS CURVE, CONCAVE SOUTHWESTERLY; THENCE NORTHWESTERLY 225.66 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 6°12'58"; THENCE LEAVING LAST SAID CURVE, NORTH 65° 54'43" EAST, 103.05 FEET; THENCE NORTH 30° 51'33" WEST 218.46 FEET TO THE NORTHWESTERLY LINE OF SAID PARCEL "B"; THENCE NORTHEASTERLY ALONG SAID NORTHWESTERLY LINE, NORTH 65° 54'43" EAST 1505.00 FEET; THENCE SOUTHEASTERLY, ALONG A PRODUCTION OF THE WESTERLY LINE OF SAID PARCEL "B", SHOWN ON SAID MAP AS S 10°30' W 9982.5', SOUTH 10° 38'16" WEST 816.48 FEET TO A POINT IN THE NORTHERLY LINE OF THAT PARCEL OF LAND CONVEYED TO NURSERYMAN'S EXCHANGE, INC., A CALIFORNIA CORPORATION BY DEED RECORDED SEPTEMBER 13, 1982, UNDER RECORDER'S SERIAL NO. 82078057, OFFICIAL RECORDS, SAID LINE DESCRIBED IN SAID DEED AS "SOUTH 60° 5'23" EAST 160.93 FEET"; THENCE SOUTH 58° 49'30" EAST ALONG SAID LINE, 148.83 FEET TO A POINT DESIGNATED "A" FOR THE PURPOSE OF THIS DESCRIPTION; THENCE NORTH 62° 35'35" EAST, 173.55 FEET; THENCE NORTH 39° 32' 31" EAST, 126.05 FEET; THENCE NORTH 44° 01'59" EAST, 73.37 FEET; THENCE NORTH 40° 27'35" EAST, 85.82 FEET; THENCE NORTH 51' 31'08" EAST, 152.41 FEET; THENCE SOUTH 29° 24' 27" EAST, 181.64 FEET TO A POINT ON THE SOUTHEASTERLY LINE OF THE AFORESAID PARCEL "B"; THENCE ALONG LAST SAID LINE, SOUTH 42° 40'33" WEST, 527.72 FEET TO THE MOST WESTERLY CORNER OF PARCEL "C", AS LAST SAID PARCEL IS SHOWN ON THAT CERTAIN PARCEL MAP RECORDED IN BOOK 39 OF PARCEL MAPS AT PAGES 22 AND 23, SAN MATEO COUNTY RECORDS; THENCE ALONG THE SOUTHWESTERLY LINE OF LAST SAID PARCEL, SOUTH 40° 24' 22" EAST, 40.08 FEET TO THE MOST NORTHERLY CORNER OF THE LANDS DESCRIBED IN THE DEED TO HALF MOON BAY PROPERTIES INC., RECORDED IN BOOK 7984 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 120; THENCE ALONG THE NORTHWESTERLY LINE OF LAST SAID LANDS TO A POINT ON THE NORTHEASTERLY LINE OF THE LANDS DESCRIBED AS PARCEL II IN THE DEED TO NURSERYMEN'S EXCHANGE, INC., RECORDED IN BOOK 7984 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 122, SOUTH 53' 08' 40" WEST,

*Master Easement Agreement*

21.52 FEET; THENCE NORTH 65° 03'34" WEST 44.98 FEET TO THE MOST WESTERLY CORNER OF LAST SAID LANDS; THENCE ALONG THE NORTHWESTERLY LINE OF THE AFORESAID PARCEL "A", THE FOLLOWING COURSES: SOUTH 53° 08'40" WEST, 130.00 FEET; NORTH 36° 51'20" WEST, 40.00 FEET; SOUTH 53° 08'40' WEST, 40.00 FEET AND SOUTH 36° 51'20" EAST, 6.00 FEET TO THE MOST NORTHERLY CORNER OF THE AFORESAID LANDS DESCRIBED AS PARCEL I; THENCE ALONG THE NORTHWESTERLY LINE OF LAST SAID LANDS, THE FOLLOWING COURSES: SOUTH 54° 35' 05" WEST, 58.85 FEET; SOUTH 84° 41'06" WEST, 32.21 FEET; SOUTH 44° 39'45" WEST, 94.59 FEET; SOUTH 80° 52'48" WEST, 40.04 FEET; SOUTH 83° 39'13" WEST, 70.26 FEET; NORTH 73° 57'01 "WEST, 48.77 FEET; SOUTH 86° 50' 54" WEST, 50.18 FEET; NORTH 33° 14'33" WEST, 43.62 FEET; NORTH 75° 58'47" WEST, 45.40 FEET; SOUTH 59° 16'30" WEST, 32.26 FEET; SOUTH 72° 15'45" WEST, 67.05 FEET; NORTH 87° 31'51 "WEST, 20.33 FEET; NORTH 84° 51'02" WEST, 35.40 FEET; SOUTH 76° 55'26" WEST, 27.81 FEET; SOUTH 53° 37'20" WEST, 76.045 FEET; SOUTH 47° 16'44" WEST, 81.56 FEET AND SOUTH 46° 37'01 "WEST, 90.79 FEET TO THE POINT OF BEGINNING; ALL AS SHOWN ON APPROVAL OF LOT LINE ADJUSTMENT, RECORDED JANUARY 7, 2010, SERIES NO. 2010-001484.

RESERVING THEREFROM AN EASEMENT FOR INGRESS AND EGRESS, PUBLIC OR PRIVATE UTILITIES, STORM DRAINAGE, APPURTENANCES AND MAINTENANCE THERETO, LYING IN, ON, OVER, UNDER AND ALONG A STRIP OF LAND 20 FEET IN WIDTH, LYING IMMEDIATELY ADJACENT TO AND SOUTHEASTERLY OF THE FOLLOWING DESCRIBED NORTHWESTERLY LINE THEREOF:

BEGINNING AT THE HEREIN DESCRIBED POINT "A"; THENCE FROM SAID POINT OF BEGINNING ALONG THE NORTHWESTERLY LINE OF THE HEREIN DESCRIBED REAL PROPERTY, THE FOLLOWING COURSES: NORTH 62° 35'35" EAST, 173.55 FEET; THENCE NORTH 39° 32' 31" EAST, 126.05 FEET; THENCE NORTH 44° 01'59" EAST, 73.37 FEET; THENCE NORTH 40° 27'35" EAST, 85.82 FEET; THENCE NORTH 51° 31'08" EAST, 152.41 FEET TO THE MOST NORTHERLY CORNER OF THE HEREIN DESCRIBED REAL PROPERTY AND THE NORTHEASTERLY TERMINUS OF THE HEREIN DESCRIBED NORTHWESTERLY LINE; SAID EASEMENT BEING CONTIGUOUS, FOR ITS FULL WIDTH, AT ITS NORTHEASTERLY TERMINUS TO A LINE THAT BEARS SOUTH 29° 24'27" EAST AND AT ITS SOUTHWESTERLY TERMINUS TO A LINE THAT BEARS SOUTH 41° 28'53" EAST.

ALSO RESERVING THEREFROM AN EASEMENT FOR INGRESS AND EGRESS, PUBLIC OR PRIVATE UTILITIES, STORM DRAINAGE, APPURTENANCES AND MAINTENANCE THERETO, LYING IN, ON, OVER, UNDER AND ALONG THE FOLLOWING DESCRIBED PARCEL:

BEGINNING AT THE HEREIN DESCRIBED POINT "A"; THENCE FROM SAID POINT OF BEGINNING ALONG THE NORTHWESTERLY LINE OF THE HEREIN DESCRIBED REAL PROPERTY, NORTH 62° 35' 35" EAST, 51.55 FEET; THENCE LEAVING LAST SAID LINE, SOUTH 41° 28'53" EAST, 230.55 FEET TO A POINT ON THE SOUTHEASTERLY LINE OF PARCEL "B", AS LAST SAID PARCEL IS SHOWN ON THAT CERTAIN PARCEL MAP RECORDED IN BOOK 39 OF PARCEL MAPS AT PAGES 22 AND 23, SAN MATEO COUNTY RECORDS; THENCE ALONG LAST SAID LINE, SOUTH 42° 40' 33" WEST, 9.86 FEET TO THE MOST WESTERLY CORNER OF PARCEL "C", AS LAST SAID PARCEL IS SHOWN ON SAID PARCEL MAP; THENCE ALONG THE SOUTHWESTERLY LINE OF LAST SAID PARCEL, SOUTH 40° 24' 32" EAST, 40.08 FEET TO THE MOST NORTHERLY CORNER OF THE LAND DESCRIBED IN THE DEED TO HALF MOON BAY PROPERTIES INC., RECORDED IN BOOK 7984 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 120; THENCE ALONG THE NORTHWESTERLY LINE OF LAST SAID LANDS, SOUTH 53° 08'40" WEST, 21.52 FEET TO A

*Master Easement Agreement*

POINT IN THE NORTHEASTERLY LINE OF THE LANDS DESCRIBED AS PARCEL II IN THE DEED TO NURSERYMEN'S EXCHANGE INC.. RECORDED IN BOOK 7984 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 122; THENCE ALONG SAID NORTHEASTERLY LINE, NORTH 65° 03'34" WEST 44.98 FEET TO THE MOST NORTHERLY CORNER OF SAID PARCEL II; THENCE NORTH 41° 28'53" WEST, 241.20 FEET TO THE POINT OF BEGINNING.

APN:   048-300-340   JPN:  048-030-300-02 and 048-030-300-02.02

PARCEL B:

PARCEL B, AS SAID PARCEL IS DESIGNATED ON THE MAP FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA ON NOVEMBER 14, 1977, IN VOLUME 39 OF PARCEL MAPS AT PAGES 22 AND 23.

EXCEPTING THEREFROM THAT PORTION CONVEYED IN A DEED TO NURSERYMEN'S EXCHANGE, INC., A CALIFORNIA CORPORATION, BY DEED RECORDED AUGUST 28, 1980, IN BOOK 7984 OF OFFICIAL RECORDS OF SAN MATEO COUNTY AT PAGE 122.

ALSO EXCEPTING THEREFROM THAT PORTION CONVEYED TO NURSERYMEN'S EXCHANGE, INC., A CALIFORNIA CORPORATION, BY DEED RECORDED SEPTEMBER 13, 1982, UNDER RECORDERS SERIAL NO. 82078057, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM LOT 4, AS DESIGNATED ON THE MAP ENTITLED, 'MAP OF THE LANDS OF J. M. VASQUES, PART OF THE RANCHO CORRAL DE TIERRA VASQUES", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON JANUARY 2, 1886, IN BOOK "A" OF MAPS AT PAGE 44 AND A COPY ENTERED IN BOOK 1 OF MAPS AT PAGE 63 SAID LOT 4 BEING A PORTION OF PARCEL 'B" ABOVE.

ALSO EXCEPTING THEREFROM ALL THAT PORTION LYING SOUTHWESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT THE SOUTHERLY TERMINUS OF THE WESTERLY LINE OF SAID PARCEL 'B' SHOWN ON SAID MAP AS "S 10° 30' W 9982.5'", THENCE ALONG A SOUTHERLY PRODUCTION OF SAID LINE, SOUTH 10° 38'16" WEST 816.48 FEET TO A POINT IN THE NORTHERLY LINE OF THAT PARCEL OF LAND CONVEYED TO NURSERYMAN'S EXCHANGE, INC., A CALIFORNIA CORPORATION BY DEED RECORDED SEPTEMBER 13, 1982, UNDER RECORDER'S SERIAL NO. 82078057, OFFICIAL RECORDS, SAID LINE DESCRIBED IN SAID DEED AS "SOUTH 60° 15'23" EAST 160.93 FEET", SAID POINT DISTANT THEREON NORTH 58° 49' 30" WEST 148.83 FEET FROM THE SOUTHEASTERLY TERMINUS; ALL AS SHOWN ON APPROVAL OF LOT LINE ADJUSTMENT, RECORDED JANUARY 7, 2010, SERIES NO. 2010-001484.

APN: 047-340-180 JPN: 047-034-340-09

TRACT G:

LOT 3, AS DESIGNATED ON THE MAP ENTITLED, "MAP OF THE LANDS OF J. M. VASQUES, PART OF THE RANCHO CORRAL DE TIERRA VASQUES", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON

JANUARY 2, 1886, IN BOOK "A" OF MAPS AT PAGE 44 AND A COPY ENTERED IN BOOK 1 OF MAPS AT PAGE 63.

APN: 047-340-120

*Master Easement Agreement*

31568980v5_336453-00006

EXHIBIT C

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF HALF MOON BAY, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, BEING A PORTION OF THE LANDS SHOWN AS PARCEL "A" AND PARCEL "B" OF THAT LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484 TOGETHER WITH THAT PORTION OF LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING IN THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL B, BEING THE SOUTHERLY TERMINUS OF THAT CERTAIN COURSE SHOWN AS "N25°38'24"E 2808.96" ON SAID LOT LINE ADJUSTMENT; THENCE ALONG THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL "A" AND PARCEL "B" THE FOLLOWING COURSES:

1-   SOUTH 44°38'24" WEST 626.96 FEET;
2-   SOUTH 42°40'33" WEST 527.72 FEET;
2-   SOUTH 40°26'14" EAST 40.08 FEET;
3-   SOUTH 53°08'40" WEST 21.54 FEET;
4-   NORTH 65°04'21" WEST 44.99 FEET;
5-   SOUTH 53°08'40" WEST 130.00 FEET;
6-   NORTH 36°51'20" WEST 40.00 FEET;
7-   SOUTH 53°08'40" WEST 40.00 FEET;

THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, SOUTH 36°51'20" EAST 40.00 FEET TO THE SOUTHEASTERLY BOUNDARY OF SAID LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS; THENCE SOUTHWESTERLY ALONG SAID BOUNDARY, SOUTH 53°08'40" WEST 179.84 FEET; THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, NORTH 36°51'20" WEST 70.45 FEET; THENCE NORTH 53°08'40"EAST 259.84 FEET; THENCE NORTH 25°58'32" EAST 46.58 FEET; THENCE NORTH 35°44'33" EAST 45.32 FEET; THENCE SOUTH 56°38'37" EAST 12.39 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 100.14 FEET; THENCE SOUTHEASTERLY 34.04 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19°28'41" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 69.96 FEET; THENCE EASTERLY 50.95 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 41°43'20"; THENCE NORTH 52°04'25" EAST 26.84 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 52.06 FEET; THENCE NORTHEASTERLY 10.38 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°25'26"; THENCE NORTH 48°38'35" EAST 49.71 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 285.61 FEET; THENCE NORTHEASTERLY 51.15 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10°15'38" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 78.32 FEET; THENCE NORTHEASTERLY 17.67 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12°55'24" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 981.10 FEET; THENCE NORTHEASTERLY 45.81 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 2°40'31" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE WESTERLY, HAVING A RADIUS OF 60.13 FEET; THENCE NORTHERLY 59.68 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56°51'34"; THENCE NORTH 36°03'33" WEST 87.84 FEET; THENCE NORTH 46°39'08" EAST 44.81 FEET; THENCE

NORTH 44°18'23" EAST 120.78 FEET; THENCE NORTH 54°59'03" EAST 88.24 FEET; THENCE NORTH 57°22'50" EAST 67.86 FEET; THENCE NORTH 54°58'54"EAST 62.05 FEET; THENCE NORTH 44°04'26" EAST 59.87 FEET; THENCE NORTH 38°15'32" EAST 76.39 FEET; THENCE NORTH 48°35'50" EAST 113.50 FEET; THENCE NORTH 52°51'17" EAST 68.68 FEET; THENCE NORTH 44°30'15" EAST 43.59 FEET; THENCE NORTH 36°06'45" EAST 68.88 FEET; THENCE NORTH 23°55'04" EAST 176.82 FEET; THENCE NORTH 13°03'00" EAST 275.30 FEET; THENCE NORTH 12°56'39" EAST 342.75 FEET; THENCE NORTH 07°40'40" WEST 65.80 FEET; THENCE NORTH 20°39'45" EAST 57.26 FEET; THENCE NORTH 48°07'35" EAST 67.18 FEET; THENCE SOUTH 90°00'00" EAST 69.22 FEET; THENCE SOUTH 67°55'59" EAST 95.44 FEET; THENCE SOUTH 64°21'36" EAST 135.16 TO A POINT ON THE SAID SOUTHEASTERLY BOUNDARY OF PARCEL B OF SAID LOT LINE ADJUSTMENT, SAID POINT LYING THEREON NORTH 25°38'24" EAST 958.88 FEET FROM THE POINT OF BEGINNING; THENCE SOUTH 25°38'24" WEST 958.88 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL "B" OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484.

ALSO EXCEPTING THEREFROM, THAT PORTION LYING WITHIN A 20.00 FOOT STRIP OF LAND, THE NORTHWESTERLY LINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING IN THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL B, BEING THE SOUTHERLY TERMINUS OF THAT CERTAIN COURSE SHOWN AS "N25°38'24"E 2808.96" ON SAID LOT LINE ADJUSTMENT; THENCE ALONG THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL "A" AND PARCEL "B" THE FOLLOWING COURSES:

1- SOUTH 44°38'24" WEST 626.96 FEET;
2- SOUTH 42°40'33" WEST 527.72 FEET;
2- SOUTH 40°26'14" EAST 40.08 FEET;
3- SOUTH 53°08'40" WEST 21.54 FEET;
4- NORTH 65°04'21" WEST 44.99 FEET;
5- SOUTH 53°08'40" WEST 130.00 FEET;
6- NORTH 36°51'20" WEST 40.00 FEET;
7- SOUTH 53°08'40" WEST 40.00 FEET;

THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, SOUTH 36°51'20" EAST 40.00 FEET TO THE SOUTHEASTERLY BOUNDARY OF SAID LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS; THENCE SOUTHWESTERLY ALONG SAID BOUNDARY, SOUTH 53°08'40" WEST 179.84 FEET; THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, NORTH 36°51'20" WEST 70.45 FEET; THENCE NORTH 53°08'40"EAST 259.84 FEET; THENCE NORTH 25°58'32" EAST 46.58 FEET; THENCE NORTH 35°44'33" EAST 45.32 FEET; THENCE SOUTH 56°38'37" EAST 12.39 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 100.14 FEET; THENCE SOUTHEASTERLY 34.04 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19°28'41" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 69.96 FEET; THENCE EASTERLY 50.95 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 41°43'20"; THENCE NORTH 52°04'25" EAST 26.84 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 52.06 FEET; THENCE NORTHEASTERLY 10.38 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°25'26"; THENCE NORTH 48°38'35" EAST 49.71 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 285.61 FEET; THENCE NORTHEASTERLY 51.15 FEET ALONG SAID CURVE

*Master Easement Agreement*

THROUGH A CENTRAL ANGLE OF 10°15'38" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 78.32 FEET; THENCE NORTHEASTERLY 17.67 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12°55'24" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 981.10 FEET; THENCE NORTHEASTERLY 45.81 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 2°40'31" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE WESTERLY, HAVING A RADIUS OF 60.13 FEET; THENCE NORTHERLY 59.68 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56°51'34"; THENCE NORTH 36°03'33" WEST 77.84 FEET TO A POINT HEREINAFTER REFERED TO AS POINT "A"; THENCE NORTH 36°03'33" WEST 10.00 FEET TO THE **TRUE POINT OF BEGINNING**; THENCE THE FOLLOWING 4 COURSES:

1) NORTH 46°39'08" EAST 44.81 FEET;
2) NORTH 44°18'23" EAST 120.78 FEET;
3) NORTH 54°59'03" EAST 88.24 FEET;
4) NORTH 57°22'50" EAST 42.14 FEET TO A POINT ON THE EASTERLY LINE OF PARCEL A OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484.

THE SOUTHEASTERLY LINE OF SAID 20.00 FOOT STRIP TO TERMINATE NORTHEASTERLY IN THE EASTERLY LINE OF PARCEL A OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484 AND SOUTHWESTERLY AT SAID POINT "A".

*Master Easement Agreement*

**EXHIBIT D**

**Power Poles**

*Master Easement Agreement*

31568980v5_336453-00006



EXHIBIT "D"
(POWER POLES)

## Shared Roadway

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF HALF MOON BAY, COUNTY OF SAN MATEO, STATE OF CALIFORNIA, BEING A PORTION OF THE LANDS SHOWN AS PARCEL "A" OF THAT LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484 BEING A 20.00 FOOT STRIP OF LAND, THE NORTHWESTERLY LINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING IN THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL B, BEING THE SOUTHERLY TERMINUS OF THAT CERTAIN COURSE SHOWN AS "N25°38'24"E 2808.96" ON SAID LOT LINE ADJUSTMENT; THENCE ALONG THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL "A" AND PARCEL "B" THE FOLLOWING COURSES:

1- SOUTH 44°38'24" WEST 626.96 FEET;
2- SOUTH 42°40'33" WEST 527.72 FEET;
2- SOUTH 40°26'14" EAST 40.08 FEET;
3- SOUTH 53°08'40" WEST 21.54 FEET;
4- NORTH 65°04'21" WEST 44.99 FEET;
5- SOUTH 53°08'40" WEST 130.00 FEET;
6- NORTH 36°51'20" WEST 40.00 FEET;
7- SOUTH 53°08'40" WEST 40.00 FEET;

THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, SOUTH 36°51'20" EAST 40.00 FEET TO THE SOUTHEASTERLY BOUNDARY OF SAID LAND DESCRIBED IN A DEED RECORDED AUGUST 28, 1980 IN BOOK 7984 PAGE 122 OF OFFICIAL RECORDS; THENCE SOUTHWESTERLY ALONG SAID BOUNDARY, SOUTH 53°08'40" WEST 179.84 FEET; THENCE LEAVING SAID SOUTHEASTERLY BOUNDARY, NORTH 36°51'20" WEST 70.45 FEET; THENCE NORTH 53°08'40"EAST 259.84 FEET; THENCE NORTH 25°58'32" EAST 46.58 FEET; THENCE NORTH 35°44'33" EAST 45.32 FEET; THENCE SOUTH 56°38'37" EAST 12.39 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 100.14 FEET; THENCE SOUTHEASTERLY 34.04 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 19°28'41" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 69.96 FEET; THENCE EASTERLY 50.95 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 41°43'20"; THENCE NORTH 52°04'25" EAST 26.84 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 52.06 FEET; THENCE NORTHEASTERLY 10.38 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°25'26"; THENCE NORTH 48°38'35" EAST 49.71 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 285.61 FEET; THENCE NORTHEASTERLY 51.15 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10°15'38" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 78.32 FEET; THENCE NORTHEASTERLY 17.67 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 12°55'24" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 981.10 FEET; THENCE NORTHEASTERLY 45.81 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 2°40'31" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE WESTERLY, HAVING A RADIUS OF 60.13 FEET; THENCE NORTHERLY 59.68 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56°51'34"; THENCE NORTH 36°03'33" WEST 77.84 FEET TO A POINT HEREINAFTER REFERED TO AS POINT "A";

*Master Easement Agreement*

THENCE NORTH 36°03'33" WEST 10.00 FEET TO THE **TRUE POINT OF BEGINNING**;
THENCE THE FOLLOWING 4 COURSES:

1) NORTH 46°39'08" EAST 44.81 FEET;
2) NORTH 44°18'23" EAST 120.78 FEET;
3) NORTH 54°59'03" EAST 88.24 FEET;
4) NORTH 57°22'50" EAST 42.14 FEET TO A POINT ON THE EASTERLY LINE OF PARCEL A OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484.

THE SOUTHEASTERLY LINE OF SAID 20.00 FOOT STRIP TO TERMINATE NORTHEASTERLY IN THE EASTERLY LINE OF PARCEL A OF SAID LOT LINE ADJUSTMENT RECORDED JANUARY 7, 2010 AS SERIAL NUMBER 2010-001484 AND SOUTHWESTERLY AT SAID POINT "A".

# ACKNOWLEDGMENT

STATE OF CALIFORNIA          )

                                      ) SS.

COUNTY OF _____)

On _____ before me, _____,

Notary        Public,        personally        appeared      _____
_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under the PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

STATE OF CALIFORNIA          )

                                        ) SS.

COUNTY OF _____)

On _____ before me, _____,

Notary        Public,        personally        appeared      _____
_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under the PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Master Easement Agreement*

1

Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Counsel for Debtor and Debtor in Possession
Nurserymen's Exchange, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 11-31985 |
| NURSERYMEN'S EXCHANGE, INC. | Chapter 11 |
| Debtor and Debtor in Possession | **MOTION FOR ORDER APPROVING THE SALE OF DEBTOR'S OPERATING ASSETS TO THE HIGHEST AND BEST BID FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS** |

**Date:** July 11, 2011
**Time:** 9:00 a.m.
**Place:** 235 Pine Street, Courtroom 22
      San Francisco, CA

**LIEN CLAIMANTS:**
**Wells Fargo Bank, IBM Credit LLC, Ikon Financial Services and IOS Capital**

      Nurserymen's Exchange, Inc. ("NEI" or the "Debtor"), debtor and debtor-in-possession in the above-captioned case, hereby moves this Court for entry of an Order Approving the Sale of Debtor's Operating Assets to the winning bidder at an auction to be held on July 8, 2011.

      The assets (the "Operating Assets") being sold are generally described below:

      -      Any and all assets and rights of the Seller [Debtor] that are used in or held for use in the Business, other than the Excluded Assets, including the following:

      (a) Inventory;

      (b) Accounts Receivable;

MOTION RE SALE OF OPERATING ASSETS

1

1    (c) Real Property;

2    (d) Equipment;

3    (e) all rights under Assumed Contracts;

4    (f) all Intellectual Property Rights owned or used by the Seller [Debtor]

5    (g) all goodwill relating to the Business;

6    (h) all claims, causes of action, rights of recovery or setoff of any kind against any Person who

7    holds an Assumed Liability;

8    (i) all Books and Records.

9    The capitalized terms used above are defined in the form Asset Purchase Agreement prepared by

10   Debtor's counsel.

11   This motion is based upon the Notice of Motion, the Motion and the Declaration of Justin

12   Dautoff, and upon such other oral and documentary evidence as may be presented prior to or at the

13   hearing on the Motion.

14                              **BACKGROUND/PROCEDURAL STATUS**

15   Debtor filed this case on May 23, 2011 and is operating as a Debtor in Possession pursuant to

16   Bankruptcy Code sections 1107 and 1108.  An Official Committee of Unsecured Creditors (the

17   "Committee") has been appointed and is represented by counsel.

18   Founded in 1941 as a San Francisco bulb brokerage business, and currently based in Half Moon

19   Bay in the San Francisco Bay Area, Debtor is a producer, broker and wholesaler of home decor products

20   incorporating indoor blooming plants (miniature roses, sun stars, campanula), specialty foliage (miniature

21   Christmas trees, bonsai, bamboo, cactus and succulents, etc.), holiday grow kits, and potted edibles.

22   Debtor operates in two segments: the core business and the wholesale facility.  The core business

23   services clients nationwide across all major retail channels, including supermarket chains, mass

24   merchandisers, home and garden centers, and specialty and independent operators.  The core business

25   includes the growing, brokerage, and distribution of home decor products.  The core business also

26   includes sales, marketing, and product design and development staff who collaborate with top-tier

27   customers to create unique designs for their specific market needs.  The wholesale center is a stand-alone

28   wholesaler of flowers, foliage, designer dish gardens and hardgoods to smaller, independently owned

MOTION RE SALE OF OPERATING ASSETS

2

specialty stores, florists, garden centers and supermarkets. The wholesale center also has a direct sales team and a packing and shipping facility that sells and ships directly to customers' individual stores.

Seeking to recover from operating and general economic difficulties that began in 2008, in an attempt to restore operational and financial stability, NEI implemented aggressive operational and restructuring initiatives that have positioned NEI for more efficient, streamlined operations, greater responsiveness to customers' needs, and future growth in revenues and profitability.

Beginning in September 2010, utilizing the services of an investment banker, FocalPoint Securities, LLC ("FocalPoint"), NEI began a two-part solicitation process designed to either (i) refinance the existing lender, or (ii) find a financial or strategic buyer for NEI's operating business. On a parallel track to this process, NEI has marketed certain real estate assets that are not essential to its operations. The efforts to market the real estate have culminated in the proposed sale of certain real estate to RL Communities for $8 million. The sale of the real estate is the subject of a separate motion to be heard on July 22, 2011.

As a result of the solicitation process initiated by FocalPoint, NEI received a number of written proposals to provide working capital financing from financial institutions, but these proposals did not provide enough capital to pay off pre-petition indebtedness or were contingent on new equity being invested into the business. In addition to lender proposals, NEI received several indications of interest to purchase NEI's assets. NEI executed a letter of intent that provided for a period of exclusivity for one proposed buyer, which began engaging in extensive business and legal due diligence. NEI did not finalize an asset purchase agreement with the interested party and exclusivity was terminated less than two weeks before the bankruptcy filing. Since the termination of exclusivity, Debtor's representatives have continued to market the Operating Assets and meet with and provide information to interested buyers.

**THE OPERATING ASSETS AND THE SALE PROCEDURES**

The Operating Assets consist primarily of the real property used in the operation of the business, the inventory, the accounts receivable, Debtor's contractual rights to certain executory contracts, the equipment used in the operation of the business, the goodwill associated with Debtor's business and Debtor's intellectual property, including trademarks, patents and the like.

MOTION RE SALE OF OPERATING ASSETS

3

Upon filing its case, Debtor filed a motion seeking to establish approved procedures for handling the sale of the Operating Assets (the "Sale Procedures"). By an order dated June 10, 2011, the Court granted Debtor's motion and approved the Sale Procedures to govern the sale of the Operating Assets. In very general terms, the Sale Procedures provide as follows:

• Parties wishing to bid on the Operating Assets must execute a confidentiality and non-disclosure agreement to have access to confidential due diligence information;

• An interested party will be provided a form Asset Purchase Agreement for the purchase of the Operating Assets;

• Unless Debtor selects a stalking horse bidder, which it must do no later than June 30, 2011, all bids must be submitted by July 6, 2011;

• Bids must include adequate information to demonstrate to the Debtor and the Committee that the bidder has the financial ability to consummate the purchase of the Operating Assets;

• An auction will be held on July 8, 2011 between all parties who are deemed Qualified Bidders (as that term is used in the Sale Procedures);

• Prior to the auction, Debtor will notify all Qualified Bidders of the highest and best bid submitted by the bid deadline;

• Any party that makes a bid must provide a deposit of 5% of the purchase price being offered;

• Wells Fargo may credit bid at the auction;

• Debtor may, in consultation with the Committee and pursuant to the terms in the Sales Procedures, cancel the auction;

• If the auction does go forward on July 8, 2011, Debtor, after consultation with the Committee, shall select a Winning Bidder (as that term is used in the Sales Procedures) and seek approval of the sale of the Operating Assets to such bidder at the hearing set for July 11, 2011;

• If there is a second highest bid (the "Backup Bid"), in the event the Winning Bidder fails to consummate the sale, Debtor shall close the sale with the Backup Bidder without further order of the Court; and,

MOTION RE SALE OF OPERATING ASSETS

4

1   •  The Sale Procedures also establish a procedure for dealing with the assumption of

2 executory contracts and the assignment of those contracts to the Winning Bidder, and any dispute in

3 connection with the assumption and assignment.

4             **Sale Free and Clear of Liens**

5    By this Motion, Debtor seeks an order approving the sale free and clear of the liens of Wells

6 Fargo, IBM Credit LLC, Ikon Financial Services and IOS Capital, and of all claims and interests, with all

7 such liens, claims and interests attaching the to proceeds of sale to the extent, validity and priority

8 existing prior to the sale.

9          **Buyer to Receive Section 363(m) Protection**

10    The Motion seeks a determination that the proposed buyer is a good faith purchaser and entitled to

11 the protections provided by Bankruptcy Code section 363(m).  Section 363(m) of the Bankruptcy Code

12 provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of

13 this section of a sale or lease of property does not affect the validity of a sale or lease under such

14 authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m).

15 Under Bankruptcy Code section 363(m), "an appeal of a bankruptcy court's ruling on a foreclosure action

16 [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property, unless the

17 debtor [or other complaining party] stays the foreclosure [or other] sale pending an appeal." *Mann v.*

18 *Alexander Dawson, Inc. (In re Mann)*, 907 F.2d 923, 926 (9th  Cir. 1990) "[T]he primary goal of the

19 mootness rule [embodied in section 363(m)] 'is to protect the interest of a good faith purchaser . . . of the

20 property,' thereby assuring finality of sales." *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-*

21 *Kona Land Co.)*, 846 F.2d 1170, 1173 (9th Cir. 1988) (quoting *Community Thrift & Loan v. Suchy (In re*

22 *Suchy)*, 786 F.2d 900, 901-02 (9th Cir. 1985). Lack of good faith for purposes of Bankruptcy Code

23 section 363(m) is generally determined by the existence of fraudulent conduct or insider dealing

24 during the sale process. *See, e.g., In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983).

25    As the Winning Bidder is not yet known, Debtor anticipates submitting a subsequent declaration

26 to establish the facts necessary for the Court to determine that the Winning Bidder qualifies as a good

27 faith purchaser.  *See e.g. T.C. Investors v. Joseph (In re M Capital Corp*, 290 B.R. 743, 748-749 (9th Cir.

28 BAP 2003).

MOTION RE SALE OF OPERATING ASSETS

### Legal Argument

Bankruptcy Code section 363 provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." Bankruptcy Code § 363(b). To approve the use, sale or lease of property outside of the ordinary course of business, the Debtor must show four requirements: "(1) that a sound business reason exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith." *In re Medical Software Solutions*, 286 B.R. 431 (Bankr. D. Utah 2002). *See Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. BAP 1988) (quoting *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986). In general, bankruptcy courts often defer to a debtor's business judgment regarding the sale of estate assets, unless such decision is arbitrary and capricious. Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." See In re *Curlew Valley Assocs.*, 14 B.R. 506, 511-514 (Bankr. D. Utah 1981). *See also, Committee of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp)*, 722 F.2d 1063, 1070 (2nd Cir. 1983).

The Court should also consider whether the proposed transaction will further the diverse interests of the debtor, creditors, and equity holders, whether the assets are increasing or decreasing in value, and whether allowing the transaction would render meaningless the protections afforded to creditors under chapter 11. *See In re Work Recovery, Inc.*, 202 B.R. 301, 304 (Bankr. D. Ariz. 1996) (citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986)); *see also In re Chrysler LLC*, 576 F.3d 108, 117–18 (2d Cir. 2009)

Debtor submits that the sale of the Operating Assets pursuant to the procedures set forth in the Sales Procedures is well within the exercise of Debtor's reasonable business judgment. FocalPoint has been marketing the Operating Assets since the fall of 2010, while also seeking possible alternative financing. Based on those efforts, the proposed sale, depending on what bids are received, has the potential to maximize return for the creditors. The Sales Procedures establish a fair method for

MOTION RE SALE OF OPERATING ASSETS

6

1  auctioning the Operating Assets and obtaining the highest and best bid for them. Moreover, the

2  Committee is also involved in the process to attempt to obtain the best result for creditors. Finally, if the

3  Debtor and the Committee determine that there is not an appropriate bid, they can cancel the auction.

4  Debtor is authorized to complete the sale pursuant to Bankruptcy Code section 363(f), which

5  provides, the Debtor may sell property free and clear of any lien, claim, or interest in such property, if,

6  among other things:

7  (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

8  (2) such entity consents;

9  (3) such interest is a lien and the price at which such property is sold is greater than the aggregate

10  value of all liens on such property;

11  (4) such interest is in bona fide dispute; or

12  (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money

13  satisfaction of such interest.

14  Satisfaction of any one of the five requirements will be sufficient to permit the sale of the

15  Operating Assets free and clear of liens, claims, encumbrances, pledges, mortgages, security interests,

16  charges, options, and other interests (collectively, the "Interests"). The Debtor believes that other than the

17  Wells Fargo lien listed above, the remaining interests listed are the result of cautionary UCC filings in

18  connection with leases. To the extent there are liens senior to the Wells Fargo lien, Debtor does not

19  expect any of the putative lienholders to object, or otherwise expects the price garnered for the Operating

20  Assets to be in excess of the value of any liens. Debtor understands that if a Winning Bidder is chosen,

21  Wells Fargo consents to the sale.

22  Debtor also seeks waiver of the 14 day stay provided for in Bankruptcy Rule 6004(h), which

23  provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14

24  days after entry of the order, unless the court orders otherwise." Debtor requests that the order approving

25  the sale be effective immediately by providing that the 14 day stay under Bankruptcy Rule 6004(h) is

26  waived. The stay should be eliminated to allow the sale to close immediately "where there has been no

27  objection to the procedures." 10 Collier on Bankruptcy 15th Ed. Rev ¶6064.09. Here, absent an

28  unexpected objection, there is no reason why the stay should not be lifted in this instance.

MOTION RE SALE OF OPERATING ASSETS

1

**Conclusion**

2        Based on the above, Debtor requests that the Court approve the sale of the Operating Assets to the

3   Winning Bidder, if any, determined at the July 8, 2011 auction. Debtor further requests that the Court

4   make a finding that the buyer is a good faith purchaser and entitled to the protections of Bankruptcy Code

5   section 363(m). Finally, Debtor requests that the Court waive the stay provided for in Bankruptcy Rule

6   6004(h) with respect to the effectiveness of the order approving the sale of the Operating Assets.

7   Dated: June 22, 2011            LAW OFFICES OF STEPHEN D. FINESTONE

8

9                                   /s/ Stephen D. Finestone
                                    Stephen D. Finestone
10                                  Attorneys for Debtor and Debtor in Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION RE SALE OF OPERATING ASSETS

8

## EXHIBIT M

## FORM OF ESCROW AGREEMENT

This Agreement (this "Agreement") is made and entered into as of July [ ], 2011 by and among Nurserymen's Exchange, Inc., a California corporation (the "Seller"), Floramoda, Inc., a California corporation (the "Buyer"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as escrow agent hereunder (the "Escrow Agent"). The Escrow Agent shall be provided a copy of the Purchase Agreement for reference purposes only, and without limiting any other provisions of this Agreement, the Escrow Agent shall have no duties, obligations or liabilities arising under the Purchase Agreement.

## BACKGROUND

A. The Seller and the Buyer have entered into that certain Asset Purchase Agreement dated as of [ ], 2011 (the "Purchase Agreement"), pursuant to which the Seller has agreed to sell, and the Buyer has agreed to buy, the Purchased Assets. Capitalized terms used herein not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

B. Section 2.1(c) of the Purchase Agreement provides for the delivery by the Buyer of a sum equal to $200,000 (the "Escrow Deposit") to the Escrow Agent, such Escrow Deposit to be held in escrow by the Escrow Agent and disbursed in accordance with the terms of this Agreement.

C. Section 2.1(d) of the Purchase Agreement provides for the delivery by the Buyer of a sum equal to $400,000 (the "Escrow Holdback") to the Escrow Agent, such Escrow Deposit to be held in escrow by the Escrow Agent and disbursed in accordance with the terms of this Agreement.

D. The Escrow Agent has agreed to accept, hold, and disburse the Escrow Deposit and the Escrow Holdback deposited with it and the earnings thereon in accordance with the terms of this Agreement.

E. In order to establish the escrow of funds and to effect the provisions of the Purchase Agreement, the parties hereto have entered into this Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1. <u>Appointment of and Acceptance by the Escrow Agent</u>. The Seller and the Buyer hereby appoint the Escrow Agent to serve as escrow agent hereunder. The Escrow Agent hereby accepts such appointment and (a) upon receipt by wire transfer of the Escrow Deposit in accordance with Section 2(a) below, agrees to hold, invest and disburse the Deposit Fund in accordance with this Agreement and (b) upon receipt by wire transfer of the Escrow Holdback in accordance with Section 2(b) below, agrees to hold, invest and disburse the Holdback Fund in

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 203 of 326

accordance with this Agreement.

2. <u>Deposits</u>.

(a) Simultaneously with the execution and delivery of this Agreement, the Buyer will transfer the Escrow Deposit by wire transfer of immediately available funds, to an account designated by the Escrow Agent (the "<u>Deposit Account</u>"). The Escrow Agent will hold the Escrow Deposit, together with all investments thereof and additions thereto and all interest accumulated thereon and proceeds therefrom (together with the Escrow Deposit, the "<u>Deposit Fund</u>") in escrow upon the terms and conditions set forth in this Agreement and shall not withdraw or otherwise distribute the Deposit Fund from the Deposit Account except as provided herein.

(b) At the Closing (as defined in the Purchase Agreement), the Buyer will transfer the Escrow Holdback by wire transfer of immediately available funds, to an account designated by the Escrow Agent (the "<u>Holdback Account</u>"). The Escrow Agent will hold the Escrow Holdback, together with all investments thereof and additions thereto and all interest accumulated thereon and proceeds therefrom (together with the Escrow Holdback, the "<u>Holdback Fund</u>") in escrow upon the terms and conditions set forth in this Agreement and shall not withdraw or otherwise distribute the Holdback Fund from the Holdback Account except as provided herein.

3. <u>Disbursement of the Deposit Fund</u>. The Deposit Fund shall be held and disbursed by the Escrow Agent as follows:

a. <u>Upon the Closing</u>. If the Closing (as defined in the Purchase Agreement) occurs, then upon receipt of joint written instructions from the Seller and the Buyer ("<u>Joint Written Direction</u>"), the Escrow Agent shall deliver Deposit Fund to the Seller.

b. <u>Failure to Close</u>.

(i) Except as set forth in Section 3(b), if the Purchase Agreement is terminated pursuant to Sections 8.1, then upon receipt of Joint Written Direction, the Escrow Agent shall deliver the full amount of the Deposit Fund to the Buyer.

(ii) If the Purchase Agreement is terminated by the Buyer other than in accordance with Section 8.1 of the Purchase Agreement or by the Seller pursuant to (A) Section 8.1(c)(i) of the Purchase Agreement, (B) Section 8.1(c)(iii) of the Purchase Agreement provided that the failure to consummate the Closing is due to the failure of the Buyer to perform any of its obligations under this Agreement to the extent required to be performed by the Buyer on or prior to the Closing Date, or (C) Section 8.1(c)(iv) or Section 8.1(c)(v) of the Purchase Agreement provided that the event, circumstance, condition, fact, effect or other matter on which the termination is based is the result of the failure of the Buyer to perform any of its

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 204 of 326

obligations under this Agreement, then upon receipt of Joint Written Direction, the Escrow Agent shall deliver the full amount of the Deposit Fund to the Seller.

     c.     <u>Early Release of the Deposit Fund</u>.  Prior to the release of the Deposit Fund in accordance with Sections 3(a) or 3(b) hereof, the Seller and the Buyer may, by Joint Written Direction, instruct the Escrow Agent to release the Deposit Fund to the Seller or the Buyer, and the Escrow Agent shall be entitled to conclusively rely, without liability, thereon.

     4.     <u>Disbursement of the Holdback Fund</u>.  The Holdback Fund shall be held and disbursed by the Escrow Agent until the delivery to the Escrow Agent of Joint Written Direction advising that the Final Cash Purchase Price (as defined in the Purchase Agreement) has been finally determined pursuant to Section 2.2(c) thereof and directing the Escrow Agent to make disbursement of the Escrow Holdback.  Prior to the release of the Holdback Fund in accordance with this Section 4, the Seller and the Buyer may, by Joint Written Direction, instruct the Escrow Agent to release the Holdback Fund to the Seller or the Buyer, and the Escrow Agent shall be entitled to conclusively rely, without liability, thereon.

     5.     <u>Suspension of Performance; Disbursement Into Court</u>.  If, at any time, (i) there shall exist any dispute between the Seller and the Buyer with respect to the holding or disposition of all or any portion of the Deposit Fund or the Holdback Fund or any other obligations of the Escrow Agent hereunder, (ii) the Escrow Agent is unable to determine, to the Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Deposit Fund or the Holdback Fund or the Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) the Seller and the Buyer have not within thirty (30) days of the furnishing by the Escrow Agent of a notice of resignation pursuant to Section 7 hereof, appointed a successor escrow agent to act hereunder, then the Escrow Agent may, in its sole discretion, take either or both of the following actions:

     a.     suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of the Escrow Agent or until a successor escrow agent shall have been appointed (as the case may be); or

     b.     petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction in any venue convenient to the Escrow Agent, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all of the Deposit Fund or the Holdback Fund, after deduction and payment to the Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder; *provided, however*, Escrow Agent shall not be so entitled to deduct any such fees and expenses to the extent that they are incurred as a result of Agent Fault Behavior (as defined below).

31570544

3

The Escrow Agent shall have no liability to the Seller, the Buyer or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability that may arise, or be alleged to have arisen, as a result of any delay in disbursement of the Deposit Fund or the Holdback Fund or any delay with respect to any other action required or requested of the Escrow Agent; provided, however, nothing herein shall be deemed to limit or relieve Escrow Agent's liability arising out of any gross negligence or willful misconduct on its part or that of its employees, officers, directors, consultants, agents or other representatives (such negligence or willful misconduct, "<u>Agent Fault Behavior</u>").

6. <u>Investment of Funds</u>. The Escrow Agent is herein directed and instructed to invest and reinvest the Deposit Fund and the Holdback Fund in the U.S. dollar denominated money market deposit account of the Escrow Agent (which has a rating on its short- term deposits on the date of deposit "A-l+" by S&P and "P-1" by Moody's) described on Schedule A hereto. The Escrow Agent may sell or liquidate any of the foregoing investment at any time without any further instructions from the Seller or the Buyer if the proceeds thereof are required for any disbursement of the Deposit Fund or the Holdback Fund permitted or required hereunder. All investment earnings shall become part of the Deposit Fund or the Holdback Fund, respectively, and investment losses shall be charged against each such respective fund. The Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Deposit Fund or the Holdback Fund. With respect to any portion of the Deposit Fund or the Holdback Fund received by the Escrow Agent after twelve o'clock, p.m., Central Standard Time, the Escrow Agent shall not be required to invest such funds until the next business day.

7. <u>Resignation of the Escrow Agent</u>. The Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving thirty (30) days prior written notice to the Seller and the Buyer specifying a date when such resignation shall take effect. Upon any such notice of resignation, the Seller and the Buyer jointly shall appoint a successor escrow agent hereunder prior to the effective date of such resignation. If the Seller and the Buyer fail to appoint a successor escrow agent within such time, the Escrow Agent shall have the right to petition a court of competent jurisdiction to appoint a successor escrow agent, and all costs and expenses (including without limitation attorneys fees) related to such petition shall be paid jointly and severally by the Seller and the Buyer. The retiring Escrow Agent shall transmit all records pertaining to the Deposit Fund and the Holdback Fund and pay all of the Deposit Fund and the Holdback Fund to the successor escrow agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder, but excluding any of the foregoing to the extent attributable to Agent Fault Behavior. After any retiring Escrow Agent's resignation, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Escrow Agent under this Agreement. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 206 of 326

business of the Escrow Agent's corporate trust line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.

8. <u>Liability of the Escrow Agent</u>. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Agreement, including without limitation any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct caused any loss to the Seller and the Buyer. The Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Fund in accordance with the terms of this Agreement. The Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. The Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Fund, any account in which the Escrow Fund is deposited, this Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding. The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. The Seller and the Buyer, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel, except to the extent such liability results from Agent Fault Behavior.

The Escrow Agent is authorized, in its sole discretion, to comply with final orders issued or process entered by any court with respect to the Deposit Fund or the Holdback Fund, without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Deposit Fund or the Holdback Fund is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

31570544

5

9.     <u>Indemnification of the Escrow Agent</u>.  From and at all times after the date of this Agreement, the Seller and the Buyer, jointly and severally, shall, to the fullest extent permitted by law, defend, indemnify and hold harmless the Escrow Agent and each director, officer, employee, attorney, agent and affiliate of the Escrow Agent against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation the Seller and the Buyer, whether threatened or initiated, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Agreement or any transactions contemplated herein, except in all events to the extent the same results from Agent Fault Behavior.  The obligations of the Seller and the Buyer under this section shall survive any termination of this Agreement and the resignation or removal of the Escrow Agent.

10.     <u>Fees and Expenses of the Escrow Agent</u>.  The Seller and the Buyer shall compensate the Escrow Agent for its services hereunder in accordance with <u>Schedule B</u> attached hereto.  All of the compensation and reimbursement obligations set forth in this section shall be payable by the Seller and the Buyer, jointly and severally, upon demand by the Escrow Agent.  The obligations of the Seller and the Buyer under this section shall survive any termination of this Agreement and the resignation or removal of the Escrow Agent. Escrow Agent is authorized to, and may, disburse to itself from the Deposit Fund and the Escrow Holdback, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which the Escrow Agent or any indemnified party is entitled to seek indemnification pursuant to this Agreement but specifically excluding any amounts to the extent arising or payable as a result of any Agent Fault Behavior). If for any reason funds in the Deposit Fund or Escrow Holdback are insufficient to cover such compensation and reimbursement, the Seller and the Buyer shall promptly pay such amounts to the Escrow Agent or any indemnified party upon receipt of an itemized invoice.

11.     <u>Representations and Warranties</u>.  The Seller and the Buyer each respectively make the following representations and warranties to the Escrow Agent:

(i)     It has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms.

(ii)     The applicable persons designated on <u>Schedule C</u> attached hereto have been duly appointed to act as authorized representatives hereunder and have full power and authority to execute and deliver any Joint Written Direction, to amend, modify or waive any provision of this Agreement and to take any and all other actions as authorized representatives under this Agreement, all without further consent or direction from, or

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 208 of 326

notice to, it or any other party.  Any modification of such authorized representatives shall be provided by written notice delivered to each party to this Agreement.

12.  <u>Governing Law; Consent to Jurisdiction and Venue</u>.  This Agreement shall be construed and interpreted in accordance with the internal laws of the State of California without giving effect to the conflict of laws principles thereof.

13.  <u>Notice</u>.  All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered by hand, overnight delivery service, electronic mail or facsimile transmitter (with confirmed receipt) to the physical address, electronic address or facsimile number set forth in this section, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date received.

If to the Seller at:

Nurserymen's Exchange, Inc.
2651 North Cabrillo Highway
Half Moon Bay, California 94019
Attention:      Justin Dautoff
Facsimile:      (650) 284-3094
Telephone:     (650) 712-4195
E-mail:          jdautoff@bloomrite.com

with a copy to:

Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2700
Los Angeles, CA  90067
Attention:  Mark Conley
Facsimile:      (310) 712-8225
Telephone:     (310) 788-4690
Email:           mark.conley@kattenlaw.com

If to the Buyer at:

Floramoda, Inc.
360 Espinosa Road
Salinas, CA 93907
Attn:            Mr. Charles Kosmont
                   Ms. Leslie Surber
Facsimile:      (831) 443-1345
Telephone:
E-mail:          ckosmont@rocketfarms.com
                   lsurber@rocketfarms.com

Case: 11-31985   Doc# 186   Filed: 07/19/11   Entered: 07/20/11 10:19:20   Page 209 of 326

If to the Escrow Agent at:

        U.S. Bank National Association, as Escrow Agent
        209 S. LaSalle Street, Suite 300
        Chicago, IL  60604
        Attention:  Grace Gorka, Corporate Trust Services
        Facsimile:  312/ 325-8974
        Telephone: 312/ 325-8907
        E-mail:      grace.gorka@usbank.com

14.      <u>Amendment or Waiver</u>.  This Agreement may be changed, waived, discharged or terminated only by a writing signed by the Seller, the Buyer and the Escrow Agent.  No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver.  A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

15.      <u>Severability</u>.  To the extent any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

16.      <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Deposit Fund and the Holdback Fund and sets forth in their entirety the obligations and duties of the Escrow Agent with respect to the Deposit Fund and the Holdback Fund.

17.      <u>Binding Effect</u>.  All of the terms of this Agreement, as amended from time to time, shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of Seller, Buyer and Escrow Agent.

18.      <u>Termination</u>.  Upon the disbursement of all amounts in the Deposit Fund and the Holdback Fund pursuant to Section 3 and Section 4 or the disbursement of all amounts in the Deposit Fund and the Holdback Fund into court pursuant to Section 5, this Agreement shall terminate and the Escrow Agent shall have no further obligation or liability whatsoever with respect to this Agreement, the Deposit Fund or the Holdback Fund.

19      <u>Dealings</u>.  The Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may buy, sell, and deal in any of the securities of the Seller or the Buyer and become pecuniarily interested in any transaction in which the Seller or the Buyer may be interested, and contract and lend money to the Seller or the Buyer and otherwise act as fully and freely as though it were not the Escrow Agent under this Agreement.  Nothing herein shall preclude the Escrow Agent from acting in any other capacity for the Seller or the Buyer or for any other entity.

20.      <u>Security Advice Waiver</u>.  The parties hereto acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant them

31570544

8

the right to receive brokerage confirmations for certain security transactions as they occur, they specifically waive receipt of such confirmations to the extent permitted by law. The Escrow Agent will furnish the Seller and the Buyer periodic cash transaction statements that include detail for all investment transactions made by the Escrow Agent.

  21. <u>Tax Reporting</u>. The Escrow Agent shall have no responsibility for the tax consequences of this Agreement and hereby advises each party to consult with independent counsel concerning any tax ramifications. Any interest or income on the Deposit Fund or the Escrow Holdback fund shall be reported on an accrual basis and shall be deemed to be for the account of the Seller or the Buyer, as applicable, unless determined otherwise in accordance with the terms of this Agreement.

  22. <u>Identifying Information</u>. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Escrow Agent requires documentation to verify its formation and existence as a legal entity. The Escrow Agent may ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation. The Seller and the Buyer acknowledge that a portion of the identifying information set forth herein is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "<u>Act</u>"), and the Seller and the Buyer agree to provide any additional information requested by the Escrow Agent in connection with the Act or any similar legislation or regulation to which the Escrow Agent is subject, in a timely manner.

  23 <u>Counterparts</u>. This Agreement and any related Joint Written Direction or directions may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other. Copies (whether facsimile, electronically reproduced, photostatic or otherwise) of signatures to this Agreement and any related Joint Written Direction or directions shall be deemed to be originals and may be relied on to the same extent as the originals.

  **[Remainder of this page intentionally left blank; signature page follows.]**

Case: 11-31985 Doc# 186 Filed: 07/19/11 Entered: 07/20/11 10:19:20 Page 211 of 326

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**NURSERYMEN'S EXCHANGE, INC.**

By: _____
Name:
Title:

**FLORAMODA, INC.**

By: _____
Name: Charles I. Kosmont
Title: Chief Executive Officer

**U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent**

By: _____
Name: Grace A. Gorka
Title: Vice President

31570544

## SCHEDULE A

### U.S. BANK NATIONAL ASSOCIATION
### MONEY MARKET ACCOUNT AUTHORIZATION
### DESCRIPTION AND TERMS
### (Internal CUSIP 9AMMF05B2)

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

### AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account. The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

# SCHEDULE B

## Schedule of Fees for Services as Escrow Agent

**I.    Acceptance Fee:**                                                    **Waived**

The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing.  This is a flat one-time fee, payable at closing.

**II.    Annual Administration Fee:**                                    **$1,500**

Annual administration fee for performance of the routine duties of the escrow agent associated with the management of the account.  Administration fees are payable annually in advance without proration.

**III.    Disbursement and Reporting Processing Fees:**              **Waived**

Processing fees cover the routine duties of escrow agent associated with the administration of the account.  This includes payment by check or wire and applicable 1099 reporting.  This assumes that the escrow agent will receive complete and accurate payment and taxpayer information, upon which it can conclusively rely, on a timely basis.

**IV.    Out-of-Pocket Expenses:**                                    **At Cost**

Reimbursement of expenses associated with the performance of our duties, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees.

**V.    Extraordinary Expenses:**

Extraordinary fees are payable to the agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business.  Payment of extraordinary fees is appropriate where particular inquiries, events or developments are unexpected, even if the possibility of such things could have been identified at the inception of the transaction.  Extraordinary services might include, without limitation, amendments or supplements, specialized reporting, non-routine calculations, foreign currency conversions, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.

## IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

## SCHEDULE C

**Authorized Signatories:**

**Buyer:**

The following person(s) are hereby designated and appointed as authorized representatives of the Buyer under the Escrow Agreement **(only one signature shall be required for any direction):**

_____          _____
      Name                                    Specimen signature

_____          _____
      Name                                    Specimen signature

_____          _____
      Name                                    Specimen signature

**Seller:**

The following person(s) are hereby designated and appointed as authorized representatives of the Seller under the Escrow Agreement **(only one signature shall be required for any direction):**

_____          _____
      Name                                    Specimen signature

_____          _____
      Name                                    Specimen signature

_____          _____
      Name                                    Specimen signature

# **EXHIBIT N**

(Mutual General Release)

# MUTUAL GENERAL RELEASE

THIS MUTUAL GENERAL RELEASE (this "***Release***") is dated as of [August _____], 2011, by and between Nurserymen's Exchange, Inc., a California corporation ("***NEI***"), on the one hand, and Floramoda, Inc., a California corporation ("***FI***"), and Monterey Peninsula Horticulture, Inc., a California corporation ("***MPH***"), on the other hand. In this Release, FI and MPH are collectively referred to as the "***Buyer Parties***")

WHEREAS, NEI is a debtor under chapter 11 of title 11 of the United States Code in a bankruptcy case pending in the United States Bankruptcy Court for the Northern District of California;

WHEREAS, NEI and FI are parties to an Asset Purchase Agreement, dated as of July 13, 2011 (as amended, supplemented or otherwise modified from time to time, the "***Asset Purchase Agreement***"), relating to, among other things, the sale by NEI, and purchase by FI, of certain assets and properties of NEI relating to the Business (as defined in the Asset Purchase Agreement), all in the manner and subject to the terms and conditions set forth in the Asset Purchase Agreement and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, pursuant to the Asset Purchase Agreement, and in connection with the consummation of the transactions contemplated thereby (the "***Contemplated Transactions***"), the Parties are entering into this Release;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  <u>Definitions</u>.  For all purposes of this Release, capitalized terms not otherwise defined herein shall have the meanings set forth in the Asset Purchase Agreement.  As used in this Release, the following terms have the respective meanings set forth below:

"***Claims***" shall mean any claim, right, demand, action, cause of action, chose in action, lawsuit, or judgment of any nature whatsoever, whether known or unknown, in Law, equity, or otherwise, whether for recovery of money or property, or for consequential or other damages or other relief, and whether arising by way of counterclaim or otherwise.

"***Petition Date***" shall mean the date that the chapter 11 petition commencing the Bankruptcy Case was filed.

"***Retained FI Claims***" shall mean the Buyer's Claim and any and all Claims under any of the Transaction Documents as a result of any failure by NEI to perform its obligations thereunder, the terms of which obligations require performance thereof following the Closing Date.

## EXHIBIT N

"***Retained NEI Claims***" shall mean any and all Claims under any of the Transaction Documents as a result of any failure by FI to perform its obligations thereunder, the terms of which obligations require performance thereof following the Closing, including any Claims under the Asset Purchase Agreement as a result of any failure by FI to perform its obligations under Section 6.3 of the Asset Purchase Agreement.

"***Transaction Documents***" shall mean the Asset Purchase Agreement, the exhibits and schedules attached thereto including the Assignment and Assumption Agreement for Assumed Contracts, the Assignment and Assumption Agreement for Real Property Leases, the Assignment for Intellectual Property, the Family Property Leases, the PUD Lease, the PUD Leaseback Assignment, the Reservoir Easement Agreement, the Owned Real Property Deed, this General Release, and any other written contract, agreement, instrument, or certificate entered into in connection with the Contemplated Transactions.

2.    <u>Release by NEI</u>.  NEI hereby covenants not to sue and hereby fully releases and forever discharges each of the Buyer Parties and each of their respective predecessors, successors, subsidiaries, divisions, joint ventures, affiliates, and each of their respective past, present and future principals, officers, directors, employees, controlling Persons, administrators, executors, trustees, attorneys, agents, advisors, representatives and assigns (collectively, the "***FI Releasees***"), from any and all Claims of any nature whatsoever, regardless of when, by whom and wherever and however asserted, arising before or after the Petition Date, that NEI ever had, now has or hereafter can, shall or may have, or may claim to have, whether directly or indirectly, or by assignment or succession, against the FI Releasees, or any of them, for, upon, or by reason of any matter, cause or thing, to the extent, and only to the extent, arising before the Closing in connection with or related to the Transaction Documents or the Contemplated Transactions (other than the Retained NEI Claims).

3.    <u>Release by Buyer Parties</u>.  Each of the Buyer Parties hereby covenants not to sue and hereby fully releases and forever discharges NEI and each of its predecessors, successors, subsidiaries, divisions, joint ventures, affiliates, and each of their respective past, present and future principals, officers, directors, employees, controlling Persons, administrators, executors, trustees, attorneys, agents, advisors, representatives and assigns (collectively, the "***NEI Releasees***"), from any and all Claims of any nature whatsoever, regardless of when, by whom and wherever and however asserted, arising before or after the Petition Date, that such Party Party ever had, now have or hereafter can, shall or may have, or may claim to have, whether directly or indirectly, or by assignment or succession, against the NEI Releasees, or any of them, for, upon, or by reason of any matter, cause or thing, to the extent, and only to the extent, arising before Closing in connection with or related to the Transaction Documents or the Contemplated Transactions (other than the Retained FI Claims).

4.    <u>California Civil Code 1542</u>.  NEI and each of the Buyer Parties acknowledge that it is aware of and has read Section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release,

2

which if known by him must have materially affected his settlement with the debtor."

NEI and each of the Buyer Parties acknowledges and understands the rights and benefits conferred by Section 1542 of the California Civil Code and the risks associated with waiver of said Section 1542, and after receiving advice of counsel, hereby consciously and voluntarily waives, relinquishes and releases any and all rights and benefits available under said Section 1542 insofar as they apply, or may be construed to apply, to each release set forth in or contemplated by this Release. In so doing, NEI and each of the Buyer Parties expressly acknowledges and understands that it may hereafter discover facts in addition to or different from those that it now believes to be true with respect to the subject matter of the disputes, claims and other matters released in this Release, but expressly agrees that it has taken these facts and possibilities into account in electing to make and to enter into this Release, and that the releases given herein shall be and remain in effect as full and complete releases notwithstanding the discovery or existence of any such additional or different facts or possibilities.

5. <u>Enforceability</u>. Each party to this Release represents, warrants and acknowledges that it has had the opportunity to consult with independent discover counsel regarding the legal effects of this Release, and that it is executing this Release of its own free will and accord, for the purposes and considerations set forth herein. Each party to this Release hereby acknowledges that this Release is binding and enforceable against it in accordance with its terms. Any law or regulation that provides that the language of a contract shall be construed against the drafter shall not apply to this Release.

6. <u>Authority</u>. Each party to this Release represents, warrants and acknowledges that it has all power and authority to execute and deliver this Release and to grant the releases herein.

7. <u>Third Party Beneficiaries</u>. The parties to this Release specifically intend that each of the FI Releasees and each of the NEI Releasees who are not signatories to this Release shall be and hereby are specifically made third party beneficiaries of this Release. Except for such FI Releasees and NEI Releasees who are not signatories to this Release, this Release shall be for the sole benefit of the parties hereto, and is not intended to give nor shall it be construed to give any Person not a party hereto, any legal or equitable right, remedy, or claim hereunder.

8. <u>No Admissions</u>. Nothing in this Release or any negotiations or proceedings in connection herewith shall constitute or be deemed or claimed to be evidence of an admission by any party of any liability, violation of law, or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any party. Neither this Release nor any negotiations or proceedings in connection herewith may be used in any proceeding against any party for any purpose whatsoever except with respect to effectuation and enforcement of this Release.

9. <u>Governing Law</u>. THIS GENERAL RELEASE SHALL BE GOVERNED BY, AND INTERPRETED AND CONSTRUED UNDER, THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW PRINCIPLES.

3

10.    <u>Counterparts; Facsimile</u>.  This General Release may be executed in multiple counterparts, each of which shall constitute one and the same instrument; and the manual signature of any party hereto that is transmitted to any other party or its counsel by facsimile shall be deemed for all purposes to be an original signature.

11.    <u>Interpretation</u>.  The headings, captions and arrangements used in this Release are for convenience only and shall not affect the interpretation of this Release.  Words in the singular include the plural and words in the plural include the singular.  In case any one or more of the provisions contained in this Release shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Release shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

12.    <u>Amendments</u>.  This General Release may not be modified orally, but only by an agreement in writing signed by each of the parties hereto.  Any provision of this Release can be waived, amended, supplemented or modified by written agreement of the parties hereto.

13.    <u>Binding Effect; Assignment</u>.  This General Release may not be assigned by any party without the written consent of the other parties and any attempted assignment will be null and void.  This General Release will be binding upon each of the parties and their respective heirs, successors, permitted assigns, and legal representatives, and will inure to the benefit of each of the parties to this Release and their respective heirs, successors, permitted assigns, and legal representatives.

14.    <u>Entire Agreement</u>.  This General Release constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings, written or oral, with respect to the subject matter hereof.  The terms of this Release may not be changed, modified or discharged in any manner whatsoever except by an instrument in writing signed by all of the parties hereto.  A failure of any party to insist on strict compliance with any provision of this Release shall not be deemed a waiver of such provision or any other provision hereof.  Each of the parties acknowledges that no party has relied upon any representations from the other parties except as specifically provided in this Release.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

4

IN WITNESS WHEREOF, the undersigned have executed this Release as of the date first above written.

**NEI:**

Nurserymen's Exchange, INC.
a California corporation,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

**BUYER PARTIES:**

Floramoda, Inc.,
a California corporation

By: _____
Name:_____
Its:_____

Monterey Peninsula Horticulture, Inc.,
a California corporation

By: _____
Name:_____
Its:_____

*[SIGNATURE PAGE TO GENERAL RELEASE]*

5

**DISCLOSURE SCHEDULES**
**TO**
**NURSERYMEN'S EXCHANGE, INC.**
**ASSET PURCHASE AGREEMENT**

July 14, 2011

Reference is made to that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated of an even date herewith, by and between NURSERYMEN'S EXCHANGE, INC., a California corporation (the "**Seller**"), and Floramoda, Inc., a California corporation (the "**Buyer**"). Terms defined in the Purchase Agreement are used with the same meaning in these Disclosure Schedules.

These Disclosure Schedules are being delivered by the Seller pursuant to the Purchase Agreement. Disclosure made under one part of these Disclosure Schedules shall be deemed disclosure under any other part of these Disclosure Schedules or the Purchase Agreement if it is reasonably evident without further investigation such disclosure is relevant and applicable to such other part. Disclosure of any matter in these Disclosure Schedules will not constitute or imply any representation, warranty or undertaking, or an expression of a view not expressly given in the Purchase Agreement that such matter is required to be disclosed pursuant to the Purchase Agreement. The inclusion of any matter in these Disclosure Schedules does not constitute a determination by the Seller that any such matter is material. The disclosure of any matter in these Disclosure Schedules does not establish or imply a standard of materiality or any other standard for purposes of the Purchase Agreement. The information contained in these Disclosure Schedules is disclosed solely for the purposes of the Purchase Agreement, and no information contained in these Disclosure Schedules shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including, without limitation, any violation of law or breach of any agreement.

**Disclosure Schedules**

| | |
|---|---|
| 1.1(a) | Leased Real Property |
| 1.1(c) | Assumed Contracts |
| 1.1(e) | Family Owned Fixtures and Leasehold Improvements |
| 1.1(g) | Excluded Owned Real Property |
| 1.1(h) | Existing Family Property Leases |
| 1.1(i) | Leased Family Property |
| 1.1(j) | Owned Real Property |
| 1.1(k) | Permitted Liens |
| 1.1(l) | Certain Excluded Contracts |
| 1.1(m) | Utility Deposits |
| 1.1(n) | Excluded Licenses |
| 3.2 | Third Party Consents |
| 3.4 | Title |
| 3.5 | Defaults Under Assumed Contracts |
| 3.6 | Employee Matters |
| 3.7 | Open Orders |
| 3.8 | Inventory |
| 3.9(a) | Seller's Registered IP |
| 3.9(b) | Intellectual Property Contracts |
| 3.10 | Rebate Customers |
| 3.12 | Business Permits |
| 3.13 | Real Property |

**1.1(a)**

**Leased Real Property**

1.  That certain real property leased pursuant to the terms of the certain real property lease, dated as of October 9, 2000, as extended by that certain Extension of Lease, dated February 10, 2010 and that certain Extension of Lease, dated June 16, 2011, each of the foregoing by and between North County Industrial Park LP, a California Limited Partnership, as lessor, and Seller, as lessee, with respect to that certain real property located at 1330 Distribution Way, Suites C and D, Vista, CA 92083.

2.  That certain real property leased pursuant to lease agreement, by and between California Department of Transportation ("Cal Trans"), as lessor and Seller, as lessee, dated as of December 27, 2010 (the "Cal Trans Lease), with respect to that certain real property located at 2651 Cabrillo Highway, Half Moon Bay, San Mateo County, California 94029 and more particularly described as:

State highway access, driveway and service roads from the two locations (as indicated on the exhibit to the Cal Trans Lease) on the eastern side of Cabrillo Highway across Cal Trans property to the westerly edge of their respective adjoining private properties, comprising approximately 10,850 square feet.

**1.1(c)**

**Assumed Contracts**

| No. | Description of Contract | Parties | Effective Date/Expiration Date |
|-----|------------------------|---------|-------------------------------|
| 1 | That certain real property lease agreement, by and between California Department of Transportation ("Cal Trans"), as lessor and Seller, as lessee, dated as of December 27, 2010, with respect to that certain real property located at 2651 Cabrillo Highway, Half Moon Bay, San Mateo County, California 94029 | Cal Trans and Seller | Effective Date: Dated as of December 27, 2010<br><br>Expiration Date: December 31, 2013 |
| 2 | That certain real property leased pursuant to the terms of the certain real property lease, dated as of October 9, 2000, as extended by that certain Extension of Lease, dated February 10, 2010, and that certain Extension of Lease, dated June 16, 2011, each of the foregoing by and between North County Industrial Park LP, a California Limited Partnership, as lessor, and Seller, as lessee, with respect to that certain real property located at 1330 Distribution Way, Suites C and D, Vista, CA 92083 | North County Industrial Park LP, a California Limited Partnership, as lessor, and Seller, as lessee | Effective Date: Dated as of October 9, 2000, ,as extended by that certain Extension of Lease, dated February 10, 2010 and that certain Extension of Lease, dated June 16, 2011<br><br>Expiration Date: June 30, 2012 |

## 1.1(e)

### Family Owned Fixtures and Leasehold Improvements

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area* | Date Acquired |
|---|---|---|---|---|---|---|
| 15450 | Fences, Roads, Etc. | 1459 | Roads Dept. #4 & 14 | (blank) | N | 1/1/2001 |
| 15450 | Fences, Roads, Etc. | 823 | Road - South Property | (blank) | SF | 12/1/1982 |
| 15450 | Fences, Roads, Etc. | 1820 | Paving GH 4W | P.1072 | N | 1/1/2004 |
| 15450 | Fences, Roads, Etc. | 2003 | Upgrade North Property Main Gate #1 | P1129, JE #1805 | N | 6/30/2006 |
| 15450 | Fences, Roads, Etc. | 124 | Gate - So. Property | (blank) | SF | 11/30/1996 |
| 15450 | Fences, Roads, Etc. | 121 | Main Gate - North Property | (blank) | N | 5/31/1987 |
| 15450 | Fences, Roads, Etc. | 122 | Fence - South Property | (blank) | SF | 1/31/1990 |
| 15450 | Fences, Roads, Etc. | 120 | Fence - South Property Pond | (blank) | SF | 12/1/1985 |
| | | | | | | |
| 15310 | Greenhouse Equipment | 1445 | Bench system Dept.4 & 14 | see asset notes | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 1450 | Lights Dept #4 & 14 | (blank) | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 290 | Rose Dept. Equipment | (blank) | N | 9/20/1994 |
| 15310 | Greenhouse Equipment | 197 | Lighting | Bldg #8 West | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 192 | Boiler - Heating System | Bldg #8 | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 283 | Bldg #8 - Roses (Heating, Etc.) | (blank) | N | 12/1/1994 |
| 15310 | Greenhouse Equipment | 1748 | HID Lights - Dept 21 house 1 & 6 | P.1056 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 188 | Benches | Bldg #8 | N | 12/1/1997 |

---

\*     N =   The real property located at 2651 No. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels: 048-300-210, 048-300-230 and 048-300-240.

       SG = The real property located at 2125 So. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels: 066-093-060 and 066-093-050.

       SF =   The real property located at 2125 So. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels: 066-093-030 and 066-093-040.

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 944 | Benches, & Flood Tables | HMB - Dept. #1, Section A & B | N | 8/31/1986 |
| 15310 | Greenhouse Equipment | 275 | HID Lights | Dept #15 | N | 12/31/1995 |
| 15310 | Greenhouse Equipment | 185 | Container Conveyors | Bldg #8 | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 1837 | Robot Line Take-Out / Set-Down (2) GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1840 | Manual Grading System & Packing Units (2) GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1447 | Electric System Dept. #4 & 14 | (blank) | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 203 | Irrigation Equipment | Bldg #8, Boom Sprayer, Fertilizer Injector,General | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 1812 | Lights GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 914 | Heat Retention System | HMB - Dept #26 | SG | 3/2/1989 |
| 15310 | Greenhouse Equipment | 1844 | Mechanization in Building GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 196 | Electric Parel & Breakers | Bldg #8 | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 184 | (2) Automatic Pot Robots & Conveyors | Bldg. #8 | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 187 | Bench Posts | Bldg #8 | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 1416 | Fertilizing Equipment - Capital Lease | Dept. #4 & 14 | N | 12/31/2000 |
| 15310 | Greenhouse Equipment | 1410 | New Greenhouse - Light Blackout Cloth | Dept. #4 & #14 | N | 11/13/2000 |
| 15310 | Greenhouse Equipment | 1749 | Flood Tables - Dept 21 house 2 | P.1075 | N | 1/1/2004 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 1448 | Electric transformer, switchboard Dept. #4 & 14 | (blank) | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 1552 | HID Lights - East BLDG #8 | East BLDG #8 - Dept 50 - Project #P1036 | N | 12/15/2002 |
| 15310 | Greenhouse Equipment | 191 | Blackout Cloth | Bldg #8 West | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 151 | HID System | Dept #21, House #2, North & South Side | N | 12/31/1999 |
| 15310 | Greenhouse Equipment | 1841 | Overhead Pipe Track - Conveyor Lift Unit  GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 954 | Dept #1, Section A & B | see notes | N | 6/30/1986 |
| 15310 | Greenhouse Equipment | 1839 | Cleaner Station GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1411 | New Greenhouse- Shading Cloth | Dept #4 & #14 | N | 11/13/2000 |
| 15310 | Greenhouse Equipment | 1863 | New Netafim Project HSE 1/2/3/5 Dept 32-P1107 | See-JE-Z7 | SG | 12/31/2004 |
| 15310 | Greenhouse Equipment | 1805 | Benches GH 4West | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1412 | New Greehouse - Heating system | Dept #4 & #14 | N | 11/13/2000 |
| 15310 | Greenhouse Equipment | 1449 | Irrigation system Dept. #4 & 14 | (blank) | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 172 | Reefer | Bldg #1, Dept #4 | N | 1/1/1999 |
| 15310 | Greenhouse Equipment | 253 | New Electric Parels (2) | Dept #15 | N | 7/1/1995 |
| 15310 | Greenhouse Equipment | 848 | Conveyor System | HMB - Dept. #14 | N | 9/29/1992 |
| 15310 | Greenhouse Equipment | 1808 | Electrical system GH 4West | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 932 | Benches | HMB - Dept #21 | N | 4/1/1988 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 339 | HID Lighting (582) | Dept #4 | N | 12/1/1993 |
| 15310 | Greenhouse Equipment | 1414 | New Greenhouse - CO2 System | Dept. #4 & #14 | N | 12/22/2000 |
| 15310 | Greenhouse Equipment | 1451 | Lights, Shade & Vent Dept. #4 & 14 | 8/16/01 PG&E REFUND ($16,045.50), Org. $66,315.76 | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 154 | Electrical Service | Dept. #21 | N | 5/1/1999 |
| 15310 | Greenhouse Equipment | 1838 | Overhead Crane GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 970 | Rolling Benches, Biotherm System | HMB - Dept #21 | N | 1/29/1986 |
| 15310 | Greenhouse Equipment | 863 | Environmental Control System - Priva Computers | HMB - Dept. #21 | N | 11/20/1991 |
| 15310 | Greenhouse Equipment | 212 | Shade Cloth | Bldg #8 West | N | 10/1/1997 |
| 15310 | Greenhouse Equipment | 872 | Soil Area Conveyors & Feedors | (blank) | N | 12/6/1990 |
| 15310 | Greenhouse Equipment | 868 | (32) PAH36OS Modine Heaters | HMB - Dept #26, So. Property | SG | 7/1/1990 |
| 15310 | Greenhouse Equipment | 1809 | Heating system GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 216 | Rose House - Capitalize Interest | (blank) | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 851 | Priva Computer System | HMB - Bldg #1 & 4 | N | 12/30/1992 |
| 15310 | Greenhouse Equipment | 2089 | Installation of a water treatment for Mikado & Ven | de-ionization water system ( Project # 1139 ) | N | 8/31/2007 |
| 15310 | Greenhouse Equipment | 1905 | Installation Automatic Curtain System | 50-Replace Shade Cloth Dept#26 | SG | 1/25/2005 |

PRIVILEGED AND CONFIDENTIAL

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 1974 | Replace Damaged Heaters #32 | MOD-PDP35 Gas Fired Heater/Exchanger/Burner | SG | 2/6/2006 |
| 15310 | Greenhouse Equipment | 1195 | 3 Tier Propagation Benches - House #5C-D | (blank) | N | 12/15/1978 |
| 15310 | Greenhouse Equipment | 1988 | 400W/600W HPS Fixture, 24' Steel U Track,C-Bracket | HID Installation HSE 5 Dept.21 | N | 12/15/2005 |
| 15310 | Greenhouse Equipment | 297 | Hot Water Boiler | Bldg #8 | N | 10/4/1994 |
| 15310 | Greenhouse Equipment | 1452 | Phone System Dept. #4 & 14 | (blank) | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 1815 | Boom & Nozzle Ferterlize Injectors GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1419 | Dept. #21 Black Shade | (blank) | N | 4/21/2001 |
| 15310 | Greenhouse Equipment | 1810 | Hoogendorn System GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 299 | HID Lights | Bldg #15 (364) | N | 7/26/1994 |
| 15310 | Greenhouse Equipment | 2143 | Auto Heat Retention & Black Out Curtain System | Dept 21 AFE 2010-02 | N | 11/1/2009 |
| 15310 | Greenhouse Equipment | 238 | Fog System | Dept #15 | N | 3/8/1996 |
| 15310 | Greenhouse Equipment | 156 | HID Lights | Dept. #21, House #3 | N | 5/1/1999 |
| 15310 | Greenhouse Equipment | 840 | Shade Cloth | HMB - Dept. 8, Part of Rose House | N | 5/12/1993 |
| 15310 | Greenhouse Equipment | 338 | HID Lighting (336) | Dept #8, will be installed in new Rose House | N | 12/1/1993 |
| 15310 | Greenhouse Equipment | 853 | Priva Computer System | HMB - Bldg #8 | N | 11/11/1992 |
| 15310 | Greenhouse Equipment | 852 | Priva Computer System | HMB - Dept. #27 | SG | 7/2/1992 |
| 15310 | Greenhouse Equipment | 1849 | Replace Blackout Cloth House 5 | 50 | N | 10/11/2004 |
| 15310 | Greenhouse Equipment | 335 | Black-Out Heat Retention Custain | Bldg #1, Dept #4 | N | 2/25/1994 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area* | Date Acquired |
|---|---|---|---|---|---|---|
| | | | System | | | |
| 15310 | Greenhouse Equipment | 1811 | Irrigation GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 850 | Benches - Bldg #8 | Bldg #8 | N | 2/12/1993 |
| 15310 | Greenhouse Equipment | 893 | Rolling Benches & Container Tables | HMB - Dept. #15 | N | 3/20/1990 |
| 15310 | Greenhouse Equipment | 871 | Soil Area Enclosure | (blank) | N | 11/29/1990 |
| 15310 | Greenhouse Equipment | 1750 | Black Out Rep - Dept 21 house 2 | P.1081 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 857 | HID Lights | HMB - Bldg #8 | N | 1/28/1993 |
| 15310 | Greenhouse Equipment | 1817 | UV Top Plastic Filter GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 267 | Fertilizer Injector | Dept #14 | N | 12/23/1995 |
| 15310 | Greenhouse Equipment | 286 | Fertilizing System | Bldg #8 | N | 9/22/1994 |
| 15310 | Greenhouse Equipment | 993 | Electrical System & Soil Area | HMB - Bldg #15 | N | 3/11/1985 |
| 15310 | Greenhouse Equipment | 1842 | Plant Cleaning Blow Unit W/Vacuum System GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1835 | Water System  GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 234 | Heat Retention Curtain | Dept #27 (68% See attached) | SG | 4/25/1997 |
| 15310 | Greenhouse Equipment | 1403 | Rose Fertilizer | for Dept. #4 | N | 9/12/2000 |
| 15310 | Greenhouse Equipment | 198 | Flood Tables | Dept #15 | N | 10/1/1997 |
| 15310 | Greenhouse Equipment | 1480 | Heating Curtain | Dept 8 | N | 8/3/2001 |
| 15310 | Greenhouse Equipment | 1401 | Curtain System | for Building #21 house #4 | N | 7/13/2000 |
| 15310 | Greenhouse Equipment | 858 | Blackout Cloth Heat Retention | HMB - Dept. #15 | N | 10/1/1991 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 217 | Dock Levelor | HMB - Shipping Dept | N | 12/17/1996 |
| 15310 | Greenhouse Equipment | 1464 | Heat-Retention System | Dept. 21 House 2 North 1/2 Greenhouse | N | 9/25/2001 |
| 15310 | Greenhouse Equipment | 1807 | Blackout Shade System GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 963 | Gas Meters | HMB - North & South Property | SG | 11/22/1985 |
| 15310 | Greenhouse Equipment | 1784 | Electric Service | HMB - Dept #4,#5,#14,#50 | N | 9/4/1987 |
| 15310 | Greenhouse Equipment | 1761 | Complete ML High Pressure Fog & Fan System | Campanula - Dept 21, HSE 2 South | N | 4/1/2004 |
| 15310 | Greenhouse Equipment | 846 | Modine Gas Heaters 208/230V | HMB - Bldg #8 | N | 11/2/1992 |
| 15310 | Greenhouse Equipment | 1822 | Greenhouse 4 West Equip Interest Capitalized | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 236 | Flood Tables | Dept #15 | N | 8/4/1995 |
| 15310 | Greenhouse Equipment | 1813 | Shading & Heating Retention Curtain System GH 4W | P.1072 | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 1924 | Complete ML Humidfication System W/MLP300 Pump | Campanula Propagation Fog Syst | N | 5/5/2005 |
| 15310 | Greenhouse Equipment | 209 | Priva Controls | Bldg #8 West | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 300 | HID Lights | Bldg #8, Roses (204) | N | 8/1/1994 |
| 15310 | Greenhouse Equipment | 223 | Benches | Dept #15 | N | 5/16/1997 |
| 15310 | Greenhouse Equipment | 965 | 12-Roller Conveyors w 465 Pipe Supports | 8-Dept 21, 4-Dept 27 (So. Prop) | N | 3/25/1986 |
| 15310 | Greenhouse Equipment | 200 | Humidity Control System | Bldg #8 East | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 1683 | Dept 21 HSE 2 - Fog & Fan System | (blank) | N | 2/3/2003 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 294 | Shade Cloth | Dept #15, Ranges D, 1, 2, 3 | N | 12/5/1994 |
| 15310 | Greenhouse Equipment | 293 | Shade Cloth | Bldg #15, Ranges A, B & C | N | 12/5/1994 |
| 15310 | Greenhouse Equipment | 1834 | Benches System GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 211 | Shade Cloth | Bldg #8 East | N | 6/1/1998 |
| 15310 | Greenhouse Equipment | 244 | Packing Area | Dept #14 | N | 10/27/1995 |
| 15310 | Greenhouse Equipment | 155 | HID Lights | Dept. #21, House #2 | N | 5/1/1999 |
| 15310 | Greenhouse Equipment | 1446 | Boom Sprayer System Dept. #4 & 14 | (blank) | N | 1/1/2001 |
| 15310 | Greenhouse Equipment | 321 | Fog System for Rose Propagation | (blank) | N | 7/29/1994 |
| 15310 | Greenhouse Equipment | 971 | Benches | HMB - Dept #21 | N | 7/1/1985 |
| 15310 | Greenhouse Equipment | 2002 | HID Lights Dept.21, House 5 | P1124 JE#1805 | N | 6/30/2006 |
| 15310 | Greenhouse Equipment | 307 | Priva Computer System | Bldg #8, Rose Dept. | N | 9/13/1994 |
| 15310 | Greenhouse Equipment | 1059 | Irrigation System | Bldgs #14 & #15 | N | 1/31/1981 |
| 15310 | Greenhouse Equipment | 1714 | Fog System | Dept 8 - House #4 (P1090) | N | 10/31/2003 |
| 15310 | Greenhouse Equipment | 843 | Mobile Clipmaster (Rose Trimmer) | HMB - Dept. #4 | N | 3/11/1993 |
| 15310 | Greenhouse Equipment | 1420 | Bald Generator | MIST System Roses | N | 6/15/2001 |
| 15310 | Greenhouse Equipment | 320 | Cooler Box | Bldg #8 | N | 2/28/1995 |
| 15310 | Greenhouse Equipment | 1843 | Automatic Transport from F to E  GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |

PRIVILEGED AND CONFIDENTIAL

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 301 | HID Lights | Bldg #8, Other (132) | N | 8/1/1994 |
| 15310 | Greenhouse Equipment | 1454 | Boom Sprayer System Dept. #8 | Dept. #8 roses | N | 10/3/2000 |
| 15310 | Greenhouse Equipment | 911 | (10) #3E518 Natural Gas Heaters | HMB - Dept #27 | SG | 9/30/1988 |
| 15310 | Greenhouse Equipment | 340 | Main Switchboard 2000amp | Dept #8 | N | 10/28/1993 |
| 15310 | Greenhouse Equipment | 1836 | Train Rail Extention GH 4West | P.1072 (for support documents, pls see A#1805) | N | 1/1/2004 |
| 15310 | Greenhouse Equipment | 232 | Heat Retention Curtain | Dept #26 (32% - See attached) | SG | 4/25/1997 |
| 15310 | Greenhouse Equipment | 186 | (3) Conveyor Belts - Packing Area | Range 4 | N | 10/3/1997 |
| 15310 | Greenhouse Equipment | 194 | HID Lights | Dept #21 | N | 10/1/1997 |
| 15310 | Greenhouse Equipment | 309 | Priva Upgrade | Dept #20, 14, 15 | N | 6/15/1995 |
| 15310 | Greenhouse Equipment | 855 | HID Lights | HMB - Bldg #15 | N | 2/8/1993 |
| 15310 | Greenhouse Equipment | 163 | Gate #1 - North Property | (blank) | N | 11/1/1998 |
| 15310 | Greenhouse Equipment | 2135 | Installation of a water recycle system in Dept.#1 | Capture the irrigation water in the Dept.( P1147 ) | N | 3/1/2009 |
| 15310 | Greenhouse Equipment | 1539 | Hoogendoorn Expansion | Environmental Computer System | N | 10/18/2002 |
| 15310 | Greenhouse Equipment | 1462 | New Greenhouse Patio | Dept 8 | N | 7/20/2001 |
| 15310 | Greenhouse Equipment | 923 | 10 #3E517 Natural Gas Heaters | 297M BTU's, Sterlin Mfq. HMB-So. Dept. #26 | SG | 12/15/1987 |
| 15310 | Greenhouse Equipment | 201 | Overhead Irrigation | Dept #26 | SG | 11/1/1997 |
| 15310 | Greenhouse Equipment | 157 | Netafirm System | Dept. #26 | SG | 4/1/1999 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| 15310 | Greenhouse Equipment | 225 | Heat Retention Curtain | Dept #21, Bldg #23 | N | 2/12/1997 |
| 15310 | Greenhouse Equipment | 322 | Bog Madsen Tray Washer | with Water Recyles w/Volt Motor | N | 7/1/1993 |
| 15310 | Greenhouse Equipment | 910 | (8) P/N 3E378 Natural Gas Heaters | HMB - Dept #27 | SG | 8/31/1988 |
| 15310 | Greenhouse Equipment | 1197 | South Property Watering System | (blank) | SF | 1/5/1979 |
| 15310 | Greenhouse Equipment | 195 | Lighting - Dept #21, House #3 | (blank) | N | 6/30/1998 |
| 15310 | Greenhouse Equipment | 1196 | Electrical Light System - House #5 | (blank) | N | 4/18/1979 |
| 15310 | Greenhouse Equipment | 306 | Priva Computer System | Rose Dept., Boiler, Headhouse | N | 2/15/1995 |
| 15310 | Greenhouse Equipment | 161 | (2) Conveyors | Dept. #8 & #21 | N | 9/10/1998 |
| 15310 | Greenhouse Equipment | 152 | Priva Computer Environmental | Control Software | N | 12/20/1999 |
| 15310 | Greenhouse Equipment | 1199 | 1- Reznor Gas Fired Unit Heater Bldg #21 (6) | (blank) | N | 3/31/1978 |
| 15310 | Greenhouse Equipment | 894 | Hot Bench System | HMB - Dept. #15 | N | 11/17/1989 |
| 15310 | Greenhouse Equipment | 1402 | Range #15 Conveyors | (blank) | N | 7/14/2000 |
| 15310 | Greenhouse Equipment | 162 | Dock Levelor | Bldg #28 | N | 1/1/1999 |
| 15310 | Greenhouse Equipment | 190 | Benches & Posts | Bldg #1C | N | 12/1/1997 |
| 15310 | Greenhouse Equipment | 891 | Mist System | HMB - Dept. #15 | N | 5/10/1990 |
| 15310 | Greenhouse Equipment | 1200 | 6- X-400 Reznor Heater for Greenhouses22,23,18,19 | (blank) | N | 2/22/1978 |
| 15310 | Greenhouse Equipment | 844 | Marklift Scissor Lift | (blank) | N | 10/6/1992 |
| 15310 | Greenhouse Equipment | 1034 | Irrigation System | HMB - Sanchez #5, completed 6/83 | N | 6/30/1983 |
| 15310 | Greenhouse | 228 | Chemical Hoppes | Soil Area | N | 4/16/1997 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| | Equipment | | | | | |
| 15310 | Greenhouse Equipment | 296 | Conveyor - Rose Parking | Dept #4 | N | 6/23/1995 |
| 15310 | Greenhouse Equipment | 1785 | Electric Service | HMB - Dept #4,#5,#14,#50 | N | 9/4/1987 |
| 15310 | Greenhouse Equipment | 1201 | Water Tank for South Property | (blank) | SG | 8/22/1977 |
| 15310 | Greenhouse Equipment | 305 | Fertilizer Tanks | Dept #2, South Property | SF | 6/9/1995 |
| 15310 | Greenhouse Equipment | 269 | Air Compressor | Dept #15 | N | 12/29/1995 |
| 15310 | Greenhouse Equipment | 1018 | New Electrical Switchboard | (blank) | N | 2/1/1984 |
| 15310 | Greenhouse Equipment | 214 | Shade Cloth | Mum House , Bldg #22 | N | 2/1/1998 |
| 15310 | Greenhouse Equipment | 959 | 1-Dock Lavelar | HMB - Bldg #12 | N | 3/18/1986 |
| 15310 | Greenhouse Equipment | 890 | Low Volume Mister w/2 Time Clocks | (blank) | N | 2/16/1990 |
| 15310 | Greenhouse Equipment | 285 | Heat Retention System | Bldg #8, Headhouse | N | 8/16/1994 |
| 15310 | Greenhouse Equipment | 284 | Heat Retention System | Bldg #8, Rose Section | N | 8/9/1994 |
| | | | | | | |
| 15410 | Greenhouses | 1845 | Bldgs & Greenhouses (Dept. 7,8,14,15,50) | A#1356 - split 1845 & 1846 | N | 6/30/1978 |
| 15410 | Greenhouses | 1455 | Greenhouse -  Dept #4 & 14 | Rose House 1st construction | N | 1/1/2001 |
| 15410 | Greenhouses | 102 | Greenhouse - Bldg. #8 West | (blank) | N | 12/1/1997 |
| 15410 | Greenhouses | 1818 | Greenhouse 4W | Rose House 2nd construction, P.1072 | N | 1/1/2004 |
| 15410 | Greenhouses | 94 | Greenhouse - Bldg. #8 | (blank) | N | 12/31/1992 |
| 15410 | Greenhouses | 1819 | Foundation GH 4W | Rose House 2nd construction, P.1072 | N | 1/1/2004 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area* | Date Acquired |
|---|---|---|---|---|---|---|
| 15410 | Greenhouses | 1375 | Leveling | Original cost for Bldg#12. As adjust for IRS audits thru 6/30/77 | N | 7/1/1974 |
| 15410 | Greenhouses | 1898 | Replace Dept.32SP Greenhouse | 50 | SG | 9/7/2004 |
| 15410 | Greenhouses | 1372 | Office Addition - Other | (blank) | N | 10/1/1978 |
| 15410 | Greenhouses | 1369 | Bldg. #28 (Whse.) | (blank) | N | 6/30/1979 |
| 15410 | Greenhouses | 92 | Fiberglass - Dept #26 | (blank) | SG | 10/31/1991 |
| 15410 | Greenhouses | 100 | Dynaglass - South Property | (blank) | SG | 4/1/1995 |
| 15410 | Greenhouses | 95 | Dynaglass - Bldg. #21 | (blank) | N | 7/31/1993 |
| 15410 | Greenhouses | 93 | Dynaglass - Bldg. #21 | (blank) | N | 8/31/1992 |
| 15410 | Greenhouses | 1377 | Warehouse - Office | Original cost for Bldg#12. As adjust for IRS audits thru 6/30/77 | N | 7/1/1975 |
| 15410 | Greenhouses | 1376 | Paving Cost | Original cost for Bldg#12. As adjust for IRS audits thru 6/30/77 | N | 7/1/1974 |
| 15410 | Greenhouses | 1379 | Improvements to GH #21 to #24 | (blank) | N | 6/30/1982 |
| 15410 | Greenhouses | 1846 | Bldgs & Greenhouses (Dept. 7,8,14,15,50) | A#1356 - split 1845 & 1846 | N | 6/30/1978 |
| 15410 | Greenhouses | 1971 | Clear Acrylic Roof Dept 21 House 5 | (blank) | N | 12/16/2005 |
| 15410 | Greenhouses | 1671 | South Property New Hoops | Project 1066 | SF | 5/15/2003 |
| 15410 | Greenhouses | 2000 | Old Mis Remodel Project | P1118, JE#1805 | N | 6/30/2006 |
| 15410 | Greenhouses | 91 | Fiberglass - Dept #27 | (blank) | SG | 5/31/1990 |
| 15410 | Greenhouses | 99 | Dynaglass - South Property | (blank) | SG | 4/1/1995 |
| 15410 | Greenhouses | 1370 | Office Addition - Electrical | (blank) | N | 10/1/1978 |
| 15410 | Greenhouses | 89 | Fiberglass - Dept. #27 | (blank) | SG | 9/30/1987 |
| 15410 | Greenhouses | 101 | Dynaglass - Dept. #21 - | (blank) | N | 4/1/1995 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area* | Date Acquired |
|---|---|---|---|---|---|---|
| | | | #24 | | | |
| 15410 | Greenhouses | 96 | Addition - Bldg. #8 | (blank) | N | 6/30/1994 |
| 15410 | Greenhouses | 90 | South Property Shade Canopy | (blank) | SF | 7/1/1987 |
| 15410 | Greenhouses | 1371 | Office Addition - Plumping | (blank) | N | 10/1/1978 |
| 15410 | Greenhouses | 88 | Fiberglass - Dept. #21 | (blank) | N | 3/31/1986 |
| 15410 | Greenhouses | 98 | Dynaglass - South Property | (blank) | SG | 4/1/1995 |
| 15410 | Greenhouses | 1821 | Greenhouse 4 West Interest capitalized | Rose House 2nd construction, P.1072 | N | 1/1/2004 |
| 15410 | Greenhouses | 1373 | Addition to GH #23 & #24 | Completed 11/1/80 | N | 6/30/1981 |
| 15410 | Greenhouses | 1368 | Houses #5C &  #5D | (blank) | N | 6/30/1979 |
| 15410 | Greenhouses | 97 | Dynaglass - Bldg. #8 (Headhouse) | (blank) | N | 9/30/1994 |
| 15410 | Greenhouses | 1378 | Warehouse - Addition | Original cost for Bldg#12. As adjust for IRS audits thru 6/30/77 | N | 7/1/1976 |
| 15220 | Improve, Roads, Paving, etc. | 38 | Paving | (blank) | N | 11/1/1974 |
| 15430 | Offices | 1967 | Office Memodel MIS Dept | JE 1801  .. P1115 | N | 9/30/2005 |
| 15430 | Offices | 1999 | BLDG. #12 Back Office Moves | Labor 7/1-12/312005, P1109 | N | 1/1/2006 |
| 15430 | Offices | 1966 | Bldg 12 F/O Purchasing Dept | JE 1801   P 1114 | N | 12/1/2005 |
| 15430 | Offices | 1958 | Capitalized Labor F/O Purchasing JE 1801 | JE 1801 FY 2005 booked FY 2006 1/31/2006 | N | 12/31/2005 |
| 15430 | Offices | 108 | Personnel Office & Conference Room | (blank) | N | 3/31/1995 |
| 15430 | Offices | 821 | Warehouse Office | (blank) | N | 6/1/1982 |

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area[*] | Date Acquired |
|---|---|---|---|---|---|---|
| | | | (BLDG #12) | | | |
| 15430 | Offices | 1957 | Capitalized labor MIS Remodel | P1115 Labor for FY 05 booked FY 06 jan 06 | N | 9/30/2005 |
| 15430 | Offices | 820 | Warehouse Office (BLDG #12) | (blank) | N | 1/1/1980 |
| | | | | | | |
| 15440 | Other | 110 | South Property Refer | (blank) | SF | 12/1/1982 |
| 15440 | Other | 1110 | Photo Room | (blank) | N | 1/1/2000 |
| 15440 | Other | 1478 | Upgrade Refrigeration Equip. at South Facility | All So Prop Replacement | SF | 9/6/2001 |
| 15440 | Other | 116 | Box Storage Shed - So. Prop | (blank) | SF | 3/31/1992 |
| 15440 | Other | 111 | North Property Refer | (blank) | N | 10/1/1985 |
| 15440 | Other | 119 | Dept. #32 Lunchroom | (blank) | SG | 1/1/1999 |
| 15440 | Other | 109 | South Property Restrooms | (blank) | SG | 1/1/1980 |
| 15440 | Other | 115 | Lunchroom/Bath (Dept #1-4) | (blank) | N | 6/15/1989 |
| 15440 | Other | 112 | Privaroom/Bathrooms (Dept #14-15) | (blank) | N | 3/31/1986 |
| 15440 | Other | 114 | Chemical Bldg. | (blank) | N | 5/31/1987 |
| 15440 | Other | 2128 | Rebuild roof structure and replace asphalt and tar | So. Property reefer roof repairs ( AFE 2009-12 ) | SF | 12/31/2008 |
| 15440 | Other | 1776 | Finish Bathroom (Dept. #14-15) | (blank) | N | 11/30/1986 |
| 15440 | Other | 1925 | Replace Windows in House by Water Tank | North Property | N | 6/30/2005 |
| 15440 | Other | 118 | Dept. #5 Office (R&D) | (blank) | N | 10/1/1998 |
| 15440 | Other | 1777 | Finish Bathroom (Dept. #14-15) | (blank) | N | 11/30/1986 |
| | | | | | | |
| 15490 | Soil & Water Conservation | 134 | Expenditures | (blank) | N | 6/1/1985 |
| 15490 | Soil & Water Conservation | 135 | Expenditures | (blank) | N | 7/1/1985 |
| 15490 | Soil & Water Conservation | 133 | Expenditures | (blank) | N | 1/1/1980 |

**PRIVILEGED AND CONFIDENTIAL**

| G/L Asset Acct# | G/L Asset Account Description | Asset No. | Asset Description 1 | Asset Description 2 | Area* | Date Acquired |
|---|---|---|---|---|---|---|
| 15460 | Water Well & Tanks | 1551 | Water Tank - South Property | Dept 50, Project #P1048 | SG | 6/13/2003 |
| 15460 | Water Well & Tanks | 132 | Water Tank | (blank) | N | 6/1/1999 |
| 15460 | Water Well & Tanks | 127 | Sewer Hook-Up - Phase I | (blank) | N | 10/1/1985 |
| 15460 | Water Well & Tanks | 125 | Water Tanks | (blank) | N | 1/1/1977 |
| 15460 | Water Well & Tanks | 128 | Sewer Hook-Up - Phase Ii | (blank) | N | 9/30/1986 |
| 15460 | Water Well & Tanks | 129 | Drainage Ditch - South Property | (blank) | SF | 7/15/1987 |
| 15460 | Water Well & Tanks | 130 | Well - Main Well North Property | (blank) | N | 5/31/1990 |
| 15460 | Water Well & Tanks | 131 | So. Property Sump | (blank) | SF | 1/1/1991 |
| 15460 | Water Well & Tanks | 126 | Water Tanks | (blank) | N | 1/1/1980 |
| | | | | | | |
| 15230 | Water Wells and Tanks | 55 | South Property | (blank) | SG | 1/1/1977 |

**1.1(g)**

**Excluded Owned Real Property**

1. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Being a portion of Parcel "B" as said Parcel is shown on that certain map filed in the Office of the County Recorder of San Mateo County, State of California on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23, Records of San Mateo County, California, more particularly described as follows:

Beginning at the Southwesterly end of that course shown as North 53° 06' 31" East 825.26 feet as shown on said parcel map, said point also being the Easterly corner of the Lands of Guttman as recorded in Book 2786 of Official Records at Page 414, Records of San Mateo County, California; thence North 28° 46' 20" West along the Northeasterly line of said Lands of Guttman, a distance of 314.00 feet to the Northerly corner of said Lands of Guttman, said Northerly corner of being in the flow line up a small creek; thence up the flow line of said creek the following courses and distances: North 47° 20' 28" East, North 47° 20' 28" East 87.90 feet, North 48° 00' 11" East 78.96 feet, North 54° 20' 47" East 74.02 feet, North 77° 38' 53" East 26.92 feet, South 84° 07' 35" East 34.27 feet, South 86° 48' 24" East 19.68 feet, North 72° 59' 12" East 64.92 feet, North 59° 59' 57" East 31.23 feet, South 75° 15' 20" East 43.95 feet, South 32° 31' 06" East 42.23 feet, North 87° 34' 21" East 48.58 feet, South 73° 13' 34" East, 47.22 feet, North 84° 22' 40" East 68.02 feet, North 81° 36' 15" East 38.77 feet, North 45° 23' 12" East 91.58 feet, North 85° 24' 33" East 31.18 feet, North 55° 18' 32" East 56.98 feet to where said creek intersects the common line of Parcels "A" and "B" of said Parcel Map; thence South 36° 53' 29" East along said common line 34.00 feet; thence South 53° 06' 31" West along the Southwesterly line of said Parcel "B" 825.26 feet to the point of beginning.

APN:    048-300-280

JPN:    048-030-300-02.03A

2. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Being a portion of Parcel "B" as said Parcel is shown on that certain map filed in the Office of the County Recorder of San Mateo County, State of California on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23, Records of San Mateo County, California, more particularly described as follows:

Beginning at the northeasterly end of that course shown as North 53°06'31" East 130 feet as shown on said Parcel Map; thence along the common lines of Parcel "A" and "B" of said Parcel Map, the following courses:

South 36°53'29" East 40.00 feet, North 53°06'31" East 21.26 feet; thence leaving said common line north 64°52'55" West 45.30 feet to the point of beginning.

APN: 048-300-300

JPN: 048-030-300-02.01.01A

3. All that certain real property situated in the City of Half Moon Bay, County of San Mateo, State of California, being a portion of the lands shown as Parcel "A" and Parcel "B" on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County Records, said real property being more particularly described as follows:

Beginning at the most Westerly corner of the lands described as Parcel I in the Deed to Nurserymen's Exchange Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122; said point of beginning also being the most Northerly corner of the lands described in the Deed recorded in Book 2786 of Official Records of San Mateo County, at Page 414; thence from said point of beginning along the Northwesterly line of last said lands, South 59° 11' 54" West, 206.67 feet to the most Westerly corner of last said lands; thence along the Southwesterly line of the aforesaid Parcel "B", North 28° 45' 46" West, 533.70 feet to the beginning of 2080.00 foot radius curve, concave Southwesterly; thence Northwesterly 225.66 feet along said curve through a central angle of 06° 12' 58"; thence leaving last said curve, North 65° 54' 43" East, 103.05 feet; thence North 30° 51' 33" West 218.46 feet to the Northwesterly line of said Parcel "B"; thence Northeasterly along said Northwesterly line, North 65° 54' 43" East 1505.00 feet; thence Southeasterly, along a production of the Westerly line of said Parcel "B", shown on said Map as S 10° 30' W 9982.5', South 10° 38' 16" West 816.48 feet to a point in the Northerly line of that parcel of land conveyed to Nurseryman's Exchange, Inc., a California corporation by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records, said line described in said Deed as "South 60° 15' 23" East 160. 93 feet"; thence South 58° 49' 30" East along said line, 148.83 feet to a point designated "A" for the purpose of this description; thence North 62° 35' 35" East, 173.55 feet; thence North 39° 32' 31" East, 126.05 feet; thence North 44° 01' 59" East, 73.37 feet; thence North 40° 27' 35" East, 85.82 feet; thence North 51° 31' 08" East, 152.41 feet; thence South 29° 24' 27" East, 181.64 feet to a point on the Southeasterly line of the aforesaid Parcel "B"; thence along last said line, South 42° 40' 33" West, 527.72 feet to the most Westerly corner of Parcel "C", as last said parcel is shown on that certain Parcel Map recorded in Book 39 of Parcel Maps, at Pages 22 and 23, San Mateo County records; thence along the Southwesterly line of last said parcel, South 40° 24' 32" East, 40.08 feet to the most Northerly corner of the lands described in the Deed to Half Moon Bay Properties Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 120; thence along the Northwesterly line of last said lands to a point on the Northeasterly line of the lands described as Parcel II in the Deed to Nurserymen's Exchange, Inc., recorded in Book 7984 of Official Records of San Mateo County, at Page 122, South 53° 08' 40" West, 21.52 feet; thence North 65° 03' 34" West 44.98 feet to the most Westerly corner of last said lands; thence along the Northwesterly line of the aforesaid Parcel "A", the following courses:

South 53° 08' 40" West, 130.00 feet; North 36° 51' 20" West, 40.00 feet; South 53° 08' 40" West, 40.00 feet and South 36° 51' 20" East, 6.00 feet to the most Northerly corner of the aforesaid lands described as Parcel I; thence along the Northwesterly line of last said lands the following courses:

South 54° 35' 05" West, 58.85 feet; South 84° 41' 06" West, 32.21 feet; South 44° 39' 45" West, 94.59 feet; South 80° 52' 48" West, 40.04 feet; South 83° 39' 13" West, 70.26 feet; North 73° 57' 01" West, 48.77 feet; South 86° 50' 54" West, 50.18 feet; North 33° 14' 33" West, 43.62 feet; North 75° 58' 47" West, 45.40 feet; South 59° 16' 30" West, 32.26 feet; South 72° 15' 45" West, 67.05 feet; North 87° 31' 51" West, 20.33 feet; North 84° 51' 02" West, 35.40 feet; South 76° 55' 26" West, 27.81 feet; South 53° 37' 20" West, 76.045 feet; South 47° 16' 44" West, 81.56 feet and South 46° 37' 01" West, 90.79 feet to the point of beginning; all as shown on approval of Lot Line Adjustment, recorded January 7, 2010, Series No. 2010-001484.

APN:   048-300-310
             048-300-330

JPN:   048-030-300-02
           048-030-300-02.02

4. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Lot 3, as designated on the Map entitled, "Map of the Lands of J. M. Vasques, part of the Rancho Corral De Tierra Vasques", which Map was Filed in the Office of the Recorder of the County of San Mateo, State of California on January 2, 1886 in Book "A" of Maps at Page 44 and a copy entered in Book 1 of Maps at Page 63.

APN:   047-340-120

JPN:   047-34-340-12A

5. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Parcel B, as said parcel is designated on the Map filed in the office of the County Recorder of San Mateo County, State of California on November 14, 1977, in Volume 39 of Parcel Maps at Pages 22 and 23.

EXCEPTING THEREFROM that portion conveyed to Nurserymen's Exchange, Inc., a California corporation, by Deed recorded August 28, 1980, in Reel 7984, at Image 122, Official Records.

ALSO EXCEPTING THEREFROM that portion conveyed to Nurserymen's Exchange, Inc., a California corporation, by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records.

ALSO EXCEPTING THEREFROM Lot 4, as designated on the Map entitled, "Map of the Lands of J. M. Vasques, Part of the Rancho Corral De Tierra Vasques", which Map was filed in the Office of the Recorder of the County of San Mateo, State of California on January 2, 1886, in Book "A" of Maps, at Page 44 and a copy entered in Book 1 of Maps at Page 63. Said Lot 4 being a portion of Parcel "B" above.

ALSO EXCEPTING THEREFROM all that portion lying Southwesterly of the following described line:

Beginning at the Southerly terminus of the Westerly line of said Parcel "B" shown on said Map as "S 10° 30' W 9982.5' " , thence along a Southerly production of said line, South 10° 38' 16" West 816.48 feet to a point in the Northerly line of that parcel of land conveyed to Nurseryman's Exchange, Inc., a California corporation by Deed recorded September 13, 1982, under Recorder's Serial No. 82078057, Official Records, said line described in said Deed as "South 60° 15' 23" East 160.93 feet", said point distant thereon North 58° 49' 30" West 148.83 feet from the Southeasterly terminus; all as shown on approval of Lot Line Adjustment, recorded January 7, 2010, Series No. 2010-001484.

APN: 047-340-180

JPN:  047-034-340-09A

**1.1(h)**

**Existing Family Property Leases**

1. That certain real property lease, dated as of August 1, 2001, and amended and restated as of October 1, 2010, by and between Jack and Linda Pearlstein, Trustees of the Jack and Linda Pearlstein Trust u/a dated 1/11/1999, Kit Shiotani, Trustee of the Kit Shiotani Revocable Trust u/a dated 1/17/2001 and Gail and Thomas Hollingsworth, Trustees of the Hollingsworth Family Trust u/a dated 6/04/1993, collectively as lessors, and Seller, as lessee, with respect to that certain real property described as follows:

The real property consists of approximately 25.83 acres of land located at 2651 No. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels:

> 048-300-210
> 048-300-230
> 048-300-240

2. That certain real property lease, dated as of August 1, 2001, and amended and restated as of October 1, 2010, by and between Jack and Linda Pearlstein, Trustees of the Jack and Linda Pearlstein Trust u/a dated 1/11/1999, Kit Shiotani, Trustee of the Kit Shiotani Revocable Trust u/a dated 1/17/2001 and Gail and Thomas Hollingsworth, Trustees of the Hollingsworth Family Trust u/a dated 6/04/1993, collectively as lessors, and Seller, as lessee, with respect to that certain real property described as follows:

The real property consists of 9 acres of land located at 2125 So. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels:

> 066-093-060
> 066-093-050

3. That certain real property lease, dated as of July 1, 1994, and amended and restated as of October 1, 2010, by and between Jack Pearlstein and Gail Hollingsworth, collectively as lessors, and Seller, as lessee, with respect to that certain real property described as follows:

Approximately 10 acres of land with improvement thereon located at 2125 So. Cabrillo Highway, Half Moon Bay and more particularly described as tax parcels:

> 066-093-030
> 066-093-040

## 1.1(i)

## Leased Family Property

1. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

The Parcel of Land as shown on that certain Parcel Map entitled "Parcel Map, in the incorporated area of the City of Half Moon May, being a portion of the Rancho Corral de Tierra Vasquez, Half Moon Bay, San Mateo County, California", which Parcel Map was filed in the Office of the Recorder of the County of San Mateo on January 3, 1972 in Book 15 of Parcel Maps, at Page 15.

APN:  048-300-210
      048-300-230

JPN:  048-030-300-21A
      048-030-300-23A

2. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Parcel A, as shown on that certain Parcel Map entitled, "Parcel Map, in the incorporated area of the City of Half Moon Bay, being a portion of the Rancho Corral de Tierra Vasquez, Half Moon Bay, San Mateo County, California", which Parcel Map was filed in the Office of the Recorder of the County of San Mateo on July 5, 1974 in Book 25 of Parcel Maps, at Page 8.

APN:  048-300-240

JPN:  048-030-300-24A

3.  All that certain real property situate in the City of Half Moon Bay, County of San Mateo, State of California, described as follows:

PORTION OF LOTS 10 AND 11, AS DESIGNATED ON THE MAP ENTITLED "SUBDIVISION MAP OF A PORTION OF THE JOHNSTON RANCH", WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN MATEO, STATE OF CALIFORNIA ON NOVEMBER 4, 1892 IN BOOK "B" OF MAPS AT PAGE 4, AND A COPY ENTERED IN BOOK 2 OF MAPS AT PAGE 57, MORE PARTICULARLY DESCRIBED AS FOLLOWS:
BEGINNING AT THE POINT ON THE EASTERLY LINE OF THE COAST HIGHWAY AS ESTABLISHED BY THE DEED FROM FRANK ENOS ALVES AND VIRGINIA ALVES, HUSBAND AND WIFE, TO THE STATE OF CALIFORNIA, DATED AUGUST 27, 1952 AND RECORDED NOVEMBER 12, 1952 IN BOOK 2325 OFFICAL RECORDS OF SAN MATEO COUNTY, PAGE 21 (41575-K), DISTANT THEREON SOUTH 6° 00' EAST 387.42 FEET FROM THE NORTHERLY LINE OF LOT 9, AS SHOWN ON SAID MAP OF "SUBDIVISION MAP OF A PORTION OF THE JOHNSTON RANCH", THENCE NORTH 84° 00' EAST 1132.00 FEET PARALLEL WITH SAID NORTHERLY LINE OF LOT 9; THENCE SOUTH 6° 00' EAST 383.00 FEET TO A POINT, SAID POINT BEING MARKED BY A 1-1/2 INCH IRON PIPE, WHICH POINT BEARS NORTH 84° 00' EAST 21.44 FEET FROM THE NORTHEASTERLY CORNER OF THAT CERTAIN 9.75 ACRE TRACT OF LAND DESCRIBED IN THE DEED FROM FRANK ENOS

ALVES AND WIFE, TO ANNA MAY ALVES, DATED MAY 3, 1933 AND RECORDED MAY 8, 1933 IN BOOK 590 OFFICIAL RECORDS OF SAN MATEO COUNTY, PAGE 360 (24482-C); THENCE SOUTH 84° 00' WEST 21.44 FEET TO THE SAID NORTHEASTERLY CORNER OF SAID 9.75 ACRE TRACT 901.85 FEET, MORE OR LESS, TO THE EASTERLY LINE OF THE LANDS DESCRIBED IN THE DEED FROM FRANK ENOS ALVES AND EIFE, TO ERNEST ALVES AND CLARA K. ALVES, DATED OCTOBER 17, 1950 AND RECORDED OCTOBER 24, 1950 IN BOOK 1963 OFFICIAL RECORDS OF SAN MATEO COUNTY, PAGE 206 (94758-I); THENCE NORTH 6° 00' WEST ALONG SAID LAST MENTIONED EASTERLY LINE 198.81 FEET, MORE OR LESS, TO THE NORTHEASTERLY CORNER OF SAID LAST MENTIONED LANDS; THENCE SOUTH 84° 02' 30" WEST ALONG THE . NORTHERLY LINE THEREOF 208.71 FEET, MORE OR LESS, TO THE SAID EASTERLY LINE OF THE COAST HIGHWAY, FIRST ABOVE REFERRED TO, THENCE, NORTH-WESTERLY ALONG SAID LAST MENTIONED LINE 184.04 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN:    066-093-050
        066-093-060

4.  All that certain real property situate in the State of California, unincorporated area of the County of San Mateo, and also City of Half Moon Bay; being a portion of Lots 9 and 10, as described on that Map entitled "Map of the Johnston Ranch, San Mateo County," which Map was filed in Volume B of Maps at Page 31 and copied into Volume 2 of Maps at Page 4, Records of San Mateo County, more particularly described as follows:

Beginning at the point of intersection of the Easterly line of the Coast Highway as established by the Deed from Frank Enos Alves and Virginia Alves, husband and wife, to the State of California, dated August 27, 1952, and recorded November 12, 1952, in Book 2325, Official Records of San Mateo, County, Page 21 (41575-K) with the Northerly line of said Lot 9; thence North 83° 56' 54" East 1, 131.27 feet along said line of Lot 9 to a point, said point being marked by a 1-1/2 inch pipe; thence South 5° 59' 29" East 387.42 feet; thence South 83° 56'54" West 1,131.21 feet to the said Easterly line of the Coast Highway; thence North 6° 00' 00" West along said last mentioned line 387.42 feet to the point of beginning.

Pursuant to Approval of Lot Line Adjustment recorded February 25, 1982, Series No. 82015660, San Mateo County Records.

APN:    066-093-030
APN:    066-093-040

JPN:    066-09-093-03A
        066-09-093-04A

**1.1(j)**

**Owned Real Property**

1. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Parcel "A" as shown on that certain Map entitled "Parcel Map being a Resubdivision of a Portion of Lot 1 as shown on that certain Map entitled "Map of the land of J. M. Vasques, Port of the Rancho Corral de Tierra Vasques", which Map was filed on January 1, 1886 in Book "A" of Maps at Page 44, and a copy entered in Book 1 of Maps at Page 63 and a portion of that Parcel as conveyed from Louis S. Miguel to State Building Supply and Equipment Company, as recorded in Volume 2910, Official Records, 501, Records of San Mateo County, Half Moon Bay, San Mateo County, Calif.", filed in the office of the County Recorder of San Mateo County, State of California, on November 14, 1977 in Volume 39 of Parcel Maps at Pages 22 and 23.

APN:        048-300-190 and
            048-300-260

JPN:        048-034-340-14.02A
            048-030-300-02.01A

2. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

PARCEL ONE:

BEGINNING at a point on the Easterly side of the road leading from Spanishtown to Half Moon Bay, said point being marked on the fence "P V" and running thence North 62 + 30' East 20.04 chains to a fence on the Easterly side of a field; thence South 29° East 2.57 chains to a stake; thence South 81° East 8.82 chains to a stake in line of fence; thence South 62° 30' West 19.23 chains to a mark on fence of race track; thence North 29° East 5.40 chains; thence South 59° West 8.60 chains to road above mentioned; thence North 29° West 2.67 chains to a place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

EXCEPTING THEREFROM so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950 in Book 1774 of Official Records of San Mateo County at page 182 (30521-I).

PARCEL TWO:

A non-exclusive easement for an existing electrical line along the Southeasterly line of Parcel Two as described in Decree Establishing Death and Terminating Joint Tenancy recorded December 19th, 1949 in Volume 1763 at Page 80, San Mateo County Records.

APN:    048-300-090

JPN:    048-030-300-09A

3. The land referred to herein is in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a stake in line of fence, on the Easterly line of the road leading from the Town of Spanishtown of Amesport Landing, said stake being 5 chains and 30 links distance South 29° East from the Southwest corner of a tract of land conveyed to Louis Cardoza Lial by Pablo Vasquez, by Deed recorded in Book 22 of Deeds of Page 117, Records of San Mateo County and running thence North 29° West 5.30 chains to the above-mentioned Southwest corner of the Louis Cardoza Lial property; thence North 59° East 8.52 chains to a stake; thence South 29° East 5.40 chains to a stake in a line of the outside fence, which encloses the Half Moon Bay Race Track, on the Easterly side of said track' thence South 59° West 8.52 chains to the place of beginning.

Being a portion of the Ranch Corral De Tierra (Vasquez).

Excepting Therefrom so much as lies within the lands described in the Deed to the State of California, dated November 25, 1949 and recorded January 19, 1950, in Book 1774 of Official Records of San Mateo County at Page 182 (30521-I)

APN:    048-300-100

JPN:    048-030-300-10A

4. The land referred to herein is situated in the County of San Mateo, City of Half Moon Bay, State of California, and is described as follows:

Beginning at a point that is distant North 28° 33' West 255.00 feet from a one inch iron pipe set for the most Southerly corner of the M. Joseph 47.723 acre Tract, said point of beginning being distant at right angles 25.00 feet from the center line and opposite Engineer's Station 372 plus 02.50 Route 2 Division 4, San Mateo County Highways; running thence from said point of beginning North 59° 04' 38" East 1403.92 feet to an old fence dividing the lands of Joseph and lands of E. Vasquez; thence along said fence North 13° 44' West 336.85 feet; thence leaving said fence South 56° 30' 26" West 1494.49 feet to the Easterly line of the above mentioned County Highway; thence along the Easterly line of said Highway South 28° 33' East 255.00 feet to the point of beginning.

EXCEPTING THEREFROM so much of the herein described property as contained in the Deed from Rose Joseph Roach, also known as Rose Joseph Roache, a widow, to State of California, dated August 16, 1949 and recorded September 26, 1949 in Book 1718 of Official Records of San Mateo County at Page 308 (11176-I).

APN:    048-300-220

JPN:    048-030-300-07A

**1.1(k)**

**Permitted Liens**

None.

**1.1(l)**

**Certain Excluded Contracts**

All contracts relating to the following liens:

| Creditor | Collateral | Jurisdiction | Filing Date | Filing No. |
|----------|-----------|--------------|-------------|------------|
| IOS Capital | Specific Equipment (Lease) | California | 11/10/2006 | 067091525540 |
| IOS Capital | Specific Equipment (Lease) | California | 02/10/2007 | 077102326987 |
| IKON Financial Services | Specific Equipment (Lease) | California | 12/21/2007 | 077141058952 |
| IKON Financial Services | Specific Equipment (Lease) | California | 09/13/2008 | 087171846941 |
| IBM Credit LLC | Specific Computer Equipment (Lease) | California | 01/25/2010 | 107220792131 |

**1.1(m)**

**Utility Deposits**

To be provided in attached Excel file entitled "Schedule 1.1(m) – Utility Deposits.xls"

**NURSERYMEN'S EXCHANGE**
**Utility Deposits (Ordinary Course and Bankruptcy-Required Utility Deposits)**

| Description | Description | | |
|---|---|---|---|
| **Perm Deposits:** | | | |
| Utilities Deposit - Florida Power and Light | Utility deposit | $ | 1,635.00 |
| Water Deposit - FLA Water | Deposit | $ | 50.00 |
| **Temp Deposits:** | | | |
| Green House Services | Gas deposit | | |
| Green House Services | Gas deposit | $ | 24,450.12 |
| **Ordinary Course Utility Deposits Total** | | **$** | **26,135.12** |

**Bankruptcy-Required Utility Deposits (Order**
**Entered 6/06/2011):**

| | | |
|---|---|---|
| Airgas NCN, Inc. | $ | 1,079.00 |
| AT&T | $ | 8,437.00 |
| AT&T Long Distance | $ | 1,723.00 |
| Coastside Cy. Water District | $ | 29,003.00 |
| Greenhouse Services Foundation | $ | 34,277.00 |
| Pacific Gas & Electric Co. | $ | 132,729.00 |
| San Diego Gas and Electric | $ | 270.00 |
| Soil & Plant Laboratory | $ | 611.38 |
| Sprint | $ | 1,471.00 |
| Verizon California | $ | 167.00 |
| Verizon Wireless | $ | 5,575.00 |
| **Bankruptcy-Required Utility Deposits Total** | **$** | **215,342.38** |

* Coastside CY. Water District has demanded additonal deposit.  The Seller is
 negotiating the additional deposit amount with Coastside CY Water District.

**1.1(n)**

**Excluded Licenses**

| No. | Description of Contract | Parties |
|---|---|---|
| 1 | Plant License Agreement, by and between Poulsen Roser A/S ("Poulsen Roser A/S") whereby Licensor grants to Seller a license for commercial exploitation of certain plant varieties, including, without limitation, for such plant varieties all plant patents and other rights regarding the reproduction, propagation and use of such plants in the United States and Canada ("Poulsen Roser A/S License No. 1"). | Poulsen Roser A/S and Seller |
| 1-A | Appendix A to Poulsen Roser A/S License No. 1, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | Poulsen Roser A/S and Seller |
| 1-A (4.C3) | Appendix A (4.C3) to Poulsen Roser A/S License No. 1, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | Poulsen Roser A/S and Seller |
| 2 | Plant License Agreement, by and among Raymond J. Evison Ltd. ("RJE Ltd."), Poulsen Roser A/S and Seller, whereby RJE Ltd. and Poulsen Roser A/S grant to Seller a license for commercial exploitation of certain plant varieties, including, without limitation, for such Plant Varieties all plant patents and other rights regarding the reproduction, propagation and use of such plants in the United States and Canada ("RJE Ltd. and Poulsen Roser A/S License No. 2") | RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand. |
| 2-A (4.C2) | Appendix A (4.C2) to RJE Ltd. and Poulsen Roser A/S License No. 2, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand. |
| 2-A (4.C4) | Appendix A (4.C4) and Royalty List to RJE Ltd. and Poulsen Roser A/S License No. 2, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand. |
| 3 | Campanula Cooperation Agreement, by and between Gartneriet PKM A/S ("Gartneriet") and Seller, whereby Gartneriet granted to Seller the exclusive right in the US to grow the varieties in possession of, or owned by Gartneriet, including varieties that are developed during the term of the agreement (the "Campanula Agreement"). | Gartneriet and Seller |
| 3-A | Appendix A to the Campanula Agreement, Production Goals. | Gartneriet and Seller |
| 3-B | Appendix B to Campanula Agreement, Royalty Schedule. | Gartneriet and Seller |
| 3-PL | Appendix to Campanula Agreement, Price List | Gartneriet and Seller |

| No. | Description of Contract | Parties |
|---|---|---|
|  | Campanula Cuttings (July 1, 2009-June 30, 2010), dated October 23, 2009. |  |
| 4 | Trademark Agreement by and among RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand, with respect to certain Poulsen Roser A/S marks. | RJE Ltd. and Poulsen Rose A/S, on the one hand, and Seller, on the other hand |
| 5 | Trademark Agreement, by and among Raymond J. Evison Ltd, Poulsen Roser A/S, on the one hand, and Seller, on the other hand, whereby RJE Ltd. and Poulsen Roser A/S grant to Seller a license to use certain Poulsen Roser A/S and Raymond J. Evison Ltd. marks. | Raymond J. Evison Ltd. and Poulsen Rose A/S, on the one hand, and Seller, on the other hand. |

**3.2**

**Third Party Consents**

1. Wells Fargo Bank, National Association ("Wells Fargo") consent required in order to enter into a sale of the Purchased Assets, pursuant to the terms of that certain Credit and Security Agreement, by and between Wells Fargo and Seller, dated as of August 15, 2008, as amended by that certain First Amendment to Credit and Security Agreement and Notice of Defaults, dated as of August 4, 2010, that certain Second Amendment to Credit and Security Agreement, dated as of August 26, 2010, that certain Third Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of September 7, 2010, that certain Fourth Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of February 28, 2011, and that Certain Fifth Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of April 26, 2011.

### 3.4

### Title

1.      The security interest granted to Wells Fargo Bank, National Association ("Wells Fargo") pursuant to the terms of that certain Credit and Security Agreement, by and between Wells Fargo and Seller, dated as of August 15, 2008, as amended by that certain First Amendment to Credit and Security Agreement and Notice of Defaults, dated as of August 4, 2010, that certain Second Amendment to Credit and Security Agreement, dated as of August 26, 2010, that certain Third Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of September 7, 2010, that certain Fourth Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of February 28, 2011, and that Certain Fifth Amendment to Credit and Security Agreement and Forbearance Agreement, dated as of April 26, 2011, which security interest is evidenced by UCC Financing Statements (a) 0871698053, amending UCC Financing Statement 087161606792, and (b) 0871698081, amending UCC Financing Statement 077100341174.

2.      The security interest granted to Wells Fargo pursuant to the terms of that certain Debtor-In-Possession Credit and Security Agreement, by and between Wells Fargo and Seller, dated as of May 23, 2011.

3.      That certain Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of August 15, 2008, by Seller in favor of Wells Fargo, as amended by that certain First Amendment to Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of December 28, 2009, that certain Second Amendment to Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of August 4, 2010, that certain Third Amendment to Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of August 26, 2010, that certain Fourth Amendment to Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of September 7, 2010, that certain Fifth Amendment to Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of February 28, 2011, and that certain Sixth Amendment to Deed of Trust, Assignment of Rents and Leases and Fixture Filing, dated as of May 23, 2011, by Seller in favor of Wells Fargo.

## 3.5

## Defaults Under Assumed Contracts

None.

## 3.6

## Employee Matters

1. Pending workers compensation and extended leave matters, as of 7/11/2011:

| Employee‡ | Hire Date | Status | Nature of Issue |
|---|---|---|---|
| Employee # 1 | 12/26/1995 | FMLA/CFRA | Expected Return 10/6/2011 |
| Employee # 2 | 11/09/1981 | Work Comp Leave | Last date worked, 8/21/2009 |
| Employee # 3 | 12/13/1979 | Personal Leave of Absence ("PLOA") | Return to work unlikely due to long term personal illness, last date worked 6/9/10 |
| Employee # 4 | 03/12/1979 | Work Comp Leave | Last date worked 8/1/2006, case settled awaiting resignation letter in order to terminate employment |
| Employee # 5 | 04/04/1984 | PLOA | Exhausted FMLA to care for spouse w/serious illness. Currently out due to own personal illness expected return before 7/29/11 |
| Employee # 6 | 11/30/1995 | Work Comp Leave | Last date worked 5/10/2010, still undergoing treatment. |
| Employee # 7 | 03/13/2000 | Extended Vac-Leave | Expected Return 7/22/2011 |

2. Pending COBRA matters:

| Status | Employee‡ | Qualifying Event Date | Last Date to Elect COBRA Coverage | Eligibility Starts | Eligibility Ends | Letter Sent | Paid Through | Premium Paid by Seller per Month | Employee Pays to TPA* |
|---|---|---|---|---|---|---|---|---|---|
| ACTIVE | Employee A | 28-AUG-2010 | | 01-SEP-2010 | 29-FEB-2012 | 24-AUG-2010 | 30-JUN-2011 | 836.34 | 836.34 |
| ACTIVE | Employee B | 11-SEP-2010 | | 01-OCT-2010 | 31-MAR-2012 | 24-AUG-2010 | 31-JUL-2011 | 84.04 | 84.04 |

| Status | Employee‡ | Qualifying Event Date | Last Date to Elect COBRA Coverage | Eligibility Starts | Eligibility Ends | Letter Sent | Paid Through | Premium Paid by Seller per Month | Employee Pays to TPA* |
|---|---|---|---|---|---|---|---|---|---|
| ACTIVE | Employee C | 11-SEP-2010 | | 01-OCT-2010 | 31-MAR-2012 | 24-AUG-2010 | 31-JUL-2011 | 556.54 | 556.54 |
| ACTIVE | Employee D | 30-AUG-2010 | | 01-SEP-2010 | 29-FEB-2012 | 24-AUG-2010 | 31-JUL-2011 | 556.54 | 556.54 |
| ACTIVE | Employee E | 29-AUG-2010 | | 01-SEP-2010 | 29-FEB-2012 | 24-AUG-2010 | 30-JUN-2011 | 1197.10 | 1197.10 |
| ACTIVE | Employee F | 01-JUL-2010 | | 01-SEP-2010 | 29-FEB-2012 | 03-SEP-2010 | 31-JUL-2011 | 556.54 | 556.54 |
| ACTIVE | Employee G | 01-JUL-2010 | | 01-SEP-2010 | 29-FEB-2012 | 27-AUG-2010 | 31-JUL-2011 | 43.12 | 43.12 |
| WAITING | Employee H | 03-JUN-2011 | 30-AUG-2011 | 01-JUL-2011 | 31-DEC-2012 | 20-JUN-2011 | | 2700.12 | 2700.12 |
| WAITING | Employee I | 02-MAY-2011 | 31-JUL-2011 | 01-JUN-2011 | 30-NOV-2012 | 03-MAY-2011 | | 599.66 | 599.66 |
| WAITING | Employee J | 18-MAY-2011 | 31-JUL-2011 | 01-JUN-2011 | 30-NOV-2012 | 20-MAY-2011 | | 867.65 | 867.65 |
| WAITING | Employee K | 17-JUN-2011 | 30-AUG-2011 | 01-JUL-2011 | 31-DEC-2012 | 27-JUN-2011 | | 556.54 | 556.54 |
| WAITING | Employee L | 09-MAY-2011 | 31-JUL-2011 | 01-AUG-2011 | 31-JAN-2013 | 04-MAY-2011 | | 556.54 | 556.54 |
| WAITING | Employee M | 20-MAY-2011 | 31-JUL-2011 | 01-JUN-2011 | 30-NOV-2012 | 20-MAY-2011 | | 556.54 | 556.54 |
| WAITING | Employee N | 24-MAY-2011 | 31-JUL-2011 | 01-JUL-2011 | 31-DEC-2012 | 20-JUN-2011 | | 2703.12 | 2703.12 |
| WAITING | Employee O | 17-JUN-2011 | 30-AUG-2011 | 01-JUL-2011 | 31-DEC-2012 | 27-JUN-2011 | | 1057.24 | 1057.24 |

*Does not include 2% administration fee to Ceridian Benefit Services (Third Party Administrator).

‡ Names of employees delivered separately to the Buyer.

3.       In late June 2010, the Seller implemented a significant downsizing of its operations and workforce.  Because of the size of the reduction in workforce (138 employees), the lay-off was conducted in compliance with the requirements of the WARN Act. The permanently laid-off employees were each notified in writing that they were being placed on 60 day paid administrative leave, relieved of all their duties and given a termination date. Following the reduction in force, the United Farm Workers Union ("UFW") began an organizing campaign to represent the agricultural workers at the Seller. On August 2, 2010, pursuant to an order of the California Agricultural Labor Relations Board (the "ALRB"), a representative election was held. Votes were cast by the current employees as well as the laid-off workers. The current employees voted 58-3 against union representation. The Seller and the UFW challenged 107 ballots consisting of 13 ballots cast by current employees working in the Wholesale Center and 94 ballots cast by the laid-off workers. The ALRB ruled that the laid-off workers were eligible to vote and ordered their ballots counted. Including the votes of the permanently laid-off employees, the UFW received the majority of the combined total votes cast.  The election results could not be certified until final ALRB disposition of the Seller's Objections and a Petition to Set Aside the Election, which were timely filed immediately following the election.

In February 2011, the ALRB dismissed some of the objections and set some for hearing. Specifically, the ALRB set for hearing the objections regarding whether the Seller was at the legally required 50% of peak employment (including seasonal workers) to hold an election.

After further investigation, the ALRB Salinas Regional Office ("Regional") issued a letter to the UFW, dated May 13, 2011 (the "Regional Letter"), notifying the UFW that Regional had determined that its original methodology used to calculate peak in the Seller's case was in error and that peak was not reached.  The Regional Letter requested that UFW withdraw its Petition for Certification or, in the alternative, Regional would "seek to have the election set aside on the basis of an incorrect count."  On May 16, 2011, Regional issued a written ruling (the "Regional Ruling") restating Regional's determination set forth in the Regional Letter.  In connection with the Regional Ruling, Regional has petitioned ALRB to dismiss the election.  Under the applicable regulations, both UFW and the Seller can file responses to the Regional Ruling and petition.  The UFW refused to withdraw its Petition for Certification.  On May 16, 2011, Regional filed a petition to dismiss the election with the ALRB. On May 17, 2011 UFW  filed an opposition to Regional's dismissal of the election with the ALRB.  The Seller filed its response on May 23, 2011.

On May 25, 2011, the ALRB issued an order that overturned Regional's dismissal of the election certification as exceeding the authority provided Regional and granted a twenty-eight day continuance. The Seller has petitioned the ALRB for reconsideration.  A hearing is scheduled for September 21 and 22, 2011 before an Investigative Hearing Examiner on the issue of peak in the Seller's case.

4.       UFW filed an unfair labor practice charge in September 2010 alleging that Seller discriminated, and continues to discriminate, against the laid-off workers by refusing to re-hire or recall such laid off workers because of their union activities.  Seller believes this to be a standard UFW practice under the circumstances surrounding Seller's significant reduction in workforce in June 2010.  In a letter addressed to Seller dated September 16, 2010 from Regional, the Regional Director states in pertinent part: "*If the charging party submits sufficient evidence to lead me to believe that an unfair labor practice may have been committed, you will be contacted and given an opportunity to present any evidence in support of your position in this matter, including witnesses, documentary evidence or a written statement of your position.*" As of the date of this disclosure, Seller has not been contacted by Regional regarding this matter.

At the time the employees were laid off, such employees were advised by Seller's HR personnel that if they wanted to come back to work for Seller on a seasonal basis they should sign up with the temp

employment agencies Seller works with. Laid off employees were provided with this information because all temporary and seasonal workers employed by Seller are hired through temp employment agencies. Once Seller actually started hiring seasonal workers again after September 2010, all laid-off workers who signed up with a temp employment agency engaged by Seller were hired.

The unfair labor practice charge was dismissed by the ALRB in June 2011.

DISCLAIMER. THIS DISCUSSION AND FOREGOING DISCLOSURES ARE NOT INTENDED TO CONSTITUTE LEGAL ADVICE AND BUYER HAS BEEN ADVISED TO SEEK ITS OWN COUNSEL WITH RESPECT TO THE EVALUATION OF THE MATTERS DISCUSSED HEREIN AND TO DRAW ITS OWN CONCLUSIONS BASED ON SUCH COUNSEL'S ADVICE.

## 3.7

## Open Orders

To be provided in attached Excel file entitled "Schedule 3.7 – Open Orders.xls"

## 3.8

### Inventory

To be provided in attached Excel file entitled "Schedule 3.8 - Inventory Reconciliation (summary).xls"

**HARDGOODS**

| Description | Total |
|---|---|
| 4 1/8 AZ BLK THERMOFORM POT | $2,527.0 |
| 5 AZ GREEN ITML POT | $1,523.3 |
| 5X1000 STRETCH WRAP CLEAR | $169.4 |
| 12X1500 STRETCH WRAP CLEAR | $127.6 |
| B FERTILIZER 20-10-20 40LB/BAG | $4,760.0 |
| B FERTILIZER 20-10-20 40LB/BAG | $2,856.0 |
| B FERTILIZER CAL MAG 15-5-15 | $6,543.6 |
| B FERTILIZER 20-10-20 40LB/BAG | $119.0 |
| B FERTILIZER CAL MAG 15-5-15 | $532.0 |
| CALCIUM NITRATE | $117.6 |
| 15-0-15 W/MINORS | $1,171.0 |
| 4 PVC CUPCAKE PURPLE SORBET | $162.8 |
| 2 BLACK PLASTIC NET POT | $239.0 |
| 2 3/8 AZ BROWN PPLM POT | $552.1 |
| 2 3/4 BLACK POT PPLM | $414.3 |
| 3 STD RND TC COLOR POT PPLM | $178.8 |
| 3 STD GREEN POT ITML | $127.6 |
| 4-1/4 ELITE STD ITML | $712.3 |
| 4 1/4 AZ BROWN | $192.0 |
| 4 1/8 AZ BLK THERMOFORM POT | $995.3 |
| 4 1/4 GER RND TRANSLUCENT(ORC) | $170.7 |
| 5 STD GRN ITML POT | $394.0 |
| 6 STD GREEN POT ITML | $1,666.5 |
| 6 1/4 BLACK PLSTC POT PPLM | $318.8 |
| 7 AZ GRN ELITE | $2,451.5 |
| 8 AZ GRN ELITE | $1,928.7 |
| 11X2000 STRETCH WRAP | $13.6 |
| #73 ROUND PLUG TRAY | $44.9 |
| 38 RND CELL PK-MED HOLE-TRAY | $24.7 |
| #162 SQUARE PLUG TRAY | $137.1 |
| #288 SQUARE PLUG FLAT | $147.7 |
| #38 DEEP SEEDLING TRAY | $483.5 |
| 24 BAMBOO POLE GREEN | $23.9 |
| FINE SAND BULK #60 | $79.6 |
| PERLITE PLUG-63 CU.FT BAG | $204.9 |
| MEDIA PLUG 5372P2H IN 72 CP | $1.9 |
| COIR GROWING MEDIUM COMPRESSED | $632.8 |
| MULTICOTE 12, 21-2-12 | $242.8 |
| MULTICOTE FERT14-7-14 12M XTRA | $15.9 |
| MULTICOTE 6 EXTRA 15-7-15 | $551.3 |
| 6X28 CLEAR SLEEVES BOPP | $100.8 |
| 12X1500 STRETCH WRAP CLEAR | $7.5 |
| PLANT STAKE-SM WIRE COIL GRN | $2,076.2 |
| PLANT STAKE -LG WIRE COIL GRN | $805.0 |
| MEDIA PLUG 5350LPH IN 50 CP | $626.2 |
| MEDIA PLUG 5372P2H IN 72 CP | $224.9 |
| B FERTILIZER 20-10-20 40LB/BAG | $3,070.2 |
| FERTILIZER 14-4-14 | $4.8 |
| B FERTILIZER/CAL-MAG 15-5-10 | $4.0 |
| CALCIUM NITRATE | $19.6 |
| POTASSIUM NITRATE | $980.0 |

| | |
|---|---|
| IRON CHELATE | $693.0 |
| MAGNESIUM SULFATE | $129.4 |
| 12X100X6 MIL CLEAR PLASTIC | $33.3 |
| 12X110X4 MIL WHITE OPAQUE PLAS | $130.5 |
| 10X100X4 MIL BLACK PLASTIC | $19.0 |
| SPACING PLASTIC GREY MAT | $120.8 |
| CHILI PEPPER CARD PICK | $218.2 |
| AMARYLLIS PINK HG TAG | $32.0 |
| AMARYLLIS WHITE HG TAG | $6.0 |
| AMARYLLIS RED HG TAG | $6.8 |
| AMARYLLIS MINI RED HG TAG | $12.0 |
| AMARYLLIS MINI PEACH HG TAG | $211.5 |
| AMARYLLIS ASST HG TAG | $109.8 |
| B FERTILIZER 20-10-20 40LB/BAG | $1,904.0 |
| B FERTILIZER CAL MAG 15-5-15 | $5,000.8 |
| MAGNESIUM SULFATE | $351.1 |
| 12 X 750 X.002 MIL WHT PLASTIC | $1,061.8 |
| 4 HOURGLASS VASE EMBOSSED 2011 | $58.7 |
| 4 BRIO EVD ROSE CRMC POT | $148.2 |
| 4 RETRO COLUMN FLUTE CRMC | $23.7 |
| 9X5 ORCHID STONE BOWL VDAY | $14.3 |
| 4 INDEPENDENCE DAY CHPWD BSKT | $94.6 |
| 8X5 BIRDHOUSE WOOD PLNTR '10 | $249.7 |
| 4 FIESTA II TINS 2010 TJ | $2,776.0 |
| 4 FALL BRUSHSTROKE TIN TJ | $1,335.6 |
| 10 WISHING WELL GARDEN WD SAMS | $78.4 |
| 4 5/8 AZ CLAY POT NO HOLE | $743.6 |
| 4 X 13 BOPP SLEEVE - ROSES | $349.2 |
| 2 X 7.5 CPP OB 8V SLEEVE | $134.3 |
| 5X12X15 1.6MIL CPP CLEAR SLVS | $831.6 |
| DESIGNER ROSE SLEEVE PARADE PP | $86.1 |
| DESIGNER ROSE SLEEVE VICTORY | $114.8 |
| 5.25X14X16 1.6M CPP CLEAR SLVS | $165.6 |
| 5X18 SLEEVE BOPP | $346.5 |
| 6X17X17 1.6M CPP CLEAR SLEEVES | $544.3 |
| 5X10 SLEEVE CPP (16V OB) | $649.6 |
| 6X20 SLEEVE BOPP | $201.6 |
| 7 PINK DRY | $111.9 |
| 10 ROSE DRY | $357.6 |
| 10 PINK DRY | $281.8 |
| 10 GRN DRY | $605.0 |
| 4 SHELF RACK SP:22,13,15,12RIS | $200.6 |
| 3 SHELF RACK BIRD TRELLIS SAMS | $25,845.1 |
| WOODEN RACK/ROSE W/WRAP SAMS | $143.6 |
| 4 SHELF RACK SP:15,15,15,12RIS | $54.6 |
| 4 SHELF RACK SP:18,18,18,12 RI | $273.1 |
| 13 CLAY CARTON LG | $635.2 |
| 13 BRICK DRY CARTON | $1,802.2 |
| 13 PINK DRY CARTON | $526.8 |
| 13 GRAY DRY | $285.8 |
| 15 PINK DRY | $1,216.8 |
| 15 GRN DRY | $532.3 |
| 15 GRAY DRY | $1,110.8 |
| 15 ROSE HEAVY | $319.4 |
| 18 GRN DRY | $340.7 |

| Item | Price |
|---|---|
| 18 BL DRY | $994.7 |
| 18 ROSE DRY | $1,076.6 |
| 20 BL HEAVY | $373.0 |
| 20 PURPLE DRY | $1,046.8 |
| 24 GRN HEAVY | $204.6 |
| 24 BLUE DRY | $293.0 |
| 28 GRN DRY | $1,038.6 |
| FLAT- GENERAL NURSERY | $410.0 |
| MASTER DISPLAY TRAY WHITE | $142.5 |
| 6 HOLE STARBURST NO HNDL 6"POT | $480.5 |
| 15 HOLE STARBURST INSERT | $540.2 |
| 15 HOLE INSERT | $140.7 |
| 24 HOLE INSERT | $101.9 |
| 28 HOLE INSERT | $509.1 |
| 8 CELL PARTITION BSKT | $144.7 |
| 11X2000 STRETCH WRAP | $191.0 |
| SPANISH MOSS 8# BAG | $161.3 |
| GET MEE BLUE PICK | $2,407.5 |
| CLEMATIS - BIJOU PICK | $289.0 |
| SUN STAR GENERIC TAG | $219.4 |
| ROSE MINI PARADE PICK | $1,070.0 |
| ROSE VICTORY CARD PICK | $428.0 |
| ROSE MINI PALACE PICK | $325.4 |
| WHITESTAR CARD PICK | $204.0 |
| INDOOR FLOWERING STAKE H/DEPOT | $86.4 |
| CAMPANULA GET MEE BLUE ONLY ST | $88.4 |
| BLOOMRITE GENERIC I STAKE | $258.1 |
| GENERIC STAKES TJ | $630.4 |
| ROSE STAKES TJ | $323.1 |
| ROSE MINI PARADE STAKE | $267.7 |
| CLEMATIS - PARISIENNE HG TAG | $210.9 |
| AMARYLLIS MINI RED HG TAG | $139.7 |
| AMARYLLIS MINI PEACH HG TAG | $92.6 |
| 15 LITE YELLOW FABRI SQ. | $167.0 |
| 2 ROSE EMBOSSED GREEN | $58.3 |
| 6 PVC POT PINK 238 | $275.1 |
| 4 PVC MINI PLEAT SORBET TJ | $1,164.3 |
| 4 PVC CUPCAKE PURPLE SORBET | $6,239.9 |
| 4 PVC CUPCAKE ASST.SORBET WM | $2,804.9 |
| 20 PINK BROCADE | $835.2 |
| 17 CRANBERRY CHAMBRAY | $477.9 |
| 15 NE FLORAL TRELLIS GREEN/GRN | $767.0 |
| 15 NE FLORAL TRELLIS PINK/PINK | $920.4 |
| 15 NE FLORAL TRELLIS ORNG/YELL | $306.8 |
| 15 NE FLORAL TRELLIS LAV/PURP | $230.1 |
| 4IN STRIBBON-GOLD | $658.3 |
| FELT LAYERED BIRD PICK 2010 | $151.2 |
| 4 EURO PP CERAMIC POT | $1,293.6 |
| 3 FLORETTE ECO GLASS | $1,812.8 |
| 3 CLAY COVER | $154.8 |
| 4 1/4 GER RND TRANSLUCENT(ORC) | $53.9 |
| 6 AZ CLEAR POT | $126.1 |
| 4X15 BLUE SLEEVE | $53.5 |
| 4X24 SLV ORCHID SCARF WRAP SFW | $837.8 |
| 4X24 SLEEVE ORCHID SFWY | $963.2 |

| | |
|---|---|
| 6X28 CLEAR SLEEVES BOPP | $268.8 |
| 7.25X32 SLEEVE 1.6 BOPP CB 6V | $1,106.7 |
| 24 GRN DRY | $196.5 |
| 28 GRN DRY | $311.6 |
| 28 BL DRY | $502.1 |
| 40 PURPLE HEAVY | $633.0 |
| 47 GRN DRY | $261.1 |
| FLAT-GENERAL NURSERY | $277.7 |
| 4.5 TPB BLACK SHUTTLE TRAY | $1,140.4 |
| DISPLAY TRAY -INSPIRED DESIGN | $349.0 |
| MASTER DISPLAY TRAY WHITE | $311.6 |
| MASTER DISPLAY TRAY WHITE | $264.2 |
| INSPIRED DESIGN BACKBOARD | $136.4 |
| INSPIRED DESIGN BACKBOARD | $104.8 |
| 8 HOLE INSERT FOR 4 POT | $72.6 |
| 8 HOLE INSERT FOR 4 1/2 POT | $80.6 |
| 10 HOLE INSERT | $295.8 |
| 12 CELL PARTITION ECO GLASS | $198.0 |
| 15 CELL PARTITION | $33.9 |
| 24 GREEN TWIST TIE | $28.7 |
| 23.5IN WOOD BRWN WAX STAKE | $1,356.0 |
| 30CM PLANT STAKE W/2CLIPS BRN | $1,531.4 |
| 50CM PLANT STAKE W/2 CLIPS BRN | $2,250.3 |
| SPRING LEAF SHINE 20 0Z 12/CS | $47.6 |
| ORCHID ASSORTED HNG CARD | $518.7 |
| ORCHID PHALAENOPSIS HNG CARD | $99.8 |
| 4 'STICKY' PAPER TWIST TIE | $10.7 |
| B FERTILIZER CAL MAG 15-5-15 | $1,702.4 |
| AMMONIUM SULFATE | $63.5 |
| CALCIUM NITRATE | $117.6 |
| 15-0-15 W/MINORS | $1,836.8 |
| POTASSIUM NITRATE | $352.8 |
| COPPER CHELATE | $154.0 |
| SOLUBOR | $42.0 |
| 3 1/4 SQUARE BLACK POT | $624.6 |
| 7 AZ GRN ELITE | $587.5 |
| 10 AZ GREEN POT | $138.2 |
| FREESIA RING 6 | $5,225.0 |
| BAMBOO TRELLIS 2 STAKE 24 IN | $508.0 |
| BULK COARSE AQUARIUM SAND | $7.9 |
| B FERTILIZER 20-10-20 40LB/BAG | $2,427.6 |
| POTASSIUM SULFATE | $376.3 |
| LEAF SHINE CONC IN 55 GAL DRUM | $18.3 |
| 24X100X6 MIL CLEAR PLASTIC | $1,233.8 |
| 1 PER BLACKBERRY ARAPAHO THORNLES | $709.2 |
| 1 PER RASPBERRY RED HERITAGE | $801.0 |
| GET MEE IN SORBET POT | $7,244.8 |
| ADEPT | $1,121.2 |
| ALL SEAONS SPRAY OIL | $319.9 |
| ANTI-STRESS 550 | $35.0 |
| ARIA | $403.2 |
| AVID | $818.5 |
| B-NINE SP | $3,733.5 |
| CAMELOT | $7.7 |
| CAPSIL | $277.8 |

| | |
|---|---|
| CHIPCO 26019 50 WP | $1,467.1 |
| CHLORINE GENERAL BLEACH 5.5 | $4,377.6 |
| CHRYSTAL AVB | $1,603.3 |
| CITATION | $3,408.6 |
| CLOUDE COVER | $36.0 |
| COMPASS | $695.1 |
| CONFIGURE | $149.7 |
| CONTRAC | $56.4 |
| CONCISE GAL. | $1,770.7 |
| COPPER SULFATE | $565.2 |
| CORRAL | $141.2 |
| CYCOCEL | $461.9 |
| CYGNUS 1LB | $908.4 |
| DACONIL 2787 WDG. | $55.9 |
| DEADLINE M-P'S | $221.8 |
| DECATHLON 20-WP | $74.5 |
| DECREE | $658.7 |
| DIMETHOATE 2.67 GC | $175.5 |
| DIPEL 2X | $15.7 |
| DIP & GROW | $248.8 |
| DISTANCE | $3,138.8 |
| DISCUS | $50.2 |
| DITHANE T-0 | $176.3 |
| DOWNSIZE | $5,277.8 |
| DURSBAN 50WP | $88.7 |
| EAGLE 40 WP | $91.1 |
| ENSTAR II | $1,217.1 |
| ENDEAVOR | $1,068.0 |
| E-RASE | $160.9 |
| FLAGSHIP 25WG | $2,750.9 |
| FINALE CHEM. | $266.4 |
| FLORAMITE WDB | $394.4 |
| FLOREL | $426.2 |
| FRESCO | $859.3 |
| FREE HAND | $78.4 |
| HEXAGON 50 WP | $417.6 |
| HERITAGE | $2,068.5 |
| HORMEX #3 | $394.8 |
| IMIDAN 50 WP | $75.1 |
| M-PEDE | $188.4 |
| INSIGNIA | $415.0 |
| INTREPIA 2F | $574.1 |
| ADORN | $3,392.8 |
| FLANKER | $492.8 |
| FUCILADE GALLON | $324.1 |
| HAWK QTS. | $481.6 |
| JUDO | $204.5 |
| JUNCTION | $54.0 |
| KALIGREEN SP. | $118.6 |
| KONTOS | $404.2 |
| KOCIDE 2000 T/N/O DF | $18.5 |
| LI-700 | $76.3 |
| MALATHION AQ 8 | $47.0 |
| MARATHON 1%GR | $188.8 |
| MARATHON 60-WSP | $2,192.4 |

| | |
|---|---|
| MAVRIK AQUAFLOW | $1,688.4 |
| MARATHON II | $527.2 |
| MEDALLION | $711.2 |
| MESUROL 75 WP (I) | $3,404.6 |
| METHALDEHYDE 3.5 | $241.2 |
| MICROTHIOL MWS. | $42.0 |
| MOISTURIN | $50.7 |
| NEUTRALIZER FC. | $2.3 |
| ORTHENE WP. | $892.4 |
| PAGEANT FUNGICIDE | $951.2 |
| PEDESTAL | $1,168.8 |
| PIPRON L | $762.0 |
| PHYSAN-20 | $82.6 |
| PRO-GIBB GIBERELIC ACID | $39.9 |
| DURAGARD | $1,435.2 |
| PROTECT DF. | $9.2 |
| PYLON | $734.2 |
| RONSTAR GR | $62.0 |
| ROOT ZONE | $29.1 |
| SAFARI 20SG | $4,303.9 |
| SANMITE | $704.0 |
| SCIMITAR/GC | $813.7 |
| SEGWAY | $6,814.3 |
| SEVIN 50WP | $54.9 |
| CONSERVE SC | $1,168.2 |
| SPECTRO 90 WDG. | $863.3 |
| STATURE DM | $1,960.0 |
| SULFUR BURNING | $49.6 |
| SUREGUARD | $244.0 |
| TALUS | $1,118.6 |
| TALSTAR FLOWABLE | $777.4 |
| TAME 2.4 EC | $106.7 |
| T-BIRD 4.5L | $177.6 |
| TERRAGUARD 50WP | $106.6 |
| TETRASAN 5WDG | $1,190.7 |
| THIOLUX | $2.0 |
| TOPFLOR | $348.3 |
| TRANSFILM/ANTI-TRANSPIRANT | $43.7 |
| TRISTAR 70 WSP | $276.0 |
| ULTRA PURE OIL | $345.0 |
| VIREO MEC. | $976.2 |
| VENDEX WP | $67.2 |
| WILT PRUF | $33.7 |
| WHITE FLY TRAP STICKY | $39.9 |
| XEROTON 3 PER/GAL | $143.4 |
| 2X1 UPC STICKERS 5000/ROLL | $686.8 |
| 2X4 BOX LABELS UPC 1365/ROLL | $838.7 |
| 3X5 BOX LABELS UPC 1000/ROLL | $1,009.9 |
| 4X6 BOX LABELS UPC 1000/ROLL | $750.2 |
| SMALL THERMAL RIBBON UPC 2X1 | $38.8 |
| LG THERMAL RIBBON (3X5 & 4X6) | $295.1 |
| 1 3/8X1 TINY UPC STCKRS 5000/R | $535.4 |
| 2X3 GROWN TO LAST SFWY LABEL | $3.6 |
| GARDEN CENTER BOX STICKER | $2,708.3 |
| 10X3 INDOOR FLORAL BOX STICKER | $10.0 |

| | |
|---|---|
| 2X6 WHITE LABEL PERFORATED | $257.6 |
| 32 - 48 FAHRENHEIT STICKER | $0.3 |
| ABOVE 48 FAHRENHEIT STICKER | $200.3 |
| 1 PART SM COMP PAPER GRN BAR | $104.7 |
| 2 PART SM COMP PAPER GRN BAR | $938.1 |
| 1 PT LG COMP PAPER GRN BAR | $471.2 |
| 4 PT LG COMP PAPER GRN BAR | $2,167.2 |
| 1 PT 9-1/2 X 11 WHTE COMP PAPR | $257.6 |
| 1 PT 12 X 8-1/2 WHT COMP PAPER | $-- |
| BLUES FORM FOR SHIPPING | $3,637.9 |
| BLUES FORM FOR WILL CALL | $1,940.4 |
| CONTINUOUS STENCIL FORMS | $504.0 |
| NE MERCHANDISE RETURN FORM | $592.7 |
| NE-INVOICE | $851.2 |
| 8 1/2 X 14 WHITE COPY PAPER | $96.0 |
| 8 1/2 X 11 WHITE COPY PAPER | $172.4 |
| #9 LEFT WINDOW ENVELOPE | $837.8 |
| #10 STD ENVELOPE | $352.5 |
| LEFT WINDOW ENVELOPE CUSTOM | $1,494.4 |
| RIGHT WINDOW ENVELOPE CUSTOM | $618.0 |
| MANILA ENVELOPE | $520.5 |
| SFWY 4 PINK BASKET | $1,040.3 |
| SFWY 4 STAIN CRMC ORCHID POT | $12,382.3 |
| 2 BANDANA CUP CERMIC TJ | $1,040.1 |
| 2 BROCADE CERAMIC 2010 | $106.7 |
| 2 ARTISIAN CUP CRMC TJ 2010 | $604.5 |
| 2 VINTAGE CRACKLE CHICKS CRMC | $204.7 |
| 2 MINI EASTER PLSTC TOTE | $602.0 |
| 4 DIAMOND VASE CERAMIC | $5,530.1 |
| 4 METALLIC CRMC LUXE POT | $360.6 |
| 4 EURO PP CERAMIC POT | $21,244.1 |
| 4 MODERN MOM VASE 2011 | $5,737.1 |
| 4 CUPID CRMC CRACKLE GREY WASH | $1,625.7 |
| 4 CUPID CRMC WHITE CRACKLE | $3,447.4 |
| 4 CRMC BLUE TRUMPET POT | $561.0 |
| FL6 MODERN CL FOL POT/6 INSERT | $2,521.3 |
| 2 SHORELINE CERAMIC | $35.6 |
| 2 AMERICANA MINI STARS | $960.1 |
| 6 ANGLE TOP CERAMIC POT SAMS | $2,742.5 |
| 5X3 OVAL GLASS | $752.6 |
| 10X3 GLASS WINDOW BOX | $11,265.6 |
| 4 GLASS FLOWER POT MED RND | $1,039.4 |
| 6 HURRICANE FOOTED GLASS | $15,397.2 |
| 3 FLORETTE ECO GLASS | $4,491.6 |
| 2 LUCKY CLOVER FUTE CERAMIC TJ | $2,031.8 |
| 4 GABBY MUGS | $772.3 |
| 3 RND MILK GLASS CNDLHLR 70734 | $310.5 |
| 2 HOLIDAY GLASS GEMS | $6,569.1 |
| 2 MOSAIC GLASS | $365.5 |
| 4 HOURGLASS VASE EMBOSSED 2011 | $704.4 |
| ME MED HOURGLASS ASST/INSERT | $3,615.5 |
| 2 GINGERBREAD MEN CRMC CUP | $9.2 |
| 6 SNOW POT SQ CRMC SELECT | $319.0 |
| 4 STARS & STRIPES TO GO | $36.8 |
| 6 DUAL OVAL GRDN CRMC F.DAY TJ | $7,938.7 |

| | |
|---|---|
| 3 WOODLAND KEEPSAKE CRMC | $419.1 |
| 3 HOL GEOMETRIC CRMC | $360.9 |
| 6X4 HOL GEOMETRIC CRMC TJ | $3,015.3 |
| 2 SNOW FAUNA COLLECTION | $1,893.8 |
| 2 FALLING LEAVES CRMC | $508.0 |
| 2 HALLOWEEN CERAMIC | $8,092.4 |
| 2 PUMPKIN PATCH CRMC | $23.3 |
| 4 RUSTICA CERM | $1,795.0 |
| 3 PLSTC GHOUL ASST 73028-3 | $5,014.1 |
| 2 EQUINOX CACHEPOT | $6,857.3 |
| 4 HARVEST STONE CENTERPIECE | $5,912.9 |
| 4 SANTA FE MATTE CRMC | $1,144.3 |
| 4 BROCADE CERAMIC PLANTER | $1,603.1 |
| 3 TRICK/TREAT CRMC CHARACTER | $2,930.6 |
| 4 HOLIDAY BEAR CERAMIC POT/SET | $4,822.1 |
| HOLIDAY DECO SET/BAG ONLY | $515.2 |
| 4 RND METALLIC CRMC | $522.3 |
| 4 FLORENTINE PEDESTAL VASE CER | $211.9 |
| 4 GLAZED TC SNOWDROP POT TJ | $335.9 |
| 4 BRIO EVD ROSE CRMC POT | $1,807.7 |
| 4 BRIO EVD GET MEE CRMC POT | $6,593.6 |
| 4 BRIO EVD ORG STAR CRMC POT | $1,219.2 |
| 2 BRIO PETITE CUP CRMC TJ | $8,493.1 |
| 3 HARLEQUIN VASE CRMC | $726.4 |
| 4 DOTTIE CRMC POT | $190.0 |
| 4 LINDSAY DAMASK CERM VASE '10 | $9,554.1 |
| 4 RETRO COLUMN FLUTE CRMC | $2,032.9 |
| 5 EMB.HOURGLASS VDAY CRMC SAMS | $643.5 |
| 5 EMB.HOURGLASS MDAY CRMC SAMS | $579.1 |
| 5 HOURGLASS VASE CRMC SAMS | $331.1 |
| 5 PINK PAW PRINTS CRMC 09 | $10.1 |
| 9X6 OVAL BROCADE/STRIPE | $5,800.0 |
| 9X5 ORCHID STONE BOWL VDAY | $14.3 |
| 7 CRUMPLED CERAMIC TJ | $2,233.2 |
| 4 HARLOW CERAMIC VASE | $423.4 |
| 2 CUPCAKE FLUTE CRMC TJ 2011 | $772.1 |
| 4 SENTIMENTAL CHERUBS CRMC | $4,178.6 |
| 4 CUPCAKE FLUTE CRMC 2011 | $8,697.3 |
| 2 PETITE FOUR EGG CACHE CRMC | $5,337.3 |
| 2 ROLY POLY BUNNIES CRMC 2011 | $670.5 |
| 9X6 MODERN CRMC BOWL SAMS | $359.0 |
| 4 V.DAY CAPIZ POT/2010 | $4,099.7 |
| 4 LOVE PEDESTAL VASE | $902.6 |
| 2 LOVE BUG PLANTER 2010 | $114.3 |
| 2 TRUFFLE CERAMIC POT 2010 | $452.1 |
| 6 BELLA GARDEN BOWL 2010 | $2,268.5 |
| 4 SWEETHEART CHERUBS CER 2010 | $666.8 |
| 3 CANDY EGG CERAMIC 2010 | $829.1 |
| 2 ANGELINA PETITE BROCADE 2010 | $1,828.8 |
| 4 CHELSEA CERAMIC 2010 | $328.7 |
| 4 BOTANICAL IMPRESSIONS CRMC | $34.6 |
| 4 LOVE PEDESTAL VASE HD | $4,028.6 |
| 2 LADY LOVE BUGS CRMC | $58.3 |
| 2 NORTH POLE CHARACTER CRMC | $1,333.6 |
| 2 VICTORIAN CHARM CUP CRMC | $73.4 |

| | |
|---|---:|
| 2 WINTER SCROLL CUP CRMC | $3,017.5 |
| 4 DOUBLE HEART FELT SATCHEL 10 | $841.9 |
| 4 BOUNTIFUL BOWL RATTAN BSKT | $23.2 |
| 4 GOLDEN HARVEST RATTAN BASKET | $10,940.2 |
| 4 HARVEST BURLAP CHIPWOOD BSKT | $56.3 |
| 4 HALLO EVE RATTAN BASKET | $46.4 |
| 4 INDEPENDENCE DAY CHPWD BSKT | $12,795.9 |
| 2 GLITTER DAISY FLUTE TIN 2010 | $522.5 |
| 4 JODY BUTTLERFLY TIN 2010 | $304.3 |
| 8X5 BIRDHOUSE WOOD PLNTR '10 | $1,882.2 |
| 4 SAILCLOTH/BEACH CANVAS BAGTJ | $204.3 |
| 4 SINGLE HEART FELT SATCHEL | $8,646.4 |
| 4 HARD CANDY BROCADE VASE TIN | $958.0 |
| 4 AUTUMN FLARE WEAVE BSKT | $2,900.7 |
| 4.5 WOVEN POLY STRAP BSKT | $1,328.4 |
| CARA'S RATTAN BSKT W/EAR HNDLS | $4,702.9 |
| 5 WALNUT STAIN WILLOW BSKT TJ | $1,971.6 |
| 9X5 VINTAGE WOODEN GARDEN TRUG | $556.3 |
| 8 EMILY RND WILLOW BASKET | $1,439.8 |
| 10 EMILY SQ GIFT BASKET XLG | $2,503.0 |
| 10 EMILY RND GIFT BSKT XLG | $2,897.1 |
| 8 BLUE WASH WILLOW HOURGLASS | $512.9 |
| 10 BLUE WASH WILLOW HOURGLASS | $1,902.7 |
| 3 BURLAP SACK W/MOTIFS TJ '09 | $30.6 |
| 6 GINGHAM PAPER WOVEN BSKT TJ | $990.9 |
| 6 PAPER LINEN WEAVE BASKET TJ | $219.0 |
| 6X7 HIGH TEA PLATTER BSKT | $804.0 |
| 6 PROVENCE NAT WILLOW | $1,011.0 |
| 8X5 FATHERS DAY WOOD TRUG TJ | $2,219.6 |
| 8 SQ PINK WASH WILLOW SELCT | $2,846.3 |
| 8 SQ BLUE WASH WILLOW SELCT | $2,506.6 |
| 8 SQ GREEN WASH WILLOW SELCT | $2,955.9 |
| 4 LET IT SNOW FABRIC BASKET | $101.4 |
| 14X5 OVAL WOOD ROPE BSKT | $2,163.4 |
| 4 SNOWFLAKE EMB.TIN ASST | $22,319.6 |
| 4 SWIRL HANGING BUG TIN TJ | $251.6 |
| 4 ORBIT EMB.RINGS FLUTE TIN TJ | $348.4 |
| 4 AUTUMN BROCADE TIN 09 | $2,142.5 |
| 4 FIESTA II TINS 2010 TJ | $4,112.6 |
| 6 TWIG RIMMED VASE TIN | $7,228.6 |
| 8X5 LATTICE & HEARTS TIN TJ | $566.1 |
| 2 BUTTERFLY PETITE/TWIG CUP | $1,625.7 |
| 4 ETCHED COPPER TIN TJ | $671.3 |
| 4 FALL BRUSHSTROKE TIN TJ | $16,904.2 |
| 9X5 SCALLOP TOP SCROLL TIN SAM | $806.4 |
| 4 HOLLY SCROLL TIN BSKT 08 | $205.5 |
| 4 WINE LABEL TIN | $14,361.0 |
| 3 AMERICANA TIN | $1,095.4 |
| 2-2 IN FLEUR DUET TIN | $340.6 |
| 4 ETERNITY PEDESTAL TIN | $2,302.5 |
| 6 SWEET SENTIMENTS TIN | $1,999.9 |
| 8X5 SWEET SENTIMENTS METAL BSK | $1,857.9 |
| 4 FLORA TIN POT | $1,304.9 |
| 8X5 BROCADE METAL BASKET | $169.3 |
| 3 GOLDEN AUTUMN EMB. TIN TJ 09 | $156.7 |

| | |
|---|---|
| 4 DECK THE HALLS VASE TIN | $2,463.6 |
| 4 HOLIDAY SHINE ENAM.VASE TIN | $3,007.6 |
| 4 LIGHT YOUR OWN TREE TIN | $808.9 |
| 4 PATTERN PLAY SHIMMER TIN | $404.5 |
| ROUND ORBIT TIN 8" TJ | $1,006.4 |
| 2 TRIPLE ORBIT TIN ON TRAY | $235.5 |
| 4 RND PAINTED TIN ON BASE | $745.9 |
| 3 HOBNAIL ENAMEL TIN | $679.2 |
| 6 VERTIGO TIN | $232.2 |
| 4 SHERBET TINS ASST | $127.7 |
| 13X6 SILVER OVAL ORBIT TIN | $12,386.8 |
| 3 PATRIOTIC TIN '08 | $402.5 |
| 4 FLEUR DE PROVENCE TIN | $7,981.3 |
| 6 WALLPAPER METAL BUCKET | $1,410.4 |
| 4 EYELET LACE METAL VASE | $6,827.0 |
| 4 ARTS AND CRAFTS TIN 08 | $119.7 |
| 4 MODULAR TIN F'08 | $325.1 |
| 2 ORBIT COPPER/GOLD TRIO-TRAY | $1,229.6 |
| 4 WINTER WHITE TIN ASST F'08 | $1,826.8 |
| 4 SILVER BELLS BASKET TIN | $780.6 |
| MSTR CODE DSPLY TINS 16 EA | $41,301.8 |
| 4 SPRING TIN PLANTER 77237-5 | $161.6 |
| 4.25 STRIPE TIN 77258-0 | $212.9 |
| METAL TOOL SET WOOD HNDLS | $127.9 |
| 8X5 GARDENING TIN BSKT | $5,802.2 |
| 4 SQ EMBOSS TIN | $1,500.8 |
| 4 SQ EMBOSS SPRING TIN | $2,466.7 |
| 3 GREEN TIN/PINK RIM | $677.4 |
| 4 HOLIDAY FLEUR TIN | $307.5 |
| 2 TIN GIFT BOX | $5,577.1 |
| 4 FIONA THE SECOND TIN VASE | $3,255.0 |
| 9X3 HOBNAIL TIN PLNTR TJ | $2,496.1 |
| 6 CHELSEA EMBOSSED TIN | $388.1 |
| 4 ELIZABETH EMBOSSED TIN VASE | $313.5 |
| 4 LINER FOR GAL TIN (1150-08) | $-- |
| 3 ANTIQUE COPPER FNSH POT | $254.0 |
| 4 JULY 4TH VINTAGE ENAMEL TIN | $223.9 |
| ANGLE TOP TIN ASST COLORS | $255.5 |
| 3 ZEN RND POT NO DRAIN | $5,861.3 |
| 4 ZEN SQ POT TJ | $3,238.5 |
| FL-6 RND CRMC GLAZE BALL SAMS | $736.9 |
| FL-6 SQ CRMC GLAZED POT SAMS | $750.0 |
| 3X5 MODERN CL BONSAI/12 INSERT | $1,494.7 |
| 4 LG TWIG BUNNY BASKET 62114- | $888.9 |
| 4 FIBER BASKET | $396.5 |
| 4 FIBER/TWIG BASKET | $353.4 |
| 8 ORANGE SISAL FIBER BOWL | $331.2 |
| 4 SCALLOP SISAL CUPS TJ | $163.1 |
| 6X8 RATTAN BASKET W/GLASS TUBE | $23,496.9 |
| 4 BEACH BAG BASKET | $2,058.0 |
| 4 HALLOWEEN PAPER POTS TJ | $829.8 |
| 4 RUFFLE EASTER PAPER BSKT 11 | $1,780.5 |
| 9X5 VINTAGE GARDEN WOOD BOX | $69.6 |
| 10 WISHING WELL GARDEN WD SAMS | $23,277.2 |
| 2 PATRIOTIC STAR WOODEN TRUG | $12,559.5 |

| | |
|---|---|
| 4 AMERICANA TRUG | $206.6 |
| 4 M/DAY WD BSK GIFT SET 78480- | $1,522.7 |
| 7X7 SLOUCH BASKET TJ | $3,991.4 |
| 7X7 TWO TONE BASKET | $1,129.6 |
| 4 Z-WEAVE BASKET | $1,554.4 |
| 8X5 CLASSIC HEARTS GIFT SET | $2,834.5 |
| 6 SPRING LINEN BASKET | $1,909.2 |
| 4 FESTV TUMBLER BLUE TWINKLE | $1,448.3 |
| 4 FESTV TUMBLER GOLD SCROLL | $1,215.3 |
| MUSIC BOX RED (PAPER) | $26.4 |
| 3 NATURE WMBOSSED TIN TJ | $522.5 |
| 4 BE MY VALENTINE BOX TO GO | $1,520.8 |
| 2 1/4 STD CLAY POT | $1,713.6 |
| 6 CM BROWN GROWERS POT W/WICK | $2,585.0 |
| 6 CM BRN GROWER POT/3LEGS/WICK | $6,514.2 |
| 2 BLACK PLASTIC NET POT | $1,218.9 |
| 2 3/8 AZ BROWN PPLM POT | $5,269.7 |
| 2 3/4 BROWN POT (6.5L) | $2,013.8 |
| 2 3/4 BLACK POT PPLM | $423.9 |
| 3 STD CLEAR POT PPLM | $18,602.7 |
| 3 AZD GREEN POT PPLM (TO 8D) | $3,671.4 |
| 3 AZ CLAY POT | $100.3 |
| 3 CLAY COVER | $987.0 |
| 3 1/4 SQUARE BLACK POT | $666.2 |
| 4-1/4 ELITE STD ITML | $2,822.4 |
| 4 1/4 STD GRRN (11BD/PPLM) | $4,947.0 |
| 4 5/8 AZ CLAY POT NO HOLE | $20,115.2 |
| 4 1/2 AZ GRN POT | $436.5 |
| 4 1/8 AZ BLK THERMOFORM POT | $31,734.1 |
| 4 1/4 GER RND TRANSLUCENT(ORC) | $5,990.0 |
| 4 SCR DEEPLINER DL4 | $23.8 |
| 5 SCR DEEPLINER DL5 | $63.9 |
| 6 STD GREEN POT ITML | $2,440.0 |
| 6 AZ BRN PPLM | $2,927.5 |
| 6 AZ CLAY POT | $521.5 |
| 6 SCR DEEPLINER DL6 | $517.7 |
| 7 AZ GRN ELITE | $2,532.5 |
| 7 SAUCER-CLEAR VINYL | $118.0 |
| 7 SCR DEEPLINER DL7 | $116.4 |
| 8 AZ GRN ELITE | $185.1 |
| 8 SAUCER-CLEAR VINYL | $196.4 |
| 9 SCR DEEPLINER DL9 | $690.6 |
| 10 SAUCER-CLEAR VINYL | $1,215.1 |
| 10 SCR DEEPLNR DL10 | $239.9 |
| 12 SAUCER-CLEAR VINYL | $81.3 |
| 16 SCR DEEP LINER | $1,723.7 |
| 10-30 BROWN PAPER SLEEVE | $397.5 |
| 12-30 BROWN PAPER SLEEVE | $504.0 |
| 4X18 BROWN PAPER SLEEVE | $97.4 |
| 5-18 POINT | $211.4 |
| 6-15 BROWN PAPER SLEEVE | $86.2 |
| 6-30 BROWN PAPER SLEEVE | $139.4 |
| 8-20 BROWN PAPER SLEEVE | $326.8 |
| 4-18 WP SLEEVE | $194.7 |
| PVC TUBE-VENUS DISPLAY UNIT | $16,586.3 |

| | |
|---|---|
| 4 X 13 BOPP SLEEVE - ROSES | $5,994.6 |
| 4X8 PRINTED 1.6 BOPP SLEEVE | $1,372.8 |
| 2 X 7.5 CPP OB 8V SLEEVE | $1,396.2 |
| 5X12X15 1.6MIL CPP CLEAR SLVS | $5,929.0 |
| 4X24 SLV ORCHID SCARF WRAP SFW | $10,890.9 |
| 4X11.25 1.2CPP SB NARC PWHT | $323.4 |
| 4X11.25 1.2CPP SB MINI DAFF | $184.8 |
| 5.5X11X14.5L CLEAR PP RED/HNDL | $228.4 |
| DESIGNER ROSE SLEEVE PARADE PP | $4,132.8 |
| DESIGNER ROSE SLEEVE VICTORY | $4,018.0 |
| 8.5X8.5X2.5CM INSERT SLEEVES | $86.2 |
| 25.8X10.7X66.5CM/UPGRADE SLVS | $5,352.5 |
| 26.767X12.5X66.5CM NON UPGRADE | $1,473.9 |
| 5.25X14X16 1.6M CPP CLEAR SLVS | $1,242.0 |
| 5X16.25X15.5 1.6 CPP CLEAR SLV | $1,632.0 |
| 5X14X17 1.6M CPP CLEAR SLEEVES | $352.0 |
| 6X17X17 1.6M CPP CLEAR SLEEVES | $1,915.2 |
| 5X10 SLEEVE CPP (16V OB) | $3,763.2 |
| 6X20 SLEEVE BOPP | $1,881.6 |
| 6X28 CLEAR SLEEVES BOPP | $3,696.0 |
| 7.25X32 SLEEVE 1.6 BOPP CB 6V | $3,478.2 |
| 7.5X14 SLEEVE 1.6 BOPP BULBS | $615.7 |
| 8X20X30 CLEAR BOPP SLEEVE | $1,038.0 |
| 9X26X20 1.5 CPP CLEAR SLEEVE | $438.4 |
| 25X25X20 SFWY BOX | $2,802.6 |
| 7 PINK DRY | $940.2 |
| 7 PURPLE DRY | $322.6 |
| 10 ROSE DRY | $298.0 |
| 10 PINK DRY | $1,690.8 |
| 10 GRN DRY | $2,459.7 |
| 13 CLAY CARTON LG | $3,645.6 |
| 13 BRICK DRY CARTON | $10,107.0 |
| 13 GRAY DRY | $2,143.7 |
| 15 PINK DRY | $10,235.9 |
| 15 GRN DRY | $5,588.8 |
| 15 GRAY DRY | $927.0 |
| 15 ROSE HEAVY | $4,034.9 |
| 15 BLACK HEAVY | $270.6 |
| 18 RED XMAS - LARGE | $476.3 |
| 18 GRN DRY | $1,043.8 |
| 18 GRAY DRY | $3,032.1 |
| 18 ROSE DRY | $625.1 |
| REG SLOTTED CTN | $679.1 |
| 20 LIME NEW | $1,237.8 |
| 20 PURPLE DRY | $1,891.0 |
| 24 GRN HEAVY | $2,750.0 |
| 24 BLUE DRY | $8,335.1 |
| 28 GRN DRY | $5,732.8 |
| 28 BL DRY | $1,004.2 |
| 28 SM FRUIT DSPLY BOX | $3,684.5 |
| 29 TURQUOISE DRY TGT | $1,877.9 |
| 43 TOPIARY | $1,821.5 |
| FLAT- GENERAL NURSERY | $2,231.2 |
| FLAT-GENERAL NURSERY | $1,190.0 |
| SHUTTLE TRAY 6" BLACK DST-15C6 | $206.0 |

| | |
|---|---|
| 4.5 TPB BLACK SHUTTLE TRAY | $3,695.0 |
| INJECTION RING TRAY-SIDE HOLDR | $539.5 |
| VENUS DISPLAY TRAY CORE LINE | $1,778.0 |
| MASTER DISPLAY TRAY WHITE | $831.0 |
| 12 DISPLAY TRAY -SM FRUIT | $2,597.2 |
| HEADER CARD-VENUS FLY TRAP II | $1,045.3 |
| HEADER CARD VENUS FLY TRAP | $654.4 |
| HEADER CARD ECHEVERIA | $655.2 |
| HEADER CARD LA PETITE | $3,081.7 |
| HEADER CARD-M/DAY CRMC W/ROSE | $493.0 |
| HEADER CARD LA PETITE M.ROSE | $104.0 |
| HEADER CARD LA PETITE CAMPANUL | $240.9 |
| INSPIRED DESIGN BACKBOARD | $311.8 |
| SPRING SHELF TALKERS | $452.9 |
| MOTHER'S DAY 1 STICK PICK | $1,478.0 |
| MOTHER'S DAY 2 STICK PICK | $700.0 |
| 6 HOLE STARBURST NO HNDL 6"POT | $240.2 |
| 8 HOLE INSERT FOR 4 1/2 POT | $985.6 |
| 15 HOLE STARBURST INSERT | $540.2 |
| 24 HOLE INSERT | $415.5 |
| 24 HOLE INSERT WHITE ONE PIECE | $551.2 |
| 24 HOLE INSERT (PIN CUSHION) | $2,812.9 |
| 28 HOLE INSERT | $531.9 |
| 12 HOLE INSERT (2 PK PER CASE) | $1,775.0 |
| 18 HOLE INSERT KRAFT | $370.2 |
| 10 HOLE INSERT | $1,807.9 |
| 10 HOLE INSERT (ORCHID CARTON) | $3,659.5 |
| 15 HOLE SQ INSERT KRAFT | $1,020.3 |
| 12 CELL PARTITION ECO GLASS | $1,037.3 |
| 15 CELL PARTITION/3"ORCHID CLY | $1,582.1 |
| 24 CELL PARTITION | $664.0 |
| 28 CELL PARTITION | $3,215.3 |
| 12X1500 STRETCH WRAP CLEAR | $1,320.7 |
| 7 X 18 KRAFT PAPER SHEETS | $130.5 |
| 11X18 KRAFT PAPER SHEETS | $352.8 |
| NEWSHEET 30# ROLL | $125.4 |
| 12" X 250' BUBBLE WRAP MSTR CD | $870.2 |
| 2 STYROFOAM BLOCK | $222.8 |
| CLEAR PACKING TAPE | $31.4 |
| CRYSTAL CLEAR TAPE | $270.5 |
| WHITE STRAPPING | $501.8 |
| AMARYLLIS BOX KIT BI-COLOR | $205.5 |
| AMARYLLIS BOX KIT RED | $411.9 |
| AMARYLLIS BOX KIT WHITE | $206.4 |
| NARCISSUS PAPERWHITE BOX KIT | $669.9 |
| 6 TAHITI WOVEN CHIPWOOD | $802.6 |
| 13X6 DBL WINDOW CHIPWOOD | $866.4 |
| 13X6 DBL WINDOW BAMBOO | $3,057.6 |
| #73 ROUND PLUG TRAY | $65.0 |
| 38 RND CELL PK-MED HOLE-TRAY | $390.2 |
| PRO 38 TRAY 4 DRAIN HOLES | $1,919.1 |
| #128 DEEP PLUG TRAY | $713.6 |
| #38 DEEP GROOVE TUBE TRAY | $589.3 |
| WREATH WIRE 35 1/2 LONG | $561.0 |
| TOPIARY WIRE HEART FRAMES | $2,982.2 |

| | |
|---|---|
| 4 WIRE GLOBE FRAME | $423.7 |
| BAMBOO FAN TRELLIS 2 STAKE 2" | $9,159.9 |
| 18 BAMBOO ARCHED TRELLIS | $3,228.2 |
| 8 BAMBOO HOOP | $816.6 |
| PLANT STAKE-SM WIRE COIL GRN | $328.9 |
| BULK COARSE AQUARIUM SAND | $276.0 |
| LIGHTS 20 PER BLUE/WHT FACETED | $1,784.1 |
| PERLITE COMMERCIAL 43.5 CU FT | $492.3 |
| LIGHTS MINI STAR 10/PER RED | $2,620.3 |
| LIGHTS MINI STAR 10/PER BLUE | $1,139.5 |
| WATER LEVEL STICKER T.JOE | $253.2 |
| FALL/WINTER CATALOGUE | $-- |
| YELLOW MESH BARSEAL BAG-SMALL | $917.3 |
| YELLOW MESH BARSEAL BAG-LARGE | $657.6 |
| NATURAL RUBBER BANDS #12 | $42.3 |
| #117 RUBBER BANDS | $78.6 |
| TWINE WHITE 650' TUBE | $872.5 |
| SISAL NATURAL COLOR BULK | $2,163.9 |
| ORANGE STAKE PRINTED | $1,088.5 |
| LAVENDER POT STAKE 1X6 | $25.2 |
| WHITE POT STAKE 1X6 | $25.2 |
| YELLOW POT STAKE 1X6 | $75.6 |
| RED POT STAKE 1.5 X 7 | $163.2 |
| YELLOW POT STAKE 1.5 X 7 | $154.3 |
| TURQUOISE POT STAKE 1.5 X 7 | $168.3 |
| SELF WATERING WICK-6IN LENGTHS | $957.0 |
| COIR FIBER DISK 1 LITER | $250.7 |
| COCO FIBER DISK 1/2" X 2 3/8" | $121.2 |
| LV2404 5.0 M3 BALE | $6,762.7 |
| LV004 5.5 M3 BALE MEDIA | $2,399.0 |
| LV1775 MEDIA 6M3 | $11,902.7 |
| SPHAGNUM MOSS NZ KG COMPRESSED | $11,728.6 |
| MEDIA PLUG IN 5350 LP IN 50 CP | $6,866.6 |
| MEDIA PLUG 5350LPH IN 50 CP | $23,797.1 |
| LV3328 5.5M3 LV308 MEDIA EXTRA | $459.8 |
| LV3329 LV2404 5.5M3 MEDIA EXTR | $301.3 |
| MEDIA PLUG 5372P2H IN 72 CP | $1,213.1 |
| LV3819 6FT3 LV308+GH MEDIA | $134.4 |
| LV3820 6FT3 LV308+GH MEDIA | $134.4 |
| LV4492 CAMPANULA SOIL 5.0CU MT | $826.6 |
| LV4320 CAMPANULA SOIL 4.5M3 | $1,505.0 |
| LV4576 PINE SOIL W/CRF 4.5 CU | $467.8 |
| LV082 5M3 BALE MEDIA | $4,251.1 |
| LV4320 4.5M3 BALE MEDIA | $7,901.1 |
| COIR CHIPS 1/4IN WASHED | $7,449.1 |
| COIR GROWING MEDIUM COMPRESSED | $632.8 |
| MULTICOTE 12, 21-2-12 | $714.1 |
| B FERTILIZER CAL MAG 15-5-15 | $4,256.0 |
| FERTILIZER 22-3-8 CRF 6 MONTHS | $949.8 |
| AMMONIUM NITRATE | $180.3 |
| AMMONIUM SULFATE | $10.6 |
| 15-0-15 W/MINORS | $11,020.8 |
| MULTICOTE FERT14-7-14 12M XTRA | $1,854.1 |
| MULTICOTE 6 EXTRA 15-7-15 | $2,213.7 |
| 21-2-11 APEX NATIVE FERTILIZER | $1,792.1 |

| | |
|---|---|
| 12-6-12 T180 CRF ORCHIDS FERT. | $2,447.2 |
| LEAF SHINE CONC IN 55 GAL DRUM | $7,064.4 |
| FERTILIZER STEM 25# | $354.2 |
| LIME F 2.5 GAL | $1,400.0 |
| 9X400X4 CLEAR PLASTIC | $2,032.1 |
| 10X100X4 MIL CLEAR PLASTIC SH | $235.2 |
| 12X100X4MIL CLEAR PLASTC SHEET | $733.8 |
| 12X400X1 MIL CLEAR PLASTIC | $465.7 |
| 12X200X2 MIL CLEAR PLASTIC | $744.5 |
| 12X100X6 MIL CLEAR PLASTIC | $399.2 |
| 24X100X6 MIL CLEAR PLASTIC | $580.6 |
| 9X1500X1 ML WHT OPAQUE PLASTIC | $1,508.0 |
| 12X110X4 MIL WHITE OPAQUE PLAS | $149.1 |
| 10X100X4 MIL BLACK PLASTIC | $171.4 |
| 12X100X4 MIL BLACK PLASTIC | $548.4 |
| 12X100X6 MIL BLACK PLASTIC | $362.9 |
| 12 X 750 X.002 MIL WHT PLASTIC | $424.7 |
| 12X500 REMAY AGROFABRIC WHT | $1,724.8 |
| SPACING PLASTIC GREY MAT | $241.5 |
| CAMPANULA WHT GET MEE (ALPINE) | $1,649.8 |
| GET MEE BLUE PICK | $24,556.5 |
| CAMPANULA WHT WONDER (ALPINE) | $822.6 |
| CAMPANULA GET MEE W/PICK SAMS | $779.2 |
| CAMPANULA BLUE WONDER (ALPINE) | $2,589.6 |
| CARIBBEAN LILY - CARD W/PICK | $497.2 |
| CARRIBEAN LILY - CARD W/PICK | $3,299.6 |
| CHILI PEPPER CARD PICK | $419.7 |
| COBRA LILY CARD PICK | $1,620.0 |
| FREESIA CARD PICK | $1,150.3 |
| ECHEVERIA CARD PICK | $979.1 |
| CLEMATIS - BIJOU PICK | $261.6 |
| HEATHER PINK HILL CARD/PICK | $239.6 |
| JASMINE CARD PICK | $296.9 |
| CORKSCREW PICK | $241.7 |
| LAVENDER CARD PICK | $1,615.7 |
| LILY OF THE VALLEY CARD PICK | $642.0 |
| LEWISIA CARD PICK | $1,792.8 |
| NARCISSUS PICK | $5,649.2 |
| KALANCHOE CARD PICK | $1,499.4 |
| DESERT ROSE PICK(PADDLE PLANT) | $8,667.0 |
| PIN CUSHION W/WIRE PICK '07 | $4,513.5 |
| PROTEA CARD PICK | $219.4 |
| ORANGE STAR TC CARD PICK | $13,096.8 |
| SUN STAR GENERIC TAG | $642.0 |
| ROSE MINI PARADE PICK | $22,898.0 |
| ROSE VICTORY CARD PICK | $22,042.0 |
| ROSE MINI PALACE PICK | $6,497.7 |
| PARADE ROSE CARD W/PICK SAMS | $4,066.5 |
| ROSE TIFFANY PICK | $5,265.0 |
| ROSE TIFFANY CARD PICK | $5,286.2 |
| BREAST CANCER AWARNESS-M.ROSE | $1,677.2 |
| PITCHER PLANT PICK | $2,191.0 |
| MIKADO CARD W/PICK | $582.7 |
| ORNAMENTAL PEPPER CARD PICK | $428.4 |
| OREGANO PICK | $429.4 |

| | |
|---|---|
| POMEGRANATE PICK | $2,847.6 |
| CYCLAMEN CARD/PICK | $476.0 |
| CYCLAMEN CARD W-PICK SAMS | $1,316.1 |
| ECHEVERIA CARD PICK | $1,605.0 |
| EUROPEAN TREE PICK | $425.1 |
| EUROPEAN TREE GOLDEN PICK | $249.7 |
| ITALIAN STONE PINE PICK | $1,733.9 |
| EARTH DAY CARK PICK | $1,057.6 |
| INT. WOMAN'S DAY CARD SFWY | $332.9 |
| DECK THE HALLS-ITALIAN PINE | $863.5 |
| LIGHT YOUR OWN TREE/EURO TREE | $214.0 |
| BUTTERFLY BUSH INSERT CARD H/D | $44.0 |
| BLUEBERRY INSERT CARD | $247.6 |
| RED RASPBERRY INSERT CARD H/D | $65.1 |
| BLACKBERRY SHAWNEE INSERT CARD | $115.8 |
| GRAPE FLAME INSERT CARD | $81.1 |
| GRAPE CONCORD INSERT CARD | $451.6 |
| GRAPE NIAGARA INSERT CARD | $602.2 |
| GRAPE THOMPSON INSERT CARD | $115.8 |
| WISTERIA INSERT CARD H/D | $43.4 |
| INDOOR FLW T-STAKE SPANISH | $59.2 |
| INDOOR FOL T-STAKE SPANISH | $140.6 |
| ORCHID T-STAKE SPANISH | $56.8 |
| INDOOR FLOWERING STAKE H/DEPOT | $324.0 |
| CAMPANULA GET MEE BLUE ONLY ST | $745.7 |
| DAHLIA CARE STAKE | $106.4 |
| HERBS-MINT CARE STAKE | $76.7 |
| HERB-ROSEMARY CARE STAKE | $76.7 |
| HERB-SAGE CARE STAKE | $105.1 |
| CROCUS - SPRING BRITE '02 | $138.2 |
| BLOOMRITE GENERIC I STAKE | $833.0 |
| CLOVER FOUR LEAF STAKE | $5,259.6 |
| DAFFODIL CARD PICK | $2,631.3 |
| DAFFODIL-MINI SPRING BRITE BLB | $75.1 |
| IRIS CARE STAKE SP BRITE 02 | $307.1 |
| HYACINTH CARD PICK | $1,534.9 |
| HYACINTH SPRING BRITE STAKE | $72.0 |
| KALE STAKE | $291.6 |
| TULIP CARD PICK | $1,878.9 |
| GENERIC STAKES TJ | $4,491.6 |
| ROSE STAKES TJ | $6,548.3 |
| ROSE MINI PARADE STAKE | $3,221.7 |
| MINI ROSE GENERIC I CARE STAKE | $843.5 |
| BONSAI KENGAI FOLDED HG TAG | $1,554.8 |
| FL BAMBO HG TAG SGL PAGE | $5,621.2 |
| FL BONSAI HG TAG SGL PAGE | $2,700.0 |
| FL BONSAI CARMONA HG TAG | $123.0 |
| FL BONSAI KOONTI PALM HG TAG | $820.0 |
| CALANDIVA HG TAG | $853.3 |
| GRAPE CABERNET HG TAG | $1,419.0 |
| AZALEA HG TAG ON STRING | $218.2 |
| KALANCHOE HG TAG ON STRING | $1,449.0 |
| CORNUCOPIA HG TAG | $334.8 |
| HEBE NEW ZEALAND HG TAG | $201.2 |
| ORIENTAL LILY HNG CARD | $1,592.0 |

| | |
|---|---|
| ORCHID ASSORTED HG TAG | $5,093.9 |
| ORCHID PHAL HANG TAG | $7,095.0 |
| ORCHID PHALAENOPSIS HNG CARD | $5,745.6 |
| ZYGO CACTUS HG TAG | $22.6 |
| PATIO ROSE TREE HG TAG | $84.2 |
| ROSE T&C - LEXINGTON HG TAG | $232.5 |
| ROSE T&C - MANHATTAN HG TAG | $232.6 |
| ROSE T&C - TAOS HG TAG | $59.4 |
| CASTLE ROSE HG TAG | $702.0 |
| WATER IMMEDIATELY | $2,736.0 |
| BONSAI CARE INSTRUCTIONS | $442.8 |
| BLACKBERRY SHAWNEE HNG TAG | $719.5 |
| BLUEBERRY MISTY HNG TAG | $679.2 |
| BLUEBERRY SHARPBLUE HNG TAG | $734.6 |
| BLUEBERRY GENERIC W/TWIST TIE | $50.1 |
| BLUEBERRY BLUE CROP HNG TAG WM | $118.4 |
| BLUEBERRY HG TAG H/D | $34.6 |
| BLUEBERRY BLUECROP OVAL WM | $104.7 |
| BLUEBERRY JERSEY HNG TAG WM | $116.2 |
| BLUEBERRY JERSEY OVAL TAG WM | $104.7 |
| BLUEBERRY MISTY HNG TAG WM | $560.5 |
| BLUEBERRY MISTY OVAL TAG WM | $224.0 |
| BLUEBERRY SHARPBLUE HNG TAG WM | $527.0 |
| BLUEBERRY SHARPBLUE OVAL WM | $168.0 |
| BUTTERFLY BUSH HNG TAG | $264.8 |
| CONCORD GRAPE OVAL STICKER | $5.2 |
| GRAPE CONCORD HG TAG | $488.7 |
| GRAPE NIAGARA HG TAG H/D | $489.9 |
| GRAPE FLAME HG TAG | $322.7 |
| GRAPE THOMPSON HG TAG H/D | $245.9 |
| GRAPE THOMPSON HG TAG | $285.8 |
| GRAPE THOMPSON SEEDLES HNG TAG | $253.0 |
| GRAPE FLAME SEEDLESS HNG TAG | $530.3 |
| GRAPE NIAGARA HNG TAG | $136.2 |
| GRAPE CONCORD HNG TAG | $136.2 |
| POMEGRANATE HNG TAG | $484.9 |
| POMEGRANATE OVAL STICKER | $509.6 |
| BLACKBERRY THORNLESS HG TAG WM | $302.3 |
| BLACKBERRY THORNLESS OVAL WM | $160.0 |
| RED RASPBERRY HERITAGE HNG TAG | $1,011.9 |
| RASPBERRY RED HERITAGE OVAL WM | $223.2 |
| RED RASPBERRY OVAL TAG WM | $80.0 |
| WISTERIA HG TAG H/D | $27.7 |
| WISTERIA HNG TAG | $275.3 |
| BUTTERFLY BUSH HG TAG H/D | $29.0 |
| 12 RND SISAL LINER | $229.2 |
| 15 NATURAL BURLAP W/LINER | $2,121.8 |
| 15 LAVENDER FABRI SQ. | $542.8 |
| 15 LITE YELLOW FABRI SQ. | $668.0 |
| 15 PINK FABRI | $618.8 |
| 17 GREEN FABRI | $1,000.8 |
| 17 ORANGE FABRI SQ | $475.4 |
| 17 FABRI PINK SQ | $420.0 |
| 17 YELLOW FABRI SQ | $1,350.0 |
| 20 ROOGANZA LINER SHEET RED | $502.3 |

| | |
|---|---|
| 20 ROOGANZA LINER SHEET PINK | $504.0 |
| 20 PINK FABRI | $672.0 |
| 20 YELLOW FABRI | $421.2 |
| 22 PINK SCALLOP FABRI | $1,400.0 |
| 2 ROSE EMBOSSED GREEN | $286.4 |
| 2 TUSCAN GREEN EMBOSS 577U | $609.0 |
| 2 GLITTER PVC | $774.7 |
| 3 PVC POT - BLUE 539 RND TGT | $83.4 |
| 3 COPPER SHINY PVC | $3,041.0 |
| 4 PVC POT - RED METALLIC | $1,361.4 |
| 5 PVC POT RED METALLIC RND | $4,490.1 |
| 6 PVC POT PINK 238 | $1,650.8 |
| 6 LEAF VINE EMBOSS | $1,750.3 |
| 6AZ RED EMBOSS HEARTS | $873.6 |
| 6AZ PINK EMBOSS HEARTS | $873.6 |
| 6 AZ PINK HEART SWIRL SQ | $896.4 |
| 7 PVC POT - GREEN 5777U | $4,588.9 |
| 4.5 WOOD GRAIN COPPER SORBET | $1,368.0 |
| 4 PVC MINI PLEAT SORBET TJ | $19,133.7 |
| 4 PVC CUPCAKE PURPLE SORBET | $41,183.3 |
| 4 PVC CUPCAKE ASST.SORBET WM | $1,492.9 |
| CHILI PEPPER SLIP COVER | $1,996.9 |
| 5 1/2 DEKO COVER WHITE DEEP | $473.4 |
| GARDEN CLEMATIS MERCH JACKET | $5,145.7 |
| CROCUS ANGLE TOP TIN JACKET | $44.7 |
| HYACINTH ANGLE TOP TIN JACKET | $40.7 |
| ROSE TOWNE&COUNTRY MERCH JCKT | $1,638.4 |
| PASSION VINE MERCH JACKET | $303.4 |
| CORNWALL HYAC/JAN BOS PINK TJ | $135.8 |
| CORWALL HYAC/DELFT BLUE TJ | $139.7 |
| CORWALL NARC/PAPER WHITE TJ | $155.2 |
| 30 SOFT PINK/PINK | $364.0 |
| 15 WINTER BROCADE RED | $3,712.8 |
| 15 CHANEL SCF FRST WHT-GRN SFW | $168.4 |
| 15 TWIST & TWIRL W/GRN FRT/MET | $446.7 |
| 15 SATIN STARBURST/FROST GRN | $1,641.2 |
| 15 ALLEGRO GRN-SLV/SILVER BACK | $1,989.0 |
| 15 INTERMEZZO RED/GOLD/GLD BAC | $2,121.6 |
| 15 PATRIOTIC WRAP | $221.4 |
| 15 YELLOW-GREEN FLIP SHEET | $309.3 |
| 15 HAMILTON PLAID RED/GOLD BAC | $2,917.2 |
| 15 WINTER BROCADE METALLIC | $928.2 |
| 24 ORANGE GRID | $2,266.4 |
| 20 INTERMEZZO SIL/GRN/SLVR BAC | $638.4 |
| 20 BLUE BANDANA | $1,038.8 |
| 24 FANCY CLEAR/RUST FROST SFWY | $447.3 |
| 24 CHANEL CHOCO ORG-YELL-RUST | $2,875.5 |
| 24 HUNTER GREEN | $156.8 |
| 24 ORANGE ALLEGRO/FROST DK RED | $421.7 |
| 24 LINEN GOLD | $1,120.0 |
| 15 COPPER FLORAL TRELLIS | $1,840.8 |
| 15 ORANGE FLORAL TRELLIS | $1,534.0 |
| 15 CRANBERRY FLORAL TRELLIS | $1,840.8 |
| 15 PINE FLORAL TRELLIS | $1,994.2 |
| 15 SILVER FLORAL TRELLIS | $1,994.2 |

| | |
|---|---:|
| 9 RED WHT STRIPE/RED BACK SQ | $240.5 |
| 12 ARGYLE RED-WHITE/RED BACK | $746.9 |
| 12 CHAMBRAY BURGANDY/GREEN BAC | $960.3 |
| 12 WINTER BROCADE METALLIC | $746.9 |
| 20 WINTER BROCADE RED | $1,879.2 |
| 14 GOLD-BURGNDY PLAID/BURG BCK | $300.0 |
| 14 ROYAL PLAID #2/GOLD BACK | $225.0 |
| 14 PATCHWORK W/RED BACK | $225.0 |
| 22 TWINKLE RED/SILVER BACK | $1,240.5 |
| 22 WINTER SPECTRUM GOLD/RED BK | $496.2 |
| 22 MAJESTIC STRIPE BURG/GOLD | $783.0 |
| 13 RED PLAID/GREEN BACK | $1,259.7 |
| 13 ACANTHUS RED & GOLD/GLD BCK | $770.0 |
| 13 ROYAL STRIPE #3/GOLD BACK | $630.0 |
| 24 WINTER BROCADE RED | $1,699.8 |
| 15 HIGHLAND PAPEL SAGE SUPVALU | $252.0 |
| 15 NE FLORAL TRELLIS GREEN/GRN | $2,147.6 |
| 15 NE FLORAL TRELLIS PINK/PINK | $2,914.6 |
| 15 NE FLORAL TRELLIS ORNG/YELL | $11,658.4 |
| 15 NE FLORAL TRELLIS LAV/PURP | $613.6 |
| 24 CHAMBRAY SILVER & BLACK | $533.6 |
| 15 TWINKLE BLUE/SILVER BACK | $265.2 |
| 15 CHAMBRY SILVER/GOLD BACK | $420.0 |
| 15 CHANE SCARF WHT FROST/GRN | $257.0 |
| 30 RED PLAID/GREEN BACK | $722.4 |
| 24 ORANGE LOTUS HEB | $119.5 |
| 8 PINK CELLO | $592.2 |
| 12 SILVER SHIMMER SQ CELLO | $239.2 |
| 13 YELLOW CELLO | $51.6 |
| 14 YELLOW CELLO SQ. | $366.8 |
| 14 GREEN CELLO SQ. | $419.2 |
| 14 PINK CELLO SQ. | $366.8 |
| 15 GREEN CELLO | $401.8 |
| 15 YELLOW CELLO SQ. | $1,894.2 |
| 15 LAVENDER CELLO SQ. | $459.2 |
| 15 HOT PINK CELLO SQ. | $134.4 |
| 17 LT PINK CELLO | $171.9 |
| 20 GREEN SQ CELLO | $1,008.0 |
| 20 PINK SQ CELLO | $352.4 |
| 24 PINK SQ CELLO | $403.2 |
| 24 COPPER SQ CELLO | $2,116.8 |
| 09 SPRING BOW PICK YEL/PNK AST | $1,438.4 |
| 08 VDAY FLOCKED HEART PICK | $134.5 |
| 4IN STRIBBON-GOLD | $908.0 |
| 4 'STICKY' PAPER TWIST TIE | $4,984.0 |
| GOLFER BONSAI PICK | $3,358.7 |
| FISHERMAN BONSAI PICK | $3,788.2 |
| BOAT BONSAI PICK | $3,416.3 |
| 03 GRADUATION CAP/SKROLL PICK | $1,174.8 |
| FLAG PICK '09 | $1,773.6 |
| CANDLE HOLDERS-PLASTIC | $680.1 |
| CNDLHLDR PLSTC W/12"ORG CNDL | $893.6 |
| BUTTERFLY SINGLE 7" PICK | $475.5 |
| 07E BIRDNEST PICK | $815.0 |
| 07 RED GLITTER HEART PICK | $103.9 |

| | |
|---|---:|
| TWIG GARLAND WREATH PICK ASST | $285.6 |
| FELT LAYERED BUTTERFLY PICK 10 | $6.5 |
| FELT LAYERED BIRD PICK 2010 | $387.1 |
| CANDLE ORANGE 10 | $67.2 |
| GHOULISH GREETER FELT PICK | $16.0 |
| GHOULISH GREETING BLACK PICK | $58.1 |
| 07 CMAS BULBS CLAY PICK | $134.8 |
| 07 RED FRUIT/FLORAL BOUQ PICK | $2,147.4 |
| 08 GARLAND/CLEAR BOX SLVR/GOLD | $495.3 |
| GARLAND CANDY/P.CONE/STAR MULT | $4,487.6 |
| HAMMERED TIN STAR PICK LG 5" | $463.7 |
| HAMMERED TIN STAR PICK LG 7" | $5,341.6 |
| GLITTER PINECONE NAT-SIL PICK | $43.5 |
| GLITTER PINECONE 6 ARM NAT-SIL | $336.7 |
| 07 CANDY TOPPER | $266.1 |
| 5 METAL SNOWFLAKE PICK ASST WM | $8,449.5 |
| 06C15 DOVE W/BOWS | $275.9 |
| DOVE PICK | $399.3 |
| PINE CONE 3/PER PICK | $681.4 |
| 3E09 RED XMAS TREE(FIMO) PICK | $933.9 |
| 3E09 5 PER GLITER BALLS MULTI | $1,429.1 |
| 4E09 3 RED FELT CARDINALS PICK | $3,690.1 |
| 6E09 GOLD CONE/BERRY/LVS BOUQT | $1,152.8 |
| 4P09 BURLAP FEED BAG TOPPER | $1,064.4 |
| KRIS KRINGLE FACE | $40.8 |
| NATRL PCONE W/FALL LVS PICK | $870.8 |
| 12 SISAL HEART PICK | $215.4 |
| 18 BIRCH BRANCHES PICK | $1,007.0 |
| 28 SILK BIRD OF PARADISE | $1,065.0 |
| 6.5 AZ M/DAY DK PNK/LT PINK | $362.6 |
| 6 AZ STRIPE PCVR | $408.0 |
| 6 AZ MONACO LILAC PCVR | $136.1 |
| 6 AZ MONACO PEACH PCVR | $135.0 |
| 6 AZ MONACO PINK PCVR | $136.1 |
| 6 AZ MONACO GREEN PCVR | $226.8 |
| 7 GOLD METALLIC PCVR | $4,351.2 |
| 7 RED METALLIC PCVR | $2,672.1 |
| ASST POT HANGERS IN DSPLY POT | $101.5 |
| 5 SNOWMAN POT HANGER | $14.5 |
| 5 CHRISTMAS POT HANGER 91727 | $5,359.2 |
| 28 ILLUSION PINWHEEL STAKE AST | $163.3 |
| 24 ILLUSION PINWHEEL STAKE 08 | $74.1 |
| FANCIFUL BUNNY STATUE '08 | $5,300.5 |
| PENNSYLVANIA DUCK '08 | $615.0 |
| LANDSEER LION COLL '08 | $9,636.9 |
| FOUR SEASONS COLL '08 | $555.7 |
| HARVEST DUET CRATE '08 | $443.8 |
| HARVEST FESTIVAL PUMPKIN COLL | $3,087.7 |
| 9 KING PENGUIN CRMC 08 | $1,128.1 |
| 13 KING PENGUIN CRMC 08 | $2,960.1 |
| 10"HT FATHER CHRISTMAS | $2,450.4 |
| 10 POLAR BEAR CRMC COLL '07 | $3,738.8 |
| 10 ARTIC POLAR BEAR COLL '08 | $3,278.2 |
| 11 HOLLY JOLLY CMAS COLL '08 | $5,453.4 |
| 15 HOLIDAY NATURAL TREE F08 | $3,157.9 |

| | |
|---|---:|
| 18 AUTUMN BOUNTY WREATH | $117.3 |
| 11 POLY SQUIRREL | $813.4 |
| 5 LANCASTER DUCK COLL. SMALL | $3,054.4 |
| 7 GARDEN GNOMES RAIN GAUGE | $438.6 |
| 2.2# MIX RIVER STONES 90027 | $452.1 |
| 2.2# BLACK RIVER STONES 90021 | $800.9 |
| 16 OZ BLACK RIVER STONES | $881.8 |
| 20# SM BLACK RIVER STONES | $3,709.4 |
| PALLET COVER 2 MIL W/6 MO UVI | $199.1 |
| 4 SPRING BIRDHOUSE '99 62444 | $1,807.1 |
| FL-6 MODERN CLASSIC/6 FOL PREM | $2,126.3 |
| ME MED HOURGLASS CERM POT ASST | $13,086.9 |
| 4 BUTTON CERAMIC PLNTR TJ | $13,008.4 |
| 6 OLIVIA PEDESTAL CRMC POT TJ | $28,238.1 |
| 6 CHIPWOOD GINGHAM BSKT TJ | $2,152.3 |
| 4 BURLAP SACK (3 COLORS) | $11,276.0 |
| 4 FALL BRUSHSTROKE TIN TJ | $7,058.9 |
| 8X5 RUSTIC TIN WINDOWBOX | $8,593.0 |
| 4 ZOO TIN PLNTR TJ | $12,928.2 |
| MC GLAZED CER RD PETITE BAMBOO | $3,933.1 |
| PILLOW POT CERAMIC ASST SAMS | $4,453.6 |
| 13 BLACK HEAVY | $599.4 |
| 13 GRAY DRY | $250.1 |
| 15 LIME DRY | $2,026.6 |
| 18 GRAY DRY | $294.8 |
| 20 GRN DRY | $29.0 |
| 20 TURQUOISE CARTON | $689.5 |
| 28 PURPLE DRY | $224.4 |
| 40 CELL PARTITION | $415.3 |
| 15 CELL PARTITION | $1,329.8 |
| STYROFOAM PEANUTS 14 CU FT | $394.1 |
| 8X5 NATURAL WILLOW OVAL BSKT | $269.8 |
| HYDRANGEA CARD PICK | $1,288.2 |
| SEDUM - CARD W/PICK | $652.5 |
| 98 BOUQUET ROSES M/DAY | $2,037.3 |
| COFFEE MUG PO#123838 | $12,573.8 |
| Mesh/Ribbon | $326.4 |
| Mesh/Ribbon | $74.0 |
| Floral Supplies | $3,829.1 |
| Oasis | $178.0 |
| Oasis | $243.0 |
| Oasis | $445.3 |
| Asst Supplies | $272.6 |
| Asst Supplies | $493.9 |
| Moss | $72.6 |
| Ceramic Large | $6.0 |
| Ceramic Large | $2,472.3 |
| Statuary | $51.5 |
| Statuary | $192.0 |
| Statuary | $8.0 |
| Picks and Stakes | $9.1 |
| Picks and Stakes | $42.8 |
| Value Easter Items | $219.4 |
| Value Harvest Items | $131.4 |
| Value Christmas Items | $1,083.2 |

| | |
|---|---:|
| Christmas | $1,287.4 |
| Value Christmas Items | $405.2 |
| Value Christmas Items | $421.9 |
| Statuary | $82.7 |
| Christmas | $86.5 |
| Value Christmas Items | $1,105.8 |
| Value Christmas Items | $91.1 |
| Harvest | $3,525.1 |
| Value Harvest Items | $52.9 |
| Value Harvest Items | $198.0 |
| Harvest | $342.0 |
| Christmas | $1,641.6 |
| Metal Pots | $382.6 |
| Metal Pots | $17.8 |
| Ceramic Small | $51.4 |
| Value Harvest Items | $983.3 |
| Deco Beads | $104.2 |
| Ceramic Small | $209.8 |
| Ceramic Small | $232.0 |
| Ceramic Small | $217.0 |
| Statuary | $51.7 |
| Value Easter Items | $19.1 |
| Bark | $572.1 |
| Rocks | $98.0 |
| Rocks | $26.5 |
| Rocks | $89.5 |
| Liners | $382.5 |
| Liners | $56.0 |
| Liners | $14.0 |
| Liners | $21.0 |
| Liners | $29.8 |
| Liners | $28.0 |
| Liners | $60.8 |
| Liners | $72.0 |
| Liners | $20.0 |
| Liners | $49.5 |
| Liners | $162.5 |
| Fertilizer | $425.6 |
| Fertilizer | $739.2 |
| Fertilizer | $2,308.7 |
| Fertilizer | $464.0 |
| Fertilizer | $791.2 |
| Fertilizer | $729.0 |
| Fertilizer | $1,248.9 |
| Leaf Shine | $110.4 |
| Leaf Shine | $543.8 |
| Leaf Shine | $858.7 |
| Value Christmas Items | $226.8 |
| Metal Pots | $67.4 |
| Glass | $440.9 |
| Moss | $129.6 |
| Moss | $391.5 |
| Moss | $2,408.0 |
| Terra Cotta | $310.6 |
| Terra Cotta | $313.5 |

| | |
|---|---|
| Terra Cotta | $541.5 |
| Terra Cotta | $1,360.3 |
| Terra Cotta | $276.9 |
| Terra Cotta | $406.0 |
| Terra Cotta | $752.4 |
| Terra Cotta | $455.4 |
| Terra Cotta | $13.2 |
| Terra Cotta | $289.1 |
| Terra Cotta | $465.3 |
| Terra Cotta | $563.3 |
| Terra Cotta | $191.0 |
| Terra Cotta | $203.0 |
| Terra Cotta | $1,414.0 |
| Terra Cotta | $396.1 |
| Terra Cotta | $55.1 |
| Terra Cotta | $459.8 |
| Terra Cotta | $219.8 |
| Terra Cotta | $158.4 |
| Terra Cotta | $417.9 |
| Terra Cotta | $968.7 |
| Terra Cotta | $1,178.3 |
| Terra Cotta | $171.0 |
| Terra Cotta | $517.9 |
| Terra Cotta | $239.7 |
| Terra Cotta | $135.6 |
| Liners | $11.9 |
| Liners | $82.7 |
| Liners | $795.4 |
| Liners | $633.6 |
| Liners | $429.0 |
| Liners | $100.0 |
| Liners | $128.1 |
| Liners | $109.2 |
| Liners | $94.9 |
| Liners | $29.5 |
| Ceramic Small | $562.1 |
| Ceramic Small | $82.8 |
| Ceramic Small | $53.5 |
| Ceramic Small | $937.4 |
| Ceramic Small | $524.4 |
| Value Everyday Items | $423.4 |
| Value Everyday Items | $300.0 |
| Value Everyday Items | $1,343.0 |
| Ceramic Small | $407.6 |
| Terra Cotta | $70.6 |
| Value Everyday Items | $419.3 |
| Value Everyday Items | $14.0 |
| Grower Pots | $355.0 |
| Baskets | $248.6 |
| Baskets | $389.9 |
| Baskets | $972.0 |
| Baskets | $17.7 |
| Baskets | $9.7 |
| Baskets | $8.6 |
| Value Everyday Items | $82.2 |

| | |
|---|---|
| Value Everyday Items | $221.5 |
| Value Everyday Items | $891.4 |
| Value Everyday Items | $127.8 |
| Value Everyday Items | $295.4 |
| Value Everyday Items | $317.3 |
| Baskets | $2,533.4 |
| Baskets | $2,657.2 |
| Baskets | $636.6 |
| Baskets | $272.0 |
| Baskets | $446.2 |
| Baskets | $99.5 |
| Baskets | $32.4 |
| Baskets | $28.9 |
| Baskets | $412.5 |
| Value Everyday Items | $1,287.0 |
| Value Everyday Items | $21.2 |
| Value Everyday Items | $398.2 |
| Value Everyday Items | $56.6 |
| Value Everyday Items | $405.5 |
| Baskets | $16.5 |
| Baskets | $235.2 |
| Baskets | $176.4 |
| Baskets | $629.6 |
| Baskets | $541.4 |
| Value Christmas Items | $127.7 |
| Value V-Day Items | $84.6 |
| Ceramic Small | $73.1 |
| Value Easter Items | $399.4 |
| Value Easter Items | $380.2 |
| Value Everyday Items | $179.4 |
| Value Everyday Items | $18.9 |
| Value Easter Items | $4,784.0 |
| Value Mother's Day Items | $26.0 |
| Value Easter Items | $552.0 |
| Value Mother's Day Items | $39.2 |
| Value Easter Items | $129.6 |
| Value Easter Items | $397.1 |
| Value V-Day Items | $252.0 |
| Value V-Day Items | $652.8 |
| Value V-Day Items | $518.4 |
| Value Mother's Day Items | $158.4 |
| Value Christmas Items | $919.6 |
| Value Everyday Items | $168.5 |
| Value Harvest Items | $1,884.1 |
| Value Everyday Items | $51.1 |
| Value Harvest Items | $126.7 |
| Metal Pots | $108.0 |
| Value Mother's Day Items | $32.3 |
| Value Christmas Items | $726.1 |
| Value Christmas Items | $115.5 |
| Value V-Day Items | $93.6 |
| Value V-Day Items | $175.7 |
| Value V-Day Items | $1,829.1 |
| Value Christmas Items | $242.9 |
| Value Christmas Items | $319.7 |

| | |
|---|---|
| Value Easter Items | $532.8 |
| Value Everyday Items | $306.9 |
| Value Everyday Items | $479.5 |
| Value Everyday Items | $45.0 |
| Value Easter Items | $16.2 |
| Value Everyday Items | $36.0 |
| Value V-Day Items | $1,498.2 |
| Metal Pots | $10.9 |
| Metal Pots | $-- |
| Value Christmas Items | $81.0 |
| Value Christmas Items | $291.8 |
| Value Christmas Items | $177.1 |
| Value Everyday Items | $77.0 |
| Value Everyday Items | $410.4 |
| Value V-Day Items | $68.2 |
| Value V-Day Items | $60.5 |
| Value Mother's Day Items | $202.0 |
| Value Everyday Items | $64.4 |
| Value Everyday Items | $144.6 |
| Value Everyday Items | $387.0 |
| Value Everyday Items | $2,075.8 |
| Value Easter Items | $52.0 |
| V-Day | $344.3 |
| Value V-Day Items | $37.4 |
| V-Day | $199.9 |
| Ceramic Small | $93.8 |
| Value Mother's Day Items | $514.8 |
| Value Mother's Day Items | $124.0 |
| Value Everyday Items | $275.0 |
| Value V-Day Items | $3.5 |
| Value V-Day Items | $71.0 |
| Value V-Day Items | $62.4 |
| Value Christmas Items | $339.0 |
| Value Christmas Items | $314.6 |
| Value V-Day Items | $924.8 |
| Value Everyday Items | $586.3 |
| Value Christmas Items | $32.8 |
| Value Harvest Items | $23.0 |
| Harvest | $706.4 |
| Value Everyday Items | $971.9 |
| Ceramic Small | $111.6 |
| Value V-Day Items | $98.3 |
| Value Mother's Day Items | $136.1 |
| Value Everyday Items | $1,084.1 |
| Value Christmas Items | $994.5 |
| Value V-Day Items | $463.1 |
| Value V-Day Items | $193.0 |
| Glass | $75.7 |
| Ceramic Small | $48.0 |
| Value V-Day Items | $140.4 |
| Baskets | $367.2 |
| Baskets | $653.1 |
| Value V-Day Items | $34.0 |
| Baskets | $7.3 |
| Baskets | $80.0 |

| | |
|---|---:|
| Value V-Day Items | $1,487.6 |
| Value Easter Items | $204.1 |
| Value Easter Items | $677.0 |
| Value V-Day Items | $82.1 |
| Baskets | $188.8 |
| Value Harvest Items | $1,900.8 |
| Baskets | 415.8 |
| Baskets | 1071 |
| Baskets | 846.45 |
| Value Christmas Items | 1397.4 |
| Value V-Day Items | 99.2 |
| Value Everyday Items | 203.52 |
| Value Easter Items | 475.524 |
| Baskets | 51.04 |
| Value Christmas Items | 467.82 |
| Baskets | 627.9984 |
| Value Everyday Items | 419.23 |
| Value Mother's Day Items | 65.6 |
| Baskets | 38.2464 |
| Value V-Day Items | 110.96 |
| Value Everyday Items | 552.72 |
| Ceramic Small | 41.4 |
| Value Christmas Items | 105.34 |
| Value Christmas Items | 76.84 |
| Ceramic Small | 110.88 |
| Ceramic Small | 238.5 |
| Ceramic Small | 1209.12 |
| Ceramic Small | 46.2 |
| Ceramic Small | 96 |
| Ceramic Small | 313.2 |
| Ceramic Small | 2245.53 |
| Ceramic Small | 1199.22 |
| Ceramic Small | 254.1 |
| Ceramic Small | 524.7 |
| Ceramic Small | 252 |
| Ceramic Small | 881.64 |
| Ceramic Large | 485.76 |
| Ceramic Small | 436.8 |
| Ceramic Small | 19.08 |
| Ceramic Small | 9 |
| Ceramic Small | 635.58 |
| Ceramic Small | 114.84 |
| Ceramic Small | 71.28 |
| Ceramic Small | 98.01 |
| Ceramic Small | 12.46 |
| Ceramic Small | 496.32 |
| Ceramic Small | 1306.8 |
| Ceramic Small | 685.08 |
| Ceramic Small | 392.7 |
| Ceramic Small | 792 |
| Ceramic Small | 891 |
| Ceramic Small | 1267.35 |
| Ceramic Small | 306.21 |
| Ceramic Small | 35.82 |
| Ceramic Small | 1034.16 |

| | |
|---|---:|
| Ceramic Small | 1100.88 |
| Ceramic Small | 262.71 |
| Ceramic Small | 43.56 |
| Ceramic Small | 1128.87 |
| Ceramic Small | 0 |
| Ceramic Small | 1507.32 |
| Ceramic Small | 1092 |
| Ceramic Small | 308.88 |
| Ceramic Small | 374.55 |
| Ceramic Small | 475.86 |
| Ceramic Small | 161.7 |
| Ceramic Small | 535.68 |
| Ceramic Small | 302.91 |
| Ceramic Small | 105.6 |
| Ceramic Small | 126.36 |
| Ceramic Small | 88.74 |
| Ceramic Small | 77.7 |
| Ceramic Small | 203.67 |
| Ceramic Small | 179.31 |
| Ceramic Small | 166.32 |
| Baskets | 220.41 |
| Baskets | 345.84 |
| Statuary | 47.4 |
| Baskets | 282.96 |
| Baskets | 155.61 |
| Glass | 350.1 |
| Glass | 718.8 |
| Glass | 720 |
| Glass | 256.71 |
| Ceramic Small | 159.3 |
| Glass | 119.34 |
| Glass | 116.82 |
| Glass | 97.35 |
| Glass | 253.44 |
| Glass | 383.64 |
| Glass | 572.4 |
| Glass | 31.68 |
| Ceramic Small | 172.8 |
| Ceramic Small | 119.7 |
| Ceramic Large | 280 |
| Ceramic Large | 56 |
| Ceramic Large | 8 |
| Ceramic Large | 140 |
| Ceramic Large | 100 |
| Ceramic Large | 128 |
| Ceramic Large | 120.003 |
| Ceramic Large | 364 |
| Ceramic Large | 304 |
| Ceramic Large | 81 |
| Baskets | 450 |
| Baskets | 375 |
| Baskets | 300 |
| Baskets | 288 |
| Baskets | 190.5 |
| Ceramic Large | 16 |

| | |
|---|---:|
| Ceramic Large | 480 |
| Ceramic Large | 280 |
| Ceramic Small | 203.7 |
| Ceramic Small | 131.4 |
| Ceramic Small | 52.8 |
| Ceramic Small | 176 |
| Ceramic Large | 70 |
| Ceramic Large | 42 |
| Ceramic Large | 12 |
| Ceramic Large | 465 |
| Ceramic Large | 250 |
| Ceramic Large | 100 |
| Ceramic Large | 225 |
| Ceramic Large | 183.37 |
| Ceramic Large | 33.32 |
| Asst Supplies | 99.36 |
| Asst Supplies | 166.32 |
| Asst Supplies | 95.2 |
| Asst Supplies | 31.9 |
| Asst Supplies | 141.6 |
| Ceramic Small | 405 |
| Ceramic Small | 245 |
| Ceramic Small | 136 |
| Ceramic Small | 2.57 |
| Ceramic Small | 42 |
| Ceramic Small | 794.75 |
| Ceramic Small | 20.5 |
| Ceramic Small | 5.4 |
| Baskets | 0 |
| Baskets | 0 |
| Baskets | 0 |
| Baskets | 0 |
| Baskets | 0 |
| Baskets | 0 |
| Baskets | 76.5 |
| Baskets | 0 |
| Baskets | 0 |
| Baskets | 0 |
| Ceramic Large | 0 |
| Ceramic Large | 306 |
| Ceramic Large | 816 |
| Ceramic Large | 372 |
| Ceramic Large | 140 |
| Ceramic Large | 20 |
| Ceramic Large | 60 |
| Ceramic Large | 40.2 |
| Ceramic Large | 19.8 |
| Ceramic Large | 165 |
| Baskets | 1520.55 |
| Baskets | 1462 |
| Baskets | 3034.5 |
| Baskets | 455.8 |
| Baskets | 282.5 |
| Baskets | 1778.7 |
| Baskets | 1809.3 |

| | |
|---|---:|
| Baskets | 332.8 |
| Ceramic Large | 108 |
| Ceramic Large | 8.4 |
| Ceramic Small | 3.8 |
| Ceramic Small | 622.05 |
| Ceramic Small | 56.05 |
| Ceramic Small | 77.5 |
| Ceramic Small | 788.62 |
| Moss | 949 |
| Value V-Day Items | 153.36 |
| Glass | 1017.36 |
| Glass | 138.18 |
| Glass | 1073.42 |
| Glass | 83.16 |
| Ceramic Small | 36.75 |
| Ceramic Small | 206.5 |
| Ceramic Small | 24 |
| Ceramic Small | 10 |
| Ceramic Small | 40 |
| Ceramic Small | 405 |
| Ceramic Small | 680.4 |
| Ceramic Small | 57 |
| Ceramic Small | 104 |
| Ceramic Small | 2.25 |
| Value V-Day Items | 265.68 |
| Christmas | 170.31 |
| Value Everyday Items | 248.96 |
| Christmas | 115.2 |
| Ceramic Small | 516 |
| Glass | 170.2 |
| Ceramic Small | 451.08 |
| Ceramic Small | 61.93 |
| Ceramic Small | 371.58 |
| Christmas | 400.04 |
| Mesh/Ribbon | 31.74 |
| Value Harvest Items | 377.6 |
| Value Harvest Items | 50.4 |
| Value Harvest Items | 926.8 |
| Mesh/Ribbon | 975.66 |
| Value Christmas Items | 320.86 |
| Value Christmas Items | 217.44 |
| Value Christmas Items | 282.72 |
| Ceramic Small | 79.2 |
| Ceramic Small | 42 |
| Value Harvest Items | 544.44 |
| Value Harvest Items | 50.4 |
| Baskets | 255 |
| Baskets | 3087.36 |
| Baskets | 292.24 |
| Baskets | 173.28 |
| Value Harvest Items | 478.72 |
| Ceramic Small | 18 |
| Ceramic Small | 76.8 |
| Value Everyday Items | 5971.2 |
| Ceramic Small | 2952.63 |

| | |
|---|---|
| Value Everyday Items | 2193.92 |
| Value Everyday Items | 92.16 |
| Value Everyday Items | 374.4 |
| Value Everyday Items | 218.88 |
| Ceramic Small | 4466 |
| Value Everyday Items | 1808.04 |
| Rocks | 1212.12 |
| Ceramic Small | 183.3 |
| Ceramic Small | 15 |
| Christmas | 237.048 |
| Christmas | 2297.96 |
| Christmas | 170.436 |
| Baskets | 101.64 |
| Value Everyday Items | 14.76 |
| Ceramic Small | 1.208 |
| Metal Pots | 237.6 |
| Metal Pots | 326.4 |
| Christmas | 73.664 |
| Christmas | 146.56 |
| Mesh/Ribbon | 602.8 |
| Christmas | 71.604 |
| Ceramic Small | 23.8 |
| Ceramic Small | 77.4 |
| Ceramic Small | 97.2 |
| Value Everyday Items | 809.1 |
| Picks and Stakes | 252.85 |
| Terra Cotta | 182 |
| Ceramic Small | 21 |
| Glass | 466.4 |
| Glass | 370 |
| Glass | 15.5 |
| Glass | 81.6 |
| Ceramic Small | 141 |
| Value V-Day Items | 6.82 |
| Oasis | 363.61 |
| Ceramic Small | 25 |
| Value Christmas Items | 183.57 |
| Ceramic Small | 37.5 |
| Value Christmas Items | 355.2 |
| Value Christmas Items | 218.46 |
| Value Christmas Items | 767.52 |
| Value Christmas Items | 255.36 |
| Value Christmas Items | 570.96 |
| Rocks | 503.2 |
| Mesh/Ribbon | 49.14 |
| Christmas | 200 |
| Ceramic Small | 217 |
| Ceramic Small | 409.5 |
| Ceramic Small | 25 |
| Ceramic Small | 645 |
| Ceramic Small | 261 |
| Ceramic Small | 1077.75 |
| Ceramic Small | 86.4 |
| Terra Cotta | 76.13 |
| Terra Cotta | 143.26 |

| | |
|---|---|
| Terra Cotta | 147.07 |
| Terra Cotta | 122.72 |
| Terra Cotta | 800.8 |
| Value Everyday Items | 0 |
| Value Christmas Items | 311.64 |
| Ceramic Small | 21.4 |
| Value Everyday Items | 51.6 |
| Value Everyday Items | 97.96 |
| Value Everyday Items | 47.56 |
| Bark | 284.76 |
| Ceramic Small | 174 |
| Value Everyday Items | 230.04 |
| Ceramic Small | 65 |
| Terra Cotta | 44.1 |
| Ceramic Small | 1743 |
| Value Everyday Items | 5.64 |
| Ceramic Large | 67.56 |
| Ceramic Large | 127.26 |
| Ceramic Large | 238.74 |
| Ceramic Large | 61.15 |
| Fountains | 1636.7 |
| Ceramic Small | 126.75 |
| Ceramic Small | 1.01 |
| Terra Cotta | 11.25 |
| Terra Cotta | 297.95 |
| Terra Cotta | 171 |
| Terra Cotta | 1258.18 |
| Terra Cotta | 57 |
| Terra Cotta | 118.75 |
| Ceramic Small | 108 |
| Ceramic Large | 928 |
| Ceramic Large | 13.78 |
| Ceramic Small | 99 |
| Ceramic Small | 120 |
| Ceramic Small | 103.68 |
| Baskets | 384.42 |
| Baskets | 58.08 |
| Christmas | 1137.136 |
| Christmas | 119.45 |
| Harvest | 232.368 |

**Inventory Advances for Hardgoods**

| | |
|---|---|
| Soil | 85000 |
| Grower Pots | 71000 |
| X'mas deco picks | 55000 |
| X'mas deco picks | 71000 |
| Sorbet Pots | 40000 |
| Deco containers | 30000 |
| Deco containers | 25000 |
| Baskets | 7000 |
| Fall deco items | 8000 |
| Picks/plant tags | 68000 |
| X'mas tree sleeves | 50000 |
| **Total Hardgoods** | **$2,800,913.0** |

**SOFTGOODS**

| Description | Total |
|---|---|
| GET MEE    NO DECO | $1,029.8 |
| GET MEE    NO DECO | $15,228.4 |
| GET MEE    NO DECO | $29,071.9 |
| GET MEE    NO DECO | $31,820.5 |
| GET MEE    NO DECO | $28,785.2 |
| GET MEE    NO DECO | $28,013.3 |
| GET MEE    NO DECO | $26,019.2 |
| GET MEE    NO DECO | $14,804.5 |
| GET MEE    NO DECO | $22,395.3 |
| GET MEE    NO DECO | $20,976.5 |
| GET MEE    NO DECO | $19,685.4 |
| GET MEE    NO DECO | $21,525.0 |
| GET MEE    NO DECO | $19,552.4 |
| GET MEE    NO DECO | $220.5 |
| GET MEE    NO DECO | $889.1 |
| GET MEE    NO DECO | $922.2 |
| GET MEE    NO DECO | $5,203.9 |
| GET MEE    NO DECO | $3,792.3 |
| GET MEE    NO DECO | $3,308.0 |
| GET MEE    NO DECO | $3,820.1 |
| GET MEE    NO DECO | $3,410.1 |
| WHITE WONDER  NO DECO | $3,126.5 |
| WHITE WONDER  NO DECO | $832.3 |
| WHITE WONDER  NO DECO | $6,938.5 |
| WHITE WONDER  NO DECO | $10,318.3 |
| CLEMATIS CONE no deco | $12,860.6 |
| CLEAMTIS FAN TRELLIS NO DECO | $44,917.5 |
| ECHEVERIA METALLICA NO DECO | $2,212.0 |
| ORCHID PHALAENOPSIS NO DECO | $9,378.3 |
| ORCHID PHALAENOPSIS  NO DECO | $9,769.4 |
| ORCHID PHALAENOPSIS  NO DECO | $28,890.8 |
| ORCHID PHALAENOPSIS  NO DECO | $4,927.3 |
| ORCHID PHALAENOPSIS  NO DECO | $5,164.9 |
| ORCHID PHALAENOPSIS  NO DECO | $18,265.8 |
| ORCHID PHALAENOPSIS  NO DECO | $122,551.5 |
| ORCHID PHALAENOPSIS  NO DECO | $9,036.9 |
| ORCHID PHALAENOPSIS  NO DECO | $8,415.1 |
| ORCHID PHALAENOPSIS  NO DECO | $8,291.6 |
| ORCHID PHALAENOPSIS  NO DECO | $8,581.2 |
| ORCHID PHALAENOPSIS  NO DECO | $7,226.6 |
| ORCHID PHALAENOPSIS  NO DECO | $8,471.0 |
| ORCHID PHALAENOPSIS  NO DECO | $11,468.7 |
| ORCHID PHALAENOPSIS  NO DECO | $1,881.1 |
| ORCHID PHALAENOPSIS  NO DECO | $7,040.5 |
| ORCHID PHALAENOPSIS  NO DECO | $628.7 |
| ORCHID PHALAENOPSIS  NO DECO | $2,981.0 |
| ORCHID PHALAENOPSIS  NO DECO | $1,439.8 |
| ORCHID PHALAENOPSIS  NO DECO | $4,339.7 |
| ORCHID MILTONIOPSIS no deco | $5,610.8 |
| ORCHID ODONTOGLOSSUM | $6,253.8 |
| ORCHID ODONTOGLOSSUM | $12,901.2 |
| ORCHID ODONTOGLOSSUM | $15,598.6 |
| ORCHID ODONTOGLOSSUM | $3,905.3 |

| | |
|---|---|
| ORCHID PAPHIOPEDILUM  no deco | $7,012.1 |
| ORCHID PAPHIOPEDILUM  no deco | $1,922.7 |
| ORCHID MILTONIA | $2,880.0 |
| ORCHID PHALAENOPSIS | $6,400.0 |
| ORCHID ODONTOGLOSSUM | $4,243.3 |
| CHILL OUT CHILI no deco | $17,308.5 |
| CHILL OUT CHILI no deco | $37,917.3 |
| CHILL OUT CHILI no deco | $38,499.4 |
| CHILL OUT CHILI no deco | $8,895.1 |
| CHILL OUT CHILI no deco | $19,274.8 |
| ROSE MINI NO DECO | $2,801.0 |
| ROSE MINI NO DECO | $2,250.1 |
| ROSE MINI NO DECO | $3,016.6 |
| ROSE MINI NO DECO | $2,883.0 |
| ROSE MINI NO DECO | $6,070.1 |
| ROSE MINI NO DECO | $23,213.9 |
| ROSE MINI NO DECO | $14,283.1 |
| ROSE MINI NO DECO | $25,076.9 |
| ROSE MINI NO DECO | $9,647.4 |
| ROSE MINI NO DECO | $12,352.0 |
| ROSE MINI NO DECO | $13,434.2 |
| ROSE MINI NO DECO | $11,102.4 |
| ROSE MINI NO DECO | $11,801.5 |
| ROSE MINI NO DECO | $3,736.2 |
| ROSE NO DECO | $806.9 |
| ROSE NO DECO | $7,540.3 |
| HELLEBORUS NO DECO | $70,161.8 |
| VICTORY ROSE NO DECO | $2,277.3 |
| VICTORY ROSE NO DECO | $14,743.4 |
| VICTORY ROSE NO DECO | $13,714.2 |
| VICTORY ROSE NO DECO | $12,884.6 |
| VICTORY ROSE NO DECO | $15,995.2 |
| VICTORY ROSE NO DECO | $25,852.9 |
| VICTORY ROSE NO DECO | $10,660.0 |
| VICTORY ROSE NO DECO | $9,446.6 |
| VICTORY ROSE NO DECO | $9,003.6 |
| VICTORY ROSE NO DECO | $8,587.7 |
| VICTORY ROSE NO DECO | $16,308.8 |
| VICTORY ROSE NO DECO | $8,033.9 |
| IVY ASST | $75.2 |
| POTHOS | $31.1 |
| ITAL STONE PINE GREEN NO DECO | $5,052.0 |
| ITAL STONE PINE GREEN NO DECO | $1,795.0 |
| ITALIAN STONE PINE NO DECO | $58,445.6 |
| ITALIAN STONE PINE NO DECO | $107,505.9 |
| ITALIAN STONE PINE NO DECO | $75,133.8 |
| ITALIAN STONE PINE NO DECO | $6,742.2 |
| ITALIAN STONE PINE NO DECO | $13,870.0 |
| ITALIAN STONE PINE  NO DECO | $45,285.5 |
| ITALIAN STONE PINE  NO DECO | $76,261.3 |
| ITALIAN STONE PINE  NO DECO | $8,822.5 |
| ITALIAN STONE PINE  NO DECO | $3,144.3 |
| EUROPEAN TREE NO DECO GREEN | $6,832.0 |
| EUROPEAN TREE NO DECO GREEN | $98,490.5 |
| EUROPEAN TREE NO DECO GREEN | $118,261.7 |

| | |
|---|---|
| EUROPEAN TREE NO DECO GREEN | $24,993.8 |
| EUROPEAN TREE NO DECO GREEN | $13,368.4 |
| EURO TREE GOLDEN NO DECO | $17,176.6 |
| EUROPEAN TREE NO DECO 20/CS | $42,574.9 |
| EUROPEAN TREE NO DECO 20/CS | $144,489.5 |
| EUROPEAN TREE NO DECO 20/CS | $80,981.8 |
| EUROPEAN TREE NO DECO 20/CS | $53,756.8 |
| EUROPEAN TREE NO DECO 20/CS | $2,709.5 |
| EUROPEAN TREE NO DECO 20/CS | $22,103.7 |
| EUROPEAN TREE NO DECO 20/CS | $11,946.0 |
| EURO TREE GOLDEN NO DECO | $10,059.9 |
| EURO TREE GOLDEN NO DECO | $575.8 |
| EUROPEAN TREE NO DECO | $65,358.8 |
| EUROPEAN TREE NO DECO | $42,132.0 |
| EUROPEAN TREE GREEN NO DECO | $56,567.3 |
| EUROPEAN TREE GREEN NO DECO | $1,115.0 |
| EURO TREE GOLDEN  no deco | $22,141.3 |
| EURO TREE GOLDEN  no deco | $8,167.7 |
| CORKSCREW GRASS(JUNCUS)no deco | $12,708.2 |
| VENUS/CARNIVORUS/NEW DISPLAY | $12,187.6 |
| VENUS/CARNIVORUS/NEW DISPLAY | $9,232.4 |
| VENUS FLY TRAP CELLS | $4,116.0 |
| 4" SCF-Aloe Vera T/C | $962.6 |
| 6" SCF- Aloe Vera | $46.9 |
| 4" SCF-Frost Sq Glass/Bamboo | $604.9 |
| 4" SCF-Rect Crmc/Bamboo | $626.1 |
| 4" SCF-Rect Crmc/Bamboo/Silk | $290.7 |
| 4" SCF-Frost Rd Glass/Bamboo/Silk | $2,527.8 |
| 4" SCF-Rect Crmc/Bamboo Trellis | $5,266.2 |
| 4" SCF-Ceramic O/Bamboo | $2,761.7 |
| 2" SCF-Cactus/Succlnt Glazed Crmc | $479.8 |
| 3" SCF-Star Cactus in Glazed Pot | $127.9 |
| 3" SCF- Cactus-Succulents Glz/Ped | $715.9 |
| 4" SCF-Succulents Clay | $368.5 |
| SCF-Spoon Succulent Garden Med | $1,295.4 |
| 4" SCF-Jade in Terra Look Pot | $61.4 |
| 3" SCF-Mod Classic/Bam/Petit/Silk | $307.9 |
| 6 IN WC CERAMIC ORCHID GARDEN | $95.3 |
| 4 IN WC PLANTED ORCHID GARDEN | $131.8 |
| 6 IN INDOOR TROPICAL/MODERN ELEMENTS | $78.9 |
| 5 IN FFL-MODERN CLASSIC/5 FOL PREM | $73.6 |
| 3 IN BONSAI/MODERN GLAZED PHOTO | $246.6 |
| 4X6 IN BONSAI/MODERN GLAZED PHOTO | $313.0 |
| 3 IN BAMBOO 3 STEM W/SILK | $13.1 |
| 3 IN MODERN CLASSIC BONSAI | $860.4 |
| 8 IN WC CLAY GARDEN-BROMELIADS 3per | $16.4 |
| 6 IN WC CLAY GARDEN WITH CACTUS | $27.8 |
| 12 IN WC TROPICAL GARDEN LARGE | $121.2 |
| 10 IN WC TROPICAL GARDEN | $88.0 |
| 8 IN WC TROPICAL GARDEN | $39.4 |
| 15 IN WC ORCHID BORABORA  GARDEN | $54.1 |
| 14 IN WC ORCHID BOWL | $354.6 |
| 12 IN WC ORCHID BOWLS | $510.3 |
| 6 IN WC ASST DISH GARDEN PLANTED | $493.7 |
| 4 IN WC SMALL DISH GARDEN ASST PLNT | $287.5 |

| | |
|---|---|
| 13 IN WILL CALL BLOOMING BASKET | $22.4 |
| 12 IN WILL CALL BLOOMING BSKT SPECAL | $205.7 |
| 10 IN WILL CALL BLOOMING BSKT SPECAL | $122.8 |
| 9 IN WILL CALL ORCHID GARDEN | $424.3 |
| 9 IN WILL CALL BLOOMING BSKT SPECAL | $258.8 |
| 8 IN WILL CALL BLOOMING BSKT SPECAL | $252.9 |
| 7 IN WILL CALL BLOOMING BSKT SPECAL | $444.6 |
| 6 IN WILL CALL BLOOMING BASKET | $327.9 |
| 5 IN WILL CALL BLOOMING BSKT SPECAL | $211.8 |
| 3 IN VENUS/CARNIVORUS DSPLY  W/CALL | $507.4 |
| 6 IN SPATHIPHYLLUM EX LARGE | $438.2 |
| 3 IN SPATHIPHYLLUM | $147.0 |
| 8 IN POLE POTHOS | $272.1 |
| 6 IN POTHOS POLES | $334.3 |
| 10 IN PALM MAJESTY EXCLUSIVE | $248.0 |
| 17 IN SAGO PALM | $400.0 |
| 14 IN PALM SAGO | $485.4 |
| 10 IN PALM SAGO | $156.0 |
| 6 IN PALM SAGO | $761.3 |
| 7 GAL HI KENTIA PALM 6' | $2,958.0 |
| 5 GAL HI KENTIA PALM 5ft | $1,950.5 |
| HI KENTIA PALM 4-4-1/2ft | $333.4 |
| 2 GAL PALM-KENTIA | $170.2 |
| 10 IN NE-JADE | $95.0 |
| 8 IN SCF-JADE | $305.0 |
| 6 IN SCF-JADE  9/cs | $292.6 |
| 4 IN SCF-JADE | $104.0 |
| NE-TOPIARY ANIMALS ASST SMALL | $96.0 |
| 12 IN NE-IVY TOPRY TRIPLE BALL 8ft | $425.0 |
| 4 IN NE-IVY TOPIARY HEART 8in wide | $38.4 |
| 10 IN NE-IVY TOPIARY DOUBLE BALL 4ft | $72.0 |
| 10 IN IVY TOPIARY CONE 4ft | $44.0 |
| LARGE HANGING MONKEY | $48.0 |
| 6 IN SNAIL IVY TOPIARY | $72.0 |
| 6 IN NE-IVY TOPIARY JUMPING FROG | $32.0 |
| NE-IVY TOPIARY TURTLE | $24.0 |
| MOTHER DUCK | $24.0 |
| SMA NE-IVY TOPIARY MINI TURTLE | $18.0 |
| TOPIARY DOGS - SITTING, DACHSUND & OTHE | $32.0 |
| SMA NE-IVY TOPIARY BUNNY ON POT SM | $20.0 |
| 7 POT NE-BEAR W/GLASSES ON POT | $56.0 |
| 4 IN HYPOESTES SPLASH | $234.0 |
| 8 IN FFL-HOYA HANGING BASKET | $424.2 |
| 4 IN HOYA   WC | $18.8 |
| 12 IN STAGHORN FERN ON PLAQUE | $80.0 |
| 10 IN NE-MOTHER FERN | $21.0 |
| 10 IN FERN ASST | $10.5 |
| 8 IN NE-FERN BOSTON | $747.6 |
| 8 IN NE-MOTHER FERN | $123.3 |
| 6 IN NE-FERN STAGHORN | $25.0 |
| 6 IN NE-FERN ASST | $153.0 |
| 6 IN NE-FERN BOSTON | $442.2 |
| 6 IN NE-MOTHER FERN | $394.4 |
| 6 IN NE-ASPARAGUS FERN | $68.3 |
| 6 IN NE-MAIDENHAIR FERN | $13.6 |

| Item | Price |
|------|-------|
| 4 IN NE-MAIDENHAIR FERN | $390.0 |
| 4 IN NE-MOTHER FERN | $312.0 |
| 4 IN FERN ASST | $170.3 |
| 6 IN NE-HG SELAGINELLA MOSS ASST | $107.2 |
| 4 IN NE-SELAGINELLA   CLUB MOSS | $175.5 |
| 3 IN CLIVIA | $128.3 |
| 6 IN CALATHEA | $207.0 |
| 4 IN CALATHEA | $675.5 |
| 3 IN CALATHEA | $214.0 |
| 9 IN ASST CACTUS WC | $42.5 |
| 6 IN NE-SUCCULENTS | $204.8 |
| 6 IN NE-STRING OF HEARTS SUCCULENT | $51.0 |
| 6 IN NE-STRING OF PEARLS SUCCULENT | $102.0 |
| 6 IN CACTUS | $409.5 |
| 4 IN NE-CACTUS & SUCCULENTS | $1,658.5 |
| 4 IN NE-SUCCULENTS ASST | $727.6 |
| 2 IN SUCCULENTS 60/CASE | $781.0 |
| 2 1/2 SCF-CACTUS/SUCCULENT W/FLOWER | $90.2 |
| 6 IN NE-BREYNIA | $31.5 |
| 24X15  IN FL/HB BONSAI GIANT CARMONA | $1,269.7 |
| 7X10  IN BONSAI ASST CERAMIC POT | $100.0 |
| 6 IN ALOE | $245.7 |
| 4 IN ALOE | $215.6 |
| 8 IN NE FOLIAGE HG ASST. | $30.0 |
| 6 IN BG-PIGGYBACK | $78.2 |
| 6 IN NE-POTHOS MARBLE QUEEN | $765.0 |
| 8 IN HANGING LIPSTICK | $71.4 |
| 8 IN IVY GRAPE | $90.8 |
| 8 IN ENGLISH IVY HG | $532.4 |
| 6 IN NE-POTHOS HANGING | $183.6 |
| 6 IN FOLIAGE HG ASST | $64.6 |
| 6 IN NE-SPIDER PLANT | $128.7 |
| 6 IN NE-PHILO CORDATUM BRAZIL | $144.3 |
| 6 IN NE-PHILO CORDATUM | $176.8 |
| 6 IN NE-PALM PONYTAIL | $1,085.3 |
| 6 IN NE-IVY CISSUS | $72.0 |
| 6 IN NE-HOYA | $70.3 |
| 6 IN NE-FICUS REPENS | $214.4 |
| 4 IN NE-IVY PREMIUM | $577.8 |
| 4 IN NE FICUS REPENS-VARIEGATED | $41.0 |
| 4 IN MARGINATA CANE | $312.0 |
| 14 IN NE-FICUS LYRATA  5 STAKE | $332.0 |
| 14 IN NE-FICUS BENJAMINA 1 STAKE | $1,345.5 |
| 12 IN NE-FICUS LYRATA BUSH | $594.0 |
| 12 IN NE-FICUS BENJAMINA BUSH | $476.0 |
| 10 IN NE-FICUS BENJ. 2 STAKE | $837.0 |
| 10 IN NE-FICUS LYRATA  3 STAKE | $435.0 |
| 10 IN NE-BANANA | $247.0 |
| 6 IN FFL-EUGENIA DBL BALL TOPRY TC | $515.5 |
| 4 IN MONEY WEAVE TREE FANCY/TC | $45.1 |
| 21 IN PHOENIX ROEBELLINI  6 FT | $600.0 |
| 16 IN HI PALM RHAPIS | $100.0 |
| 15 GAL FICUS BENJAMINA  BUSH | $598.5 |
| 17 IN PHOENIX ROEBELLINI  4 FT | $1,980.0 |
| 14 IN YUCCA 4-3-2 | $770.0 |

| | |
|---|---|
| 14 IN SCHEFFLERA AMATE | $257.0 |
| 14 IN PHOENIX ROEBELLINI | $396.0 |
| 14 IN PALM RHAPIS | $724.5 |
| 14 IN PONYTAIL PALM 4ft | $120.0 |
| 14 IN PALM NEANTHE BELLA | $285.3 |
| 7 GAL HI PALM FISHTAIL  6 FT. | $237.5 |
| 14 IN PALM ARECA | $249.0 |
| 14 IN FICUS LYRATA STD. | $832.0 |
| 14 IN DRAC MASSANGEANA 5-4-3-2  6FT | $581.1 |
| 14 IN CHAMEDOREA PALM | $1,064.0 |
| 14 IN BIRD OF PARADISE | $102.0 |
| 14 IN ARALIA | $76.0 |
| 12 IN SCHEFFLERA ARBORICOLA | $416.0 |
| 5 GAL HI PALM RAPHIS | $52.5 |
| 12" HI DRAC LISA CUT BACK | $1,134.0 |
| 12 IN CHAMADOREA PALM | $12.6 |
| 10 IN ZZ PLANT | $18.3 |
| 10 IN YUCCA  CANE 3-2-1 | $461.7 |
| 10 IN SPATHIPHYLLUM LYNISE | $279.5 |
| 10 IN SCHEFF ARBORICOLA EXCLUSIVE | $104.5 |
| 10 IN SCHEFFLERA AMATE | $683.1 |
| 10 IN SANSEVIERIA EXCLUSIVE | $409.2 |
| 10 IN PHOENIX ROEBELLINI EXCLUSIVE | $246.0 |
| 10 IN PHILO IMPERIAL GREEN | $196.0 |
| 10 IN PALM PONYTAIL EXCLUSIVE | $195.8 |
| 10 IN PALM RHAPIS | $111.2 |
| 10 IN FICUS DECORA EXCLUSIVE | $375.0 |
| 10 IN FICUS ALI BRAIDED | $209.0 |
| 10 IN FICUS ALI STD | $411.3 |
| 10 IN FICUS BENJAMINA STD | $21.8 |
| 10 IN FICUS BENJAMINA BRAIDED | $182.0 |
| 10 IN DRAC WARNECKII | $75.3 |
| 10 IN DRAC MASSANGEANA 4-3-2 | $1,713.8 |
| 10 IN DRAC MASSANGEANA 3-2-1 | $675.7 |
| 10 IN DRAC MARG EXCLUSIVE | $86.3 |
| 10 IN HI DRAC JANET CRAIG | $623.5 |
| 3 GAL HI DRAC LISA C/B 5ft 4ppp | $2,205.0 |
| 10 IN CHINA DOLL EXCLUSIVE | $375.0 |
| 10 IN CHINESE EVERGREEN | $259.7 |
| 10 IN BIRD OF PARADISE WHITE | $258.8 |
| 10 IN CHAMAEDOREA PALM | $386.4 |
| 10 IN CATARACTARUM PALM | $132.0 |
| 10 IN ARALIA EXCLUSIVE | $271.3 |
| 3 GAL MING ARALIA | $31.5 |
| 10 IN ASPIDISTRA | $372.8 |
| 10 IN CORDYLINE SISTER EXCLUSIVE | $290.3 |
| 8 IN ZZ PLANT | $214.2 |
| HI SONG OF INDA 3-4 ft | $28.5 |
| 8 IN SPATHIPHYLLUM PETITE | $99.5 |
| 8 IN SPATHIPHYLLUM LYNISE | $399.0 |
| 8 IN SCHEFFLERA ARBORICOLA | $195.8 |
| 8 IN SANSEVIERIA EXCLUSIVE | $416.0 |
| 8 IN PALM NEANTHE BELLA | $198.4 |
| 8 IN FICUS BENJAMINA | $243.6 |
| 8 IN FERN BIRDSNEST | $271.3 |

| | |
|---|---:|
| 2 GAL DRAC WARN  C/B  4PPP   4-5ft | $304.0 |
| 8 IN DRAC LISA CB 4ft | $1,120.0 |
| 8 IN DRAC JANET CRAIG TIP 3-4 ft | $26.3 |
| 8 IN DRAC MARGINATA | $356.5 |
| 2 GAL HI DRAC JANET CRAIG TIPS 3ft | $252.0 |
| 8 IN DIEFFENBACHIA | $310.8 |
| 8 IN CROTON | $148.8 |
| 8 IN CORDYLINE ASSORTED | $36.3 |
| 8 IN CHINESE EVERGREEN | $437.1 |
| 8 IN DRACAENA ASST | $194.3 |
| 6 IN ZZ PLANT | $781.0 |
| 6 IN SONG OF INDIA | $3.3 |
| 6 IN SCHEFFLERA ARBORICOLA | $68.0 |
| 6 IN SANSEVIERIA EXCLUSIVE | $327.6 |
| 6 IN PINEAPPLE PLANT | $4.9 |
| 6 IN FL/HB PONYTAIL PALM TC BELL | $3.4 |
| 6 IN PALM NEANTHE BELLA | $243.2 |
| 6 IN NEPHTHYTIS | $140.8 |
| 6 IN IVY ASST | $618.8 |
| 6 IN FOLIAGE-HOMOLOMENA | $24.3 |
| 6 IN DRAC WARNECKII | $490.1 |
| 6 IN DRAC COMPACTA | $91.8 |
| 6 IN DIEFFENBACHIA | $13.4 |
| 6 IN CROTON | $394.9 |
| 6 IN AGLAONEMA WC | $627.6 |
| 6" Nephthytis Totem Pole | $88.2 |
| 6 IN ARALIA ELEGANTISSIMA | $154.0 |
| 6 IN DRACAENA ASST | $328.3 |
| 4 IN POTHOS | $129.5 |
| 4 IN PHILO CORDATUM | $263.8 |
| 4 IN PALM NEANTHE BELLA | $285.2 |
| 4 IN NEPHTHYTIS | $497.1 |
| 4 IN MARANTA RED | $434.7 |
| 4 IN DIEFFENBACHIA | $201.6 |
| 4 IN CROTON | $256.1 |
| 4 IN ALOCASIA POLLY | $92.5 |
| 4 IN PEPEROMIA ASST | $29.4 |
| 4 IN DRACAENA ASST | $10.4 |
| 4 IN ARALIA ASST | $176.7 |
| 4 IN FANCY FOLIAGE ASST | $39.0 |
| 3 IN NEPHTHYTIS | $171.4 |
| 3 IN IVY ASST | $170.1 |
| 3 IN DIEFFENBACHIA | $105.8 |
| 2 IN FOLIAGE ASSORTED | $122.5 |
| 6 IN NE-VIOLET | $58.0 |
| 4 IN NE-VIOLET  15/cs | $71.4 |
| 2 IN NE-VIOLET | $51.8 |
| 4 IN VICTORY ROSE | $486.8 |
| 5 IN ROSE MINI no deco | $177.5 |
| 5" Palace Rose | $192.8 |
| 4 IN ROSE MINI NO DECO   W/CALL | $651.0 |
| 6 IN WHITE STAR | $168.0 |
| 4 IN ORANGE STAR   W/CALL | $229.9 |
| 2 IN ORANGE STAR - EXPRMTL | $3.1 |
| 6 IN NE-ORCHID PHALAENOPSIS 1 SPIKE | $588.4 |

| Item | Price |
|---|---|
| 8 IN ORCHID ODONTOGLOSSUMS | $639.2 |
| 4 IN ORCHID ODONTOGLOSSUM T/C | $3,168.0 |
| 4 IN ORCHID PHAL DBL SPIKE T/C | $4,060.0 |
| 4 IN ORCHID PHALAENOPSIS T/C | $2,072.0 |
| 3 IN ORCHID PHALAENOPSIS T/C | $1,210.3 |
| 3 IN ORCHID ONCIDIUM | $262.0 |
| 6" LIPSTICK PLANT | $166.6 |
| 4 IN LAVENDER   no deco | $66.7 |
| 6 IN KALANCHOE | $123.0 |
| 4 IN KALANCHOE | $27.8 |
| 2 IN KALANCHOE | $112.8 |
| 10 IN NE-IMPATIENS NEW GUINEA BSKT | $184.0 |
| 6 IN NE-IMPATIENTS NEW GUINEA | $32.0 |
| 4 IN NE-IMPATIENS NEW GUINEA 4X4 SQ | $5.4 |
| 6 IN NE-HYDRANGEA | $114.3 |
| 6 IN HYBRID LILY SUMMER no deco | $84.0 |
| 4 IN NE-GLOXINIA | $34.5 |
| 10 IN NE-GERANIUM | $8.0 |
| 1 GAL NE-GERANIUM | $13.0 |
| 10 IN FUCHSIA HANGING WC | $112.0 |
| 6 IN NE-FUSHSIA | $6.5 |
| 6 IN SCF-FUCHSIA | $9.6 |
| 6 IN NE-EXACUM | $75.0 |
| 4 IN EXACUM | $82.5 |
| 6 IN ECHEVERIA METALLICA NO DECO W/Call | $343.2 |
| 4 IN ECHEVERIA DARK PRINCE W/C | $207.0 |
| 4 IN ECHEVERIA | $243.8 |
| 10 STE 24 IN L.BAMBOO STRAIGHT | $105.6 |
| 10 STE 18 IN L. BAMBBO STRAIGHT | $54.0 |
| 10 STE 12 IN L.BAMBOO STRAIGHT | $33.6 |
| 10 STE 12 IN L. BAMBOO SPIRAL | $96.0 |
| 10 STE 18 IN L. BAMBOO SPIRAL | $72.0 |
| 10 STE 30 IN  L. BAMBOO SPIRAL | $20.0 |
| 6 IN CLEMATIS CONE no deco | $123.4 |
| 6 IN CLEMATIS MOUND | $311.5 |
| 6 IN CLEMATIS MOUND | $132.0 |
| 6 IN CHRYSANTHEMUM | $32.0 |
| 6 1/2 CHRYSANTHEMUMS  PREMIUM | $54.0 |
| 4 IN NE-CHRYSANTHEMUM | $13.2 |
| 6 IN NE-CHENILE | $49.5 |
| 4 IN GET MEE IN SORBET | $88.2 |
| 6 IN NE-CALADIUM | $12.5 |
| 4 IN SCF-CALADIUMS | $42.0 |
| 6 IN NE-BROMELIAD ASST. | $1,525.0 |
| 4 IN BROMELIADS PREMIUM | $156.8 |
| 6 IN NE-BEGONIA HYBRID | $276.9 |
| 6 IN BEGONIA REX | $227.3 |
| 4 IN NE-BEGONIA HYBRID | $190.8 |
| 4 IN NE-BEGONIA REX | $139.5 |
| 8 IN NE-AZALEA TREE | $62.6 |
| 6 IN NE-AZALEA PREMIUM 10X10 | $2,100.2 |
| 4 IN AZALEA | $1,327.4 |
| 4 IN NE-AZALEA TREE | $72.0 |
| 5 IN NE-APHELANDRA | $348.8 |
| 6 IN ANTHURIUM | $339.3 |

| Item | Price |
|------|-------|
| 4 IN ANTHURIUM | $3.3 |
| HANGING ESCARGOT TILLANDSIAS | $427.5 |
| EX-LARGE TILLANDSIA LOOSE | $1,927.5 |
| LAR NE-TILLANDSIA LOOSE - LARGE | $1,026.2 |
| MED NE-TILLANDSIA LOOSE - MEDIUM | $805.9 |
| SMA NE-TILLANDSIA LOOSE-SMALL | $663.8 |
| 22X11 WHEAT GRASS | $7.5 |
| 4 IN STREPTOCARPUS | $314.0 |
| 6 IN CRASSULA CROSBY JADE | $35.0 |
| 10 IN SANSEVERIA CYLINDRICA | $100.0 |
| 8 IN AEONIUM MINT SAUCER | $42.0 |
| 6 IN CRASSULA GOLLUM | $20.0 |
| 3 IN FERN ASSORTED | $103.0 |
| 14 IN FOUQUERIA DIGUETTI BAJA | $70.0 |
| 12 IN BOTTLE PALM | $30.0 |
| 14 IN PHILODENDRON | $108.0 |
| 8 IN SHRIMP PLANT | $17.3 |
| 5 IN STAGHORN FERN | $32.5 |
| 10 IN ARDISIA | $40.0 |
| 10 IN AEONIUM DECORUM SUNBURST | $112.0 |
| 5 IN HYDRANGEA | $41.2 |
| 6 IN BEGONIA ANGEL WING | $32.2 |
| 4 IN SONG OF INDIA | $49.4 |
| 8 IN CANDY CORN H/B | $45.0 |
| 4 IN BOXWOOD IN CLAY POT | $120.0 |
| 8 IN STROMANTHE TRICOLOR | $135.0 |
| 4 IN LIPSTICK | $58.5 |
| 10 IN AEONIUM ARBOREUM ATROPURP. | $80.5 |
| 8 IN MEXICAN FLAME VINE | $5.8 |
| 8 IN PREGNANT ONION | $99.2 |
| POODLE TOPIARY | $40.0 |
| 15 GAL EUPHORBIA ACRURENSIS | $225.0 |
| 14 IN EUPHORBIA INGENS | $105.0 |
| 36 IN L.BAMBOO STEM STRAIGHT | $15.0 |
| 6 IN ROSEMARY UPRIGHT | $47.6 |
| 10 IN DRACAENA ANITA | $109.5 |
| BABY DUCK IVY TOPIARY | $24.0 |
| 6 IN AEONIUM KIWI | $84.0 |
| 12 IN EUPHORBIA INGENS | $175.0 |
| 8 IN IVY GLOBE TOPIARY | $15.9 |
| 8 IN MACHO FERN | $116.3 |
| NEST W/BIRD TOPIARY | $11.2 |
| 14 IN DIOON SPINULOSUM | $105.0 |
| 5 GAL ECHINOCACTUS GRUSONII | $110.0 |
| 14 IN POLASKIA CHICHIPE | $140.0 |
| 12 IN POLASKIA CHICHIPE | $200.0 |
| 15 GAL AUTRALIAN TREE FERN | $70.0 |
| 6.5 IN IVY SINGLE BALL ON STEM | $447.7 |
| 6.5 IN IVY CONE | $76.0 |
| 14 IN PODOCARPUS BUSH | $336.0 |
| 32 IN LUCKY BAMBOO STEM STRAIGHT | $30.0 |
| 10 IN OAK LEAF IVY | $31.5 |
| SMALL CAT TOPIARY | $22.4 |
| 6 IN EUPHORBIA FIRESTICK | $10.5 |
| 6 IN BRUNFELSIA | $108.0 |

| | |
|---|---|
| 8 IN MARANTA RED HB | $36.0 |
| 14 IN FICUS TRIANGULARIS | $49.0 |
| 6" Janet Craig Cane | $111.0 |
| 10 IN SCHEFFLERA ARBORICOLA 3 STAKE | $783.0 |
| 6 IN BIRDNEST FERN | $376.2 |
| 10 IN CREEPING CHARLEY HANGING | $21.0 |
| 14 IN EUPHORBIA AMAK | $140.0 |
| 10 IN ALOCASIA CALODORA | $162.0 |
| 6" POTTED RASPBERRY | $60.0 |
| 10 IN EUPHORBIA AMAK | $69.0 |
| 6" Value Dishgarden | $22.1 |
| 10" Euph Tirucallii Pencil Plant | $24.7 |
| 6" Candy Corn Hanging Basket | $45.5 |
| 6" String of Banana Hanging Basket | $112.2 |
| 6" Gardenia Topiary | $66.0 |
| 6" Black Gold Fish HB | $42.0 |
| 6" Rat Tail/Aporocactus | $46.0 |
| 6" Donkey Tail | $115.6 |
| 6" CREEPING CHARLEY PURPLE | $17.0 |
| 10" EUGENIA SINGLE BALL | $162.5 |
| 10" EUGENIA POM POM 5 BALL | $30.4 |
| 10" EUGENIA DOUBLE BALL | $163.8 |
| 10" EUGENIA SINGLE BALL | $114.0 |
| 4" FITTONIA 15/CS | $93.8 |
| 4 IN DRACAENA WARNECKII LEMON LIME | $390.0 |
| 6 IN ANGEL VINE H/B | $30.6 |
| 14" BLUE POINT SPIRAL | $62.9 |
| 12 IN FEROCACTUS COVILLEI PLANT | $63.0 |
| 6 IN SANSEVIERIA CYLINDERICA | $38.5 |
| 12 IN EUPHORBIA AMAK | $75.0 |
| 8" Dracaena Janet Craig C/B Cane | $247.5 |
| 8 IN PHILODENDRON XANADU | $76.5 |
| 8" Dracaena Warneckii C/B Cane | $231.0 |
| 14 IN FEROCACTUS COVILLEI | $70.0 |
| 10 IN ECHINOCACTUS GRUSONII | $34.5 |
| 8 IN ALOCASIA ODORA | $40.0 |
| 4" Ivy Ball | $30.0 |
| MINI ORCHID CERAMIC PLNTR | $31.5 |
| 8" X 5" Geneve Mini Orchid Garden | $58.7 |

**Inventory Advances for Softgoods**

| | |
|---|---|
| Blueberries | $48,000.0 |
| Zygo Cactus | $125,000.0 |
| Calla Lilies | $40,000.0 |
| **Total Softgoods** | **$2,840,547.5** |

| | |
|---|---|
| **Total Hardgoods** | **$2,800,913.0** |
| **Total Softgoods** | **$2,840,547.5** |
| **Total Gross Inventory** | **$5,641,460.5** |
| **Less Reserves** | **(282,895.22)** |
| **Total Net Inventory** | **$5,358,565.31** |

**3.9(a)**

**Seller's Registered IP**

a.    <u>Patents</u>

    None.

b.    <u>Trademarks</u>

1.    **BLOOM-RITE®**



- REG # 1,308,252
- Class 31
- Registered 12/4/1984
- Renewed 11/10/2004
- Next renewal due by December 4,  2014
- Granting Jurisdiction: USPTO

2.    **BLOOM-RITE®**

- "BLOOM RITE"
- REG #900511
- Class 31
- Registered October 13, 1970
- Renewed March 2, 2001
- Next Renewal due by October 13, 2010
- Granting Jurisdiction: USPTO

3.    **GET MEE®**

- "GET MEE"
- REG # 2,891,767

- Class 31
- Registered 10/5/2004
- §8 Statement of Use due 10/5/2010
- Renewal due by October 5, 2014
- Granting Jurisdiction: USPTO

**DISCLOSURE: Ownership of this mark will be released to Gartneriet PKM A/S prior to consummation of a sale of the assets of the Seller and this mark shall not be part of the Purchased Assets purchased by Buyer.**

4. **KID'S DAY®**

a.

- "KID'S DAY"
- REG #1833043
- Classes 20, 21, 26
- Registered 4/26/1994
- Renewed 3/23/2007
- Next renewal due by April 2014
- Granting Jurisdiction: USPTO

b.

- "KID'S DAY"
- REG #1816068
- Class 31
- Registered 1/11/1994
- Renewed 2/29/2004
- Next renewal due by January 11, 2014
- Granting Jurisdiction: USPTO

5.. **CHILDREN'S DAY®**

a.

- "CHILDREN'S DAY"
- REG #1737746
- Class 31
- Registered 12/1/1992
- Renewed 11/20/2003
- Next renewal due by December 1, 2012
- Granting Jurisdiction: USPTO

b.

- "CHILDREN'S DAY"
- REG #1831770
- Class 20,21,26
- Registered 4/19/1994
- Renewed 3/23/2007
- Next renewal due by April 19, 2014
- Granting Jurisdiction: USPTO

6. **Alpine Series®**



- REG # 3309701
- Class 31
- Registered 10/9/2007
- §8 Statement of Use due b/t October 2012-2013
- Renewal due by October 2017
- Granting Jurisdiction: USPTO

7.. **EUROPEAN TREE ®**

- "EUROPEAN TREE"
- SN: 77/ 284,490
- Class 31

- Registered 7/15/2008

8.. **SPRING BRITE®**

- "SPRING BRITE"
- SN: 77/ 284,951
- Class 31
- Registered 6/17/2008

9. **LOVE BUGS®**

- "LOVE BUGS"
- Reg. No. 3,968,491
- Registered May 31, 2011
- Intl. Class 21

c. <u>Copyrights</u>

1. **Sorbet Pot Collection**

- Registration Number: VA 1-231-589
- Registration Date: 11/12/2003
- Granting Jurisdiction: Copyright Office
- See Attachment A

2. **Venus Fly Trap Container & Display**

- Registration Number: VA 1-629-679
- Registration Date: 11/1/2007
- Granting Jurisdiction: Copyright Office

3. **Pool Party- Confetti #1 Mylar Wrap**

- Registration Number: VAu 707-550
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

4.     **Pool Party- Confetti #2 Mylar Wrap**

- Registration Number: VAu 707-105
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

5.     **Pool Party- Bubbles Mylar Wrap**

- Registration Number: VAu 707-106
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

6.     **Pool Party- Cabana Stripe Mylar Wrap**

- Registration Number: VAu 707-549
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

7.     **Argyle Mylar Wrap (various patterns)**

- Registration Number: VAu 719-698
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

8.     **Blob Dots Mylar Wrap (various colors)**

- Registration Number: VAu 719-696
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

9.     **Blueberries Mylar Wrap (various patterns)**

- Registration Number: VAu 719-699
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

10. **Falling Leaves Mylar Wrap (various colors)**

- Registration Number: VAu 719-695
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

11. **Chambray Mylar Wrap (various colors)**

- Registration Number: VAu 719-693
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

12. **Scroll  Mylar Wrap (various colors)**

- Registration Number: VAu 719-694
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

13. **Watermelon Mylar Wrap (various patterns)**

- Registration Number: VAu 719-697
- Registration Date: 6/9/2006
- Granting Jurisdiction: Copyright Office
- See Attachment B

14. **Abutilon Merchandising Jacket**

- Registration Number: VA 1-111-047
- Registration Date: 8/13/2001

- Granting Jurisdiction: Copyright Office

15. **Phalaenopsis Merchandising Jacket**

- Registration Number: VA 1-111-048
- Registration Date: 8/13/2001
- Granting Jurisdiction: Copyright Office

16. **Passion Flower Merchandising Jacket**

- Registration Number: VA 1-130-743
- Registration Date: 4/25/2002
- Granting Jurisdiction: Copyright Office

17. **Perennial Collection Merchandising Jacket**

- Registration Number: VA 1-130-744
- Registration Date: 4/25/2002
- Granting Jurisdiction: Copyright Office

18. **Towne & Country Roses Merchandising Jacket**

- Registration Number: VA 1-120-960
- Registration Date: 8/16/2001
- Granting Jurisdiction: Copyright Office

19. **Tulips Merchandising Jacket**

- Registration Number: VA 1-158-752
- Registration Date: 4/25/2002
- Granting Jurisdiction: Copyright Office

20. **Tree Peony Merchandising Jacket**

- Registration Number: VA 1-110-522
- Registration Date: 8/13/2001
- Granting Jurisdiction: Copyright Office

21. **Clematis Merchandising Jacket**

- Registration Number: VA 1-110-523
- Registration Date: 8/13/2001
- Granting Jurisdiction: Copyright Office

22. **Narcissus Sleeve**

- Application received by Copyright Office 10/30/2007

**3.9(b)**

**Intellectual Property Contracts**

| No. | Description of Contract | Parties |
|---|---|---|
| 1 | Plant License Agreement, by and between Poulsen Roser A/S ("Poulsen Roser A/S") whereby Licensor grants to Seller a license for commercial exploitation of certain plant varieties, including, without limitation, for such plant varieties all plant patents and other rights regarding the reproduction, propagation and use of such plants in the United States and Canada ("Poulsen Roser A/S License No. 1"). | Poulsen Roser A/S and Seller |
| 1-A | Appendix A to Poulsen Roser A/S License No. 1, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | Poulsen Roser A/S and Seller |
| 1-A (4.C3) | Appendix A (4.C3) to Poulsen Roser A/S License No. 1, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | Poulsen Roser A/S and Seller |
| 2 | Plant License Agreement, by and among Raymond J. Evison Ltd. ("RJE Ltd."), Poulsen Roser A/S and Seller, whereby RJE Ltd. and Poulsen Roser A/S grant to Seller a license for commercial exploitation of certain plant varieties, including, without limitation, for such Plant Varieties all plant patents and other rights regarding the reproduction, propagation and use of such plants in the United States and Canada ("RJE Ltd. and Poulsen Roser A/S License No. 2") | RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand. |
| 2-A (4.C2) | Appendix A (4.C2) to RJE Ltd. and Poulsen Roser A/S License No. 2, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand. |
| 2-A (4.C4) | Appendix A (4.C4) and Royalty List to RJE Ltd. and Poulsen Roser A/S License No. 2, to apply in the period from October 1, 2010 to September 30, 2011, as the same may be amended, supplemented or restated from time to time. | RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand. |
| 3 | Campanula Cooperation Agreement, by and between Gartneriet PKM A/S ("Gartneriet") and Seller, whereby Gartneriet granted to Seller the exclusive right in the US to grow the varieties in possession of, or owned by Gartneriet, including varieties that are developed during the term of the agreement (the "Campanula Agreement"). | Gartneriet and Seller |
| 3-A | Appendix A to the Campanula Agreement, Production Goals. | Gartneriet and Seller |
| 3-B | Appendix B to Campanula Agreement, Royalty Schedule. | Gartneriet and Seller |
| 3-PL | Appendix to Campanula Agreement, Price List Campanula Cuttings (July 1, 2009-June 30, 2010), dated | Gartneriet and Seller |

| No. | Description of Contract | Parties |
|-----|------------------------|---------|
|  | October 23, 2009. |  |
| 4 | Trademark Agreement by and among RJE Ltd. and Poulsen Roser A/S, on the one hand, and Seller, on the other hand, with respect to certain Poulsen Roser A/S marks. | RJE Ltd. and Poulsen Rose A/S, on the one hand, and Seller, on the other hand. |
| 5 | Trademark Agreement, by and among Raymond J. Evison Ltd, Poulsen Roser A/S, on the one hand, and Seller, on the other hand, whereby RJE Ltd. and Poulsen Roser A/S grant to Seller a license to use certain Poulsen Roser A/S and Raymond J. Evison Ltd. marks. | Raymond J. Evison Ltd. and Poulsen Rose A/S, on the one hand, and Seller, on the other hand. |

**3.10**

**Rebate Customers and Purchase Orders**

| Dated as of June 16, 2011 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Customer Name** | **Defective Allowance** | **Marketing Allowance** | **Straight Discount** | **Volume Discount** | **EDI Discount** | **Merchandising Allowance** | **New Store Allowance** | **Crossdock Fee** | **Other Discounts** |
| **Home Depot** | | | | 0.5% | 0.25% | 5% - 10% | 10% | | |
| **Lowe's** | | 3% | | 1% | | 1.5% | 0.1% | | |
| **Meijer** | | | | | | 3.5% | | | |
| **Unified Grocers (Seattle)** | | | | | | | | 7.5% | |
| **United Grocers (Portland)** | | | | | | | | 15% | |
| **WalMart** | | | | | | | 10% | | |

**3.12**

**Business Permits**

|     | Permit Description |
| --- | --- |
| 1. | U.S. Master File (US 130150) From the U.S. Department of the Interior |
| 2. | City of Half Moon Bay Business License |
| 3. | Permit to Import Plant/Plant Products (issued by Animal and Plant Health Inspection Service) |
| 4. | City of Vista Business License |
| 5. | Federal Fish & Wildlife Permit (issued by U.S. Department of the Interior, Fish & Wildlife Service) |
| 6. | License to Sell Nursery Stock (issued by CA Department of Food and Agriculture) |
| 7. | Produce Dealers Act License (#A13558) (issued by CA Department of Food & Agriculture Market Enforcement Branch)[2] |
| 8. | Protected Plant Permit (issued by Animal and Plant Health Inspection Service) |
| 9. | Permit to Import Plant/Plant Products (issued by Animal and Plant Health Inspection Service) |
| 10. | CA Board of Equalization Seller's Permit |
| 11. | San Mateo County Hazardous Materials Business Plan (issued by San Mateo County Environmental Health Services Division) |
| 12. | San Mateo County Hazardous Materials Business Plan (issued by San Mateo County Environmental Health Services Division) |
| 13. | Sewer Authority—Mid-Coastside Permit No. GF100. |
| 14. | Permits and Licenses for Diversion and Use of Water (issued by State Water Resources Control Board) |

---

[2] Pursuant to that certain letter dated July 6, 2011 (the "Notice"), from the California Department of Food and Agriculture Market Enforcement Branch (the "CA F&A") addressed to the Seller regarding the Seller's Produce Dealers Act License, the CA F&A has requested that the Seller submit a surety bond to the CA F&A, in accordance with Section 56189.5 of the Food and Agriculture Code, in the amount of $1,000,000. According to the Notice, if the Seller fails to submit the requested surety bond, the CA F&A may, after notice and opportunity for hearing, suspend or revoke the Seller's Produce Dealers Act License.

**Schedule 3.13**

**Real Property**

The Seller does not represent or warrant that improvements to the Real Property are in compliance with the American with Disabilities Act of 1990, as amended, or correlative state laws.

# AMENDMENT NO. 1 TO
## ASSET PURCHASE AGREEMENT

This Amendment No. 1 to Asset Purchase Agreement (this "**Amendment**") is made and entered into as of July _____, 2011 by and between **NURSERYMEN'S EXCHANGE, INC.,** a California corporation (the "**Seller**"), and **FLORAMODA, INC.,** a California corporation (the "**Buyer**" and, collectively with **Seller**, the "**Parties**"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Asset Purchase Agreement (as defined below).

## RECITALS

A.      The Parties have entered into that certain Asset Purchase Agreement dated as of July 14, 2011, as previously modified and amended (the "**Asset Purchase Agreement**").

B.      Section 9.6 of the Asset Purchase Agreement provides that the Asset Purchase Agreement may be amended at any time by additional written agreements as may be mutually determined by the Parties to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the Parties.

C.      The Parties desire to amend the Asset Purchase Agreement to provide for certain amendments as set forth herein.

## AGREEMENT

In consideration of their respective covenants set forth herein, the Parties agree as follows:

1.      <u>Amendments to Section 1.1</u>.

1.1     Section 1.1 of the Asset Purchase Agreement is hereby amended by amending and restating in its entirety the definition of the term "Excluded Assets" as follows:

"*Excluded Assets*" shall mean (i) any Contract that is not an Assumed Contract, (ii) the right to the Purchase Price and other rights granted to the Seller under this Agreement; (iii) the Existing Family Property Leases; (iv) the Excluded Owned Real Property; (v) all fixtures, trade fixtures and leasehold improvements located on the Leased Family Property as set forth on <u>Section 1.1(e)</u> of the Disclosure Schedule (Family Owned Fixtures and Leasehold Improvements); (vi) any shares of capital stock or other equity interests of the Seller or any of or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Seller; (vii) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of the Seller, in each case to the extent applicable to any period prior to the Closing Date (but not any of the foregoing paid by the Buyer); (viii) any property or asset of any kind (whether tangible, intangible or otherwise) held or used by the Seller solely in connection with any Contract or Lease that is not among the Assumed Contracts; (ix) the Excluded Books and Records; (x) all Cash; (xi) all insurance policies, including, without limitation, insurance policies on the lives of key employees

1

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 318 of 326

that are held by the Seller; (xii) professional retainers paid by the Seller; (xiii) any amounts that have been placed into escrow accounts for the benefit of professionals; (xiv) all refunds, deposits, prepayments and prepaid expenses with respect to other Excluded Assets or made under any Excluded Contract; (xv) all Bankruptcy-Required Utility Deposits; (xvi) all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person that has provided insurance to the Seller or against any "insider" of the Seller within the meaning of the Bankruptcy Code; (xvii) all personnel records of employees of the Seller (other than personnel records of any Employees that are hired by the Buyer at the Closing); (xviii) all attorney-client and other privileged materials of the Seller relating to the preparation, commencement and administration of the Bankruptcy Case, the transactions contemplated by this Agreement and the PUD Transaction; (xix) all Accounts Receivable; (xx) the prorated portion of all rent under the Existing Family Property Leases paid by the Seller for periods after the Closing Date (the "Prorated Rent"); (xxi) all Avoidance Actions; (xxii) any Business Permit that is not transferable by the Seller, and any amounts posted to secured the Seller's obligations thereunder; and (xxiii) any deposits or letters of credit posted to secure workers compensation insurance for any period prior to the Closing; *provided, however*, that the Excluded Assets shall not include any Ordinary Course Utility Deposits.

1.2     Section 1.1 of the Asset Purchase Agreement is hereby amended by inserting the following as a new paragraph in appropriate alphabetical order within that Section:

"*OCC*" shall mean the official committee of unsecured creditors in the Bankruptcy Case.

1.3     Section 1.1 of the Asset Purchase Agreement is hereby amended by amending and restating in its entirety the definition of the term "Purchased Assets" as follows:

"*Purchased Assets*" shall mean any and all assets and rights of the Seller that are used in or held for use in the Business, other than the Excluded Assets, including the following:

(a)     Inventory;

(b)     Real Property; provided, that with respect to the Leased Real Property, it is only the rights of the lessee under the applicable lease if such lease is an Assumed Contract;

(c)     Equipment;

(d)     the Purchased Advances;

(e)     all rights under Assumed Contracts;

(f)     all Intellectual Property Rights owned or used by the Seller, including Seller's Marks and Seller's Copyrights (except as set forth in Section 3.9(a) of the Disclosure Schedule (Seller's Registered IP)), and excluding any Intellectual Property Rights licensed to the Seller pursuant to the Excluded Licenses;

DOCS_LA:241448.1 58760-001

Case: 11-31985     Doc# 186     Filed: 07/19/11     Entered: 07/20/11 10:19:20     Page 319 of 326

(g)     all goodwill relating to the Business;

(h)     all claims, causes of action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability (other than any such claims, causes of action, rights of recovery or setoff against any insider of the Seller within the meaning of the Bankruptcy Code);

(i)     all Books and Records; and

(j)     all Business Permits, in each case to the extent transferable by the Seller.

2.     Amendment to Section 2.1(d).  Section 2.2(d)(i) of the Asset Purchase Agreement is hereby amended and restated in its entirety as follows:

(i)     At the Closing, Seller shall deliver to the Escrow Agent, as a holdback from and out of the proceeds of the Cash Purchase Price for any post-Closing purchase price adjustment required by Section 2.2 hereof, a deposit in immediately available funds in an amount equal to $400,000 (together with all accrued interest thereon, the "Escrow Holdback") pursuant to the Escrow Agreement.  The Escrow Agent shall hold the Escrow Holdback in a segregated escrow account in accordance with the terms of this Agreement and subject to the jurisdiction of the Bankruptcy Court.  Seller and Buyer shall bear equally the fees and costs of the Escrow Agent.

3.     Amendments to Section 2.2.

3.1     Section 2.2(a)(i) of the Asset Purchase Agreement is hereby amended and restated in its entirety as follows:

(a)     *Estimated Cash Purchase Price*

(i)     No earlier than five (5) Business Days prior to the Closing Date, the Seller shall deliver to the Buyer a statement setting forth (A) the estimated Inventory Amount (the "Estimated Closing Date Inventory Amount") and (B) a calculation of the estimated Cash Purchase Price as determined pursuant to Section 2.2(a)(ii) (the "Estimated Closing Date Statement").  The Inventory Amount shall be determined on the basis of a physical count conducted by the Seller to which the Seller shall invite the Buyer and the OCC and their respective representatives to attend and observe.  The Inventory Amount shall include a complete and accurate schedule of all Inventory Advances as of a date not earlier than the week ending immediately before the Closing Date.  The Seller shall deliver the Estimated Closing Date Statement to the Buyer no later than two (2) Business Days before the Closing Date.

3.2     Section 2.2(b) of the Asset Purchase Agreement is hereby amended and restated in its entirety as follows:

(b)     *Final Cash Purchase Price; Holdback; Objection*

3

(i)     Within forty-five (45) days following the Closing Date, the Buyer shall deliver to the Seller a statement setting forth (A) the actual Inventory Amount as of the Closing Date (the "Closing Date Inventory Amount"), (B) a calculation of the Final Cash Purchase Price as determined pursuant to Section 2.2(b)(ii), and (C) the amount by which the Final Cash Purchase Price as determined by the Buyer pursuant to Section 2.2(b)(ii) is less than or greater than the Estimated Cash Purchase Price as reflected in the Estimated Closing Date Statement (such statement so delivered, the "Closing Date Statement"). The Closing Date Inventory Amount shall be determined in the same manner as the Estimated Closing Date Inventory Amount, except there shall be no adjustment in respect of any live Inventory that is diseased or not properly cared for in addition to such adjustment, if any, taken in connection with the determination of Estimated Closing Date Inventory. The Closing Date Statement shall be prepared in accordance with GAAP and, to the extent consistent therewith, on a basis consistent with the Seller's financial statements.

(ii)     The final Cash Purchase Price shall equal the Cash Purchase Price less the Closing Date Inventory Shortfall, if any; *provided, however*, that if the Closing takes place based on an Estimated Cash Purchase Price equal to $3,700,000 or more, then in no event shall the final Cash Purchase Price be less than $3,300,000 (such final Cash Purchase Price, as determined pursuant to this Section 2.2(b)(ii), the "Final Cash Purchase Price"). For the avoidance of doubt, in no event shall the Final Cash Purchase Price be greater than the Cash Purchase Price dollar amount set forth in Section 2.1(b)(i) hereof.

3.3     Section 2.2(c) of the Asset Purchase Agreement is hereby amended and restated in its entirety as follows:

(c)     *Holdback Period*; *Objection*.

(i)     Subject to the other provisions of this Section 2.2, the Escrow Deposit shall be held in Escrow for a period of time after the Closing Date (i) until the Objection Period expires without an Objection Notice, or (ii) if there is an Objection Notice, (A) until the Seller, the OCC and the Buyer have agreed on the Final Cash Purchase Price, or (B) if the Buyer, the OCC and the Seller cannot agree on the Final Cash Purchase Price, until the Arbitrator makes its determination of the Final Cash Purchase Price (the "Holdback Period"), as security for the amount by which the Final Cash Purchase Price as determined in accordance with this Section 2.2 may be less than the Estimated Cash Purchase Price as reflected in the Estimated Closing Date Statement.

(ii)     The Seller and the OCC each shall have fifteen (15) Business Days following the receipt of the Closing Date Statement by the later of the two of them to receive the Closing Statement (the "Objection Period") within which to give notice in writing to the Buyer objecting on bona fide grounds to the Closing Date Statement (the "Objection Notice"). In the event the Buyer receives an Objection Notice within the Objection Period, the Buyer, the OCC and Seller

4

shall in good faith attempt to resolve the objection to the Closing Date Statement within fifteen (15) Business Days following the Objection Period, and, if the Buyer, the OCC and the Seller have not resolved the Objection Notice, not later than forty-five (45) Business Days following the Objection Period, such dispute shall be submitted to, and all issues having a bearing on such dispute shall be resolved by, a nationally recognized accounting firm reasonably satisfactory to Buyer, the OCC and the Seller (the "Arbitrator").

(iii)    In resolving any such dispute, the Arbitrator shall consider only those items or amounts in the Closing Date Statement as to which the Seller or the OCC has disagreed.  The Arbitrator's determination of such items and amounts shall be final and binding on the Parties and the OCC, absent fraud or manifest error.

(iv)    Nothing in this Section 2.2(c) shall be construed to authorize or permit the Arbitrator to: (A) determine any questions or matters whatsoever under or in connection with this Agreement except for the resolution of differences between the Seller, the OCC and the Buyer regarding the determination of the Closing Date Statement; (B) determine any issue regarding the Closing Date Statement except for items specifically identified in the dispute notice from the Seller or the OCC which have not theretofore been resolved by mutual agreement of the Seller, the OCC, and Buyer; or (C) resolve any such differences by making an adjustment to the Closing Date Statement that is outside of the range defined by amounts as finally proposed by the Seller, the OCC and the Buyer.

(v)    The Arbitrator shall use commercially reasonable efforts to complete its work within thirty (30) days following its engagement.  The expenses of the Arbitrator shall be shared equally by the Seller on one hand and Buyer on the other hand.

(vi)    When the Buyer, the OCC and the Seller have agreed on the Final Cash Purchase Price within three (3) Business Days of such agreement, or if it is necessary for the Arbitrator to make a final determination of the Final Cash Purchase Price, within three (3) Business Days of the Arbitrator's final determination of the Final Cash Purchase Price, as the case may be, (A) if the Final Cash Purchase Price is less than the Estimated Cash Purchase Price, the Buyer and the Seller shall cause the Escrow Agent to release to the Buyer an amount of the Escrow Holdback equal to the difference between the Final Cash Purchase Price and the Estimated Cash Purchase Price, and (B) if the Final Cash Purchase Price is equal to or greater than the Estimated Cash Purchase Price, the Buyer and the Seller shall cause the Escrow Agent to release the full amount of the Escrow Holdback to the Seller and the Buyer shall pay to the Seller the additional amount (if any) necessary, when aggregated with the full amount of the Escrow Holdback, to make up the difference between the Final Cash Purchase Price and the Estimated Cash Purchase Price; *provided, however*, for the avoidance of doubt, (i) in no event shall the Buyer have any obligation to pay any amount for the Final Cash Purchase Price in excess of the Cash Purchase Price

5

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 322 of 326

dollar amount set forth in Section 2.1(b)(i) hereof, less the Escrow Deposit and the full amount of the Escrow Holdback released to Seller and (ii) Seller's liability to the Buyer shall not exceed the amount of the Escrow Holdback.

(vii) During the Objection Period, the Buyer shall give the Seller and the OCC reasonable access, at the Seller's or the OCC's sole respective cost and expense, to the Books and Records in the possession or control of the Buyer and any personnel which relate to the preparation of the Closing Date Statement for purposes of resolving any dispute concerning the Closing Date Statement and the calculation of the Final Cash Purchase Price.

4. Amendment to Section 2.3. Section 2.3 of the Asset Purchase Agreement is hereby amended and restated in its entirety as follows:

2.3 Allocation of Purchase Price. No later than 90 days following the Closing Date, Buyer shall provide Seller and the OCC with a proposed allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets. If neither the Seller nor the OCC delivers a written notice disagreeing with Buyer's proposed allocation within 30 days following Seller's receipt thereof, the proposed allocation shall be final. If either the Seller or the OCC delivers a written notice disagreeing with Buyer's proposed allocation within 30 days following the receipt thereof, the Parties and the OCC shall use commercially reasonable efforts to resolve such dispute within thirty days following the date of the dispute notice. If the Buyer and, the Seller and the OCC are unable to resolve any material differences with regard to the allocation of the Purchase Price within 30 days after the delivery of the written notice disagreeing with the Buyer's proposed allocation, then any disputed, material matters will be finally and conclusively determined by an independent certified public accounting firm or independent certified appraisal firm (the "Valuation Expert") mutually agreed upon by the Buyer and, the Seller and the OCC (such agreement not to be unreasonably withheld or delayed by the Buyer, the Seller or the OCC). The Valuation Expert shall promptly resolve any such matters in dispute and render a written report as to the disputed matters and the resulting allocation, which allocation shall be final and binding on the Buyer or, the Seller or the OCC. The final allocation of the Purchase Price and Assumed Liabilities determined in accordance with this Section 2.3, shall be set forth on a written schedule (the "Allocation Schedule"). The Seller and the Buyer agree to timely file, or to cause to be timely filed, Internal Revenue Service Form 8594 (or any comparable form under state, local, or foreign Tax law) and any required attachments thereto in accordance with the Allocation Schedule. Except to the extent otherwise required pursuant to a "determination" within the meaning of IRC Section 1313(a) (or any comparable provision of state, local or foreign law), neither the Seller nor the Buyer shall take, or shall permit any of its Affiliates to take, a Tax position (whether on a Tax Return or otherwise) that is inconsistent with the allocation reflected in the Allocation Schedule.

5. Amendments to Section 7.2.

6

5.1    Section 7.2(h) of the Asset Purchase Agreement is hereby amended and restated in its entirety as follows:

(h)    The Seller, the Buyer, and the WF Lender shall have entered into an written agreement satisfactory to the Buyer in its reasonable discretion by which (i) the Seller waives and releases any claim against the Buyer based on any ownership interest or asserted ownership interest of the Seller in or to those assets and categories of assets described under the heading "Family Owned Assets" on the NEI Fixed Asset Listing heretofore furnished by the Seller to the Buyer (other than any such claim arising under the Family Property Leases), (ii) the Buyer acknowledges that any right, title or interest of the Buyer in such assets or categories of assets arises exclusively under and is subject to and governed by the Family Property Leases, and (iii) the WF Lender consents to and approves the foregoing arrangements and agrees to recognize and to refrain from interfering with the Buyer's use and enjoyment of such assets other than pursuant to any lawful exercise of its remedies as a secured lender against the Family Property Leases. Notwithstanding anything herein to the contrary, nothing herein is intended to, nor shall it release claims Seller may have against the Family with respect to the ownership of the Family Owned Assets, provided however that any recourse that the Seller may have with respect to the Family Owned Assets shall not interfere with Buyer's interest in the Lease and use of the Family Owned Assets during the term of the Lease and any extensions thereof.

5.2    Section 7.2 shall be amended by the addition of a new Section 7.2(i), which shall read in full as follows:

(i)    The Buyer shall not have notified the Seller in writing of its objection or disapproval of the conduct, accuracy or results of the physical count of Inventory pursuant to Section 2.2(a)(i) of this Agreement.

5.3    Section 7.2 shall be amended by the addition of a new Section 7.2(j), which shall read in full as follows:

(i)    The WF Lender shall have confirmed in writing delivered to the Buyer that all conditions required for a release of the WF Lender's liens on the Purchased Assets shall have been satisfied in full.

6.    <u>Effectiveness of Amendments</u>.  All of the amendments to the Asset Purchase Agreement set forth herein shall be deemed to have become effective as of the date first above written.

7

Case: 11-31985    Doc# 186    Filed: 07/19/11    Entered: 07/20/11 10:19:20    Page 324 of 326

7.    <u>No Other Amendments; Integration</u>.  Except as specifically amended hereby, all of the other terms and conditions of the Asset Purchase Agreement are hereby ratified and remain in full force and effect in accordance with their terms.  From and after the execution and delivery of this Amendment, the Asset Purchase Agreement and this Amendment shall be read together as, and shall constitute, a single integrated agreement.   Any reference to the "Agreement" in the Asset Purchase Agreement or any reference in any other document to the Asset Purchase Agreement shall be deemed to refer to the Asset Purchase Agreement as amended hereby.

8.    <u>Applicable Law</u>.  This Amendment shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of California applicable to contracts made and performed in such State.

9.    <u>Counterparts</u>.  This Amendment may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

DOCS_LA:241448.1 58760-001

IN WITNESS WHEREOF, Buyer and Seller have executed this Agreement as of the day and year first above written.

**SELLER:**

NURSERYMEN'S EXCHANGE, INC.

By: _____
Name: _____
Title: _____

**BUYER:**

FLORAMODA, INC.,
a California corporation

By: _____
Name: _____
Title: _____

**APPROVED BY:**

MONTEREY PENINSULA HORTICULTURE,
INC., a California corporation

By: _____
Name: _____
Title: _____

9