Stephen D. Finestone (125675)
John F. Sullivan (175236)
LAW OFFICES OF STEPHEN D. FINESTONE
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820
Email: sfinestone@pobox.com

Counsel for Debtor and Debtor in Possession
Tally One, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>TALLY ONE, INC.<br><br>fka NURSERYMEN'S EXCHANGE, INC.<br><br>Debtor and Debtor in Possession | Case No. 11-31985<br><br>Chapter 11<br><br>**OPPOSITION TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER CONVERTING DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7**<br><br>Date: September 23, 2011<br>Time: 10:00 a.m.<br>Place: 235 Pine Street, Courtroom 22<br>San Francisco, CA |

    Tally One, Inc. (the "Debtor"), debtor and debtor-in-possession in the above-captioned case, hereby opposes the Motion of Official Committee of Unsecured Creditors For Order Converting Debtor's Chapter 11 Case to Chapter 7 (the "Motion"). The Official Committee of Unsecured Creditors shall be referred to herein as "Movant." As set forth below, Debtor opposes the Motion because there is no legal or factual basis for granting it, and creditors will be worse off if the Motion is granted.

///

///

///

///

DEBTOR'S OPPOSITION TO
MOTION TO CONVERT TO CHAPTER 7
    1

# I. ABSENT THE DEBTOR'S REQUEST TO CONVERT THE CASE, THE COURT CANNOT GRANT THE MOTION BECAUSE THE DEBTOR QUALIFIES AS A FARMER

Bankruptcy Code Section 1112(c) provides that where a Chapter 11 debtor is a "farmer," the Court may not convert a Chapter 11 case to Chapter 7 unless the debtor so requests.[1] "Farmer" is defined as a "person that received more than 80% of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person." Bankruptcy Code Section 101(20). Bankruptcy Code Section 101(21), in turn, provides in relevant part that "[t]he term "farming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops . . . ." "The definition of "farming operation" does not provide an exclusive list of all farming activities and is not limited to the specific activities delineated in the statute." *Rinehart v. Sharp (In re Sharp)*, 361 B.R. 559, 564 (Bankr. 10th Cir. 2007) (*citing In re Armstrong*, 812 F.2d 1024, 1026 (7th Cir. 1987) and *Watford v. Fed. Land Bank of Columbia (In re Watford),* 898 F.2d 1525, 1527 (11th Cir. 1990)).

The Debtor is a "farmer," so the Court cannot convert the case based on the Motion. In determining whether a debtor's business is a "farming operation," courts apply either the "traditional risks of farming" test or the "totality of the circumstances" test. Under the first test, courts consider whether the operation in question is subject to the "traditional risks of farming." *See In re Teolis*, 419 B.R. 151, 155-60 (Bankr. D.R.I. 2009). "Some of the risks associated with traditional farming are drought, flood, disease or insect infestation, frost, and fluctuating crop prices." *Id*. at 161. Whether the Debtor's live product was in the growth stage or the "preserving for sale" stage, the Debtor always faced risk to its live product via one or more of these factors. Thus, with respect to its live product, the Debtor's operations satisfy the "traditional risks of farming" test."

Under the second test, courts look at the following factors: "1. The location of the operation;

---

[1] Subsection (c) of Section 1112 provides as follows:

> The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.

DEBTOR'S OPPOSITION TO
MOTION TO CONVERT TO CHAPTER 7      2

2. The nature of the enterprise; 3. The type of product and its eventual market; 4. The physical presence or absence of family members at the property; 5. Ownership of traditional farm assets; 6. Whether the owners are engaged in the process of growing or developing crops or livestock; and 7. Whether the operation is subject to the *inherent risks of farming*." *Teolis* at 156 (quotation omitted). In this case, the debtor's operated its business on land zoned "agricultural," the products were products of the soil, family members participated significantly in the operations of the Debtor, the Debtor owned traditional farm assets, the operations involved the growing and selling of crops, and, as discussed above, the Debtor continually faced the inherent risks of farming. Under the totality of the circumstances test, the operations of the Debtor were a farming operation. *See Teolis* at 156-61 (products of the soil grown by a nursery were crops and the nursery operation was a farming operation under both the "totality of the circumstances" and the "inherent risks of farming" test).

In fiscal year 2010, the taxable year preceding the taxable year of the bankruptcy filing, the Debtor earned all of its income from one of three activities: (i) the growth, preservation, and sale of products of the soil, (ii) the preservation and sale of products of the soil grown by third parties, and (iii) the sale of decorative hard goods, such as ceramic pots or baskets. In fiscal year 2010, substantially less than 15% of the gross income of the Debtor was derived from the sale of decorative hard goods. Thus, more than 85% of the gross income was derived from the growth and/or preservation and sale of crops. In view of these facts and circumstances, the Debtor's operations in fiscal year 2010 were "farming operations" and the Motion should be denied.

## II. MOVANT HAS FAILED TO ESTABLISH CAUSE UNDER BANKRUPTCY CODE SECTION 1112(b)(4)

Movant attempts to establish "cause" on two grounds. The first alleged ground is set forth in subsection (b)(4)(A), which is the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]" Motion at 6:14-17. The second alleged ground, which Movant admits is not expressly set forth in the statute, is "[t]he absence of any appropriate Debtor representative to serve as the responsible individual in the chapter 11 case . . . ." Motion at 7:20-21. Movant fails on both grounds.

As to the first ground, Movant fails to establish "substantial or continuing loss to or diminution of

the estate." The only facts Movant sets forth[2] that are relevant to this factor are that the Debtor's operating assets have been sold, that Debtor has no remaining employees, that Debtor has no revenue generating activity and that administrative expenses are increasing. These facts are not entirely true, but even if they were do not establish diminution of the estate. Debtor's primary remaining assets consist of accounts receivable, real property and litigation assets, none of which are wasting assets. Moreover, with the mere passage of time, administrative expenses will increase in almost every bankruptcy case, which increases claims against the estate but does not diminish the estate. In sum, Movant has not established loss to or diminution of the estate.

More importantly, Movant has also failed to establish "the absence of a reasonable likelihood of rehabilitation." First, as set forth in the accompanying Declaration of Stephen D. Finestone, Debtor and the Committee had an agreement in principal to file a joint liquidating plan and a draft of the plan and disclosure statement were completed. Movant indicated it wanted its financial advisor, Andrew Hinkelman from FTI Consulting, Inc. to serve as the liquidating trustee, an appointment with which Debtor did not have a problem.

Since Movant has apparently determined it does not wish to co-sponsor a plan anymore, Debtor intends to file a plan of liquidation shortly after the hearing on the Motion if the case is not converted to Chapter 7. Where a plan of liquidation is in prospect, Section 1112(b)(4)(A) cannot serve as "cause" for conversion to Chapter 7. *See Lennon v. Grimmett (In re Lennon)*, 2005 Bankr. LEXIS 3367 at *9 n. 9 (Bankr. 9th Cir. July 20, 2005).[3] Movant has failed to establish "absence of a reasonable likelihood of

---

[2]The only "precedent" Movant cites is *Bay Area Material Handling, Inc. v. U.S. Trustee (In re Bay Area Material Handling, Inc.)*, 1996 U.S. App. LEXIS 2272 (9th Cir. Jan. 25, 1996), which is an unpublished decision. According to Rule 36-3 of the Rules of the United States Court of Appeals for the Ninth Circuit, this case may not be cited except as provided in such rule. None of the exceptions apply here.

[3]In *Lennon*, the Bankruptcy Appellate Panel stated as follows:

> Section 1112(b)(1) requires the absence of a reasonable likelihood of rehabilitation. Rehabilitation under § 1112(b)(1) is distinct from reorganization and means "to put back in good condition and reestablish on a sound basis." 4 NORTON BANKRUPTCY LAW AND PRACTICE 2D § 82:4 (Rev. 7/93). Where, as here, a liquidating plan is contemplated, § 1112(b)(1) does not serve as a basis for conversion. Id. See also In re GPA Tech. Consultants, Inc., 106 B.R. 139, 142 (Bankr. S.D. Ohio 1989).

*Id*. The text referred to as Section 1112(b)(1) is now found in subsection (b)(4), the subsection upon which Plaintiff relies to establish "cause" for conversion. Moreover, although *Lennon* is an unpublished decision and

rehabilitation," and thus cannot establish "cause" under subsection (b)(4).

Finally, if subsection (d)(4) were deemed to apply to this case, it would apply to *every* case in which the Debtor has sold its operating assets. In all such cases, no further revenues can be generated from operations (because the operating assets have been sold), administrative expenses rise (because time passes), and the debtor cannot reorganize (because the operating assets have been sold). It is unlikely that Congress intended that whenever a Debtor sells its operating assets, the case must be converted to Chapter 7. That is the inescapable conclusion of Movant's argument, and further proof that Movant's argument is flawed.

Movant's second ground for conversion ("absence of any appropriate Debtor representative to serve as the responsible individual") provides little or no basis for conversion. First, there is no basis to question Ms. Hollingsworth's ability to serve as responsible individual for the interim. The fact that the Committee asserts that it (or the estate) has claims against her does not alter the analysis. Ms. Hollingsworth would only serve in the capacity through plan confirmation, which may occur within approximately 90 days. After that a liquidating trustee would be appointed and could pursue the claims against Ms. Hollingsworth and other insiders if appropriate. There is no fast approaching statute of limitations that requires immediate action on the alleged claims, or on the preference claims either for that matter.

Movant also makes a knowingly deceptive argument with respect to the Debtor's ability to provide information regarding preferential transfers. Movant sets forth a series of interactions between Movant and Debtor and then concludes by stating that Debtor advised that it did not have the "manpower" to deal with Movant's requests. The "lack of manpower" quote was, however, taken out of context and chronologically misplaced to create an impression that is inaccurate. As set forth in the accompanying declarations of Stephen D. Finestone and Alan Okahata, Debtor provided considerable information and analysis to Movant with regard to the potential preference claims and offered to follow

---

has "NO PRECEDENTIAL VALUE", it "MAY BE CITED FOR ANY PERSUASIVE VALUE IT MAY HAVE." *Id*.

DEBTOR'S OPPOSITION TO
MOTION TO CONVERT TO CHAPTER 7        5

up with additional information as requested.[4] A little accurate chronology is necessary:

- Movant first requested a considerable amount of information on the potential preference claims on July 29, 2011. The correspondence included a 25 page list of payments to creditors and asked for all supporting documentation for each payment, a payment record for each creditor for the year prior to the bankruptcy filing, all invoices received from each creditor for the year prior to the bankruptcy, all communications between the Debtor and all its vendors (not limited to any specific time frame) and all contracts with vendors. Aside from the fact that the request was a highly inefficient approach to the analysis, the request was made at a particularly inopportune time as Debtor's personnel were fully occupied in getting the operating asset sale closed by August 5, 2011, as required under its agreement with the buyer

- After the sale closed, on or about August 10, 2011, Debtor advised Movant that Debtor did not have sufficient manpower at that time to deal with the request. In the same communication, however, Debtor advised Movant's counsel that Debtor would get back to her the following week. Movant's brief neatly omits the second part of the communication. Morever, contrary to the erroneous time line set forth in the Motion, the communication was sent on August 10, 2011, before the Movant had received any information from the Debtor.

- On August 19, 2011, Debtor provided the Movant with an initial spreadsheet of information on the potential preferential transfers along with Alan Okahata's direct contact information so Movant could follow up with him directly on the information they needed. (Mr. Okahata is employed by Debtor's financial advisor/turnaround consultant and is intimately familiar with Debtor's financial information).

- On August 19, 2011, Movant's counsel asked for a further analysis. Mr. Okahata advised that he would provide the requested analysis the following week.

- On August 23, 2011, Mr. Okahata provided Movant's counsel a further and more detailed spreadsheet analysis of the transfers.

---

[4] One might question, given the peculiar timing of Movant's request for information and its mischaracterization of Debtor's response, whether Movant was really just seeking to create a basis, however implausible, for its motion.

DEBTOR'S OPPOSITION TO
MOTION TO CONVERT TO CHAPTER 7        6

- Movant's counsel thanked Mr. Okahata for his analysis and noted that they would need to see the hard copy information at some point.

- On September 13, 2011 Debtor's counsel contacted Movant's counsel and noted that Movant should advise as to what hard copy information they wished to see after review of the additional analysis provided by Mr. Okahata, and advised that Ms. Hollingsworth would provide the hard copies. Movant did not respond.

Movant also asserts that Ms. Hollingsworth is ill suited to serve as the short term Responsible Individual because she has no pecuniary interest in maximizing the estate. First, this is not true, as Ms. Hollingsworth holds an unsecured claim. Second, and perhaps more importantly, Movant's evidence of her failed stewardship is Debtor's effort to obtain an additional $250,000 from the buyer of the PUD property (after Debtor had already successfully negotiated a $500,000 increase in the purchase price). The one example Movant cites disproves its point.

Unmentioned by Movant is the additional work Debtor carried out since the closing of the sale, which work has been spearheaded by Ms. Hollingworth. Debtor responded to numerous requests by Movant to provide information on insurance policies. Debtor initiated cancellation of appropriate insurance policies and the collection of unused premiums. Debtor set about working with the various utility companies to terminate service and seek the return of the post petition deposits. Debtor also worked with an outside company to see if it could monetize its "key man" insurance policies for the benefit of the estate.

Finally, Movant had advance notice of and the opportunity to object to the designation of Ms. Hollingsworth as responsible individual, but failed to do so. In view of Movant's failure to object, it would be odd for Movant to prevail on its Motion based on the designation of Ms. Hollingsworth.

### III. UNDER THE FACTS AND CIRCUMSTANCES OF THE CASE, CONVERSION OF THE CASE TO CHAPTER 7 IS NOT IN THE BEST INTERESTS OF THE CREDITORS AND THE ESTATE

A. Conversion of the Case Could Impair the Ability of the Debtor to Close the Sale of the PUD Property on Terms Favorable to the Estate.

By the time this brief is filed, Debtor will have filed the Motion to sell the PUD Property. According to the terms of the proposed transaction, Debtor would receive $6.5 million and the transaction

would likely close by mid to late November 2011. Conversion of the case could potentially harm the ability to close the sale and could encourage the buyer to revisit the deal. As set forth in the accompanying Declaration of Jack Pearlstein, the sale of the PUD Property is not a simple transaction given its planned use as a residential development and the intricacies of development along the California coast. While Mr. Pearlstein is currently involved in the buyer's due diligence efforts, were the case converted a Chapter 7 trustee would not have the benefit of Mr. Pearlstein's involvement, or at best would face a delay to get "up to speed" on the transaction..

In the late 1990's, Mr. Pearlstein worked closely with the Debtor's legal team, its land use consultants with officials of the City of Half Moon Bay, the Coastside County Water District and the Granada Sanitary District to establish new PUD zoning for this property, allowing it to be developed for approximately 79 housing units. The process continued through 2000 and 2001 and was eventually successful, securing final approvals from both the City of Half Moon Bay and the California Coastal Commission. Debtor also negotiated and has been paying for sewer hook ups necessary to enable the further development of this PUD property at the appropriate time.

The sale potential of the PUD property depends entirely on the ability to secure the remaining development entitlements for these 79 units. This will require further processing of applications before both the City of Half Moon Bay, possibly the California Coastal Commission, and applications to the Coastside County Water District for approval of third party transfers to the developer of water connections otherwise not available from the District directly. The proposed purchaser has a 60-day due diligence period (from August 29, 2011) to decide whether or not to go forward with the sale. The purchaser's comfort level with this sale depends on its assessment of the likelihood of being successful in promptly processing the required applications before the City of Half Moon Bay and the other government entities.

Mr. Pearlstein's knowledge of the regulatory policies and practices of the involved agencies, both from many years of processing various Half Moon Bay applications for permits for the Debtor as its President, and his involvement in the original PUD processing and rezoning, potentially makes his involvement critical to a successful sale. Moreover, he was involved in the negotiation of two sales agreements for this PUD property following the filing of the Chapter 11 Petition, including the proposed

sale to Dobbins Properties, LLC ("Dobbins") now before the Court for approval.

If the sale with Dobbins closes, it will be significant help to Debtor's estate. The secured debt on the property is approximately $4.5-$4.6 million. Thus, if the sale closes, the estate will receive significant additional funds (from the $6.5 million purchase price) that can begin to fund distributions to administrative claimants and unsecured creditors. Finally, as the sale motion provides for a potential overbid, if the case is converted, Mr. Pearlstein will not be around to interface with potential overbidders, thereby lessening the chances of competitive bidding on the PUD Property.

To turn this process over to a Trustee at this critical time could put the future of the sale in jeopardy due to a Chapter 7 Trustee's lack of zoning background and site specific experience for the PUD property, not to mention the time it would require for the Chapter 7 Trustee's professionals to be employed and get up to speed. In consideration of all these factors, the Debtor and particularly, the Debtor's owners, are best situated to get Debtor's remaining properties sold at the best possible price.

B. Conversion of the Case Could Impair the Collection of Accounts Receivable

At this time, pursuant to agreement reached between Debtor and Floramoda, Inc. ("Buyer"), the buyer of the Debtor's operating assets, Buyer is currently collecting Debtor's accounts receivable on behalf of Debtor.

If this case were converted to chapter 7, it is unclear whether Buyer would continue to collect accounts receivable with the same energy and effectiveness. Buyer's agreement is with Wells Fargo Bank and the Debtor, not with the chapter 7 trustee who would be appointed if the case were converted to chapter 7. The risk of disruption to the collection of accounts receivable is yet another reason why the Court should not convert the case to chapter 7.

C. Conversion of the Case Would Result in the Setting of a New Claims Bar Date

The current claims bar date is September 26, 2011. Pursuant to Rules 1019(2) of the Federal rules of Bankruptcy Procedure, when a Chapter 11 case is converted to Chapter 7, "[a] new time period for filing . . . a claim . . . shall commence under Rules 1017, 3002, 4004, or 4007 . . . ." Rule 3002 provides, in turn, that "a proof of claim is timely filed if it is filed not later than 90 days after the first dates set for the meeting of creditors called under § 341(a) of the Code . . . " Moreover, pursuant to Rule 1019(3), "[a]ll claims actually filed by a creditor before conversion of the case are deemed filed in the Chapter 7

case." In sum, the conversion of the case to chapter 7 would not decrease claims against the estate but could increase such claims, perhaps substantially. This potential increase in claims is yet another reason why conversion of the case to chapter 7 could harm the estate.

**CONCLUSION**

Based on the reasons set forth above, Debtor requests that this Court deny the Motion. There is no legal or factual basis to grant the motion and doing so would likely cause harm to the estate.

Dated: September 16, 2011          LAW OFFICES OF STEPHEN D. FINESTONE


/s/ Stephen D. Finestone
Stephen D. Finestone
Counsel for Debtor and Debtor in Possession